**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

SLUSH PUPPIE LIMITED,

                Plaintiff,

    v.

THE ICEE COMPANY,

                Defendant.

CASE NO. 1:19-cv-00189-MRB

Judge Michael R. Barrett

**DEFENDANT ICEE'S MOTION FOR SANCTIONS AGAINST BENESCH FRIEDLANDER COPLAN & ARANOFF LLP AND ATTORNEYS MARK AVSEC, ELIZABETH R. EMANUEL, MATTHEW D. GURBACH, RONALD L. HOUSE, JENNIFER M. TURK, AND ERIC LARSON ZALUD, PURSUANT TO 28 U.S.C. SECTION 1927, FED. R. CIV. PROC. 26(G), AND THE COURT'S INHERENT AUTHORITY**

Defendant, The ICEE Company, respectfully moves for sanctions in the form of an award of attorney's fees and costs against the law firm of Benesch, Friedlander, Coplan & Aronoff LLP, as well as individual attorneys Mark E. Avsec, Elizabeth R. Emanuel, Matthew D. Gurbach, Ronald D. House, Jennifer M. Turk, and Eric L. Zalud. ICEE requests that the Court issue the proposed order to show cause and, following briefing and, if requested, a hearing, enter sanctions holding the individual attorneys and the Benesch firm jointly and severally liable for ICEE's costs and attorney's fees in defending this case. ICEE further respectfully requests that the Court order ICEE to file proof of its costs and attorney's fees within 30 days of the Court's order granting sanctions.

In support of the motion, ICEE incorporates and relies upon the attached Memorandum of Law, any reply, the depositions filed on the docket in this case and cited in the memoranda, and the Exhibits referenced in and attached to the memoranda.

A proposed order to show cause accompanies this motion.

Dated:  January 12, 2020                  Respectfully submitted,

**DUANE MORRIS LLP**

BY:  _/s/David J. Wolfsohn_
David J. Wolfsohn (*admitted pro hac vice*)
Tyler R. Marandola (*admitted pro hac vice*)
30 South 17th Street
Philadelphia, PA 19103
Tel.: (215) 979-1000
Fax: (215) 979-1020
djwolfsohn@duanemorris.com
tmarandola@duanemorris.com

Kenneth M. Argentieri (Ohio Bar No. 0067493)
Trial Attorney
600 Grant St., Ste. 5010
Pittsburgh, PA 15219
Tel.: (412) 497-1000
Fax: (412) 497-1001
kmargentieri@duanemorris.com

*Attorneys for Defendant, The ICEE Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2020 I served the foregoing document on counsel of

record by CM/ECF, as follows:

Ronald L. House
Jennifer M. Turk
Justin L. Monday
Benesch, Friedlander, Coplan & Aranoff
41 South High Street
Suite 2600
Columbus, Ohio 43215-6164
rhouse@beneschlaw.com
jturk@beneschlaw.com
jmonday@beneschlaw.com


I further certify that, on January 12, 2020 I served the foregoing document on counsel

listed below by email, and will serve the same by first-class mail, as follows:

| | |
|---|---|
| Matthew D. Gurbach | Elizabeth R. Emanuel |
| Bricker & Eckler LLP | Dinsmore & Shohl LLP |
| 1001 Lakeside Avenue East, Suite 1350 | 1001 Lakeside Avenue. Suite 990 |
| Cleveland, OH 44114-1142 | Cleveland, OH, 44114 |
| MGurbach@bricker.com | elizabeth.emanuel@dinsmore.com |


BY: */s/ Tyler Marandola*
Tyler Marandola

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

                    Plaintiff,

      v.

THE ICEE COMPANY,

                    Defendant.

CASE NO. 1:19-cv-00189-MRB

Judge Michael R. Barrett

**[PROPOSED] ORDER TO SHOW CAUSE WHY COUNSEL SHOULD NOT BE SANCTIONED PURSUANT TO 28 U.S.C. § 1927, FED. R. CIV. P. 26(g), AND THE COURT'S INHERENT AUTHORITY**

AND NOW this _____ day of _____, 2021, it is hereby ORDERED that attorneys Mark E. Avsec, Elizabeth R. Emanuel, Matthew D. Gurbach, Ronald L. House, Jennifer M. Turk, and Eric L. Zalud, and the law firm of Benesch, Friedlander, Coplan & Aronoff LLP, shall appear before the Court to show cause in writing why each should not be sanctioned pursuant to 28 U.S.C. § 1927, Fed. R. Civ. P. 26(g), and the Court's inherent authority, for their conduct in this case, as follows:

1.   Any attorney identified in this Order who wishes to file a brief or declaration showing cause why he or she should not be sanctioned shall do so by _____. Any attorney may, as he or she chooses, file a separate brief, or join together to file a single brief on behalf of some or all of the attorneys.  ICEE may file a reply by _____.

2.   Any attorney identified in this Order who desires an evidentiary hearing on the issue of sanctions shall request one as part of his or her brief.  Should one or more attorneys request an evidentiary hearing, the Court will hold a telephonic conference to discuss scheduling of the hearing.

3.  Counsel for ICEE is directed to serve this Order upon Matthew D. Gurbach and

Elizabeth E. Emanuel by email and first-class mail to their new law office addresses.  All other

counsel will receive a service copy of this order via ECF.


IT IS SO ORDERED.

_____
JUDGE MICHAEL R. BARRETT
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

               Plaintiff,

     v.

THE ICEE COMPANY,

               Defendant.

CASE NO. 1:19-cv-00189-MRB

Judge Michael R. Barrett

**DEFENDANT ICEE'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SANCTIONS AGAINST BENESCH FRIEDLANDER COPLAN & ARANOFF LLP AND ATTORNEYS MARK AVSEC, ELIZABETH R. EMANUEL, MATTHEW D. GURBACH, RONALD L. HOUSE, JENNIFER M. TURK, AND ERIC LARSON ZALUD, PURSUANT TO 28 U.S.C. SECTION 1927, FED. R. CIV. PROC. 26(g), AND THE COURT'S INHERENT AUTHORITY**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ...........................1

II.    FACTUAL BACKGROUND .......................................................................................3

    A.    Peters Forges the 2000 Appointment and the November 20, 2017 Version of the "February 2011" History of Working Practise ............................... 3

    B.    Peters Forges the "Wendsday" Email, and Sends the Forgeries to U.K. Counsel, Who Sends Them to Attorneys Zalud and Avsec in 2018 ...................... 4

    C.    RPC Sends the "Wendsday" Email and "History" to Avsec and Gurbach............. 7

    D.    Ignoring the Evidence of Forgery, the Benesch Lawyers File the Complaint Based on the Forged 2000 Appointment............................................... 8

    E.    The Benesch Lawyers Receive the Real 2011 "History," Showing That Peters Copied the Signatures From It Into the Forged 2000 Appointment............. 9

    F.    Attorneys Gurbach, House, and Emanuel Withhold the Forged "History" and the "Wendsday" Email and Sign False Discovery Responses ....................... 10

    G.    Emanuel Belatedly Produces the "Wendsday" Email but Without the Incriminating Metadata ...................................................................................... 12

    H.    The Benesch Team Confronts Peters About the Forged "Wendsday" Email, but Says Nothing to the Court or Opposing Counsel ................................ 13

    I.    Gurbach and House Fail to Correct Peters' Deposition Perjury .......................... 14

    J.    Gurbach, House, and Turk Sign False Responses to Requests for Admission and Falsely State That They Have Made "Reasonable Inquiries"........................................................................................................... 15

    K.    The Court Finds Probable Cause That a Crime or Fraud Has Been Committed but Counsel Does Nothing to Preserve Peters' Computers ............... 16

    L.    House and Turk Finally Produce the Wrongfully Withheld Forged History........ 17

III.    ARGUMENT .............................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*DiLuzio v. Village of Yorkville*, 2016 WL 7406535 (S.D. Ohio Dec. 22, 2016) ..........................20

*Followell v. Mills,* 317 Fed. Appx. 501 (6th Cir. 2009) ................................................18

*Jones v. Illinois Central R. Co.*, 617 F.3d 843 (6th Cir. 2010)..................................................2, 19

*Journigan v. Medical Team, Inc.*, 2011 WL 740804 (Feb. 24, 2011 E.D. Mich.).......................18

*KCI USA, Inc. v. Healthcare Essentials, Inc.*, 2018 WL 3428711 (N.D. Ohio July 16, 2018) .................................................................................................. 18-19

*Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485 (N.D. Ohio 2013)............................................. 19-20

**Statutes**

28 U.S.C. § 1927.................................................................................................2, 18, 20

**Rules**

Federal Rule of Civil Procedure 26(g) .................................................................*Passim*

Ohio Professional Conduct Rule 3.3..................................................................2, 18, 19

Ohio Professional Conduct Rule 3.4..................................................................2, 18

## I.     PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

On November 18, 2020, SPL's counsel admitted that "it could no longer ethically continue to prosecute claims under the 2000 Agreement."  Doc. 82 PAGEID2050.  And on November 19, counsel admitted that those claims were "meritless."  Doc. 85 at PAGEID 2176. Yet counsel knew or recklessly disregarded the fact that they could not ethically prosecute these meritless claims the day this case was filed.  Plaintiff's counsel nonetheless recklessly chose to prosecute this case aggressively for 2 years, covering up and ignoring the overwhelming evidence of their client's criminal wrongdoing.  ICEE was thus forced to expend a huge amount of time and money to expose that wrongdoing while plaintiff achieved its bad faith purpose of continuing to infringe ICEE's trademarks in the U.K. and Europe.  Plaintiff's counsel should be sanctioned for their complicity and at least tacit encouragement of this scheme.

In gearing up for litigation, counsel knew that the genuineness of the 2000 Appointment would be central to the case.  ICEE, when presented with the agreement in February 2018, had immediately questioned its authenticity, questioning why it had never been raised by SPL during nine years of negotiations. SPL's counsel, therefore, was hoping to find any documents that supported the genuineness of the 2000 Appointment, or that showed that ICEE knew about it. Emails between counsel reveal that, well before the complaint was filed, counsel's attention was focused on several documents that purported to provide just such corroboration.  In April 2018, U.K. counsel for SPL called to Ohio counsel's attention an email dated November 2008 quoting from the forged 2000 Appointment, noting that it was a "helpful contemporaneous email[] that refer[s] to the payment of royalties pursuant to the 2000 licence agreement," and the "only correspondence around this time dealing with this issue."  For sure, a "helpful" document, but it was also a fabrication, with the automatically generated date spelled "Wendsday" and with metadata showing that "markp" had created it from a Word document on January 17, 2018.

Likewise, in April 2018, in the same package of documents from U.K. counsel, Ohio counsel received a copy of a forged "History of Working Practice" also created by "markp" on November 20, 2017 rather than on its ostensible date of February 2011. Comparison of this forged History with the 2011 original and with the 2000 Appointment shows that the signatures from the original were copied and pasted into the 2000 Appointment; that "markp" added language to the forged History that quotes from the 2000 Appointment; and that "markp" replaced the signatures in the forged History to hide the fact that he had copied them into the 2000 Appointment. SPL's counsel wrongfully withheld the Wendsday email with the "markp" metadata as well as the forged History until September 2020.

Counsel had to have been aware from the outset that both the "Wendsday" email and its metadata and the November 20, 2017 version of the "2011" "History of Working Practise" were forged by Mark Peters to make the 2000 Appointment appear to be genuine. It was bad enough that Peters committed a fraud on this Court and likely obstruction of justice, but counsel aided and abetted this criminality by failing to abide by their duty of candor to the Court and opposing counsel under Ohio Rules of Professional Conduct 3.3 and 3.4, as well as their obligations under Federal Rule of Civil Procedure 26(g) to provide accurate discovery responses and to preserve evidence. Instead of quickly coming clean, Ohio counsel "caus[ed] [defense] counsel to waste resources uncovering the truth." *Jones v. Illinois Central R. Co*., 617 F.3d 843, 856 (6th Cir. 2010). Pursuant to 28 U.S.C. § 1927, Fed. R. Civ. P. 26(g), and the Court's inherent authority, SPL counsel and their law firm should be ordered to pay ICEE's attorneys' fees and costs.

## II.    FACTUAL BACKGROUND

### A.    Peters Forges the 2000 Appointment and the November 20, 2017 Version of the "February 2011" History of Working Practise

As explained in ICEE's Motion for Sanctions, Mark Peters was unhappy with the limited rights granted to SPL to the SLUSH PUPPiE® trademarks under the 1996 and 1999 agreements. Doc. 73 at pp. 1-4.  After failing to convince ICEE over nine years that supposed oral "understandings" gave SPL broad trademark rights, Peters resorted to forgery.  He created a fake "Appointment of Trade Mark Licence" giving SPL exclusive rights in the U.K. and Europe by copying Will Radcliff's (the founder of Slush Puppie) and a witness' signatures from a 2011 "History of Working Practise" and pasting them into the fake Appointment:



| 2011 History of Working Practise | Forged 2000 Appointment |
|---|---|

*Id*. at pp. 5-6.  Then, on November 20, 2017, Peters tried to hide his forgery by replacing the Radcliff and witness signatures in the 2011 "History," also adding entries that "corroborated" the forged 2000 Appointment by paraphrasing its paragraph 4A:

**Forged Nov. 20, 2017 History of Working Practise:**



2000 - End 2000
WR and RPP agree that all merchandising and any sub licensing, brand, protection, exclusive manufacturing rights and the right to use the trade mark Slush Puppie as Slush Puppie Ltd see fit for all of the UK, Southern Ireland and Europe have been vested to Slush Puppie Ltd for in perpetuity, in return for a revised royalty payment that is to be an amount proportionally equal to 2.5% of the cost of Slush Puppie syrups in pounds sterling prices to distributors in the UK for the previous calendar year

3



Signed by

Date

in the presence of

### B.     Peters Forges the "Wendsday" Email, and Sends the Forgeries to U.K. Counsel, Who Sends Them to Attorneys Zalud and Avsec in 2018

On the same day of these forgeries, Peters sent the fabricated History and the 2000 Appointment to SPL's U.K. counsel—RPC.  Doc. 73 at pp. 7-8.  He then had RPC seek out the Benesch firm to initiate litigation in Ohio against ICEE. On December 1, 2017, RPC sent Benesch attorneys Zalud and Avsec the "initial documents for consideration related to potential litigation," Doc. 73-11PAGEID 1419, including the forged 2000 Appointment, Doc. 73-20 PAGEID 1557 (referring to "Trade mark licence" as "Document 4")), and the forged History, Doc. 73-12  PAGEID 1479-1483 (referred to in the Dec. 1, 2017 email as "Document 5:  A chronology setting out the history of the relationship . . ." *See* Doc. 73-20 at PAGEID 1557). The "History" received by Avsec and Zalud had the metadata showing that "markp" had created the "Hisoty [sic]" from a Word document just before emailing it (Doc. 73-12 PAGEID 1483):

| | |
|---|---|
| File: | Hisoty of Working Practice.pdf |
| Title: | Microsoft Word - Will  RPP history of SP USA Contrat V1.1 |
| Author: | markp |
| Subject: | |
| Keywords: | |
| Created: | 11/20/2017 3:31:42 PM |

RPC was apparently suspicious about the sudden appearance of the 2000 Appointment.   As noted, Peters suddenly "found" the 2000 Appointment after 9 years during which neither he nor his father Ralph ever mentioned it.  And the document is suspicious on its face, using English spellings when it was supposedly drafted by a Cincinnati native; referring to the nonexistent

4

"Ohio County"; containing numerous passages of gibberish; and lacking dates for the signatures. The lengthy, dense agreement has no negotiating history, and, supposedly, no originals could be found.  Moreover, Peters could never get his story straight about where he found it, at one point claiming it was in Majorca at his father's "residence" (though his father never had a residence there), but later saying it was found in a box in the U.K.  And, incredibly, Peters never told anyone at SPL about his "discovery."  Given these suspicious circumstances,  RPC asked Peters if he could prove that ICEE was aware of it, noting "anything that fixes ICEE with knowledge of that document 4, or shows that ICEE has been working to its terms, would be helpful."  Doc. 73 PAGEID 1303.  Since there was no real evidence that "fixes ICEE with knowledge," Peters fabricated it by copying into a Word document a November 2008 email from ICEE's Jerry Bird to SPL's head of finance, Lindsay Kirby, asking "how the 2007 Royalty was determined," and then typing up a fake reply referring to the forged "Trade Mark Licence dated August 8, 2000":

From: Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
Sent: Wendsday, November 12, 2008 10:57 AM
To: Bird, Jerry
Subject: Royalty 2007

Dear Jerry,

The royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000.

On page two - A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

Is this what you need?

Regards,
Lindsay

The fake email quotes from ¶ 4 A of the Appointment (Doc. 73-12 PAGEID 1455 ("'Royalty' shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices . . ."), just as Peters did with the forged History (Doc . 73-12 PAGEID 1482 ("an amount proportionally equal to 2.5% of the cost of Slush Puppie syrups in pounds [sic] sterling prices . . ."). Not noticing that he had misspelled "Wednesday" in what should have been the date/time that Microsoft Outlook generates automatically and which cannot be altered (or misspelled) by the user, Peters sent it to RPC on January 17, 2018:  "[T]here is an e mail

exchange from our head of finance to DPSU explaining we are paying 2.5% royalty. . . . Is this

of any help?"  Doc. 73 at 11; Doc . 73-14 PAGEID 1501.  The metadata shows that "markp"

created it from a Word document minutes before he sent it to RPC. Doc. 73-14 PAGEID 1516.

On April 17, 2018, RPC sent Zalud and Avsec the "Wendsday" email, describing it as

"helpful contemporaneous emails that refer to the payment of royalties pursuant to the 2000

licence agreement."  Doc. 73-20 PAGEID 1555; Doc. 73-11 PAGEID 1422 ("Transmittal of

background information . . . ").  RPC emphasized that "we understand that this is the only

correspondence around this time [i.e., 2008] dealing with this issue."  Doc. 73-20 PAGEID 1556.

On September 20, 2018, RPC's Ben Mark wrote to Avsec and Gurbach about filing an

injunction proceeding against one of ICEE's licensees.  Doc. 73-13 PAGEID 1483-94.  Mark

had doubts about the validity of the 2000 Appointment, noting "irrespective of whether the 2000

agreement is valid and in force . . ."  *Id.* at PAGEID 1494. When Mark was considering in May

2018 sending ICEE's U.K. trademark attorneys—Gowling—the "Wendsday" email in response

to their April 25 letter (Doc. 73-15 PAGEID 1518), he noticed that, in the email, Kirby asks

Bird, "Is this what you need?"  Doc. 73-20 PAGEID 1560.  Mark wrote to Peters, explaining that

he thought it odd that Peters did not have Bird's response to Kirby's query: "One point to

mention is that the risk of relying on the 2008 email without having done full searches is that any

response and subsequent correspondence could be highly relevant – we note in particular the

email ends with a question 'is this what you need?'"  Doc. 73-16 PAGEID 1522.  Notably, RPC

had asked Peters to provide it with "all of SPL's emails, correspondence and hard copy records,"

Doc. 73-16 at PAGEID1524, but he never did.  Doc. 73-16 at PAGEID 1524.[1]  Tellingly, Ben

Mark never sent the "Wendsday" email to Gowling.[2]  Doc. 73-16 PAGEID 1527.

### C.    RPC Sends the "Wendsday" Email and "History" to Avsec and Gurbach

On September 21, 2018 Avsec, Gurbach, Ben Mark, Cran, and Pownall discussed

preparing the complaint.  Doc. 73-13 PAGEID 1490. A few days later, Pownall sent Avsec,

Gurbach, and House the "Wendsday" email yet again (*id.* at PAGEID 1485), as well as another

copy of the forged History (Doc. 73-11 PAGEID 1438).  Pownall also sent Avsec and Gurbach

the litigation hold that RPC had sent Peters, Doc. 73-13 PAGEID 1490.  And RPC sent Peters its

"E-Discovery Questionnaire" on October 4.  Doc. 73-11 PAGEID 1441.  Presumably, RPC told

Peters to preserve electronic evidence on the computers he used, but the Benesch attorneys never

searched them, and Peters claims they went "poof" or were "stolen" three days after ICEE served

SPL with a notice to inspect on August 13, 2020.  Doc. 73 at p 15; Doc. 87 at pp 10-11.

Avsec reviewed the documents and the signatures carefully, observing that the 2000

Appointment "was executed by both Will Radcliff and Ralph Peters," and asking RPC whether

Ralph Peters is Mark's father, which Pownall confirmed.  Doc. 73-13 PAGEID 1486.

Presumably, the Benesch lawyers then spoke to Ralph Peters, but they must not have liked what

he told them because they decided he "will not be a witness in this case."  Doc. 31-8.  Avsec then

fired off a letter to ICEE that falsely claimed that "the parties have been operating under the

terms of the 2000 Agreement (including its royalty provisions) since ICEE's acquisition of the

---

[1] "I understand that you already have the electronic documents available, so please send those through . . . This exercise needs to be carried out to properly answer Gowling's allegations and it will be more compelling if we can provide a comprehensive response.  The previous Weightmans letters and the recent Gowling response show the risk of asserting a factual position that is contradicted by the documents. . . . [T]his document collation and review process should be carried out as soon as possible, so we can prepare the follow up letter to Gowling . . ."

[2]Although the Benesch lawyers are not copied, they likely discussed RPC's concerns on the phone.  Even if they did not, they should have been asking these questions to meet their obligations under Fed. R. Civ. Proc. 11 and 26(g).

SLUSH PUPPiE® brand and business in 2006." Doc. 73-17.  Avsec falsely represented that the "2000 Agreement *supersedes all previous agreements* between or among the parties . . .," demanding that ICEE "immediately cease and desist from licensing to third parties" rights to the SLUSH PUPPiE® trademarks.  Doc. 73-17 PAGEID 1534 (emphasis in original).  But, perhaps having the same doubts as Ben Mark, Avsec did not mention the "Wendsday" email.

ICEE's response pointed out that, during years of negotiations, SPL had acknowledged that the 1996 and 1999 agreements were in effect and never mentioned the 2000 Appointment. Doc. 73-19 PAGEID 1541-1542.  ICEE attached a February *2001* fax from the former Slush Puppie Corp. officer who had signed the 1999 agreement stating that "the UK Manufacturing license [ ] needs to be adjusted to reflect 2 ½ % commission vs. 5%."  Doc. 73-19 PAGEID 1545.  This proved that Slush Puppie Corp. was unaware of any 2000 Appointment, since its royalty rate was already set at 2.5%.  Finally, ICEE attached a memo from SPL board member Alan Beaney acknowledging *in 2017* that the "Slush Puppie contractual arrangements in Europe" are the 1996 and 1999 agreements, not any 2000 Appointment.  Doc. 73-19 PAGEID 1546, 1548-1552.  Gurbach responded on November 6, 2018, ignoring all these points, but reiterating that the forged 2000 Appointment "governs the relationship" between SPL and ICEE.  Ex. 1. Like Avsec, however, Gurbach also did not send ICEE the "Wendsday" email.

### D.  Ignoring the Evidence of Forgery, the Benesch Lawyers File the Complaint Based on the Forged 2000 Appointment

Ignoring the obvious warning signs, Avsec, Gurbach, and House prepared a complaint with the help of Cran and Mark, filing it on February 12, 2019.  Doc. 73-11 PAGEID 1442-1445; Doc. 2.  All the counts are based on the forged 2000 Appointment.  Paragraph 23 avers falsely that "[a] true and correct copy of the 2000 Appointment is attached hereto . . . ."  Doc. 2 PAGEID 99.  In fact, the lawyers had never even searched for the "original." Had they done so,

8

they likely would have found it on one or more of Peters' computers. The complaint also alleges that the 2000 Appointment "supersedes" the 1996 and 1999 agreements. Doc. 2 PAGEID 99. Tracking the language from ¶4 A that Peters had inserted into the "Wendsday" email and the forged History, the complaint falsely alleges that "[a]fter Defendant ICEE's acquisition of the SLUSH PUPPIE trademarks and business, Plaintiff SPL continued to pay royalties to ICEE under the 2000 Appointment in the amount of 2.5% of the total cost of Syrups charged and sold to distributors after appropriate discounts in the 2000 Territory as required thereunder." *Id.* ¶ 38.

ICEE timely removed the case to this Court and, on May 19, 2019, the parties filed their Rule 26(f) report. ICEE noted the threshold issue about the validity of the 2000 Appointment, and proposed quick discovery on that subject and an early motion for summary judgment. Doc. 20 PAGEID 294-295. SPL opposed early discovery and rejected ICEE's proposal for an early summary judgment motion concerning the forged Appointment. Doc. 20 PAGEID 295.

### E. The Benesch Lawyers Receive the Real 2011 "History," Showing That Peters Copied the Signatures From It Into the Forged 2000 Appointment

On May 21, 2019, ICEE requested all documents about the 2000 Appointment, including internal SPL communications, and documents "supporting, undermining, or otherwise relating to" the allegations in paragraphs 35 and 38 of the complaint that SPL had paid royalties to Dr. Pepper and ICEE "under the 2000 Appointment in the amount of 2.5% of the total cost of Syrups charged and sold to distributors after appropriate discounts in the 2000 Territory as required thereunder." Ex. 2 at pp. 7-8. Despite the fact that this language was copied by Peters into the "Wendsday" email and the forged History, SPL's attorneys withheld the forged History as privileged, and decided not to produce the "Wendsday" email until February 2020. Both documents were clearly responsive to ICEE's May 2019 document requests.

9

On October 28, 2019, **ICEE** produced emails that included Peters' April 2011 transmittal of the real February 2011 History to ICEE attorney Karen Kline. Doc. 60-4. The last entry in the real History is for "1981 to 1996," *id.* at PAGEID 1019, unlike the forged one, which has an entry for 2000 paraphrasing ¶4 A of the 2000 Appointment, Doc. 73-12 PAGEID 1482.  As SPL has belatedly admitted, Peters copied the Radcliff and witness signatures from the 2011 History into the forged 2000 Appointment, and then replaced the signatures in the 2011 History to try and disguise his forgeries.  Doc. 73-29 PAGEID 1607; Doc. 73-27 (ICEE Expert Report).  Even if the Benesch attorneys had not already seen the 2011 History up to this point, certainly by October 2019 they knew from ICEE's production that the History **they** had received from RPC in 2018 was a forgery, and that Mark Peters had failed to provide them with the real 2011 History.[3]

F.     **Attorneys Gurbach, House, and Emanuel Withhold the Forged "History" and the "Wendsday" Email and Sign False Discovery Responses**

In November 2019, ICEE served written discovery that sought to lay the groundwork for a summary judgment motion based on the facts that the 2000 Appointment had never been sent by SPL to Dr. Pepper/Seven-Up, Inc. (ICEE's predecessor) or ICEE before Peters' February 28, 2018 email to ICEE's Dan Fachner (Doc. 60-5); that it was not listed in any of the asset purchase agreements involving the SLUSH PUPPiE business; and that Will Radcliff never actually signed it.  Request for Admission No. 4 asked SPL to "[a]dmit that [SPL] did not provide a copy of the Purported 2000 Agreement to ICEE until February 28, 2018."  Ex. 3 at p. 2.  Similarly, RFA 5 asked SPL to admit that there were "no records indicating that the Purported 2000 Agreement was ever provided to ICEE before February 28, 2018."  *Id.*  Admitting this would prove that

_____

[3] It is also possible that Benesch **did** receive the real 2011 History from Peters but decided wrongfully to withhold both it and the 2017 forged version.  The original History was never produced by Benesch, only by ICEE.  So either Peters wrongfully withheld it from his lawyers, or the lawyers wrongfully withheld it from ICEE.

Peters lied when he told ICEE's Dan Fachner on March 20, 2018 that the 2000 Appointment "was in fact raised with ICEE many years ago . . ." Doc. 60-6 PAGEID 1029.

In response to this discovery, Gurbach and Emanuel stated that SPL "cannot 'admit' or 'deny' anything . . . nor can it provide any information requested therein, because it is without knowledge and information sufficient to respond to this Request at this time," and that "it is without knowledge and information sufficient to know whether there are any documents or other information identifying a date." Ex. 4, pp. 19-20; *id.* at pp. 12-13. This was false: On the day they signed these responses, Gurbach had multiple copies of both the "Wendsday" email and the forged History in his inbox. Doc. 73-20 PAGEID 1556; Doc. 73-13 PAGEID 1485, 1498-99; Doc. 73-11 PAGEID 1438. Since the "Wendsday" email and the forged History both quote from ¶ 4 A of the 2000 Appointment, if Gurbach and Emanuel believed these were genuine, they should have been identified and produced since they both would be "evidence" that SPL did indeed "provide a copy of the Purported 2000 Agreement to ICEE" before February 28, 2018**. *And if Gurbach and Emanuel believed the documents were forgeries, they had a duty to inform the Court and defense counsel of their client's crime and fraud.* They did neither, instead serving a false discovery response and continuing to withhold incriminating evidence.

Interrogatories 6 and 7 asked for information about the History of Working Practise, in response to which Gurbach and Emanuel raised no privilege issue, stated that they did not know where the original was, and promised to produce all responsive documents. Ex. 4 at pp. 7-8. To have made the "reasonable inquiry" required by Rule 26(g), Gurbach and Emanuel should have examined both the original History, which ICEE had produced in October, and the forged version that Gurbach and Avsec received from RPC in 2018. Either Gurbach and Emanuel knew

that Peters had forged the 2017 version, or they had not conducted the reasonable inquiry required by Rule 26(g). Moreover, they continued to wrongfully withhold the forged History.

On January 8, 2020, ICEE counsel asked the Benesch attorneys about the History, and whether there was any evidence that SPL had sent the 2000 Appointment to ICEE before Peters emailed it to Fachner on February 28, 2018. Ex. 5, Jan. 8, 2020 email from T. Marandola to M. Gurbach. Emanuel, copying Gurbach, again promised that "[a]ny responsive documents regarding the History of Working Practise will be produced, to the extent any exist . . ." Doc. 73-18 PAGEID 1537. Despite this promise, she again decided not to produce the forged History. Emanuel's letter then reiterated the lie that there was no one who could say whether any "records indicated that the Purported 2000 Agreement was ever provided to ICEE before February 28, 2018," and that SPL was "without knowledge and information sufficient to answer." Again, the Benesch partners had multiple copies of the "Wendsday" email and the forged History in their email inboxes. The whole point of these forgeries was to fabricate evidence that "the Purported 2000 Agreement was . . . provided to ICEE before February 28, 2018."

### G. Emanuel Belatedly Produces the "Wendsday" Email but Without the Incriminating Metadata

On February 19, without explanation for the delay, Emanuel produced the "Wendsday" email. Doc. 60-8. But Emanuel produced it without its incriminating metadata showing that "markp" had created it from a Word document on January 17, 2018. Importantly, Emanuel was savvy about metadata, even complaining to defense counsel right around this time about missing metadata in ICEE's production, and promising that SPL would "include the same metadata in its future productions." Ex. 6, Nov. 19, 2019 letter from E. Emanuel to D. Wolfsohn, at 3.

12

**H.     The Benesch Team Confronts Peters About the Forged "Wendsday" Email, but Says Nothing to the Court or Opposing Counsel**

Six days after the belated production of the "Wendsday" email, House—copying the whole Benesch Team—asked Peters for "more information" about it: "In preparing for your deposition we reviewed the attached which we received from RPC early in the case. . . . We need to know whether the attached e-mail string can be retrieved in native format by your IT people and where the string came from.  The word 'Wednesday' is misspelled as 'Wendsday' in the date of the top e-mail.  An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition."  Doc. 73-21 at PAGEID 1563.  Despite numerous reminders, neither Peters nor any "IT people" ever substantively responded to House's "critical" question.  Doc. 73-22, 73-23.  There was no "native" email to "retrieve" because Peters had forged it.  And, if Peters is to be believed, SPL didn't even have any "IT people."  M. Peters Oct. 9, 2020 Dep. at 65:13-17 ("We don't have an IT guy.  We're a small business.").

House's February 25, 2020 email proves that no later than this date, House, Gurbach, Turk, Avsec, and Emanuel all knew their client had committed forgery, and they wanted to pin the blame for this coming out at Peters' deposition scheduled for the next week on Peters himself.  Peters was likely insisting that the "Wendsday" email was genuine, which House knew was false.  House would have foreseen a debacle at the deposition, so he wanted to make sure Peters understood that—and that it was all on him.  House's request for an explanation for the misspelling of "Wendsday" was facetious: no explanation was possible other than that Peters typed it—and, of course, House never received any explanation from "IT" or anyone else.  House knew that this was not just a typical Peters typo.  Of course, no one from Benesch had ever asked Peters about his other misspellings and told Peters to talk to "IT" about them.  *See, e.g.,* Doc. 73-12 PAGEID 1483 ("contrat"), Doc. 73-6 PAGEID 1373 ("wrights"), Doc. 73-13

13

PAGEID 1485 ("roylaty").  The misspelling of "Wendsday" could only mean that Peters himself had typed up what should have been the automatically generated date and time in a Word document and then created a PDF from that, just as the metadata that Emanuel withheld from ICEE showed.  Doc. 73-14 at PAGEID 1516.  Indeed, no one from Benesch ever asked to examine any of Peters' laptops, nor did they conduct any inquiry at all into the origin of the email.  That is because they already knew the answer.

Peters got the message, so, instead of informing the Court and defense counsel about Peters' forgery, the Benesch lawyers cancelled the deposition, sought an indefinite moratorium on all discovery, asked the Court to order settlement discussions, and falsely claimed that Peters' health was an issue.  Doc. 73 at pp. 14-17.  When it looked like counsel could delay Peters' deposition no longer, Gurbach sent ICEE's counsel a letter that "withdrew" the "Wendsday" email from production, but he withheld all information about the forgery.  Doc. 60-10.  The day before, House, in another curious email to Peters, stated that "we have reached the conclusion inferred from the circumstances that the e-mail is not authentic."  Doc. 73-23 PAGEID 1569.  But those same "circumstances" were present in 2018 when Benesch received the "Wendsday" email with its metadata; they were present on February 12, 2019, when the complaint was filed; and they were present on February 19, 2020, when Emanuel produced the document to ICEE.

## I.    Gurbach and House Fail to Correct Peters' Deposition Perjury

At Peters' deposition on July 1, which was attended by both Gurbach and House, counsel obstructed the proceedings with meritless objections, and stood by while Peters repeatedly committed perjury.  Peters falsely denied that Lindsay Kirby did not type the "Wendsday" email (56:10-15, 58:15-18); falsely denied typing up that email himself (56:16-5757:14); and falsely denied copying the Will Radcliff and witness signatures and pasting them into the 2000 Appointment (128:24-129:13).  ICEE Counsel attempted to find out why the "Wendsday" email

had been withdrawn, but House instructed Peters not to answer any questions about that, or about counsel's other communications with Peters about the forged email.  And House took the position that SPL had no information at all about the History of Working Practise, including its "location" or "change of location."  Ex. 7, MP022, June 23, 2020 Email from R. House to D. Wolfsohn.  Yet House had never examined any of Peters' laptops that Peters had used to create the November 20, 2017 forged History. House and Gurbach listened to Peters' examination at length about the 2011 History, knowing that ICEE still did not have a copy of the forged version, 199:18-209:24, yet they said nothing, and even continued to withhold it after the deposition.

**J.      Gurbach, House, and Turk Sign False Responses to Requests for Admission and Falsely State That They Have Made "Reasonable Inquiries"**

Defense counsel was thus forced to go to the expense of preparing and serving requests for admission about the "Wendsday" email.  Ex. 8.  The Benesch attorneys waited the full 30 days before responding.  Doc. 60-12.  In its responses, SPL finally admitted that the "Wendsday" email was "not genuine," but also represented that after making "a reasonable inquiry" they could not say whether Kirby wrote it or not, when it was created, or whether SPL's computer systems were programmed to mis-spell the days of the week. Doc. 60-12 PAGEID 1052-53. Despite all the information to the contrary (including the metadata still being withheld), counsel denied that Peters authored the "Wendsday" email.  *Id.*  In fact, counsel's only "inquiry" was in February, when they facetiously asked Peters to ask his "IT people" for a "native" version.  As noted, no "IT people" ever responded, yet none of SPL's attorneys asked to examine Peters' laptops, none of them called Lindsay Kirby, and none of them ever asked to speak directly to anyone at SPL other than the forger himself.  After receiving no response from Peters, counsel made no inquiry at all.  Counsel knew that Peters was the forger.

15

**K.** **The Court Finds Probable Cause That a Crime or Fraud Has Been Committed but Counsel Does Nothing to Preserve Peters' Computers**

In light of Gurbach's and House's improper invoking of the attorney-client privilege to hide Peters' fraudulent conduct, ICEE was forced to file its Motion to Compel Information Relating to Plaintiff's Fabricated Evidence.  Doc. 60.  On August 31, the Court ruled that the motion had merit, and that the crime-fraud exception to the attorney-client privilege applied. Docs. 62, 67.  The Court ordered SPL to produce for *in camera* inspection all communications between SPL and RPC about the "Wendsday" email.  House represented to the Court on September 8, 2020 that he had complied with the Court's Order.  Ex. 9, Sept. 8, 2020 Letter from R. House to Hon. M. Barrett.  Meanwhile, on August 13, 2020, ICEE served a notice to inspect the computers and other devices Peters had used to fabricate the 2000 Appointment and the Wendsday Email, along with requests for documents about the "Wendsday" email (even though they were responsive to requests served in May 2019).  Doc. 73-24.  Again, the Benesch lawyers waited the full 30 days to respond.  Doc. 73-25.  In the meantime, they must have tipped off Peters about the imminent inspection; he claims his car was broken into on August 16 and his two laptops were supposedly stolen.  Incredibly, SPL's initial response—served on September 14—three weeks ***after*** the "theft"—promised to make the computers available for inspection, Doc. 73-25 PAGEID 1585, and, on September 24, a Benesch associate told ICEE he was "coordinating the document imaging efforts on SPL's end."  Ex. 10, Sept. 24, 2020 email from J. Monday to D. Wolfsohn.  But five days later, without explanation, SPL served a supplemental response stating that "SPL does not have possession or control of any devices responsive to this Request."  Doc. 73-26 PAGEID 1591. The "theft" aside, despite knowing that Peters had forged

the "Wendsday" email, none of the Benesch attorneys ever examined Peters' computers or had him make a backup or have an image taken, in clear violation of their discovery obligations.

**L.      House and Turk Finally Produce the Wrongfully Withheld Forged History**

ICEE's August 13, 2020 document requests exposed even more wrongful withholding of incriminating documents.  On September 15, 2020, SPL produced a 33-page privilege log.  That log revealed that counsel had withheld numerous ***non-privileged*** documents responsive to ICEE's 2019 requests that were attached to emails received by Benesch and RPC lawyers.  On September 16, ICEE identified ***91*** such log entries.  Ex. 11, Sept. 16, 2020 Email from T. Marandola to R. House, at 2-3. Two days later, ICEE identified two documents that appeared to be responsive to the Court's Order requiring *in camera* production, but that were not provided to the Court.  *Id.* at 2.  Benesch then acknowledged to the Court that its prior disclosure was incomplete.  Ex. 12, Sept. 18, 2020 Letter from R. House to Hon. M. Barrett.  SPL also agreed to produce the 91 non-privileged log entries, but continued to withhold the forged History and an additional copy of the "Wendsday" email—even though they were non-privileged attachments to an email that ICEE had identified on September 16.  When ICEE brought this to SPL's attention, House responded that SPL had withheld the History and the "Wendsday" email because they were not specifically listed in the 91 log entries that ICEE had identified!  Ex. 11, Sept. 20, 2020 Email from T. Marandola to R. House; Ex. 13, Sept. 21, 2020 Email from R. House to T. Marandola. Finally, on September 21, 2020, House produced the forged History, which the Benesch firm had since December 2017, along with the incriminating version of the "Wendsday" email, which they had since April 2018. Ex. 13.  Sure enough, the documents contained the metadata that Benesch had tried so hard to hide: "markp" had created the forged History from a Word document on November 20, 2017, and created the "Wendsday" email from a Word

17

document on January 17, 2018. But for ICEE's persistence in sniffing out each improperly held document, Benesch would *still* be withholding them.

## III.    ARGUMENT

Pursuant to 28 U.S.C. § 1927, attorneys should be required to personally pay "'the excess costs, expenses, and attorney's fees reasonably incurred' when the attorney 'multiplies the proceedings in any case unreasonably and vexatiously.'" Such sanctions are warranted when an attorney objectively 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Journigan v. Medical Team, Inc.*, 2011 WL 740804, * 2 (E.D. Mich. Feb. 24, 2011) (quoting *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)). "Section 1927 sanctions 'require a showing of something less than subjective bad faith, but something more than negligence or incompetence.'" *Journigan*, quoting *Red Carpet*, 465 F.3d at 646; *Followell v. Mills,* 317 Fed. Appx. 501 (6th Cir. 2009) ("courts must be vigilant to admonish, correct, and deter through sanctions" "shrewd but reckless lawyering"; denial of sanctions reversed*).*

Pursuant to Ohio Professional Conduct Rules 3.3 and 3.4, SPL's attorneys have an affirmative duty to the Court and opposing counsel to advise and correct their client's discovery violations and false statements in the complaint and discovery responses and testimony. *KCI USA, Inc. v. Healthcare Essentials, Inc.*, 2018 WL 3428711, *8-9 (N.D. Ohio July 16, 2018), *vacated and remanded on other grounds*, 797 Fed. Appx. 1002, 2020 U.S. App. LEXIS 1616 (6th Cir. Jan. 16, 2020). In *KCI USA*, for example, the client had fabricated evidence, which was eventually found by defense counsel on the defendants' hard drive. 2018 WL 3428711, * 8. Once that fabricated evidence was discovered, defense counsel moved to withdraw as counsel. *Id.* at *3. The district court nonetheless sanctioned counsel because of their "lack of forthrightness about Defendants' misconduct (even after it had been) discovered on Defendants'

18

hard drive." *Id.* at *8. The court found that counsel had violated their duty of candor under Ohio Prof. Cond. Rule 3.3: Counsel were not permitted to "just stick their heads in the sand and cower behind their clients' disobedience." *Id.* at *9.

Here, counsel knew that Peters had forged the "Wendsday" email, the November 20, 2017 version of the "History," and the 2000 Appointment itself. Not only did they do nothing to bring these forgeries to the Court's or opposing counsel's attention, but they delayed and obstructed ICEE's efforts to uncover the truth. Counsel received the forgeries in 2017 and 2018, including the incriminatory metadata. A strong inference is raised that they were aware of the forgeries, since they withheld the "Wendsday" email from production, eventually producing it without the incriminating metadata, and they withheld the forged "History" as well. Moreover, they confronted Peters with his forgery in February 2020, got no adequate explanation, and then did nothing to preserve, collect, or review Peters' laptops, conducting no inquiry at all. They then served false discovery responses, stating that they had "no information" about the History of Working Practise, and falsely stating that they had conducted "reasonable inquiries."

The "withholding of a highly relevant 'smoking gun' document" such as the forged History on unjustified privilege grounds alone justifies an assessment of fees and costs against the involved attorneys. *Jones v. Illinois Central R. Co.*, 617 F.3d 843, 854-55 (6th Cir. 2010) (affirming sanctions against defense counsel based on § 1927 where defense counsel claimed privilege over incriminating documents that "were not plausibly privileged"); *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 507 (N.D. Ohio 2013). As in *Lauku*s, SPL's counsel have "knowingly offered (or allowed to be offered) vague and evasive discovery responses designed to thwart defense counsel's ability to engage in meaningful discovery; . . . failed to make a

reasonable effort to discover and produce evidence responsive to discovery requests; failed to correct discovery responses they knew to be inaccurate, misleading or false . . . " *Id*. at 489.

Counsel's failure to correct Peters' perjury, or to withdraw as counsel, is also sanctionable under section 1927. "The claim, 'I don't remember' can be a lie if the speaker does remember, and even though no one can see another's memory, the falsity is subject to proof by circumstantial evidence, admissions, and other evidence.'" *Laukus*, 292 F.R.D. at 505 (quoting *Valley Eng'rs Inc. v. Electric Eng'g Co.*, 158 F.3d 1051, 1055 (9th Cir. 1998)). An attorney's failure "to correct what he should have known to be false and misleading testimony" is sanctionable. *Laukus*, 292 F.R.D. at 509. Attorneys have "an affirmative duty to correct the record." *Id.* Here, Peters testified incredibly and repeatedly that he did not remember anything about the History, the Wendsday email, or his recent conversations with counsel about those documents. He claimed not to recall where the documents were found, and he had no explanation for why "markp" appeared in the metadata showing that he had created these documents in late 2017 and early 2018. Counsel had a duty to correct these lies or to withdraw.

The Benesch firm and counsel should also be sanctioned pursuant to Rule 26(g) and the Court's inherent authority. Under Rule 26(g),counsel has an obligation to "conduct a reasonable investigation into his clients' representations concerning discovery" and "to preserve sources of discoverable information." *DiLuzio v. Village of Yorkville*, 2016 WL 7406535, * 33-34 (S.D. Ohio Dec. 22, 2016), R&R adopted, 2017 WL 780605 (S.D. Ohio Feb. 28, 2017). "[C]ounsel has an affirmative obligation to speak with the key players to preserve the sources of discoverable information." 2016 WL 7406535, * 38-39. Where the client lacks a plausible explanation for fabrications, that is evidence of bad faith. 2016 WL 7406535, * 27. The Benesch attorneys violated this rule, and they therefore "must" be sanctioned. Fed. R. Civ. P. 26(g)(3).

Dated:  January 12, 2021                 Respectfully submitted,

**DUANE MORRIS LLP**

BY:  _/s/ David J. Wolfsohn_

David J. Wolfsohn (*admitted pro hac vice*)
Tyler R. Marandola (*admitted pro hac vice*)
30 South 17th Street
Philadelphia, PA 19103
Tel.: (215) 979-1000
Fax: (215) 979-1020
djwolfsohn@duanemorris.com
tmarandola@duanemorris.com

Kenneth M. Argentieri (Ohio Bar No. 0067493)
600 Grant St., Ste. 5010
Pittsburgh, PA 15219
Tel.: (412) 497-1000
Fax: (412) 497-1001
kmargentieri@duanemorris.com

*Attorneys for Defendant, The ICEE Company*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2020 I served the foregoing document on counsel of

record by CM/ECF, as follows:

Ronald L. House
Jennifer M. Turk
Justin L. Monday
Benesch, Friedlander, Coplan & Aranoff
41 South High Street
Suite 2600
Columbus, Ohio 43215-6164
rhouse@beneschlaw.com
jturk@beneschlaw.com
jmonday@beneschlaw.com


I further certify that, on January 12, 2020 I served the foregoing document on counsel

listed below by email, and will serve the same by first-class mail, as follows:

| | |
|---|---|
| Matthew D. Gurbach | Elizabeth R. Emanuel |
| Bricker & Eckler LLP | Dinsmore & Shohl LLP |
| 1001 Lakeside Avenue East, Suite 1350 | 1001 Lakeside Avenue. Suite 990 |
| Cleveland, OH 44114-1142 | Cleveland, OH, 44114 |
| MGurbach@bricker.com | elizabeth.emanuel@dinsmore.com |


BY: _/s/ Tyler Marandola_
Tyler Marandola