IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

                Plaintiff,

      v.

THE ICEE COMPANY,

                Defendant.

CASE NO. 1:19-cv-00189-MRB

Judge Michael R. Barrett

**DEFENDANT ICEE'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SANCTIONS AGAINST BENESCH FRIEDLANDER COPLAN & ARANOFF LLP AND ATTORNEYS MARK AVSEC, ELIZABETH R. EMANUEL, MATTHEW D. GURBACH, RONALD L. HOUSE, JENNIFER M. TURK, AND ERIC LARSON ZALUD, PURSUANT TO 28 U.S.C. SECTION 1927, FED. R. CIV. PROC. 26(g), AND THE COURT'S INHERENT AUTHORITY**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ...........................1

II.     ARGUMENT ....................................................................................................................4

      A.     Respondents Repeatedly Mis-State the Standards for Sanctions Under Section 1927 and the Court's Inherent Power ........................................................ 4

      B.     Respondents Avsec, Zalud, Gurbach, and House Knew or Should Have Known That the 2000 Appointment Was not Authentic so They Should not Have Filed This Case ........................................................................................ 5

      C.     Respondents' Post Hoc Unsupported Attempted Justifications for Filing the Complaint are Meritless ..................................................................................... 9

      D.     At Key Junctures in the Case, Respondents Should Have Withdrawn as Counsel or Come Forward With Their Knowledge of Mark Peters' Forgery and Fraud on the Court .......................................................................... 11

           1.     Respondents Do not Deny Being Presented With Direct Evidence of Mark Peters' Forgeries in October 2019 ................................................ 11

           2.     Turk and House Admit Noticing the Misspelling of Wendsday in February 2020, Yet They and the Others Do Nothing to Investigate, Preserve Critical Evidence, Inform The Court, or Inform ICEE .................................................................................................. 13

      E.     Respondents' Fail to Produce Critical Documents in Their Possession and Engage in Chronic Bad Faith Discovery Responses and Delays......................... 16

           1.     Respondents Emanuel, Turk, Gurbach, and House Wrongfully Withhold the Forged 2017 History of Working Practise ......................... 17

           2.     Respondents Withhold the Wendsday Email's Metadata......................... 19

           3.     Respondents Certify False Discovery Responses ..................................... 19

           4.     Respondents Fail to Correct Peters' Perjury ............................................ 22

      F.     ICEE's Detailed Factual Recitation More Than Satisfies Due Process, but ICEE Welcomes a Hearing .................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Balfour Guthrie v. HunterMarine Transport, Inc.*,
  118 F.R.D. 66 (M.D. Tenn. 1987) ........................................................................10

*BDT Prods., Inc. v. Lexmark Int'l, Inc.*,
  602 F.3d 742 (6th Cir. 2010) ...........................................................................4, 11

*Ceglia v. Zuckerberg*,
  2013 WL 1208558 (W.D.N.Y. Mr. 26, 2013) ..........................................................14

*Cook v. Am. S.S. Co.*,
  134 F.3d 771 (6th Cir. 1998) ...............................................................................25

*Darnell v. Arthur*,
  782 Fed. Appx. 413 (6th Cir. 2019)........................................................................3

*DiLuzio v. Village of Yorkville, Ohio*,
  2016 WL 7406535 (S.D. Ohio Dec. 22, 2016) ........................................................20

*ECIMOS, LLC v. Nortek Global HVAC, LLC*,
  736 Fed. Appx. 577 (6th Cir. 2018)........................................................................25

*John B. v. Goetz*,
  531 F.3d 448 (6th Cir. 2008) ...............................................................................14

*Johnson v. BAE Systems, Inc.*,
  307 F.R.D. 220 (D.D.C. 2013)..........................................................................24-25

*Jones v. Illinois Cent. R. Co.*,
  617 F.3d 843 (6th Cir. 2010) ..........................................................................3, 17-18

*Laukus v. Rio Brands, Inc.*,
  292 F.R.D. 485 (N.D. Ohio 2013) .................................................................15, 18, 23

*Maddox v. E.F. Hutton Corp.*,
  723 F. Supp. 1246 (M.D. Tenn. 1989)...............................................................4, 23

*Mann v. G&G Mfg., Inc.*,
  900 F.2d 953 (6th Cir. 1990) ............................................................................7, 10

*Merritt v. Int'l Assn of Machinists & Aerospace Workers*,
  613 F.3d 609 (6th Cir. 2010) .................................................................................8

*Metz v. Unizan Bank*,
  655 F.3d 485 (6th Cir. 2011) .........................................................................4, 11, 25

*Nisus Corp. v. Perma-Chink Sys., Inc.*,
    2007 WL 2317401 (E.D. Tenn. Aug. 9, 2007) ........................................................25

*Nix v. Whiteside*,
    475 U.S. 157 (1986)......................................................................................................3

*Okros v. Angelo Iafrate Constr. Co.*,
    298 Fed. Appx. 419 (6th Cir. 2008)............................................................................23

*Plastech Holding Corp. v. WM Greentech Auto. Corp.*,
    257 F. Supp. 3d 867 (E.D. Mich. 2017)....................................................................4, 9

*In re Porsche Cars N. Am., Inc.*,
    2012 WL 4361430 (S.D. Ohio Sept. 25, 2012) ..........................................................20

*Red Carpet Studios v. Sater*,
    465 F.3d 642 (6th Cir. 2006) ................................................................................ 16-17

*Ridder v. City of Springfield*,
    109 F.3d 288 (6th Cir. 1997) ....................................................................................3, 9

*Williamson v. Recovery Limited P'Ship*,
    826 F.3d 297 (6th Cir. 2016) ..................................................................................4, 14

*Williamson v. Recovery Ltd. P'Ship*,
    2014 WL 1884401 (S.D. Ohio May 9, 2014) ......................................................14-15, 22

**Rules**

Fed. R. Civ. P. 1 ............................................................................................................2

Fed. R. Civ. P. 26 ..............................................................................................2, 20, 22

Fed. R. Civ. P. 30(b)(6)...........................................................................................*Passim*

Ohio R. Prof. Cond. 3.3 ...............................................................................................23

Ohio R. Prof. Resp. 4.1 ...............................................................................................24

**Statutes**

28 U.S.C. § 1927...........................................................................................................*Passim*

## I.    PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

This motion raises an urgent question for the profession: Is it, as Respondents argue, a "good deed" for litigators to knowingly aid and abet a client in his repeated acts of fraud, forgery, and perjury; delay and complicate the litigation for years with false and evasive discovery responses, frivolous motions, and lies about their clients' health and mental state; fail to produce core documents sitting in counsel's inboxes because they prove their client is a fraudster; do nothing to preserve or even examine their client's incriminating evidence—all in an effort to coerce a defendant into a favorable settlement? Respondents argue that they were performing such "good deeds" when they:

- Filed this lawsuit in February 2019 based on a supposed August 2000 Appointment of Trade Mark Licence that no one in the company remembered or could authenticate, that was "discovered" under suspicious and vague circumstances, and that contained signatures plainly lifted from a 2011 document—the "History of Working Practise";

- Deliberately withheld from production the forged 2017 "History of Working Practise"—which Attorneys Avsec and Zalud received among a handful of key documents in 2018—and even a cursory comparison with real 2011 History proves that Mark Peters forged the 2000 Appointment;

- Deliberately withheld metadata showing that Mark Peters had forged the "Wendsday" email—metadata that, again, Avsec, Gurbach, and Zalud had sitting in their inboxes among the handful of other key documents they received from UK counsel in 2018—a year before this lawsuit was filed;

- Waited to withdraw from production the "Wendsday" email for four months after Attorneys Turk and House now concede they knew it was a forgery, and years after Attorneys Gurbach, Avsec, and Zalud do not deny they realized it was a forgery, while proceeding aggressively ahead with discovery and attempts to force a settlement;

- Never once consulted with SPL's robust IT department about collecting or preserving relevant documents, instead delegating all discovery responsibilities to serial forger and fraudster Mark Peters—even after Respondents admit they knew he was a forger—and said nothing when Peters lied under oath that he did not have an IT department;

- Never asked to *inspect* Mark Peters' laptop—despite the fact that SPL's own candid Rule 30(b)(6) designee and full time IT professional conceded on Tuesday

that the only possible explanation for the Wendsday Email is that Mark Peters forged it on his laptop;

- Did nothing to **preserve** Mark Peters' laptops, even after they knew he had forged "the Wendsday email" and the 2017 History of Working Practise on it, and then, knowing that nothing had been collected or preserved and **still not asking Peters to preserve**, alerted him that ICEE's digital forensic team would be collecting from it, thereby enabling him to make the laptop "unavailable" for inspection by claiming it had been stolen;

- Repeatedly represented in discovery responses that "reasonable inquiry" had been made, even though the signatories of those responses—principally, Matthew Gurbach and Ron House—had made **no inquiry at all**—as SPL's own Rule 30(b)(6) designee has finally admitted **this Tuesday**;

- Demanded that ICEE provide all metadata for all of its document production, and repeatedly promised reciprocally that all documents relating to the "History of Working Practise" would be produced with their metadata, while continuing to withhold the 2017 version of that document—with its metadata showing that "markp" had created it in 2017 from a Word document—which, again, was sitting in the in boxes of, at least, Attorneys Avsec, Gurbach, and Zalud;

- Waited 2 months while they knew ICEE was preparing its motion for summary judgment before attempting to "withdraw" SPL's admittedly "meritless" claims based on the forged 2000 Appointment, which current SPL counsel now finally admits they cannot "ethically prosecute"; and

- Delayed for over 5 months the deposition of SPL's top IT professional, who admitted within the first few minutes of his deposition that (1) he had never been contacted by any of the Benesch or RPC attorneys until preparing for his deposition; (2) he was not asked to preserve any relevant evidence; (3) he was not asked to search for evidence relating to the forgery of the Wendsday Email until after he was informed that Mark Peters had made his laptop "unavailable"; (4) only Mark Peters had access to the real email string that the "Wendsday Email" was added to; and (5) the only explanation he could think of for the "Wendsday Email" is that Mark Peters forged it.

If these are "good deeds," then this profession has truly sunk to a new low.

Respondents' brief consists of deliberate mischaracterizations of the law in this circuit and a torrent of "strawman" arguments. But most telling—and most damning—are the affidavits that supposedly "support" the brief. These terse and artfully worded declarations from only three of the six individual respondents do not dispute any of the key facts. Most telling of all, not a single respondent swears that they were unaware—whether at the outset of this litigation or at various critical junctures along its long, sad history—that the 2000 Appointment was a forgery—

2

with signatures lifted from the real 2011 History of Working Practise. Nor does anyone swear that they were unaware at any point that the Wendsday Email and the 2017 History of Working Practise were forgeries. And not a single respondent attempts to explain their numerous false discovery responses or the misrepresentations made in their discovery correspondence.

The bottom line is that Respondents facilitated—and the current Benesch attorneys continue to facilitate—SPL's attempted fraud on the Court and ICEE. Lawyers are responsible not just for zealous representation of their clients, but for "secur[ing] the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The law enforces this duty by requiring counsel signing discovery responses to certify that they are complete and correct to the best of the lawyer's knowledge when made, Fed. R. Civ. P. 26(g), making counsel who unreasonably and vexatiously multiply proceedings personally responsible for the excess costs, 28 U.S.C. § 1927, and giving courts the inherent authority to impose sanctions on counsel and law firms whose actions prejudice the administration of justice. Attorneys House, Gurbach, Turk, Emanuel, Zalud, and Avsec failed to live up to these standards, thereby causing ICEE to incur hundreds of thousands of dollars in attorney's fees litigating a case that should have ended long ago, and indeed should never have been filed. And the Benesch firm has acted in bad faith, thereby justifying sanctions against it under the Court's inherent authority. Respondents do not deny that they have long known that Mark Peters is a serial forger and fraudster, and therefore a perjurer. Counsel in more difficult circumstances than Respondents have found the courage to carry out the duty to protect the integrity of the justice system. *See Nix v. Whiteside*, 475 U.S. 157, 161 (1986) (counsel told client that proposed testimony would be perjury and "if he did do that it would be my duty to advise the Court of what he was doing and that I felt he was

3

committing perjury"). If Respondents' conduct is not worthy of sanctions under section 1927 or the Court's inherent authority then this profession is not worthy of such a name.

## II.     ARGUMENT

### A.     Respondents Repeatedly Mis-State the Standards for Sanctions Under Section 1927 and the Court's Inherent Power

Respondents' brief relies on repeated claims that they did not act with "sinister" intent, or did not have "actual knowledge" of Peters' perjury or the meritless nature of SPL's claims under the 2000 Appointment. In fact they did, but "sinister intent" and "actual knowledge" are not required. Sanctions are appropriate under Section 1927 when a lawyer "knows or ***reasonably should know*** that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims." *Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997) (emphasis supplied). This standard does not require that the sanctioned attorney acted in bad faith or "subjectively knew that his [or her] conduct was inappropriate," but does require more than mere negligence or inadvertence. *Darnell v. Arthur*, 782 Fed. Appx. 413, 418 (6th Cir. 2019); *see also Jones v. Illinois Cent. R. Co.*, 617 F.3d 843, 856 (6th Cir. 2010) (sanctioning attorney who acted "recklessly" and "dragg[ed] her feet despite the implication of possible perjury"). Sanctions can likewise be imposed under the Court's inherent power where "counsel knew or ***should have known***" the claim was meritless. *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (emphasis supplied).

An additional finding of bad faith is what distinguishes sanctions under the Court's inherent power from sanctions under Section 1927. But "bad faith" means simply that a claim is brought or continued "for an improper purpose such as harassment." *Id.* Notably, improper purpose can be inferred from the circumstances, including the "withholding [of] material

evidence" or by "delaying or disrupting litigation," or "attempt[ing] to force the other side into

settlement." *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 754, 756 (6th Cir. 2010).

Respondents also repeatedly urge upon this Court the clear and convincing evidence

standard, even though they begrudgingly recognize the fact that the Sixth Circuit has never

required that standard of proof. Resp. Br. 3. Indeed, in *Williamson v. Recovery Limited P'Ship*,

826 F.3d 297, 302 (6th Cir. 2016), the Sixth Circuit rejected the clear-and-convincing standard

and affirmed the district court's decision to award sanctions under its inherent power against a

"stonewalling attorney." The Court noted that the district court incorrectly applied the clear and

convincing evidence standard, drawing from "fraud-on-the-court" case law, which did not apply

"because this case involves a court's inherent power to sanction." *Id.*; *see also Plastech Holding*

*Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 873 (E.D. Mich. 2017) (in awarding

sanctions due to fabricated contract, stating that the Sixth Circuit "would likely not require the

higher burden of clear and convincing proof" and citing *Williamson*); *Maddox v. E.F. Hutton*

*Corp.*, 723 F. Supp. 1246, 1250 (M.D. Tenn. 1989) (applying preponderance standard to

sanctions under inherent power). The standard of proof would not change the outcome here

since few if any of the facts relating to the misconduct are in dispute, but Respondents invite

legal error by urging the Court to apply a clear-and-convincing standard.

> **B.** **Respondents Avsec, Zalud, Gurbach, and House Knew or Should Have**
> **Known That the 2000 Appointment Was not Authentic so They Should not**
> **Have Filed This Case**

Marc Avsec, Eric Zalud, Matthew Gurbach, and Ronald House had ample evidence from

which they reasonably should have concluded that any claim based upon the 2000 Appointment

would be meritless, either because the 2000 Appointment was not authentic or because it could

not bind ICEE because ICEE had never seen or assumed it when it purchased the SLUSH

PUPPiE brand from Dr. Pepper/Seven-Up in 2006. *See* ICEE Br. 3-9.

**First**, Avsec, Zalud, Gurbach, and House knew that Mark Peters raised the 2000 Appointment with ICEE *for the first time* on February 28, 2018, despite years of discussion about the scope of SPL's rights under the 1996 and 1999 agreements. ICEE Br. 4-5. SPL's British counsel at Weightmans had even written to ICEE in August of 2017 that "it is clear" that the 1996 and 1999 agreements "form the basis of the relationship between" SPL and ICEE. Doc. 60-3 at PAGEID 1008. Respondents do not dispute that neither Mark Peters nor his father Ralph recalled this "Appointment."[1] Indeed, only a few months before it was supposedly "signed," Mark Peters himself entered into the 1999 Distributor Agreement. Doc. 73-4. And in 2010, Ralph Peters acknowledged to his son that there was no written exclusive license so they would have to argue "established practice" instead, noting that "Established practice known about and not contested is tantamount to agreement." Doc. 73-6 at PAGEID 1373. In that same email, Mark Peters despondently noted to his father that "even the USA lawyers" said "we have zero wrights" [sic] because of the plain language in the 1996 agreement. Indeed, in January 2017, SPL's Alan Beaney—who was Mark Peters' point man in the negotiations over trademark rights with ICEE—described SPL's position as based on an *unwritten* agreement that SPL claimed had "subsisted since the 1970's." Doc. 73-19 at PAGEID 1546, 1552. A suddenly "found" agreement that neither Mark Peters or Ralph Peters had ever known about and that conflicted with what everyone at the company thought SPL's rights were should obviously have been suspect to Avsec, Gurbach, House, and Zalud. **None of the Respondents dispute any of this.**

**Second**, in December 2017 Peters sent the forged "History of Working Practise" to RPC, who sent it to Benesch attorneys Avsec and current lead litigation counsel Zalud. Doc. 73-20 at

---

[1] Contrary to Respondents' contention that Ralph Peters was non compos mentis, his granddaughter testified just last week that his "body has failed, but his brain is still there." L. Peters Mar. 16, 2021 Dep. 74:3-5.

PAGEID 1557; Doc. 73-12 at PAGEID 1482-83. **Respondents do not deny that Peters forged the 2017 History to try and corroborate the forged 2000 Appointment**, which is obvious when one examines the document. The metadata show it was created by "markp" from a Microsoft Word document on November 20, 2017. Doc. 73-12 at PAGEID 1483. There has been only one "markp" at SPL—Mark Peters. L. Peters Mar. 16, 2021 Dep. 38:23-39:2; A. Somorin Mar. 16, 2021 Dep. 40:23-41:1.

*Third*, in September 2018, ICEE's counsel sent SPL contemporaneous evidence that the 2000 Appointment was not authentic. ICEE Br. 8. ICEE informed SPL that it had "followed up with [Dr. Pepper/Seven-Up], who confirmed that in its 2000 acquisition" it only received the 1996 and 1999 agreements. *Id.* at PAGEID 1541-42. And ICEE sent a 2001 fax from Slush Puppie Corporation who moved to Dr. Pepper that did not mention the 2000 Appointment, but instead referenced the 1996 Manufacturing Appointment, stating that it "needs to be adjusted to reflect 2 ½% commission." *Id.* at PAGEID 1545. Obviously, there had been an oral agreement to lower the royalty rate that was not reflected in any executed contract.

*Fourth*, when RPC and Benesch sought corroboration of the 2000 Appointment, they received the Wendsday email, which had a misspelled date and metadata showing "markp" as the author, and a creation date of January 17, 2018—the same day it was transmitted to counsel. Doc. 73-14 PAGEID 1516. RPC was obviously highly suspicious of this document—a fact that Respondents do not deny. ICEE Br. at 6-7, Doc. 89 at PAGEID 2312. RPC's Ben Mark noted that the last line in "Kirby's" (actually Peters') November 12, 2008 email says "Is this what you need?," yet there was apparently no response. Given RPC's own suspicions—which led them not to send the Wendsday Email to ICEE—Gurbach, Avsec, House, or Zalud should have contacted SPL's IT group. *See Mann v. G&G Mfg., Inc.*, 900 F.2d 953, 959 (6th Cir. 1990)

(counsel sanctioned where "reasonable inquiry" pre-filing would have revealed complaint to be "not well-grounded in fact"). Indeed, as we just found out on Tuesday of this week (no thanks to current Benesch counsel, who tried to put a stop to and then delay any such critical deposition) SPL had a new IT group that started in summer 2018, led by Abiodum Somorin. A. Somorin Mar. 16, 2021 Dep. 15:2-5. Somorin was not asked to search for the Wendsday email until *late 2020*, when he, of course, found that no such email existed anywhere in SPL's system, and by which time Peters' laptop was "unavailable" for inspection. *Id.* at 57:9-58:8; 49:15-50:15 (M. Peters requested search for Wendsday email after he reported his laptops stolen). Had Benesch requested that search before it filed the complaint in February 2019, it would have exposed the email as a fake. *Id.* at 59:5-12. And, of course, Benesch offers no explanation for why—if it truly believed the Wendsday email to be genuine—it did not show it to ICEE before it filed the complaint, or why RPC drafted, but never sent a response letter to ICEE using the Wendsday email as its "kill shot" evidence that ICEE was aware of the 2000 Appointment, or why RPC's Ben Mark said "irrespective of whether the 2000 Agreement is valid and in force . . ." ICEE Br. at 6-7. Amazingly, *none* of the Respondents state that they believed the Wendsday Email was genuine, and only *two* (House and Turk) claim that they did not notice the misspelled Wendsday before it was produced. The only reasonable explanation is that Avsec, Gurbach, Zalud and House knew the Wendsday Email was a forgery. *See Merritt v. Int'l Assn of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (imposing sanctions for failure to conduct reasonable factual inquiry before filing complaint). Under the circumstances, a reasonable lawyer would have asked SPL's IT department to determine whether the Wendsday Email was legitimate, and would have searched for any digital evidence regarding the creation of the 2000 Appointment. This would have confirmed that these were forgeries. Respondents did nothing.

Accordingly, under 28 U.S.C. § 1927, Avsec, Zalud, House, and Gurbach must pay the fees they

caused ICEE to incur in defending the case. *Ridder*, 109 F.3d at 298-99.

### C.   Respondents' Post Hoc Unsupported Attempted Justifications for Filing the Complaint are Meritless

Benesch, Avsec, Zalud, House, and Gurbach do not dispute that they had the evidence

discussed above at their disposal when they decided to file the complaint.[2]  Instead, their lawyers

make various arguments not supported by the three affidavits.  These are lawyers' arguments,

and nothing more.  *See Plastech Holding Corp.*, 257 F. Supp. 3d at 875 (sanctioning party for

suing on fabricated agreement in part because party could not "direct the Court to any record

evidence, whether in the form of an affidavit or deposition testimony, that anyone affiliated with

[sanctioned party] believed" that the document was genuine, and they thus relied on "nothing

more than a lawyer's unsworn conclusion").

**The 2.5% Royalty Rate.**  Respondents claim that the fact that SPL paid royalties at 2.5%

to ICEE rather than the 5% in the 1996 Manufacturing Agreement, supports the conclusion that

the 2000 Appointment was genuine.  This argument is contradicted by every piece of

information available to SPL.  Specifically, in 2018, ICEE sent Benesch the 2001 fax that

referenced needing to adjust the "Manufacturing license" to "2 ½% commission."  Doc. 73-19 at

PAGEID 1545.  If the 2000 Appointment were valid, there would have been no such need. More

fundamentally, SPL *itself* had provided an explanation for the 2.5% payment that had nothing to

do with any 2000 Appointment. Board member Alan Beaney explained in 2017 that SPL had

---

[2] Respondents' claim that  ICEE "makes no argument Benesch lacked a good-faith basis to file the lawsuit," Resp. Br. 8, ignores six full pages of ICEE's motion, ICEE Br. 3-9.  And again, sanctions do not require that Respondents subjectively believed the complaint to be baseless.

agreed with Dr. Pepper/Seven-Up to drop the royalty to 2.5% *as part of a change to the way freezer sales were handled*.  Doc. 73-19 at PAGEID 1549.

**Course of Dealing Amendment to the 1999 Agreement.**  Respondents' brief claims that, regardless of the 2000 Appointment, "SPL had an argument the 1999 Agreement had been modified by a consistent course of dealing where SPL paid a 2.5% royalty."  Resp. Br. 9.  But Mark Peters himself never argued to ICEE between 2009 and 2018 that any "course of dealing" resulted in a *written* agreement, nor could he have. Moreover, the 1999 Distributor Agreement has no royalty provision at all, so this argument makes no sense.  Again, none of the declarations say that the decision to file the complaint was influenced by this incoherent argument.

**Unauthenticated Letters.**  Respondents rely upon a hodge podge of letters of unexplained origin.  No one has stepped forward to swear that any of these documents is authentic. We are left in the dark as to where they were found, when they were found, and—most importantly in a case in which all the key documents have been forged—whether any of them is genuine.  Just as telling is the fact that none of the Respondents swears that they relied on these—or even saw them—in filing the complaint.[3]  Since even Respondents do not attest that they considered these documents when they decided to file the complaint, the unauthenticated letters do nothing to prove that Respondents performed a reasonable investigation.  *Mann*, 900 F.2d at 959 (sanctioning counsel where information discrediting complaint was available to counsel pre-filing but counsel did not investigate); *Balfour Guthrie v. HunterMarine Transport,*

---

[3] On its face, the "Blevins" letter clearly does not relate to the 2000 Appointment that Peters forged—which radically different from both the 1996 manufacturing appointment and the 1999 distributor agreement.  The letter refers to an "8 August 2000 *renewal* contract," which cannot be a reference to the 2000 Appointment, which was not a "renewal" of anything.  Doc. 82-1 at PAGEID 2063.  Indeed, that was the whole point of Peters' forgery:  He wanted a brand new contract that gave him broad, exclusive rights not provided by the 1996 or 1999 agreements.

*Inc.*, 118 F.R.D. 66, 74 (M.D. Tenn. 1987) ("minimal pre-filing research that consists primarily of conversations with a client is not enough to show that a complaint is well grounded in fact").

**D.**     **At Key Junctures in the Case, Respondents Should Have Withdrawn as Counsel or Come Forward With Their Knowledge of Mark Peters' Forgery and Fraud on the Court**

**1.**     **Respondents Do not Deny Being Presented With Direct Evidence of Mark Peters' Forgeries in October 2019**

In assessing sanctions, "parties and attorneys have a responsibility to halt litigation *whenever* they realize they are pursuing a meritless suit." *BDT Prods, Inc.*, 602 F.3d at 753 n.6; *see also Metz*, 655 F.3d at 489. If they do not, they are subject to sanctions under § 1927 and/or the Court's inherent authority. None of the Respondents denies being aware of direct evidence of forgery of multiple documents by Mark Peters in October 2019. Yet Respondents continued with their aggressive and dilatory litigation strategy to try and force ICEE to the settlement table.

October 28, 2019 was when ICEE substantially completed its document production. Ex. 5. On that date, ICEE produced two documents that definitively showed that both the 2017 History and the Wendsday email were fabricated, thereby showing as well that the 2000 Appointment was also a forgery. First, ICEE produced the April 26, 2011 email in which Peters had sent the ***real*** History to ICEE's counsel. *See* Doc. 60-4. That document notably ended the "history" at 1996 and did not mention the 2000 Appointment. The lawyers do not deny reviewing this "History." And they do not deny noticing by this time, if not earlier, that (1) the 2017 forged History adds references to the 2000 Appointment that are not in the original 2011 History, (2) Radcliff's and his witnesses' signatures were lifted from the original history and pasted into the 2000 Appointment, (3) Peters replaced the Radcliff and witness signature with different ones in the forged History—even though the dates are the same: February 22, 2011; and (4) the metadata shows that "markp" created it from a Word document on the same day that

he sent it to RPC. Doc. 73-12. While Respondents' concede that ICEE's August expert report provides "evidence conclusively proving" that Peters copied the signatures from the 2011 History into the 2000 Appointment, Respondents do not deny that they noticed this much earlier.

There can therefore be no question that, as of October 2019, House, Gurbach, Emanuel, and Turk—and perhaps Zalud, —knew or should have known that Peters had forged the Wendsday Email, forged the History of Working Practice, and lifted the signatures from the real, 2011 history to forge the signatures in the 2000 Appointment. Corroborating this is the fact that, shortly thereafter, SPL amended its complaint to add claims under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. Those were the agreements that SPL had said repeatedly were "nullities"—"superseded" by the (forged) 2000 Appointment. Doc. 29-7. The only reason to add claims in December 2019 under those "dead" agreements was if Respondents were concerned that ICEE would put the pieces of the puzzle together showing that Peters forged the 2000 Appointment. In fact, to allege both that the 2000 Appointment was "alive"—that it superseded the "dead" 1996 and 1999 agreements—but reserve the right to say the opposite— that the 1996 and 1999 agreements were not dead—is itself proof of bad faith, Doc. 73 at PAGEID 1297-1302, a fact Respondents simply ignore.

The second smoking gun that Gurbach, House, Turk, and Emanuel received in October 2020 is the real email chain that forms part of the forged "Wendsday" email string. Doc. 60-11. It shows the real responses between Kirby and Bird, making it clear that Kirby did not respond to Bird until December 8, at which point she did not reference the 2000 Appointment. Peters was not copied on this response, so he was unaware of Kirby's real response to Bird's November 11 request for information. Quick review of this original email string proves definitively that the Wendsday email is a fake—whether one notices the misspelling of "Wendsday" or not.

12

**2.     Turk and House Admit Noticing the Misspelling of Wendsday in February 2020, Yet They and the Others Do Nothing to Investigate, <u>Preserve Critical Evidence, Inform The Court, or Inform ICEE</u>**

ICEE's brief explains the significance of the Wendsday email—and of Respondents' reaction to it—in February 2020. Again, as of this time, Zalud, Avsec, and Gurbach had already had the Wendsday Email with its metadata in their in boxes since 2018—showing that "markp" created it from a Word document on the same day he sent it to RPC, who in turn sent it to Zalud and Avsec. Doc. 89 at 7-8, 14, PAGEID 2313-14, 2320; Doc. 73-13 PAGEID1490; Doc. 73-11 PAGEID 1438. Neither Zalud, Avsec, nor Gurbach deny that they reviewed and understood the implications of the Wendsday Email before filing the complaint—nor do they explain why they failed to reference it in the pre-suit correspondence or in the complaint itself—so the Court can assume—given their silence—that they were aware that Mark Peters had forged it.

Then, in February 2020, House writes to Peters telling him it is "critical" for him to have his "IT people" find a "native" version of the email because "the word Wednesday is misspelled as Wendsday." ICEE Br. at 13-14 PAGEID 2319-20. At this point House, Gurbach, Turk, Avsec, and Emanuel "all knew their client had committed forgery," ICEE Br. 13, *and none of them deny this*. The significance of the Wendsday Email was not just that it was forged, but that it showed that *Mark Peters himself knew the 2000 Appointment was not authentic*, so he was trying to "corroborate" it with "evidence" that it was sent to ICEE in 2008.  ICEE Br. 9-10.

SPL's belated Rule 30(b)(6) testimony from the head of its IT group bangs the nail into the coffin.  Abiodum Somorin confirmed on Tuesday that only Mark Peters had access to the genuine email chain, since Kirby was long gone and her email account was not migrated over to SPL's new system in 2016 or 2017. Somorin Dep. 42:17-20, 43:18-44:9.  Moreover, Somorin could think of no other possibility than that Mark Peters had forged the "Wendsday" email. *Id.* at 45:18-24.  Yet even though House is telling Peters in February 2020 that it is "critical" to

"have your IT people look at this," Peters never did, Respondents knew that, but neither House, Emanuel, Avsec, Gurbach, Turk, or Zalud ever spoke to SPL's IT people until Zalud was implored by this Court to do so after conferences on February 8 and February 22, when Zalud was forced to acknowledge he had still not spoken to Somorin. Indeed, even as late as February 8 of this year, Zalud was falsely representing to the Court that SPL as an entity had no information on the Rule 30(b)(6) topics. Ex. 14. The only conceivable reason why none of the Respondents ever contacted SPL's IT department is that they knew it would merely confirm that Peters was a serial forger. *Williamson*, 826 F.3d at 303 (counsel can be sanctioned for being "willfully blind" to facts requiring disclosure).

Moreover, since Respondents admit they were aware of Peters' forgery by February 2020, they had an ethical obligation to inspect and preserve evidence of Peters' forgery on his laptops. Instead, they did nothing. ICEE Br. 13-14; Somorin Dep. 73:1-13. "[I]t is beyond question that a party to civil litigation has a duty to preserve relevant information, including ESI, when that party 'has notice that the evidence is relevant to litigation . . . ." *John B. v. Goetz*, 531 F.3d 448, 458 (6th Cir. 2008). When dealing with forgers like Peters, forensic analysis of a wrongdoer's computers is often crucial. *Ceglia v. Zuckerberg*, 2013 WL 1208558, at *11 (W.D.N.Y. Mr. 26, 2013) (fraud being perpetrated on computers requires forensic analysis); *Williamson v. Recovery Ltd. P'Ship*, 2014 WL 1884401, at *12 (S.D. Ohio May 9, 2014). Here, Respondents knew no later than February 2020 that Peters had forged the Wendsday Email and the 2017 History of Working Practise. Yet Respondents' brief contains *no* explanation for why they did not even attempt to inspect or preserve Peters' computers. Instead, they expect to be rewarded for a "good deed" when they told Peters in August of 2020—almost 2 years after the complaint was filed—that ICEE wanted to inspect his computers and devices. ICEE's

14

characterization of this communication as a "tip off" is spot on because, at this juncture, (1) Respondents knew that they had ***not*** inspected the computers or asked Peters to preserve them, (2) Respondents knew that they had ***not*** asked SPL's IT department to preserve or inspect the computers, and (3) Respondents knew that Peters had falsely ***denied*** fabricating the Wendsday email and was intent on evading discovery about it. It was entirely predictable that, given such a history, Peters' computers would magically become "unavailable" as soon as Respondents told him that ICEE wanted to inspect them. Attorneys have an obligation to preserve critical evidence, and Respondents violated that obligation here. *Williamson*, 2014 WL 1884401 at \*12 ("In sum, it is not reasonable for an attorney merely to rely on his clients to gather all relevant documents, when he is personally aware that responsive documents exist which have not been produced, and when he is aware of his client's desire for less-than-full disclosure to the Court.").

Respondents' argument that none of this matters because they "withdrew" the Wendsday Email from production just before Peters was deposed on July 1 is frivolous. First, Respondents' "withdrawal" of the Wendsday email did not fulfill their "affirmative duty to correct the record." *Laukus*, 292 F.R.D. at 509. Second, that Respondents' counsel characterizes a ***four-month delay*** in withdrawing it as ***"immediate"*** is astonishing. One wonders what this Court's reaction would be if it ordered a party to do something "immediately" and that party waited four months before complying—and then asked the Court for a pat on the head for its "good deed."[4]

Respondents also argue that one of their "good deeds" was moving to dismiss SPL's meritless claims based on the 2000 Appointment in October, arguing that it was ICEE's expert

---

[4]Respondents' predilection for "blaming COVID" for its discovery abuse is beneath contempt. Resp. Br. at n. 10 PAGEID 2450. Respondents blame COVID for supposedly not having time to send a three-sentence letter to opposing counsel, somehow excusing the four-month delay from February 25 to June 26. Doc. 73-21 (Feb. 25, 2020 email from House to Peters); Doc. 60-10 (Gurbach's June 26, 2020 letter to Wolfsohn). Yet during these same four months, COVID did not prevent them from filing motions seeking to have the Court force settlement discussions and a moratorium on discovery. Docs. 46, 47, 51, 52, & June 15, 2020 Ltr. From R. House to Hon. M. Barrett.

who provided "evidence conclusively proving" that the 2000 Appointment was a forgery when her report was served in August 2000. But Respondents do not deny that they had the evidence ICEE's expert relied upon—the 2011 History and the 2000 Appointment—and *more*. Unlike ICEE's expert, Benesch had the Wendsday email with metadata and the forged 2017 History, which were additional evidence the 2000 Appointment was a fake.

### E. Respondents' Fail to Produce Critical Documents in Their Possession and Engage in Chronic Bad Faith Discovery Responses and Delays

Even in cases that have merit, sanctions under 28 U.S.C. § 1927 are appropriate if an attorney pursues the case by tactics that intentionally abuse the judicial process or knowingly disregard the risk that actions will needlessly multiply proceedings. *Red Carpet Studios v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006). Regardless of what Respondents may have thought of Mark Peters or of SPL's case, they were not justified in their 2-year campaign of false certifications, obfuscation, and delay. Under Sixth Circuit law, respondents must be held responsible where they acted "in the face of an obvious risk that [they were] increasing the work on the other party without advancing the litigation." *Id.* at 647. ICEE's brief describes that conduct in painstaking detail, and indeed the Court is familiar with much of it, from Respondents' tooth-and-nail fight to prevent the deposition of Ralph Peters, to its hide-the-ball discovery tactics with the Wendsday email, its repeated proffers of Mark Peters as a "prepared" 30(b)(6) witness, and its attempt over the last few months to hide the fact that its professional IT team was never asked to search for or preserve key evidence until well after it was too late. Respondents' declarations do nothing to absolve them of these numerous violations of their discovery responsibilities.[5]

---

[5] The attached appendices A and B put in context Respondents' false statements, obfuscations, and delays with respect to the improper withholding of the Wendsday Email's original metadata and the forged 2017 History.

Sanctions under section 1927 are clearly warranted. *Red Carpet Studios*, 465 F.3d at 646

(purpose of § 1927 is in part "to deter dilatory litigation practices").

### 1. Respondents Emanuel, Turk, Gurbach, and House Wrongfully Withhold the Forged 2017 History of Working Practise

There is no dispute that the 2017 History was withheld from ICEE until ***September 2020***,

when it finally turned up on a privilege log—despite not plausibly being privileged and requested

in May 2019—and when it was only produced because defense counsel repeatedly requested it.

*Jones*, 617 F.3d at 855 (bad faith where counsel withheld document that was "not plausibly

privileged"). The 2017 History is conclusive evidence of Peters' forgery of the 2000

Appointment—a fact that the metadata and signatures prove—and a fact that none of the

Respondents denies. And it is beyond belief that Respondents were not acutely aware that such

stunning proof of their client's forgery and perjury had not been produced to ICEE's counsel.

Respondents' explanation for withholding the 2017 History is evasive. Ms. Turk says

that "a scanned copy of the 'History of Working Practice, [sic] was also uploaded to Everlaw.

However, the document was inadvertently tagged as 'Non-responsive, duplicate,' and, therefore,

was not produced." Doc. 95-5 at PAGEID 2490. Turk does not say, however, that the ***2017***

***forged History*** was so tagged. And the important "History" for purposes of ICEE's motion is

not the real, 2011 History—which might have been marked as "duplicate" since ICEE produced

it in October 2019—but the one that Peters forged in 2017—which had been sitting in the

inboxes of Avsec and Zalud since 2017 with its metadata showing that "markp" created it shortly

before sending it to RPC and proving that Peters lied at his deposition when he denied forging

the 2000 Appointment. Turk says nothing about ***that*** document, and it is clear her declaration is

not referring to it because the forged 2017 History is not "scanned," but rather is an electronic

document with incriminating metadata. Moreover, regardless of how documents may have been

tagged in Everlaw, Gurbach, Avsec, and Zalud fail to explain why they did not produce this smoking gun document—or how they could possibly be unaware that such damning evidence of forgery had ***not*** been produced to defense counsel. *Laukus*, 292 F.R.D. at 505-506 (sanctioning attorneys where they failed to ask co-counsel for documentation and failed to bring to the attention of opposing counsel a key document that was not produced). Avsec and Zalud submitted no declarations, and Gurbach's is a one-liner saying nothing about the forged history that he received and reviewed in 2018—as part of a small set of the key documents that RPC sent Benesch. Doc. 73-20 at PAGEID 1557 ("Document 5"). And Respondents' brief fails to address ICEE's point that Emanuel had promised on January 28, 2020 to produce "[a]ny responsive documents regarding the History of Working Practise . . . to the extent any exist" with ***all of their metadata intact***.[6] Doc. 73-18 at PAGEID 1537-38. Moreover, Turk does not explain why she didn't produce the 2017 History after she admittedly reviewed the Everlaw database on February 7, 2020 and confirmed that not all responsive documents had been produced. Doc. 95-5 at ¶ 4-5. The forged 2017 History is the kind of explosive document that would keep any litigator up all night. It is not credible that Respondents would not have been keenly focused on the fact that it had never been produced.

Nor is this a case in which the parties reviewed hundreds of thousands of documents and a contract reviewer unfamiliar with the case made a tagging error. The forged 2017 History was one of a handful of key documents that Avsec, Zalud, and Gurbach had in their possession from the outset, ICEE expressly requested all documents relating to the History, Emanuel promised to

---

[6] Respondents attempt to excuse Emanuel because she was an associate. But associates are bound by the rules of professional conduct just like partners, and junior lawyers are not immune from sanctions. Ohio R. Prof. Resp. 5.2(a); *Jones*, 617 F.3d at 857 (sanctioning lawyer despite it being "defense counsel's first trial"). Tellingly, Emanuel does not deny that she was aware of the forged 2017 History and of the fact that it had not been produced.

produce them, and yet Respondents held it back anyway—for ***almost two years***. The only reasonable conclusion is that Gurbach, House, Turk, and Emanuel deliberately decided to withhold it from ICEE because it incriminated Peters.

### 2. Respondents Withhold the Wendsday Email's Metadata

Respondents admit that they withheld the version of the Wendsday email with the incriminating metadata showing that it was created from a Word document by "markp" on January 17, 2018. Turk tries to excuse this default by claiming she received "hard copy" documents" from the "case file" on February 7, 2020 and, after reviewing the Everlaw database, noticed that not all of them had been produced, and thus had Emanuel produce the Wendsday email with a handful of other documents on February 19, 2020. Doc. 95-5 at ¶ 4-5. Because the document was a "scan," Turk says, it did not contain the incriminating metadata. *Id.* at ¶ 7. But none of the Respondents explains why Gurbach, Avsec, or Zalud did not produce what they had in their inboxes. Respondents *knew* that ICEE needed the metadata—and Emanuel—copying Gurbach, House, and Turk—promised to give them it. Doc. 89-6 at PAGEID 2376. Gurbach, Avsec, and Zalud had the metadata, yet they withheld it.[7] They offer no excuse, and the logical reason is that they knew it proved that Peters was a forger. That is the quintessence of bad faith, as well as vexatiously multiplying the proceedings.

### 3. Respondents Certify False Discovery Responses

Fed. R. Civ. Proc. 26(g)(1)(A) requires counsel who sign a discovery response to certify that it is "complete and correct as of the time it is made." If counsel's certification is false and without substantial justification, then sanctions are mandatory. Fed. R. Civ. P. 26(g)(3).

---

[7] As Appendix A highlights, Benesch and counsel for ICEE engaged in extensive back and forth in October 2019 about the importance of producing metadata associated with emails, so Benesch knew this issue was crucial.

"[C]ounsel is obligated to examine critically the information that a client provides about the existence and availability of the requested documents" and has a "duty 'to cooperate in the discovery process; to be transparent about what information exists, how it is maintained, and whether and how it can be retrieved; and above all exercise sufficient diligence . . . to ensure that all representations made to opposing parties and to the Court are truthful and based upon a reasonable investigation of facts.'" *DiLuzio v. Village of Yorkville, Ohio*, 2016 WL 7406535, *34 (S.D. Ohio Dec. 22, 2016), *R&R adopted*, 2017 WL 780605, at *3 (S.D. Ohio Feb. 28, 2017) (affirming default judgment and attorney's fees for bad faith stymying of discovery). Counsel may not simply "accept[] his clients' representations concerning the existence and availability of requested documents as true, without any investigation." *Id.*; *In re Porsche Cars N. Am., Inc*., 2012 WL 4361430, at *8 (S.D. Ohio Sept. 25, 2012) ("reasonable inquiry" means counsel must identify and give instructions to appropriate personnel to collect responsive documents, then review them, and follow up on inadequacies). ICEE's brief identified numerous responses respondents falsely certified, none of which are addressed in the attorney declarations. Because these false and misleading discovery requests and chronic stonewalling throughout this litigation vexatiously multiplied the proceedings, they also violate section 1927.[8]

On December 23, 2019, Matt Gurbach signed SPL's responses to ICEE's first and second interrogatories, second requests for production, and first requests for admission. The responses falsely claimed that SPL could not admit or deny whether it had provided ICEE a copy of the 2000 Appointment before February 28, 2018, or whether there were any records indicating that it was given to ICEE before then. Doc. 89-4 at PAGEID 2367-68. Respondents' brief attempts to

---

[8] As noted, Appendix A and Appendix B set out in chronological order the roadblocks that Respondents put in defense counsel's way to delay and hinder discovery of the truth and improperly increase ICEE's defense costs.

defend the responses by claiming that there were "multiple documents corroborating the existing of the 2000 Agreement." Resps.' Br. 24. But that is not a defense—that is the point. Gurbach had the Wendsday email (a supposed communication with ICEE) and the fake 2017 History (supposedly communicated to ICEE) in front of him when he wrote these responses. If he believed those documents were genuine, then the truthful response to the RFA would have been a denial, along with production of those documents. Doc. 89-4 at PAGEID 2360-61. Instead, Gurbach signed a RFA response he knew was false, certifying that SPL did not know enough to admit or deny, or even to "know whether there are any documents" relevant to the request.

Second, SPL's August 10, 2020 responses to ICEE's Third Set of Requests for Admission, also signed by Gurbach, falsely certified that counsel had undertaken a "reasonable inquiry" and that SPL did not have sufficient information to admit or deny three of ICEE's five requests relating to the Wendsday email. Doc. 60-12. These included a request to admit that Kirby did not write the Wendsday email, that it was created after November 1, 2017, and that SPL's computer systems were not programmed to automatically generate mis-spellings of days of the week. Counsel's lack of inquiry was confirmed by SPL's IT chief, Abiodum Somorin, who testified on March 16 that he had never been asked to conduct a search of SPL's electronic records for the Wendsday email until "late 2020," after Mark Peters had conveniently claimed his laptops were stolen, and Mr. Somorin further admitted that no inquiry was performed by SPL.[9] A. Somorin Mar. 16, 2021 Dep. 48:18-50:15. Mr. Somorin also readily admitted that it was impossible for SPL to program Outlook to misspell the days of the week. *Id.* at 66:16-67:4. And Mr. Somorin was not even shown a copy of the Wendsday email until preparation for his deposition as a designee of SPL. *Id.* at 72:22-24. Respondents' declarations do not even attempt

---

[9] Predictably, a search turned up no emails with the word "Wendsday." A. Somorin Mar. 16 Dep. 57:13-58:10.

to claim that they conducted any investigation, and the brief merely says that lawyers may rely on their client's factual assertions, Resp. Br. at 25, omitting the part of the committee note stating that "the attorney may rely on assertions by the client and on communications with other counsel in the case *as long as that reliance is reasonable under the circumstances.*"  Fed. R. Civ. P. 26(g), Advisory Committee Notes to 1983 Amendment (emphasis supplied).  All Respondents had to do was talk to Somorin—who confirmed that only Mark Peters had access to the real Kirby email string, and only Mark Peters could have forged the Wendsday email.  Respondents have admitted that they never bothered to talk to Somorin, yet they certified falsely that they had made a reasonable inquiry.  They made no inquiry at all.  Respondents were well aware of Peters' "desire for less-than-full disclosure to the Court," and they were not entitled to simply type up and certify his lies. *Williamson*, 2014 WL 1884401, at \*12.  Mr. Gurbach violated his obligation "not to participate in his client's obfuscation." *Id.*

### 4.    Respondents Fail to Correct Peters' Perjury

Respondents do not deny that they were aware no later than February 2020 that the Wendsday Email was a forgery.  And SPL's Rule 30(b)(6) designee has testified that he could think of no other explanation other than that Peters forged it.  Gurbach, House, and Turk attempt to justify their failure to correct Peters' perjury by arguing in identical language that Peters never explicitly told them that the Wendsday email "was a forgery or that [he had] committed perjury during his deposition."  Doc. 95-3 at ¶ 3; Doc. 95-4 at ¶ 13; Doc. 95-5 at ¶ 10.  Respondents then urge an extraordinary rule on the Court: a lawyer has "no duty to disclose the alleged perjury" so long as the perjured testimony "has not been contradicted by statements to counsel."  Doc. 95 at 13.  According to Respondents, a lawyer is in the clear as long as the client lies to both the adversary and his lawyer.  Thankfully, that is not the law.  To the contrary, a lawyer's knowledge can be "inferred from the circumstances" and a lawyer cannot "ignore an obvious falsehood,"

regardless of the client's mendacity. Ohio R. Prof. Cond. 3.3 cmt. 8; *Okros v. Angelo Iafrate Constr. Co.*, 298 Fed. Appx. 419, 432-33 (6th Cir. 2008) (lawyer committed fraud on the court where he "had cause to know" that his client lied about placing a phone call and did not reveal it). As SPL's own Rule 30(b)(6) witness just confirmed on Tuesday, there is only one explanation for the Wendsday Email: that Mark Peters forged it. A. Somorin Dep. 45:18-24. Only he had access to the string, and only he would have the means, motive, and opportunity to author it in Word and convert it to PDF—which the metadata incontrovertibly show he did.

Tellingly, on June 25, 2020, House wrote to Peters to tell him that Benesch had "reached the conclusion inferred from circumstances that the [Wendsday] e-mail is not authentic." Doc. 73-23. House's email mirrored the "inferred from the circumstances" language of the commentary to rule 3.3 because he was conveying that Benesch had ***knowledge*** the email was fake, thus triggering their ethical obligations.[10] Certainly at that point, Respondents had a straightforward obligation: to tell ICEE what they had concluded, even if doing so meant revealing privileged information. Respondents had already produced the document to ICEE, and thus were in a position where it had facilitated their client's attempt at fraud. Respondents' knowledge of the fraud thus required them to "disclose a material fact when disclosure is necessary to avoid assisting an illegal or fraudulent act by a client." Ohio R. Prof. Resp. 4.1(b); *see also Johnson v. BAE Systems, Inc.*, 307 F.R.D. 220, 229 (D.D.C. 2013) (counsel sanctioned for failing to "make counsel for the [other party] aware" that prior production contained altered medical records). The comments to the rule make clear that fulfilling this duty may require

---

[10] Respondents claim that they were duty-bound to ignore Peters' lies because doubts about credibility must be resolved in favor of the client. But this only applies to "reasonable doubts," *Maddox*, 723 F. Supp. at 1249 ("swearing contest" in which client "consistently maintained his initially credible version"), which do not exist here. *Laukus*, 292 F.R.D. at 509. SPL's own Rule 30(b)(6) witness admitted there is no other plausible explanation than that Peters forged it. And the documentary evidence all points in one direction: Mark Peters forged the documents—a fact that Respondents do not contest.

disclosure of facts that "may be protected by the attorney-client privilege" and "may include disaffirming an opinion, document, affirmation, or the like, or may require further disclosure to avoid being deemed to have assisted the client's illegal or fraudulent act." *Id.* at cmt. 3. In this case, the "fraudulent act" was the production and creation of the Wendsday email in the first place, which itself was compelling evidence that the 2000 Appointment had been forged as well. But rather doing what the rule required and revealing its conclusion to ICEE, Gurbach sent a cryptic two-sentence letter to ICEE's counsel on June 26, 2020 "withdrawing" the document, without any explanation as to why, leaving ICEE to figure it out for itself. Doc. 60-10. Gurbach's vague letter, and House's silence at Peters' ensuing deposition, assisted SPL in perpetuating its attempted fraud and in vexatiously multiplying the proceedings.

> **F.** **ICEE's Detailed Factual Recitation More Than Satisfies Due Process, but ICEE Welcomes a Hearing**

ICEE's opening brief contains a detailed recitation of the sanctionable conduct of each of the individual attorney respondents, by name and by act, citing dozens of exhibits and deposition transcripts. Moreover, SPL had described much of this conduct in previous filings, including the Motion to Compel Information Relating to Plaintiff's Fabricated Evidence (Doc. 60) and the motion for sanctions against SPL (Doc. 73). These filings set forth the full "complexity of the factual and procedural history"—as ***Respondents themselves*** admitted in their motion for an extension of time. Doc. 91 at PAGEID 2412. Indeed, in that motion, Respondents complained that the factual allegations were ***too*** detailed and ***too*** lengthy: "[T]he Motion for Sanctions is 109 pages long, inclusive of exhibits. The related Motion against Slush Puppie Limited is 352 pages long. . . . The complexity of the factual and procedural history is easily shown – Defendant could barely fit the 15 pages of factual allegations into the 20-page limit of its brief." *Id.* As Respondents' own authorities make clear, all due process requires is that each attorney be given

24

"notice and an opportunity to be heard." *Cook v. Am. S.S. Co.*, 134 F.3d 771, 775 (6th Cir. 1998); *see also Metz v. Unizan Bank*, 655 F.3d 485, 491 (6th Cir. 2011).[11] ICEE's motion describes, as Respondents themselves put it, the full "complexity of the factual and procedural history" that comprises the sanctionable conduct of each attorney respondent—and of the firm as a whole—in meticulous detail, much more detail than in other cases that have ordered or affirmed sanctions.[12] *See Metz*, 655 F.3d at 491 (due process satisfied where brief mentioned request for sanction on page 1 and provided two pages of supporting argument on pages 17-18).

In any event, ICEE's motion asked the Court to issue a show-cause order, which is "a well-established procedure in dealing with § 1927 sanctions." *Cook*, 134 F.3d at 776. If any of the Respondents want to "present[] evidence and arguments why sanctions should not be imposed," *id.,* or why they should only be responsible for a greater or lesser proportion of the fees and costs ICEE has spent defending this "meritless" action, they can do so at a show-cause hearing.

---

[11] Ironically, Respondents cite *ECIMOS, LLC v. Nortek Global HVAC, LLC*, 736 Fed. Appx. 577, 585 (6th Cir. 2018) in arguing that ICEE's brief is not specific. But *ECIMOS* faulted the *sanctioned* party for making vague assertions about a lack of due process without specifying "how the violation occurred." *Id.*

[12] Respondents' reliance on *Nisus Corp. v. Perma-Chink Sys., Inc.*, 2007 WL 2317401 (E.D. Tenn. Aug. 9, 2007) is not to the contrary. There, the court held the motion insufficient where it did not identify individual attorneys at all, instead simply seeking sanctions against "the Merchant & Gould attorneys involved." *Id.* at *4.

Dated:  March 19, 2021                    Respectfully submitted,

**DUANE MORRIS LLP**

BY:  */s/ David J. Wolfsohn*
David J. Wolfsohn (*admitted pro hac vice*)
Tyler R. Marandola (*admitted pro hac vice*)
30 South 17th Street
Philadelphia, PA 19103
Tel.: (215) 979-1000
Fax: (215) 979-1020
djwolfsohn@duanemorris.com
tmarandola@duanemorris.com

Kenneth M. Argentieri (Ohio Bar No. 0067493)
600 Grant St., Ste. 5010
Pittsburgh, PA 15219
Tel.: (412) 497-1000
Fax: (412) 497-1001
kmargentieri@duanemorris.com

*Attorneys for Defendant, The ICEE Company*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2021 I served the foregoing document on counsel of

record by CM/ECF.


BY: _/s/ Tyler Marandola_
Tyler Marandola

# Appendix A

## Chronology of Events Related to Wendsday Email

**Chronology of Events Related to Wendsday Email**

| Date | Event | Citation |
|---|---|---|
| December 20, 2017 | Attorney David Cran at British law firm RPC writes to Mark Peters that "anything that fixes ICEE with knowledge of [the 2000 Appointment], or shows that ICEE has been working to its terms, would be helpful." | Doc. 73-14 at PAGEID 1502-03 |
| January 17, 2018, 9:53 a.m. | "markp" creates Wendsday email from a Word document. | Doc. 73-14 at PAGEID 1516 (showing metadata of document as sent to Cran) |
| January 17, 2018, 10:26 a.m. | Mark Peters sends Wendsday email to David Cran and Ben Mark at RPC, with "markp" metadata. | Doc. 73-14 at PAGEID 1501 |
| **April 17, 2018** | Attorneys **Avsec** and **Zalud** receive the Wendsday email from RPC, with "markp" metadata. | Doc. 73-20<br><br>*See* Attachment 1 |
| April 25, 2018 | ICEE's British counsel at Gowlings sends letter to SPL's British counsel at Weightmans denying knowledge of 2000 Appointment and stating it does not bind ICEE. | Doc. 73-15 |
| May 3, 2018 | RPC attorney Ben Mark drafts proposed response letter to ICEE's British counsel. The draft relies on the Wendsday email, and RPC shares the draft with Mark Peters. | Doc. 73-16 |
| August 17, 2018 | Attorney **Avsec** sends letter to ICEE threatening litigation, writing that there is "no question that the parties have been operating under the terms of the 2000 Agreement (including its royalty provisions) since ICEE's acquisition of the SLUSH PUPPIE® brand and business in 2006." Attorney Avsec does not reference or attach the Wendsday email, even though it and the 2017 forged History of Working Practise are the only "evidence" that ICEE would have been aware of the 2000 Appointment. | Doc. 73-17 |
| September 13, 2018 | ICEE's U.S. counsel responds to Attorney Avsec's letter, again reiterating that neither ICEE | Doc. 73-19 |

| | | |
|---|---|---|
| | nor its predecessor-in-interest at Dr. Pepper/Seven-Up, Inc. had "knowledge of the 2000 Document until attached to your client's February 28, 2018 email." | |
| **September 25, 2018** | Attorney Holly Pownall at RPC sends Attorneys **Avsec**, **Gurbach**, and **House** another copy of the Wendsday email, supplying it as evidence that SPL "has referenced [the 2000 Appointment] in correspondence" with ICEE. This copy likewise contains "markp" metadata with creation date of 1/17/2018 at 9:53 a.m. | Doc. 73-13<br><br>*See* Attachment 2 |
| November 6, 2018 | Attorney **Gurbach** responds to ICEE's counsel's September 13 letter, but addresses none of ICEE's factual claims about the 2000 Appointment. | Doc. 89-1 |
| February 12, 2019 | SPL files this lawsuit, with Attorneys **House** and **Gurbach** on the signature block. | Doc. 1-1 |
| June 25, 2019 | ICEE's counsel writes a letter to SPL terminating the 1996 and 1999 Agreements. | Doc. 29-6 |
| June 28, 2019 | Attorney **Gurbach** responds to ICEE's January 25, 2019 letter, asserting that the termination "is a nullity" because the 2000 Appointment has superseded the 1996 and 1999 agreements. The response does not reference or include the Wendsday email. | Doc. 29-7 |
| July 5, 2019 | SPL responds to ICEE's first set of document requests, and promises to produce "[a]ll communications between [SPL] and ICEE relating to the Purported 2000 Appointment." | Exhibit 1 to ICEE Reply Brief |
| October 11, 2019, 1:32 p.m. | SPL makes its first production of documents, consisting of about 2000 pages, but does not include the Wendsday email. | Exhibit 2 to ICEE Reply Brief |
| October 11, 2019, 5:34 p.m. | ICEE counsel writes to Attorneys **Gurbach**, **House**, and **Emanuel** highlighting that "none of the documents were produced with associated metadata, despite the fact that most of the production appears to be emails and attachments." ICEE's email requests that SPL | Exhibit 3 to ICEE Reply Brief |

| | | |
|---|---|---|
| | "reproduce the documents with appropriate metadata." | |
| October 16, 2019 | Attorney **Gurbach** writes to ICEE counsel responding to October 11 email, saying he is "reviewing your requests relating to metadata and parent-child relationships" and asking why *ICEE's* initial production lacked metadata. | Doc. 31-5 |
| October 23, 2019 | ICEE's counsel responds to Attorney Gurbach explaining that ICEE's production was of scanned paper documents that "had no metadata," and that ICEE would "produce the metadata associated with [its] electronically stored information." <br><br> ICEE again requests that SPL produce the metadata associated with its electronic documents. | Exhibit 4 to ICEE Reply Brief |
| October 28, 2019 | ICEE substantially completes its document production, and produces ICEESPL_005772, the real Lindsay Kirby-Jerry Bird email chain to which the Wendsday email would have belonged, if genuine. | Exhibit 5 to ICEE Reply Brief; Doc. 60-11 (genuine Kirby-Bird chain) |
| October 29, 2019 | SPL produces metadata for its first production of documents, and Attorney **Gurbach** again asks ICEE to confirm that it has produced "the associated metadata for any of the *e-mails* contained in its first production." | Exhibit 6 to ICEE Reply Brief |
| November 18, 2019 | SPL makes its second production of documents, consisting of about 1,500 pages, but does not include the Wendsday email. | Doc. 73-28 |
| November 27, 2019 | ICEE serves First Set of Requests for Admission. Request 4 asks SPL to admit that "Slush Puppie Limited did not provide a copy of the Purported 2000 Agreement to ICEE until February 28, 2018." <br><br> Request for Admission 5 asks SPL to admit that there "are no records indicating that the Purported 2000 Agreement was ever provided to ICEE before February 28, 2018." | Doc. 89-3 |

| December 23, 2019 | SPL responds to ICEE's First Request for Admissions. The responses are signed by Attorney **Gurbach**.<br><br>SPL's Response to RFA 4: "Objection. SPL cannot 'admit' or 'deny' anything in response to this Request for Admission, nor can it provide any information requested therein, because it is without knowledge and information sufficient to respond to the Request at this time. SPL reserves the right to supplement at a later date."<br><br>SPL's Response to RFA 5: "Objection. SPL cannot 'admit' or 'deny' anything in response to this Request for Admission, nor can it provide any information requested herein, because it is without knowledge and information sufficient to respond to this Request at this time, but reserves the right to supplement at a later date."<br><br>(SPL never supplements these responses.) | Doc. 89-4 |
|---|---|---|
| January 8, 2020 | ICEE's counsel writes to Attorneys Gurbach, House, and Emanuel raising deficiencies in SPL's responses to Requests for Admission 4 and 5 (and accompanying interrogatories), which requested SPL to admit that it had not provided a copy of the 2000 Appointment to SPL, and that there are "no records indicating that the Purported 2000 Agreement was ever provided to ICEE before February 28, 2018." | Doc. 89-5 |
| January 28, 2020 | Attorney **Emanuel** writes to ICEE responding to ICEE's January 8, 2020 message and indicating that its responses to RFAs 4 and 5, and to the accompanying interrogatories, "remain as stated." | 73-18 |
| **February 19, 2020** | Attorney **Emanuel** produces a copy of the Wendsday email, without the "markp" metadata. | Doc. 60-8; 60-9<br><br>*See* Attachment 3 |
| February 25, 2020 | Attorney **House** writes to Mark Peters indicating that "Wendsday" is misspelled in the Wendsday email. | Doc. 73-21 |

| | House writes: "We need to know whether the attached e-mail string can be retrieved in native format by your IT people and where the string came from . . . An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition." | |
|---|---|---|
| February 26, 2020 | Attorney **House** writes to Mark Peters asking him to "advise where your IT people are on retrieving the e-mail string." The IT people are never contacted by Peters or SPL counsel. | Doc. 73-22 |
| June 25, 2020 | Attorney **Gurbach** writes to David Cran at RPC that "[a]n issue has arisen with regard to a document that we received at the inception of this case and I would like to discuss it with you." | Exhibit 7 |
| **June 25, 2020** | Attorney **House** writes to Mark Peters, copying Attorneys **Gurbach** and **Turk**, that Benesch has "reached the conclusion inferred from circumstances that the e-mail is not authentic." | Doc. 73-23 |
| June 26, 2020 | Attorney **Gurbach** writes to ICEE's counsel withdrawing the Wendsday email. The entirety of the substance of the letter is: "Please be advised that Plaintiff withdraws documents SP003569-SP003570 from its prior document production. Plaintiff will not be offering this document into evidence in this matter nor will it use it as an exhibit to any pleading, motion, or deposition." | Doc. 60-10 |
| July 1, 2020 | First deposition of Mark Peters occurs, with Attorney **House** defending. | Doc. 74 |
| July 10, 2020 | ICEE serves Requests for Admission directed to the Wendsday email's authenticity and authorship. | Doc. 89-8 |
| August 10, 2020 | SPL responds to ICEE's RFAs, and the responses are signed by Attorney **Gurbach**.<br><br>SPL's response to RFA 19 admits that the Wendsday email is not a genuine email from Lindsay Kirby to Jerry Bird. With respect to three RFAs (20, 21, and 23), SPL responds and Attorney **Gurbach** certifies that SPL has "made | Doc. 60-12 |

| | | |
|---|---|---|
| | a reasonable inquiry" and does not have enough information to admit or deny. | |
| August 13, 2020 | ICEE serves Request for Inspection directed to computers and electronic devices used by Mark Peters between June 1, 2017 and November 1, 2018. | Doc. 73-24 |
| August 13, 2020 | At ICEE's request (originally requested during the July 1, 2020 deposition of Mark Peters), Benesch provides a privilege log purporting to show how Benesch received the Wendsday email, and communications with Mark Peters relating to its withdrawal. | Doc. 60-7 |
| August 27, 2020 | ICEE files Motion to Compel allegedly privileged communications and documents relating to the Wendsday email on the grounds of the crime-fraud exception to attorney-client privilege. | Doc. 60 |
| August 31, 2020-September 10, 2020 | Court grants ICEE's Motion to Compel on crime-fraud grounds and orders Benesch to produce for *in camera* inspection communications relating to the Wendsday email | Doc. 62, 67 |
| September 8, 2020 | Attorney **House** sends first round of documents to Court for *in camera* inspection. | Doc. 89-9 |
| September 14, 2020 | SPL responds to ICEE's August 13 inspection request by saying it will, "to the extent such devices exist, . . . produce the requested devices" to a third party vendor for imaging.  This response is signed by Attorney **House**.  **House** knows that nothing has been done to preserve any of Peters' devices. | Doc. 73-25 |
| September 15, 2020 | SPL produces privilege log showing receipt of Wendsday email by RPC, and communications between RPC and Mark Peters relating to it. | Doc. 73-11 |
| September 16, 2020 | ICEE's counsel writes to Benesch indicating that its September 15, 2020 log contains more than 75 documents that "were attached to allegedly privileged emails that have not been produced | Doc. 69-2 |

| | and do not appear to be independently privileged," and requests their production. | |
|---|---|---|
| September 18, 2020 | ICEE's counsel follows-up on its September 16, 2020 email, and asks Attorney House to "confirm asap" that two specific documents were among the documents Benesch supplied to the Court for *in camera* review.<br><br>In fact, they were not. | Doc. 69-2 |
| September 18, 2020 | Benesch supplements its production of documents *in camera* to include the withheld documents that ICEE identified. | Doc. 89-12 |
| **September 18, 2020** | Benesch produces the nonprivileged attachments requested in ICEE's counsels' September 16, 2020 email.<br><br>The production includes, for the first time, the Wendsday email with its original metadata showing a creation date of January 17, 2018 by "markp" from a document titled "Microsoft Word – Document2" | Exhibit 8 to ICEE Reply Brief |
| September 21, 2020 | ICEE writes to the Court highlighting the significance of the newly produced metadata, which shows the Mark Peters fabricated the Wendsday email shortly before sending it to British counsel at RPC. | Doc. 69 |
| September 24, 2020 | Benesch tells ICEE that it "will be coordinating the document imaging efforts on SPL's end." | Doc. 89-10 |
| September 25, 2020 | The Court completes its *in camera* review and orders production of documents subject to crime-fraud exception. | Exhibit 9 to ICEE Reply Brief |
| September 29, 2020 | SPL sends a "supplemental" response to ICEE's inspection request stating that "SPL does not have possession or control of any devices responsive to this Request." This response is signed by Attorney **House**. **House** provides no explanation for this change in position. | Doc. 73-26 |
| October 2, 2020 | ICEE serves a 30(b)(6) Notice of Deposition on SPL seeking testimony about the Wendsday | Exhibit 10 |

|  | email. The witnesses with knowledge are not produced until March 16, 2021, based on this Court's order. |  |
| --- | --- | --- |
| October 9, 2020 | Mark Peters is produced as a 30(b)(6) witness, and denies all knowledge of the Wendsday email, and admits he is not prepared to provide any testimony with regard to the 18 topics in the notice. | Doc. 76 |
| October 15, 2020 | Benesch files motion for leave to amend to withdraw claims based on 2000 Appointment, writing that "SPL will not seek to enforce any rights set forth under the 2000 Agreement." | Doc. 72 |
| November 24, 2020 | ICEE's counsel writes to Attorneys House, Zalud, Turk, and Monday to point out that Mark Peters was unprepared to testify about the Wendsday email and to seek a fully prepared witness. | Exhibit 11 to ICEE Reply Brief |
| December 1, 2020 | Attorney **Turk** writes to ICEE counsel that "[r]egarding the 30(b)(6) topics from Mark Peters' October 9, 2020 deposition, other than what has already been testified to, there is no one at SPL who has knowledge regarding the Kirby email or where the email was located."<br><br>The March 16, 2021 deposition of Abiodum Somorin showed that this statement was false. Notably, neither Attorney **Turk** nor any other Benesch attorney had tried to speak with SPL's IT professionals about the Wendsday email, and neither did Mark Peters. | Exhibit 12 to ICEE Reply Brief |
| January 26, 2021 | ICEE writes to the Court seeking a prepared 30(b)(6) witness on the topics relating to the Wendsday email. | Exhibit 13 to ICEE Reply Brief |
| February 8, 2021 | Attorney **Zalud** writes to the Court and represents that "no one at [SPL] has the knowledge sought" by ICEE's requests, and therefore asks that the Court rule that SPL has complied with its discovery obligations.<br><br>This statement is false, and as of this date **Zalud** had not spoken to SPL's IT professionals | Exhibit 14 to ICEE Reply Brief |

| | | |
|---|---|---|
| | regarding the deposition topics, and neither had Mark Peters. | |
| February 8, 2021 | Court holds a conference and orders SPL to find an appropriate 30(b)(6) witness to testify on the topics in ICEE's notice. | |
| February 19, 2021 | Attorney **Zalud** writes to ICEE's counsel proposing testimony from Abiodum Somorin, whom he characterizes as SPL's "IT consultant," and from Mark Peters.<br><br>Mr. **Zalud** proposes deposition dates of "April 27, 28, or 29" for each witness, and proposes that ICEE's counsel travel to the United Kingdom and Northern Ireland to take the depositions.<br><br>Attorney **Zalud** still has not spoken directly to Somorin. | Exhibit 15 |
| February 22, 2021 | Court holds conference with the parties, and Attorney **Zalud** admits that he has not yet even spoken with Somorin to determine if he has relevant information to provide. | |
| March 1, 2021 | Court holds a conference and orders depositions to go forward by Zoom, in March. SPL now says it will present Abiodum Somorin and Laura Peters, the latter of which is Mark Peters' niece.<br><br>The depositions are ultimately scheduled for March 16, 2021 | |
| March 10, 2021 | ICEE serves amended Rule 30(b)(6) Notice on SPL. | Exhibit 16 to ICEE Reply Brief |
| March 15, 2021 | Attorney Zalud signs SPL's Response to Seventh Amended 30(b)(6) Notice. Response notably claims that "[t]here is no one at SPL with knowledge of who typed the Wendsday Email, although it does indicate, on its face, Lindsay Kirby as the sender and that is who SPL believes typed it. She last worked for SPL in 2009." | Exhibit 17 to ICEE Reply Brief |
| March 16, 2021 | ICEE takes the deposition of SPL's designee, Abiodum Somorin, who works as SPL's head of IT. Somorin testifies that he searched for, but | |

| | could not find, a native version of the Wendsday email in SPL's systems, and that he could not think of any other explanation than that Mark Peters typed the Wendsday email. He also testifies that only Mark Peters had access to the authentic string on top of which Peters typed the November 12, 2008 "Wendsday" email. He further testifies that Kirby's email account was apparently not migrated over to SPL's current Office 365 email system, which migration took place in 2015 or 2016. | |

# ATTACHMENT 1

**Wendsday Email Metadata
Received by Benesch on April 17, 2018
SP005951**

**From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
**Sent:** Wendsday, November 12, 2008 10:57 AM
**To:** Bird, Jerry
**Subject:** Royalty 2007

Dear Jerry,

The royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000.

On page two - A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

Is this what you need?

Regards,
Lindsay


**From:** Bird, Jerry [mailto:jbird@slushpuppie.com]
**Sent:** 11 November 2008 14:27
**To:** Lindsay Kirby <lindsay.kirby@slushpuppie.co.uk>
**Cc:** Mark Peters <mark@slushpuppie.co.uk>
**Subject:** FW: Royalty 2007

Lindsay - just a follow-up - what we need is the supporting information on how the 2007 Royalty was determined. I think you call it the production commission statement. We need it for 2007 as well as 2006 please. It appears that our Royalty has dropped dramatically from the past and would like to try and understand..

Regards,

Jerry Bird
Slush Puppie Brands
423.728.5121
FAX 423.728.3043

---

**From:** Bird, Jerry
**Sent:** Friday, October 24, 2008 9:43 AM
**To:** 'Lindsay Kirby'
**Subject:** RE: Royalty 2007

No - we got the money..What I need is the supporting financials on how the amount was calculated.. Spreadsheet or something detailing how the money was determined... We need for our records..

Jerry Bird
Slush Puppie Brands

CONFIDENTIAL

423.728.5121
FAX 423.728.3043

---

**From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
**Sent:** Friday, October 24, 2008 9:28 AM
**To:** Bird, Jerry
**Subject:** Royalty 2007

Dear Jerry,


A payment of £35010.00 was made on 24/09/08 for the royalty for 2007.

Is this what you were looking for.

Regards,
Lindsay

CONFIDENTIAL

SP005952

## Record Information

| | | | |
|---|---|---|---|
| Control Number: | SP005951 | Control Number End Attach: | SP005952 |
| Record Type: | | Primary language: | |
| Media Type: | | Processing Folder Path: | |
| Level: | | Container name: | |
| Unified Title: | | Container ID: | |
| Primary Sort Date/Time: | | Container extension: | |

Email Metadata    **File Metadata**    Document Metadata

| | | | |
|---|---|---|---|
| **File Type:** | | **Contains Embedded Files:** | |
| **Document Extension:** | PDF | **Has Hidden Data:** | |
| **File Size:** | 570257.00 | **Has OCR Text:** | |
| **Date Created:** | 1/17/2018 9:53 AM | **Speaker Notes:** | |
| **Date Last Modified:** | 1/17/2018 9:53 AM | **Track Changes:** | |
| **Last Accessed Date/Time:** | | **Unprocessable:** | |
| **SHA1 Hash:** | | **Source Path:** | |
| **SHA256 Hash:** | | **Virtual path:** | |
| **Password Protected:** | | | |
| **File Name:** | SP005951.pdf | | |

Email Metadata    File Metadata    **Document Metadata**

| | | | |
|---|---|---|---|
| **Title:** | Microsoft Word - Document2 | **Last Printed Date/Time:** | |
| **Author:** | markp | **Last Saved Date/Time:** | |
| **Document Subject:** | | **MS Office Document Manager:** | |
| **Comments:** | | **MS Office Revision Number:** | |
| **Company:** | | **Original Author Name:** | |

# ATTACHMENT 2

**Wendsday Email Metadata**
**Received by Benesch on September 25, 2018**
**SP006268**

**From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
**Sent:** Wendsday, November 12, 2008 10:57 AM
**To:** Bird, Jerry
**Subject:** Royalty 2007

Dear Jerry,

The royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000.

On page two - A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

Is this what you need?

Regards,
Lindsay


**From:** Bird, Jerry [mailto:jbird@slushpuppie.com]
**Sent:** 11 November 2008 14:27
**To:** Lindsay Kirby <lindsay.kirby@slushpuppie.co.uk>
**Cc:** Mark Peters <mark@slushpuppie.co.uk>
**Subject:** FW: Royalty 2007

Lindsay - just a follow-up - what we need is the supporting information on how the 2007 Royalty was determined. I think you call it the production commission statement. We need it for 2007 as well as 2006 please. It appears that our Royalty has dropped dramatically from the past and would like to try and understand..

Regards,

Jerry Bird
Slush Puppie Brands
423.728.5121
FAX 423.728.3043

---

**From:** Bird, Jerry
**Sent:** Friday, October 24, 2008 9:43 AM
**To:** 'Lindsay Kirby'
**Subject:** RE: Royalty 2007

No - we got the money..What I need is the supporting financials on how the amount was calculated.. Spreadsheet or something detailing how the money was determined... We need for our records..

Jerry Bird
Slush Puppie Brands

CONFIDENTIAL

423.728.5121
FAX 423.728.3043

---

**From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
**Sent:** Friday, October 24, 2008 9:28 AM
**To:** Bird, Jerry
**Subject:** Royalty 2007

Dear Jerry,


A payment of £35010.00 was made on 24/09/08 for the royalty for 2007.

Is this what you were looking for.

Regards,
Lindsay

CONFIDENTIAL

SP006269

## Record Information

| | | | |
|---|---|---|---|
| **Control Number:** | SP006268 | **Control Number End Attach:** | SP006269 |
| **Record Type:** | | **Primary language:** | |
| **Media Type:** | | **Processing Folder Path:** | |
| **Level:** | | **Container name:** | |
| **Unified Title:** | | **Container ID:** | |
| **Primary Sort Date/Time:** | | **Container extension:** | |

### Email Metadata  |  File Metadata  |  Document Metadata

| | | | |
|---|---|---|---|
| **File Type:** | | **Contains Embedded Files:** | |
| **Document Extension:** | pdf | **Has Hidden Data:** | |
| **File Size:** | | **Has OCR Text:** | |
| **Date Created:** | 1/17/2018 9:53 AM | **Speaker Notes:** | |
| **Date Last Modified:** | 1/17/2018 9:53 AM | **Track Changes:** | |
| **Last Accessed Date/Time:** | | **Unprocessable:** | |
| **SHA1 Hash:** | | **Source Path:** | |
| **SHA256 Hash:** | | **Virtual path:** | |
| **Password Protected:** | | | |
| **File Name:** | 2008.11.12_-_LK_E_Mail_2007_Roylaty.pdf | | |

### Email Metadata  |  File Metadata  |  Document Metadata

| | | | |
|---|---|---|---|
| **Title:** | Microsoft Word - Document2 | **Last Printed Date/Time:** | |
| **Author:** | markp | **Last Saved Date/Time:** | |
| **Document Subject:** | | **MS Office Document Manager:** | |
| **Comments:** | | **MS Office Revision Number:** | |
| **Company:** | | **Original Author Name:** | |

# ATTACHMENT 3

**Wendsday Email Metadata**
**Produced by Benesch on February 19, 2020**
**SP003569**

**From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
**Sent:** Wendsday, November 12, 2008 10:57 AM
**To:** Bird, Jerry
**Subject:** Royalty 2007

Dear Jerry,

The royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000.

On page two - A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

Is this what you need?

Regards,
Lindsay

**From:** Bird, Jerry [mailto:jbird@slushpuppie.com]
**Sent:** 11 November 2008 14:27
**To:** Lindsay Kirby <lindsay.kirby@slushpuppie.co.uk>
**Cc:** Mark Peters <mark@slushpuppie.co.uk>
**Subject:** FW: Royalty 2007

Lindsay - just a follow-up - what we need is the supporting information on how the 2007 Royalty was determined. I think you call it the production commission statement. We need it for 2007 as well as 2006 please. It appears that our Royalty has dropped dramatically from the past and would like to try and understand..

Regards,

Jerry Bird
Slush Puppie Brands
423.728.5121
FAX 423.728.3043

**From:** Bird, Jerry
**Sent:** Friday, October 24, 2008 9:43 AM
**To:** 'Lindsay Kirby'
**Subject:** RE: Royalty 2007

No - we got the money..What I need is the supporting financials on how the amount was calculated.. Spreadsheet or something detailing how the money was determined... We need for our records..

Jerry Bird
Slush Puppie Brands

CONFIDENTIAL

SP003569

423.728.5121
FAX 423.728.3043

**From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
**Sent:** Friday, October 24, 2008 9:28 AM
**To:** Bird, Jerry
**Subject:** Royalty 2007

Dear Jerry,

A payment of £35010.00 was made on 24/09/08 for the royalty for 2007.

Is this what you were looking for.

Regards,
Lindsay

CONFIDENTIAL

SP003570

**Record Information**

| | | | |
|---|---|---|---|
| Control Number: | SP003569 | Control Number End Attach: | SP003570 |
| Record Type: | | Primary language: | |
| Media Type: | | Processing Folder Path: | |
| Level: | | Container name: | |
| Unified Title: | | Container ID: | |
| Primary Sort Date/Time: | | Container extension: | |

Email Metadata    **File Metadata**    Document Metadata

| | | | |
|---|---|---|---|
| File Type: | | Contains Embedded Files: | |
| Document Extension: | pdf | Has Hidden Data: | |
| File Size: | | Has OCR Text: | |
| Date Created: | 9/24/2018 12:37 PM | Speaker Notes: | |
| Date Last Modified: | | Track Changes: | |
| Last Accessed Date/Time: | | Unprocessable: | |
| SHA1 Hash: | | Source Path: | |
| SHA256 Hash: | | Virtual path: | |
| Password Protected: | | | |
| File Name: | 17NCOLOR.pdf | | |

Email Metadata    File Metadata    **Document Metadata**

| | | |
|---|---|---|
| Title: | | Last Printed Date/Time: |
| Author: | | Last Saved Date/Time: |
| Document Subject: | | MS Office Document Manager: |
| Comments: | | MS Office Revision Number: |
| Company: | | Original Author Name: |

# Appendix B

## Chronology of Events Related to History Of Working Practise

**Chronology of Events Related to History of Working Practise**

| Date | Event | Citation |
|------|-------|----------|
| April 26, 2011 | Mark Peters emails document dated February 16, 2011 and titled "History of working practice between Slush Puppie USA and Slush Puppie UK formerly Able Foods Ltd formerly Somportex Ltd" to ICEE's outside counsel, Karen Kline.<br><br>The Will Radcliff and "BJ Cork" signatures are the same in the "August 8, 2000" Appointment of Trade Mark Licence.<br><br>The name of the attachment sent to Ms. Kline is "Will & RPP history of SP USA Contrat V1.pdf" | Doc. 60-4; 73-29<br><br>*See* Attachment 1 |
| November 20, 2017, 3:31 p.m. | Mark Peters produces an altered version of the History of Working Practise by adding two entries purporting to corroborate the existence of the 2000 Appointment. The altered History, unlike the original, references an agreement between Will Radcliff and Ralph Peters in 2000 that mimics the 2000 Appointment.<br><br>Peters removes the Will Radcliff and "BJ Cork" signatures and replaces them with others so that now the signatures in this History do not look the same as those in the "2000" Appointment.<br><br>The document title of the altered History is "Microsoft Word – Will RPP history of SP USA Contrat V1.1" and the author is "markp." | Doc. 73-12 at PAGEID 1483 (showing metadata for 2017 History of Working Practise)<br><br>*See* Attachment 2 |
| November 20, 2017, 4:14 p.m. | Mark Peters sends the altered History, along with the 2000 Appointment and three other documents, to Attorney Charles Suchett-Kaye at the British law firm of RPC.<br><br>Peters misleadingly sends the email with the subject line "Slush Puppie Documents from Stephan Loos." Loos was a former assistant to and close friend of Ralph Peters, who did not like Mark Peters and who had had no dealings with him at this time. S. Loos Aug. 25, 2020 Dep. 13:13-14:17. | Doc. 73-12 at PAGEID 1453; |

| December 1, 2017 | RPC sends the altered History of Working Practise to Attorneys **Avsec** and **Zalud**, along with the 2000 Appointment and three other documents. | Doc. 73-20 at PAGEID 1557 (Document 5: A chronology setting out the history of the relationship between SPC (and its predecessors in title) and SPL). |
| --- | --- | --- |
| February 12, 2019 | SPL files this lawsuit, attaching as Exhibit D the "2000" Appointment containing the Radcliff and BJ Cork signatures from the original 2011 History. | Doc. 1-1 |
| July 5, 2019 | SPL responds to ICEE's first set of document requests, and promises to produce "documents memorializing, referred to, or otherwise relating to any of the facts set forth in the February 16, 2011 'History of working practice between Slush Puppie USA and Slush Puppie UK formerly Able Foods formerly Somportex Ltd' signed by Ralph Peters and Will Radcliff." This discovery response is signed by Attorney **Gurbach**. | Exhibit 1 to ICEE Reply Brief |
| October 11, 2019, 1:32 p.m. | SPL makes its first production of documents, consisting of about 2000 pages, but does not include either version of the History of Working Practise. | Exhibit 2 to ICEE Reply Brief |
| October 28, 2019 | ICEE substantially completes its document production, and produces ICEESPL_002454, which is the real 2011 History of Working Practise that Mark Peters emailed to ICEE's counsel in April 2011. | Exhibit 5 to ICEE Reply Brief; Doc. 60-4 |
| November 18, 2019 | SPL makes its second production of documents, consisting of about 1,500 pages, but does not include the History of Working Practise. | Doc. 73-28 |
| January 8, 2020 | ICEE's counsel writes to Attorneys Gurbach, House, and Emanuel raising deficiencies in SPL's response to ICEE's interrogatories directed to the History of Working Practise. Specifically, ICEE questions how SPL could claim to lack knowledge about the original (or | Doc. 89-5 |

| | | |
|---|---|---|
| | the lack of an original) of the History of Working Practise, given that Mark Peters had procured it and sent it to ICEE's counsel in 2011. ICEE likewise raised the issue that SPL had not identified or produced any communications relating to the History of Working Practise. | |
| January 28, 2020 | Attorney **Emanuel** responds to ICEE's January 8, 2020 communication, stating that "[a]ny responsive documents regarding the History of Working Practise will be produced." | Doc. 73-18 |
| February 19, 2020 | SPL makes its third production of documents, but does not include either version of the History of Working Practise. | Doc. 60-8 |
| July 1, 2020 | Mark Peters is deposed for the first time, and defended by Attorney **House**. Upon lengthy questioning about the History of Working Practise, he testifies that "we've got a file that's been found in Malaysia that's on its way to the United Kingdom." M. Peters July 1, 2020 Dep. 120:14-16.<br><br>Peters explains that he believes the Malaysian file contains the History of Working Practise, but says "I don't know" when asked how long the file has been in transit or what sort of courier it was sent by. M. Peters July 1, 2020 Dep. 120:24-14.<br><br>Attorney **House** remains silent, despite the fact that he still has not produced the 2017 altered version of the History of Working Practise, which is in Benesch's possession. | Doc. 74 |
| July 13, 2020 | Mark Peters' deposition continues, again defended by Attorney **House**. Despite 12 days having elapsed, Peters has no update on the Malaysian file, and no information about its whereabouts. M. Peters July 13, 2020 Dep. 359:2-360:8.<br><br>When pressed, Peters says that a maid, who he knows only as "BB," might have some | Doc. 75 |

| | | |
|---|---|---|
| | information about it.  M. Peters July 13, 2020 Dep. 360:10-24.<br><br>Attorney **House** remains silent. | |
| July 27, 2020 | ICEE's counsel follows up with Attorneys Gurbach, House, and Turk on the status of the Malaysian file, requesting an update. | Exhibit 18 to ICEE Reply Brief |
| August 5, 2020 | ICEE's counsel follows up on the July 27, 2020 email, which has still not yet been responded to. | Exhibit 19 to ICEE Reply Brief |
| August 10, 2020 | ICEE's counsel follows up yet again, having received no response from Attorneys House, Gurbach, or Turk to the July 27 email asking about the Malaysian file. | Exhibit 20 to ICEE Reply Brief |
| August 11, 2020 | Attorney **House** finally responds on the issue of the Malaysian file: "We have no additional update on the status of the package.  It has not arrived." | Exhibit 21 to ICEE Reply Brief |
| August 11, 2020 | ICEE's counsel writes back to Attorneys House, Gurbach, and Turk to inquire about the apparent disappearance of the Malaysian file: "What is the explanation for the loss of this key piece of evidence? Are you telling me that there's no record of the means by which this was sent—no tracking number, no information whatsoever?" | Exhibit 22 to ICEE Reply Brief |
| August 24, 2020 | ICEE's counsel, following a meet and confer, writes to request the status of the Malaysia binder referred to by Peters in his deposition on July 1. | Exhibit 23 to ICEE Reply Brief |
| August 24, 2020 | Attorney **House** responds to ICEE's request by saying "[w]e have no new information on the Malaysia binder." | Exhibit 24 to ICEE Reply Brief |
| August 29, 2020 | ICEE's counsel again follows up to request more information on the Malaysian file. | Exhibit 25 to ICEE Reply Brief |
| August 31, 2020 | Attorney **House** provides a no-update update: "I have no news on Malaysia." | Exhibit 26 to ICEE Reply Brief |

4

| September 15, 2020 | SPL produces a privilege log showing, among other things, receipt of the 2000 Appointment by counsel from Mark Peters.<br><br>An entry on page 8 of the log shows Peters' November 20, 2017 email to RPC's Charles Suchett-Kaye, with attachments that include the 2000 Appointment and the as-yet-still-not-produced 2017 altered version of the History of Working Practise. Benesch claims that this document is protected from discovery by the attorney-client privilege. | Doc. 73-11 at PAGEID 1426 |
|---|---|---|
| September 16, 2020 | ICEE's counsel writes to Benesch stating that Benesch's September 15, 2020 log contains more than 75 documents that "were attached to allegedly privileged emails that have not been produced and do not appear to be independently privileged," and requests their production.<br><br>ICEE's counsel's email mistakenly does not identify the History of Working Practise among the entries requested from page 8 of the log, so Benesch continues to hold it back. | Doc. 69-2 |
| September 18, 2020 | Benesch produces the nonprivileged attachments requested in defense counsel's September 16, 2020 email.<br><br>Because the History of Working Practise was not specifically listed by ICEE in its September 16 email, Benesch continues to withhold it. | Exhibit 8 to ICEE Reply Brief |
| September 20, 2020 | ICEE's counsel realizes that the September 16 email did not specifically request every non-privileged attachment. So he writes another email to Attorneys House, Turk, and Monday, indicating that "there are still attachments that are being withheld, and it is not clear the basis for doing so."<br><br>Among the documents requested are the five attachments to Peters' November 20, 2017 email to Suchett-Kaye, which include the History of Working Practise. | Doc. 89-11 |

| September 21, 2020 | Attorney **House** responds to ICEE's counsel's September 20, 2020 email, and produces for the first time the altered 2017 version of the History of Working Practise that has been in Benesch's possession for nearly three years—since December 1, 2017.<br><br>In contrast with the 2011 History, this version has an entry for 2000, quoting from the 2000 Appointment, and the signatures of Will Radcliff and "BJ Cork" have been swapped out. The metadata shows the November 20, 2017 creation date by "markp" from a Word document, just as Benesch originally received it from RPC in 2018. | Doc. 89-13 |

# ATTACHMENT 1

**History of Working Practise Metadata
Received by ICEE from Mark Peters on April 26, 2011**

**ICEESPL_002455**

# History of working practise between Slush Puppie USA and Slush Puppie UK formerly Able Foods Ltd formerly Somportex Ltd

16/02/2011

**1975**

Ralph Peters (RP) as MD of Somportex (SPUK) discovered Slush Puppie (SP) at a food exhibition in the USA.

RP met Will Radcliff (WR) – founder/owner/president of SP Cincinnati (SPC).

RP purchased 2 trial SP freezers and small amount of syrups from SPC.

SPUK had no success in trials on SP.

RP phoned to tell WR that the trial was not a success.

WR advised RP to buy 25 more freezers and syrups - he would then come to the UK and show SPUK how to succeed.

SPUK ordered the 25 Freezers, WR came to the UK.

WR advised RP in addition to selling freezers and syrup as a wholesaler to distributors for onward sale to retailers and hence the public SPUK should set up a 'Profit Share' system for their sales team to use in order to sell directly to retailers, who would then sell to the general public.

At this time SPUK proceeded on the basis of these two business models namely:

1. The Profit Share model which encompassed loaning freezers to retailers and up charging for the supply of syrup; and

2. The Distributor model which encompassed selling freezers and syrup to distributors who would then enter into their own Profit Share arrangement with their own retailers

SPC initially acted as the manufacturer who sold freezers and syrup to SPUK. SPUK then acted as a distributor to a series of smaller distributors and retailers who sold SP onward to the general public.

1 of 4

In recent years, the 'Profit Share' system has become the sole basis of how SPUK operate in the UK. SPUK's distribution network (which once saw 25 independent distributors acting and operating their own Profit Share systems in the UK) has been scaled back so that at present SPUK are the sole UK distributor of SP.

SPUK sales team with WR and RP placed all 27 freezers with syrups in London on 'Profit Share'. RP also began his attempts to develop a distribution network

RP visited WR in Cincinnati and advised SP trade mark should be registered in Europe. WR agreed.

SPUK registered the SP Trade Mark.

**1976**

SPUK purchased more freezers and syrups from SPC

RP attended SP Distributor convention in the USA.

RP visited WR in USA. WR and RP discussed whether a written contract was needed to confirm the hand-shake agreement between SPC and SPUK. RP gave WR a sheet of paper stating "I do it your way" which sufficed at this time and which was displayed on a wall behind WR's desk.

**1977**

WR advised RP that SPUK should and could manufacture syrups for the UK and Europe on an exclusive basis and in perpetuity.

SPUK sets up syrup manufacturing plant to produce syrups in UK

WR and RP agreed on royalty payments to SPC for syrups manufactured in UK and sold in Europe and all other products (Cups, T shirts, posters, pens, watches, aprons, tea towels, badges, confectionery etc) that SPUK manufacture or have manufactured which carry the SP logo will be royalty free in perpetuity

SP Trademark is transferred to SPC from SPUK based on the agreed terms referred to above

The relationship between SPC and SPUK changed when SP began manufacturing syrup in the UK. SPC now received a royalty payment in respect of the syrup manufactured by SPUK rather than SPUK purchasing syrup directly from SPC.

2 of 4

Confidential

SPUK now acted as the manufacturer in the UK, in addition to their previous role as wholesaler, supplying SP to smaller distributors and direct to retailers. SPC were no longer required to provide SP with syrup but in this period continued to supply SPUK with freezers. SP continued to account to SPC for the agreed royalty payment

RP attended SPC convention in the USA and annually thereafter.

RP visited Cincinnati advising SPUK is prepared to roll out SP across UK.

WR visited the UK to discuss business model for UK distributors/retailers

**1978**

WR visited the UK to help establish SP distributors/retailers in UK

WR & RP agree on distributors/retailers licensing principle whereby SPUK will issue exclusive area license to distributors.

WR helps on sell in to distributors/retailers in the UK.

**1979**

WR and RP agreed that SP would expand into Europe from SPUK's UK base. WR visited the UK to help establish SP distributors in Europe

WR & RP agree on distributors licensing principle whereby SPUK has sole responsibility for establishing and selling to distributors in Europe.

The 'Profit Share' system was not expanded into Europe because of the logistical problems that SPUK would have faced in implementing such a system. Instead SPUK implemented the distributor business model in Europe which saw SPUK act as the manufacturer who provided freezers and syrup to distributors in Europe. These distributors sold onto retailers, in accordance with the established Profit Share scheme, who then sold SP to the general public.

SPUK continued to pay a royalty to SPC in respect of the sales made in Europe to distributors.

WR & RP agreed that SPUK will inform SPC of the identity of the European distributors. SPC would licence the European distributors directly . The actual licence was to be prepared by SPC and sent to SPUK to issue to the appointed distributor.

Confidential

**1980**

WR & RP travel around Europe setting up SP distributors in Europe

**1981 to 1996**
WR attended annual Distributor sales conferences in Europe and helps to sell syrups, products, freezers

Signed by Ralph Peters          Date  16/2/2011

in the presence of

Signed by Will Radcliff          Date  2/22/11

in the presence of          2/22/11

4 of 4

| Email Metadata | **File Metadata** | Document Metadata |

| | |
|---|---|
| **File Type:** Adobe Portable Document Format | **Contains Embedded Files:** |
| **Document Extension:** pdf | **Has Hidden Data:** |
| **File Size:** | **Has OCR Text:** |
| **Date Created:** 4/26/2011 9:32 PM | **Speaker Notes:** |
| **Date Last Modified:** 4/26/2011 9:32 PM | **Track Changes:** |
| **Last Accessed Date/Time:** | **Unprocessable:** |
| **SHA1 Hash:** | **Source Path:** |
| **SHA256 Hash:** | **Virtual path:** |
| **Password Protected:** | |

| Email Metadata | File Metadata | **Document Metadata** |

| | |
|---|---|
| **Title:** C:\Documents and Settings\Mark.DOMAIN\My Documents\History of working.tif | **Last Printed Date/Time:** |
| **Author:** Mark | **Last Saved Date/Time:** |
| **Document Subject:** | **MS Office Document Manager:** |
| **Comments:** | **MS Office Revision Number:** |
| **Company:** | **Original Author Name:** |

# ATTACHMENT 2

**History of Working Practise Metadata
Received by RPC from Mark Peters on
November 20, 2017 and by Attorneys Avsec and Zalud
on December 1, 2017**

**Produced to ICEE on September 21, 2020 without
Bates Numbering**

# History of working practise between Slush Puppie USA and Slush Puppie UK formerly Able Foods Ltd formerly Somportex Ltd

16/02/2011

1975

Ralph Peters (RP) as MD of Somportex (SPUK) discovered Slush Puppie (SP) at a food exhibition in the USA.

RP met Will Radcliff (WR) — founder/owner/president of SP Cincinnati (SPC).

RP purchased 2 trial SP freezers and small amount of syrups from SPC.

SPUK had no success in trials on SP.

RP phoned to tell WR that the trial was not a success.

WR advised RP to buy 25 more freezers and syrups - he would then come to the UK and show SPUK how to succeed.

SPUK ordered the 25 Freezers, WR came to the UK.

WR advised RP in addition to selling freezers and syrup as a wholesaler to distributors for onward sale to retailers and hence the public SPUK should set up a 'Profit Share' system for their sales team to use in order to sell directly to retailers, who would then sell to the general public.

At this time SPUK proceeded on the basis of these two business models namely:

1. The Profit Share model which encompassed loaning freezers to retailers and up charging for the supply of syrup; and

2. The Distributor model which encompassed selling freezers and syrup to distributors who would then enter into their own Profit Share arrangement with their own retailers

SPC initially acted as the manufacturer who sold freezers and syrup to SPUK. SPUK then acted as a distributor to a series of smaller distributors and retailers who sold SP onward to the general public.

In recent years, the 'Profit Share' system has become the sole basis of how SPUK operate in the UK. SPUK's distribution network (which once saw 25 independent distributors acting and operating their own Profit Share systems in the UK) has been scaled back so that at present SPUK are the sole UK distributor of SP.

SPUK sales team with WR and RP placed all 27 freezers with syrups in London on 'Profit Share'. RP also began his attempts to develop a distribution network

RP visited WR in Cincinnati and advised SP trade mark should be registered in Europe. WR agreed.

SPUK registered the SP Trade Mark.

1976

SPUK purchased more freezers and syrups from SPC

RP attended SP Distributor convention in the USA.

RP visited WR in USA. WR and RP discussed whether a written contract was needed to confirm the hand-shake agreement between SPC and SPUK. RP gave WR a sheet of paper stating "I do it your way" which sufficed at this time and which was displayed on a wall behind WR's desk.

1977

WR advised RP that SPUK should and could manufacture syrups for the UK and Europe on an exclusive basis and in perpetuity.

SPUK sets up syrup manufacturing plant to produce syrups in UK

WR and RP agreed on royalty payments to SPC for syrups manufactured in UK and sold in Europe and all other products (Cups, T shirts, posters, pens, watches, aprons, tea towels, badges, confectionery etc) that SPUK manufacture or have manufactured which carry the SP logo will be royalty free in perpetuity

SP Trademark is transferred to SPC from SPUK based on the agreed terms referred to above

The relationship between SPC and SPUK changed when SP began manufacturing syrup in the UK. SPC now received a royalty payment in respect of the syrup manufactured by SPUK rather than SPUK purchasing syrup directly from SPC.

SPUK now acted as the manufacturer in the UK, in addition to their previous role as wholesaler, supplying SP to smaller distributors and direct to retailers. SPC were no longer required to provide SP with syrup but in this period continued to supply SPUK with freezers. SP continued to account to SPC for the agreed royalty payment

RP attended SPC convention in the USA and annually thereafter.

RP visited Cincinnati advising SPUK is prepared to roll out SP across UK.

WR visited the UK to discuss business model for UK distributors/retailers

1978

WR visited the UK to help establish SP distributors/retailers in UK

WR & RP agree on distributors/retailers licensing principle whereby SPUK will issue exclusive area license to distributors.

WR helps on sell in to distributors/retailers in the UK.

1979

WR and RP agreed that SP would expand into Europe from SPUK's UK base. WR visited the UK to help establish SP distributors in Europe

WR & RP agree on distributors licensing principle whereby SPUK has sole responsibility for establishing and selling to distributors in Europe.

The 'Profit Share' system was not expanded into Europe because of the logistical problems that SPUK would have faced in implementing such a system. Instead SPUK implemented the distributor business model in Europe which saw SPUK act as the manufacturer who provided freezers and syrup to distributors in Europe. These distributors sold onto retailers, in accordance with the established Profit Share scheme, who then sold SP to the general public.

SPUK continued to pay a royalty to SPC in respect of the sales made in Europe to distributors.

WR & RP agreed that SPUK will inform SPC of the identity of the European distributors. SPC would licence the European distributors directly. The actual licence was to be prepared by SPC and sent to SPUK to issue to the appointed distributor.

1980

WR & RP travel around Europe setting up SP distributors in Europe

1981 to 1999
WR attended annual Distributor sales conferences in Europe and helps to sell syrups, products, freezers. RP and SL visit WR - SP Cincinnati each year

2000 - End 2000
WR and RPP agree that all merchandising and any sub licensing, brand, protection, exclusive manufacturing rights and the right to use the trade mark Slush Puppie as Slush Puppie Ltd see fit for all of the UK, Southern Ireland and Europe have been vested to Slush Puppie Ltd for in perpetuity, in return for a revised royalty payment that is to be an amount proportionally equal to 2.5% of the cost of Slush Puppie syrups in pounds sterling prices to distributors in the UK for the previous calendar year

2001
Slush Puppie Corporation is Sold to Dr Pepper/Seven Up Inc

Signed by Ralph Peters                    Date  06/2/2011

in the presence of

Signed by                                 Date  2/22/11

in the presence of                              2/22/11

4 of 4

## Record Information

| | | | |
|---|---|---|---|
| **Control Number:** | REL0000000007 | **Control Number End Attach:** | REL00000( |
| **Record Type:** | Edoc | **Primary language:** | |
| **Media Type:** | application/pdf | **Processing Folder Path:** | \20210319 |
| **Level:** | 1 | **Container name:** | |
| **Unified Title:** | Hisoty of Working Practice.pdf | **Container ID:** | 0 |
| **Primary Sort Date/Time:** | 11/20/2017 3:31 PM | **Container extension:** | |

Email Metadata | **File Metadata** | Document Metadata

| | | | |
|---|---|---|---|
| **File Type:** | Adobe Portable Document Format | **Contains Embedded Files:** | No |
| **Document Extension:** | PDF | **Has Hidden Data:** | |
| **File Size:** | 298006.00 | **Has OCR Text:** | Yes |
| **Date Created:** | 11/20/2017 3:31 PM | **Speaker Notes:** | |
| **Date Last Modified:** | 11/20/2017 3:31 PM | **Track Changes:** | |
| **Last Accessed Date/Time:** | | **Unprocessable:** | No |

**SHA1 Hash:** 1A1FFF67397A16318E977A2D1F500A0E70B09B880210319

**SHA256 Hash:** 60A09D5430D8EC38CEB6491F6A0784E401B920B0439507AAC9A9C6C7D97

**Password Protected:**

**File Name:** Hisoty of Working Practice.pdf

Email Metadata | File Metadata | **Document Metadata**

| | | | |
|---|---|---|---|
| **Title:** | Microsoft Word - Will RPP history of SP USA Contrat V1.1 | **Last Printed Date/Time:** | |
| **Author:** | markp | **Last Saved Date/Time:** | |
| **Document Subject:** | | **MS Office Document Manager:** | |
| **Comments:** | | **MS Office Revision Number:** | |
| **Company:** | | **Original Author Name:** | |