IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

                    Plaintiff,

        v.

THE ICEE COMPANY,

                    Defendant.

CASE NO. 1:19-cv-00189-MRB

Judge Michael R. Barrett

**THE ICEE COMPANY'S MOTION FOR SUMMARY JUDGMENT ON SPL'S
TWELFTH CLAIM FOR RELIEF IN ITS AMENDED AND SUPPLEMENTAL
<u>COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION......................................................................................1

II.     RELEVANT UNDISPUTED FACTS........................................................3

     A.     SPL Agrees to the 1996 and 1999 Agreements ................................... 3

     B.     ICEE Buys the SLUSH PUPPiE Business and SPL Refers to the 1996 and 1999 Agreements as Being the Ones Governing the Parties' Relationship ........... 6

     C.     SPL Claims That the 2000 Appointment of Trademark Licence Supersedes the 1996 and 1999 Agreements and then Sues ICEE on It ................ 7

     D.     SPL Admits That the Wendsday Email, History of Working Practise, and 2000 Appointment Are "not Genuine Documents" ............................................. 9

     E.     The Discovery Conference and Request for Briefing .........................................10

III.    ARGUMENT........................................................................................10

     A.     Summary Judgment Standard ..........................................................................10

     B.     The Provisions in the 1996 and 1999 Agreements Permitting ICEE to Terminate if It Is Sued by SPL Are Clear and Unambiguous...............................11

     C.     Characterizing Termination as "Wrongful" or "Bad Faith" Does not Override the Agreements' Express Power of Termination...................................12

     D.     SPL Cannot Claim Now That the 1996 and 1999 Agreements Are Unconscionable ................................................................................................15

     E.     This Court Should Decline SPL's Invitation to Rewrite the 1996 and 1999 Agreements..........................................................................................................18

IV.    CONCLUSION......................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp. 3d 764 (S.D. Ohio
2016) ............................................................................................................... 11-12

*Blue Water Imports, Inc. v. Strickrath*, 552 F. Supp. 3d 762 (S.D. Ohio 2021) ......................... 10

*Cardinal Stone Co., Inc. v. Rival Mfg. Co.*, 669 F.2d 395 (6th Cir. 1982) .......................... *Passim*

*Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir. 1979) ................ 13-14, 16

*Gaib Equipment Co. v. J.I. Case Co.*, 875 F.2d 863 (6th Cir. 1989) ................................. *Passim*

*Jackson v. Gen. Elec. Aviation*, 518 F. Supp. 3d 1104 (S.D. Ohio 2021) ................................... 11

*MJR Int'l, Inc. v. Am. Arbitration Ass'n*, 596 F. Supp. 2d 1090 (S.D. Ohio 2009) ............... 11-12

*Smith v. Continental Casualty Co.*, 425 F. Supp. 3d 908 (S.D. Ohio 2019)
(Barrett, J.) ..................................................................................................... 10-12

**State Cases**

*Bank of New York Mellon v. Rhiel*, 122 N.E.3d 11219 ............................................................. 16

*Beverage Holdings, L.L.C. v. 5017 Lombardo, L.L.C.*, 150 N.E.3d 28 (Ohio 2019) ................. 11

*Brondes Ford, Inc. v. Habitec Sec.*, 38 N.E.3d 1056 (Ohio Ct. App. 2015) .............................. 15

*Caley v. Glenmoor Country Club, Inc.*, 1 N.E.3d 471 (Ohio Ct. App. 2013)....................... 11, 15

*Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294 (Ohio Ct. App. 1993) ................. 15, 18

*Hamilton Ins. Serv.*, 714 N.E.2d at 901 .................................................................................... 19

*Oldendick v. Crocker*, 70 N.E.3d 1033 (Ohio Ct. App. 2016) ............................................ 11, 15

*Taylor Bldg. Corp of Am. v. Benfield*, 884 N.E.2d 12 (Ohio 2008)................................... *Passim*

*Tecco v. Iconic Labs*, 2022 Ohio 2041 (Ohio Ct. Apls 2022) ................................................... 16

## I.    INTRODUCTION

On February 19, 2019, Slush Puppie Limited ("SPL") sued ICEE under a 2000
Appointment of Trademark License, Doc. 2 Exh. D. The complaint alleged that the parties'
1996 Manufacturing Appointment and 1999 Distributor Agreement had been superseded by the
2000 Appointment, and that it (and not the 1996 and 1999 agreements) governed the parties'
"rights, duties, and obligations."  Doc. 2 at PAGEID 105. Contrary to the parties' 1999
Distributor Agreement, which defined the "Territory" as only the U.K. and Ireland, SPL claimed
that it had exclusive rights to use the SLUSH PUPPiE® trademarks throughout Europe. *Id*. at
PAGEID 105-106. SPL's complaint sought to enjoin ICEE from allowing any third parties to
use the SLUSH PUPPiE trademarks in the "2000 Territory," i.e., throughout Europe as well as
the U.K. and Ireland. *Id*. at 107-108. The complaint also accused ICEE of "deceptive trade
practices," including "causing a likelihood of confusion as to source." *Id.* at 109-110.

On June 25, 2019, ICEE terminated the 1996 and 1999 agreements pursuant to the
provisions in both contracts giving ICEE the right to do so when sued by SPL. Notwithstanding
these clear and unambiguous termination provisions, SPL's Amended and Supplemental
Complaint as well as its proposed Second Amended Complaint (SAC) allege that ICEE's
termination of these agreements "is contrary to law," is in "bad faith," and is "wrongful." Doc.
27 at PAGEID 378; Doc. 72 at PAGEID 1205. SPL argues that "because SPL sought to enforce,
among other things, its right to exclusive use of the SLUSH PUPPIE Trademark" under the ***2000
Appointment***, ICEE was not permitted to terminate the ***1996 and 1999*** agreements. The theory
makes no sense because, in fact, at the time that ICEE terminated the 1996 and 1999 agreements,
SPL had not sued on them, but instead on the 2000 Appointment. Moreover, it is difficult to
understand how ICEE's termination could be "wrongful" or in "bad faith" when SPL itself

thought the termination was "a nullity," *id.* at PAGEID 379, because the agreements were not in effect, having been "superseded" by the 2000 Appointment.

Common sense and logic aside, Ohio law is clear that a party has a right to enforce the terms of clear and unambiguous termination provisions. SPL does not and cannot dispute that both the 1996 and 1999 agreements provide ICEE with the right to terminate if SPL sues ICEE for any reason (other than "on account"). Even if it could somehow be considered "wrongful" or in "bad faith" to terminate contracts that one's counterparty believes have already been terminated, that is not a valid legal basis for finding the terminations ineffective. Under Ohio law, the question of "bad faith" termination of a contract is subsumed within the question of whether the contract is unconscionable, and the concept of "good faith" may not be used "to override an express power of termination." *Cardinal Stone Co., Inc. v. Rival Mfg. Co.*, 669 F.2d 395, 396 (6th Cir. 1982). SPL has not alleged that the 1996 and 1999 agreements are unconscionable, nor could it, since, six months after termination, it asserted claims under those same contracts. But even if it had alleged unconscionability, SPL cannot meet either of the two prerequisites for establishing it. *Taylor Bldg. Corp of Am. v. Benfield*, 884 N.E.2d 12, 20 (Ohio 2008) (party claiming unconscionability bears burden of proving that agreement is both procedurally and substantively unconscionable). Because unconscionability is an issue of law, *id.,* ICEE is entitled to summary judgment on SPL's Twelfth Claim for Relief, and any liability or damages theories based on its position that the 1996 and 1999 agreements remained in effect after ICEE's termination on June 25, 2019.[1]

---

[1] In the event that the Court grants SPL's motion to amend, Doc. 72, ICEE would be entitled to summary judgment on SPL's Eighth Claim for Relief of the proposed SAC since that claim's allegations are identical.

## II.     RELEVANT UNDISPUTED FACTS

### A.     SPL Agrees to the 1996 and 1999 Agreements

The 1996 Appointment of Syrup Manufacturer ("1996 Manufacturing Appointment") is between Able Foods Ltd. (called "Manufacturer"), now known as Slush Puppie Limited, and Slush Puppie Corporation (the Cincinnati entity founded by Will Radcliff).  Am. Cmplt. Doc. 27 at PAGEID 362 ¶ 12 & its Exh. B; Doc. 72 at PAGEID 1188.[2]  Under the Manufacturing Appointment, Slush Puppie Corporation "appointed Able Foods to certain European countries including the U.K. and Ireland ('1996 Territory') as Able Foods' primary area of manufacturing and sales responsibility for SLUSH PUPPiE products."  Am. Cmplt. Doc. 27 at Exh. B, PAGEID 393.  The appointment grants SPL "the limited use of SLUSH PUPPiE formulas, recipes and processes, which shall remain trade secrets and the exclusive property of SLUSH PUPPiE for the purpose of manufacturing neutral base and syrup."  *Id.* at its Exh. B at PAGEID 393.  The appointment "is subject to and conditioned upon the Manufacturer's continued performance meeting the standards of SLUSH PUPPIE for quality and performance quotas . . . ."  *Id.*  The appointment also provides that SPL "shall not manufacture, bottle, distribute, or sell directly or indirectly, any other product for use in Slush machines not promoted by SLUSH PUPPIE" and that it "shall continually use its primary and best efforts" to fill all orders for, and deliver product to, SLUSH PUPPIE authorized customers . . . ."  *Id.*

The Manufacturing Appointment further provides that SLUSH PUPPIE Corporation is the registered owner of the trademark "SLUSH PUPPIE."  Doc. 27 at PAGEID 395 ¶ (11).  Accordingly, upon termination, "Manufacturer shall immediately cease using said SLUSH

---

[2] ICEE cites to the proposed SAC to make clear that, even if the Court grants SPL's motion to amend, the SAC would contain the same allegations supporting a finding of no genuine issue of material fact as to the effectiveness of ICEE's termination.  By so doing, ICEE does not waive its position that the motion to amend should be denied.

PUPPIE trademarks or designs, . . . tradenames, signs, emblems, insignias, symbols . . . or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever . . . ." *Id.* Moreover, upon termination, "any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products." *Id.*

The appointment sets forth several grounds upon which Slush Puppie Corporation can terminate, including failure to perform, sale of the business without consent, discontinuance of production of a product for 30 days, failure to adequately supply customers, and bankruptcy. *Id.* at its Exh. B at PAGEID 394-395, § (8)(A)-(E). Most germane is the following:

> (8) This appointment is perpetual, however, in addition to any and all rights and remedies Slush Puppie [Corporation] may cancel and terminate this appointment by written notice to Manufacturer for any one of the following reasons: ….
>
> D. . . . The filing of any legal action other than for collection on account against SLUSH PUPPIE, its representatives, distributors, customers, manufacturers, or suppliers . . . .

*Id.* at its Exh. B at PAGEID 395. In other words, unless the legal action is for "collection on account," any type of lawsuit brought by SPL gives ICEE the right immediately to terminate.

The Manufacturing Appointment contains an integration clause. *Id.* at Exh. B PAGEID 397 ¶ (22). It was signed on behalf of Able Foods by Ralph Peters and on behalf of Slush Puppie Corporation by Will Radcliff on February 5, 1996. *Id.* at PAGEID 398. Far from there being any "coercion or force to enter the contract," which a party alleging unconscionability must prove, *Gaib Equipment Co. v. J.I. Case Co.*, 875 F.2d 863 (6th Cir. 1989), Will Radcliff was a "close personal friend" of Ralph Peters. Indeed, they often traveled around Europe together in Mr. Radcliff's Lear Jet. Exh. A, R. Peters Dep. at 26:4-27:1.

Almost four years later, on December 12, 1999, Ralph Peters' son Mark Peters—who was then the managing director of the parent company that wholly owns SPL, https://find-and-

update.company-information.service.gov.uk/officers/sDuyQJcd-aTlBj5hokAKxnwzpg/appointments--signed the 1999 Distributor Agreement between Slush Puppie Corporation ("COMPANY") and SPL ("DISTRIBUTOR"). Doc. 27 at its Exh. C. The agreement provided SPL with the exclusive right to use the SLUSH PUPPiE name for promoting and distributing "Products," as defined, in the "Territory," limited to the U.K. and Ireland. *Id*. at PAGEID 401. SPL agreed to "vigorously promote the sale . . . of the PRODUCTS in the TERRITORY and to develop a qualified sales and service force for the PRODUCTS in important commercial centers of the TERRITORY." *Id*. at PAGEID 402. SPL also agreed to keep "COMPANY" "regularly informed of [its] operating and sales activities relating to the PRODUCTS, and to furnish COMPANY . . . descriptions of any novel applications or modifications of the PRODUCTS." *Id*. 402. The Distributor Agreement provides that Slush Puppie Corporation owns the SLUSH PUPPiE trademarks and that SPL is "absolutely prohibited" from using them or the logo unless approved in writing. *Id*. at PAGEID 403. Like the Manufacturing Appointment, the agreement contains an integration clause. *Id*. § VII.

The Distributor Agreement sets forth various bases for termination by "COMPANY" subject to notice and an opportunity to cure. *Id*. at PAGEID 404, § VIII C & D. The agreement also lists grounds for immediate termination without opportunity to cure, including filing for bankruptcy and inability to pay debts to Slush Puppie Corporation. *Id*. at § VIIIF. Like the Manufacturing Appointment (but without the exception for an action "for collection on account"), the agreement provides that the "Company may, for good cause, IMMEDIATELY terminate" Distributor upon written notice "where DISTRIBUTOR has committed or COMPANY reasonably anticipates that DISTRIBUTOR is about to commit . . . 4. The filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives,

5

DISTRIBUTORS, manufacturers or suppliers . . . ." *Id.* at VIII F 4.  The Distributor Agreement expressly provides that SPL waives the right to any compensation for "build-up of Territory" or "recoupment of investment," because any such investment "is done at DISTRIBUTOR's risk." *Id.* at Section I.

There is no drafting history in the summary judgment record regarding either of these agreements. ICEE's May 21, 2019 set of requests for production of documents sought "[a]ll documents relating to agreements between You and owners of the Slush Puppie brand before ICEE," Exh. B at 7, but SPL has produced no documents relating to the negotiation of either agreement—no drafts and no pre-execution communications between the parties. Moreover, Ralph Peters testified in February 2020 that he could not remember anything about any documents from ten or more years before his deposition.  Exh. A, R. Peters Dep. at 11:19-28:7. Mark Peters agreed at his deposition that he had signed the 1999 agreement, but he did not help negotiate it and he did not know who did. Doc. 74, M. Peters July 1, 2020 Dep. at 131:19-24.

**B.    ICEE Buys the SLUSH PUPPiE Business and SPL Refers to the 1996 and 1999 Agreements as Being the Ones Governing the Parties' Relationship**

In 2001, Dr Pepper/Seven Up purchased the SLUSH PUPPIE trademarks and related business from Slush Puppie Corporation.  Am. Complaint, Doc. 27 at PAGEID 356, ¶ 34.  Slush Puppie Corporation assigned all of its right, title and interest to the SLUSH PUPPiE trademarks to Dr Pepper. *Id.* at ¶ 35.  In 2006, ICEE bought from Dr Pepper the SLUSH PUPPiE trademarks and business and became obligated under the 1996 Manufacturer Appointment and 1999 Distributor Agreement. *Id.* at PAGEID 357.  ICEE thereby acquired all right, title, and interest to the SLUSH PUPPiE trademarks. *Id.*

After ICEE acquired the SLUSH PUPPiE brand, SPL repeatedly referred ICEE to the terms of the 1996 and 1999 agreements.  For example, on July 27, 2009, Mark Peters sent

ICEE's Dan Fachner the 1996 Manufacturing Appointment and the 1999 Distributor Agreement, noting that the latter "only covers the United Kingdom and Ireland" and not European countries. Doc. 60-1 at PAGEID 977. And on April 4, 2010, Peters sent Fachner the Manufacturing Appointment, noting that, under it, "we have been appointed primary area of manufacturing and sales responsibility" in the defined territory, and paraphrasing various of its provisions. Doc. 60-2 at PAGEID 996 ("I am not sure if you have a copy of the manufacturing agreement. Please see attached."). Years later, SPL's counsel described the "Existing Agreements" between the parties as being the 1996 and 1999 agreements. Doc. 60-3 at PAGEID 1008. Similarly, on January 10, 2017, SPL's Alan Beaney described "the Slush Puppie contractual arrangements in Europe" as being the same agreements. Doc. 73-9 at PAGEID 1384 & 1385.

### C.     SPL Claims That the 2000 Appointment of Trademark Licence Supersedes the 1996 and 1999 Agreements and then Sues ICEE on It

On February 28, 2018, Mark Peters sent the 2000 Appointment to Dan Fachner. Doc. 60-5 at PAGEID 1021. Peters told Fachner that the 2000 Appointment "governs the arrangements between the parties" rather than the 1996 and 1999 agreements, "which were the subject of our previous discussions." *Id*. Fachner responded by noting that "[f]or the past 11 years we have had many discussions live and documented around the challenges of our agreements dated 1996 and 1999. . . . This is the first time that you have shared another contract. Where did this contract come from and why was this never produced or mentioned in the past decade?" Doc. 60-6 at PAGEID 1029. In response, SPL's counsel reiterated Peters' new position:

> The SLUSH PUPPIE APPOINTMENT OF TRADE MARK LICENCE dated August 8, 2000 . . . is the current operative agreement governing the relationship between SPL, on the one hand, and J&J Snack Foods Corp. . . . and its subsidiary The ICEE Company . . . on the other hand. . . .
>
> The 2000 Agreement, which ***supersedes all previous agreements*** between or among the parties (or their predecessors-in-interest)

7

> granted SPL the perpetual and *exclusive* use of the SLUSH PUPPIE® trademarks in connection with the manufacturing *and* distribution of SLUSH PUPPIE® products in the subject territories, including the U.K. and Europe.
>
> If you elect not to respond and/or continue to license the use of the SLUSH PUPPIE® brand in violation of our client's rights, be advised that SPL will not hesitate to seek redress *as permitted under the 2000 Agreement*.

Doc. 27-11 at PAGEID 468 (emphasis in original); Doc. 72-8.

On September 13, 2018, ICEE counsel responded, pointing out that (1) the 2000 Appointment was not among the contracts ICEE acquired from Dr Pepper, (2) Dr Pepper and ICEE had always operated under the 1996 and 1999 agreements; (3) SPL had never before mentioned the 2000 Appointment, (4) there were "serious questions" about the document's authenticity, and (5) SPL had not supported its authenticity. Doc. 73-19 at PAGEID 1541-1542.

Former Benesch attorney Matt Gurbach responded by reiterating that the 2000 Appointment "governs the relationship between" SPL and ICEE. Doc. 89-1 at PAGEID 2330. He also claimed that, under the 2000 Appointment, SPL had the exclusive right to use the SLUSH PUPPIE trademark in the U.K., Ireland, and elsewhere in Europe and that ICEE had breached that agreement. Gurbach then threatened legal action. *Id.*

On February 12, 2019, SPL made good on that threat, suing ICEE in the Hamilton County Court of Common Pleas. Doc. 2. The complaint acknowledges that the parties had entered into the 1996 Manufacturing Appointment and the 1999 Distributor Agreement,. *id.* at PAGEID 96-5, but it goes on to assert claims based solely on the 2000 Appointment, claiming that it "supersed[ed]" the 1996 and 1999 agreements. Doc. 2 at ¶ 25, PAGEID 99 (2000 Appointment "supersedes all prior manufacturing and distributor appointments, agreements or understandings between the parties" including 1996 and 1999 agreements), *id.* at ¶ 57, PAGEID 105-106 (2000 Appointment "is the contract under which SPL's and ICEE's rights duties and

obligations are governed."); *id.* at ¶ 61, PAGEID 106-107 (seeking declaration that parties' rights, duties and obligations are governed by 2000 Appointment).

On June 25, 2019, ICEE provided SPL with written notice that it was terminating the two agreements because of SPL's lawsuit. Doc. 29-6 at PAGEID 575-76. The notice quotes from the relevant termination terms of both agreements, noting that SPL had filed a legal action "other than for collection on account" against ICEE. SPL responded to this notice by claiming that the terminations were "a nullity" because the 1996 and 1999 agreements had already "been superseded by the 2000 Appointment." Doc. 29-7 at PAGEID 578. Likewise, when SPL filed its Amended Complaint in December 2019, it alleged that "ICEE's purported termination of the 1996 Appointment and the 1999 Distributor Agreement is a nullity—each has been superseded by the 2000 Appointment." Doc. 27-13 at PAGEID 475. In line with this position, Count Twelve of SPL's Amended and Supplemental Complaint seeks a declaration that ICEE's termination of the 1996 and 1999 agreements "is contrary to law and is in bad faith." Doc. 27 at PAGEID 378. Nonetheless, SPL also pled "in the alternative" claims for breach of contract under the "superseded" 1996 and 1999 agreements. *Id.* at PAGEID 367-377.

On January 27, 2020, in response to ICEE's counterclaims, SPL again alleged that the 1996 and 1999 agreements had been superseded by the 2000 Appointment and that it had no obligations under them. Doc. 32 at PAGEID 646-652. And SPL again alleged that "the purported termination" of the agreements "that were no longer effective is a nullity . . . ." *Id.* at PAGEID 646.

**D.    SPL Admits That the Wendsday Email, History of Working Practise, and 2000 Appointment Are "not Genuine Documents"**

In the fall of 2020, SPL conceded that its claims under the 2000 Appointment were "meritless," (Doc. 85 PAGEID 2176) and that "counsel for SPL [had] determined that it could no

9

longer ethically continue to prosecute" them." Doc. 82 PAGEID 2050. SPL further conceded that the 2000 Appointment was "not genuine." Doc. 85 at PAGEID 2173 n.1 & PAGEID 2176; *see also* Doc. 95 at PAGEID 2449 ("Prior to [ICEE's expert's] report, there was no evidence conclusively proving that 2000 Appointment was a forgery."). Ignoring its allegations that the 1996 and 1999 agreements were not in effect and that SPL had no obligations under them because they had been superseded by the 2000 Appointment, *see, e.g.,* Doc. 32 at PAGEID 646-652, SPL asked this Court allow it to file a second amended complaint withdrawing the claims asserted under the 2000 Appointment but permitting it to proceed with its "alternative" claims under the 1996 and 1999 agreements. Doc. 72 at PAGEID 1179, 1182.

### E.    The Discovery Conference and Request for Briefing

On September 29, 2022, the Court and parties agreed to expedited briefing on a motion for partial summary judgment regarding SPL's claim that ICEE's termination was "wrongful" and a "nullity." Doc. 174 at PAGEID 5641-5644, 24:12-27:6; Oct. 20, 2022 Minute Entry. If ICEE's termination was effective, discovery relating to ICEE's alleged breaches of the 1996 or 1999 agreements taking place after June 26, 2019 would be irrelevant.

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Smith v. Continental Casualty Co.*, 425 F. Supp. 3d 908, 910 (S.D. Ohio 2019) (Barrett, J.). Thus, "the Court may . . . grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case." *Blue Water Imports, Inc. v. Strickrath*, 552 F. Supp. 3d 762, 772

(S.D. Ohio 2021). Unconscionability is a question of law that is properly resolved at the summary judgment stage. *Caley v. Glenmoor Country Club, Inc.*, 1 N.E.3d 471, 480 (Ohio Ct. App. 2013); *Oldendick v. Crocker*, 70 N.E.3d 1033, 1041 (Ohio Ct. App. 2016). SPL bears the burden of proving unconscionability. *Id.*; *Taylor*, 884 N.E.2d at 34.

**B.     The Provisions in the 1996 and 1999 Agreements Permitting ICEE to Terminate if It Is Sued by SPL Are Clear and Unambiguous**

Under well-settled Ohio law, "if the language of a contract is plain and unambiguous, [courts must] enforce the terms as written and . . . may not turn to evidence outside the four corners of the contract to alter its meaning." *Jackson v. Gen. Elec. Aviation*, , 518 F. Supp. 3d 1104, 1112 (S.D. Ohio 2021); *Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp. 3d 764, 772 (S.D. Ohio 2016) (""Where a contract's terms are clear and unambiguous, no interpretation or construction is necessary, and terms will be given the effect called for by the plain language of the contract."). When "considering the language of a particular contractual provision, common words will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement." *Jackson*, 518 F. Supp. 3d at 1112; *Beverage Holdings, L.L.C. v. 5017 Lombardo, L.L.C.*, 150 N.E.3d 28, 31-32 (Ohio 2019) (same). "A court may not interpret what has no need of interpretation. . . . Furthermore, a contract does not become ambiguous merely because its operation may work a hardship upon one of the parties." *MJR Int'l, Inc. v. Am. Arbitration Ass'n*, 596 F. Supp. 2d 1090, 1098-99 (S.D. Ohio 2009). Moreover, "[w]here both parties are commercial enterprises, as they are here, Ohio courts presume that they possess 'a high degree of sophistication in matters of contract'" and intended the plain language of the contract to have meaning. *Aero.*, 186 F. Supp. 3d at 772. Issues relating to contract interpretation are questions of law properly resolved through summary judgment. *Smith*, 425 F. Supp. 3d at 910.

11

The 1996 Manufacturing Appointment provides that it may be terminated for "[t]he filing of any legal action other than for the collection on account against SLUSH PUPPIE [Corporation]. . . ." Doc. 27-2 at 393. The 1999 Distributor Agreement provides that Slush Puppie Corporation may immediately terminate the agreement "for good cause" upon a "filing by DISTRIBUTOR of any claim or legal action against COMPANY," or even if "Company" "reasonably anticipates that DISTRIBUTOR is about to commit" any such act. *Id.* at PAGEID 405. Other than suits for "collection on account," the language covers lawsuits alleging any type of claim. These provisions are clear, unambiguous, and require no additional interpretation to be enforced. *MJR Int'l, Inc.*, 596 F. Supp. 2d at 1098-99.

Given that these termination provisions are clear and unambiguous and both contracts contain integration clauses, extrinsic evidence "may not be considered." *Aero*, 186 F. Supp. 3d at 772. But even if extrinsic evidence were admissible, there isn't any: discovery has revealed no drafts or negotiations over any of either contract's terms. Accordingly, ICEE had the right to terminate in the event that it was sued by SPL on any ground "other than on account."

## C. Characterizing Termination as "Wrongful" or "Bad Faith" Does not Override the Agreements' Express Power of Termination

SPL has argued that ICEE's terminations were "wrongful" because ICEE allegedly breached, and then SPL "sought to enforce that breach, and [ICEE] used that as a way to terminate and that . . . was wrongful." Doc. 174 at PAGEID 5641 24:12-20; *see also* Sept. 26, 2022 Letter from E. Zalud, Esq. to Hon. M. Barrett, Exh. C (claiming that ICEE breached exclusivity provisions of the 1996 and 1999 agreements by entering into licensing agreements in 2016 and 2017; when Frozen Brothers "called out the violations," ICEE "us[ed that call out, of its own breaches, as a basis for putative termination"); Doc. 27 at PAGEID 378 (seeking

declaratory judgment that ICEE's termination "is wrongful and a nullity" and "contrary to law and in bad faith"; since ICEE allegedly breached, it was not entitled to terminate).

When deciding whether termination of a dealership agreement is effective, "the proper test [is] one of unconscionability," not whether the termination was done in "good faith." *Gaib*, 875 F.2d 863, *3. In *Gaib*, the dealer had claimed that the company had engaged in anticompetitive behavior, violated exclusive territory agreements, and breached various terms in the dealer agreements. *Id.* at *2. The dealer agreement at issue permitted either party to terminate for any reason on 90 days' notice. Notwithstanding the fact that the dealer's claims against the company had not been resolved, the company gave notice of termination. *Id.* at *2. The district court granted summary judgment in favor of the company. *Id.* *3. On appeal, Gaib argued that he should have been able to present evidence to the fact finder that the termination was not done in good faith. *Id.* at *3. The Sixth Circuit found this argument "unpersuasive," noting that *Cardinal Stone Co., Inc. v. Rival Mf'ng Co.*, 669 F.2d 395 (6th Cir. 1979), had "explicitly rejected the requirement of good faith in dealer termination clauses, finding instead that the proper test was one of unconscionability," and citing with approval the Fifth Circuit's decision in *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir. 1979).

*Cardinal Stone* dealt with the question of whether the concept of "good faith" could "override an express power of termination." 669 F.2d at 396. In *Cardinal Stone*, the contractual arrangement involved twenty-two purchase orders. *Id.* at 396. Rival cancelled the last eight orders under a provision that gave it the right to terminate any purchase order at any time. *Id.* Cardinal argued that the principal of "good faith" precluded Rival from arbitrarily terminating the orders. *Id.* The district court rejected this position "as a matter of law," entering judgment for Rival. On appeal, the Sixth Circuit agreed, holding that, from the outset, "Cardinal was on

13

notice that Rival had the unilateral right to terminate at anytime." 669 F.2d at 396. The court further found that, by signing the agreement with such unambiguous terms, Cardinal "accepted this risk when it signed the agreement." *Id*. Accordingly, "Cardinal cannot be heard to complain of Rival's exercise of a right which Cardinal expressly relinquished." In closing, the Sixth Circuit again cited *Corenswet* with approval, ruling that "[t]he terms of paragraph 18 are unambiguous and must be given their plain and ordinary effect." *Id*. at 396-97.

*Corenswet* dealt with distributorship contracts of indefinite duration, like the 1999 Distributor Agreement. Judge Wisdom canvassed the law regarding whether to "read a good faith limitation into termination clauses of distributorship contracts that permit termination without cause." 594 F.2d at 137-38. The Fifth Circuit concluded that the "better approach" is to determine whether the disputed clause is unconscionable. *Id*. at 138. "Since a termination without cause will almost always be characterizable as a 'bad faith' termination, focus on the terminating party's state of mind will always result in the invalidation of unrestricted termination clauses. We seriously doubt, however, that public policy frowns on any and all contract clauses permitting termination without cause. Such clauses can have the salutary effect of permitting parties to end a soured relationship without consequent litigation." *Id*. at 139. Accordingly, the court concluded that "[w]hen a contract contains a provision expressly sanctioning termination without cause there is no room for implying a term that bars such a termination." *Id*. at 138.

*Gaib*, *Cardinal Stone*, and *Corenswet*, then, all stand for the proposition that principles of "good faith" or "bad faith" do not provide a legal basis to "override an express power of termination." *Cardinal Stone*, 669 F.2d at 396. Parties that sign agreements providing their counterparty with the right to terminate "cannot be heard to complain" of their counterparty's "exercise of a right which [they had] expressly relinquished." *Id*. at 396. The proper test, and

14

the only test for measuring whether a clear contractual termination provision is enforceable, is one of unconscionability. *Gaib,* 875 F.2d 863, *3. SPL cannot meet that test based on the undisputed facts.

### D.     SPL Cannot Claim Now That the 1996 and 1999 Agreements Are Unconscionable

The party claiming unconscionability must "allege and prove" both procedural and substantive unconscionability. *Taylor*, 884 N.E.2d at 20; *Caley*, 1 N.E.3d at 480; *Oldendick*, 70 N.E.3d at 1041. Unconscionability is largely reserved for protecting consumers—not commercial entities. *See Brondes Ford, Inc. v. Habitec Sec.*, 38 N.E.3d 1056, 1082 (Ohio Ct. App. 2015). Indeed, "[i]n commercial settings, courts rarely find unconscionability." *Id.*

Substantive unconscionability relates to "unfair and unreasonable terms," while procedural unconscionability relates to the "individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294, 1299 (Ohio Ct. App. 1993). Thus, in determining "whether a commercial contract provision is unconscionable, courts will examine, as in consumer transactions, the harshness of the terms of the contract and the relative bargaining positions and experience of the parties, although the commercial plaintiff is held to a higher standard than the ordinary consumer." *Brondes Ford, Inc.*, 38 N.E.3d at 1082. "One of the necessary elements of unconscionability in dealer termination clauses is coercion or force to enter the contract." *Gaib*, 875 F.2d 863, * 3.

SPL cannot meet either prong. First, it has never alleged unconscionability. *Oldendick*, 70 N.E.3d at 1041. Not only has SPL never made any such allegation, it has sued ICEE on both contracts. To assert a claim under a contract is to assert that there *was* a "voluntary meeting of the minds" (*id.*, *Collins*, 621 N.E.2d at 1299)—no contract is enforceable without it. "In order to

15

form any contract, there must be a meeting of the minds of the parties regarding the contract's essential terms . . . ." *Bank of New York Mellon v. Rhiel*, 122 N.E.3d 11219; *Tecco v. Iconic Labs*, 2022 Ohio 2041 (Ohio Ct. Apls 2022). SPL cannot on the one hand assert claims based on the premise that the 1996 and 1999 agreements are binding and reflect a "voluntary meeting of the minds" while simultaneously arguing the opposite. SPL's assertion of claims for breach of the 1996 Appointment and 1999 Agreement preclude it from arguing that those agreements are unconscionable. Thus, as a matter of law, SPL could not meet the procedural unconscionability prong even if it had alleged it.

Second, there is no evidence of "coercion or force to enter the contract[s]." *Gaib*, 875 F.2d 863, *3. Both Ralph and Mark Peters are ultra-wealthy individuals who have owned a thriving business with tens of millions of dollars in yearly turnover spanning numerous countries and offering many products other than Slush Puppie.

As for substantive unconscionability, the courts in *Gaib*, *Cardinal Stone*, and *Corenswet* held that termination clauses permitting termination for *any* reason at any time were not unconscionable. Here, the provisions in question permit termination based on the manufacturer/distributor suing the company, which is a very good reason to terminate, especially in a licensing arrangement. Where the distributor sues the company, termination "can have the salutary effect of permitting parties to end a soured relationship . . ." *Corenswet*, 594 F.2d at 139. Moreover, numerous terms in both contracts require cooperation and candid communication Doc. 27 at Exh. B ¶ (7) ("Manufacturer will at all times cooperate to the fullest . . ."); ¶ 12 (prohibiting divulging of trade secrets); Doc. 27 at Exh. C § IV. C (Distributer agrees to keep Company regularly informed of operating and sales activities): D (requiring Distributor to cooperate), X (confidentiality), XI (Distributor agrees not to sell directly competitive items), as

16

well as trust on the part of the company that the exclusive licensee is properly presenting the brand, and these are goals that one might reasonably consider to be jeopardized when the distributor sues the company. After all, litigation only ensues when the parties have been unable to work out the dispute that ends up being the subject of the lawsuit.

Indeed, this case is the poster child for why provisions permitting termination where the dealer sues the company are not unreasonable. While termination is appropriate regardless of whether Mark Peters forged the Wendsday Email, History of Working Practise, or 2000 Appointment, SPL has admitted and it is undisputed that they are "not genuine." It is undisputed as well that the lawsuit filed by SPL was "meritless," Doc. 85 PAGEID 2176, so much so that "counsel for SPL [had] determined that it could no longer ethically continue to prosecute claims under the 2000 Agreement," Doc. 82 PAGEID 2050. The plain language of both agreements clearly gives ICEE the right to terminate them in the case of *meritorious* lawsuits based on *genuine* agreements. *A fortiori* it is not unreasonable to have the right to terminate a complex relationship where one has questions about the authenticity of the agreement upon which the dealer or manufacturer has based their lawsuit. If termination without cause is not unconscionable, termination based on a "meritless" lawsuit certainly is not either. Where the parties have unambiguously agreed to give the licensor the right to terminate when the licensee sues the licensor, the licensor certainly should not be forced to stay in the relationship throughout the litigation and thereafter.

Moreover, the complaint filed by SPL in February 2019 alleged that the 1996 and 1999 agreements had been superseded and that the 2000 Appointment, and not the 1996 or 1999 agreements, governed the parties' obligations. Doc. 2 ¶ 25, PAGEID 99, ¶ 57, PAGEID 105-106; ¶ 61, PAGEID 106-107. It is not unreasonable to have the right to terminate a perpetual

17

manufacturing and distributorship relationship where the distributor/manufacturer has told you repeatedly and in no certain terms that it is not obligated to comply with the real agreements because they have been "superseded" by an agreement of questionable authenticity. Indeed, SPL's filing, at the very least, amounted to a repudiation of the territory restrictions (the UK and Ireland) in the 1999 Agreement, since it asserted the right under the 2000 Appointment to use the SLUSH PUPPiE trademarks in all of Europe, which is not permitted under the 1999 Agreement. Again, where the parties have agreed that the licensor can terminate if sued by the distributor, the licensor should not be forced to stay in a relationship with a party that has renounced the parties' true agreements. The termination clauses are clearly "commercially reasonable" and not unconscionable as a matter of law. *Click Camera*, 621 N.E.2d at 1299-1300; *Taylor Bldg.*, 884 N.E.2d at 20 (determination of whether contract is unconscionable is issue of law).

### E. This Court Should Decline SPL's Invitation to Rewrite the 1996 and 1999 Agreements

As noted, SPL argues that because ICEE allegedly breached the 1996 and 1999 agreements and SPL then "called out the violations," ICEE could not terminate after SPL sued it on the 2000 Appointment. As noted, SPL has not pled unconscionability, and thus has never articulated in a pleading what it believes was unconscionable about termination of the 1996 and 1999 agreements. But, based on its letter to the Court and arguments during a discovery conference, the theory seems to be that once SPL claimed that ICEE had violated the agreements, ICEE was never allowed to terminate them, even if sued by SPL on a "not genuine" document that SPL was claiming had "superseded" the 1996 and 1999 agreements. Doc. 174 at PAGEID 5641 24:12-20; Sept. 26, 2022 Letter from E. Zalud, Esq. to Hon. M. Barrett, Exh. C; Doc. 27 at PAGEID 378 (seeking declaratory judgment that ICEE's termination "is wrongful and

a nullity" and "contrary to law and in bad faith"; since ICEE allegedly breached, it was not entitled to terminate).

The short answer to this is that the termination provisions do not make any exception for such situations. The plain language permits termination by ICEE in the event it is sued for anything—including breach of contract of the 1996 and 1999 agreements—other than (in the case of the 1996 Appointment) for collection on account. Of course, SPL did not sue ICEE on those agreements; it asserted "meritless" claims based on the "not genuine" 2000 Appointment. But even if SPL had sued on the genuine agreements, the point is that the language "any legal action" in both agreements does not admit of any exceptions. So even if it were correct that ICEE had breached the 1996 or 1999 agreements, it still had the right to terminate in the event that SPL filed "any claim or legal action" against ICEE. SPL would like that language to read "any claim or legal action *except when ICEE breached[3] before such action was filed*," but that is not what it says. Courts "cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract." *Hamilton Ins. Serv.*, 714 N.E.2d at 901. When it signed the agreements, SPL "accepted this risk" that, if it sued, ICEE could terminate, and ICEE was free to exercise that right to terminate. *Cardinal Stone*, 669 F.2d at 396.

## IV.    CONCLUSION

For the foregoing reasons, ICEE respectfully requests that the Court enter summary judgment on SPL's Twelfth Claim for Relief, or, in the alternative, the SAC's Eighth Claim for Relief, precluding any claims or damages based on the 1996 Manufacturing Appointment or the 1999 Distributor Agreement after they were terminated on June 25, 2019.

---

[3] Of course, ICEE did not breach, but this Court need not resolve that issue on this motion.

Dated: October 21, 2022        Respectfully submitted,

**DUANE MORRIS LLP**

BY:  /s/David J. Wolfsohn
David J. Wolfsohn (*admitted pro hac vice*)
Tyler R. Marandola (*admitted pro hac vice*)
30 South 17th Street
Philadelphia, PA 19103
Tel.: (215) 979-1000
Fax: (215) 979-1020
djwolfsohn@duanemorris.com
tmarandola@duanemorris.com

Kenneth M. Argentieri (Ohio Bar No. 0067493)
Trial Attorney
600 Grant St., Ste. 5010
Pittsburgh, PA 15219
Tel.: (412) 497-1000
Fax: (412) 497-1001
kmargentieri@duanemorris.com

*Attorneys for Defendant, The ICEE Company*

## CERTIFICATE OF SERVICE

I, David J. Wolfsohn, hereby certify that on this 21st day of October, 2022, I served a true and correct copy of the foregoing to all counsel of record by ECF filing.

/s/David J. Wolfsohn
David J. Wolfsohn