**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

Slush Puppie Limited,

      Plaintiff/Counterclaim Defendant,      Case No. 1:19-cv-189

             v.                    Judge Michael R. Barrett

The ICEE Company,

      Defendant/Counterclaim Plaintiff.

<u>**OPINION & ORDER**</u>

This matter is before the Court on Defendant The ICEE Company's Motion (Doc. 175) for Summary Judgment on SPL's Twelfth Claim for Relief in its Amended and Supplemental Complaint[1]. SPL filed a memorandum in opposition (Doc. 177), to which ICEE replied (Doc. 179). The Court held oral argument on February 6, 2023 and, ruling from the bench, granted ICEE's Motion. (*See* 02/07/2023 Minute Entry and NOTATION ORDER). This Opinion & Order is entered pursuant to Fed. R. Civ. P. 56(a) ("The court should state on the record the reasons for granting or denying the motion [for summary judgment or partial summary judgment].").

## I.    BACKGROUND FACTS

**The parties.** Plaintiff Slush Puppie Limited ("SPL") is a private limited company organized under the laws of England and Wales, with its principal place of business in High Wycombe, Buckinghamshire, England. (Doc. 27 PAGEID 350 ¶ 1; Defendant The ICEE Company's Counterclaims to the Amended Complaint, Doc. 29 PAGEID 497 ¶ 1). Defendant The ICEE Company ("ICEE") is an American corporation organized

---

[1] (Doc. 27).

under the laws of the State of Delaware with its principal place of business located in La Vergne, Tennessee.  (Doc. 29 PAGEID 497 ¶ 2).

**1996 Manufacturing Appointment.** The 1996 Appointment of Syrup Manufacturer ("1996 Manufacturing Appointment") is between Slush Puppie Corporation ("SPC") and Able Foods Ltd. ("Manufacturer"), later known as Slush Puppie Limited[2].  (Doc. 27-2).  The appointment grants SPL "THE LIMITED USE OF [SPC] FORMULAS, RECIPES AND PROCESSES, WHICH SHALL REMAIN TRADE SECRETS AND THE EXCLUSIVE PROPERTY OF [SPC] FOR THE PURPOSE OF MANUFACTURING NEUTRAL BASE AND SYRUP."  (*Id.* PAGEID 393 (recitals)).   The appointment is exclusive (to a list of 27 European countries, including the United Kingdom) and  "is subject to and conditioned  upon the Manufacturer's continued performance meeting  the standards of [SPC] for quality  and performance quotas[.]" (*Id.* PAGEID 393 ¶ (1)).   The appointment  also provides that SPL "shall  not manufacture, bottle, distribute, or sell directly or indirectly, any other product for use in Slush machines not promoted  by [SPC]" and that it "shall continually use its primary and best efforts . . . to fill all orders for, and deliver product to, [SPC] authorized customers[.]" ( *Id.* PAGEID 394 ¶¶ (4)(5)).

The appointment additionally provides that "[SPC] is the registered owner of the trademark 'SLUSH PUPPIE' and all labels and designs incidental thereto . . . [and] [s]hould this appointment be terminated, Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . tradenames, signs, emblems,

---

[2] (Doc. 27 PAGEID 353 ¶ 19).

insignias, symbols, tokens, or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever[.]" (*Id.* PAGEID 395 ¶ (11)). Moreover, "[u]pon any termination, . . . any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products." (*Id.*).

Although the appointment is perpetual, it lists several grounds upon which SPC can terminate. (*Id.* PAGEID 394–95 ¶ (8)). Pertinent here:

> (8) This appointment is perpetual, however, in addition to any and all rights and remedies [SPC] may cancel and terminate this appointment by written notice to Manufacturer for any one of the following reasons:
> . . . .
>> D. The voluntary or involuntary petition of Manufacturer seeing relief under any provision of any receivership or bankruptcy law or other law for relief of debtors[     ]. **The filing of any legal action other than for collection on account against [SPC]**, its representatives, distributors, customers, manufacturers, or suppliers[.]

(emphasis added).

Finally, the appointment contains an integration clause[3] and a choice-of-law (Ohio) provision[4]. It was signed on February 5, 1996 (in Cincinnati, Hamilton County, Ohio) by Ralph Peters[5] on behalf of Able Foods and by Will Radcliff on behalf of SPC.

---

[3] (Doc. 27-2 ¶ (22) ("This appointment expresses fully the understanding and all prior understandings are hereby canceled, and no further changes in the terms of this appointment shall be valid except when and if reduced to writing and signed by both Manufacturer and SLUSH PUPPIE, by legally authorized officials."); Doc. 27-2 PAGEID 398 ("This appointment represents the full agreement of the parties and supersedes and replaces any and all previous manufacturing appointments.")).

[4] (Doc. 27-2 ¶ (24) ("This appointment and all of its terms and conditions shall be governed by and interpreted under the laws of the State of Ohio[.]")).

[5] (Ralph Peters depo., Doc. 84 PAGEID 2128–2131 (23:10–26:8)).

There is no drafting history in the summary judgment record regarding the 1996 Manufacturing Appointment.[6]

**1999 Distributor Agreement.** The International Independent Area Distributor License Agreement, executed in 1999 and effective January 1, 2000 ("1999 Distributor Agreement"), is between SPC ("Company") and SPL ("Distributor"). (Doc. 27-3 PAGEID 400 (recitals), 408 (§ XIX), 409 (Exhibit A)). Mark Peters, Ralph Peters' son,[7] signed on behalf of SPL. (*Id*.; Ralph Peters depo., Doc. 84 PAGEID 2136 (31:4–18)). This license granted different rights[8], to include "THE RIGHT TO THE USE OF THE NAME 'SLUSH PUPPIE' FOR THE PROMOTION AND DISTRIBUTION OF PRODUCTS [i.e., freezers, neutral base, flavors, cups, other related items, and other products which may be specifically approved in writing from time to time] OFFERED BY COMPANY" in the United Kingdom and Ireland. (Doc. 27-3 PAGEID 400 (recitals), 409 (Exhibit A)). As Distributor, SPL agreed to "vigorously promote" the sale of SPC's products in "important commercial centers" within its exclusive territory and to keep SPC "regularly informed" of its "operating and sales activities" relating to SPC's products. (*Id.* PAGEID 402 §§ IV.A, IV.C). The agreement provides that SPC owns

---

[6] ICEE represents that SPL produced no drafts or pre-execution communications in response to its May 21, 2019 set of requests for production of documents. (Doc. 175 PAGEID 5658). Moreover, Ralph Peters testified (in February 2020) that he could not remember any particulars. (Ralph Peters depo., Doc. 84 PAGEID 2125–2133 (20:10–28:13) ("I cannot remember in specific detail from so many years ago.")).

[7] (Ralph Peters depo., Doc. 84 PAGEID 2122 (17:13–14); 2139–2141 (34:7–36:6)).

[8] (Doc. 27-3 § VII ("This Agreement is not a license or consent for DISTRIBUTOR to enter into the manufacturing of any of the PRODUCTS. In the event that such license or consent is granted, this agreement shall exist independent thereof.")).

the SLUSH PUPPIE trademarks (name and logo), allowing SPL to use them only upon "continued qualification" as a "bona fide" Distributor.  (*Id.* PAGEID 403 § VI.D).  SPL's use of the SLUSH PUPPIE trademarks "is unauthorized upon termination of this Agreement."  (*Id.*).

Although the agreement is perpetual, it lists bases upon which SPC will terminate the license, subject to notice and a (60-day) opportunity to cure.  (*Id.* PAGEID 404 §§ VIII.A–D).  It also lists bases upon which SPC will immediately terminate the license (without opportunity to cure), including SPL filing for bankruptcy protection or SPL's inability to pay its debts to SPC.  (*Id.* PAGEID 405 §§ VIII.F.1–5).  Pertinent here, SPC may, "for good cause[ ]" immediately terminate the license upon "[t]he filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers, or suppliers[.]"  (*Id.* PAGEID 405 § VIII.F.4).  Upon termination, SPL waived the right to any compensation "for any claim for 'build-up of TERRITORY' or recoupment of investment, as such is done at DISTRIBUTOR'S risk."  (*Id.* PAGEIE 405 § VIII.I).

Finally, like the manufacturing appointment, the distributor agreement contains an integration clause[9] and a choice-of-law (Ohio) provision[10].  There is no drafting history in the summary judgment record regarding the 1999 Distributor Agreement.[11]

---

[9] (Doc. 27-3 § XVII ("This Agreement expresses the full agreement and understanding between the parties, and supersedes any and all prior grants of license or other oral or collateral agreement, understanding, or representation of any kind.  Any amendment of this Agreement must, of necessity, be in writing.")).

[10] (Doc. 27-3 § XVI ("The parties agree that in all matters pertaining to this Agreement, the laws of the State of Ohio, USA shall be applicable and controlling.")).

[11] Mark Peters testified during his (July 1, 2020) deposition that he signed, but did not negotiate, the

**Sale of the SLUSH PUPPIE trademarks & related business.** In 2001, Dr Pepper/Seven Up, Inc. ("DPSU") purchased the SLUSH PUPPIE trademarks and business from SPC. (Doc. 27 PAGEID ¶ 34; Doc. 29 PAGEID 503 ¶ 34). All trademarks relating to the SLUSH PUPPIE business were thereafter assigned to DPSU. (Doc. 27 PAGEID 356 ¶ 35 & Exh. F (Doc. 27-6); Doc. 29 ¶ 35). In 2006, ICEE purchased the SLUSH PUPPIE trademarks and business from DPSU and became obligated under the 1996 Manufacturing Appointment and 1999 Distributor Agreement. (Doc. 27 PAGEID 357 ¶ 38; Doc. 29 PAGEID 503 ¶ 38). All trademarks relating to the SLUSH PUPPIE business were thereafter assigned to ICEE. (Doc. 27 PAGEID 357 ¶ 39 & Exh. H (Doc. 27-8); Doc. 29 PAGEID 503 ¶ 39).

**Subsequent correspondence between SPL & ICEE concerning the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.** On July 27, 2009, Mark Peters sent copies of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement to Dan Fachner[12] as a follow-up to Peters' request for help with "the issue with Slush Costa Blanca." (Doc. 60-1 PAGEID 975). On September 27, 2009, Peters corresponded with Fachner about a "major problem" with "ex Distributors" in Spain, attaching again the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. Peters points out that the exclusive territory defined in the manufacturing appointment is significantly greater than the territory identified in

---

distribution agreement on behalf of SPL. (Mark Peters depo., Doc. 74 PAGEID 1673 (130:1–18, 131:19–24)).

[12] Dan Fachner currently serves as President of J&J Snack Foods Corp., which owns 100% of The ICEE Company; he has served as the president and/or CEO of ICEE since 1997. (Dan Fachner decl., Doc. 103-1 ¶ 3).

the distributor agreement ("because of the way the contracts was set up between my Father and Will [Radcliff] many years ago"). "What I need to allow us to [start a trademark action in Spain] is a side letter from you amending the International Independent Area Distribution Agreement executed the 23rd December 1999 section Exibit A TERRITORY to be the same as the Manufacturing agreement." (*Id.* PAGEID 977–78).

On April 1, 2010, Peters emailed Fachner about expanding the distributor license beyond the United Kingdom and Ireland. (Doc. 60-2 PAGEID 997 ("Dan I know you are now the brand owner and we are at your mercy on this. I just know that to have a third party agency who can make a little money from selling a trinket or two and they have not got once cent invested in it. For them to be representing Slush Puppie at trade shows is something that will do untold damage to our business and ultimately your brand. It is simply not worth it. I think my last suggestion to you was that we take a little time out to look at the best way for both businesses, on how we work together on the Slush Puppie brand by **re looking at the master agreements**.") (emphasis added)). As part of an ongoing exchange, Peters emailed Fachner on April 10, 2010 and attached another copy of the 1996 Manufacturing Agreement. (*Id.* PAGEID 996 ("Thank you for your time on the telephone. I am not sure if you have a copy of the manufacturing agreement. Please see attached.")).

Fast forward to January 10, 2017, when SPL's Alan Beaney—in an email to Steve Every, ICEE's Vice President for Managed Service and International—described "the Slush Puppie contractual arrangements in Europe" as the contract effective on 1st

January 1996 (Syrup Manufacture (and sale) in Europe) and the contract effective on 1st January 2000 (Distribution Agreement in UK and Ireland). (Doc. 73-9 PAGEID 1381–1388).

Later that same year, on <u>August 8, 2017</u>, SPL's Manchester counsel sent return correspondence to ICEE's London counsel, in which it refers to "the International Independent Area Distributor License Agreement dated 23 December 1999 (the 'Distribution Agreement') and the Appointment of Syrup Manufacturer Agreement dated 5 February 1996 (the 'Manufacturer Agreement') (collectively the "Existing Agreements')." (Doc. 60-3 PAGEID 1008). "Whilst it is clear that the Existing Agreements form the basis of the relationship between Slush Puppie and Icee, the terms of the Existing Agreements do not encompass the entirely of the relations between the parties, as the Existing Agreements have been varied by agreement since 1999. . . . Given the uncertainties that have developed as a result of modifications to the Existing Agreements over the course of the last 17 years, we consider that it would be in the interests of both Slush Puppie and Icee to attempt to codify, and where necessary update, the terms of the Existing Agreements so as to take into account the reality of Slush Puppie's business, on behalf of Icee and the Slush Puppie brand, in the UK and Europe and to create a clearer understanding of the parties' respective roles going forward." (*Id.* PAGEID 1008–1009).

**The 2000 "Appointment of Trade Mark Licence".** On February 28, 2018, Mark Peters emailed Dan Fachner with news of a recently discovered agreement:

> Following our previous discussions, in the course of reviewing our existing arrangements, **we have identified the attached**

8

> **exclusive licence**[13] **dated 8 August 2000, which governs the arrangements between the parties**. **This exclusive licence post-dates both the Appointment** of Syrup Manufacturer Agreement dated 5 February **1996 and** the International Independent Area Distributor License **Agreement** dated 23 December **1999**, which were the subject of our previous discussions. This exclusive licence confirms that SPL has the exclusive rights to use the SLUSH PUPPIE trade mark in Europe in relation to freezers, syrups and products for the promotion of the SLUSH PUPPIE trade mark.

(Doc. 60-5 PAGEID 1021 (emphases added)). Fachner responded on March 12, 2018, noting that "[f]or the past 11 years we have had many discussions live and documented around the challenges of our agreements dated 1996 and 1999. . . . This is the first time that you have shared another contract. Where did this contract come from and why was this never produced or mentioned in the past decade?" (Doc. 60-6 PAGEID 1029).

Benesch attorney Mark E. Avsec responded (on August 17, 2018) on behalf of SPL with a cease-and-desist letter, which begins:

> This firm serves as U.S. intellectual property litigation counsel to Slush Puppie Limited ("SPL"). We have reviewed the correspondence (including between and among solicitors) and the various agreements concerning SPL's exclusive right to use the SLUSH PUPPIE® trademarks in the United Kingdom, Southern Ireland and Europe. The SLUSH PUPPIE APPOINTMENT OF TRADE MARK LICENCE dated August 8, 2000 (the "2000 Agreement") is the current operative agreement governing the relationship between SPL, on the one hand, and J&J Snack Foods Corp. ("J&J") and its subsidiary The ICEE Company ("ICEE") (together, "you"), on the other hand. There is no question that the parties have been operating under the terms of the 2000 Agreement (including its royalty provisions) since ICEE's acquisition of the SLUSH PUPPIE® brand and business in 2006. . . .

---

[13] (Doc. 60-5 PAGEID 1022–1027).

This firm is now engaged because the 2000 Agreement is expressly governed by Ohio law and recites that any dispute must be litigated in the State of Ohio.  The 2000 Agreement, which *supersedes all previous agreements* between or among the parties (or their predecessors-in-interest) granted SPL the *perpetual* and *exclusive* use of the SLUSH PUPPIE® trademarks in connection with the manufacturing *and* distribution of SLUSH PUPPIE® products in the subject territories, including the U.K. and Europe.  Notwithstanding this stark language, J&J (through ICEE) has inexplicably granted other parties the right to use the SLUSH PUPPIE® trademark in connection with the manufacturing and distribution of SLUSH PUPPIE® products in the U.K. and Europe.

(Doc. 27-11 PAGEID 468–69 (emphasis in original)).  Avsec closed with the admonition, "If you elect not to respond and/or continue to license the use of the SLUSH PUPPIE® brand in violation of our client's rights, be advised that SPL will not hesitate to seek redress as permitted under the 2000 Agreement."  (*Id.* PAGEID 469).

Duane Morris attorney Karen C. Kline responded (on September 13, 2018) on behalf of ICEE, pointing out that (1) the 2000 Appointment was not among the contracts ICEE acquired from (predecessor-in-interest) DPSU; (2) DPSU and ICEE had always operated under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement; (3) SPL had never (before February 28, 2018) mentioned the 2000 Appointment; and (4) there were "serious questions" about the document's authenticity, which SPL had failed to support.  (Doc. 73-19 PAGEID 1541–1543).  Benesch attorney Matthew Gurbach responded (on November 6, 2018), reiterating that the 2000 Agreement "currently governs the relationship" between SPL and ICEE, such that SPL has "the exclusive right to use the SLUSH PUPPIE trademark in the United Kingdom, Ireland and elsewhere in Europe."  (Doc. 89-1).  Gurbach threatened legal action.  (*Id.*).

10

**SPL sues ICEE.**  SPL filed suit against ICEE in the Court of Common Pleas for Hamilton County, Ohio on February 12, 2019, asserting causes of action arising out of the 2000 Appointment.  (Doc. 2).  ICEE removed the suit to the Southern District of Ohio on March 8, 2019.  (Doc. 1).  ICEE answered and counterclaimed against SPL on April 29, 2019.  (Doc. 13).

Meanwhile, on June 25, 2019, ICEE (through Duane Morris attorney and current trial counsel David J. Wolfsohn) provided written notice to Mark Peters that it was terminating the 1996 Manufacturing Appointment and the 1999 Distributor Agreement because of SPL's lawsuit.  (Doc. 29-6).  The notice quotes from the relevant language within both agreements, observing that SPL had filed a legal action "other than for collection on account" against ICEE.  (*Id.*).  Benesch attorney Matthew Gurbach responded to Wolfsohn (on June 28, 2019) that "ICEE's purported termination of the 1996 Appointment and the 1999 Distributor Agreement is a nullity—each has been superseded by the 2000 Appointment."  (Doc. 29-7).

The Court entered a Calendar in this civil action on October 30, 2019.  (10/30/2019 Minute Entry).  In connection therewith, SPL filed an Amended and Supplemental Complaint on December 16, 2019.  (Doc. 27).[14]  The first four claims for relief assert causes of action arising out of the 2000 Appointment; the remaining eight claims are asserted "in the alternative" and arise out of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.  (*Id.*).

---

[14] The Amended and Supplemental Complaint was signed by Matthew D. Gurbach, Elizabeth Emmanuel, and Ronald L. House.  At various times, all three attorneys withdrew their appearance as counsel of record (Docs. 50, 68, 141) and they are no longer affiliated with the Benesch law firm.

ICEE answered and counterclaimed against SPL on January 6, 2020. (Doc. 29). SPL filed its Answer to ICEE's counterclaims on January 27, 2020. (Doc. 32). Throughout, SPL maintains it had no obligations under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement because they were superseded by the 2000 Appointment. And SPL reiterates its allegation the "the purported termination of agreements that were no longer effective is a nullity[.]" (*Id.* ¶ 39).

Motion practice (both before and since the filing of these pleadings) has been endemic[15] and the docket is otherwise rife with discovery disputes that have required the Court's intercession.

**ICEE's Motion for Partial Summary Judgment.** During the September 29, 2022 Discovery Conference,[16] the parties agreed (with the Court's approval) to expedited briefing (on a motion for partial summary judgment) as to SPL's Twelfth Claim for Relief (in the alternative)[17] "that ICEE's purported termination of the 1996

---

[15] Of note, in October 2020 SPL sought leave to file a second amended complaint to withdraw its causes of action arising out of the 2000 Appointment. (Doc. 72). SPL explained that it learned "well after" it filed its Amended and Supplemental Complaint (in December 2019) that the 2000 Agreement is "not a genuine document" such that the claims premised upon it were "meritless[.]" (Doc. 85 PAGEID 2176). The Court heard oral argument (on February 6, 2023) on this matter as well. Over ICEE's opposition (Doc. 81) and ruling again from the bench, the Court granted SPL's Motion for Leave to File Second Amended Complaint to Withdraw Certain Causes of Action (Doc. 72). (*See* 02/07/2023 Minute Entry and NOTATION ORDER). The Court also heard oral argument on two other motions and, likewise ruling from the bench, granted ICEE's Motion to Amend Its Counterclaims (Doc. 152) and denied SPL's Motion for Protective Order Regarding the Slushy Jack's Brand (Doc. 158). (*Id.*). A written order memorializing these three rulings will be docketed forthwith.

[16] (*See* Transcript of Proceedings, *Status Conference via Telephone*, Doc. 174 PAGEID 5641–5644 (24:12–27:7); 10/20/2022 Minute Entry and (nunc pro tunc) NOTATION ORDER (for proceedings held 9/29/2022)).

[17] SPL pleads these substantive allegations in support of its Twelfth Claim for Relief:

. . . .

152. This claim and allegations herein are plead (sic) in the alternative should the Court find

Appointment and 1999 Agreement is wrongful and a nullity."[18]

## II.     STANDARD OF LAW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is, indeed, mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 417 U.S. 317, 322 (1986); *Blue Water Importers, Inc. v. Strickrath*, 552 F. Supp. 3d 762, 772 (S.D. Ohio 2021) (citing *Celotex*).  "The issue of unconscionability is a question of law."  *Caley v. Glenmoor Country Club*, 2013-Ohio-4877, 1 N.E.3d 471, at ¶ 44 (Ohio App. 5 Dist. 2013) (citing *Ins. Co. of N. Am. v. Automatic Sprinkler Corp.*, 67 Ohio St. 2d 91, 98,

---

that the 2000 Appointment is not the enforceable agreement between the parties.  The aforesaid actions of ICEE also form the basis of **claims arising under the 1999 Agreement**.

153.  **As a result of ICEE's breach of the 1999 Agreement, Plaintiff SPL, having no recourse, filed this action herein seeking to enforce its rights**.

154.  Section 8(D) of the 1996 Appointment provides that ICEE may terminate the agreement should SPL file a legal action other than for collection on account against SPC, its representatives, distributors, customers, manufacturers, or suppliers.  Section VIII(F)(4) of the 1999 Agreement provides that SPC may terminate the agreement should SPL file any legal claim or legal action against SPC, its representatives, distributors, manufactures or suppliers.

155.  Understanding that the 2000 Appointment contains no such termination provision, ICEE disputes the authenticity of the 2000 Appointment.  Despite the fact that the 2000 Appointment has superseded the 1996 Appointment and the 1999 Agreement, ICEE has, by its Termination Notice, purported to terminate the 1996 Appointment and 1999 Agreement.

156.  Should this Court determine that the 1996 Appointment and 1999 Agreement have not been superseded by the 2000 Appointment, **ICEE's termination** thereof because SPL sought to enforce, among other things, its right to exclusive use of the SLUSH PUPPIE trademark, **is contrary to law and is in bad faith**.

157.  Further, SPL substantially performed its obligations under the 1996 Appointment and 1999 Agreement.  **As the party that breached the 1996 Appointment and 1999 Agreement** by, among other things, its actions alleged herein, **ICEE is not entitled to terminate the agreements and its purported termination is wrongful**.

(Doc. 27 PAGEID 378 (emphases added)).

[18] (Doc. 27 PAGEID 378 ¶ 158, PAGEID 386 ¶ 12 (Prayer for Relief)).

423 N.E.2d 151, 156 (citing Ohio Rev. Code § 1302.15(A))); *see Oldendick v. Crocker*, 2016-Ohio-5621, 70 N.E.3d 1033, at ¶ 21 (Ohio App. 8 Dist. 2016) (citing *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St. 3d 352, 2008-Ohio-938, 884 N.E.2d 12, at ¶ 35 (Ohio 2008) (citing *Automatic Sprinkler*)).  The party asserting unconscionability, here SPL, bears the burden of proving it.  *See Taylor Bldg.*, 884 N.E.2d 12, ¶ 35; *Caley*, 1 N.E.3d 471, at ¶ 46.

### III.   ANALYSIS

### A. The provisions in the 1996 Manufacturing Appointment and the 1999 Distributor Agreement permitting ICEE to terminate if it is sued by SPL are plain and unambiguous

"Ohio law is clear that 'if the language of the contract is plain and unambiguous, [courts must] enforce the terms as written, and  . . . may not turn to evidence outside the four corners of the contract to alter its meaning.'"  *Jackson v. Gen. Elec. Aviation*, 518 F. Supp. 3d 1104, 1112 (S.D. Ohio 2021) (quoting *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 159 Ohio St. 3d 194, 2019-Ohio-4716, 150 N.E.3d 28, at ¶ 13 (Ohio 2019)).  "And, 'when considering the language of a particular contractual provision, common words will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement.'"  *Id.* (quoting *Beverage Holdings*) (cleaned up).  "A court may not interpret 'what has no need of interpretation.'"  *MJR Int'l v. Am. Arbitration Ass'n*, 596 F. Supp. 2d 1090, 1098–99 (S.D. Ohio 2009) (quoting *Allen v. Standard Oil Co.*, 2 Ohio St. 3d 122, 124, 443 N.E.2d 497, 499 (Ohio 1982)).  Furthermore, a contract does not become ambiguous merely because 'its operation may work a hardship upon one of the parties.'"  *Id.* at 1099 (quoting *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920, 924 (Ohio 1989)).  Finally,

14

"[w]here both parties are commercial enterprises, as they are here, Ohio courts presume that they possess 'a high degree of sophistication in matters of contract.'" *Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp 3d 764, 772 (quoting *Glaspell v. Ohio Edison Co.*, 29 Ohio St. 3d 44, 47, 505 N.E.2d 264, 267 (Ohio 1987)).

As discussed, the 1996 Manufacturing Appointment provides that it may be terminated (by written notice) for "[t]he filing of any legal action other than for the collection on account against SLUSH PUPPIE [Corporation], its representatives, distributors, customers, manufacturers, or suppliers[.]" (Doc. 27-2 PAGEID 394–95 ¶ (8) D). The 1999 Distributor Agreement provides that Slush Puppie Corporation (as COMPANY) may immediately terminate the agreement "for good cause[ ]" upon a "filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers, or suppliers[.]" (Doc. 27-3 PAGEID 405 § VIII.F.4). Read together, other than suits for the "collection on account" vis-à-vis the 1996 Appointment, the contract language permits termination as to lawsuits alleging *any* type of claim.

The undersigned finds that these provisions are plain and unambiguous. That said, the Court must enforce them. *Jackson*, 518 F. Supp. 3d at 1112. As (eventual) successor-in-interest to SPC, ICEE had the right to terminate the 1996 Manufacturing Appointment and the 1999 Distributor Agreement after SPL filed suit against it (for other than "collection on account") in February 2019.

15

**B. Characterizing a termination as "wrongful" or in "bad faith"[19]
   is not a basis to override a provision that confers an express power
   to terminate**

The Sixth Circuit has "explicitly rejected the requirement of good faith in dealer termination clauses, finding instead that the proper test [ i]s one of unconscionability." *Gaib Equip. Co. v. J.I. Case Co.*, 875 F.2d 863, *3 (6th Cir. 1989) (unpublished table decision) (citing *Cardinal Stone Co., Inc. v. Rival Mfg. Co.*, 669 F.2d 395, 396 (6th Cir. 1982)). At issue in *Cardinal Stone* was whether "the silent incorporation of the obligation to deal in good faith" can "override an express power of termination." 669 F.2d at 396. The answer, as a matter of law, is no:

> The parties here were experienced businessmen who executed a large number of valuable contracts. From the outset Cardinal was on notice that Rival had the unilateral right to terminate at anytime. It accepted this risk when it signed the agreement. Although that risk has now resulted in economic hardship, Cardinal may not here represent itself as an untutored victim of sharp business practice. . . . Cardinal cannot be heard to complain of Rival's exercise of a right which Cardinal expressly relinquished. The terms of paragraph 18 are unambiguous and must be given their plain and ordinary effect.

*Id.* In reaching its decision, the Sixth Circuit cited with approval *Corenswet v. Amana Refrigeration, Inc.*, 594 F.2d 129 (5th Cir.), *cert. denied*, 444 U.S. 938 (1979), a case in which the Fifth Circuit declined to allow the Uniform Commercial Code's good faith requirement to "override an express power of termination." *Id.* "[I]nstances of real economic overreaching [are] better analyzed under the unconscionability provisions of

---

[19] SPL premises its misplaced "bad faith" claim on its belief that, once it claimed that ICEE had violated the 1996 Manufacturing Appointment and the 1999 Distributor Agreement, ICEE was prohibited from terminating either one of them. (Doc. 27 PAGEID 378 ¶ 157 ("As the party that breached the 1996 Appointment and 1999 Agreement by, among other things, its actions alleged herein, ICEE is not entitled to terminate the agreements and its purported termination is wrongful.")).

the U.C.C." *Id.*[20]

### C. The "legal action" termination provisions within the 1996 Manufacturing Appointment and the 1999 Distributor Agreement are not unconscionable

The party claiming unconscionability must prove that the contract is both procedurally *and* substantively unconscionable. *Taylor Bldg.*, 884 N.E.2d 12, at ¶ 34. Procedural unconscionability concerns "individual circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible." *Collins v. Click Camera & Video, Inc.*, 86 Ohio App. 3d 826, 834, 621 N.E.2d 1294, 1299 (Ohio App. 2 Dist. 1993). Substantive unconscionability "involves those factors which relate to the contract terms themselves and whether they are commercially reasonable." *Id.* In determining whether a commercial contract provision is unconscionable, "courts will examine, as in consumer transactions, the harshness of the terms of the contract and the relative bargaining positions and experience of the parties, although the commercial plaintiff is held to a higher standard than the ordinary consumer." *Brondes Ford, Inc. v. Habitec Sec.*, 2015-Ohio-2241, 38 N.E.3d 1056, at ¶ 113 (Ohio App. 6 Dist. 2015) (cleaned up). "In commercial settings, courts rarely find unconscionability." *Id.*[21]

---

[20] "The question these cases present is whether public policy forbids enforcement of a contract clause permitting unilateral termination without cause. Since a termination without cause will almost always be characterizable as a 'bad faith' termination, focus on the terminating party's state of mind will always result in the invalidation of unrestricted termination clauses. We seriously doubt, however, that public policy frowns on any and all contract clauses permitting termination without cause. Such clauses can have the salutary effect of permitting parties to end a soured relationship without consequent litigation. . . What public policy does abhor is economic overreaching[,] the use of superior bargaining power to secure grossly unfair advantage. That is the precise focus of the Code's unconscionability doctrine; it is not at all the concern of the Code's good faith performance provision." *Corenswet*, 594 F.2d at 138–39.

[21] White, Summers, & Hillman, Uniform Commercial Code § 5:3 (6th ed. Nov. 2022 update) ("It is harder for a business, whether incorporated or not, to win on a claim of unconscionability than for a camel to

The summary judgment record does not support a finding of unconscionability, even if it had been alleged by SPL. "One of the necessary elements of [procedural] unconscionability in dealer termination clauses is coercion or force to enter the contract." *Gaib*, 875 F.2d 863, *3 (citing *Corenswet*, 594 F.2d at 139 n.12). Ralph Peters' testimony, which is undisputed, rules this out.

When asked about details surrounding his execution of the 1996 Manufacturing Appointment on behalf of SPL, Peters described his relationship with SPC's principal Will Radcliff: "Mr Radcliff became a friend of mine. . . . Close friend. . . . And, for instance, when he – when we agreed that we would not just do England, but we would do Europe he travelled with me to find and appoint distributors in various countries. So we travelled together. . . . Yes. Sometimes in Mr Radcliff's Lear jet, and sometimes commercially. But you have to understand as well as being in the same kind of business[ ] . . . Mr Radcliff became a real close personal friend." (Ralph Peters depo., Doc. 84 PAGEID 2131–2132 (26:9–27:1)). When asked why "appointment" was used in 1996 and "agreement" was used in 1999, Peters quipped that he "ha[d ] not the faintest idea. . . . You have to understand these things for Will and I were just bits of paper. We had a handshake. And that was enough." (*Id.* PAGEID 2136–2137 (31:4–32:12)).[22]

---

pass through the eye of a needle.").

[22] Peters shared another anecdote that belies the notion that he, on behalf of SPL, was bullied into doing business with SPC:

    A.  And you see even here on my company's address, can you see what it says underneath the words, "Slush Puppie Limited".
    Q.  "The Kennels". Oh, it is a joke?
    A.  Yes, of course, it was a joke.

Peters also testified that, in 2000, Radcliff "was getting very ill.  And he was getting Alzheimer's."  (*Id.* PAGEID 2146 (41:19–20)).  But before Radcliff sold SPC to DPSU, he told Peters he was going to reduce SPL's royalty "'because I am out, I cannot help you after this, but at least I am going to help you by reducing the royalty you pay'." (*Id.* PAGEID 2147–2148 (42:13–43:23)).  Peters then observed, "That is a lot of help." (*Id.* PAGEID 2148 (43:6–7)).  Indeed, it was.  The royalty rate (to be paid under the 1996 Manufacturing Appointment) was cut in half, reduced from 5% to 2.5%.  (Doc. 29 PAGEID 499 ¶ 12, PAGEID 503 ¶¶ 33, 34).

As for substantive unconscionability, the courts in *Gaib*, *Cardinal Stone*, and *Corenswet* held that clauses permitting termination for *any* reason were not unconscionable.  Here, the provisions at issue permit immediate termination for an ostensibly good reason: when the licensee sues the licensor.  "[Contract clauses allowing unilateral termination without cause] can have the salutary effect of permitting parties to end a soured relationship without consequent litigation."  *Corenswet*, 594 F.2d at 138.

SPL fails to address unconscionability in its memorandum in opposition, which

---

Q.   I wondered about that.
A.   It is a puppy you see.
Q.   Of course.
A.   That was the kind of relationship we had.
Q.   Right. Right. Nice.
A.    Even you laughed at that.

. . . .

Mr Wolfsohn: Such a good joke.
[Ralph Peters]:  It was a fun thing. You know.
Mr Wolfsohn:  Absolutely.

(Ralph Peters depo., Doc. 84 PAGEID 2137 (32:14–25), PAGEID 2158 (53:6–9)).

the Court will interpret as concession. And, separately, what it does argue is contrary to Ohio law.

SPL maintains that "ICEE was not entitled to manufacture an at-will termination through its own breach. A narrower reading is available, which would sanction SPL only if it undertook disruptive litigation on non-material grounds." (Doc. 177 PAGEID 5772). Section (8)D of the 1996 Manufacturing Appointment and Section VIII(F)(4) of the 1999 Distributor Agreement "must be read only to forbid lawsuits over **non-material** breaches or filings against ICEE's other partners. It was created to prevent disruptive litigation by a party who becomes who becomes litigious over ancillary matters—not to give the licensor a free pass to exit the relationship by breaching core terms with impunity." (*Id.* PAGEID 5779 (emphasis in original)). SPL cautions that, "if ICEE's interpretation is upheld, it would create a powerful incentive for a licensor like ICEE to commit an overt material breach to serve as the basis for an eventual termination of an agreement." (*Id.* PAGEID 5780). It then discusses three "interpretive" principles that "defeat" ICEE's reading of the contracts. (*Id.* PAGEID 5780–5781).

SPL is wrong, because, as discussed already, terms that are *not* ambiguous need *not* be "interpreted." *See MJR Int'l*, 596 F. Supp. 2d at 1098–99. "When the terms included in an existing contract are clear and unambiguous, we cannot create a new contract by finding an intent not expressed in the clear and unambiguous language of the written contract." *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St. 2d 270, 273, 714 N.E.2d 898, 901 (Ohio 1999) (citation omitted). Once it signed the

20

1996 Manufacturing Appointment, and (later) the 1999 Distributor Agreement, SPL "accepted th[e ] risk" that, if it sued, ICEE was free to exercise its right to terminate. *See Cardinal Stone*, 669 F.2d at 396.

As a final matter, the Court turns its attention to SPL's laser-like focus on "good cause." (Doc. 177 PAGEID 5781–5784). First, these words are not found in the 1996 Manufacturing Appointment. Second, termination of the 1996 Manufacturing Appointment automatically terminated the 1999 Distributor Agreement.[23] Third, the 1999 Distributor Agreement contains two sets of grounds for termination—one (§ VIII.C–E) with notice and an opportunity to cure and another (§ VIII.F.1–5) that may take place "IMMEDIATELY" and "without regard to the above stated cure provisions[.]" This is typical in distributorship agreements. *See, e.g., Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937–38 (6th Cir. 1989).

SPL argues that "good cause" cannot characterize the five events listed in § VIII.F, because that would "turn the requirement of 'good cause' into surplusage." (Doc. 177 PAGEID 5783). According to SPL, if "good cause" characterizes the "trigger events" then "the words would not appear at all." (*Id.*). "The parties guarded against pretextual termination based on trivialities by requiring 'good cause' *in addition* to a technical triggering of the language of one of the subsections." (*Id.* PAGEID 5782 n.4 (emphasis in original)). But, as ICEE explains, it is *SPL's* reading that would render

---

[23] (Doc. 27-2 ¶ (17) ("Where contemporaneously with this Appointment of Syrup Manufacturer there is a Grant of Independent Area Distributor License to Manufacturer to serve as a distributor as set forth in said agreement, these two agreements shall be deemed as interdependent. Any expiration, breach, or termination of either agreement is to be deemed an expiration, breach, or termination of the other unless otherwise excepted in writing."); *see id.* ¶ (8)A).

"good cause" meaningless.  Section VIII.D already allows termination for "cause" anytime the Distributor is in "violation or breach of the AGREEMENT" for "failure to meet sales expectations" or because the Distributor "has fallen below satisfactory performance[.]"  Section VIII.F only makes sense if it is listing the specific circumstances that, on their own, will *always* constitute good cause for "IMMEDIATE" termination without an opportunity to cure.  Moreover, if the parties had wanted to agree that the five circumstances were *not* good cause, there would be no need to list them at all, because, by definition, they would *not* be sufficient for immediate termination.

ICEE also points out that the termination provision found in the 1996 Manufacturing Appointment reinforces this view.  It would be odd for the parties to have then agreed that a bankruptcy filing (by Manufacturer) and a legal action (initiated by Manufacturer) required no opportunity to cure and were each a sufficient reason on their own for termination, yet three years later decide—as to the "interdependent" Distributor Agreement—that they were not.

## IV.    CONCLUSION

ICEE's Motion (Doc. 175) for Summary Judgment—as to SPL's Twelfth Claim for Relief in its Amended and Supplemental Complaint[24]--is hereby **GRANTED**.  The Court determines as a matter of law that ICEE's termination was effective, which precludes SPL from claiming declaratory relief (or seeking damages) relating to ICEE's alleged breaches of the 1996 Manufacturing Appointment or the 1999 Distributor Agreement taking place after June 25, 2019.

**IT IS SO ORDERED.**                                    /s/ *Michael R. Barrett*
                                                        JUDGE MICHAEL R. BARRETT

_____

[24] (Doc. 27).