IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

       Plaintiff/Counterclaim/Defendant

       v.

THE ICEE COMPANY,

               Defendant/Counterclaim
Plaintiff

CASE NO. 1:19-cv-00189-MRB

**DEFENDANT/COUNTERCLAIM PLAINTIFF THE ICEE COMPANY'S ANSWER
AND COUNTERCLAIMS TO
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendant/Counterclaim Plaintiff The ICEE Company ("ICEE"), responds to Plaintiff

Slush Puppie Limited's ("SPL") Second Amended Complaint ("SAC") as follows:

<u>**PARTIES AND JURISDICTION**</u>

1.     Admitted.

2.     It is admitted that ICEE is a corporation organized under the laws of the State of

Delaware.  The remaining allegations of this paragraph are denied.  By way of further answer,

ICEE's principal place of business is in La Vergne, Tennessee.

3.     Admitted in part; denied in part.  By way of further answer, ICEE admits that

SPL's Mark Peters forged a license agreement (Exhibit D to the original complaint) providing

that the exclusive venue for any litigation arising from or in any way connected with the forged

license agreement shall lie exclusively in Ohio.  SPL's American counsel Mark Avsec also

claimed that "any dispute" between the parties "must be litigated in the State of Ohio."  Doc. 2 at

PAGEID 170, Exh. J.  ICEE denies, however, that it ever agreed to this forged document.

ICEE further admits that what Plaintiff refers to as the 1996 Appointment, attached as Exhibit B to the Second Amended Complaint, contains the following two clauses related to choice of law and venue:

(16) It is understood and agreed that it is the intention of the parties that this agreement comply with all applicable statutes, or rules and regulations of any states, the United States of America, or any foreign nation, state, province, or county that may have jurisdiction over the execution, enforcement, or performance of this agreement. The parties agree that in all matters pertaining to this agreement, the laws of the State of Ohio, USA, shall be applicable and controlling and the exclusive venue for any litigation arising from or in any way connected with this agreement shall rest exclusively in the Court of Common Pleas of Hamilton County, Ohio, USA.

(24) This appointment and all of its terms and conditions shall be governed by and interpreted under the laws of the State of Ohio and that the exclusive venue for any litigation arising from or in any way connected with this agreement shall lie exclusively in the Court of Common Pleas of Hamilton County, Ohio, USA but this provision shall not preclude SLUSH PUPPIE from instituting legal proceedings in any other country having or claiming jurisdiction in respect thereof. This agreement is not valid until approved and executed at the general offices of SLUSH PUPPIE Corporation in Cincinnati, OH, USA.

ICEE further admits that what Plaintiff refers to as the 1999 Agreement, attached as Exhibit C to the Second Amended Complaint, contains the following clause related to choice of law and venue:

XVI.   <u>Governing Law</u>

It is understood and agreed that it is the intention of the parties that this Agreement comply with all applicable statutes, rules and regulations of any and all states of the United States of America, or any nation, state, province, or county that may have jurisdiction over the execution, enforcement, or any performance of this Agreement. The parties agree that in all matters pertaining to this Agreement, the laws of the State of Ohio, USA shall be applicable and controlling. The exclusive venue for any litigation arising from, or in any way connected with, this Agreement shall rest exclusively in the Court of Common Pleas of Hamilton County, Ohio, USA.

2

4.      Admitted.

5.      ICEE admits only that, for certain time periods, SPL was authorized by now-terminated agreements with ICEE to manufacture and distribute certain products bearing ICEE's SLUSH PUPPIE® trademarks.  ICEE further admits that the Second Amended Complaint purports to seek declaratory and injunctive relief, but ICEE denies that SPL is entitled to any such relief or any relief whatsoever.   ICEE further admits that the Second Amended Complaint seeks damages and declaratory relief from ICEE based on allegations of unauthorized uses of SLUSH PUPPiE® trademarks by ICEE on account of sales taking place outside the United States.  ICEE denies, however, that such allegations have any merit.  ICEE denies the remaining allegations in paragraph 5 of the Second Amended Complaint, including but not limited to the allegation that Plaintiff has "exclusive" rights to the SLUSH PUPPIE® trademarks in any territory, that any goodwill from the use of the SLUSH PUPPIE® trademarks has inured to the benefit of Plaintiff, or that SPL has any rights whatsoever with respect to the SLUSH PUPPIE® trademarks.

6.      ICEE admits that Slush Puppie Corporation ("SPC") was once an Ohio Corporation.  ICEE further admits that, from at least 1978 to approximately the beginning of 2001, SPC owned various SLUSH PUPPIE® trademarks used in connection with slush-type drinks and products and services associated with those drinks, including syrups and other "preparations for making slush-type beverages."  ICEE denies the remaining allegations in paragraph 6 of the Second Amended Complaint.

**A.      The 1978 Appointment.**

7.      ICEE lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 of the Amended Complaint, and therefore denies them.

3

8.      ICEE lacks knowledge or information sufficient to form a belief about the truth of the averments of this paragraph and they are therefore denied.

9.      ICEE lacks knowledge or information sufficient to form a belief about the truth of the averments of this paragraph and they are therefore denied.

10.      ICEE lacks knowledge or information sufficient to form a belief about the truth of the averments of this paragraph and they are therefore denied.

11.      ICEE lacks knowledge or information sufficient to form a belief about the truth of the averments of this paragraph and they are therefore denied.

**B.      The 1996 Appointment.**

12.      ICEE admits that SPC entered into the agreement with Able Foods, a copy of which is attached to the Second Amended Complaint as Exhibit B.  ICEE refers SPL to that document for the agreement's terms.  The remaining allegations of this paragraph are denied.  By way of further answer, ICEE properly terminated the 1996 Appointment on June 25, 2019.

13.       Defendant refers SPL to Exhibit B for the terms of the 1996 Appointment.  The remaining allegations of this paragraph are denied.  By way of further answer, ICEE properly terminated the 1996 Appointment on June 25, 2019.

14.      Defendant refers SPL to Exhibit B for the terms of the 1996 Appointment.  The remaining allegations of this paragraph are denied.  By way of further answer, ICEE properly terminated the 1996 Appointment on June 25, 2019.

15.      ICEE refers SPL to Exhibit B for the terms of the 1996 Appointment.  The remaining allegations of this paragraph are denied.  By way of further answer, ICEE properly terminated the 1996 Appointment on June 25, 2019.

16.     ICEE refers SPL to Exhibit B for the terms of the 1996 Appointment.  The remaining allegations of this paragraph are denied.  By way of further answer, ICEE properly terminated the 1996 Appointment on June 25, 2019.

17.     ICEE refers SPL to Exhibit B for the terms of the 1996 Appointment.  The remaining allegations of this paragraph are denied.   By way of further answer, ICEE properly terminated the 1996 Appointment on June 25, 2019.

18.     ICEE refers SPL to Exhibit B for the terms of the 1996 Appointment.  The remaining allegations of this paragraph are denied. By way of further answer, ICEE properly terminated the 1996 Appointment on June 25, 2019.

19.     It is admitted only that after 1996 but before 1999, Able Foods changed its name to Slush Puppie Limited, and that Slush Puppie Limited is a plaintiff and counterclaim defendant in this action.  It is admitted further that, until properly terminated by ICEE on or about June 25, 2019, SPL was a party to the 1996 Appointment.

### C.     The 1999 Agreement.

20.     ICEE admits that Slush Puppie Corporation entered into an agreement with SPL, a copy of which is attached to the Amended Complaint as Exhibit C.  ICEE refers SPL to that document for the agreement's terms.  The remaining allegations of this paragraph are denied.  By way of further answer, ICEE properly terminated the 1999 Agreement on June 25, 2019.

21.     ICEE refers SPL to Exhibit C for the terms of the 1999 Appointment.  The remaining allegations of this paragraph are denied. By way of further answer, ICEE properly terminated the 1999 Agreement on June 25, 2019.

22.     ICEE refers SPL to Exhibit C for the terms of the 1999 Appointment.  The remaining allegations of this paragraph are denied. By way of further answer, ICEE properly terminated the 1999 Agreement on June 25, 2019.

23.     ICEE refers SPL to Exhibit C for the terms of the 1999 Appointment.  The remaining allegations of this paragraph are denied. By way of further answer, ICEE properly terminated the 1999 Agreement on June 25, 2019.

> **D.     "Defendant ICEE's Breach Of The 1996 Appointment and the 1999 Agreement."**

24.     It is admitted that in or around January 2001, Dr Pepper/Seven Up, Inc. purchased the SLUSH PUPPiE trademarks and related business from SPC.  As to whether it became obligated under the 1996 Appointment and 1999 Agreement, that calls for a legal conclusion, and is therefore deemed denied.

25.     ICEE lacks knowledge or information sufficient to form a belief as to the truth of the allegation in this paragraph that after DPSU's purchase of the SLUSH PUPPiE trademarks and business, SPL paid royalty payments to DPSU in the amount of 2.5% of the total cost of Syrups charged and sold to distributors after appropriate discounts.  The remaining allegations of this paragraph are admitted.

26.     Admitted.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     This paragraph's allegations call for a legal conclusion and they are, accordingly, deemed denied.

34.     Denied.  By way of further answer, ICEE had no need for a pretext to terminate the 1996 Appointment and the 1999 Agreement:  As the Court has held and as the judgment entered reflects, the plain language of those agreements permitted termination by ICEE in the event that SPL sued ICEE.  Moreover, SPL and its American attorneys have engaged in an illegal scheme to defraud the Court and ICEE with forged and fraudulent documents in order to infringe ICEE's trademarks and unjustly enrich itself from such ongoing and willful infringement.

35.     Denied.  By way of further answer, ICEE had no plan to "eliminate SPL."  On the contrary, it was only after SPL sued ICEE on a forged document as part of its and its American attorneys' scheme to defraud ICEE and the American courts with the intent of claiming rights to ICEE trademarks that SPL did not have that ICEE decided to terminate the 1996 and 1999 agreements. By way of further answer, the Court has already held that ICEE's termination was lawful and proper under the plain language of the 1996 and 1999 agreements, and has entered judgment accordingly.

36.      Denied.

37.     Denied.

38.     It is admitted only that this Court has subject-matter jurisdiction to determine the harm caused to ICEE by the lessening of the goodwill and reputation the SLUSH PUPPiE® brand enjoys with the buying public on account of SPL's illegal scheme to defraud the American courts and ICEE with its forgeries and fraudulent practices.  The remaining allegations of this paragraph are denied.

39.     Denied.

40.     ICEE admits only that the Court has subject matter jurisdiction over the question of which party has unjustifiably benefited from its unlawful acts and has been unjustly enriched. ICEE denies that it has engaged in any unlawful acts or has harmed SPL.  To the contrary, it is SPL that has engaged in numerous unlawful acts, including continued use of ICEE's SLUSH PUPPiE® trademarks, as well as Obstruction of Justice under United States Criminal Code 18 U.S.C. § 1503, and thereby defrauded this Court and harmed ICEE, thereby being unjustly enriched and entitling ICEE to recoup from SPL the revenues that SPL has received by virtue of SPL's unlawful acts. ICEE denies the remaining allegations of this paragraph.

41.     It is admitted that SPL via its American attorneys made a fraudulent demand in the United States sent to ICEE in the United States, demanding that ICEE contact licensees in the United Kingdom and Europe.  The demand was based on a forged document as part of a scheme by SPL and its American attorneys to defraud ICEE by filing the forged document in the American courts and then engaging in a pattern of delay, perjury, and spoliation of evidence.  It is further admitted that the Court has subject matter jurisdiction to determine which party has rights to the SLUSH PUPPiE® trademarks.  The remaining allegations of this paragraph are denied.

42.     It is admitted only that this Court has subject matter jurisdiction to determine which party had the exclusive rights to use the SLUSH PUPPiE® trademarks.  It is denied that SPL had any such rights, or has any such rights.  To the contrary, the Court has already ruled that SPL has no such rights because ICEE properly terminated any of SPL's rights to use the ICEE SLUSH PUPPiE® trademarks on June 25, 2019.  Moreover, SPL has admitted that ICEE owns "all right, title, and interest . . . with respect to the SLUSH PUPPIE trademarks in various geographic territories throughout the world, including, without limitation, in the United States

and, for the purposes of this action, specifically in territories comprising the 1996 Territory and 1999 Territory." *See supra* ¶ 26. The remaining allegations of this paragraph are denied.

43. It is admitted that on June 25, 2019, ICEE's counsel sent a letter to SPL terminating the 1996 Appointment and 1999 Agreement on the ground that SPL had filed this action. It is further admitted that a true and correct copy of the termination letter is attached to the SAC as Exhibit H. It is denied that SPL filed this action seeking to protect its rights. To the contrary, SPL has admitted that the contract it sued on when it filed this action was "not genuine," and that the claims based on that forged contract were "meritless." Moreover, SPL's counsel finally admitted in November 2020 that they could not ethically proceed with prosecuting claims based on the contract that SPL had forged. Doc. 82 at PAGEID 2050. The remaining allegations of this paragraph are denied.

## FIRST CLAIM FOR RELIEF
(Breach of Contract – Declaratory Judgment)

44. ICEE incorporates by reference its responses to paragraphs 1-43 of the Second Amended Complaint.

45. ICEE admits that it acquired ownership of the SLUSH PUPPiE® trademarks and related business from the DPSU and ICEE asset purchase agreements and the SPC Trademark Assignment and DPSU Trademark Assignment. ICEE denies the remaining allegations in paragraph 45 of the Second Amended Complaint. By way of further answer, ICEE refers SPL to the 1996 Appointment for its precise terms.

46. ICEE admits that this Court has subject-matter jurisdiction over the question of the parties' respective legal rights and duties insofar as the SLUSH PUPPiE® trademarks are concerned. ICEE denies the remaining allegations of this paragraph.

47.      Denied. By way of further answer, ICEE refers SPL to the 1996 Appointment itself for its actual terms.

48.      Denied.  By way of further answer, SPL forged the Appointment of Trademark Licence and then claimed through its co-conspirators at the Benesch firm that this forgery superseded the 1996 Appointment and the 1999 Agreement.  SPL then pled that it had no obligations under the 1996 Appointment or the 1999 Agreement, that those agreements were not effective, and that ICEE's termination of them was "a nullity" because of the forged 2000 Appointment of Trademark Licence.  Doc. 32.  The remaining allegations of this paragraph are denied.

49.      ICEE admits that SPL's American counsel made a fraudulent demand that ICEE cease and desist from allowing others to manufacture or sell SLUSH PUPPiE neutral base and syrups based on the forged Appointment of Trademark Licence in furtherance of SPL's and its American attorneys' scheme to defraud this Court and ICEE.

50.      Denied.

## SECOND CLAIM FOR RELIEF
(Breach of Contract – Declaratory Judgment)

51.      ICEE incorporates by reference its responses to paragraphs 1-50 of the Second Amended Complaint.

52.      ICEE admits that it acquired ownership of the SLUSH PUPPiE trademarks and related business from the DPSU and ICEE asset purchase agreements and the SPC Trademark Assignment and DPSU Trademark Assignment.  The remaining allegations of this paragraph are denied.  By way of further answer, ICEE refers SPL to the 1999 Agreement for its terms.

53.     ICEE admits that this Court has subject-matter jurisdiction over the question of the parties' respective legal rights and duties insofar as the SLUSH PUPPiE trademarks are concerned.  ICEE denies the remaining allegations of this paragraph.

54.     Denied. By way of further answer, ICEE refers SPL to the 1999 Appointment itself for its actual terms.

55.     Denied.  By way of further answer, SPL forged the Appointment of Trademark Licence and then claimed through its co-conspirators at the Benesch firm that this forgery superseded the 1996 Appointment and the 1999 Agreement.  SPL then pled that it had no obligations under the 1996 Appointment or the 1999 Agreement, that those agreements were not effective, and that ICEE's termination of them was "a nullity" because of the forged 2000 Appointment of Trademark Licence.  Doc. 32.  The remaining allegations of this paragraph are denied.

56.     ICEE admits that SPL's American counsel made a fraudulent demand that ICEE cease and desist from allowing others to use the SLUSH PUPPiE trademarks based on the forged Appointment of Trademark Licence in furtherance of SPL's and its American attorneys' scheme to defraud this Court and ICEE.  ICEE further admits that this Court has subject-matter jurisdiction over the question of the parties' rights to use the SLUSH PUPPiE trademarks.  The remaining allegations of this paragraph are denied.

57.     Denied.

### THIRD CLAIM FOR RELIEF
(Violation of Ohio's Deceptive Practices Act, R.C. 4165.01, *et seq.*)

58.     ICEE incorporates by reference its responses to paragraphs 1-57 of the Second Amended Complaint.

59.     ICEE admits that Ohio's Deceptive Trade Practices Act applies to the question of which party was causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services under R.C. 4165.02(A)(2) and causing a likelihood of confusion or misunderstanding as to affiliation, connection or association with the parties under R.C. 4165(A)(3).  ICEE denies that it was creating any such likelihood of confusion.  To the contrary, SPL was.  The remaining allegations of this paragraph are denied.

60.     Denied.

61.     Denied.

62.     Denied.

**FOURTH CLAIM FOR RELIEF**
(Breach of Contract – Damages)

63.     ICEE incorporates by reference its responses to paragraphs 1-62 of the Amended Complaint.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

**FIFTH CLAIM FOR RELIEF**
(Breach of Contract – Damages)

70.     ICEE incorporates by reference its responses to paragraphs 1-69 of the Amended Complaint.

71.     Denied.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

## PRAYER FOR RELIEF

ICEE denies that Plaintiff is entitled to any of the relief it seeks.  ICEE requests a judgment dismissing the claims in Plaintiff's Amended Complaint with prejudice, its costs and reasonable attorney's fees, sanctions against SPL and its counsel pursuant to 28 U.S.C. § 1927 and the Court's inherent power, along with any other relief the Court deems just and proper.

## JURY DEMAND

ICEE demands a jury trial on all issues so triable.

## <u>AFFIRMATIVE DEFENSES</u>

The Second Amended Complaint fails to state a claim upon which relief can be granted.

Plaintiff's claims are barred by estoppel and/or waiver.

Plaintiff's claims are barred by its fraud.

Plaintiff's claims are barred by its spoliation of evidence.

Plaintiff's claims are barred by its and its counsel's litigation misconduct.

Plaintiff is not entitled to injunctive or other equitable relief on account of laches or other delay in seeking relief.

Plaintiff is not entitled to injunctive or other equitable relief on account of its unclean hands, spoliation of evidence, and litigation misconduct.

13

**DEFENDANT THE ICEE COMPANY'S**
**COUNTERCLAIMS TO THE SECOND AMENDED COMPLAINT**

For its counterclaims against Slush Puppie Limited ("SPL"), The ICEE Company

("ICEE") pleads as follows:

**PARTIES AND JURISDICTION**

1.      On information and belief, counterclaim defendant Slush Puppie Limited is a

company organized under the laws of the United Kingdom, with its principal place of business at

Coronation Road, Cressex Business Park, High Wycombe, Buckinghamshire, HP12 3TA.  On

information and belief, Slush Puppie Limited has changed its name to Frozen Brothers Limited.

2.      Counterclaim Plaintiff The ICEE Company is a corporation organized under the

laws of the State of Delaware, with its principal place of business at 265 Mason Road

La Vergne, TN 37086.

3.      This Court has subject matter jurisdiction over these counterclaims based on

diversity of citizenship, 28 U.S.C. § 1332(a)(2) since the amount in controversy exceeds the sum

or value of $75,000 exclusive of interest and costs, and the counterclaims are between a citizen

of a State and a citizen of a foreign state.  This Court has subject-matter jurisdiction over ICEE's

Lanham Act claims based on federal question jurisdiction, 28 U.S.C. § 1331, since the Lanham

Act arises under the laws of the United States, and the Lanham Act itself, 15 U.S.C. § 1121(a).

4.      This Court has personal jurisdiction over SPL because, among other reasons, SPL

has consented to personal jurisdiction by filing its Complaint, Amended Complaint, and Second

Amended Complaint in this District, by forging a contract and having it provide for jurisdiction

in this district and then suing on that forged contract, and because these counterclaims arise from

the same nucleus of operative facts as alleged in the Complaint, Amended Complaint, and/or

Second Amended Complaint.

## FACTS

### THE SLUSH PUPPIE® BUSINESS AND MARKS

5.      The SLUSH PUPPIE® frozen drink business was started by Willard ("Will")

Radcliff, who founded the Slush Puppie Corporation in Cincinnati, Ohio and built it into a

successful international business.

6.      From around 1978 until early 2001, Slush Puppie Corporation owned the

trademarks for SLUSH PUPPIE® along with various logos and designs used in connection with

Slush Puppie Corporation's goods and services (collectively, the "SLUSH PUPPIE® Marks").

7.      The SLUSH PUPPIE® Marks and various logos and designs are registered

trademarks in the United States, the United Kingdom, and the European Union, among other

places.  Among other marks, the SLUSH PUPPIE® Marks include:

   a.   U.S. Trademark Registration No. 1,665,188 covering "nonalcoholic slush type

        beverages, syrups, and preparations for making slush type beverages,"

   b.   U.S. Trademark Registration No. 3,132,350 covering "clothing, namely tops, t-

        shirts, pants and loungewear, headwear, jackets and footwear."

8.      Since 2006, ICEE has been the owner of the Slush Puppie business and of the

SLUSH PUPPIE® Marks, which it bought from Dr. Pepper/Seven Up, Inc. ("DPSU") pursuant

to an asset purchase agreement.  DPSU, in turn, had purchased the business from Slush Puppie

Corporation in a 2001 asset purchase agreement.

9.      By virtue of its purchase of certain SLUSH PUPPIE® assets from DPSU, ICEE

assumed two contracts with SPL relating to SPL's rights to certain limited use of certain SLUSH

PUPPIE® Marks: a 1996 Appointment of Syrup Manufacturer that had been entered into by

Slush Puppie Corporation and Able Foods, Ltd. ("the 1996 Manufacturing Appointment") and a

1999 "International Independent Area Distributor License Agreement" with SPL (the "1999 Distributor Agreement").

## THE 1996 MANUFACTURING APPOINTMENT

10.     The 1996 Manufacturing Appointment was originally entered into on or about January 1, 1996, by Slush Puppie Corporation and SPL's predecessor, Able Foods, Ltd. A copy of the 1996 Manufacturing Appointment is attached hereto as Exhibit A.

11.     The 1996 Manufacturing Appointment provided SPL with a limited license to manufacture SLUSH PUPPIE syrup and neutral base for use with SLUSH PUPPIE machines and products in certain European countries and the United Kingdom.

12.     Section 3A of the 1996 Manufacturing Appointment defines the "royalty" SPL must pay as "an amount proportionately equal to 5% of the cost of SLUSH PUPPIE's products in pound sterling prices to distributors in the U.K. for the previous calendar year."

13.     The 1996 Manufacturing Appointment provides in paragraph 8.D that Slush Puppie Corporation may cancel and terminate the appointment by written notice to SPL for, among other reasons, "[t]he filing of any legal action other than for collection on account against SLUSH PUPPIE, its representatives, distributors, customers, manufacturers, or suppliers . . . ."

14.     The 1996 Manufacturing Appointment provides that, "[u]pon any termination of this Agreement, [SPL] shall make no claim of any kind because of such termination, and [SPL] agrees to waive, and does hereby waive the right to any compensation which may be allowable or imposed for such termination as liquidated damages or other such payments, if any.  The termination of this agreement, as herein provided, shall not affect [SPL's] obligation to pay any amount accruing to SLUSH PUPPIE or any of its affiliates under the provisions of the agreement while it was in effect."

16

15. The 1996 Manufacturing Appointment provides that, upon termination, "Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever . . . ."

16. The 1996 Manufacturing Appointment provides that, "[u]pon any termination, Manufacturer shall immediately cease and desist from further use of any SLUSH PUPPIE trademarks, names, logos or references and any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products."

17. Will Radliff executed the 1996 Manufacturing Appointment on behalf of the Slush Puppie Corporation on February 5, 1996.

18. Diane Menzer, a vice president of the Slush Puppie Corporation, witnessed Will Radcliff's execution of the 1996 Manufacturing Appointment.

## THE 1999 DISTRIBUTOR AGREEMENT

19. On or about December 23, 1999, Slush Puppie Corporation entered into the 1999 Distributor Agreement. A copy of the 1999 Distributor Agreement is attached hereto as Exhibit B.

20. The 1999 Distributor Agreement became effective on January 1, 2000.

21. The 1999 Distributor Agreement provided SPL with a limited license to distribute certain SLUSH PUPPIE® Products as therein defined within the defined territory of the United Kingdom and Ireland.

22. Paragraph VIII.F. of the 1999 Distributor Agreement provides, *inter alia*, that "COMPANY may, for good cause, IMMEDIATELY terminate this grant of Independent Area Distributor License upon written notice to DISTRIBUTOR, without regard to the above stated cure provisions, where DISTRIBUTOR has committed or COMPANY reasonably anticipates

17

that DISTRIBUTOR is about to commit any of the following acts: . . .  4.  The filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers or suppliers . . . ."

23.     Paragraph III.B of the 1999 Distributor Agreement provides, *inter alia*, that, "[u]pon termination of this Agreement, DISTRIBUTOR shall return to COMPANY, or effectively destroy, all literature, signs, advertising material, promotional matter, and other materials identifying the former DISTRIBUTOR with COMPANY or its PRODUCTS and shall immediately cease to identify itself with COMPANY or use the MARKS or any confusing similarity thereof, and shall discontinue or change it's [sic] company name if DISTRIBUTOR employed any such company name or product mark as a part of DISTRIBUTOR'S name, logo, or business.  It is agreed that after expiration (without renewal) or termination of this agreement, any use of the MARKS by DISTRIBUTOR will result in irreparable injury to COMPANY and DISTRIBUTOR hereby consents to a court order enjoining DISTRIBUTOR from using the MARKS in any way, notwithstanding any other enforcement remedy."

24.     Paragraph VI.H of the 1999 Distributor Agreement provides, *inter alia*, that "[a]ny breach of this DISTRIBUTOR Agreement, or termination . . . shall, of necessity, require Distributor to immediately cease and desist from the further use of the Slush Puppie name and logo, and return any and all PRODUCTS, materials, signs, emblems, and the like, bearing the Slush Puppie name and logo, to COMPANY in Cincinnati, Ohio, freight prepaid."

25.     The 1999 Distributor Agreement defines "COMPANY" as Slush Puppie Corporation and DISTRIBUTOR as SPL.

26.     The 1999 Distributor Agreement was executed on behalf of the Slush Puppie Corporation by Diane Menzer, a vice president of the company.  Tara Behanan witnessed Menzer's execution of the agreement.

### DR. PEPPER/SEVEN UP BUYS THE SLUSH PUPPIE® BUSINESS IN 2001 AND CONTINUES OPERATING UNDER THE 1996 AND 1999 AGREEMENTS

27.     In or around January 2001, Dr. Pepper/Seven Up, Inc. ("DPSU") purchased the SLUSH PUPPIE® Marks and related business from Slush Puppie Corporation pursuant to an asset purchase agreement.

28.     SPL has alleged in this litigation that Slush Puppie Corporation and SPL entered into an "Appointment of Trade Mark Licence" on or about August 8, 2000 and that this purported agreement superseded the 1996 and 1999 agreements.  SPL further alleged that a "true and correct" copy of the original 2000 "Appointment of Trade Mark Licence" was attached to SPL's amended complaint (Doc. 27) at Exhibit D.

29.     The "2000 Appointment of Trade Mark Licence" ("Purported 2000 Agreement") referred to in SPL's Amended Complaint, however, was never provided to DPSU as part of its acquisition of certain SLUSH PUPPIE® assets.

30.     Moreover, SPL never provided DPSU with a copy of the Purported 2000 Agreement at any time before or during DPSU's ownership of the SLUSH PUPPIE® business.

31.     DPSU did, however, receive copies of the 1996 Manufacturing Appointment and of the 1999 Distributor Agreement in connection with its purchase of the SLUSH PUPPIE® assets.

32.     DPSU operated pursuant to the 1996 Manufacturing Appointment and the 1999 Distributor Agreement during its ownership of the Slush Puppie business.

33. In approximately late 2000 or early 2001, SPL and Slush Puppie Corporation agreed to lower the royalty rate to be paid under the 1996 Manufacturing Appointment to 2.5%.

34. On February 7, 2001, Diane Menzer, a former Slush Puppie Corporation employee who worked for DPSU after its acquisition of the SLUSH PUPPIE® business, informed Kim Yee of DPSU by fax that the 1996 "manufacturing license" needed "to be adjusted to reflect the 2 ½% commission" that had been lowered by agreement from its original 5%. The fax references paragraph "(3A)," which is the section of the 1996 Manufacturing Appointment that defines the royalty payable by SPL.

35. Menzer believed that the 1996 Manufacturing Appointment was still in effect as of February 7, 2001.

36. Beginning at some point in 2000 or early 2001, SPL compensated Slush Puppie Corporation and its successors with royalty payments of only 2.5% of the total cost of syrups charged and sold to distributors after appropriate discounts.

**ICEE BUYS THE SLUSH PUPPIE® BUSINESS AND CONTINUES OPERATING UNDER THE 1996 AND 1999 AGREEMENTS**

37. In May of 2006, ICEE and Dr. Pepper/Seven Up, Inc. entered into an asset purchase agreement relating to the SLUSH PUPPIE® business and trademarks.

38. As a result of the asset purchase agreement with DPSU, ICEE became the owner of the SLUSH PUPPIE® business and trademarks throughout the world.

39. By Trademark Assignment dated May 26, 2006, ICEE acquired all right, title, and interest of Dr. Pepper/Seven Up, Inc. with respect to the SLUSH PUPPIE® Marks in various geographic territories throughout the world, including, without limitation, in the United States and, for purposes of this action, specifically in the territories listed in the 1996 Manufacturing

Appointment and the 1999 Distributor Agreement.  A copy of the Trademark Assignment is attached hereto as Exhibit C.

40.      ICEE never received a copy of the Purported 2000 Agreement as part of its acquisition of the SLUSH PUPPIE® business from DPSU.

41.      The Purported 2000 Agreement was not listed or referenced on any of the disclosure schedules or anywhere else in the asset purchase agreement between DPSU and ICEE.

42.      ICEE did receive copies of the 1996 Manufacturing Appointment and 1999 Distributor Agreement from DPSU in connection with ICEE's purchase of the SLUSH PUPPIE® assets.

43.      ICEE operated pursuant to the 1996 Manufacturing Appointment and the 1999 Distributor Agreement in its relationship with SPL following the acquisition of the SLUSH PUPPIE® business from DPSU.

44.      ICEE understood that the 1996 Manufacturing Appointment and the 1999 Distributor Agreement had not been superseded by any more recent, written agreement.

45.      ICEE accepted 2.5% as a royalty under the 1996 Appointment on the basis of the modification between the parties of the royalty rate from 5% to 2.5%, as reflected in Ms. Menzer's February 7, 2001 fax to Ms. Yee.

**SPL REPEATEDLY CONCEDES THAT THE OPERATIVE LICENSING AGREEMENTS BETWEEN THE PARTIES ARE THE 1996 MANUFACTURING AGREEMENT AND THE 1999 DISTRIBUTOR AGREEMENT**

46.      Between 2010 and 2018, SPL and ICEE engaged in discussions about the scope of SPL's rights to use the SLUSH PUPPIE trademarks.  Some of those discussions took place in the United States.

47.     In the course of the discussions of ICEE and SPL between 2010 and 2017, SPL repeatedly affirmed that the 1996 Manufacturing Appointment and the 1999 Distributor Agreement were in effect between SPL and ICEE.

48.     In the course of the discussions between ICEE and SPL between 2010 and 2017, SPL affirmed that there was no written agreement other than the 1996 and 1999 agreements that governed SPL's and ICEE's relationship.

49.     For example, on August 8, 2017, SPL's United Kingdom counsel, Josh Conroy of Weightmans LLP, sent a letter to ICEE's United Kingdom counsel.  In that letter, Mr. Conroy referred to the 1996 Manufacturing Appointment and the 1999 Distributor Agreement together as the "Existing Agreements" and wrote that "[I]t is clear that the Existing Agreements form the basis of the relationship between Slush Puppie and ICEE."  A copy of Attorney Conroy's August 8, 2017 letter is attached hereto as Exhibit D.

50.     Between 2010 and February 28, 2018, SPL always referred to the 1996 Manufacturing Appointment and 1999 Distributor Agreements as the operative written agreements between the parties.

## MARK PETERS FORGES THE PURPORTED 2000 AGREEMENT

51.     SPL's Managin Director--Mark Peters--however, was not happy with the limited rights provided under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement, even though he had signed the latter.

52.     Peters argued to ICEE that certain oral understandings, procedures, and methods, and "working practise" gave SPL broader rights than those contained in the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.

53.     According to Peters, procedures and methods established over the 35 years before 2010 gave SPL the responsibility to represent, license, manufacture, and sell Slush Puppie products in Europe.

54.     But Peters knew from his own attorney that the written agreements did not support the rights he claimed.

55.     Peters' American lawyers had told him in 2010 that SPL had "zero wrights" [*sic*] outside of those set forth in the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.

56.     Nonetheless, Peters attempted to convince ICEE's American lawyers that there was a "working practise" that provided SPL with broader trademark rights to ICEE's SLUSH PUPPiE® trademarks than the rights set forth in the 1996 and 1999 agreements.

57.     In 2011, Peters sent ICEE's counsel a document titled "History of Working Practise," claiming that "my father [Ralph Peters] and Will Radcliffe [sic] have documented the history behind the agreements we have today and what they intended the agreements to secure for both parties."

58.     The PDF that Peters sent ICEE's counsel is dated February 16, 2011 and has the file name "Will & RPP History of SP USA Contrat [*sic*] V1.pdf."  It is signed by both Ralph

Peters and Will Radcliff, along with two witnesses:



59.     This History of Working Practise claims to trace the "history" of the parties' relationship up to 1996.

60.     In discovery, SPL's counsel at the Benesch firm never produced this document.

61.     Between 2011 and 2017, Mark Peters attempted to negotiate various agreements with ICEE that would supersede the 1996 Manufacturing Appointment and 1999 Distributor Agreement, but he was unable to reach a deal.

62.     Mark Peters then set out to defraud ICEE out of its trademark rights by creating in 2017 a fake "Appointment of Trade Mark Licence," dated August 8, 2000.

63.     The forged 2000 Appointment purported to grant SPL "the exclusive use of the SLUSH PUPPIE trademark(s)" in a broad range of European territories:

NOW, THEREFORE, SPC hereby GRANTS to SPL the exclusive use of the SLUSH PUPPIE trademark(s), subject to and conditioned upon the SPL compliance with the following terms and conditions.

THIS APPOINTMENT IS LIMITED TO THE CONDITIONS OF THIS AGREEMENT, AND SHALL BE WITHIN THE FOLLOWING DEFINED "TERRITORY".

The exclusive TERRITORY is defined as, the following geographical entities or States as each is defined to exist as of the date of this Agreement:

| | | | |
|---|---|---|---|
| Austria | Belgium | Bosnia/Hercegovina | Croatia |
| Cyprus | Czech Republic | Denmark | Finland |
| France | Germany | Gibraltar | Greece |
| Hungary | Ireland | Italy | Liechtenstein |
| Luxembourg | Macedonia | Malta, Gozo | Monaco |
| Montenegro | Netherlands | Norway | Poland |
| Portugal | Serbia | Slovakia | Slovenia |
| Spain | Sweden | Switzerland | U.K. |
| Vatican City | | | |

64.     Peters wanted any dispute regarding the SLUSH PUPPiE® trademark rights to be resolved in the American courts, so he put a provision in the forged agreement that provided that the exclusive venue for any litigation arising from or in any way connected with the agreement would be in Ohio.

65.     Peters copied Radcliff's signature and that of a witness from the 2011 History of Working Practise into the forged 2000 Appointment.

| History of Working Practise<br>Sent to ICEE on April 26, 2011 | Purported 2000 Appointment<br>Sent to ICEE February 28, 2018 |
|---|---|
| Signed by Will Radcliff           Date | Day      of   August 2000 |
|                                          | By: |
| in the presence of                      | |
|                        2/22/11           | WITNESSED BY: |

66.     Radcliff had died before Peters engaged in this fabrication--in 2014--a fact that Peters was aware of in 2017.

67.     After fabricating the 2000 Appointment, Peters sent it to Solicitor Charles Suchett-Kaye at the British law firm of Reynolds Porter Chamberlain ("RPC") on November 20, 2017.

68.     Peters also attached a "History of Working Practise" to his November 20, 2017 email to Suchett-Kaye, but he changed the 2011 version to conceal his lifting of the Radcliff signature from the original "History" and his pasting of it into the forged 2000 Appointment.

69.     While the 2011 version of the History of Working Practise ended with entries up to the year 1996, Peters added two entries for 2000 that paraphrased paragraph 4A of the forged 2000 Appointment:

> 2000 - End 2000
> WR and RPP agree that all merchandising and any sub licensing, brand,
> protection, exclusive manufacturing rights and the right to use the trade mark
> Slush Puppie as Slush Puppie Ltd see fit for all of the UK, Southern Ireland and
> Europe have been vested to Slush Puppie Ltd for in perpetuity, in return for a
> revised royalty payment that is to be an amount proportionally equal to 2.5% of
> the cost of Slush Puppie syrups in pounds sterling prices to distributors in the
> UK for the previous calendar year
>
> 2001
> Slush Puppie Corporation is Sold to Dr Pepper/Seven Up Inc

70.     Peters also replaced the original Radcliff signature and witness signatures with a different Radcliff signature and a different witness name:



71.     The metadata for this document show that it was created on November 20, 2017 from a Microsoft Word document titled "Will RPP history of SP USA Contrat [sic] V1.1" and authored by "markp." These metadata were intact when the documents was received by both RPC and the Benesch attorneys in Ohio representing SPL.

72.     As of November 20, 2017, the only person at SPL named Mark with a last name beginning with a "P" was Mark Peters.

73.     On December 20, 2017 RPC told Peters that "anything that fixes ICEE with knowledge of" the 2000 Appointment "or shows that ICEE has been working to its terms, would be helpful."

74.     After receiving this email, Peters fabricated such "helpful" evidence.

75.     Peters copied and pasted a genuine November 11, 2008 email generated in Microsoft Outlook from ICEE's Jerry Bird to SPL's then finance director, Lindsay Kirby, on which Peters had been copied, seeking "supporting information on how the 2007 Royalty was determined," into a Microsoft Word document.

76.     The only people at SPL who received the genuine email with ICEE's Jerry Bird were Lindsay Kirby and Mark Peters. Kirby left SPL in 2009, so the only person at SPL who had access to the genuine email exchange was Mark Peters.

77.     Peters then typed up a reply to the genuine November 11 email in Word saying that the "royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000."

> **From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
> **Sent:** Wednesday, November 12, 2008 10:57 AM
> **To:** Bird, Jerry
> **Subject:** Royalty 2007
>
> Dear Jerry,
>
> The royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000.
>
> On page two - A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.
>
> Is this what you need?
>
> Regards,
> Lindsay

78.     "Kirby's" November 12  email paraphrases Paragraph 4A of the 2000 Appointment of Trade Mark Licence.

79.     As noted, Kirby had left SPL in 2009.

80.     In the November 12, 2008 email purportedly from Kirby, Peters mis-spelled "Wednesday" as "Wendsday."

81.     Since the time, date, and day of the week of an email are and were at the time automatically generated by Microsoft Outlook, the mis-spelling of Wendsday made it clear to anyone who noticed the misspelling that the November 12, 2008 email was not genuine.

82.     The metadata for this document show that the pdf was created by "markp" from a "Microsoft Word – Document2" created on January 17, 2018.

83.     Both RPC and the attorneys at the Benesch firm who represented SPL received the PDF document containing the forged November 12, 2008 email with these metadata.

84.     As of January 17, 2018, the only person at SPL named Mark with a last name beginning with a "P" was Mark Peters.

28

85.     On that same date—January 17, 2018—Peters sent the Kirby email to RPC, asking "Is this of any help?"

86.     On April 17, 2018, Ben Mark at RPC sent the "Wendsday Email" with its metadata to Mark Avsec and Eric Zalud of the Benesch firm, who had been hired to initiate litigation in Ohio.  Noting that this email exchange was "helpful," Ben Mark informed Avsec and Zalud that the "Wendsday Email" was "the only correspondence around this time dealing with the issue."

87.     Until February 28, 2018, SPL never mentioned the Purported 2000 Agreement with ICEE.

88.     Until February 28, 2018, SPL never provided ICEE with a copy of the Purported 2000 Agreement.

89.     On or about February 28, 2018, Mark Peters sent a copy of the Purported 2000 Agreement for the first time to ICEE.  A copy of Mr. Peters' February 28, 2018 email is attached hereto as Exhibit E.

90.     In his February 28, 2018 email to ICEE's Dan Fachner, Peters claimed that the 2000 Appointment gave SPL "the exclusive rights to use the SLUSH PUPPIE trade mark in Europe in relation to freezers, syrups and products for the promotion of the SLUSH PUPPIE trade mark."

91.     In reply, ICEE's Dan Fachner asked Peters where the 2000 Appointment came from and why it had never previously been produced or mentioned in the past decade.

92.     Peters responded to Fachner's questions by stating that the 2000 Appointment "was in fact raised with ICEE many years ago (even though, as an oversight, it was not

mentioned in more recent correspondence) – and indeed royalties have been paid by us, and accepted by ICEE, under that agreement for many years."

93.    That claim was false.

94.    On April 25, 2018, ICEE counsel at Gowling informed SPL's U.K. trademark counsel that Peters had failed to say where the 2000 Appointment had come from, or to explain why it had not previously been produced.  Gowling further stated that ICEE would not accept that the 2000 Appointment had any binding effect, or which should be considered further as part of any discussions.

95.    On May 3, 2018, SPL's U.K. counsel at RPC expressed doubts about the authenticity of the 2008 "Wendsday Email," noting to Mark Peters himself that it was curious that the email ended with the question "is this what you need?" when Peters was unable to produce any response to that question: "One point to mention is that the risk of relying on the 2008 email without having done full searches is that any response and subsequent correspondence could be highly relevant – we note in particular the email ends with a question 'is this what you need?'"

96.    Yet neither RPC nor Benesch ever conducted "full searches" of SPL's email to try and authenticate the "helpful" "Wendsday Email" that purported to be from 2008.

97.    On August 17, 2018, SPL's American counsel—specifically, Mark Avsec of the Benesch firm—responded to Gowling's letter.

98.    Avsec's August 17, 2018 letter insisted that "there is no question that the parties have been operating under the terms of the 2000 Agreement (including its royalty provisions) since ICEE's acquisition of the SLUSH PUPPIE brand and business in 2006."

99.     Avsec further stated that the 2000 Appointment "supersedes all previous agreements between or among the parties (or their predecessors-in-interest)" and that it "granted SPL the perpetual and exclusive use of the SLUSH PUPPIE trademarks in connection with the manufacturing and distribution of SLUSH PUPPIE products" in the U.K. and Europe.

100.     Avsec insisted that Ohio law applied to the parties' trademark rights in the U.K. and Europe, and that "any dispute must be litigated in the State of Ohio."

101.     Avsec demanded that ICEE immediately cease and desist from licensing third parties with distribution rights to SLUSH PUPPiE, and that ICEE immediately contact licensees and instruct them to cease and desist as well.

102.     Meanwhile, RPC told Mark Peters to preserve relevant evidence for potential litigation in December 2017, and sent him RPC's Litigation Guide, which included a section on preserving documents.

103.     Notwithstanding receiving this litigation hold, Peters later destroyed all digital evidence of his various fabrications.

104.     On September 25, 2018, RPC attorney Holly Pownall and Benesch attorneys Matt Gurbach, Ron House, and Mark Avsec exchanged emails in which they noted how important the "Wendsday Email" was to trying and prove in litigation in United States courts that the forged 2000 Appointment was genuine.

### SPL FILES A MERITLESS LAWSUIT BASED ON THE FORGED 2000 APPOINTMENT

105.     ICEE refused to accede to Avsec's demand that it cease and desist from licensing its SLUSH PUPPiE® trademarks.

106. On February 12, 2019, SPL filed a complaint initiating this action and asserting various claims against ICEE in the Court of Common Pleas of Hamilton County, Ohio.

107. The complaint alleges that it attaches a "true and correct copy of the 2000 Appointment," but SPL knew that to be a false statement.

108. Any "original" of the 2000 Appointment was on Mark Peters' laptop, which he destroyed at some point after he received a litigation hold from RPC.

109. ICEE removed SPL's lawsuit to this Court on March 8, 2019.

110. As noted above, under the 1996 Manufacturing Appointment, ICEE is entitled to terminate the appointment based on "the filing or any legal action other than for collection on account against SLUSH PUPPIE, its representatives, distributors, customers, manufacturers, or suppliers." The claims that SPL asserted in the initial complaint in this action are not for collection on account.

111. As further noted above, under the 1999 Distributor Agreement, ICEE is entitled to terminate the agreement based on "the filing by [SPL] of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers, or suppliers."

112. On June 25, 2019, ICEE sent notice to SPL that it was immediately terminating SPL's rights under the 1996 Manufacturing Appointment and 1999 Distributor Agreement based on SPL's filing of this litigation against ICEE. A copy of that notice is attached hereto as Exhibit F.

113. ICEE's terminations of the 1996 Manufacturing Appointment and 1999 Distributor Agreement were proper under the terms of those agreements, as this Court has held.

114. SPL received ICEE's notice of termination no later than the end of June 2019.

115.    SPL has acknowledged receipt of the June 25, 2019 notice of termination of the 1996 and 1999 agreements.

116.    As of the time that SPL received ICEE's notice of termination, SPL had no right to use, license, or sublicense any of the SLUSH PUPPIE® Marks.

## SPL FAILS AND REFUSES TO COMPLY WITH THE TERMINATION PROVISIONS OF THE 1996 AND 1999 AGREEMENTS

117.    Notwithstanding receiving notice of termination, SPL failed and refused to comply with its various termination-related obligations under the 1996 Manufacturing Appointment and 1999 Distributor Agreement, including, but not limited to, failing to cease using the SLUSH PUPPIE® Marks, continuing to hold itself out as a licensee of the SLUSH PUPPIE® Marks in its business and on its website, and maintaining its relationships with its current licensees for slush beverages and other products, among other breaches and infringements.

118.    SPL even claimed without any basis that ICEE's termination of the 1996 Appointment and 1999 Agreement is "a nullity" based on its fraudulent claim that the Purported 2000 Agreement "supersedes" the 1996 and 1999 agreements.  June 28, 2019 letter from M. Gurbach to D. Wolfsohn, Exh. G.

119.    Yet, at the same time, SPL claimed in its Amended Complaint that the 1996 Manufacturing Appointment and 1999 Distributorship Agreement were still in effect and that the Purported 2000 Agreement did ***not*** supersede the 1996 and 1999 agreements.

120.    SPL's argument that, on the one hand, the Purported 2000 Agreement superseded the 1996 and 1999 agreements but, on the other hand, the 1996 and 1999 agreements are somehow still in effect is nonsensical and has been made in bad faith.

121.     SPL's continued insistence in this U.S. litigation after ICEE's termination that the forged 2000 Appointment governed the parties' trademark rights was made to allow it to continue to infringe ICEE's SLUSH PUPPiE trademarks and to force ICEE to incur huge costs as a result of that litigation in an effort to impede ICEE from stopping SPL from continuing to use the SLUSH PUPPiE® trademarks.

### SPL'S AMERICAN LAWYERS ARE DIRECTED BY SPL'S MARK PETERS TO ENGAGE IN DISCOVERY MISCONDUCT AND DELAY SO THAT SPL CAN CONTINUE TO INFRINGE ICEE'S SLUSH PUPPIE TRADEMARKS

122.     Beginning in the summer of 2019, the parties began discovery in this case.

123.     By November 18, 2019, SPL had produced 3568 pages of responsive documents.

124.     Because SPL's litigation counsel at the Benesch firm had doubts about the authenticity of the Kirby email, they initially withheld it from production despite the fact that they had received it on April 27, 2018.

125.     SPL's litigation counsel at the Benesch firm also withheld from production the 2011 version and the forged version of the History of Working Practise, even though they had received those documents from RPC in 2017 and/or 2018.

126.     In February 2020, SPL's litigation counsel at the Benesch firm produced the Kirby email to ICEE in an effort to convince ICEE to settle this case.

127.     This was shortly before SPL urged the Court to declare a moratorium during which the parties would be required to engage in settlement negotiations.

128.     With ICEE pressing for a deposition of Peters, SPL's litigation counsel at the Benesch firm became concerned that the optics of the "Wendsday Email" would not be favorable if Peters had to testify about it at a deposition.

129.     On February 25 and 26, 2020, SPL counsel Ron House, copying co-counsel Gurbach, Avsec, Turk, and Emanuel, wrote to Peters, attaching the "Wendsday Email."   House

attached the email string, noting that it had been received from RPC "early in the case." House said that he needed "to know whether the attached e-mail string can be retrieved in native format by your IT people and where the string came from. The word 'Wednesday' is misspelled as 'Wendsday' in the date of the top e-mail. An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition."

130. Peters failed to provide any of the Benesch lawyers with an explanation for why "Wendsday" was misspelled.

131. Concerned about how Peters would testify, the Benesch lawyers cancelled Peters' deposition, which had been scheduled for February 27, 2020, and filed for a moratorium of discovery.

132. Peters next falsely claimed to the Benesch attorneys that SPL's "IT person" was away and could not respond but would be back in a few days.

133. House and the other Benesch attorneys had still not received an explanation for the mis-spelling of Wendsday as of March 3, 2020. On that date, House wrote: "Finally, with your IT person back please have that person search for the November 12, 2008 email from Lindsay Kirby to Jerry Bird in native format. And we need to know where the e-mail came from. This is critical."

134. House asked these questions of Peters because House knew that the spelling of "Wendsday" had to mean that the email had been forged.

135. None of SPL's counsel at Benesch ever received information from SPL's "IT people" about the Wendsday email.

136. None of SPL's counsel at Benesch ever received an explanation from Peters for why "Wendsday" was misspelled.

137.    None of SPL's counsel at Benesch ever received a native version of the "Wendsday Email."

138.    No later than early March 2020, Benesch attorneys House and Gurbach knew that it was likely that Mark Peters had created the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

139.    Although they had noticed the mis-spelling of "Wendsday" no later than February 2020, as of early March 2020, Benesch attorneys House and Gurbach had no plausible explanation for the mis-spelling of Wendsday in the November 12, 2008 email between Lindsay Kirby and Jerry Bird other than that it was written by Mark Peters.

140.    Between early March 2020 and late June 2020, the Benesch attorneys did nothing to inform the Court or ICEE about their suspicions that Mark Peters had forged the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

141.    On June 25, 2020, Benesch attorney Matt Gurbach spoke with RPC attorney David Cran about the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

142.    The June 25, 2020 call was prompted by the fact that Mark Peters' deposition via Zoom had been ordered by the Court—over Benesch's objections—to take place on July 1, 2020.

143.    During the June 25, 2020 call, the attorneys from Benesch and RPC shared their suspicions that Mark Peters had written the "Wendsday Email" himself.

144.    Later that day, Benesch attorneys Gurbach and House discussed the November 12, 2008 email from Kirby to Bird with Peters.  Again, Peters had no explanation for the mis-spelling of Wendsday and had never found a native version.

145.    The June 25, 2020 conversation with Peters confirmed for the Benesch attorneys that Peters had forged it.

146.    The Benesch attorneys were aware that no other person at SPL would have had the means, motive, or opportunity to forge this email.

147.    None of the Benesch attorneys ever informed ICEE or its counsel about their suspicions that Mark Peters had written the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

148.    Despite suspecting that Mark Peters was a forger and that Peters had tried to "corroborate" the authenticity of the 2000 Appointment with the "Wendsday Email," SPL's attorneys at Benesch continued to insist in discovery that the forged 2000 Appointment governed the parties' trademark rights and superseded the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.

149.    SPL's attorneys at Benesch even denied in discovery that Mark Peters had written the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

150.    SPL's attorneys at Benesch engaged in this conduct in the United States to facilitate SPL's continued use of ICEE's SLUSH PUPPiE® trademarks.

## **MARK PETERS SPOLIATES EVIDENCE TO TRY AND HIDE HIS FORGERIES**

151.    On August 13, 2020, ICEE served a Request for Inspection and Request for Production of documents to inspect all computers and other devices used or accessed by Mark Peters between June 1, 2017 and November 1, 2018.

152.    On September 14, 2020, SPL responded that it "will produce the requested devices to an agreed upon third-party vendor for purposes of imaging the devices" and would produce the images to ICEE after reviewing them for privilege.

153.    Fifteen days later, on September 29, 2020, SPL's attorneys at Benesch stated that SPL "does not have possession or control of any devices responsive to this Request."

154.    Mark Peters destroyed or disposed of the devices that he used between June 1, 2017 and November 1, 2018 to prevent the detection of evidence of his multiple forgeries.

155.    SPL's attorneys at Benesch did nothing to ensure that Peters preserved the evidence of his forgeries.

## FORCED INTO A CORNER, SPL'S ATTORNEYS FINALLY ADMIT THAT THE 2000 APPOINTMENT IS "NOT GENUINE" BUT THEY NONETHELSS AID AND ABET MARK PETERS' PLAN B

156.    In August 2020, ICEE served on SPL its expert report showing that the 2000 Appointment had been forged.

157.    SPL's Benesch attorneys later admitted that the report conclusively proved that the 2000 Appointment was not genuine.

158.    Consistent with their directive from Mark Peters to delay, however, the Benesch lawyers representing SPL waited until just before summary judgment motions were due—October 15, 2020—to inform ICEE and the Court that they did not intend to proceed with claims based on the forged 2000 Appointment.

159.    The Benesch attorneys representing SPL admitted that the claims they had filed in this case in February and December 2019 based on the 2000 Appointment were "meritless" and that they had determined that they could no longer ethically continue to prosecute those claims, yet they refused to admit that the only person who could have engaged in this forgery was Mark Peters.

160.    At this point, Mark Peters pivoted to his "Plan B." Aided and abetted by the attorneys at Benesch, SPL now claimed that it had "performed its obligations under the terms" of the 1996 and 1999 agreements—even though SPL and its attorneys had earlier alleged that those same agreements had been superseded by the forged 2000 Appointment.

161.    The purpose of this "Plan B" was to gradually transition all of the SLUSH PUPPiE customers to an identical product that SPL would call Slushy Jack's while holding itself out as the source for SLUSH PUPPiE.

162.    In thousands of emails sent to SLUSH PUPPiE customers and potential customers in 2020 and 2021—long after SPL's rights to use the SLUSH PUPPiE name had been terminated—SPL held itself out as the source for SLUSH PUPPiE products.

163.    For example, a November 2020 "rebranding" letter from Mark Peters prominently featured the SLUSH PUPPiE logo, reading "Important news from SLUSH PUPPiE®" and reassured retailers that the rebranding would not "in any way affect existing commercial relations with customers, partners, suppliers, management, manufacturing, contracts, and personnel."

164.    SPL deliberately made its artwork for the marketing of "Slushy Jack's" look confusingly similar to that for SLUSH PUPPiE, for example by using the same color scheme and similar imagery of a cartoonish character holding a slush drink.

165.    SPL used the same recipe for "Slushy Jack's" that it had used and was using for SLUSH PUPPiE syrup.

166.    SPL told its customers that Slushy Jack's was SLUSH PUPPiE syrup, using the "SAME ORIGINAL no added sugar recipe and flavor range."

167.    Until at least fall of 2021, SPL continued to offer for sale SLUSH PUPPiE syrup, cups, and consumables to hundreds of customers who had branded their retail freezers as "Slushy Jack's."

168.    Until at least fall of 2021, SPL offered for sale Slushy Jack's syrups, cups, and consumables to customers who had branded their retail freezers as "SLUSH PUPPiE."

169.    For months after SPL announced its rebranding effort in October and November 2020, SPL continued to sell SLUSH PUPPiE to SLUSH PUPPiE customers.

170.    In violation of its duty to preserve evidence, SPL then destroyed evidence of its "transition" to Slushy Jack's, including destruction of documents relating to web design, the layout of SPL's sales ordering portals, and internal communications about the execution of SPL's "Plan B."

171.    To ensure that it could continue with its illegal infringement unmolested, SPL board member Laura Peters submitted a false affidavit to this Court, claiming that use of the SLUSH PUPPiE name had ceased by December 2020.  That statement was blatantly false and perjurious.

172.    Meanwhile, SPL deliberately tied up various of ICEE's domain names and social media accounts, including by offering some for sale and informing the World Intellectual Property Organization that the domains should not be transferred to ICEE because this Court "has yet to decide this."  SPL had used these domains for communication by email with "customers, suppliers" and others for long after ICEE had terminated SPL's rights to use the name Slush Puppie.  And Mark Peters directed SPL's digital director Peter Splatt to file numerous spurious trademark applications using the Slush Puppie and ICEE name—or confusingly similar words--in various jurisdictions in bad faith in an attempt to confuse the public.  Mark Peters also directed Splatt to incorporate new entities using the Slush Puppie name, notwithstanding Laura Peters' testimony before this Court that SPL "was moving completely away from the Slush Puppie Name" and would never change its name back to Slush Puppie. See, e.g., Doc. 143, which is hereby incorporated by reference as if set forth fully herein.

## COUNT ONE
### (Breach of Contract – 1996 Manufacturing Appointment)

173.    ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

174.    ICEE is the rightful owner of all rights previously held by Slush Puppie Corporation under the 1996 Manufacturing Appointment.

175.    The 1996 Manufacturing Appointment provides that SPL "shall not manufacture, bottle, distribute, or sell director or indirectly, any other product for use in Slush machines not promoted by SLUSH PUPPIE."

176.    The 1996 Manufacturing Appointment provides in paragraph 8.D that Slush Puppie Corporation may cancel and terminate the appointment by written notice to SPL for, among other reasons, "[t]he filing of any legal action other than for collection on account against SLUSH PUPPIE, its representatives, distributors, customers, manufacturers, or suppliers . . . ."

177.    As alleged above, ICEE properly terminated the 1996 Manufacturing Appointment on June 25, 2019, and SPL has acknowledged receipt of that notice.

178.    The 1996 Manufacturing Appointment provides that, "[u]pon any termination of this Agreement, [SPL] shall make no claim of any kind because of such termination, and [SPL] agrees to waive, and does hereby waive the right to any compensation which may be allowable or imposed for such termination as liquidated damages or other such payments, if any.  The termination of this agreement, as herein provided, shall not affect [SPL's] obligation to pay any amount accruing to SLUSH PUPPIE or any of its affiliates under the provisions of the agreement while it was in effect."

179.    SPL breached that obligation when it filed its Amended Complaint alleging claims based on ICEE's termination of the 1996 Manufacturing Appointment and continued to

litigate such claims until this Court entered partial summary judgment in favor of ICEE on its right to terminate the 1996 Manufacturing Appointment.

180.    The 1996 Manufacturing Appointment provides that, upon termination, "Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever . . . ."

181.    The 1996 Manufacturing Appointment provides that, "[u]pon any termination, Manufacturer shall immediately cease and desist from further use of any SLUSH PUPPIE trademarks, names, logos or references and any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products."

182.    SPL has breached its express obligation under the 1996 Manufacturing Appointment to immediately cease using SLUSH PUPPIE® trademarks upon termination.

183.    SPL has breached its express obligation under the 1996 Manufacturing Appointment to immediately change its name to delete any reference to SLUSH PUPPIE® products.

184.    SPL's breaches were made in bad faith.  SPL was notified of the termination of the 1996 Manufacturing Appointment, acknowledged receipt of that notice, yet it claimed that it could ignore the notice because the Purported 2000 Agreement supposedly superseded the 1996 Manufacturing Appointment.  Yet, at the same time, SPL argued that the Purported 2000 Agreement did *not* supersede the 1996 Manufacturing Appointment.

185.    SPL's breaches have caused damage to ICEE consisting of attorney's fees and costs incurred in defending SPL's claims in this litigation and lost licensing opportunities.

**COUNT TWO**
<u>(Breach of Contract – 1999 Distributor Agreement)</u>

186.    ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

187.    ICEE is the rightful owner of all rights of Slush Puppie Corporation under the 1999 Distributor Agreement.

188.    The 1999 Distributor Agreement granted SPL a limited right to distribute "PRODUCTS" defined as "Slush Puppie freezers, neutral base, flavors, cups, other related items, and other products which may be specifically approved in writing from time to time as meeting COMPANY's marketing plans and quality standards."

189.    SPL breached this obligation by distributing, or granting licenses to distribute, products that were not within the limited scope of the definition of "PRODUCTS" in the 1999 Distributor Agreement.  SPL knew of its limited rights under the 1999 Distributor Agreement, and violated them purposely and repeatedly by selling or licensing products that are not encompassed by those agreements, and/or selling outside the territory covered by those agreements.

190.    For example, SPL distributed, or granted licenses to distribute apparel, spray candy, and ice pops, none of which are "PRODUCTS" as defined by the 1999 Distributor Agreement.

191.    SPL also claims it has "been in discussions with Tesco about selling its own SLUSH PUPPIE products for resale."  Such products are/would be outside the scope of the definition of PRODUCTS in the 1999 Distributor Agreement.

192.    Accordingly, SPL has breached the 1999 Distributor Agreement.

193.    On various occasions, ICEE has informed SPL that its licensees' sales are outside the scope of the 1999 Distributor Agreement and therefore illegal.

194.    For example, on May 21, 2019, ICEE, through its counsel, informed SPL's UK counsel that SPL licensees' sales of various products were unauthorized and illegal.  May 21, 2019 Letter from D. Wolfsohn to J. Conroy, Esq., Exhibit H. ICEE insisted that SPL cease and desist from engaging in such licensing and sublicensing activities, and also demanded that SPL provide ICEE with information about its licensing activities.

195.    SPL ignored ICEE's cease and desist letter.  It has failed and refused to cease its illegal licensing activities, and failed and refused to provide ICEE with the requested information.

196.    SPL's licensing activities constitute willful violations of the 1999 Distributor Agreement.

197.    The terms of the 1999 Distributor Agreement also limited SPL's distribution rights to the United Kingdom and Ireland.

198.    SPL breached this obligation by distributing, or granting licenses to distribute, PRODUCTS (or other SLUSH PUPPIE® branded goods) outside of the United Kingdom and Ireland.

199.    SPL has encouraged its licensees to continue to sell SLUSH PUPPIE® products.

200.    SPL has informed its licensees that they are permitted to continue to sell SLUSH PUPPIE® products.

201.    Paragraph III.B. of the 1999 Distributor Agreement provides that, upon termination, SPL must return to ICEE or destroy all literature, signs, advertising material, promotional matter, and other materials identifying SPL with ICEE or its SLUSH PUPPIE "PRODUCTS," and shall immediately cease to identify itself with ICEE or use the SLUSH

PUPPIE  Marks or any confusingly similar marks, and shall discontinue or change its company name to remove references to "SLUSH PUPPIE."

202.    SPL has failed and refused to return or destroy the material referenced in Paragraph III.B, and it has continued to identify itself and hold itself out as a SLUSH PUPPIE licensee.

203.    SPL has failed and refused to change its name to remove the reference to "SLUSH PUPPIE."

204.    Paragraph VI.H. of the 1999 Distributor Agreement provides that, upon termination, SPL must "immediately cease and desist from the further use of the Slush Puppie name and logo, and return any and all PRODUCTS, materials, signs, emblems, and the like, bearing the Slush Puppie name and logo, to" ICEE.

205.    SPL has failed and refused to cease using the SLUSH PUPPIE name and logo, and has failed and refused to return all "PRODUCTS" bearing the SLUSH PUPPIE name and logo to ICEE.

206.    Paragraph VIII.M of the 1999 Distributor Agreement provides that, in the event of termination, SPL will deliver to ICEE all documents supplied to SPL, its subsidiary and associated companies, and appointees/sublicensees, by and on behalf of ICEE, containing information that is the subject of the 1999 Distributor Agreement, and thereafter, neither SPL, its subsidiary, or associated companies, nor its appointees/sublicensees, shall make or sell Products, as defined therein, within or without SPL's territory for a period of five years after termination.

207.    SPL has failed and refused to comply with Paragraph VIII.M of the 1999 Distributor Agreement.

208.     After it received notice of termination in June 2019, not only did SPL fail to cease and desist from further using the SLUSH PUPPIE name and logo, but it continued to license and encourage its illegal licensees to manufacture, offer for sale, and/or sell unauthorized products.

209.     SPL's breaches have caused damages to ICEE, including lost revenue from sales of products outside the scope of the 1999 Distributor Agreement, lost revenue from sales outside the territories covered by the 1999 Agreement, and lost licensing opportunities.

210.     SPL's breaches have also caused irreparable harm that cannot be remedied by money damages, and therefore SPL's conduct should be enjoined, including its continued distribution of products outside the scope of the 1999 Agreement and outside the territory of the 1999 Agreement.  In paragraph III.B. of the 1999 Distributor Agreement, SPL acknowledged that any use of the SLUSH PUPPIE® Marks will result in irreparable injury to ICEE, and has consented to a court order enjoining it from using the SLUSH PUPPIE® Marks in any way.

## COUNT THREE
### (Lanham Act – Trademark Infringement under 15 U.S.C. § 1114)

211.     ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

212.     ICEE is the owner of registered trademarks for the SLUSH PUPPIE® Marks for a variety of services in the United States, the United Kingdom, and the European Union, including but not limited to federal Registration Number 1,665,188 covering "nonalcoholic slush type beverages, syrups, and preparations for making slush type beverages," and Registration Number 3,132,350 for "clothing, namely tops, t-shirts, pants and loungewear, headwear, jackets and footwear."

213.    The SLUSH PUPPIE® Marks are inherently distinctive and strong.  The public

recognizes the SLUSH PUPPIE® Marks as designating the source of ICEE's products and

services.

214.    SPL, through the 1996 Manufacturer Appointment and the 1999 Distributor

Agreement, was granted a limited right to use the SLUSH PUPPIE® Marks.  Specifically, the

1999 Agreement provided SPL with the limited right to use the "name 'SLUSH PUPPIE' only

for the promotion and distribution of PRODUCTS offered by" ICEE  or other products

"specifically approved in writing from time to time as meeting [ICEE's] marketing plans and

quality standards."

215.    During the period of time that the 1999 Agreement was in effect, SPL infringed

the SLUSH PUPPIE® Marks by using the mark on PRODUCTS not within the scope of SPL's

limited rights.

216.    SPL has also infringed the SLUSH PUPPIE Marks after ICEE's proper

termination of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. As

alleged above, ICEE has properly terminated all of SPL's rights to use any of the SLUSH

PUPPIE® Marks.

217.    SPL argued that the Purported 2000 Agreement superseded the 1996 and 1999

agreements, but that document was forged by Mark Peters with the intent of perpetrating a fraud

on this Court and on ICEE in the United States.

218.    Accordingly, the Purported 2000 Agreement does not provide SPL with any right

to use the SLUSH PUPPIE® Marks.

219.    Since SPL's rights under the 1996 and 1999 agreements have been terminated,

and since the Purported 2000 Agreement is a forgery and unenforceable, SPL's use of the

SLUSH PUPPIE trademarks, including licensing and sublicensing, is therefore unlicensed, unauthorized, and unlawful and it infringes on ICEE's rights in the SLUSH PUPPIE® Marks.

220.    For the first approximately sixteen months after termination of those agreements, SPL engaged in a fraudulent scheme of promoting the forged Purported 2000 Agreement as an alleged basis for claiming that SPL was party to a license of the SLUSH PUPPiE® Trademarks, notwithstanding ICEE's termination of the only legitimate agreements between the parties on June 25, 2019.  In connection with this scheme, SPL conspired with its American attorneys at the Benesch firm to misuse the American courts to continue to hold itself out as the brand owner of SLUSH PUPPiE to SPL's hundreds of customers for years after ICEE had terminated all of SPL's rights.

221.    For example, SPL attorney Matthew Gurbach claimed that ICEE's "purported termination of the 1996 Appointment and the 1999 Distributor Agreement are a nullity – each has been superseded by the 2000 Appointment."  Based on this forged contract, Attorney Gurbach asserted that SPL "intends to continue operations under the 2000 Appointment and expects ICEE to abide by the terms thereof."  *See* Exh. G.

222.    Based on the forged Purported 2000 Agreement and other forged documents, SPL held itself out to its customers and potential customers as possessing the right to sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brand.

223.    By relying upon the Purported 2000 Agreement that it knew it had forged and pursuing its sanctionable filing of meritless claims based on that agreement in the United States, SPL was able to prevent ICEE from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe.

224. Indeed, SPL took affirmative steps to block ICEE's attempt to license the SLUSH PUPPiE brand in the United Kingdom and Europe. For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, SPL directed one of its U.S. attorneys--Matthew Gurbach—to falsely claim that the forged Purported 2000 Agreement was in effect, and that SPL had and would "continue operations" under the fraudulent document that Gurbach had relied upon in asserting meritless claims against ICEE in the United States. See Exhibit I. Moreover, SPL falsely informed recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud, and also referred recipients of ICEE's letters to SPL's American attorneys.

225. As alleged above, in November 2021, SPL's attorneys were forced to admit that the claims they had asserted based on the forged Purported 2000 Agreement were "meritless" (Doc. 85 PAGEID 2176) and that they "cold no longer ethically continue to prosecute" those claims (Doc. 82 PAGEID 2050). Accordingly, SPL pivoted to the frivolous position that the terminated 1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect, despite concurrently alleging that the forged Purported 2000 Agreement had "superseded" those agreements.

226. At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in Europe. SPL sent out thousands of communications stating that it was "retiring" the SLUSH PUPPiE brand, leaving the impression with consumers that it had the power to do so, and that the reasons were because the SLUSH PUPPiE brand was not "socially responsible" or "sustainable" and not consistent with the company's "vision and strategy." SPL then began telling its

49

customers and potential customers as well as consumers that it would be selling the same Slush Puppie product under a new name—Slushy Jack's.

227.    SPL was only able to use the new Slushy Jack's name for the old SLUSH PUPPiE product by illegally piggy-backing on the goodwill of ICEE's SLUSH PUPPiE brand and continuing without authorization to supply Slush Puppie product under the Slush Jack's name, which SPL described as using "the same recipe as it has always been."

228.    SPL then relied upon false and perjurious filings by its American attorneys— including declarations under penalty of perjury--in this Court to forestall any action by this Court against SPL's illegal use of the SLUSH PUPPiE® trademarks in the U.K. and Europe.

229.    Thus, for the more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, SPL has continued to sell SLUSH PUPPiE syrup and other products, and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe knowing that it had no right to do so.

230.    Moreover, since approximately November 2020, SPL has generated interest in its "Slushy Jack's" product by giving customers and consumers the false impressions that it is authorized to sell and control SLUSH PUPPiE, and that Slushy Jack's uses the "same recipe" and has "the same great taste as SLUSH PUPPiE." SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name.

231.    Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE customers, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits.

232.     SPL also deliberately designed its Slushy Jack's artwork and branding to be confusingly similar to that used for SLUSH PUPPiE so that consumers would be less likely to notice the difference.

233.     By illegally using the SLUSH PUPPiE® trademarks for years after ICEE had terminated SPL's rights in this scheme, SPL was able to pressure hundreds of its SLUSH PUPPiE customers into signing long term contracts whereby SPL would be the exclusive supplier of frozen uncarbonated beverages. This effectively blocked ICEE from penetrating this market.

234.     SPL's infringement has a substantial effect on U.S. commerce, including ICEE's ability to license the SLUSH PUPPIE® Marks in the U.S. and elsewhere.  By way of example, SPL operated its own website, slushpuppie.co.uk, which was available to U.S. consumers and is in English.  SPL obstructed ICEE's efforts to obtain control of that URL, falsely claiming that it did not own it or control it in testimony submitted to this Court.

235.     Additionally, in the run-up to filing this lawsuit, SPL presented itself in English-language media, available in the United States, as the *owner* of the SLUSH PUPPIE® brand. For example, an article in the online publication Food, Drink & Franchise quoted Mark Peters, Managing Director of "Slush Puppy Ltd., *who owns brands such as Tango Ice Blast and Slush Puppie*."  *See* Laura Mullan, *Comment: Is the Soft Drinks Industry Prepared for the UK 'Sugar Tax'?*, Food, Drink & Franchise, March 31, 2018.

236.     Additionally, SPL's illegal licensees have sold or offered for sale infringing products in the United States.  For example, Truffle Shuffle, an SPL licensee, offered SLUSH PUPPIE® branded lip balm on its website, and had the option to ship the product to customers in the United States.

51

237. SPL's infringing activities are causing and will cause ICEE irreparable harm based on SPL's presentation of itself as the owner of the brand, or as a licensed and authorized distributor of genuine SLUSH PUPPIE® drinks and products, when in fact it is unlicensed and unauthorized.

238. In addition to the illegal acts described above, on information and belief, SPL has encouraged its licensees of SLUSH PUPPIE® Marks to continue to manufacture, offer for sale, and sell unauthorized products, and to ignore ICEE's notices to SPL's licensees to cease and desist from engaging in such illegal conduct.

239. SPL knew that the 1999 Distributor Agreement had been properly terminated by ICEE and yet it continued to engage in licensing activities using the SLUSH PUPPIE® Marks. Indeed, SPL brazenly and without basis has claimed that its illegal licensees somehow still had "the right to use the SLUSH PUPPIE trademarks and brand . . . ." December 27, 2019 Letter from M. Gurbach to D. Wolfsohn, Exh. I. SPL informed its licensees that they were permitted to continue to sell SLUSH PUPPIE® products. SPL continued to sell SLUSH PUPPiE products to hundreds of SLUSH PUPPiE customers for years after ICEE had terminated all of SPL's rights to use the SLUSH PUPPiE trademarks.

240. SPL's continued use and encouragement of its licensees to use, the SLUSH PUPPIE® Marks constitutes willful infringement conducted in bad faith.

241. SPL's uses of the SLUSH PUPPIE® Marks, as described above, infringe ICEE's exclusive rights in the federally registered SLUSH PUPPIE® Marks, explicitly mislead consumers as to the source or sponsorship of SPL's goods and services, and has caused and are likely to cause confusion as to the source of SPL's goods and services.

242.     As a direct result of these actions, SPL has caused and, unless enjoined, will continue to cause ICEE to suffer irreparable injury.

243.     ICEE has no adequate remedy at law and is therefore entitled to injunctive relief.

244.     In paragraph III.B. of the 1999 Distributor Agreement, SPL acknowledged that any use of the SLUSH PUPPIE® Marks will result in irreparable injury to ICEE, and has consented to a court order enjoining it from using the SLUSH PUPPIE® Marks in any way.

245.     Additionally, ICEE is entitled to recover damages for SPL's infringement.

246.     SPL's infringement has been and is willful and in bad faith.  First, SPL knew of its limited rights under the 1996 Manufacturer Appointment and the 1999 Distributor Agreement, and further knew that the Purported 2000 Agreement was a forgery or otherwise not a binding agreement. Second, after ICEE provided notice to SPL of its termination of the 1996 Manufacturer Appointment and 1999 Distributor Agreement, SPL was well aware that it had no right to continue to license the sale or offer for sale of any SLUSH PUPPIE products.  Despite this knowledge, SPL concocted a flimsy excuse for ignoring the termination—arguing that the forged Purported 2000 Agreement superseded the 1996 and 1999 agreements.  Yet at the same time, SPL also argued that the forged Purported 2000 Agreement did not superseded the 1996 and 1999 agreements.

247.     SPL has also engaged in litigation misconduct.  For example, SPL destroyed and spoliated evidence in an attempt to hide its infringement.  SPL has also engaged in dilatory practices, has lied about the status of witnesses, and has tried to conceal the fraudulent nature of the Purported 2000 Agreement.  SPL directed the Benesch lawyers to engage in a multi-year strategy of delay in this case, which the Benesch lawyers duly executed.

248.    An essential part of SPL's scheme to continue to use the SLUSH PUPPiE marks was failing false statements and forged documents in this Court, thereby perverting the cause of justice and engaging in Obstruction of Justice.  SPL leveraged its misuse of this Court overseas to perpetuate its continued misuse of the SLUSH PUPPiE marks until it could sign up virtually all of the SLUSH PUPPiE customers to the identical "Slushy Jack's" product.

249.    For all the foregoing reasons, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a), and accordingly ICEE is entitled to recover its reasonable attorney's fees as well as enhanced damages of three times the amount of damages or profits awarded..

### COUNT FOUR
### (Lanham Act – Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125)

250.    ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

251.    Through the use of ICEE's SLUSH PUPPIE® Marks in connection with its business, its encouragement of its licensees to engage in unauthorized and illegal manufacturing, offering for sale, and sale of infringing SLUSH PUPPIE® branded products, SPL is knowingly and intentionally misrepresenting and falsely designating to the general public the affiliation, connection, association, origin, source, approval, endorsement, or sponsorship of SPL's goods and services, so as to create a likelihood of confusion by the public.

252.    As a direct result of these actions, SPL has caused and, unless enjoined, will continue to cause ICEE to suffer irreparable injury.

253.    In paragraph III.B. of the 1999 Distributor Agreement, SPL acknowledged that any use of the SLUSH PUPPIE® Marks will result in irreparable injury to ICEE, and has consented to a court order enjoining it from using the SLUSH PUPPIE® Marks in any way.

254.    ICEE has no adequate remedy at law and is therefore entitled to injunctive relief.

255.    Additionally, ICEE is entitled to recover damages for SPL's infringement.

256.    For all of the foregoing reasons, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a), and accordingly ICEE is entitled to recover its reasonable attorney's fees, SPL's profits, and enhanced damages of three times the amount of damages and profits awarded..

## COUNT FIVE
### (Deceptive Trade Practices – Ohio R.C. § 4165)

257.    ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

258.    For the first approximately sixteen months after termination of those agreements, SPL engaged in fraudulent scheme of promoting the forged Purported 2000 Agreement as an alleged basis for claiming that SPL was party to a license of the SLUSH PUPPiE Trademarks, notwithstanding ICEE's termination of the only legitimate agreements between the parties on June 25, 2019.  For example, SPL attorney Matthew Gurbach claimed that ICEE's "purported termination of the 1996 Appointment and the 1999 Distributor Agreement are a nullity – each has been superseded by the 2000 Appointment."  Based on this forged contract, Attorney Gurbach asserted that SPL "intends to continue operations under the 2000 Appointment and expects ICEE to abide by the terms thereof."  *See* Exh. G.

259.    Based on the forged Purported 2000 Agreement and other forged documents, SPL held itself out to its customers and potential customers as possessing the right to sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brand.

260.    By relying upon the Purported 2000 Agreement that it knew it had forged, SPL was able to prevent ICEE from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe.

261.    Indeed, SPL took affirmative steps to block ICEE's attempt to license the SLUSH PUPPiE brand in the United Kingdom and Europe.  For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, SPL's attorney Matthew Gurbach again falsely claimed that the forged Purported 2000 Agreement was in effect, and that SPL had and would "continue operations" under the fraudulent document.  See Exhibit I.  Moreover, SPL falsely informed recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud.

262.    In November 2021, however, SPL's attorneys were forced to admit that the claims they had asserted based on the forged Purported 2000 Agreement were "meritless" (Doc. 85 PAGEID 2176) and that they "could no longer ethically continue to prosecute" those claims (Doc. 82 PAGEID 2050).  Accordingly, SPL pivoted to the frivolous position that the terminated 1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect, despite concurrently alleging that the forged Purported 2000 Agreement had "superseded" those agreements.

263.    At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in Europe.  SPL sent out thousands of communications stating that it was "retiring" the SLUSH PUPPiE brand, leaving the impression with consumers that it had the power to do so, and that the reasons were because the SLUSH PUPPiE brand was not "socially responsible" or "sustainable"

and not consistent with the company's "vision and strategy."  SPL then began telling its customers and potential customers as well as consumers that it would be selling the same Slush Puppie product under a new name—Slushy Jack's.

264.    SPL was only able to use the new Slushy Jack's name for the old SLUSH PUPPiE product by illegally piggy-backing on the goodwill of ICEE's SLUSH PUPPiE brand and continuing without authorization to supply Slush Puppie product under the Slush Jack's name, which SPL described as using "the same recipe as it has always been."

265.    Thus, for the more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, SPL has continued to sell SLUSH PUPPiE syrup and other products, and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe knowing that it had no right to do so.

266.    Moreover, since approximately November 2020, SPL has generated interest in its "Slushy Jack's" product by giving customers and consumers the false impressions that it is authorized to sell and control SLUSH PUPPiE, and that Slushy Jack's uses the "same recipe" and has "the same great taste as SLUSH PUPPiE." SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name.

267.    Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE customers, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits.  But by illegally using the SLUSH PUPPiE name and trademarks, SPL was able to pressure nearly all of the SLUSH PUPPiE customers into long term freezer rental contracts, which provide that SPL is the exclusive provider of frozen uncarbonated beverage.

268.    In addition to its trademark registrations, ICEE also has common law rights in the SLUSH PUPPIE® Mark by virtue of its long and exclusive use of the mark for its products and services.

269.    SPL's use of ICEE's SLUSH PUPPIE® Marks is likely to cause confusion or misunderstanding as to the source, sponsorship, or approval of SPL's goods and services, or to cause confusion as to SPL's affiliation, connection, or association with ICEE.

270.    SPL's continued infringement on ICEE's rights in the SLUSH PUPPIE® Marks is willful, and SPL knows of and intends to deceive consumers.

271.    As a direct result of these actions, SPL has caused and, unless enjoined, will continue to cause ICEE to suffer irreparable injury.

272.    In paragraph III.B. of the 1999 Distributor Agreement, SPL acknowledged that any use of the SLUSH PUPPIE® Marks will result in irreparable injury to ICEE, and has consented to a court order enjoining it from using the SLUSH PUPPIE® Marks in any way.

273.    ICEE has no adequate remedy at law and is therefore entitled to injunctive relief.

274.    Additionally, ICEE is entitled to recover damages for SPL's infringement.

275.    Additionally, ICEE is entitled to recover its reasonable attorney's fees and SPL's profits.

### COUNT SIX
(Unjust Enrichment)

276.    ICEE incorporates and realleges the foregoing paragraphs as if set forth fully herein.

277.    Since ICEE's termination of the 1996 Manufacturing Appointment and the 1999 Distribution Agreement, SPL has not been licensed to sell or otherwise profit from any Slush Puppie products or services, or to use the SLUSH PUPPiE Trademarks for any purpose.

278.    For the first approximately sixteen months after termination of those agreements, SPL engaged in fraudulent scheme of promoting the forged Purported 2000 Agreement as an alleged basis for claiming that SPL was party to a license of the SLUSH PUPPiE Trademarks, notwithstanding ICEE's termination of the only legitimate agreements between the parties on June 25, 2019.  For example, SPL attorney Matthew Gurbach claimed that ICEE's "purported termination of the 1996 Appointment and the 1999 Distributor Agreement are a nullity – each has been superseded by the 2000 Appointment."  Based on this forged contract, Attorney Gurbach asserted that SPL "intends to continue operations under the 2000 Appointment and expects ICEE to abide by the terms thereof."  *See* Exh. G.

279.    Based on the forged Purported 2000 Agreement and other forged documents, SPL held itself out to its customers and potential customers as possessing the right to sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brand.

280.    By relying upon the Purported 2000 Agreement that it knew it had forged, SPL was able to prevent ICEE from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe.

281.    Indeed, SPL took affirmative steps to block ICEE's attempt to license the SLUSH PUPPiE brand in the United Kingdom and Europe.  For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, SPL's attorney Matthew Gurbach again falsely claimed that the forged Purported 2000 Agreement was in effect, and that SPL had and would "continue operations" under the fraudulent document.  See Exhibit I.  Moreover, SPL falsely informed

recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud.

282.    In November 2021, however, SPL's attorneys were forced to admit that the claims they had asserted based on the forged Purported 2000 Agreement were "meritless" (Doc. 85 PAGEID 2176) and that they "could no longer ethically continue to prosecute" those claims (Doc. 82 PAGEID 2050).  Accordingly, SPL pivoted to the frivolous position that the terminated 1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect, despite concurrently alleging that the forged Purported 2000 Agreement had "superseded" those agreements.

283.    At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in Europe.  SPL sent out thousands of communications stating that it was "retiring" the SLUSH PUPPiE brand, leaving the impression with consumers that it had the power to do so, and that the reasons were because the SLUSH PUPPiE brand was not "socially responsible" or "sustainable" and not consistent with the company's "vision and strategy."  SPL then began telling its customers and potential customers as well as consumers that it would be selling the same Slush Puppie product under a new name—Slushy Jack's.

284.    SPL was only able to use the new Slushy Jack's name for the old SLUSH PUPPiE product by illegally piggy-backing on the goodwill of ICEE's SLUSH PUPPiE brand and continuing without authorization to supply Slush Puppie product under the Slush Jack's name, which SPL described as using "the same recipe as it has always been."

285.    Thus, for the more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, SPL has continued to sell SLUSH PUPPiE syrup and other products,

and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe knowing that it had no right to do so.

286. Moreover, since approximately November 2020, SPL has generated interest in its "Slushy Jack's" product by giving customers and consumers the false impressions that it is authorized to sell and control SLUSH PUPPiE, and that Slushy Jack's uses the "same recipe" and has "the same great taste as SLUSH PUPPiE." SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name.

287. Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE customers, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits. But for SPL's illegal use of the SLUSH PUPPiE name and trademarks for years after termination of its rights, SPL would not have been able to retain the SLUSH PUPPiE customers or to lock them into long term contracts under which they agreed that SPL would be the exclusive provide of frozen uncarbonated beverages.

288. By engaging in this scheme, SPL was able to knowingly obtain from ICEE the benefit of its SLUSH PUPPiE name, brand, and trademarks, SPL was aware that it was obtaining a benefit, and SPL retained the revenues received as a result of taking this benefit under circumstances where it would be unjust for them to be retained without disgorging them to ICEE.

## PRAYER FOR RELIEF

WHEREFORE, ICEE respectfully requests that the Court grant the following relief:

A. A declaration that the document SPL characterizes as "the 2000 Appointment of Trade Mark Licence," attached as Exhibit D to SPL's Amended Complaint, is invalid, void, unenforceable, a forgery, and/or otherwise without effect as to ICEE;

B.  A declaration that SPL has no rights under what it characterizes as "the 2000 Appointment of Trade Mark Licence";

C.  A judgment that SPL has breached the 1996 Appointment, and awarding ICEE damages up to the time of ICEE's termination;

D.  A judgment that SPL has breached the 1999 Agreement, and awarding ICEE damages up to the time of ICEE's termination.

E.  A judgment that SPL's use of the SLUSH PUPPIE Mark on products outside the scope of the 1996 Appointment and 1999 Agreement, and after termination of those agreements, is willful trademark infringement under 15 U.S.C. § 1114(a), and awarding ICEE damages, injunctive relief, and attorney's fees.

F.  A judgment that SPL's use of the SLUSH PUPPIE Mark on products outside the scope of the 1996 Appointment and 1999 Agreement, and after termination of those agreements, amounts to willful unfair competition and false designation of origin under 15 U.S.C. § 1125(a), and awarding ICEE damages, injunctive relief, exemplary damages, disgorgement of SPL's profits, and attorney's fees.

G.  A judgment that SPL's use of the SLUSH PUPPIE® Marks on products outside the scope of the 1996 Manufacturer Appointment and 1999 Distributor Agreement, and on any products after termination of those agreements, amounts to deceptive trade practices under Ohio R.C. § 4165, and awarding ICEE damages, injunctive relief, costs, disgorgement of SPL's profits, and attorney's fees.

H.  Disgorgement of SPL's profits made since termination on June 25, 2019 of the 1996 Manufacturing Appointment and the 1999 Distribution Agreement from its sale of Slush Puppie

and Slushy Jack's and similar products and its sale and leasing of freezers used in connection with Slush Puppie, Slushy Jack's, and similar products.

    I.  Return to ICEE of all domain names using the words Slush Puppie.

    J.  Such other relief as the Court deems just and proper.

Dated:  April 3, 2023            Respectfully submitted,

                     **DUANE MORRIS LLP**

                     BY:  */s/David J. Wolfsohn*
                           David J. Wolfsohn (*admitted pro hac vice*)
                           Tyler R. Marandola (*admitted pro hac vice*)
                           30 South 17th Street
                           Philadelphia, PA 19103
                           Tel.: (215) 979-1000
                           Fax: (215) 979-1020
                           djwolfsohn@duanemorris.com
                           tmarandola@duanemorris.com

                           Kenneth M. Argentieri (Ohio Bar No. 0067493)
                           Trial Attorney
                           600 Grant St., Ste. 5010
                           Pittsburgh, PA 15219
                           Tel.: (412) 497-1000
                           Fax: (412) 497-1001
                           kmargentieri@duanemorris.com

                           *Attorneys for Defendant, The ICEE Company*

## CERTIFICATE OF SERVICE

I, Tyler Marandola, hereby certify that on April 3, 2023, I served a true and correct copy of the foregoing to all counsel of record by ECF filing.

 /s/Tyler Marandola
Tyler Marandola
