**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

SLUSH PUPPIE LIMITED,

      Plaintiff/Counterclaim Defendant,

            v.

THE ICEE COMPANY,

      Defendant/Counterclaim Plaintiff.

Case No. 1:19-cv-00189

Judge Michael R. Barrett

**OPINION & ORDER**

This matter is before the Court on the Motion for Reconsideration of this Court's Oral Order Granting Sanctions Discovery filed by Mark Avsec, Elizabeth R. Emanuel, Matthew D. Gurbach, Ronald L. House, Jennifer M. Turk, and Eric Larson Zalud ("Benesch Respondents"). (Doc. 253). Defendant/Counterclaim Plaintiff The ICEE Company ("ICEE") filed a memorandum in opposition (Doc. 260), to which the Benesch Respondents replied (Doc. 261).

## I.    BACKGROUND

By way of introduction, the Court will reprint (in large part) sections of its March 16, 2023 Opinion & Order (issued pursuant to Fed. R. Civ. P. 56(a)) (Doc. 189), adding more facts as necessary. The SLUSH PUPPIE frozen drink business was started by Willard ("Will") Radcliff, who founded the Slush Puppie Corporation ("SPC") in Cincinnati, Ohio and built it into a successful international business. (Defendant The ICEE Company's Counterclaims to the Amended Complaint, Doc. 29 PAGEID 498 ¶ 5). From (around) 1978 until (early) 2001, SPC owned the trademarks for SLUSH PUPPIE along with various logos and designs used in

connection with SPC's goods and services. (*Id.*).[1]

**1996 Manufacturing Appointment.** On or about January I, 1996, SPC entered into an Appointment of Syrup Manufacturer ("1996 Manufacturer Appointment") with Able Foods Ltd. (Manufacturer), later known as Slush Puppie Limited[2] ("SPL"). (Doc. 27-2). The appointment grants SPL "THE LIMITED USE OF [SPC] FORMULAS, RECIPES AND PROCESSES, WHICH SHALL REMAIN TRADE SECRETS AND THE EXCLUSIVE PROPERTY OF [SPC] FOR THE PURPOSE OF MANUFACTURING NEUTRAL BASE AND SYRUP." (*Id.* PAGEID 393 (recitals)). The appointment is exclusive (to a list of 27 European countries, including the United Kingdom) and "is subject to and conditioned upon the Manufacturer's continued performance meeting the standards of [SPC] for quality and performance quotas[.]" (*Id.* PAGEID 393 ¶ (1)). The appointment also provides that SPL "shall not manufacture, bottle, distribute, or sell directly or indirectly, any other product for use in Slush machines not promoted by [SPC]" and that it "shall continually use its primary and best efforts . . . to fill all orders for, and deliver product to, [SPC] authorized customers[.]" (*Id.* PAGEID 394 ¶¶ (4)(5)).

The appointment additionally provides that "[SPC] is the registered owner of the trademark 'SLUSH PUPPIE' and all labels and designs incidental thereto . . . [and] [s]hould this appointment be terminated, Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . tradenames, signs, emblems, insignias,

---

[1] The SLUSH PUPPIE marks include U.S. Trademark Registration No. 1,665,188 covering "nonalcoholic slush type beverages, syrups, and preparations for making slush type beverages" and U.S. Trademark Registration No. 3,132,350 covering "clothing, namely tops, t-shirts, pants and loungewear, headwear, jackets and footwear." (Defendant The ICEE Company's Counterclaims to the Amended Complaint, Doc. 29 PAGEID 498 ¶ 7).

[2] (Amended and Supplemental Complaint, Doc. 27 PAGEID 353 ¶ 19).

symbols, tokens, or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever[.]" (*Id.* PAGEID 395 ¶ (11)).  Moreover, "[u]pon any termination, . . . any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products."  (*Id.*).

Although the appointment is perpetual, it lists several grounds upon which SPC can terminate.  (*Id.* PAGEID 394–95 ¶ (8)).  Pertinent to this litigation:

> (8) This appointment is perpetual, however, in addition to any and all rights and remedies [SPC] may cancel and terminate this appointment by written notice to Manufacturer for any one of the following reasons:
> . . . .
>> D.  The voluntary or involuntary petition of Manufacturer seeing relief under any provision of any receivership or bankruptcy law or other law for relief of debtors[    ].  **The filing of any legal action other than for collection on account against [SPC]**, its representatives, distributors, customers, manufacturers, or suppliers[.]

(emphasis added).  Upon termination "for any reason by either party and for two years thereafter," Able Foods agreed to not divulge any SLUSH PUPPIE trade secrets.  (*Id.* PAGEID 395 ¶ (12)). It also agreed to not compete with SPC.  (*Id.*).  And "[t]his provision regarding trade secrets and covenants not to compete shall be construed liberally in favor of SLUSH PUPPIE."  (*Id.*).

Finally, the appointment contains an integration clause[3] and a choice-of-law (Ohio) provision[4].  It was signed on February 5, 1996 (in Cincinnati, Hamilton County,

---

3 (Doc. 27-2 ¶ (22) ("This appointment expresses fully the understanding and all prior understandings are hereby canceled, and no further changes in the terms of this appointment shall be valid except when and if reduced to writing and signed by both Manufacturer and SLUSH PUPPIE, by legally authorized officials."); Doc. 27-2 PAGEID 398 ("This appointment represents the full agreement of the parties and supersedes and replaces any and all previous manufacturing appointments.")).

4 (Doc. 27-2 ¶ (24) ("This appointment and all of its terms and conditions shall be governed by and interpreted under the laws of the State of Ohio[.]")).

Ohio) by Ralph Peters[5] on behalf of Able Foods and by Will Radcliff on behalf of SPC. There is no drafting history in the record regarding the 1996 Manufacturing Appointment.

**1999 Distributor Agreement.** Next, SPC ("Company") entered into an International Independent Area Distributor License Agreement with SPL ("Distributor"), that was executed in 1999 and effective January 1, 2000 ("1999 Distributor Agreement"). (Doc. 27-3 PAGEID 400 (recitals), 408 (§ XIX), 409 (Exhibit A)). Mark Peters, Ralph Peters' son,[6] signed on behalf of SPL. (*Id.*; Ralph Peters depo., Doc. 84 PAGEID 2136 (31:4–18)). This license granted different rights[7], to include "THE RIGHT TO THE USE OF THE NAME 'SLUSH PUPPIE' FOR THE PROMOTION AND DISTRIBUTION OF PRODUCTS [i.e., freezers, neutral base, flavors, cups, other related items, and other products which may be specifically approved in writing from time to time] OFFERED BY COMPANY" in the United Kingdom and Ireland. (Doc. 27-3 PAGEID 400 (recitals), 409 (Exhibit A)). As Distributor, SPL agreed to "vigorously promote" the sale of SPC's products in "important commercial centers" within its exclusive territory and to keep SPC "regularly informed" of its "operating and sales activities" relating to SPC's products. (*Id.* PAGEID 402 §§ IV.A, IV.C). The agreement provides that SPC owns the SLUSH PUPPIE trademarks (name and logo), allowing SPL to use them only upon "continued qualification" as a "bona fide" Distributor. (*Id.* PAGEID 403 § VI.D). SPL's use of the SLUSH PUPPIE trademarks "is unauthorized upon termination of this Agreement." (*Id.*).

---

[5] (Ralph Peters depo., Doc. 84 PAGEID 2128–2131 (23:10–26:8)).

[6] (Ralph Peters depo., Doc. 84 PAGEID 2122 (17:13–14); 2139–2141 (34:7–36:6))).

[7] (Doc. 27-3 § VII ("This Agreement is not a license or consent for DISTRIBUTOR to enter into the manufacturing of any of the PRODUCTS. In the event that such license or consent is granted, this agreement shall exist independent thereof.")).

Although the agreement is perpetual, it lists bases upon which SPC will terminate the license, subject to notice and a (60-day) opportunity to cure.  (*Id.* PAGEID 404 §§ VIII.A–D).  It also lists bases upon which SPC will immediately terminate the license (without opportunity to cure), including SPL filing for bankruptcy protection or SPL's inability to pay its debts to SPC.  (*Id.* PAGEID 405 §§ VIII.F.1–5).  Pertinent to this litigation, SPC may, "for good cause[ ]" immediately terminate the license upon "[t]he filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers, or suppliers[.]"  (*Id.* PAGEID 405 § VIII.F.4).  Upon termination, SPL waived the right to any compensation "for any claim for 'build-up of TERRITORY' or recoupment of investment, as such is done at DISTRIBUTOR'S risk." (*Id.* PAGEIE 405 § VIII.I).

Finally, like the manufacturing appointment, the distributor agreement contains an integration clause[8] and a choice-of-law (Ohio) provision[9].  There is no drafting history in the record regarding the 1999 Distributor Agreement.[10]

**Sale of the SLUSH PUPPIE trademarks & related business.**  In 2001, Dr Pepper/Seven Up, Inc. ("DPSU") purchased the SLUSH PUPPIE trademarks and business from SPC.  (Doc. 27 PAGEID ¶ 34; Doc. 29 PAGEID 503 ¶ 34).  All trademarks

---

[8] (Doc. 27-3 § XVII ("This Agreement expresses the full agreement and understanding between the parties, and supersedes any and all prior grants of license or other oral or collateral agreement, understanding, or representation of any kind.  Any amendment of this Agreement must, of necessity, be in writing.")).

[9] (Doc. 27-3 § XVI ("The parties agree that in all matters pertaining to this Agreement, the laws of the State of Ohio, USA shall be applicable and controlling.")).

[10] Mark Peters testified during his (July 1, 2020) deposition that he signed, but did not negotiate, the distribution agreement on behalf of SPL.  (Mark Peters depo., Doc. 74 PAGEID 1673 (130:1–18, 131:19–24)).

relating to the SLUSH PUPPIE business were thereafter assigned to DPSU.  (Doc. 27 PAGEID 356 ¶ 35 & Exh. F (Doc. 27-6); Doc. 29 ¶ 35).  In 2006, ICEE purchased the SLUSH PUPPIE trademarks and business from DPSU and became obligated under the 1996 Manufacturing Appointment and 1999 Distributor Agreement.  (Doc. 27 PAGEID 357 ¶ 38; Doc. 29 PAGEID 503 ¶ 38).  All trademarks relating to the SLUSH PUPPIE business were thereafter assigned to ICEE.  (Doc. 27 PAGEID 357 ¶ 39 & Exh. H (Doc. 27-8); Doc. 29 PAGEID 503 ¶ 39).

**Subsequent correspondence between SPL & ICEE concerning the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.**  On July 27, 2009, Mark Peters sent copies of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement to Dan Fachner[11] as a follow-up to Peters' request for help with "the issue with Slush Costa Blanca."  (Doc. 60-1 PAGEID 975).  On September 27, 2009, Peters corresponded with Fachner about a "major problem" with "ex Distributors" in Spain, attaching again the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.  Peters points out that the exclusive territory defined in the manufacturing appointment is significantly greater than the territory identified in the distributor agreement ("because of the way the contracts was set up between my Father and Will [Radcliff] many years ago").  "What I need to allow us to [start a trademark action in Spain] is a side letter from you amending the International Independent Area Distribution Agreement executed the 23rd December 1999 section Exibit A TERRITORY to be the same as the Manufacturing agreement."  (*Id.* PAGEID 977–78).

---

[11] Dan Fachner currently serves as President of J&J Snack Foods Corp., which owns 100% of The ICEE Company; he has served as the president and/or CEO of ICEE since 1997.  (Dan Fachner decl., Doc. 103-1 ¶ 3).

On April 1, 2010, Peters emailed Fachner about expanding the distributor license beyond the United Kingdom and Ireland.  (Doc. 60-2 PAGEID 997 ("Dan I know you are now the brand owner and we are at your mercy on this.  I just know that to have a third party agency who can make a little money from selling a trinket or two and they have not got once cent invested in it.  For them to be representing Slush Puppie at trade shows is something that will do untold damage to our business and ultimately your brand.  It is simply not worth it.  I think my last suggestion to you was that we take a little time out to look at the best way for both businesses, on how we work together on the Slush Puppie brand by **re looking at the master agreements**.") (emphasis added)).  As part of an ongoing exchange, Peters emailed Fachner on April 10, 2010 and attached another copy of the 1996 Manufacturing Agreement.  (*Id.* PAGEID 996 ("Thank you for your time on the telephone.  I am not sure if you have a copy of the manufacturing agreement.  Please see attached.")).

Speed ahead to January 10, 2017, when SPL's Alan Beaney—in an email to Steve Every, ICEE's Vice President for Managed Service and International—described "the Slush Puppie contractual arrangements in Europe[ ]" as the contract effective on 1st January 1996 (Syrup Manufacture (and sale) in Europe) and the contract effective on 1st January 2000 (Distribution Agreement in UK and Ireland).  (Doc. 73-9 PAGEID 1381–1388).

Later that same year, on August 8, 2017, SPL's Manchester counsel sent return correspondence to ICEE's London counsel, in which it refers to "the International Independent Area Distributor License Agreement dated 23 December 1999 (the 'Distribution Agreement') and the Appointment of Syrup Manufacturer Agreement dated

5 February 1996 (the 'Manufacturer Agreement') (collectively the 'Existing Agreements')." (Doc. 60-3 PAGEID 1008). "Whilst it is clear that the Existing Agreements form the basis of the relationship between Slush Puppie and Icee, the terms of the Existing Agreements do not encompass the entirety of the relations between the parties, as the Existing Agreements have been varied by agreement since 1999. . . . Given the uncertainties that have developed as a result of modifications to the Existing Agreements over the course of the last 17 years, we consider that it would be in the interests of both Slush Puppie and Icee to attempt to codify, and where necessary update, the terms of the Existing Agreements so as to take into account the reality of Slush Puppie's business, on behalf of Icee and the Slush Puppie brand, in the UK and Europe and to create a clearer understanding of the parties' respective roles going forward." (*Id.* PAGEID 1008–1009).

**The 2000 "Appointment of Trade Mark Licence".** On February 28, 2018, Mark Peters emailed Dan Fachner with news of a recently discovered agreement:

> Following our previous discussions, in the course of reviewing our existing arrangements, **we have identified the attached exclusive licence**[12] **dated 8 August 2000, which governs the arrangements between the parties**. **This exclusive licence post-dates both the Appointment** of Syrup Manufacturer Agreement dated 5 February **1996 and** the International Independent Area Distributor License **Agreement** dated 23 December **1999**, which were the subject of our previous discussions. This exclusive licence confirms that SPL has the exclusive rights to use the SLUSH PUPPIE trade mark in Europe in relation to freezers, syrups and products for the promotion of the SLUSH PUPPIE trade mark.

(Doc. 60-5 PAGEID 1021 (emphases added)). Fachner responded on March 12, 2018, noting that "[f]or the past 11 years we have had many discussions live and documented

---

[12] (Doc. 60-5 PAGEID 1022–1027).

around the challenges of our agreements dated 1996 and 1999. . . . This is the first time that you have shared another contract.  Where did this contract come from and why was this never produced or mentioned in the past decade?"  (Doc. 60-6 PAGEID 1029).

Benesch attorney Mark E. Avsec responded (on August 17, 2018) on behalf of SPL with a cease-and-desist letter, which begins:

> This firm serves as U.S. intellectual property litigation counsel to Slush Puppie Limited ("SPL").  We have reviewed the correspondence (including between and among solicitors) and the various agreements concerning SPL's exclusive right to use the SLUSH PUPPIE® trademarks in the United Kingdom, Southern Ireland and Europe.  The SLUSH PUPPIE APPOINTMENT OF TRADE MARK LICENCE dated August 8, 2000 (the "2000 Agreement") is the current operative agreement governing the relationship between SPL, on the one hand, and J&J Snack Foods Corp. ("J&J") and its subsidiary The ICEE Company ("ICEE") (together, "you"), on the other hand.  There is no question that the parties have been operating under the terms of the 2000 Agreement (including its royalty provisions) since ICEE's acquisition of the SLUSH PUPPIE® brand and business in 2006. . . .
>
> This firm is now engaged because the 2000 Agreement is expressly governed by Ohio law and recites that any dispute must be litigated in the State of Ohio.  The 2000 Agreement, which *supersedes all previous agreements* between or among the parties (or their predecessors-in-interest) granted SPL the *perpetual* and *exclusive* use of the SLUSH PUPPIE® trademarks in connection with the manufacturing *and* distribution of SLUSH PUPPIE® products in the subject territories, including the U.K. and Europe. Notwithstanding this stark language, J&J (through ICEE) has inexplicably granted other parties the right to use the SLUSH PUPPIE® trademark in connection with the manufacturing and distribution of SLUSH PUPPIE® products in the U.K. and Europe.

(Doc. 27-11 PAGEID 468–69 (emphasis in original)).  Avsec closed with the admonition, "If you elect not to respond and/or continue to license the use of the SLUSH PUPPIE® brand in violation of our client's rights, be advised that SPL will not hesitate to seek redress as permitted under the 2000 Agreement."  (*Id.* PAGEID 469).

Duane Morris attorney Karen C. Kline responded (on September 13, 2018) on behalf of ICEE, pointing out that (1) the 2000 Appointment was not among the contracts ICEE acquired from (predecessor-in-interest) DPSU; (2) DPSU and ICEE had always operated under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement; (3) SPL had never (before <u>February 28, 2018</u>) mentioned the 2000 Appointment; and (4) there were "serious questions" about the document's authenticity, which SPL had failed to support. (Doc. 73-19 PAGEID 1541–1543). Benesch attorney Matthew Gurbach responded (on November 6, 2018), reiterating that the 2000 Agreement "currently governs the relationship" between SPL and ICEE, such that SPL has "the exclusive right to use the SLUSH PUPPIE trademark in the United Kingdom, Ireland and elsewhere in Europe." (Doc. 89-1). Gurbach threatened legal action. (*Id.*).

**SPL sues ICEE.** SPL filed suit against ICEE in the Court of Common Pleas for Hamilton County, Ohio on February 12, 2019, asserting causes of action arising out of the 2000 Appointment (only). (Doc. 2). ICEE removed the suit to the Southern District of Ohio on March 8, 2019. (Doc. 1). ICEE answered and counterclaimed against SPL on April 29, 2019. (Doc. 13).

Meanwhile, on June 25, 2019, ICEE (through Duane Morris attorney and current trial counsel David J. Wolfsohn) provided written notice to Mark Peters that it was terminating the 1996 Manufacturing Appointment and the 1999 Distributor Agreement because of SPL's lawsuit. (Doc. 29-6). The notice quotes from the relevant language within both agreements, observing that SPL had filed a legal action "other than for collection on account" against ICEE. (*Id.*). Benesch attorney Matthew Gurbach responded to Wolfsohn (on June 28, 2019) that "ICEE's purported termination of the

10

1996 Appointment and the 1999 Distributor Agreement is a nullity—each has been superseded by the 2000 Appointment." (Doc. 29-7).

The Court first entered a Calendar in this civil action on October 30, 2019. (10/30/2019 Minute Entry). In connection therewith, SPL filed an Amended and Supplemental Complaint on December 16, 2019. (Doc. 27).[13] The first four claims for relief assert causes of action arising out of the 2000 Appointment; the next eight (new) claims are asserted "in the alternative" and arise out of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. (*Id.*).

ICEE answered and counterclaimed against SPL on January 6, 2020. (Doc. 29). SPL filed its Answer to ICEE's counterclaims on January 27, 2020. (Doc. 32). Throughout, SPL maintained it had <u>no</u> obligations under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement because they were superseded by the 2000 Appointment. And SPL reiterated its allegation that "the purported termination of agreements that were no longer effective is a nullity[.]" (*Id.* ¶ 39).

Much of ICEE's efforts in the initial stages of this litigation were focused on the validity of the 2000 Appointment, which it has persistently questioned since March 2018, to include the monitored depositions of Ralph Peters and Mark Peters. SPL did its best to stonewall, especially as to Ralph Peters. (*See* Docs. 30–31, 33, 35, 37–39, 42, and 44 & Minute Entries dated 01/29/2020 and 02/11/2020). Then came SPL's motion for a "moratorium" on discovery, nominally based on the COVID-19 pandemic, and a motion for a protective order to prevent a remote video deposition of Mark Peters. (Docs. 46,

---

[13] The Amended and Supplemental Complaint was signed by Matthew D. Gurbach, Elizabeth Emanuel, and Ronald L. House. At various times, all three attorneys withdrew their appearance as counsel of record (Docs. 50, 68, 141) and they are no longer affiliated with the Benesch law firm.

49, and 51 & Minute Entries dated 05/21/2020, 05/26/2020, 06/03/2020, 06/16/2020, 06/24/2020, and 07/13/2020).  On August 27, 2020, ICEE filed a motion to compel as to the infamous November 12, 2008 "Wendsday" email, purportedly written by former SPL employee Lindsay Kirby and sent to former ICEE employee Jerry Bird.  (Doc. 60 PAGEID 952–953 ("Because the email quotes from the forged Appointment of Trade Mark Licence, it was obviously created with the intent of trying to prove to this Court and the jury that the Appointment is genuine.")).  ICEE explained:

> Based on a privilege log that plaintiff's counsel recently served, SPL's attorneys have had numerous communications with SPL's managing director, Mark Peters, about the forged email beginning in the spring of 2018, continuing after the email was produced in discovery earlier this year [2020], and concluding at the end of June of this year [2020], when SPL's counsel finally wrote to ICEE's counsel to "withdraw" the fabricated document.  According to SPL's current American counsel, the forged email was sent by SPL to SPL's British counsel, RPC (formerly known as Reynolds Porter Chamberlain), who then forwarded it on April 17, 2018 to the Benesch firm.  The email was produced in discovery in February of this year [2020].  Unlike every other email produced in this case by plaintiff, the email lacks the metadata that would show when it was created and by whom.  Interestingly, SPL's privilege log shows that, shortly after the forged email was produced, plaintiff's counsel discussed the lack of metadata numerous times with SPL's managing director, Mark Peters, but decided to produce it anyway.  Then, without explanation, plaintiff's counsel suddenly withdrew the document from production on June 26[, 2020]—a few days before Mark Peters' many-times postponed deposition.  On August 10[,2020], SPL finally admitted that the November 12, 2008 email was fabricated when it responded "admit" to ICEE's request to admit that the document was not genuine.

(*Id.* PAGEID 953–954).  The undersigned granted SPL's motion to compel in an Order docketed on August 31, 2020 (Doc. 62), which it later amended (on SPL's motion) on September 10, 2020 (Doc. 67).  The Court advised that it "w[ould] conduct an *in camera* review of all communications between SPL and Reynolds Porter Chamberlain relating

to the transmission of the November 12, 2008 email from Lindsay Kirby to Jerry Bird, and reserve[d] ruling on whether the crime-fraud exception to the attorney-client privilege applies. As to the deposition of Mark Peters, . . . to ensure that ICEE's follow-up questions [we]re 'solely related to the alleged fabrication of the November 12, 2008 email,' or—stated another way—limited to inquiries 'about the generation, transmission, production, and withdrawal of the November 12, 2008 email,' at the suggestion of ICEE the Court w[ould] attend the deposition of Mark Peters as it did the deposition of Ralph Peters." (*Id.* PAGEID 1127). Letter filings followed from ICEE (Doc. 69) and SPL (Doc. 70).

On October 15, 2020, SPL filed a motion for leave to file a second amended complaint to withdraw its (four) claims based on the August 8, 2000 Appointment of Trade Mark Licence. (Doc. 72). In support of its motion for leave to withdraw, SPL concedes that the 2000 Appointment "is not a genuine document" and any claims premised upon it "were meritless[.]" (Doc. 85 PAGEID 2176).[14] ICEE followed (on October 28, 2020) with a motion for sanctions (Doc. 73) against SPL, asking for judgment in its favor on all of SPL's claims pled in SPL's then-operative amended complaint (Doc. 27).[15] On January

---

[14] SPL changed course when, "on August 24, 2020, [ICEE] produced to SPL's counsel the report of J. Wright Leonard, which cast[ ] doubt on the authenticity of the 2000 A[ppointment]. Prior to that time, the only 'evidence' pointed to by [ICEE] as evidence of lack of authenticity was such things as misspelling of words, lack of a county name and lack of reference to the document in the past. Although counsel disputes some of the conclusions reached by Ms. Leonard, after an investigation into Ms. Leonard's findings, counsel for SPL determined that it could no longer ethically continue to prosecute claims under the 2000 A[ppointment]. Accordingly, after consulting with SPL, counsel for SPL properly moved for leave to amend the complaint to dismiss all claims related to the 2000 A[ppointment]. Doc. 72." (Doc. 82 PAGEID 2049–2050). "SPL did not learn that the 2000 A[ppointment] is not a genuine document until well after SPL filed its December 16, 2019 Amended Complaint. Upon learning that the claims premised upon the 2000 A[ppointment] were meritless, SPL quickly moved to withdraw such claims." (Doc. 85 PAGEID 2176).

[15] ICEE also seeks an award of all its attorneys' fees and costs. (Doc. 73 PAGEID 1320–1321).

12, 2021, ICEE filed a second motion for sanctions (Doc. 89), this time against SPL's outside counsel, the law firm of Benesch, Friedlander, Coplan & Aronoff as well as individual Benesch attorneys Avsec, Emanuel, Gurbach, House, Turk, and Zalud. ICEE's "Preliminary Statement and Summary of Argument" reads:

> On November 18, 2020, SPL's counsel admitted that "it could no longer ethically continue to prosecute claims under the 2000 A[ppointment]." Doc. 82 PAGEID2050. And on November 19, counsel admitted that those claims were "meritless." Doc. 85 at PAGEID 2176. **Yet counsel knew or recklessly disregarded the fact that they could not ethically prosecute these meritless claims the day this case was filed. Plaintiff's counsel nonetheless recklessly chose to prosecute this case aggressively for 2 years, covering up and ignoring the overwhelming evidence of their client's criminal wrongdoing.** ICEE was thus forced to expend a huge amount of time and money to expose that wrongdoing while plaintiff achieved its bad faith purpose of continuing to infringe ICEE's trademarks in the U.K. and Europe. Plaintiff's counsel should be sanctioned for their complicity and at least tacit encouragement of this scheme.

> In gearing up for litigation, counsel knew that the genuineness of the 2000 Appointment would be central to the case. ICEE, when presented with the agreement in February 2018, had immediately questioned its authenticity, questioning why it had never been raised by SPL during nine years of negotiations. SPL's counsel, therefore, was hoping to find any documents that supported the genuineness of the 2000 Appointment, or that showed that ICEE knew about it. Emails between counsel reveal that, well before the complaint was filed, counsel's attention was focused on several documents that purported to provide just such corroboration. In April 2018, U.K. counsel for SPL called to Ohio counsel's attention an email dated November 2008 quoting from the forged 2000 Appointment, noting that it was a "helpful contemporaneous email[] the refer[s] to the payment of royalties pursuant to the 2000 licence agreement," and the "only correspondence around this time dealing with this issue." **For sure, a "helpful" document, but it was also a fabrication, with the automatically generated date spelled "Wendsday" and with metadata showing that "markp" had created it from a Word document on January 17, 2018. Likewise, in April 2018, in the same package of documents from U.K. counsel, Ohio counsel received a copy of a forged "History of Working Practi[s]e" also created by "markp" on November 20, 2017 rather than on its**

**ostensible date of February 2011.**  Comparison of this forged History with the 2011 original and with the 2000 Appointment shows that the signatures from the original were copied and pasted into the 2000 Appointment; that "markp" added language to the forged History that quotes from the 2000 Appointment; and that "markp" replaced the signatures in the forged History to hide the fact that he had copied them into the 2000 Appointment.  SPL's counsel wrongfully withheld the Wendsday email with the "markp" metadata as well as the forged History until September 2020.

**Counsel had to have been aware from the outset that both the "Wendsday" email and its metadata and the November 20, 2017 version of the "2011" "History of Working Practise" were forged by Mark Peters to make the 2000 Appointment appear to be genuine.**  It was bad enough that Peters committed a fraud on this Court and likely obstruction of justice, but counsel aided and abetted this criminality by failing to abide by their duty of candor to the Court and opposing counsel under Ohio Rules of Professional Conduct 3.3 and 3.4, as well as their obligations under Federal Rule of Civil Procedure 26(g) to provide accurate discovery responses and to preserve evidence.  Instead of quickly coming clean, Ohio counsel "caus[ed] [defense] counsel to waste resources uncovering the truth."  *Jones v. Illinois Central R. Co.*, 617 F.3d 843, 856 (6th Cir. 2010).  Pursuant to 28 U.S.C. § 1927, Fed. R. Civ. P. 26(g), and the Court's inherent authority, SPL counsel and their law firm should be ordered to pay ICEE's attorneys' fees and costs.

(Doc 89 PAGEID 2307–2308 (emphases added)).

Fast forward to April 2023,[16] when a discovery dispute (one of too many in this civil action) arose as to whether ICEE could depose the individual Benesch attorneys.  To tee up the issue, Counsel for ICEE and the Benesch Respondents agreed that ICEE would

---

[16] In the interim, and among other rulings, on March 16, 2023, the Court granted ICEE's Motion (Doc. 175) for Summary Judgment—as to SPL's Twelfth Claim for Relief in its Amended and Supplemental Complaint (Doc. 27).  (*See* Doc. 189).  The Court determined as a matter of law that ICEE's termination was effective, which will preclude SPL from claiming declaratory relief (or seeking damages) relating to ICEE's alleged breaches of the 1996 Manufacturing Appointment or the 1999 Distributor Agreement taking place after June 25, 2019.  (*Id.* PAGEID 6862).  The same day the Court granted SPL's motion (for leave to file a second amended complaint) to withdraw its claims based on the 2000 Appointment.  (Doc. 176 PAGEID 6863 (¶ 1)).

file a motion to compel[17] and (in response) the Benesch Respondents would file a motion

for protective order[18], with oral argument to follow (on May 31, 2023). Taking the matter

under advisement, the Court stated:

> So I'm going to do a couple things. First of all, I want to go back and look at the in-camera production again before I decide where this is going to go. But in the meantime, I want [counsel for ICEE] to put together a proposed order which would outline the specific limited areas of inquiry that you would have for Gurbach, Avsec, and House, okay, and I'll take a look at that and see what I think. Obviously copy [counsel for the Benesch Respondents] on that but send that in.
>
> In the meantime, I want to go back and look and review some other information and decide exactly how this ball is going to bounce. Okay?

(Doc. 220, May 31, 2023 Motions Hearing Tr., PAGEID 8701–8702). In a Discovery

Conference held on August 8, 2023, the Court advised it would permit attorney

depositions in stages. (08/08/2023 Minute Entry and NOTATION ORDER & Doc. 227,

Aug. 8, 2023 Motions Hearing Tr.). Several other Discovery Conferences followed.

---

[17] (*See* Doc. 205, The ICEE Company's [corrected] Motion to Compel the Depositions of Plaintiff's Outside Counsel (filed 04/21/23)). By way of overview, ICEE's motion to compel explains:

> SPL's former and current counsel at the Benesch firm have highly relevant information that cannot be obtained from any other sources. Recently, defendant ICEE served subpoenas on two of SPL's former counsel—Matthew Gurbach and Ron House—only after exhausting all other avenues, and only at the end of discovery. Depending on how much Gurbach and House recall about the circumstances of SPL's various forgeries, depositions of Benesch attorneys Mark Avsec, Eric Zalud, and Jennifer Turk, and former attorney Elizabeth Emanuel would also be warranted. Under any standard applicable to depositions of counsel—including the *Shelton* test—the depositions should go forward.

(*Id.* PAGEID 7943).).

[18] (*See* Doc. 210, Motion of Non-Parties Matthew D. Gurbach, Ronald L. House, Mark Avsec, Elizabeth R. Emanuel, Jennifer M. Turk, and Eric Larson Zalud for Protective Order and to Quash Subpoenas (filed 05/04/23)). The Benesch Respondents moved to quash the subpoenas served on attorneys Gurbach and House and enter a protective order precluding depositions of SPL's current and former outside counsel. (*Id.*).

(08/15/2023 Minute Entry and NOTATION ORDER & Doc. 229, Aug. 15, 2023 Motions Hearing Tr.; 08/21/2023 Minute Entry and NOTATION ORDER; 09/22/2023 Minute Entry & Doc. 247, Sept. 22, 2023 Motions Hearing Tr.; 09/29/2023 Minute Entry and NOTATION ORDER & Doc. 248, Sept. 29, 2023 Motions Hearing Tr.; 10/26/2023 Minute Entry and NOTATION ORDER (for proceedings held on 10/25/2023) & Doc. 242, Oct. 25, 2023 Motions Hearing Tr. (corrected); and 11/01/2023 NOTATION ORDER). ICEE deposed former Benesch attorney Matthew D. Gurbach on August 29, 2023 (Doc. 255); current Benesch attorney (but not part of the trial team) Mark E. Avsec on September 20, 2023 (Doc. 256); and former Benesch attorney Ronald L. House (over series of sessions) on September 27–29, October 27, and November 2, 2023 (Doc. 254)[19].

One last Discovery Conference was held on December 7, 2023.  (12/08/2023 Minute Entry (for proceedings held on 12/07/2023) & Doc. 251, Dec. 7, 2023 Motions Hearing Tr.).  At issue was scheduling the depositions of former Benesch attorney Elizabeth R. Emanuel and current Benesch attorney Jennifer L. Turk, with ICEE agreeing to "take [Eric] Zalud off the table."  (Doc. 251 PAGEID 9624 (13:25)[20]).  Briefing on the Benesch Respondents' motion for reconsideration (filed on December 12, 2023) regarding sanctions discovery followed.

---

[19] On March 1, 2021, attorney House was admitted to the hospital where he was diagnosed as having had a stroke.  (Doc. 254-1 PAGEID 9702–9703 (13:8–14:15)).  He eventually retired from the practice of law (and the Benesch firm) effective November 1, 2021.  (*Id.* PAGEID 9703 (14:16–24)).  He was later diagnosed (in July 2023) with Parkinson's disease.  (*Id.* PAGEID 9695 (6:9–10)).

[20] By Mr. Wolfsohn: "And so I would propose that we finish up the last two [Emanuel and Turk].  I do not think I need to take Mr. Zalud's testimony.  I'm convinced that, based on what his colleagues have said, he was not involved in the litigation until the fall of 2021.  So that's fine.  We can take Zalud off the table."  (Doc. 251 PAGEID 9624 (13:21–25)).

## II.    ANALYSIS

The Benesch Respondents bring their motion for reconsideration "pursuant to Fed. R. Civ. P. 54(b) and 26(c)[.]"  (Doc. 253 PAGEID 9647).  Reconsideration is justified when there is "'(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice.'"  *Louisville/Jefferson Cnty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (quoting *Rodriguez v. Tenn. Laborers Health & Welfare*, 89 F. App'x 949, 959 (6th Cir. 2004)); *Marcum v. Duchak*, No. 3:17-cv-437, 2021 WL 2580575, at *3 (S.D. Ohio June 23, 2021) (citing *Louisville/Jefferson Cnty. Metro Gov't*).    The Court presumes that the Benesch Respondents ground their motion on the third factor—to correct a clear error or to prevent manifest injustice.  (*See* Doc. 251, Dec. 7, 2023 Motions Hearing Tr. PAGEID 9632 (21:1–6) (MR. KASSON: " . . . **No federal judge in the history of the judiciary has allowed this unlimited discovery for sanctions.**  When it's been allowed it's been allowed generally before they file a motion to see whether there is a basis for it and extremely limited.  **The judges are clear.**  It cannot be this sideshow that this has been turned into.") (emphases added)).

Motions for reconsideration, whether brought under Fed. R. Civ. P. 54(b) or 59(e), are largely disfavored.  *Marcum*, 2021 WL 2580575, at *3 (citing cases).  Here, the Benesch Respondents argue that this Court has deprived them of due process because they were not given the opportunity brief the issue of ICEE's ability to conduct depositions on its motion for sanctions (as opposed to its counterclaims).

We start with the *Shelton* factors, discussed both by ICEE and the Benesch Respondents.  "[O]pposing trial counsel is [not] absolutely immune from being deposed." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).  But "[d]iscovery from

18

an opposing counsel is 'limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information …; (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case.'" *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002) (quoting *Shelton*). And the Benesch Respondents contend that "[t]he standards for discovery sanctions are much more limited than even *Shelton* discovery." (Doc. 253 PAGEID 9661; *see id.* PAGEID 9664–9665).[21]  The Court is not persuaded by the

---

[21] This position appears to differ from what was argued on May 31, 2023, as ICEE correctly points out:

> Respondents' counsel began by arguing as he had in Respondents' motion [for protective order]—that the depositions should not go forward because the issues flagged by ICEE "are all relating to the sanctions." Doc. 220 at PAGEID 8677, 23:3-5. The Court then clarified that it had not foreclosed discovery on sanctions:
>
> > THE COURT: Pat, just by the way, you know, you said I foreclosed discovery on sanctions. I really didn't. I said "at this juncture."
> >
> > MR. KASSON: Fair enough.
> >
> > THE COURT: And the order, you know, I haven't issued an order on sanctions yet, but there's going to be an order on sanctions. There's going to be a real question about whether it's the client or it's joint and several. We spent a lot of time and a lot of money chasing down the 2000 Agreement, and that's just not going to go unaddressed. And your clients, the law firm, needs to know that. But go ahead.
> >
> > MR. KASSON: Yeah, and that's fine. And if it is discovery on sanctions, it ought to be up front and clear about it because here's the first reason he gave for this deposition. . . To look at the role Gurbach played in the forgeries. There wasn't any other reasons you just heard. It was to look at the role. And that's consistent with the counterclaim. Right. And get this, the counterclaim, the reasons he says in the counterclaim that he needs this are identical to the sanction reasons.
>
> *Id.* at PAGEID 8676-7 23:7-24:1.
>
> Instead of objecting to sanctions discovery, [in an email sent] on June 5, counsel reiterated his position that discovery on sanctions was fine as long as the Court was "up front and clear about it": "If the Court decides to order discovery on the sanction issues, so be it. But the proposed order should be clear that is the basis for any such topic." Doc. 253-2.

(Doc. 260 PAGEID 11092 (footnote omitted)).

authority they cite, however, as *Indianapolis Colts v. Balt.*, 775 F.2d 177 (7th Cir. 1985) was decided pre-*Shelton* and the Magistrate Judge in *Pate v. Pac. Harbor Line, Inc.*, No. 5:21-cv-01300, 2023 U.S. Dist. LEXIS 158880, at *51 (C.D. Cal. Sept. 6, 2023) applied the *Shelton* factors, calling them "appropriate guidance[.]"[22]

"An attorney can be sanctioned under Federal Rules of Civil Procedure 26(g)(3) and 37(b)(2)(C), 28 U.S.C. § 1927, and the court's inherent powers[.]" *KCI USA, Inc. v. Healthcare Essentials, Inc.*, 797 F. App'x 1002, 1006 (6th Cir. 2020).[23] "But there remain

---

[22] Thus, the Court agrees with ICEE that it "has never understood what difference it makes whether the decision to order the depositions is based on the counterclaims or on sanctions since the issues overlap[.]" (*See* Doc. 260 PAGEID 11091).

[23] The Benesch firm represented Plaintiff KCI in the district court and on appeal. In its memorandum in support of sanctions against the law firm that originally represented Defendants, the Benesch firm explained:

> Federal Rule of Civil Procedure 37(b)(2)(A) provides that a Court may issue sanctions:
>
> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders.
>
> Fed. R. Civ. P. 37. Rule 37(b)(2)(C) provides that "instead of or in addition to the orders above, the court must order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."
>
> Moreover, district courts possess inherent authority to sanction bad faith conduct in litigation. *First Bank v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 512 (6th Cir. 2002). This authority derives from the district court's "equitable power to control the litigants before it and to guarantee the integrity of the court and its proceedings." *Id.* (citing *Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991)). If the Court "finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Id.* (internal quotation marks omitted).
>
> Additionally, under 28 U.S.C. § 1927 sanctions may be awarded against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." The Sixth Circuit has applied these sanctions where an attorney's "litigation tactics will needlessly obstruct the litigation of non-frivolous claims" and where "an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by the member of the bar to the

due process concerns in the context of sanctions, and a party or attorney must be afforded notice and an opportunity to be heard." *Id.* (citations omitted). "While 'formal notice detailing the penalties' is not required, KCI or the court had to provide notice that sanctions were being sought against the individual attorneys and not just the firm." *Id.* (citations omitted). A show cause order would suffice; so would "notice from an opposing party[.]" *Id.* (citations omitted). As to the latter, the Sixth Circuit explained:

> For example, KCI could have specifically moved for sanctions against the individual attorneys in its original omnibus sanctions motion, making it clear that it was seeking sanctions against the individual attorneys in addition to seeking sanctions against the firm. But KCI did not. Mentioning the individual attorneys in a *footnote* of a reply brief—when previous filings and allegations had been directed at the "Cavitch Firm"—is not sufficient notice. Telling is KCI's reason for flagging the individual attorneys in that footnote: "For the removal of any doubt … the Court should sanction Michael Rason, Komlavi Atsou, and Eric Weiss of the Cavitch firm." Doubt there was. And doubt is not enough to provide sufficient notice to the individual attorneys.

*Id.* (italic emphasis in the original). And without notice, the individual attorneys had no opportunity to be heard. *Id.* at 1007–1008. ("At the very least, responsive briefing from each attorney could have provided the procedural safeguards necessary here. But under the circumstances as they were, the individual attorneys did not even have the opportunity to each file a brief in response to KCI's omnibus sanctions motion since KCI did not mention it was seeking sanctions against the individual attorneys until a footnote in its reply brief.").

---

court and which, as a result, causes additional expense to the opposing party.'" *Shepherd v. Wellman*, 313 F.3d 963, 969 (6th Cir. 2002) (citations omitted).

*KCI USA, Inc. v. Healthcare Essential, Inc., et al.*, No. 1:14-cv-00549-BYP (N.D. Ohio Nov. 17, 2017) (Memorandum in Support of its Omnibus Motion for Sanctions Against Cavitch, Familo & Durkin Co., LPA, Doc. 333-1 PAGEID 5929–5930 (footnotes omitted)).

Here, in contrast, ICEE's detailed motion for sanctions (and 79 pages of exhibits) put the Benesch firm and the individual lawyers on notice as to the nature of the allegations being made by ICEE and their alleged involvement. (Doc. 89 PAGEID 2305, 2309–2324 ("FACTUAL BACKGROUND"). For example:

> On February 19, without explanation for the delay, [Elizabeth] Emanuel produced the "Wendsday" email. Doc. 60-8. But Emanuel produced it without its incriminating metadata showing that "markp" had created it from a Word document on January 17, 2018. Importantly, Emanuel was savvy about metadata, even complaining to defense counsel right around this time about missing metadata in ICEE's production, and promising that SPL would "include the same metadata in its future productions." Ex. 6, Nov. 19, 2019 letter from E. Emanuel to D. Wolfsohn, at 3.

(*Id.* PAGEID 2318). And:

> Six days after the belated production of the "Wendsday" email, House—copying the whole Benesch Team—asked Peters for "more information" about it: "In preparing for your deposition we reviewed the attached which we received from RPC early in the case. . . . We need to know whether the attached e-mail string can be retrieved in native format by your IT people and where the string came from. The word 'Wednesday' is misspelled as 'Wendsday' in the date of the top e-mail. An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition." Doc. 73-21 at PAGEID 1563. Despite numerous reminders, neither Peters nor any "IT people" ever substantively responded to House's "critical" question. Doc. 73-22, 73-23. There was no "native" email to "retrieve" because Peters had forged it. And, if Peters is to be believed, SPL didn't even have any "IT people." M. Peters Oct. 9, 2020 Dep. at 65:13-17 ("We don't have an IT guy. We're a small business.").

> House's February 25, 2020 email proves that no later than this date, House, Gurbach, Turk, Avsec, and Emanuel all knew their client had committed forgery[.] . . .House's request for an explanation for the misspelling of "Wendsday" was facetious: no explanation was possible other than that Peters typed it—and, of course, House never received any explanation from "IT" or anyone else. . . .

> Peters got the message, so, instead of informing the Court and defense counsel about Peters' forgery, the Benesch lawyers

cancelled the deposition, sought an indefinite moratorium on all discovery, asked the Court to order settlement discussions, and falsely claimed that Peters' health was an issue. Doc. 73 at pp. 14-17. When it looked like counsel could delay Peters' deposition no longer, Gurbach sent ICEE's counsel a letter that "withdrew" the "Wendsday" email from production, but he withheld all information about the forgery. Doc. 60-10. The day before, House, in another curious email to Peters, stated that "we have reached the conclusion inferred from the circumstances that the email is not authentic." Doc. 73-23 PAGEID 1569. But those same "circumstances" were present in 2018 when Benesch received the "Wendsday" email with its metadata; they were present on February 12, 2019, when the complaint was filed; and they were present on February 19, 2020, when Emanuel produced the document to ICEE.

(*Id.* PAGEID 2319–2320). Of note, counsel for the Benesch Respondents filed a 29-page memorandum in opposition to the motion for sanctions (accompanied by 25 pages of exhibits). (Doc. 95). Declarations from attorneys Gurbach (Doc. 95-3), House (Doc. 95-4), and Turk (Doc. 95-5) were included. ICEE filed a 73-page reply (with 204 pages of exhibits). (Doc. 98). The Court later denied the Benesch Respondents' motion to strike (Doc. 101) ICEE's reply and permitted them to file a sur-reply. (Doc. 182). The Benesch Respondents' sur-reply (Doc. 184) is 38 pages in length, to which ten pages of exhibits are attached including another declaration (Doc. 184-4) from attorney Turk.

In their motion for reconsideration, which ICEE fittingly describes as a "mis-styled motion for protective order seeking to preclude the depositions of [Elizabeth] Emanuel and [Jennifer] Turk[,]"[24] the Benesch Respondents protest the "sweeping discovery" that ICEE has enjoyed "of a kind never seen in federal court." (Doc. 253 PAGEID 9657). A radical pronouncement to be sure. Equally radical is the fact that this senior district judge, sworn to the Bench in 2006, has never presided over a civil action in which Plaintiff's counsel: (1) concede that the sole document (the 2000 Appointment) underpinning the

---

[24] (*See* Doc. 260 PAGEID 11087).

original complaint is not "genuine" (2) but only _after_ contentious discovery and confrontation; (3) then withdraw that document (4) and matter-of-factly pivot to documents (the 1996 Appointment and the 1999 Agreement) previously referred to in the first amended complaint as "superseded" by the not "genuine" one. In short, no other way to put it, SPL wants a "do-over." And it is against this backdrop that the Court will apply the _Shelton_ factors.

The undersigned monitored approximately 80% of the last session of the remote deposition of Mark Peters. (_See_ Doc. 76 (PAGEID 1831–1871). His testimony generally lacked candor and, pertinent to Benesch attorney depositions, he was entirely averse to answering questions about the not "genuine" 2000 Appointment, to include the fabricated-in-support November 12, 2008 "Wendsday" email and the "2011" History of Working Practise. His mantra throughout was, "I'm not an IT expert." (_See id._ PAGEID 1836–1837 (22:7–26:19),1837 (26:20–28:13), 1837–1838 (29:21–32:18), 1840 (38:17–40:16), 1845–1846 (60:5–65:21), 1848 (70:5–19), 1849 (75:3–76:9), 1850–1851 (78:3–83:14), 1852 (87:11–19), 1855 (100:7–23), 1863–1864 (130:20–134:22), 1865 (141:2–23), 1871 (165:1–15), 1872 (166:11–167:12), and 1877 (188:3–13)).

The undersigned likewise attended (at the request of counsel for the Benesch Respondents) the in-person deposition of former Benesch attorney Gurbach, which was taken at the Potter Stewart U.S. Courthouse in Cincinnati. His deposition was scheduled first (also at the request of counsel for the Benesch Respondents) because "[r]ealistically, Matt Gurbach was there for the filing of the Complaint. Matt Gurbach was there for the vast majority of this. The only thing Matt Gurbach wasn't there for was when the 2000 Appointment was withdrawn. That's it. So why don't we see what Matt knows and what

[Mark] Avsec knows, who took the case notes, and then see what Ron [House] remembers?"  (Doc. 229, Aug. 15, 2023 Discovery Teleconference Tr., PAGEID 8943 (8:7–12)).  "I think [Gurbach and Avsec are] going to be able to answer most of the questions about what happened up front, if not all of them[.]"  (*Id.* PAGEID 8943 (8:15–17)).  The Court accepted counsel's representation that, "Gurbach is going to answer the vast majority of the Benesch documents and really narrow this, which would make Ron[ House]'s deposition shorter, you know, and more focused.  I mean, I've been over this with Gurbach.  I think he's really going to narrow all this."  (*Id.* PAGEID 8945 (10:2–10)).  "[Gurbach] knows the documents.  Just trust me.  He will explain the thinking of the filing of the Complaint.  He will explain all the different reasons they had at the time he believed the [2000] Appointment was true.  He will be familiar with all those documents and was at the time."  (*Id.* PAGEID 8946 (11:10–14)).

Counsel for the Benesch Respondents overpromised.  As ICEE notes in its memorandum:

> Mr. Gurbach had numerous gaps in his memory, so many that the Court afterwards stated that "I don't think Gurbach, frankly, was that helpful.  He treated situations four years ago as if they occurred in the last century.  I mean, I don't know how many times he couldn't recall, but I don't think he was as helpful as you portray him."

(Doc. 260 PAGEID 11095–11096 (quoting Doc. 247, Sept. 22, 2023 Discovery Teleconference Tr., PAGEID 9580 (2:16–21))).  Apropos the need to depose attorneys Emanuel and Turk:

> Respondents' counsel conducted over an hour of direct examination of Mr. Gurbach, during which he produced for the first time communications that had never been produced in the litigation or logged on a privilege log.  Gurbach Dep., 329:18-401:2; 362:3-365:14; DepEx. B 10; DepEx. B 11.  Respondents' counsel focused in particular on an August 29, 2019 email from Elizabeth Emanuel to

RPC in which she states that RPC should ensure that documents are preserved.  Gurbach Dep. 382:7-386:14.  Yet Mr. Gurbach could not recall what, if any, response Ms. Emanuel received to her email.  Respondents' counsel also elicited testimony from Mr. Gurbach that SPL had retained a handwriting expert in June of 2020 because Mr. Gurbach was concerned in February 2020 that the 2000 Appointment of Trade Mark License had been forged.  *Id.* at 375:5-378:3.  Although Respondents' counsel elicited this testimony about a handwriting expert as presumably exculpatory, counsel has refused to produce any of the correspondence with the expert or any opinions—draft or otherwise.  In fact, Mr. Gurbach testified that "I don't know where [it] went."  377:24-378:3.

. . .

Mr. Gurbach disclaimed knowledge about document production in this case, especially regarding e-discovery and metadata.  **He suggested at various times that the people to ask about such things were Elizabeth Emanuel and Jennifer Turk.**  37:2-38:9 (Turk had responsibility for discovery—document review and production); 126:15-19 (Turk would have handled review of the real Lindsay Kirby emails); 192:24-193:3 (House or Turk would have contacted Ralph Peters); 2[0]7:5-2[0]8:2 ([House or] Turk might know if servers were imaged per RPC's direction); 29:7-14 (Emanuel was relied upon to log into Everlaw and find particular documents).

(Doc. 260 PAGEID 11095 (footnote omitted), 11096 (emphasis added)).

Finally, the undersigned attended some of the sessions during which former Benesch attorney House was deposed.  His recall was limited, which he attributes to his medical conditions.  (Doc. 254-1 PAGEID 9695–9696 (6:5–7:5)).  The Court refers again to ICEE's memorandum:

Mr. House could remember no detail about any conversations with [Mark] Peters or RPC; knew nothing about e-discovery or metadata regarding the document production; could not recall who prepped [Mark] Peters for his depositions; never looked at metadata in the forged documents; claimed not to have conducted any investigation into the forgeries other than asking [Mark] Peters to talk to his "IT guy"; did not know why SPL's reply brief in support of its motion to amend stated that counsel had concluded that they could not ethically proceed with claims under the Appointment of Trade Mark Licence; could not remember which documents he gave or sent to

Ms. Turk for document production; could not recall ever reviewing any of ICEE's document production; could not recall whether, in preparation for [Mark] Peters' testimony as a Rule 30(b)(6) witness on the History of Work[ing] Practi[s]e, which version—if any—of that document was shown to Mr. Peters in preparation; and could not recall which documents were sent to SPL's handwriting expert and what opinions that expert provided to Benesch or SPL.  *See id.* at 32:[6-18] (not knowing which documents he gave to Ms. Turk to be produced), 41:8-11 (**"Q. Who were the other attorneys that Jennifer Turk worked with insofar as the collection and production of emails is concerned? A. I belief it was Elizabeth Emanuel."**), 42:14-17 (**"When you say Jennifer Turk knows the area much better than you do, or you did, which area are you referring to? A. The production of ESI."**), 89:1-3 (**"So to find out who drafted this [Reply Brief in Support of Motion to Amend], I've got to talk to** Eric Zalud and **Jennifer Turk, right? A. Yes."**).

(Doc. 260 PAGEID 11097–11098 (emphases added)).  Once again, all signs point to attorneys Emanuel and Turk.

The Court finds that all three *Shelton* factors have been met.  SPL principal Mark Peters wouldn't—and former lead counsel couldn't—testify about who did what, and when, regarding the forged 2000 Appointment (and the accessory-after-the-fact "Wendsday" email and "2011" History of Working Practise).  But, according to former lead counsel, Elizabeth Emanuel and Jennifer Turk <u>can</u>.  The Court has previously signaled that sanctions (in the form of an award to ICEE of its attorneys' fees and costs) will be levied against Plaintiff Slush Puppie Limited.  The testimony of attorneys Emanuel and Turk is patently relevant to whether the Court will require the Benesch firm to share in the cost of this award.[25]  And, of course, the crime-fraud exception to the attorney-client privilege permits their testimony concerning the 2000 Appointment.

---

[25] As the Benesch firm argued in support of sanctions in *KCI*,

It is axiomatic that "trial counsel themselves have an affirmative obligation to ensure that what their clients tell them is accurate." *Williamson v. Recovery Ltd.*

Finally, the Benesch Respondents ask the undersigned "to set a show cause hearing with the Magistrate [Judge] if the Court intends to consider the recent deposition testimony." (Doc. 253 PAGEID 9647). Indeed, their counsel suggests that this is mandated in the Sixth Circuit. It is not. Unlike my colleagues serving in the Western Division at Dayton and the Eastern Division at Columbus—and even some here in Cincinnati—I handle my own discovery disputes. This civil action is no different.[26] And there is no need for "a clean slate[.]"[27] As the Court previously advised counsel for the Benesch Respondents, "emotions don't come into this."[28] That said, and to be clear, the attorney depositions may proceed, but not to bolster a theory in search of a fact. Rather,

---

P'ship, No. 2:06-CV-00292, 2014 WL 186898, at *5 (S.D. Ohio Jan. 14, 2014), aff'd, 826 F.3d 297 (6th Cir. 2016) (citation omitted).

KCI USA, Inc. v. Healthcare Essential, Inc., et al., No. 1:14-cv-00549-BYP (N.D. Ohio Nov. 17, 2017) (Memorandum in Support of its Omnibus Motion for Sanctions Against Cavitch, Familo & Durkin Co., LPA, Doc. 333-1 PAGEID 5932).

[26] (Doc. 251, Dec. 7, 2023 Discovery Teleconference Tr., PAGEID 9638 (27:11–12) ("I have to say, Pat, I mean, that whole thing you went through with the show cause order and all that stuff, those are all mostly cases where the discovery is handled by the MJ in the first instance and then the show cause comes after that versus ones where I've done a hands-on approach.") & PAGEID 9639 (28:13–19) ("I've never seen a case where it works like that, Pat. Usually what happens is you have, you know, an MJ – in all the cases that you were talking about show cause, I went back and looked at them. To the best of my recollection, they all dealt with an MJ doing the initial discovery procedure and then somebody wants to take it up with the judge. That's not what happened in this case.")).

[27] (Motion for Reconsideration of this Court's Oral Order Granting Sanctions Discovery, Doc. 253 PAGEID 9668 ("This case has been an unbelievably contentious case both on the issue of sanctions and the underlying dispute. As such, Benesch respectfully requests that the Court defer a show-ca[u]se hearing to the Magistrate Judge, where the Benesch Respondents will come forward and respond to the allegations raised by ICEE. See 28 U.S.C. §636(b)(1)([B]). The Magistrate Judge—having a clean slate—can make factual findings and a recommendation on whether sanctions should or should not be granted.")).

[28] (Doc. 220 PAGEID 8689 ("MR. KASSON: Look, I get it. I get it. You and I haven't talked about this case yet. I get it. You're annoyed. THE COURT: I'm not annoyed. I -- MR. KASSON: You're bothered by the complaint being filed because it had a document that wasn't authentic. THE COURT: I am informed. I'm not bothered by it. I mean, emotions don't come into this. MR. KASSON: Sure. THE COURT: I mean, a lot of people spent a lot of time and money before that got withdrawn, so somebody has got to cover that.")).

before the Court is a fact—the filing of a lawsuit based upon a forged document—in need of an explanation.

## III.    CONCLUSION

Based on the foregoing, the Benesch Respondents' Motion for Reconsideration (Doc. 253) regarding sanctions discovery is **DENIED** and the remaining attorney depositions (of Elizabeth R. Emanuel and Jennifer L. Turk) may proceed.

**IT IS SO ORDERED.**

/s/ *Michael R. Barrett*
JUDGE MICHAEL R. BARRETT