# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

                Plaintiff,

    v.

THE ICEE COMPANY,

                Defendant.

CASE NO. 1:19-cv-00189-MRB

Judge Michael R. Barrett

**THE ICEE COMPANY'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SANCTIONS AGAINST BENESCH FRIEDLANDER COPLAN & ARANOFF LLP AND ATTORNEYS MARK AVSEC, ELIZABETH R. EMANUEL, MATTHEW D. GURBACH, RONALD L. HOUSE, JENNIFER M. TURK, AND ERIC LARSON ZALUD, PURSUANT TO 28 U.S.C. SECTION 1927, FED. R. CIV. PROC. 26(g), AND THE COURT'S <u>INHERENT AUTHORITY</u>**

**TABLE OF CONTENTS AND SUMMARY OF THE ARGUMENT**

TABLE OF AUTHORITIES ........................................................**Error! Bookmark not defined.**

MEMORANDUM .................................................................................................................1

I.    MARK AVSEC, MATTHEW GURBACH, AND RONALD HOUSE FAIL TO
    MAKE A PROPER PRESUIT INVESTIGATION............................................................2.

    A.    Avsec, Gurbach, and House Ignore the Red Flags .................................................. 2

Documents from Benesch's case file, recently produced in connection with the depositions of the Benesch lawyers, reveal that they knew that Mark Peters was unaware of the 2000 Appointment; that Will Radcliff's personal assistant Diane Menzer (who had just signed the 1999 Agreement) was unaware of it; and that Slush Puppie Corporation had not sent it to DPSU in 2001 when the business was sold, but instead sent the "superseded" 1996 agreement. The case file also shows that the Benesch attorneys received RPC's 2018 communications with Peters in which they expressed doubts about the validity of the 2000 Appointment and reluctance to rely on the Wendsday Email, as well as concern with the fact that ICEE's UK trademark lawyers at Weightmans had sent SPL's trademark lawyers at Gowling documents that "contradicted" Mark Peters' position that the 2000 Appointment had somehow superseded the 1996 Agreement.

At their depositions, Mark Avsec and Matt Gurbach argued that the "main" evidence they had supporting the validity of the 2000 Appointment was that SPL had consistently paid DPSU and then ICEE 2.5% instead of the 5% royalty set forth in the 1996 Manufacturing Appointment. But we now know from the case file that Avsec, Gurbach, and House had substantial evidence that that was because Radcliff and Ralph Peters had made an ***oral*** agreement to lower it to 2.5% (which, ironically, is now what SPL is alleging, having been caught forging the Appointment). Thus, the fact that 2.5% had been paid confirmed that oral agreement, rather than that the 2000 Appointment was a real document.

Avsec, Gurbach, and House also knew that Mark Peters lied to ICEE when he claimed in March 2018 that he had "raised" the 2000 Appointment with ICEE. The case file further shows that in September 2018, Mark Peters told Avsec that if he wanted further information about the 2000 Appointment, he should contact Ralph Peters and Stefan Loos. Instead of contacting them or prior financial directors Alan Beaney and Lindsay Kirby, Avsec, Gurbach, and House chose to ignore all the red flags, and forge ahead on a suit based on a forged contract.

"It is axiomatic that 'trial counsel themselves have an affirmative obligation to ensure that what their clients tell them is accurate.'" Doc. 270 at PAGEID 11642. Where an attorney's conduct "falls short of the obligations owed by the member of the bar to the court and which, as a result, causes additional expense to the opposing party" or where the attorney's litigation tactics "needlessly obstruct the litigation," that attorney should be sanctioned. *Id.* at PAGEID 11635; *King v.*

*Whitmer*, 71 F.4th 511, 5321 (6th Cir. 2023). All that is required is "something more than negligence or incompetence." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006); *B&P Littleford, LLC v. Prescott Machinery*, LLC, 2021 WL 3732313, at * 9-10 (6th Cir. Aug. 24, 2021). Gurbach, House, and Avsec were "more than negligent or incompetent" in ignoring the evidence suggesting the 2000 Appointment was a fake, and failing to interview the relevant witnesses. Their failure imposed on ICEE the cost of defending against "meritless" claims and ferreting out Peters' chronic criminality.

B.     Avsec, Gurbach, and House Ignore the Forged Documents' Metadata.................. 7

Mark Peters forged at least five documents, all of which were received multiple times by Avsec, Gurbach, and House. Three of them bear the telltale signs of digital forgery. Despite touting their expertise in digital discovery matters, the Benesch lawyers chose not to take the few seconds and one or two mouse clicks needed to look at these too-good-to-be-true documents they had been sent by Mark Peters. Given the "curious" (as Avsec put it) appearance of the 2000 Appointment after almost two decades, and Peters' lies about it, the Benesch lawyers should have taken this obvious and easy step. Had they done so, they never would have filed the litigation that has cost ICEE millions. Gurbach, Avsec, and House should be sanctioned because, "in the face of an obvious risk that [they were] increasing the work on" ICEE, they decided to plow ahead with litigation based on a forged contract. *Red Carpet Studios*, 465 F.3d at 647; Doc. 270 PAGEID 11635-36 (§ 1927 sanctions awarded because attorney's conduct fell short of obligations owed by bar members to the court, causing additional expense to opposing party).

II.    AFTER SUING ON A FORGED CONTRACT, GURBACH, HOUSE, EMANUEL, AND TURK TURN A BLIND EYE TO PETERS' SCHEME TO DEFRAUD THE COURT AND HIDE EVIDENCE ........................................................8

    A.     Avsec, Gurbach, Turk, and House Know That Peters Forged the Wendsday Email ................................................................................................ 8

By no later than the end of February 2020, Avsec, Gurbach, Turk, and House knew that Mark Peters was the only one with the means, motive, and opportunity to digitally fabricate the Wendsday Email. They knew that Outlook doesn't generate mis-spellings in the automatically generated date/time field, and they knew that Peters owned SPL, was running SPL, was the only one handling the litigation, and was the one who "found" and sent the Wendsday Email to RPC after RPC had asked him for evidence that ICEE had been aware of the 2000 Appointment before Peters "discovered" it in 2017. The Wendsday Email was significant because (1) it showed that Peters was proficient with digital manipulation using his laptop, (2) it showed that Peters thought he needed to prove that the 2000 Appointment was real, and (3) it was yet another red flag about the authenticity of the Appointment. In fact, by the end of February 2020, Gurbach had concerns that the Appointment had been forged.

B.      Avsec, Gurbach, and Turk Knowingly Fail to Produce the Wendsday Email as They Had Received It—With the Incriminating Metadata ...................... 9

Despite excoriating Duane Morris for failing to produce various emails without metadata, Benesch knowingly chose to remove the metadata from the Wendsday Email and produce it to Duane Morris with none of the original metadata as the Benesch attorneys had received it multiple times from RPC.  Moreover, they never informed Duane Morris that they had stripped out the metadata.  The Benesch attorneys have argued that this was inadvertent, Doc. 95 PAGEID 2430, 2454, but they recently produced an exchange with their ediscovery expert that proves they were told the fabricated email had been scanned at Benesch, thereby removing the metadata, and that the metadata was not in the Everlaw production database.  The metadata, of course, proved that Mark Peters had created "Kirby's" November 12, 2008 email quoting from the 2000 Appointment.  Yet the Benesch lawyers chose not to look at the forged email as they had received it from RPC.  This was "more than negligent or incompetent." The Benesch lawyers "had two standards for the treatment of relevant information in this case"—aggressively seeking ICEE's information (e.g., its metadata) and doing "very little to ensure that [they were] in possession of all relevant documents and other evidence before responding to discovery." *Laukus*, 292 F.R.D. at 506. Such "woefully inadequate attention to discovery" subjects them to sanctions under Rule 26(g) and the Court's inherent powers.  292 F.R.D. at 506.

C.      Avsec, Gurbach, House and Turk Decide to Conduct no Investigation Other Than Asking the Forger if He Did It ........................................................... 11

The only one the Benesch attorneys ever suspected of fabricating the Wendsday Email was Peters, yet they chose to limit their "investigation" to asking him for an explanation (he didn't confess) and asking him to have his "IT folks" try and find the forged email "in native format."  But at their depositions, the Benesch attorneys admitted they knew that was impossible:  Since Outlook does not mis-spell Wendsday, the "Kirby" November 12 email had to have been typed up by someone on top of a cut-and-paste legitimate string, using the Word application. Indeed, we now know from Jennifer Turk's deposition that, on February 25, 2020, she compared the Wendsday string with the real string produced by ICEE, which showed that, in reality, Lindsay Kirby did not answer Jerry Bird's November 11, 2008 inquiry ("what we need is the supporting information no how the 2007 Royalty was determined.") until ***December 8***: "Dear Jerry, Sorry, I thought Robert had sent it to you.  Royalty for 2007 was based on 1,419 @ 2.5%."  Of course, the real string containing Kirby's December 8 response to Bird lacked any November 12 email quoting from the 2000 Appointment.  The only person at SPL with access to the real string was Mark Peters, and he was the one who had "found" the Wendsday Email.

At their depositions, Gurbach, Avsec, House, and Turk were unable to explain why they would ask Peters for a native email that they knew didn't exist, but the

logical explanation would be that they did not want to create a conflict by expressly accusing him of fraud, and had been advised that as long Peters didn't confess, they could continue representing (and billing) him.

D.     Gurbach, House and Turk Fail to Remedy Peters' Numerous Lies at His Deposition ........................................................................................................... 14

A few days before Mark Peters' deposition, House and Gurbach discussed the Wendsday Email with him, as well as their decision to "withdraw" it from production. They also sent him a draft letter accomplishing this withdrawal. At his deposition, Peters repeatedly lied--claiming he had never seen the Wendsday Email before his deposition prep, that he had not typed it up, and that he had never seen the withdrawal letter before. House and Gurbach did nothing to correct Peters' perjury.

E.     House and Turk Fail to Inform the Court That They Believe Duane Morris Is Correct About the Wendsday Email's Incriminating Metadata ........................ 14

After ICEE has to incur the expense of a crime/fraud motion an expert report, Benesch finally produces the Wendsday Email with its metadata, which has Mark Peters' digital fingerprints. When Duane Morris calls the Court's attention to those fingerprints, House internally confirmed with his ediscovery expert that the fingerprints incriminate Peters, but he nonetheless accuses Duane Morris of making up "facts" about the metadata.

III.     GURBACH, HOUSE, TURK, AND EMANUEL REPEATEDLY FAIL TO MEET THEIR DISCOVERY OBLIGATIONS REGARDING THE HISTORY OF WORKING PRACTISE, THEREBY IMPEDING DISCOVERY OF PETERS' CRIMES ........................................................................................................ 16

A.     Avsec, Gurbach, and House Repeatedly Receive and File the Forged History With Metadata Showing that Peters Forged It ......................................... 16

The recently produced documents show that Avsec, Zalud, Gurbach and House received, saved, and printed out numerous copies of the forged History--which they called a "CORE" document--with its incriminating metadata.

B.     Gurbach, Turk, and Emanuel Rely Entirely on Mark Peters for Document Collection ....................................................................................................... 17

Despite knowing that Peters had lied about the 2000 Appointment, and despite Peters' claims that he was "not an IT guy," Benesch put him in charge of the collection of digital evidence, including all email. Gurbach, Turk, and Emanuel did nothing to ensure that the collection was done properly, in contravention of Benesch's own ediscovery advice.

C.      Gurbach, Emanuel, and Turk Fail to Conduct a Reasonable Inquiry Into the History ........................................................................................................ 18

In October 2019, ICEE produced to Benesch the 2011 History and its transmittal email. It was easy to see that Peters had withheld from Benesch those two documents in attempt to hide his pasting of signatures from the History into the 2000 Appointment. Yet Gurbach, Emanuel, and Turk never asked Peters why the April 26, 2011 email and its attachment (the History) were missing. *Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448, 460-461 (S.D. Ohio 1995) ("All documents received from the client should be reviewed by counsel to see whether they indicate the existence of other documents not retrieved . . . and there should be appropriate follow up."; "At the very least, when plaintiff's counsel began complaining about the apparent incompleteness of the discovery documents and pointing to evidence of incompleteness, trial counsel should have established direct communication with defendant's employees who had responsibility" for collecting relevant documents); *DR Distributors*, 513 F.Supp.3d at 936 (counsel failed to conduct reasonable search for documents where they permitted client's self-collection that was not systemized or documented).

D.      Gurbach, Turk, and Emanuel Review Both Versions of the History but Fail to Produce the Forged One ........................................................................... 20

Logs produced after Emanuel's and House's depositions showed that Emanuel, House, and Turk repeatedly reviewed both versions of the History. The deposition testimony proved that they could all easily see in Everlaw, iManage, and in hard copy that the forged History had never been produced, yet they never produced it.

E.      Gurbach and House Prep Peters as 30(b)(6) Designee on the History but Continue to Withhold the Forged Version ......................................................... 211

In early March 2020, ICEE served a Rule 30(b)(6) notice asking for a designee regarding the History. Benesch designated Mark Peters. To have prepared him, his attorneys had to review a copy of the History with him. Doing so would reveal that the forged History had not been produced and that ICEE's 2011 version did not reference the 2000 Appointment, unlike the forged version.

F.      House and Turk Are Convinced That Peters Forged the 2000 Appointment but They Continue Withholding the Forged History Based on Phony Privilege Claims ................................................................................................. 23

House found ICEE's August 24, 2020 expert report "pretty convincing." It showed that Peters had pasted the signatures from the 2011 History into the 2000 Appointment. Instead of producing the forged History at that point, he continued to withhold it based on phony privilege claims.

IV.    GURBACH, HOUSE, AND TURK WERE MORE THAN NEGLIGENT OR INCOMPETENT IN FAILING TO PRESERVE EVIDENCE OF PETERS' CRIMES.................................................................................................26

The Benesch attorneys all knew that, to preserve data on a device, the device either has to be imaged or sequestered without continued use, which could compromise evidence on it. Yet they did nothing to ensure that Mark Peters' devices were preserved, even after they suspected him of digitally manipulating the Wendsday Email and the 2000 Appointment. They argued at their depositions that they had no responsibility other than telling Peters "preserve," but the law requires more specificity and that counsel follow up to ensure that preserve guidance is followed. *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F.Supp.3d 839, 905-906 (N.D. Ill. 2021). That is particularly the case where counsel suspects their client of fabricating documents.

V.    CONCLUSION................................................................................................................29

CERTIFICATE OF SERVICE ...................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*A PDX Pro Co. v. Dish Network Serv.*, LLC, 311 F.R.D. 642 (D. Colo. 2015) ...........................13

*B&P Littleford, LLC v. Prescott Machinery,* LLC, 2021 WL 3732313 (6th Cir. Aug. 24, 2021) ...................................................................................................................1

*Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448 (S.D. Ohio 1995) ..........................13, 24, 26

*Brown v. Tellermate Holdings Ltd.*, 2015 WL 4742686 (Aug. 11, 2015 S.D. Ohio) ........ 19, 24-25

*DiLuzio v. Village of Yorkville, Ohio*, 2016 WL 7406535 (S.D. Ohio Dec. 22, 2016) ....................................................................................................................................23

*DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F.Supp.3d 839 (N.D. Ill. 2021) ...............................................................................................................*Passim*

*King v. Whitmer*, 71 F.4th 511 (6th Cir. 2023) ...............................................................................1

*Laukus v. Rio Brands, Inc.* 292 F.R.D. 485 (N.D. Ohio 2013) ...........................................*Passim*

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006) ...................................................................................................... 1-2, 8

**Statutes**

28 U.S.C. Section 1927 ...............................................................................................................1, 1, 8

**Other Authorities**

Fed. R. Civ. Proc. 26(g) .........................................................................................................*Passim*

Local R. Civ. Proc. 7.2(a)(3) .........................................................................................................2

Local R. Civ. Proc. 7.3(b) ...............................................................................................................1

Although SPL continues to deny it and some of the Benesch attorneys stubbornly refused to admit it at their depositions,[1] ICEE has mustered proof beyond a reasonable doubt that Mark Peters, the managing director and owner of plaintiff Slush Puppie Limited ("I am the company") forged no fewer than five documents to support his litigation against ICEE, including the very contract upon which all of SPL's claims were based. The depositions of the Benesch Respondents and documents produced by them over the past few months show that, at every step of the way—from 2018 until long after SPL moved to amend its complaint—the Benesch attorneys turned a blind eye to Peters' crimes, frauds, and lies. Their position apparently was—and still is—that as long as Mark Peters did not expressly confess, they were free to ignore the obvious and impose the costs of frivolous litigation on ICEE. That is not the law. "It is axiomatic that 'trial counsel themselves have an affirmative obligation to ensure that what their clients tell them is accurate.'" Doc. 270 at PAGEID 11642. Where an attorney's conduct "falls short of the obligations owed by the member of the bar to the court and which, as a result, causes additional expense to the opposing party" or where the attorney's litigation tactics "needlessly obstruct the litigation," that attorney should be sanctioned. *Id.* at PAGEID 11635; *King v. Whitmer*, 71 F.4th 511, 5321 (6th Cir. 2023). All that is required is "something more than negligence or incompetence." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006); *B&P Littleford, LLC v. Prescott Machinery,* LLC, 2021 WL 3732313, at * 9-10 (6th Cir. Aug. 24, 2021) (stating standard and noting that sanctioned attorney signed some pleadings and was on signature block of others).

---

[1] *See, e.g.*, House Nov. 2 Depo., Doc. 154-5, at 381:1-4 ("I don't know that the client forged the documents."), 424:23-425:14 ("We just don't know" whether it's forged).

The Benesch Respondents, given their unique access to SPL, its witnesses, and its documents, were the ones best situated to recognize Peters' forgeries and lies for what they were, and to stop the case in its tracks before it became the multi-year, multi-million dollar litigation it now is. They had the information at their disposal to appreciate Peters' chronic criminality *in real time,* yet they filed this lawsuit and then prosecuted it "in the face of an obvious risk that [they were] increasing the work on the other party without advancing the litigation." *Red Carpet Studios*, 465 F.3d at 647. Because the Benesch Respondents' failure to fess up about what they knew contributed heavily to the expense incurred by ICEE to uncover the truth, to "adequately compensate defendant[] and deter future litigations and counsel from engaging in similar . . . misconduct," *Laukus v. Rio Brands, Inc*. 292 F.R.D. 485, 509 (N.D. Ohio 2013), the Benesch firm and the named attorneys should be held jointly and severally liable for ICEE's attorneys' fees and costs in defending against the fraudulent claims and in uncovering Peters' crimes.

## I. MARK AVSEC, MATTHEW GURBACH, AND RONALD HOUSE FAIL TO MAKE A PROPER PRESUIT INVESTIGATION

### A. Avsec, Gurbach, and House Ignore the Red Flags

Mr. Kasson argued on May 31, 2023 that, given the information Benesch received pre-suit, "I can't possibly think how the Benesch lawyers could have questioned" the propriety of filing a complaint based on the forged 2000 Appointment. Doc. 220, May 31, 2023 Tr. at 37:15-22. But the subsequent discovery shows that Benesch did indeed question the legitimacy of the Appointment, but decided to ignore the red flags and sue anyway.

By September 2018, as ICEE has noted, RPC had serious doubts about the 2000 Appointment. Doc. 89 PAGEID 2311-12. RPC had drafted, and then declined to send, a letter arguing that the 2000 Appointment was valid based on the Wendsday Email (indeed, RPC declined to send any letter). And on September 20, 2018, RPC's Ben Mark was noncommittal

about the validity of the 2000 Appointment. Doc. 89  PAGEID 2312 ("irrespective of whether the 2000 agreement is valid and in force . . . ."). Benesch lacked this compunction, and sent the response itself. But discovery shows that the Benesch Respondents *already* were having the same doubts—they just found them easier to ignore. Avsec, who was hired to evaluate the 2000 Appointment and potential litigation, Avsec Depo., Doc. 256 at 26:13-27:1, posed a critical question to Peters on September 25, 2018: "So did SPL in fact pay royalties under the August 8, 2000 Agreement to [DPSU] for some period of time until ICEE acquired the business from [DPSU]?  Can we allege that with accuracy?"  Exh. 1, B9 at 2; Exh. 2, DX161 at 3.

Avsec's question shows that he, Gurbach, and House already appreciated the holes in Peters' story about the origins of the 2000 Appointment. Peters had only "found" it in 2017. How could it be that SPL was paying royalties (to DPSU or ICEE) "under" an Appointment that Mark and Ralph Peters were unaware of?  July 13 Peters Dep., at 290:8-291, Doc. 75; Doc. 73-6 PAGEID 1373 (Mark to Ralph in 2010: "we have zero wrights"; Ralph to Mark: "Established practice known about and not contested is tantamount to agreement."); Doc. 270 PAGEID 11621-11623.  And since Mark "was running the business" and had just signed the 1999 Agreement, it was "curious" that Ralph didn't tell him about it. R. Peters Depo., 34:24-35:36:6, Doc. 74, July 13 M. Peters Depo. at 384:2-6 (Ralph never told Mark about 2000 written agreement); Avsec Depo. at 107:3-7 ("curious" neither party aware of 2000 Appointment in 2017).  Also revealing about their doubts as to the authenticity of the 2000 Appointment is what House called his folder for important documents about it: "Docs re Choice of K."  Exh. 3, DX 127, DX 168. Why this title? If the 2000 Appointment was legitimate, then it governed, since by its terms it superseded the earlier agreements. Doc. 2 PAGEID 170, PAGEID 99-100 (2000 Appointment voids prior agreements); Avsec Depo. 2 at 47:11-17. House, Avsec, and Gurbach

believed they had a "choice" about which contract to assert because ICEE had disputed the authenticity of the 2000 Appointment and they had doubts themselves.

Of course, as Benesch's presuit case file now shows (and as Benesch now ***alleges***[2]), Peters was not paying DPSU and ICEE "under" the 2000 Appointment, but "under" an oral agreement lowering the 1996 Appointment's royalty from 5 to 2.5%. Exh. 4, DX 194 at pp. 8-9; Peters July 13 Dep. at 414:12-416:9 (Peters paying 2.5% because Ralph told him Will had agreed to 2.5%). In a 2011 email between ICEE's Galloway and Peters, Galloway refers to royalty payments due under the "Syrup Manufacturer Agreement"—which House highlighted. Exh. 3, DX 127 at pp. 27, 34. House also highlighted a 2011 email in which ICEE informs Peters that 2.5% royalties are calculated "under the 1996 Appointment." The case file also has board member Beaney's 2017 memos referring to the 1996 and 1999 contracts as still in effect, noting the "verbally communicated change" to 2.5%, Exh. 3 at pp. 22-23, which Gurbach admitted is evidence of an oral agreement. Gurbach Depo. at 175:7-176:6, Doc. 255. Yet Avsec, Gurbach, and House never bothered asking Mark or Ralph Peters why they thought the royalty rate was the result of a verbally communicated change. Avsec Depo. at 215:19-216:7.

The presuit case file also contains RPC's 2018 warnings about the 2000 Appointment, which House put in a bar-coded folder because they were "significant" and "important." Sept. 27 House Depo. at 28:19-24, Doc. 254-1, Sept. 29 House Depo. at 242:5-7, Doc. 254-3. Avsec, Gurbach, and House "were working hand-in-hand" with RPC, whose views carried weight

[2] Zalud signed a pleading in November 2020 (joined by House and Turk) alleging that, based on Menzer's fax to Yee, the royalty in the 1996 manufacturing appointment ***was*** lowered to 2.5% from the original 5%. Doc. 85 PAGEID 2180. This is the same document that Gurbach, Zalud, House, and Avsec decided to ***ignore*** in 2018 in favor of the "course of conduct" of paying 2.5%, which Gurbach and Avsec repeatedly argued at their depositions was the main "evidence" that the 2000 Appointment was real. Gurbach Depo. at 109:13-24; 110:21-111:10 (arguing that Menzer fax was not significant because it was "not signed"); Avsec Depo. at 53:7-13.

because of their previous work with Ralph and Mark Peters. Gurbach Depo. at 65:4-17, 65:4-10; House Sept. 29 Depo. at 222:28-24; Avsec Depo. at 31:18-29 ("They were all very smart over there."). RPC's emails pointedly address the "risk" of asserting that the 2000 Agreement is valid, note the lack of "clarity as to the contractual arrangements between ICEE and SPL," and express reluctance to rely on the Wendsday Email. Exh. 3 at 12-13; Exhs. 1 & 5, Doc. 73-13 (DX 083) at SP006264 ("Irrespective of whether the 2000 agreement is valid and in force . . . "). RPC also lectured Peters about the "risk of asserting a factual position that is contradicted by the documents." Suspicious of the Wendsday email, RPC wanted Peters to collect all of SPL's email before it would address Gowling's allegation that Peters' sudden "discovery" "seems peculiar given that the 2000 Document was unknown to our clients, and apparently to yours." Doc. 73-15 PAGEID 1518. In RPC's view, the documents "contradicting" Peters' claim that the 2000 Appointment superseded the prior agreements included the earlier Weightmans letters stating that the 1996 and 1999 agreements were in effect (Doc. 60-3 PAGEID 1008, Doc. 270 PAGEID 11622-23) and the February 2021 fax from SPC's Menzer to DPSU's Yee attaching the 1996 Appointment and stating that it "needs to be adjusted to reflect 2 1/2 % commission"— which Gowling had sent on April 25 (which Zalud now alleges is dispositive—see footnote 2 above). Doc. 73-16, DX079 at SP006139, Exh. 5, DX 198. Menzer was Radcliff's right-hand person, R. Peters Dep. at 14:5-15:9, who witnessed Radcliff's signing of the 1999 Agreement. Doc. 27-3 PAGEID 408-409. House highlighted Menzer's fax, noting it "references only the mfg agmt." So we now know that Avsec, House, and Gurbach reviewed but decided to ignore evidence that Menzer[3] was unaware of the 2000 Appointment, and that Radcliff hadn't sent it to

---

[3] In July 2020, Gurbach called Menzer, but, according to Turk, she did not recall the 2000 Appointment, Turk May 23 Depo. at 289:23-290:6, 444:8-14, and according to Gurbach, "I didn't ask her about the facts." Gurbach Depo. at 415:7-416:1.

DPSU. Gurbach Depo. at 102:5-103:17 (conceding Menzer fax is evidence 2000 Appointment not entered into; it raised questions). They also did nothing to minimize the "risk" RPC had cautioned Peters about. House Sept. 29 Depo. at 222:13-224:4; Turk Depo. at 180:6-183:9; Gurbach Depo. at 106:107:11 (full searches and images recommended by RPC never performed). Avsec didn't even bother asking how SPL had discovered the Appointment. Avsec Depo. at 153:1-4. As he admitted, "I didn't dig into this." *Id.* at 134:1-136:7.

In the September 25, 2018 string, Mark Peters demurs answering Avsec's question about whether SPL paid royalties "under" the 2000 Agreement: "the only people I know who can answer . . . with accuracy" are Ralph Peters and Stefan Loos and "both are happy to give statements to the fact that the August 2000 Agreement is the final agreement with SP USA before the sale to Dr Pepper 7 Up." Exhs. 1 & 2. Even though Avsec claimed to be "asking questions that need to be asked to make sure we're honest in our complaint and making allegations that are truthful," Avsec Depo. at 218:9-219:4, he, Gurbach, and House chose not to interview Ralph Peters or Loos, and not to contact Kirby, Beaney, or Gary Ruffell (finance director from 1999 to 2007) before filing suit. *Id.* at 82:25-83:8, 152:23-25; Gurbach Depo. at 123:6-10, 192:17-23, 193:7-18, 412:5-6; Turk May 23 Depo. at 290:7-291:2. And despite how "curious" it was that no one recalled the 2000 Appointment, Avsec never asked Peters to explain why he was unaware of it. Avsec Depo. at 153:5-20, 223:19-224:1, 229:14-17. Instead, Avsec falsely told ICEE that "[t]here is no question that the parties have been operating under the terms of the 2000 Agreement." Doc. 27-11. Indeed, despite never receiving answers to the "questions that need to be asked," the Benesch Respondents stuck the allegations in SPL's complaint anyway, under the heading "Compliance with the 2000 Appointment," alleging that SPL had paid both DPSU and ICEE "under the 2000 Appointment." Doc. 1-1 PAGEID 18 (¶¶ 35, 38).

An additional red flag Avsec, Gurbach, and House ignored was Peters' lie that the Appointment "was in fact raised with ICEE many years ago (even though, as an oversight, it was not mentioned in more recent correspondence)." Doc. 60-6.   They knew Peters was unaware of the Appointment, and that he had repeatedly "raised" only the 1996 and 1999 Agreements.  Doc. 270 PAGEID 11621-23, Gurbach Depo. at 100:3-12; Turk Depo. at 38:4-9, 400:17-401:19 (Peters always thought 1996 Agreement was in effect); Peters July 13 Depo. at 352:24-353:5, Doc. 75.  Indeed, they knew Peters had repeatedly acknowledged to Fachner that SPL had no distribution rights outside of the UK and Ireland, a fact inconsistent with the 2000 Appointment's European exclusivity.  Turk Depo. at 432:4-433:22, 439:8-15. That Peters would lie about such a key fact should have made counsel skeptical of his representations.  "Courts recognize the common-sense proposition that attorneys should be skeptical of their clients after they have learned that their clients have been less than candid and cannot just blindly rely on clients' say so." *DR Distributors, LLC v. 21 Century Smoking, Inc*., 513 F.Supp.3d 839, 920 (N.D. Ill. 2021); Doc. 270 PAGEID 11642 (axiomatic that trial counsel have affirmative obligation to ensure accuracy of what clients tell them).

### B.    Avsec, Gurbach, and House Ignore the Forged Documents' Metadata

In the same September 25, 2018 string in which Avsec raised "questions that need to be asked" about the forged appointment, Peters forwarded a document called "WR Fax to RPP.pdf". Exh. 1, B9.  The "fax" is dated April 10, 2001, refers to "the 2000 Trademark agreement," says that SPC is "wavering [sic] any commission due," and is crudely signed "thanx Will."  Gurbach and House attached this "fax" to the original and amended complaint as "proof" the Appointment was not fabricated.  The document's metadata, however, shows it was forged: authored by "markp" and created from a Word document—just like the Wendsday Email and the forged History.  Exh. 6, DX 210.  Benesch touts itself as highly sophisticated when it comes to digital

evidence. Exh. 7, DX 128; Gurbach Depo. at 42:14-18. Given RPC's and ICEE's concern about the validity of the Appointment and the many red flags, the lawyers easily could have right-clicked their mouse to review the core documents' metadata, which "found itself residing in numerous mailboxes." Gurbach Depo. at 137:16-138:12; 144:16-145:3, 147:21-148:3; Turk May 17 Depo. at 87:15-19 (only one click needed to view metadata). Notwithstanding their ediscovery expertise (Gurbach Depo. at 42:14-18) and later obsession with ICEE's metadata, they chose to avert their eyes. Turk May 23 Depo. at 286:11-287:13; Gurbach Depo. at 137:10-138:12. Gurbach, Avsec, and House should be sanctioned because, "in the face of an obvious risk that [they were] increasing the work on" ICEE, they decided to plow ahead with litigation based on a forged contract. *Red Carpet Studios*, 465 F.3d at 647; Doc. 270 PAGEID 11635-36 (§ 1927 sanctions awarded because attorney's conduct fell short of obligations owed by bar members to the court, causing additional expense to opposing party).

## II.  AFTER SUING ON A FORGED CONTRACT, GURBACH, HOUSE, EMANUEL, AND TURK TURN A BLIND EYE TO PETERS' SCHEME TO DEFRAUD THE COURT AND HIDE EVIDENCE

### A.  Avsec, Gurbach, Turk, and House Know That Peters Forged the Wendsday Email

On February 25, 2020, House, Gurbach, Turk, and Avsec concluded that the Wendsday Email had been "doctored." Sept. 29 House Depo. at 247:12-248:22, 397:11-12, Doc. 254-3. They could see that the real email string ICEE had produced contained responses from Bird and Kirby post-dating the November 12 email from Kirby, and lacking Kirby's response to Bird quoting from the 2000 Appointment. Exh. 8, DX095; May 17 Turk Depo. at 146:18-149:11, Doc. 273, May 23 Turk depo at 351:12-23, Doc. 274; Doc. 60-9, MP4. They could see that Kirby's other emails showed she was unaware of the 2000 Appointment, Doc. 267-2, MP2, and that her Outlook account automatically generated the correct spelling of "Wednesday." Doc.

267-2, MP2 at SP001865; Exh. 4, DX 194 at p. 8; Turk Depo. at 152:15-153:21, 428:23-429:20. They could also see that Peters was copied on the emails below the fabricated one, so only he had access to them (Kirby left in 2009). Doc. 60-9. They knew that "Outlook did not generate that" and that a computer was used to copy a string from Outlook into a Word document, and then type up a fake email. Turk Depo. at 161:1-162:6, 164:7-165:18; Avsec Depo. at 260:3-8 ("a computer would spell it correctly"); Gurbach Depo. at 217:7-23 (day of week is auto generated), 240:19-25.

Avsec and House were "shocked." Avsec Depo. at 20:20-23, 163:11-18, 256:17-257:24, Doc. 256. Turk knew the document had been "doctored" by Mark Peters. May 17 Turk Depo. at 238:24-239:7. They all knew that only Mark Peters had the means, motive, and opportunity to fabricate the Wendsday email. Sept. 29 House Depo. at 232:1-10; 285:3-4, Doc. 254 (can't identify any other suspects); Gurbach Depo. at 53:18-2, 226:6-9, 248:18-24, Doc. 255. Gurbach admitted that at this point he had concerns the Appointment was *also* forged. *Id.* at 157:15-159:8, 375:8-21, Doc. 255. But Gurbach, Avsec, Turk, and House never disclosed these facts to the Court or opposing counsel, as they were obligated to do. *Laukus*, 292 F.R.D. at 506. Moreover, Zalud, House, and Turk falsely stated, in opposing ICEE's motion for sanctions against SPL, that "counsel had no knowledge of the reason for the misspelling," and falsely implied that a native version existed, when they knew it couldn't. Doc. 82 PAGEID 2045 ("To date, SPL has not been able to find the native version.").

### B. Avsec, Gurbach, and Turk Knowingly Fail to Produce the Wendsday Email as They Had Received It—With the Incriminating Metadata

Not only did the Benesch Respondents willfully conceal Peters' forgery of the Wendsday Email, but they actively prevented ICEE from learning the details of Peters' scheme. Benesch's belated document production has now shown that, despite claiming not to have noticed the

missing metadata in the February production of the Wendsday Email, Doc. 95 PAGEID 2430, 2454, in fact, the lawyers wrote to Donald McCann—e-discovery expert—to ask him to help them "understand the origin of [the Wendsday Email] and all ways in which this chain was produced from both sides." Exh. 9, B21. McCann explained that he had received the Wendsday Email from House, who obtained it "apparently based on conversations with Mark Avsec." McCann further noted that the Wendsday email as produced to ICEE was "created at Benesch and it looks to be a scan of a hard copy of the email." Exh. 9, B21. Gurbach, House, Emanuel, and Turk thus knew by March 10, 2020 that they had produced the Wendsday Email *without its metadata* because a paper copy scanned at Benesch would lack whatever metadata it had when it was sent by Mark Peters to RPC and then to Benesch. Even though Avsec, Gurbach, and House had the metadata "residing in numerous mailboxes" and knew their production lacked it, they decided not to pull it from their inboxes and not to make a proper production to ICEE that included the fabricated document's metadata (as promised by Emanuel, Doc. 89-6 PAGEID 2376). Gurbach Depo. at 144:16-146:14, 147:16-148:3, 236:12-24, Doc. 255 (never looked at metadata or asked Zalud or Avsec to see how they received it); 272:17-273:11, Doc. 255 (knew Zalud and Avsec received it from RPC and that scanning removes metadata); Avsec Depo. at 266:8-267:9, Doc. 256 (never bothered checking where he got Wendsday Email from); *id.* at 267:1-269:18 (Avsec didn't investigate; "I did not take steps."); Sept. 29 House Depo. at 258:23-264:4, Doc. 254 (it was a concern as to how Benesch had received the Wendsday Email, but he wasn't involved in finding out). The metadata, of course, showed that it had been authored by "markp" from a Word document right after RPC had asked him for evidence that ICEE was aware of the 2000 Appointment. Doc. 69 PAGEID 1131, Doc. 98 PAGEID 2541-48.

This failure starkly contrasts with Benesch's aggressive demands for ICEE's metadata just weeks beforehand. Doc. 98-6 (Gurbach, under heading "**Metadata**," chiding ICEE counsel for not producing metadata for dozens of emails); Doc. 89-6 (Emanuel demanding ICEE produce metadata for dozens of emails, promising Benesch would do the same); Exh. 10, DX 124 (Emanuel updating e-discovery expert McCann and Peters on metadata issues). Gurbach, House, Emanuel, and Turk "had two standards for the treatment of relevant information in this case"— aggressively seeking ICEE's information (e.g., its metadata) and doing "very little to ensure that [they were] in possession of all relevant documents and other evidence before responding to discovery." *Laukus*, 292 F.R.D. at 506. Such "woefully inadequate attention to discovery" subjects them to sanctions under Rule 26(g) and the Court's inherent powers. 292 F.R.D. at 506.

### C. Avsec, Gurbach, House and Turk Decide to Conduct no Investigation Other Than Asking the Forger if He Did It

After conferring with Benesch general counsel Joe Gross, Turk May 17 Depo. at 162:18-164:16, Doc. 273, House decided that all he needed to do was send Peters an email asking whether the string "can be retrieved in native format by your IT people and where the string came from. . . . An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition."[4] Doc. 73-22. But House, Gurbach, and Turk knew that there could be no native version of the "doctored" email, since an email program would not generate a native email with a misspelled date line, and thus it was clear that the November 12 email was typed up in some other format. Gurbach Depo. at 245:24-246:4, Doc. 255; Turk Depo. at 161:1-162:6, Doc. 273. Moreover, the Benesch Respondents already had the real string that proved the

---

[4] Here, "native" refers to the document's original format in which it was created. For email, the "native" is the email message file, which typically has an .eml file extension. In contrast, a non-native "email" has a different file extension, such as .pdf if the email was converted to a pdf file.

Wendsday Email was a fake—in fact, that is what Turk called to House's attention. Turk May 17 Depo. at 134:1-135:21, 138:3-139:21, 146:18-149:11, 150:2-14, Doc. 273. Because Gurbach, House, and Turk all knew that Peters was the only one who could have forged the Wendsday Email, they decided to conduct no investigation—unless asking the criminal whether he committed the crime can be considered an "investigation." Sept. 29 House Depo. at 255:22-257:16, 260:13-19, Doc. 254 (Mr. Kasson objecting to use of term "investigation"); 281:3-20 (insisting it was good idea to limit "investigation" to asking Peters about Wendsday Email). "Blind reliance on a client's representation is rarely a reasonable inquiry." *DR Distributors*, 513 F.Supp.3d at 946, 953, 967 (counsel sanctioned where on notice of repeated ESI failures, but conducted no investigation, instead continuing to rely on lying client).

On March 3, 2020, Peters promised to give House answers to his question of where the Wendsday Email came from and to search for it "in native format" (Exh. 11, DX87), and claimed he would contact his "IT folks." Turk Depo. at 142:1-6; Sept 29 House Dep. at 251:18-20, 267:10-268:13. But Peters never responded with any information. Turk Depo. at 445:8-16; Gurbach Depo. at 265:14-25; House Sept. 29 Depo. at 281:13-20. Predictably, Peters claimed not to recall where he got the Wendsday Email from. Turk Depo. at 89:21-90:2. And both House and Peters later claimed they had no idea what "native format" even meant. House Sept. 29 Depo. at 265:7-16, Doc. 254-3; Oct. 9 Peters Depo. at 169:6-18, Doc. 76. Despite the fact that Benesch exhorts attorneys to consider "the expertise of internal IT resources," Gurbach Depo. at 46:14-47:3, Gurbach, House, and Turk never even asked Peters for the names of these "IT folks," much less asked to speak with them to determine how—if at all—they had gone about searching for the "native." Turk Depo. 142:12-18; Gurbach Depo. at 291:3-12, 54:15-56:12 (never spoke to IT; unaware of anyone else doing so); Turk May 23 Depo. at 300:22-301:6; Sept.

29 House Depo. at 267:6-268:13 (relied solely on Peters' promise to "get in touch with his IT people"; never contacted "IT people"). That is because they already knew what ICEE was forced to establish in 2021 with SPL's independent IT contractor Abi Somorin: Microsoft Outlook does not misspell days of the week and cannot be programmed to do so, Somorin Mar. 16, 2021 Depo. at 31:2-6, Doc. 100, and the misspelling was because Mark Peters had typed up the email, *id.* at 40:9-13, 45:18-24. If Gurbach, House, or Turk had ever really thought there was a chance the email was real, they would have contacted the ostensible sender—Lindsay Kirby— but of course, they did not. Turk Depo. at 156:21-157:1, Doc. 273. This failure to investigate beyond asking the forger himself for an explanation can only be explained as due to a desire to avoid the ethical and financial consequences of hearing the truth said aloud. But the law does not permit attorneys to willfully blind themselves to attempts to perpetrate a fraud on the Court; the Benesch Respondents' failure to ask basic questions about this "shocking" and "once-in-a- lifetime" episode of anyone other than Mark Peters is sanctionable. *Laukus.* 292 F.R.D. at 505- 506; *Bratka*, 164 F.R.D. at 460-61; *A PDX Pro Co. v. Dish Network Serv*., LLC, 311 F.R.D. 642, 658 (D. Colo. 2015) (while counsel need not routinely assume duplicity or gross incompetence of client, counsel cannot ignore clear warnings). "Courts recognize the common-sense proposition that attorneys should be skeptical of their clients after they have learned that their clients have been less than candid and cannot just blindly rely on clients' say so." *DR Distributors*, 513 F. Supp. 3d at 920-21.

Instead of informing the Court and ICEE of counsel's awareness of Peters' crime, Gurbach, House, and Turk filed the motion for a moratorium to halt discovery and prevent Peters from being deposed. Doc. 270 PAGEID 11626. After this Court ordered Peters' deposition to proceed via Zoom in June, Benesch "withdrew" the Wendsday Email without explaining why.

Doc. 73-23. Their letter to Peters states that he "could not vouch for its authenticity," *id.,* but that was a polite way of saying that the attorneys knew Peters had forged it, since he would never have been able to "vouch" for the authenticity of an email that "Lindsay Kirby" had purportedly written and that he wasn't copied on. Gurbach, House, Emanuel, and Turk apparently believed that this CYA letter absolved them of any further responsibility.

### D. Gurbach, House and Turk Fail to Remedy Peters' Numerous Lies at His Deposition

At his deposition Peters repeatedly lied. He falsely claimed he had never seen the Wendsday Email before reviewing it for deposition prep. Peters July 13 Depo. at 303:18-22, 308:17-20, Doc. 75. He falsely denied creating it. *Id.* at 304:13-23; July 1 Depo. at 57:23-58:9, Doc. 74 (claiming he did not know who typed it up). He claimed not to recall seeing the "withdrawal" letter sent to ICEE five days before, which he had discussed with House and Gurbach six days before. July 1 Depo. at 65:15-23; Doc. 73-23 (sending Peters draft June 26 letter for his review & referring to "call today" about Wendsday Email). He falsely claimed that Kirby had written the November 8 email. *Id.* at 58:3-21. He claimed not to know that Outlook automatically generates the day of the week, even though Benesch discussed that with him. *Id.* at 58:22-59:16. He claimed that SPL did not have the title of "head of finance." Oct. 9 Depo. at 18:3-19:3, Doc. 76. He claimed not to be able to recognize his father's signature. *Id.* at 41:5-14, 43:3-8. He claimed "we don't have an IT guy" even though he had told House he did. Oct. 9 Depo. at 65:13-21. And he denied pasting Will Radcliff's signature into the 2000 Appointment. July 1 Depo. at 128:10-129:13, Doc. 74. Gurbach, Turk, and House corrected none of these false and misleading statements.

### E. House and Turk Fail to Inform the Court That They Believe Duane Morris Is Correct About the Wendsday Email's Incriminating Metadata

On September 18, 2020, only after being ordered by the Court to produce emails from RPC, Benesch finally produced the metadata for the Wendsday Email. Doc. 98-8. On September 21, ICEE counsel wrote to the Court to explain that the metadata contained Mark Peters' digital fingerprints. Doc. 69. Internally, House asked McCann whether Duane Morris' contentions were accurate, and McCann **agreed**. DX 201 ("I would agree that the description they provide is how I would interpret the metadata as well."). Instead of informing the Court that Benesch agreed that the metadata exposed Peters as the forger, House tried to make it appear that he was engaged in "full disclosure," but he said nothing about McCann's confirmation of ICEE's revelation. Doc. 70; Turk Depo. at 454:22-455:12. To the contrary, House sought to create the misleading impression that SPL disputed ICEE's "'facts'": "Because Defendant ICEE ascribes only the most sinister motives to the 'facts' that it outlines in its September 21, 2020 letter that it has filed with the Court, the undersigned must respond." Doc. 70. Turk and House never considered that the Court might have had an interest in knowing that Benesch's own e-discovery expert agreed with Duane Morris. Turk Depo. at 455:13-456:8. And House provided no excuse for producing the metadata for the Wendsday Email 7 months after its production and over two years after Avsec, Gurbach, Zalud, and House had received it in their inboxes. Doc. 70.

Given that McCann confirmed on September 22, 2020, that Mark Peters typed the Wendsday Email, it is startling that **five months later,** Zalud signed his name to SPL's Amended Response to a 30(b)(6) Notice, stating: "There is no one at SPL with knowledge of who typed the Wendsday Email, although it does note, on its face, Lindsay Kirby as the sender and that is who

SPL believes typed it." Exh. 12, at 1. That was false when written and discovery has now shown that Zalud *knew* it was false because Somorin said so.[5]

## III. GURBACH, HOUSE, TURK, AND EMANUEL REPEATEDLY FAIL TO MEET THEIR DISCOVERY OBLIGATIONS REGARDING THE HISTORY OF WORKING PRACTISE, THEREBY IMPEDING DISCOVERY OF PETERS' CRIMES

### A. Avsec, Gurbach, and House Repeatedly Receive and File the Forged History With Metadata Showing that Peters Forged It

Peters sent the History of Working Practise to ICEE's attorneys on April 26, 2011 to try and convince them that, even though the 1996 and 1999 agreements did not give SPL exclusive European rights, a "working practise" implied such rights. Doc. 267-7, MP 20; Exh. 13, DX055, Exh. 4 at pp. 8-9; Turk Depo. at 418:15-24. The History ends in 1996. Doc. 267-7. It appears to be signed by Ralph Peters on February 16, 2011, Radcliff on February 22, and has two witness signatures—"BJ Cork" and an illegible one. In late 2017, Peters copied the Radcliff, "BJ Cork," and illegible signatures and pasted them into the 2000 Appointment. House admitted that, "to the naked eye," these signatures appear identical. House Sept. 27, 2023 Depo. at 75:11-24.

On November 20, 2017, Peters created the forged History from a Word document. Doc. 73-12 PAGEID 1483. It contains a different Radcliff signature and substitutes "B Bell" for "JB Cork." Unlike the 2011 version, it paraphrases the 2000 Appointment, referring to exclusive rights in Europe and a 2.5% royalty. Exh. 14, DX 125; Sept. 28 House Depo. at 129:15-20. It thus makes it appear that Ralph and Mark Peters' *were* aware in 2011 of the 2000 Appointment.

---

[5] Zalud also knew this discovery response was false because he had signed his name to a brief that stated that *SPL* had "learn[ed] claims premised on the 2000 Agreement were meritless." Doc. 85 PAGEID 2176. If SPL (Mark Peters) believed the 2000 Agreement claims were "meritless" because it was not "genuine," how could there be an email authored in 2008 by its financial director that quoted from that agreement? Similarly, if there was a good faith basis to believe Kirby wrote it, why did Benesch "withdraw" it?

The title of the History is at odds with the reference to the 2000 Appointment since, if it were real, Peters didn't need a "working practise" to prove exclusive rights in Europe. Turk Depo. at 419:2-9, Doc. 274 (2000 Appointment inconsistent with oral agreement to operate in Europe). The forged History is thus another red flag ignored by Avsec, Gurbach, and House.

On December 1, 2017, RPC sent Avsec five documents, the forged History labeled "Document 5." Exh. 15, DX 147, Exh. 16 DX 165; Avsec Depo. at 33:15-21, 45:1-6. On September 19, 2018 Avsec emailed Gurbach the "CORE DOCUMENTS." Exh. 17, DX 189. Avsec wanted Gurbach to review them for feedback. Gurbach Depo. at 8:1-10:125. Gurbach saved the "CORE" documents to iManage. Exh. 18, DX191; Gurbach Depo. at 26:12-21, Doc. 255. On September 25, RPC sent Avsec and Gurbach *another* copy of the forged History. Exh. 19, DX190 at p. 20. House printed it out and put it in a bar-coded folder called "Client Hx of Relationship." Exh. 14, DX 125, Sept. 27 House Depo. at 52:16-22.

**B.     Gurbach, Turk, and Emanuel Rely Entirely on Mark Peters for Document Collection**

ICEE's May 2019 document requests sought all documents regarding the 2000 Appointment, communications between ICEE and SPL, and communications with Radcliff and Ralph and Mark Peters. On October 11, 2019, Emanuel produced emails collected by Mark Peters, whom Benesch had put in charge of discovery for SPL. Exh. 20, DX180; Peters July 13, 2020 Depo. at 316:3-7, Turk Depo. at 29:11-16; Gurbach Depo. at 318:6-20. Emanuel failed to produce the "CORE DOCUMENTS," including the forged History. But she did produce Mark Peters' April 26, 2011 email to ICEE counsel Karen Kline stating that "my father and Will Radcliffe [sic] have documented the history behind the agreements we have today and what they intended the agreements to secure for both parties" and that he would scan and send this history when he returned to the UK. Doc. 267-4, MP 019. Apparently, Peters did not give Benesch the

email transmitting the 2011 History, even though anyone paying attention would have noticed that he did send later email strings containing the text of the transmittal email (but not its attachment) and other emails from this period. Exh. 21, SP3801-2 (transmittal email received 3:43 AM EST on April 27), Exh. 22, SP004653 (April 28, 2011 email); Exh. 23, SP003793 (May 2011 strings including April 26 email forwarding History).

On October 28, 2019, ICEE produced the April 26, 2011 email from Peters to Kline attaching the 2011 History. Doc. 60-4; Exh. 18 MP 020. These were uploaded to Benesch's Everlaw database the same day, and a Benesch associate marked them "hot." Exh. 24, DX196. When Turk joined the team in January 2020, she printed out and reviewed the 2011 History. Turk Depo. at 24:1-10, 27:2-28:5, 351:12-16. At this point, every Benesch lawyer had multiple electronic and paper copies of the forged History as well as the 2011 History from ICEE's production marked "hot," which Peters had suspiciously not produced.

### C. Gurbach, Emanuel, and Turk Fail to Conduct a Reasonable Inquiry Into the History

On December 23, 2019, Gurbach signed SPL's response to ICEE's written discovery, with House and Emanuel on the signature block. Doc. 89-4. Regarding the History, SPL claimed not to know whether it had the original and what had happened to it. *Id.* at p. 7. A reasonable inquiry could not be conducted without actually sending "the History" to Ralph (who signed it) and Mark (who scanned it and sent it to Kline). *Tellermate*, 2015 WL 4742686, at *13 (awarding attorneys' fees under 26(g)(3) against counsel for failure to perform reasonable inquiry). If that had been done, the attorneys would have noticed that Peters had failed to send them the 2011 History and had sent the forged History instead.

Interrogatory 7 asked SPL to identify all communications about the History between SPL and Radcliff between January 26 and April 26, 2011 (when Peters sent it to Kline). Gurbach

signed responses stating that SPL would produce all responsive documents, "if any (and to the extent not already produced)." Doc. 89-4 at p. 8. Again, to have performed the "reasonable inquiry" regarding this "CORE DOCUMENT" and its transmittal to ICEE, Gurbach should have reviewed the April 26, 2011 transmittal email and the forged version he had saved to iManage and that was in his inbox.

On January 3, 2020, counsel held a meet and confer to discuss SPL's discovery responses. Doc. 49-5 at PAGEID 794. Gurbach refused to respond to ICEE's concerns because he claimed the local rule required them to be in writing. Doc. 89-5 at PAGEID 2371, DX 184. Counsel did that on January 8, again referencing Peters' April 26, 2011 transmittal email and noting the absence of any communications with Radcliff. Doc. 89-5. According to logs from Benesch's Everlaw system produced *after* Elizabeth Emanuel's deposition, she viewed **both** versions of the History on January 28, 2020. Turk Depo. 105:21-106:8. Just hours later on the same day, Emanuel claimed that SPL had "engaged in reasonable diligence to gather information to formulate SPL's good-faith written discovery responses to date." Doc. 73-18 at 3. She promised that "[a]ny responsive documents regarding the History of Working Practise will be produced, to the extent any exist." *Id.* at 2. But what did Benesch do to fulfill that obligation, particularly given that Emanuel had just viewed both versions? Again, "Reasonable diligence" should have included asking Peters why he had not produced the transmittal email and attachment, but no one at Benesch ever did that. Turk Depo. at 30:12-32:24, Doc. 273 and 450:9-451:20, Doc. 274; Gurbach Depo. at 299:10-300:12, Doc. 255.

Meanwhile, Gurbach, Turk, and House opposed Ralph Peters' deposition on the false premise that SPL "has not identified Ralph Peters as someone with discoverable knowledge in this case." Exh. 25, DX 183. In fact, as noted, on September 25, 2018, Peters had told Gurbach

and Avsec to contact Ralph Peters to obtain his statement because he and Loos were the only ones who could answer Avsec's questions, but no one did.  Emanuel Depo. at 67:25-68:3.

**D.    Gurbach, Turk, and Emanuel Review Both Versions of the History but Fail to Produce the Forged One**

After the Court overruled SPL's objections, Don McCann created a virtual prep binder for Ralph Peters containing the forged History, labeled "Not Produced."  Exh. 31, DX 196. On February 8, House again circulated the "CORE DOCUMENTS" including the forged History.  Exh. 23, DX 189.  On February 20, Turk marked one of the copies in Everlaw as "Not Responsive/Duplicate."  Exh. 31, DX 196 at p. 2, Doc. 107-5.  Turk has never explained what she thought the forged History duplicated.  We now know that Benesch had copies of the History in inboxes, bar-coded files, iManage, and on everyone's desks, but none of those were Bates stamped, and some had control numbers clearly indicating they had not been produced. Turk Depo. at 219:23-220:21, Doc. 273.  Moreover, Turk conceded that a document tagged as nonresponsive cannot also be tagged as privileged, yet two separate copies of the forged History were withheld on different privilege grounds.  Turk Depo. 66:2-8, Doc. 273. Further, the different copies of the forged History attached to the December 1, 2017 and the September 25, 2018 RPC emails were separately uploaded to Everlaw, and Turk only marked one of them as duplicate.  Turk Depo. at 67:22-68:24. These facts and subsequent events show that Gurbach, Turk, Emanuel, and House were more than negligent or incompetent in their failure to produce the forged History to ICEE. *DR Distributors*, 513 F.Supp.3d at 963 (lack of efficient system to ensure that relevant documents are produced shows lack of reasonable inquiry under Rule 26(g)).

A few days before Ralph Peters' deposition, paralegal Carrie Tolaro exported both the 2011 and forged Histories to PDF.  Exh. 31, DX 196 at p. 2.  Based on logs produced after Emanuel's deposition, we now know that, a few hours before the Ralph Peters deposition, Turk

and Emanuel viewed both histories in Everlaw. Exh. 31, DX 196 at p. 2, Turk Depo. at 128:17-129:21. It was easy to see that the forged History had not been produced, and Emanuel and Turk (who had methodically reviewed all of ICEE's production, Turk Depo. at 398:14-399:9) should have noticed that. *Id.* at 110:2-7, 128:17-129:21, 219:23-220:21. At Ralph Peters' deposition, attended by Gurbach, Turk, and Emanuel, ICEE counsel showed him the 2011 History since it was all ICEE had, focusing on the signature page. 11:19-14:15, Doc. 84. Gurbach, Emanuel, and Turk said nothing about the forged History—with its very different signature page—that was in iManage, a bar-coded folder, printed out numerous times, and in their inboxes.

On March 6, 2020, ICEE served a Rule 30(b)(6) notice asking for someone knowledgeable about the location, storage, destruction, and loss of originals of the History; its execution and who signed it; and all communications about it. Exh. 26, MP21 at pp. 7-9. "SPL did its best to stonewall," Doc. 270 at PAGEID 11626, including its "motion for a 'moratorium' on discovery, nominally based on the COVID-19 pandemic, and a motion for a protective order to prevent a remote video deposition of Mark Peters." *Id.* On May 26, the Court denied SPL's motion, and ordered Peters' 30(b)(6) deposition to go forward. May 26, 2020 Minute Entry.

### E. Gurbach and House Prep Peters as 30(b)(6) Designee on the History but Continue to Withhold the Forged Version

Gurbach and House designated Mark Peters on all topics, including the History. Doc. 89-7. Minimal preparation of Peters would have meant showing him the 2011 and forged Histories, the metadata, and the email strings from April 26-27, 2011. "A reasonable person would have expected the witness[] to have locked [himself] in a conference room for a week with the relevant documents to prepare for this critical [deposition]." *DR Distributors*, 513 F.Supp. 3d at 873. That is especially true in light of the fact that Gurbach and House were concerned about

how Peters would testify about the fabricated Wendsday Email.  Doc. 73-21("An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition.").

The deposition began on July 1, 2020, with House defending and Gurbach attending. ICEE counsel accused Peters of cutting and pasting Will Radcliff's signature into the 2000 Appointment. 128:10-129:13, Doc. 74. Peters denied it.  House thought Peters' testimony "was suspect," Sept. 29 House 235:23-236:1, Doc. 254, but House and Gurbach said nothing. *Laukus*, 292 F.R.D. at 509 (sanctions awarded against counsel who did not attempt to correct what he should have known to be false and misleading testimony at deposition).

ICEE counsel examined Peters extensively on the 2011 History.  July 1 Peters Depo. at 120-123, 190:19-211:14, Doc. 74. ICEE counsel showed Peters the transmittal email and 2011 History, produced by ICEE but not SPL, and tagged by Benesch as "hot."  Exh. 18; July 1 Peters Depo. at 195:18-21, Doc. 74. ICEE Counsel focused on the last page—which ends the "history" in 1996—and asked about the BJ Cork signature—which does not appear in the forged version. *Id.* at 203:20-206:2. Gurbach's copies of the History in his inbox and saved to iManage were, of course, the forged version—referring to the forged 2000 Appointment.  House's "Client Hx of Relationship" hard copy was also the forged version.  Yet House and Gurbach said nothing.

The deposition continued on July 13, 2020, with Peters defended by House and Turk.  A few days before, we now know from logs produced after House's deposition that House had downloaded the forged History.  Exh. 31, DX196 at p. 3.  It would have been obvious that it had not been produced.  Turk Depo. at 219:23-222:20.  On July 13, ICEE counsel spent more time going over the 2011 History and the transmittal email Benesch had not produced.  July 13 Peters Depo. at 353:6-357:3, Doc. 75. The following remarkable exchange then occurred:

Q. You'd agree with me that the History of Working Practice that was signed by your father in 2011 does not refer to an August 8, 2000, exclusive license agreement, correct?

A. Correct.

349:10:-24. Of course, the forged version (which House had just downloaded and had in his bar-coded folder), and which he, Gurbach, and Turk must have shown Peters in prep for his Rule 30(b)(6) testimony, does indeed refer to the 2000 Appointment, as Turk had noticed in February (Turk Depo. at 448:15-450:7, Doc. 274). But House, Turk, and Gurbach said nothing and continued to withhold it. This alone is sanctionable. *DiLuzio v. Village of Yorkville, Ohio*, 2016 WL 7406535, at * 37 (S.D. Ohio Dec. 22, 2016) (counsel sanctioned where he should have noticed differences between genuine and fabricated notes in prepping witness).

### F. House and Turk Are Convinced That Peters Forged the 2000 Appointment but They Continue Withholding the Forged History Based on Phony Privilege Claims

On August 24, 2020, ICEE served its expert report, showing that Radcliff's and "JB Cork's" signatures had been cut and pasted into the 2000 Appointment, and that the signature in the August 8, 2000 letter from Radcliff to Ralph Peters looked digitally manipulated. Doc. 73-10. House found the report "pretty convincing," House Sept. 27 Depo. at 75:11-20, and Willard agreed that signatures were manipulated. Exh. 27, DX203. House sent it to Peters, telling him Willard mostly agreed with Leonard. Exh. 28, DX204. Peters denied any knowledge, but House did not find Peters' denials credible. Sept. 29 House Depo. at 285:8-22. In any event, "counsel cannot simply take a client's representation about such matters at face value." *Tellermate*, 2014 WL 2987051, at * 18; *Bratka*, 164 F.R.D. at 461. Yet House said nothing to the Court or ICEE, and did nothing to ensure that evidence of the forgeries was preserved. Sept. 29 House Depo. at 287:10-19, Doc. 254-3, Nov. 2 Depo. at 425:15-19, Doc. 254-5. In fact, in SPL's opposition to ICEE's crime-fraud motion, House falsely stated that "[n]o evidence exists of any intent on the

part of SPL to deceive the Court" and that "[n]one of the emails to be reviewed show an intent by SPL to facilitate or actively conceal a crime or fraud." Doc. 65 PAGEID 1112. At this point, of course, House and Turk knew that Peters had forged the 2000 Appointment and had sent emails to RPC and Benesch in furtherance of his criminal scheme.

On September 11, House and Turk compared the History's two versions, as logs produced after House's deposition prove. Exh. 31, DX 196 at 3. They could see that none of the copies of the forged History were Bates stamped and that two separate copies were being withheld based on different claimed privileges, yet they decided to continue to withhold it because they first wanted to talk to Peters. Turk Depo. 451:21-453:13. So, on September 15, House sent ICEE a privilege log claiming different (but all inapplicable) privileges for the forged Histories attached, respectively, to the November 20, 2017 and September 25, 2018 emails from RPC. Doc. 73-11 at pp. 8 & 20.

On September 20, ICEE counsel demanded that Benesch produce the attachments to the various emails from RPC. Doc. 89-11. The next day, House finally produced the forged History, claiming it had only been requested the previous day ("We produced only the 2000 Agreement because that was all that you requested in your 9/16/2020 email. We therefore take your 9/20/2020 email as a new request for additional documents."). Doc. 89-13. Of course, ICEE had been requesting documents relating to the History for more than a year. House's false claim that ICEE's request is a "new request for additional documents" suggests that the Benesch Respondents never would have produced the forged History if ICEE counsel had not noticed that it was being wrongfully withheld on privilege grounds in the log produced in September. It also calls into question the truthfulness of Turk's claim that the forged History was withheld because it was "inadvertently tagged."

Gurbach, Emanuel, Turk, and House were more than negligent or incompetent in their failure to produce the forged History. Turk asserted that when she pressed the wrong key on her computer in February 2020 and tagged one copy of the forged History as not responsive/duplicate, that can somehow explain her repeated failure to produce it. But that doesn't explain why the copies attached to the other email from RPC or contained in the bar-coded case file were not produced. Nor does it explain why she, Gurbach, and House never produced the forged History after this—e.g., after Ralph Peters' deposition when he was shown only the 2011 version; after prepping Mark Peters for his Rule 30(b)(6) deposition; when Mark Peters testified that the History did not refer to the 2000 Appointment—even though the forged History certainly did; after receiving Leonard's report; or after reviewing the two versions on September 11. And it certainly does not explain why they deliberately withheld it in August and September on trumped-up privilege grounds.

It also does not explain the failure to produce the April 26, 2011 transmittal email with the attached 2011 History. If it is true that Gurbach, House, Turk, and Emanuel did not notice that Peters had not given them the transmittal email and its attachment, then they were not exercising any "oversight to ensure that their client's employees [were] acting competently, diligently and ethically in order to fulfill their responsibility to the Court." *Brown v. Tellermate Holdings Ltd.*, 2015 WL 4742686, at *7 (Aug. 11, 2015 S.D. Ohio); *see also Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448, 460-461 (S.D. Ohio 1995) ("All documents received from the client should be reviewed by counsel to see whether they indicate the existence of other documents not retrieved . . . and there should be appropriate follow up."; "At the very least, when plaintiff's counsel began complaining about the apparent incompleteness of the discovery documents and pointing to evidence of incompleteness, trial counsel should have established

direct communication with defendant's employees who had responsibility" for collecting relevant documents); D*R Distributors*, 513 F.Supp.3d at 936 (counsel failed to conduct reasonable search for documents where they permitted client's self-collection that was not systemized or documented). This is particularly true in light of the small number of "CORE" documents in this case. *Laukus*, 292 F.R.D. at 510 ("It is important to underscore the fact that this is not a document intensive case where one document was mistakenly omitted from the production of countless bankers' boxes full of documents."). Benesch's failure to produce the forged History alone caused ICEE huge expense. Among the Peters forgeries, the History was unique because it proved the 2000 Appointment was forged, and it gave the lie to all of Peters' nonsensical denials as to the other forgeries. Yet the Benesch Respondents withheld this smoking-gun evidence for over a year.

## IV. GURBACH, HOUSE, AND TURK WERE MORE THAN NEGLIGENT OR INCOMPETENT IN FAILING TO PRESERVE EVIDENCE OF PETERS' CRIMES

In response to Gurbach's Ediscovery survey from October 2018, SPL stated that no steps had been taken to secure documents relevant to this dispute to prevent alteration/deletion of information. Exh. 29, DX 130 at SP007982, SP007984. No one at Benesch followed up regarding this alarming statement. Turk Depo. at 462:15-23, Doc. 274. Turk did nothing to ensure that Mark Peters followed RPC's guidelines to preserve relevant electronic documents that might be deleted. Turk Depo. at 456:9-457:24.

Gurbach and House knew that Peters had homes in Monaco and Malaysia and that he traveled with his laptop. Gurbach Depo. at 208:12-209:16, Doc. 255 (Peters uses laptop for Skype; in Monaco for deposition using laptop). Turk knew that if a backup copy was not made, the files could be overwritten, and Turk has been involved in cases where a backup to a hard drive was made to preserve it. Turk Depo. at 239:17-241:1, 278:19-279:4. She agreed that

attorneys have a duty to ensure that their clients preserve evidence. *Id.* at 238:24-239:14. But it was of no concern to Turk or the others to identify the devices that Peters had used to falsify the Wendsday email and 2000 Appointment. Turk Depo. at 202:15-19. Even after Gurbach suspected in February 2020 that Peters had forged the 2000 Appointment, and after he, Turk, and House believed Peters had digitally "doctored" the Wendsday Email, they did nothing to ensure that Peters' laptop hard drives were preserved.

On August 13, 2020, ICEE requested an inspection of Peters' laptops. Exh. 30, DX205. Gurbach, Turk, and House tellingly did not communicate in writing with Peters about this, instead discussing internally whether they had ever asked Peters to preserve; all that Gurbach could dig up was an August 2019 email from Emanuel to an associate at RPC saying that "SPL must continue to preserve all paper and electronic documents" that "relate to or involve in any way the lawsuit" including computers, hard drives, and other electronic devices used by the custodians listed in an attached questionnaire. Exh. 31, DX 206. That email and a vague conversation were the sum total of Benesch's efforts to preserve, contrary to Benesch's own standards. Gurbach Depo. at 45:16-46:13, 308:7-310:24 (Benesch never harvested SPL's data and took no measures to harvest the ESI off Peters' laptops or to ensure preservation other than Emanuel's August 2019 email to the RPC associate), 313:1-314:3 (no documentation of preservation). To have properly preserved his laptops, Peters would have had to have them imaged. Gurbach Depo. at 423:14-19 (continued use of device can result in deletion of relevant evidence). This one email between Emanuel and an RPC associate was patently insufficient, particularly in a case where ICEE had questioned the authenticity of the 2000 Appointment and where RPC, Avsec, Gurbach, and House also had doubts. "Counsel cannot simply issue a litigation hold and assume they are done with their roles in preserving ESI. They must continue

to monitor and supervise or participate in a party's efforts to comply with the duty to preserve. . . . It is not sufficient to notify employees and expect the party to retain and produce all relevant information. . . . Counsel must take affirmative steps to monitor compliance." *DR Distributors*, 513 F.Supp. 3d at 921, 930, 933, 935-36. Here, the Benesch Respondents **knew** by November 2019 that ICEE was alleging digital manipulation by Mark Peters, knew by February 2020 that Peters had given them a digitally doctored email, knew that Peters spent most of his time abroad and used his laptops on those trips, and believed Peters' answers at depositions were "suspect." Yet they did nothing other than one vague August 2019 email from Emanuel to the RPC associate and a conversation whose details no one could recall.

After conferring internally regarding the fact that the only preservation attempt was the August 2019 Emanuel-RPC email, House then told Peters about the request to inspect. Oct. 4 House Depo. at 349:2-17. House and Turk claimed not to recall anything about their conversations with Peters on this subject. In any event, as of September 24, Peters had not told House that he didn't have any of the devices. Oct. 4 House Depo. at 353:17-22, 357:13-18. At some point thereafter, however, Peters told House that his "laptop" had been stolen out of his car. Turk and House did not ask Mark Peters (or RPC) for a backup, presumably because they never thought he had made one. May 23 Turk Depo. at 278:19-280:6. Turk and House say that they believe Peters' story about the theft. If so, they had an obligation to inform the Court. "Courts don't cotton to attorneys failing to promptly notify the court of spoliation issues." *DR Distributors*, 513 F.Supp.3d at 905. "The failure to timely disclose the destruction of evidence violates the rules requiring candor to the court and fairness to the opposing party and counsel." *Id.* at 906. Not only did they not do that, but they didn't even bother asking for a police report until November, after repeated prodding from ICEE. Exh. 32. Gurbach, Emanuel, House, and

Turk failed to ensure that SPL preserved Peters' hard drives. Because they were more than negligent or incompetent with regard to this failure, they should be sanctioned.

## V.     CONCLUSION

For the foregoing reasons, Defendant/Counterclaim Plaintiff The ICEE Company respectfully requests that the Court grant its motion for sanctions against the Benesch Respondents.

Dated:  September 27, 2024                   Respectfully submitted,

                                             **DUANE MORRIS LLP**

                                             BY:  _/s/ David J. Wolfsohn_
                                             David J. Wolfsohn (*admitted pro hac vice*)
                                             Tyler R. Marandola (*admitted pro hac vice*)
                                             30 South 17th Street
                                             Philadelphia, PA 19103
                                             Tel.: (215) 979-1000
                                             Fax: (215) 979-1020
                                             djwolfsohn@duanemorris.com
                                             tmarandola@duanemorris.com

                                             Kenneth M. Argentieri (Ohio Bar No. 0067493)
                                             Trial Attorney
                                             600 Grant St., Ste. 5010
                                             Pittsburgh, PA 15219
                                             Tel.: (412) 497-1000
                                             Fax: (412) 497-1001
                                             kmargentieri@duanemorris.com

                                             *Attorneys for Defendant/Counterclaim Plaintiff,*
                                             *The ICEE Company*