**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SLUSH PUPPIE LIMITED, | ) | Case No. 1:19-cv-00189-MRB |
| | ) | |
| Plaintiff, | ) | Judge Michael R. Barrett |
| | ) | |
| vs. | ) | Magistrate Judge Bowman |
| | ) | |
| THE ICEE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## BENESCH RESPONDENTS' PROPOSED FINDINGS OF FACT

Now come Respondents, Benesch, Friedlander, Coplan & Aronoff, LLP, Mark Avsec, Elizabeth R. Emanuel, Matthew D. Gurbach, Ronald L. House, Jennifer M. Turk, and Eric Larson Zalud (collectively "Benesch"), by and through their undersigned counsel, and pursuant to this Court's instructions, hereby submit the following Proposed Findings of Fact.[1]

Respectfully submitted,

*/s/ Patrick Kasson*
Patrick Kasson (0055570) (Trial Attorney)
Steven A. Chang (0088321)
Mrinali Sethi (0101295)
**REMINGER CO., L.P.A.**
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215

Ian D. Mitchell (0090643)
**REMINGER CO., L.P.A.**
525 Vine Street, Suite 1500
Cincinnati, Ohio 45202

*Counsel for the Benesch Respondents*

---

[1] A copy in Word has been submitted to chambers via email. Plus, an index with PageID #'s will be submitted after this is filed.

# TABLE OF CONTENTS

I.    **Summary of Factual Findings.** ........................................................................ 1

II.   **Procedural Posture.** ........................................................................................ 8

    A.    **The Initial Pleadings.** .......................................................................... 8

    B.    **The Sanctions Motions.** ...................................................................... 10

    C.    **ICEE Obtains the Right to Conduct Depositions Based upon Admittedly False Statements to the Court and with Benesch Never Having a Chance to Brief the Issue.** ................................................................................................ 11

    D.    **ICEE Proceeds to Take 51 Hours of Depositions, Ignoring the Court's Topics.** ................................................................................................ 14

    E.    **ICEE's Counsel Ignores the Court's Direction Not to File a Supplemental Brief.** ................................................................................................ 15

III.  **Findings of Fact** ............................................................................................. 16

    A.    **Reynolds, Porter, and Chamberlin Contact Benesch to Represent Its Long-Time Client, SPL, in a Dispute Based in the United States.** ............................ 16

    B.    **RPC and Benesch Jointly Approve the Complaint.** ........................................ 19

    C.    **Benesch and RPC's Concerns Pre-Suit Were About Successor Liability, Not Authentication of the 2000 Appointment.** ........................................... 21

    D.    **The Court's Concerns About Why SPL Has Continued to Pursue the 1996 and 1999 Agreements, After Dropping the Claims Based upon the 2000 Appointment, Are Irrelevant for this Determination.** ..................................... 25

    E.    **Prior to the Discovery of the Issues with the Wendsday Email, Benesch had No Reason to Think SPL and Mark Peters Were Engaging in Any Type of Forgery or Fraud.** ....................................................................................... 28

    F.    **ICEE's Counsel has Conceded it Was Appropriate for Benesch—in Evaluating the Authenticity of the 2000 Appointment—to Look at Contemporaneous Documents and Statement by Clients.** ............................... 31

    G.    **Pre-Suit—Benesch Had Six Documents, a Course of Dealing, and a Witness Supporting the Existence of the 2000 Appointment.** ...................................... 33

        1.    *Benesch Received Multiple Documents Rreferring to the 2000 Appointment.* ............................................................................ 33

2.      *Pre-Suit—Benesch Knew the Parties' Conduct Supported the Existence of the 2000 Appointment.* ........................................................ 35

3.      *Pre-suit—Benesch Had Financial Records Tying the Reduction of the Royalty Rate to the Timeframe in Which the 2000 Appointment was Executed.* ........................................................................................ 36

4.      *Pre-suit—Benesch Had Evidence of Further Course of Conduct That Supported the Existence of the 2000 Appointment.* ................................ 38

5.      *Pre-suit—Benesch Had an Explanation as to why Company Officials Did Not Know of the 2000 Appointment from 2010 to 2018.* ........................ 40

H.      ICEE's Argument about "Red Flags" Lacks Merit ........................................ 41

I.      Benesch Had Sufficient Evidence Which Explained this Red Flag Prior to Filing Suit .......................................................................................................... 41

J.      February 12, 2019:   PRE-SUIT—Benesch Had Sufficient Information to Justify Filing the Suit .......................................................................................... 42

K.      After Filing the Complaint, Benesch Continues to Develop a Strong Case for the Authenticity of the 2000 Appointment ........................................................ 44

1.      *By February 2020, Benesch Had a Set of Six Documents that Were so Intertwined that they Seemed to Conclusively Support the Existence of the 2000 Appointment.* .................................................................................. 44

2.      *Ralph Peters—the Only Living Party Signatory to the 2000 Appointment—Testifies to its Authenticity.* ............................................. 48

3.      *Stefan Loos Confirms the Existence of the 2000 Appointment in Discussions with Benesch.* ........................................................................ 50

L.      Benesch Wanted to Produce All Discoverable Documents. ............................ 53

M.      Benesch Took Reasonable Measures in Late February and Early March of 2020, When It Discovered the Issue with the Wendsday Email. .................... 54

N.      February 25, 2020: Benesch Had Overwhelming Evidence that Supported the Existence of the 2000 Appointment Allowing them to Proceed. ..................... 59

O.      Had Benesch Conducted a Further Investigation Pre-Suit, it Would Have Only Strengthened Its Belief that the 2000 Appointment Was Authentic. ............. 62

P.      It Was Reasonable for Benesch to Believe, After February of 2020, that ICEE No Longer Thought the 2000 Appointment Was a Forgery. .......................... 66

Q.      Benesch Withdraws the Wendsday Email on June 25, 2020, Without it Ever
        Having Been Used. ........................................................................................... 69

R.      June 25, 2020: Benesch Had Overwhelming Evidence that the 2000
        Appointment Was Authentic Allowing It to Proceed. ..................................... 70

S.      Benesch Continued to Investigate the 2000 Appointment After June 25, 2020,
        Finding More Support for it. ............................................................................ 72

        1.      Diane Menzer Confirms Will Radcliff's Signature. ............................... 72

        2.      Benesch Retains a Handwriting Expert. .................................................. 73

T.      As of August 23, 2020, Benesch Had Overwhelming Evidence that the 2000
        Appointment Was Authentic. ........................................................................... 74

U.      Benesch Moved Quickly to Withdraw the Claims Under the 2000 Appointment
        When It Could No Longer Authenticate It. ..................................................... 75

V.      Benesch Took Reasonable Steps to Instruct SPL About Its Evidence
        Preservation Obligations and Believed that all Information Was Preserved.
        ......................................................................................................................... 79

W.      Benesch Did Not Engage in a Willful Withholding of the Metadata of the
        Wendsday Email. .............................................................................................. 83

X.      Benesch Mistakenly Marked the 2017 Version of the History of Working
        Practice as Nonresponsive and Duplicate. ...................................................... 86

        1.      The Versions of the History of Working Practice Are Nearly Identical,
                Except for the Signature Page. ............................................................... 86

        2.      Benesch's Logs Show that, When the Lawyers Were Reviewing the Two
                Documents, they Never Saw Both Signature Pages at the Same Time.. 89

        3.      Benesch Made a Mistake by Not Producing the 2017 Version of the
                History of Working Practice. ................................................................. 90

        4.      Mistakes Can Happen in Complex Litigation: ICEE also Made ESI
                Discovery Tagging Mistakes. ................................................................. 92

        5.      Benesch Learns that There are Two Versions of the History of Working
                Practice in September 2020—It Did Not Purposely Withhold the
                Document. .............................................................................................. 93

Y.      ICEE's Invitation to Stack Inferences is Inappropriate. ................................. 95

Z.      ICEE Presents No Evidence that It Incurred Any Additional Attorney Fees as
        a Direct Result of Benesch's Conduct. ............................................................ 98

# FINDINGS OF FACT

Actual _documents versus stacked and speculative inferences_: that is what the Motion for Sanctions comes down to.[2] The hard evidence Benesch presents wins over speculative inferences. To be sure, the Court is struck by the fact that Defendant The ICEE Company ("ICEE") relies mostly upon inferences, most of them stacked and/or not the most reasonable inferences. Benesch, on the other hand, relies upon document after document: emails, contemporaneous records, conference notes, contracts, and financials. After more than 500 pages of briefing and 51 hours of depositions, the strength of Benesch's arguments—based on documents—versus ICEE's continuous requests for stacked inferences, is not lost on the Court. Accordingly, the Motion for Sanctions is **DENIED** with the following findings of fact below.

## I.      Summary of Factual Findings.

1.      Without the benefit of hindsight, the Court finds Benesch had reasonable information in front of them to justify its actions every step of the way.

2.      **Pre-Suit.**  Benesch made the decision to file suit to enforce the 2000 Appointment with sufficient evidence to conclude the 2000 Appointment was authentic. Benesch had (a) six documents which referenced the 2000 Appointment; (b) a requirement that the 1996 Agreement's 5 percent royalty rate only be modified by a writing signed by both of the parties; (c) the 2000 Appointment, which is the only document signed by the parties referencing a 2.5 percent reduction; (d) a course of dealing supported by financial documents from Plaintiff Slush Puppie Limited ("SPL") that the 2.5 percent was paid beginning in the year that the 2000 Appointment was executed; (e) an explanation from Mark Peters as to why he was unaware of the 2000 Appointment

---

[2] The Court is also mindful that it can only consider bases for sanctions that were raised in ICEE's Motion and for which ICEE provided notice to each individual lawyer.

and how he found it; (f) the law firm RPC's involvement, long history with SPL, and agreement with the filing of the Complaint; (g) Mark Peters's explanation as to why others at SPL were unaware of the 2000 Appointment; (h) no information to suggest that Mark Peters, a long time client of RPC, was a liar or forger; and (i) documents demonstrating that SPL had been operating on the European continent, for some time, which would be explained by the 2000 Appointment.

3.     **An Explanation of the "Red Flag":** ICEE has contended there were red flags—plural. But there were really just several instances of the same red flag: folks at SPL did not seem to know of the 2000 Appointment during the 2010–2018 period. It was reasonable for Benesch to accept Mark Peters's explanation for this pre-suit. Benesch had no reason to believe Mark Peters was lying given: (a) the significant number of documents SPL had; (b) the course of dealing between ICEE and SPL; and (c) SPL/Ralph and Mark Peters's long-term relationship with a major European firm, which referred the case to Benesch and initially worked hand in hand to develop it.

4.     **Effects of Failure to Further Investigate Pre-Suit:** ICEE has contended that Benesch should have done more, pre-suit, to investigate the 2000 Appointment. The Court finds Benesch did those things only after it filed suit. And, had it done so pre-suit, that would have only strengthened Benesch's belief that the 2000 Appointment was authentic. Post-filing, Benesch learned: (a) Ralph Peters was strongly supportive of the existence of the 2000 Appointment; (b) Stefan Loos, the witness to the 2000 Appointment, remembered its negotiation, vouched for Ralph Peters's signature, and was 99 percent sure it was his signature on the witness line; (c) Ralph Peters and Mr. Loos's stories went hand in hand as to why Mr. Radcliff was reducing the royalty and why the Agreement was executed; (d) ICEE's predecessor's president's secretary vouched for the authenticity of a letter from Will Radcliff referencing the 2000 Appointment; and (e) six

interrelated documents concerning a tax transaction strongly support the existence of the 2000 Appointment and explain away the sole document ICEE relied upon for its contentions concerning authenticity. Simply, ICEE's gripes about Benesch's pre-suit investigation are not convincing because, when Benesch performed that investigation, it led to strong evidence supporting the existence of the 2000 Appointment.

5. **February 25, 2020, Wendsday Email Reaction:** There is no evidence Benesch knew of the issues with the Wendsday Email until February 25, 2020. It makes no sense that Benesch would produce the document and then withdraw it if Benesch thought it was fake. ICEE's argument that it was produced to force settlement is non-persuasive because Benesch never used it in settlement, or any other context. And Benesch's efforts were reasonable. After consulting counsel, Benesch contacted its client multiple times, immediately seeking native data for the email. It contacted its own internal ESI specialist seeking the email in native form and the lawyers were told Benesch did not have it in native form. While Benesch did have it in native form in the inboxes of three lawyers, it was reasonable for Benesch to rely upon the litigation support manager's representation because, just weeks before: (a) the Benesch lawyers directed him to put everything in Everlaw; (b) he represented to the lawyers everything was in Everlaw—where he searched for the native file; and (c) Benesch was expecting the native file to be an email, not a PDF.

6. **February 25, 2020:** Benesch's decision to continue to pursue the case based upon the 2000 Appointment—after the discovery of the issue with the Wendsday Email and with no immediate explanation from SPL—was reasonable. By February 25, 2020, Benesch had a mountain of evidence supporting the authenticity of the Appointment: (a) twelve documents referencing it, six of which were interrelated; (b) a signatory and a witness to the actual document supporting that the deal existed and the document was not a forgery; (c) a course of practice with

respect to the payment of 2.5 percent royalty, with the 2000 Appointment being the only document signed by the parties, in writing (as the 1996 Agreement required for any modification); (d) ICEE's counsel's apparent abandonment of the authenticity issue at Ralph Peters's deposition; (e) a course of dealing on the continent of Europe consistent with it; (f) no expert report or opinion otherwise indicating the 2000 Appointment was forged; and (g) a consistent recollection—between Mr. Loos and Ralph Peters—about the existence of the 2000 Appointment and why Will Radcliff had wanted to go forward with the transaction.

7. **June 15, 2020—COVID-19 is Waning:** In March, Mark Peters told Benesch that he could not get the native form of the Wendsday Email because the U.K. was locked down and he needed to get to his office in the city. This was reasonable for Benesch to accept because: (a) COVID-19 was raging and the world was effectively shutting down, with it far worse in Europe in the Spring of 2020; and (b) SPL had completed a questionnaire indicating emails stored from the vintage of the Wendsday Email were onsite in a server. But, by mid-2020, COVID-19 started to wane.

8. **June 25, 2020—the Withdrawal of the Wendsday Email:** Benesch had followed up again with Mark Peters, who was unable to provide any type of native format supporting the Wendsday Email. But it had never been relied upon by Benesch or the Court for anything at that time. So Benesch withdrew it, which is all that was required by the ethical rules. ICEE's complaints that Benesch did not inform the Court of its subjective beliefs were not required by the ethical rules because the document had not been used or relied upon. And ICEE has yet to explain how it was damaged, when ICEE contends—in binding fashion—that no one could ever believe it could be anyone except Mark Peters who engaged in a forgery.

9.      **June 25, 2020—Proceeding with Suit:**  At this point, even if Benesch had a belief that the Wendsday Email was likely forged, it was still reasonable to proceed with the suit based upon the 2000 Appointment. Benesch still had a mountain of evidence:  (a) twelve documents referencing it, six of which were interrelated; (b) a signatory and a witness to the actual document supporting that the deal existed and that the document was not a forgery with unbelievably consistent testimony; (c) a course of practice with respect to the payment of 2.5 percent royalty supported by financial documents, with the 2000 Appointment being the only document signed by the parties, in writing (as the 1996 Agreement required for any modification); (d) ICEE's counsel's apparent abandonment of the authenticity issue at Ralph Peters's deposition; (e) a course of dealing in Europe consistent with it; and (f) no expert report or opinion otherwise indicating the 2000 Appointment was forged. Despite this, Benesch took the exceptional step of sending the Appointment, along with exemplar signatures, to a handwriting expert. This is the exact same analysis ICEE's expert performed.

10.      **August 23, 2020:** Benesch continued to pursue the suit based upon the 2000 Appointment before Mr. Loos's deposition and the production of ICEE's expert report on August 24 and 25, 2020. This was reasonable, at this time, given that Benesch had a handwriting expert. And this was on top of the mountain of evidence Benesch had: (a) twelve documents referencing it, six of which were interrelated; (b) a signatory and a witness to the actual document supporting that the deal existed and that the document was not a forgery with unbelievably consistent testimony; (c) a course of practice (and financial documents) with respect to the payment of 2.5 percent royalty, with the 2000 Appointment being the only document signed by the parties as an amendment to the 1996 Agreement required; (d) a course of dealing in Europe consistent with it; and (f) no expert report or opinion otherwise indicating the 2000 Appointment was forged.

11.     **August 24, to October 15, 2020:** Given what occurred in this timeframe, Benesch moved reasonably and swiftly to investigate further and ultimately withdraw the claim based upon the 2000 Appointment. First, Stefan Loos testified differently than Benesch expected based upon its interview of him, as documented by Ms. Turk's interview notes and deposition preparation outline. Benesch then received ICEE's report indicating the 2000 Appointment was a forgery. Benesch immediately sent it to their expert. Then, a few days later, the evidence is clear that Benesch discovered there were two versions of the "History of Working Practise" document. And on September 15—about three weeks after Benesch received ICEE's expert report—Benesch had confirmed with its own expert that it could not authenticate the 2000 Appointment. She could not say it was a forgery, but it was one of two documents that was likely forged. Benesch had a "come-to-Jesus" meeting with RPC and its client. Within a couple of weeks of that, Benesch moved to withdraw the claim. This is evidence of conscientious lawyering, not an attempt to delay the case. Simply, until Stefan Loos backed out of his expected testimony and Benesch received ICEE's expert report, it had what seemed like a mountain of evidence supporting the authenticity of the 2000 Appointment.

12.     **Benesch's evidence preservation:**  When Benesch entered the case, it confirmed with RPC—a major European firm—that it had advised SPL to preserve ESI *and computer hardware.* And Benesch received and reviewed RPC's instruction to SPL. Then, Benesch sent an ESI discovery questionnaire, which SPL responded to (a) explaining where all the data was stored; and (b) twice indicating nothing was necessary to preserve ESI, because it was all kept for tax purposes. Ms. Emanuel followed up with RPC to ensure that this was done and RPC relayed that to Mark Peters. When ICEE requested to image and search Mark Peters's personal computer, Benesch clearly intended to comply and requested it from him. ICEE's notion that Benesch was

supposed to fly across the Atlantic and personally seize the devices is not reasonable. At the very least, failure to do so is not sanctionable in light of the other efforts Benesch had engaged in earlier in the case to ensure ESI was preserved. Plus, the Court notes ICEE has not shown any damage from this, given ICEE's binding contention that no one could reasonably believe it was anyone but Mark Peters who engaged in the forgery, anyway. So, the Court fails to see any damage from not having Mark Peters's computer to prove what ICEE contends has already been conclusively proven.

13. **ICEE's Discovery Complaints:** The Court finds there is no merit that any Benesch lawyers purposefully engaged in discovery misconduct. Benesch had an obligation to give its client the benefit of the doubt. In light of the fact that Benesch had a mountain of evidence supporting the existence of the 2000 Appointment, its responses on behalf of SPL are not sanctionable.

14. **Lack of Damages Proven:** Initially, the Court notes it has already committed to sanctioning SPL, where ICEE would have the ability to recover any damages from the purported forgeries. Other than the pursuit of a grudge, the Court does not see what sanctioning Benesch will accomplish, other than perhaps a double recovery to ICEE, which is already seeking sanctions in Europe against Benesch's clients as well. But regardless, as the evidence is closed, ICEE has not put forth evidence from which the Court can delineate what damage it suffered. That is, Benesch clearly had reasonable grounds, until the end of August 2020, to be actively pursuing the case based upon the 2000 Appointment. It acted quickly from that point forward. And ICEE has not put forth evidence of damage, even if the Court concludes that Benesch's actions could have been occasioned a week or two quicker. Plus, with respect to ICEE's claim of discovery violations, there is no evidence that Benesch would have abandoned the claims based upon the 2000 Appointment had it not made the mistake on the History of Working Practise document and produced it earlier.

Until there was ICEE's expert report suggesting that the 2000 Appointment was forged, Benesch just had too much evidence suggesting it was authentic to conclude that Benesch's conduct was willful or otherwise inappropriate in not withdrawing the claim. Without evidence that Benesch should have withdrawn the claim earlier, ICEE has not put forth any specific evidence demonstrating what damages it incurred and how those damages are tied to other claimed violations, as is required by the Sixth Circuit.

## II.     Procedural Posture.

### A.     The Initial Pleadings.

15.     On February 12, 2019, Benesch filed this lawsuit on behalf of SPL against ICEE for declaratory judgment, preliminary and permanent injunctions, violations of Ohio's Deceptive Practices Act, and breach of contract under a 2000 Appointment of Trademark License ("2000 Appointment") in the Hamilton County Court of Common Pleas. (Compl., Doc. 2).

16.     On March 8, 2019, ICEE removed this case to the United States District Court for the Southern District of Ohio based on diversity jurisdiction. (Notice of Removal, Doc. 1).

17.     On April 29, 2019, ICEE filed its Answer to SPL's Complaint and asserted its Counterclaims. (Answer and Countercls., Doc. 13).

18.     Initially, the parties planned to explore early resolution and were preparing to mediate; however, the August 29, 2019, settlement conference was vacated, and the parties moved forward with litigating the case. (*See* July 17, 2019 Notation Entry; July 23, 2019 Notation Entry; Aug. 27, 2019 Notation Entry).

19.     On December 16, 2019, SPL filed an Amended Complaint for declaratory judgment, preliminary and permanent injunctions, violations of Ohio's Deceptive Practices Act, breach of contract under the 2000 Appointment, as well as claims *in the alternative* pursuant to Civil Rule 8(d) (permitting alternative pleadings) under the 1996 Manufacturing Appointment

("1996 Agreement") and the 1999 Distributor Agreement ("1999 Agreement"). (Am. Compl., Doc. 27).

20.     The parties engaged in discovery and motion practice.

21.     Both parties produced documents on a rolling basis.

22.     There were several relevant motions and decisions pertinent to ICEE's Motion for Sanctions against Benesch:

     a.     ICEE's Motion to Compel the deposition of Ralph Peters, as the only living signatory of the 2000 Appointment. (Doc. 30). The Court granted the motion, setting forth conditions under which the deposition would take place and that the Court would attend remotely. (Doc. 44).

     b.     ICEE's Motion to Compel Information Related to Fabricated Evidence, requesting SPL's privileged communications with Benesch about the Wendsday Email. (Doc. 60). The Court initially granted ICEE's motion, ordering an *in camera* production of Benesch's communications with SPL, but not RPC's. (Doc. 62). SPL moved to amend the Order, which the Court granted in part, instructing SPL to produce correspondence with Benesch and RPC *in camera* for the Court's review. (Doc. 67).

     c.     SPL's Motion for Leave to file a Second Amended Complaint, withdrawing all claims asserted under the 2000 Appointment. (Doc. 72). ICEE opposed this motion. (Doc. 81). Later, ICEE filed a Motion to Amend/Correct its Counterclaims. (Doc. 152). On March 16, 2023, the Court granted both SPL's and ICEE's motions to amend their pleadings. (Doc. 190).

23.     The Court ordered the production of quite a few attorney-client and work product documents. The Court finds that emails from Benesch, internally, are particularly relevant because

they were obviously made assuming nobody would ever see them. Thus, they show the Benesch lawyers' state of mind.

### B. The Sanctions Motions.

24. Following SPL's Motion for Leave, on October 28, 2020, ICEE filed a Motion for Sanctions against SPL. (Doc. 73).

25. Later, on January 12, 2021, ICEE filed for sanctions against Benesch. (Doc. 89).

26. To start, ICEE's counsel refused a request from Benesch's new counsel to have an extension of time to respond to the brief. (Doc. 91). The Court granted that motion regardless. (Jan. 26, 2021, Notation Order).

27. The Motion for Sanctions raised only four bases upon which sanctions are sought: (1) Benesch knew that the 2000 Appointment was forged but filed the claims anyway; (2) Benesch knew Mark Peters fabricated the Wendsday Email; (3) Benesch withheld documents and metadata in discovery; and (4) Benesch failed to preserve SPL's electronic devices. (Doc. 89, PageID # 2325).

28. Benesch filed its response to ICEE's Motion for Sanctions on February 23, 2021. (Doc. 95). Benesch raised, as a threshold point, the fact that the motion was not specific with respect to each lawyer and what they did, arguing that the motion did not meet due process notice requirements. (*Id.*, PageID # 2440–42).

29. ICEE's Reply in Support of its Motion for Sanctions against Benesch was filed on March 19, 2021. (Doc. 98). The reply brief—and its summary of events in the appendix—totaled seventy-three pages. It raised multiple new arguments.

30. Given the several new arguments raised on Reply in ICEE's brief, Benesch moved to strike the Reply on April 2, 2021, and alternately moved for leave to file a sur-reply on June 11, 2021. (Doc. 101; Doc. 107).

31.     The Court granted Benesch's Motion for Leave to file a Sur-Reply on February 14, 2023, and Benesch filed its Sur-Reply on February 16, 2023. (Doc. 182; Doc. 184).

**C.     ICEE Obtains the Right to Conduct Depositions Based upon Admittedly False Statements to the Court and with Benesch Never Having a Chance to Brief the Issue.**

32.     ICEE filed a motion for leave to amend its Counterclaim, attaching a draft counterclaim. (Mot. to Amend Countercl., Doc. 152; Exhibit A, Doc. 152-1). The draft Counterclaim allegations make no reference to the Benesch Respondents in any way. (Doc. 152-1).

33.     After ICEE filed its draft counterclaim, making no reference to the Benesch Respondents, the Court denied ICEE's request for an evidentiary hearing, indicating it had everything it needed to resolve the Motion for Sanctions. (Order, Doc. 182, PageID # 6142).

34.     Within a few weeks, ICEE, nevertheless, unilaterally noticed Mr. Gurbach's and Mr. House's depositions, stating the need for it is to determine their "roles" in the "forgeries." (*See* Gurbach Subpoena, Doc. 210-1; March 29, 2023, correspondence to David Wolfsohn, Doc. 210-2, House Subpoena, Doc. 210-5). ICEE's counsel confirmed that the sole reason for this was to determine the lawyers' "role" in the "forgeries." (March 30, 2023, correspondence from David Wolfsohn, Doc. 210-3).

35.     In response, counsel for Benesch objected based on relevance—the 2000 Appointment was no longer part of the case, so any involvement in a forgery did not matter. (April 3, 2023, correspondence from Patrick Kasson, Doc. 210-4).

36.     Upon seeing that there was no relevance for the Benesch lawyers to be deposed, ICEE filed a completely different counterclaim than the one that was attached to their Motion for Leave to Amend. (*Compare* Doc. 152-1, *with* Doc. 194).

37.     Having now inserted the Benesch lawyers directly into the Counterclaim—after (a) hearing the Court was not going to conduct an evidentiary hearing on the Motion for Sanctions; and (b) receiving Benesch's objection that the Benesch lawyers' testimony was not relevant to the underlying case, ICEE moved to compel the depositions of Mr. Gurbach and Mr. House. (*See* Doc. 205, PageID # 7960–61). In doing so, ICEE argued, under *Shelton,* Benesch's testimony is necessary and **relevant to the Counterclaims**. *Id.* No other reason was given for the depositions other than ICEE's Counterclaims. *Id.*  The Motion, in no way, referenced the need for the depositions in connection with the sanctions Motion, and the Court already said no discovery was needed. *Id*

38.     Despite knowing of Reminger's representation of the Benesch lawyers, ICEE served subpoenas on these members of the bar without sending copies to any attorney at Reminger. That is right, Mr. Gurbach found out about the subpoenas—not from his counsel—but by service of process directly to him at his office, with no courtesy copy or warning from his counsel.

39.     Benesch moved for a protective order and to quash the subpoenas, expressly arguing that ICEE's counsel was dishonest about the reason for the depositions. (*See* Doc. 210). Benesch strongly argued ICEE's counsel really wanted the depositions to bolster the Motion for Sanctions and was untruthful to the Court when he said he wanted the depositions for the Counterclaim allegations. (*Id.* at PageID #8186-89).

40.     In place of a reply brief, the Court held oral arguments on the competing motions. At the oral argument, ICEE advanced new arguments as to why it needed the testimony to support its Counterclaims, which were never argued in its Motion to Compel. (*Compare* Tr. of May 31, 2023 Hr'g, 3:8–7:8, Doc. 220, PageID # 8656–60, *with* Mot. to Compel, Doc. 205).

41.     At the hearing, Benesch points out ICEE was being untruthful to the Court—it wanted sanctions discovery under the guise of Counterclaim discovery. (*Id.* at 23:1–5, PageID # 8676). But ICEE's counsel was insistent that he did not want the discovery for sanctions, but rather for the Counterclaims. (*See id.* at 3:8–22:12, 40:21–47:20, PageID # 8656–75, 8693–97). To be sure, counsel for ICEE was *adamant* in his statement to the Court that all he wanted to do was prove ICEE's Counterclaims—the sanction issue was never mentioned by him as a basis for the depositions. (*Id.* at 12:19–21, PageID # 8665).

42.     The Court ordered ICEE to submit "specific limited areas of inquiry that [ICEE] would have for Gurbach, Avsec, and House," for the Court's review. (*Id.* at 48:1–4, PageID # 8702). There was no reference to sanctions discovery, because that had never been asked for by ICEE's counsel. In fact, ICEE's counsel had disclaimed a need for it. (*Id.* at 12:19–21, PageID # 8665).

43.     ICEE submits a proposed Order with 29 topics that exceeded—by far—the topics that it argued, at the oral argument, ICEE needed for the Counterclaim. It did this despite the Court specifically wanting "limited areas of inquiry." (*Compare id.* at 3:8–22:12, 40:21-47:20, PageID # 8656–75, 8693–700, *with* ICEE's Proposed Order, Doc. 253-1, PageID # 9675–79). And none of the discovery—and the topics approved—had anything to do with the Counterclaims, or the reasons ICEE put forward as the basis for its need for discovery in its Motion to Compel and/or at oral argument. (*Id.*).

44.     The Court held a conference to discuss the topics. At that conference, ICEE's counsel effectively conceded he had been dishonest in both the Motion to Compel and in the oral argument. He admitted that the information he sought was actively designed to support the Motion for Sanctions, despite arguing in the Motion to Compel and in the oral argument that he wanted it

for Counterclaim discovery. (Tr. of August 8, 2023 Disc. Conf. at 9:7-10:11, 19:12-18, Doc. 227, PageID #8861–62, 8871). That is right, counsel for ICEE admitted on the record that the reasons stated in the Motion to Compel and in the oral argument for the Benesch lawyers' depositions were not his real reason—it was the sanctions all along. (*Compare id.*, *with* Doc. 205).

45.     Yet, the Court ordered discovery on ICEE's Motions for Sanctions despite the issue having never been asked for, briefed, or argued. (Tr. of August 8, 2023 Disc. Conf., 3:17–21, Doc. 227, PageID # 8855).

46.     Benesch was required to undergo depositions of its lawyers on the Motion for Sanctions, having never had a chance to brief or argue whether discovery was appropriate for the sanction Motion. Rather, the discovery was ordered through a subterfuge by ICEE's counsel, the reason for which was misrepresented in the Motion to Compel and in oral argument.

**D.     ICEE Proceeds to Take 51 Hours of Depositions, Ignoring the Court's Topics.**

47.     ICEE ultimately took the depositions of five Benesch lawyers. (*See* Doc. 254-1–5 (Ron House Dep. Vols. 1–5); Doc. 255-1 (Matthew Gurbach Dep.); Doc. 256-1 (Mark Avsec Dep.); Doc. 273 (Jennifer Turk Dep. Vol. 1); Doc. 274 (Jennifer Turk Depo. Vol. 2); Doc. 275-1 (Elizabeth Emanuel Dep.)). Nearly *51 hours* of depositions were taken. (*Id.*).

48.     In taking the depositions, ICEE's counsel blatantly ignored the topics set forth by the Court to limit the depositions. In fact, he openly mocked the notion that he was limited by the topics the Court ordered the depositions confined to.

> MR. WOLFSOHN: This is from a year ago?
>
> MR. KASSON: These are the topics the Judge ordered the deposition to proceed upon. They are.
>
> Remember? In oral argument I said it's not going to turn into a free for all, and the Judge said to give me a list of topics, David. Your deposition is limited to those topics.

> MR. WOLFSOHN: Okay. We have had numerous colloquies with the Court where, barring—**the *only* restrictions are conversations with, what's that guy's name, Don Gross or Dan Gross**.

(Emanuel Dep. 63:6–19, Doc. 275-1, PageID # 12777) (emphasis added).

> MR. KASSON: … Most of those things you just listed, spoliation, are not on the [Judge's] list, **so just keep it to stuff [questions] on the list.**
>
> MR. WOLFSOHN: **No**.

(*Id.* at 256:14-17, PageID # 12970) (emphasis added).

49.     There is nothing in the record indicating the Court withdrew its order limiting the topics and/or otherwise making the depositions "wide open," except for the conversations with Benesch's in-house counsel, Joe Gross. Mr. Wolfsohn's statement was knowingly and blatantly false.

**E.      ICEE's Counsel Ignores the Court's Direction Not to File a Supplemental Brief.**

50.     On September 27, 2024, ICEE moved for leave to file a supplemental brief in support of its Motion for Sanctions, due to the discovery conducted after it filed its initial motion. (Doc. 276). The Court granted ICEE's Motion on November 7, 2024. (Nov. 8, 2024, Notation Order).

51.     Benesch filed its response to ICEE's supplemental brief on December 30, 2024. (Doc. 282).

52.     A nine-hour oral argument on ICEE's Motion for Sanctions against Benesch went forward on February 20, 2025. (Doc. 292).

53.     Benesch submitted a pin-cited version of its counsel's PowerPoint, and ICEE's counsel submitted a pin-cited timeline.

54.     After the hearing, the Court expressly told the parties it did not need any supplemental briefing:

| | |
|---|---|
| **From:** | OHSDdb_Barrett_ch <barrett_chambers@ohsd.uscourts.gov> |
| **Sent:** | Friday, March 28, 2025 1:24 PM |
| **To:** | Patrick Kasson; Wolfsohn, David J.; OHSDdb_Barrett_ch |
| **Cc:** | Marandola, Tyler R.; Mrinali Sethi; Kathleen Bedree |
| **Subject:** | RE: SPL v. The ICEE Company:  Proposed Findings of Fact and Conclusions of Law re Motion for Sanctions |

Counsel,

Judge Barrett has determined he needs no further briefing on the issue of sanctions against the Benesch Respondents.  However, he has asked me to schedule a call to discuss how the Court can most efficiently review the submitted materials.  I can offer 4/1/2025 at noon or 4/3/25 at 3:00 PM.  If neither of these dates (and times) work with your respective schedules, I will fast forward to the week of 3/14.  Please advise.

(Doc. 297-3, PageID # 14527).

55.     Undaunted, ICEE filed a supplemental brief, disregarding the Court's instruction. (Doc. 296).

56.     Then, the Court had a conference with the parties. (Doc. 300). At the end of the conference, the Court instructed the parties to each file proposed findings of fact. (Tr. 25:7–10, Doc. 300, PageID # 14571). And the parties were to file briefs on two issues: (1) whether the Court could award sanctions solely against the firm and whether sanctions needed to be imposed individually against the lawyers; and (2) whether the legal standard on the motion for sanctions is clear and convincing or some other standard. (*Id.* at 9:19–10:6, PageID # 14555–56).

## III.   Findings of Fact

### A.    Reynolds, Porter, and Chamberlin Contact Benesch to Represent Its Long-Time Client, SPL, in a Dispute Based in the United States.

57.     On December 1, 2017, David Cran—a partner at the major European firm of Reynolds, Porter, and Chamberlin ("RPC")—contacted Mr. Avsec and Mr. Zalud to provide background information for the dispute between SPL and ICEE and provided Benesch with initial documents to review. (Doc. 282-1, PageID # 13613–14). These included: (1) the 1978

Manufacture Agreement; (2) the 1996 Agreement; (3) the 1999 Agreement; (4) the 2000 Appointment; and (5) a chronology of the relationship between SPL and Slush Puppie Corporation, ICEE's predecessor. (*Id.*)

58.     On April 17, 2018, RPC contacted Benesch to provide an update on recent developments in the case and additional documents referencing the calculation of royalties under the 2000 Agreement, including the Wendsday Email. (Doc. 73-20, PageID # 1555–56).

59.     Later, on September 20, 2018, RPC reached out to Benesch again to inform the lawyers that one of ICEE's licensees had begun selling competing goods in Tesco, a major UK supermarket chain. (Doc. 276-3, PageID # 13070).

60.     After discussion with RPC, Benesch moved forward with drafting the Complaint on behalf of SPL. (*Id.* at PageID # 13067).

61.     Throughout the pre-suit stage, Benesch continued to work alongside RPC to get additional information from SPL about the background of the claim and relevant documents. (Doc. 276-16, PageID # 13332–33).

62.     In that period, RPC served as an intermediary to facilitate contact between Benesch and SPL. (Gurbach Dep. 59:19–60:1, 65:2–17, Doc. 255-1, PageID # 10282–83, 10288).

63.     The testimony is clear that RPC was the main point of contact for Benesch— including with respect to the gathering of documents in the initial discovery phase. (Gurbach Dep. 55:2–12, PageID # 10278). In fact, several emails confirmed this:

From: Pownall, Holly - RPC <Holly.Pownall@rpc.co.uk>
Sent: Friday, September 28, 2018 1:03 PM
To: Gurbach, Matthew <mgurbach@Beneschlaw.com>
Cc: Avsec, Mark <mavsec@Beneschlaw.com>; House, Ronald <rhouse@Beneschlaw.com>; Cran, David - RPC <David.Cran@rpc.co.uk>; Mark, Ben - RPC <Ben.Mark@rpc.co.uk>
Subject: RE: Slush Puppie - privileged & confidential

Hi Matthew

It was good to speak to you just now.

As discussed:

1. Please see attached our provisional comments on the draft Complaint. We will follow up with further detailed comments next week.

2. I confirm that it will only be me from the RPC team on the discovery call next week.

█████████████████████████████████████████

Many thanks

Holly

Holly Pownall
Associate
RPC
D: +44 20 3060 6726
M: +44 7736 462 111

From: Gurbach, Matthew [mailto:mgurbach@Beneschlaw.com]
Sent: 29 September 2018 Saturday 07:20
To: Pownall, Holly - RPC
Cc: Avsec, Mark; House, Ronald; Cran, David - RPC; Mark, Ben - RPC; Cook, Nora; McCann, Donald S.
Subject: Re: Slush Puppie - privileged & confidential

I do not think that that will be necessary, Holly.  We can use the time to ready our plans for document and data harvesting, preservation and eventual review. His involvement will be key when we proceed to execute the plan.

I shall circulate a dial in.

Matthew Gurbach
Partner
Litigation
Benesch, Friedlander, Coplan & Aronoff LLP
200 Public Square, Suite 2300
Cleveland, OH 44114-2378
Ph: 216.363.4413
www.beneschlaw.com



(Doc. 293-2, PageID # 14209–10).

   64. However, Benesch also had direct contact with Mark Peters, SPL's President, during this period. (Gurbach Dep. 62:19–63:6, PageID # 10285–86; Doc. 276-3, PageID # 13065–67). At times, Mark Peters directly provided Benesch with information and documents as well. (Doc. 276-3, PageID # 13065–66).

18

**B.** **RPC and Benesch Jointly Approve the Complaint.**

65.     ICEE has maintained that RPC harbored doubts about the authenticity of the 2000

Appointment. But the evidence is clear that RPC approved the filing of the Complaint.

66.     Indeed, RPC's involvement continued through the drafting of the Complaint, which

it reviewed and approved for filing:



From: Pownall, Holly - RPC <Holly.Pownall@rpc.co.uk>
Sent: Tuesday, December 18, 2018 4:46 AM EST
To: Gurbach, Matthew <mgurbach@Beneschlaw.com>; House, Ronald <rhouse@Beneschlaw.com>; Avsec, Mark <mavsec@Beneschlaw.com>
CC: Cran, David - RPC <David.Cran@rpc.co.uk>; Cook, Nora <NCook@beneschlaw.com>; Mark, Ben - RPC <Ben.Mark@rpc.co.uk>
Subject: RE: Slush Puppie / ICEE - Meeting with J&J/ICEE - privileged & confidential
Attachment(s): "Slush Puppie Exhibits.pdf","27831888-v1-COMPLAINT FOR BREACH OF TRADEMARK LICENSE - 17 DEC 18 - RPC COMMENTS.DOC"

Hi Matthew

Many thanks for this. We have corrected a couple of minor typos in paragraph 30 and 44, as visible in the attached. Other than that, the draft Complaint looks good to us. We will share it with Mark Peters.

Separately, we note that the letter from Will Radcliff to Ralph Peters dated 8 August 2000 appears at both Exhibits D and E. Should it be taken out of Exhibit D, given that paragraph 23 of the draft Complaint states *A true and correct copy of the 2000 Appointment is attached hereto as Exhibit D "*?

Kind regards

Holly

Holly Pownall
Associate
RPC
D: +44 20 3060 6726
M: +44 7736 462 111

(Doc. 293-1, PageID # 14131) (emphasis added).

67.     The Court recognizes ICEE argued in the oral argument that this was somehow not

RPC approving the Complaint because the email came from an associate. (Feb. 20, 2025, Tr. 82:3–

5, Doc. 294, PageID # 14310; Doc. 293-1, PageID # 14131). The Court disagrees. While the email

is written by Ms. Pownall, it is copied to the RPC partners who were involved—David Cran and

Ben Mark. (Doc. 293-1, PageID # 14131). And the email said: "looks good to **us**." (*Id.*) (emphasis

added). "Us" is plural, indicating all involved at RPC approved it and not just the associate.

68.     So, the Court concludes three lawyers from RPC were comfortable with the

allegations in the Complaint, which was based upon the 2000 Appointment. (*Id.*) Indeed, the Court

ordered the production of all correspondence between RPC and Benesch concerning the 2000 Appointment. Not a single document indicates that these partners did not want the Complaint, based upon the 2000 Appointment, to be filed.

69.     In the same theme, ICEE asked the Court to infer that the reason RPC sent the Complaint to Benesch to file was because RPC did not want to do so—because of doubts as to the authenticity of the 2000 Appointment. (Doc. 276-1, PageID # 12973; Tr. of Feb. 20, 2025, Oral Arg. 24:1–10, Doc. 294, PageID # 14252). The Court rejects this contention. The email from Ms. Pownall, copied to all RPC partners, obviously contradicts this by indicating that RPC feels "the draft Complaint looks good to us [plural]." (Doc. 293-1, PageID # 14131).

70.     The Court concludes Benesch, as it made the decision to file the Complaint, was aware that RPC: (a) thought the Complaint was justified; and (b) RPC was supportive of proceeding, in light of its long relationship with SPL and SPL's employees. Benesch was reasonable in considering these facts when deciding to file suit based upon the 2000 Appointment. Under a clear and convincing standard, if there are two reasonable inferences, the inference in favor of Benesch must be chosen.

71.     Moreover, ICEE has conceded—in binding fashion—that the case was sent to Benesch to file because the matter needed to be venued in Ohio under the provisions of the 2000 Appointment. (*See* Am. Countercl. ¶ 86, Doc. 196, PageID # 7133).

72.     So, RPC, an internationally recognized European firm, sent the matter to Benesch to be filed in the United States for its longstanding client. It provided Benesch with the key documents—including the 2000 Appointment. And three lawyers from RPC were involved and in accord that the Complaint was appropriate. Plus, as referenced in the papers ICEE filed concerning the suit in the U.K., RPC continues to represent SPL to date.

### C. Benesch and RPC's Concerns Pre-Suit Were About Successor Liability, Not Authentication of the 2000 Appointment.

73. ICEE has repeatedly argued that RPC had concerns about the authenticity of the 2000 Appointment and wanted to "hot potato" the case to Benesch as a result. (Doc. 89, PageID # 2310; Doc. 98, PageID # 2509; Doc. 276-1, PageID # 12973). This is not true. The communications between Benesch and RPC are clear that neither group of lawyers doubted the authenticity of the 2000 Appointment.

74. RPC contacted Benesch because RPC is a United Kingdom firm, and Benesch would be able to file suit in the United States, the venue that was selected in the 2000 Appointment. (Avsec Dep. 26:13–20, Doc. 256-1, PageID # 10758; *see also* Am. Countercl. ¶ 86, Doc. 196, PageID # 7133).

75. From the outset of the communications between Benesch and RPC, the lawyers were concerned with SPL's ability to establish *successor liability* on ICEE for the 2000 Appointment. (Doc. 282-1, PageID # 13614; Gurbach Dep. 139:17–19, 152:12–21, Doc. 255-1, PageID # 10362, 10375; Avsec Dep. 52:11–23, PageID # 10784).

76. In fact, RPC explicitly raised the issue in its early correspondence with Benesch:

> Does the ongoing payment of royalties by SPC to The ICEE Company in accordance with the terms of document 4 [the 2000 Appointment] constitute an assignment by conduct (or equivalent) of document 4 to The ICEE Company such that The ICEE Company is bound by the terms of document 4 even though it has not been assigned/transferred in writing?

(Doc. 276-16, PageID # 13332–33).

77. Given this question, Benesch researched Ohio law surrounding course of performance and ratification to determine whether the 2000 Appointment could be enforced against ICEE given ICEE's history of accepting the 2.5 percent royalty rate. The 2000 Appointment was the only contract with that rate. Mr. Gurbach confirmed this in his deposition:

Q.      What, what were you trying to analyze?

A.      Well, as it states here in point three that you, that you read, was the issue of assignment of the 2000, of the 2000 license. We knew that, that Slush Puppie had been sold to Dr. Pepper/7up and then to, to your client after that. So really one of the, the key issues that, that we were, that we were looking at and concerned with was the successor liability piece. And you saw that -- I don't remember the exhibit number, David, but it was one of the e-mails from Ron House on that issue.

(Gurbach Dep. 152:10–25, Doc. 255-1, PageID # 10375).

78.     To be sure, Benesch had internal discussions acknowledging the difficulties with establishing successor liability, with no mention that the lawyers were concerned the 2000 Appointment could be a forgery.  In fact, Mr. House sent the below email specifically discussing ways to impose successor liability upon ICEE for the 2000 Appointment:

| | |
|---|---|
| **From:** | House, Ronald |
| **Sent:** | Tuesday, November 27, 2018 6:19 PM |
| **To:** | Gurbach, Matthew; Avsec, Mark |
| **Subject:** | SPL - ICEE |
| **Attachments:** | 2001 Assignment.PDF; 2006 Trademark Assignment.PDF |

I have been thinking about ways to defeat one crucial and perhaps determinative argument made by ICEE's counsel in her 9/13/18 letter to Mark.  That is, that the asset purchase agreements between SPC and DPSU in 2001 and between DPSU and ICEE in 2006 did not identify the 2000 Agreement as a contract/asset being assigned and therefore SPL is precluded from contending that ICEE is bound by the 2000 Agreement.  The argument maybe sound and I see it as a big issue.  For a contract  to be assigned, the assignor and assignee must intend the assignment.  Although we can make arguments that the parties acted under an implied contract or that the parties are bound by the course of dealing, that does not necessarily get the client where it wants to be.  That is because  under either scenario, ICEE can presumably terminate at will because the favorable terms of the 2000 agreement (perpetual duration, termination only for good reasons) may well not be part of an implied contract or course of dealing.

How about this for an argument that the 2000 agreement is effective and enforceable against ICEE:

The 2001 Assignment of trademark by SPC to DPSU (attached) generally assigns "all right, title and interest in and to said trademark and the above-named registrations, together with the goodwill of the business symbolized by said trademark(s)..."

The 2006 Trademark Assignment Agreement between DPSU and ICEE (also attached) states that "Assignor hereby sells, assigns, transfers, conveys and delivers to the Assignee all of Assignor's right, title and interest in, to and under the Marks."

(Doc. 276-4, PageID # 13077).

79.     Mr. Gurbach testified: "In all of the e-mails that you've read to me thus far, there's never been a discussion about, one, that we were concerned that the 2000 Appointment was

somehow a forgery or somehow a fake. Our question was with regard to successor, successor liability, number one." (Gurbach Dep. 139:13–19, Doc. 255-1, PageID # 10362).

80.     This was reiterated by Mr. House and Mr. Avsec. (House Dep. Vol. II 188:2–194:12, Doc. 254-2, PageID # 9899–905; Avsec Dep. 52:11–23, Doc. 256-1, PageID # 10784).

81.     ICEE's repeated contention that RPC had concerns about the authenticity of the 2000 Appointment is based upon a single email:

> [I]rrespective of whether the 2000 agreement **is valid and in force**, these pouches appear to fall squarely within the scope of the license of the prior agreements. Whilst we would still want to pursue the claims in respect of the 2000 agreement it seems that the issue of interpretation of the scope of the earlier agreements could well be appropriate for summary judgment. We welcome your thoughts.

(Doc. 276-3, PageID # 13070) (emphasis added).

82.     Importantly, the Court notes this email discusses whether the 2000 Appointment is "valid and in force." (*Id.*) It does not use the word "authentic." And obviously the phrase "valid and in force" is more consistent with concerns of successor liability—"valid and in force" against ICEE, not whether it was a forgery. (*Id.*)

83.     The Court rejects ICEE's contention that RPC had doubts about the authenticity of the 2000 Appointment for these reasons. *First*, the correspondence between the parties—not cited by ICEE—clearly demonstrates the concern with successor liability—which is what the parties were worried about with respect to enforcement. (*See* Doc. 276-16, PageID # 13332–33; Doc. 282-1, PageID # 13614, Doc. 276-4, PageID #13077). *Second,* RPC ("us") approved the Complaint—all three lawyers—with no reservations. (*See* Doc. 293-1, PageID # 14131). There is no correspondence from RPC, anywhere, suggesting they had concerns about the Complaint, which was based upon the 2000 Appointment. *Third*, ICEE's request requires the Court to draw an inference that is not the most reasonable inference, which is prohibited by the clear and convincing

standard. It further requires the Court to stack inferences, which is impermissible. *Finally,* at best, the sole document that ICEE relies upon questions whether the 2000 Appointment was "valid and in force," not "authentic," which gives at least a reasonable inference they were discussing successor liability, not the document being a forgery. (Doc. 276-3, PageID # 13070). Under the clear and convincing standard, if there are two equally reasonable inferences, the Court is required to accept the inference in favor of Benesch.

84.    Further, the Court finds—even if RPC had concerns about authenticity—there is no evidence those concerns were conveyed to Benesch. To conclude otherwise would require the Court to, again, stack inferences. To be sure, the lawyers had been discussing the "valid and in force" language to easily be read by Benesch as being directed at the issue of successor liability. There are no documents that indicate Benesch took this to mean RPC thought it was not authentic. Rather, the Benesch lawyers were clear: they believed RPC's concern was successor liability. (Gurbach Dep. 152:10-25, Doc. 255-1, PageID # 10375; House Dep. Vol. II 188:2–194:12, Doc. 254-2, PageID # 9899–905; Avsec Dep. 52:11–23, Doc. 256-1, PageID # 10784).

85.    Further, there is no testimony that RPC ever conveyed any doubt as to the authenticity of the 2000 Appointment to Benesch. So, determining Benesch had knowledge of any alleged RPC misgivings on the authenticity of the document requires the stacking of inferences. The Court would be required to infer, from the "valid and in force" language, that RPC was concerned about authenticity. And the Court would be required to infer, on top of that inference, this concern was somehow relayed to Benesch. Under any standard—clear and convincing or any lower standard—the Court cannot stack inferences. Thus, the Court concludes, even if RPC had concerns about the authenticity of the 2000 Appointment, given RPC's approval of the Complaint and the lack of any admissible evidence to the contrary, there is no evidence Benesch was aware

of those concerns. Rather, Benesch was under the reasonable impression that RPC was fully supportive of bringing an action—for RPC's longstanding client—based upon the 2000 Appointment.

    **D.    The Court's Concerns About Why SPL Has Continued to Pursue the 1996 and 1999 Agreements, After Dropping the Claims Based upon the 2000 Appointment, Are Irrelevant for this Determination.**

    86.    When discussing issues in this case—both whether ICEE can conduct discovery and the appropriateness of sanctions—the Court has repeatedly raised concerns to Benesch's counsel about why the Benesch lawyers pursued claims under the 1996 and 1999 Appointment:

> THE COURT: When you argue in the original filing that the other documents are vitiated because the 2000 Agreement without—they have no longer a legal binding force and effect because the 2000 Agreement, and then all of a sudden you say, ah, 2000 Agreement's not real, yeah, the other ones are still in force and effect.

(Tr. of May 31, 2023 Oral Arg. 39:18–23, Doc. 220, PageID # 8692).

> Equally radical is the fact that this senior district judge, sworn to the Bench in 2006, has never presided over a civil action in which Plaintiff's counsel: (1) concede that the sole document (the 2000 Appointment) underpinning the original complaint is not "genuine" (2) but only after contentious discovery and confrontation; (3) then withdraw that document (4) and matter-of-factly pivot to documents (the 1996 Appointment and the 1999 Agreement) previously referred to in the first amended complaint as "superseded" by the not "genuine" one. In short, no other way to put it, SPL wants a "do-over." And it is against this backdrop that the Court will apply the *Shelton* factors.

(Doc. 270, PageID # 11638–39).

> THE COURT: It starts with me, frankly, with the pleading in the alternative on the Complaint. I mean, David's got a valid point. If you have an agreement that supersedes everything, you don't say: but if this agreement doesn't hold, look at the following. So it starts there. It starts through the process.

(Tr. of Feb. 20, 2025 Oral Arg. 126:15–20, Doc. 294, PageID # 14354).

87.     The Court has continually referred to this as "Plan B," adopting ICEE's argument.[3] But the Court recognizes that both RPC and Benesch always considered, from the beginning, that claims could be raised under the 1996 and 1999 Agreements if the 2000 Appointment was not enforceable under a successor liability theory. (Doc. 276-3, PageID # 13070). As Benesch has testified, its expert could not authenticate the 2000 Appointment after receiving ICEE's expert report. (Turk Dep. Vol. II 395:17–396:6, Doc. 274, PageID # 12387–88). Significantly, Benesch's expert did not say the 2000 Appointment was a forgery, but rather, said either the 2000 Appointment or the History of Working Practise was a forgery. (Doc. 276-28, PageID # 13540). So Benesch, knowing it could not authenticate the 2000 Appointment, withdrew the claim. (Doc. 72).

88.     ICEE has continued to harp on Benesch's use of the word "meritless" in its reply brief when it sought to amend the Complaint to withdraw the 2000 Appointment based claim. ICEE has continued to argue that, somehow, this shows Benesch had a solid belief that the 2000 Appointment was a forgery. But, as Mr. House and Ms. Turk explained, their experts did not say it was definitively a forgery—one of the two documents likely was. So Benesch could not authenticate it. (*See* Doc. 82, PageID # 2049–50; Doc. 85, PageID # 2176). And, obviously, a claim based upon a contract which cannot be authenticated is meritless. (House Dep. Vol. V 391:6-11, Doc. 254-5, PageID # 10165).

89.     Likewise, ICEE has taken the binding position that the 2000 Appointment is a forgery—and thus it would have no effect. The alternative claims barred under the 1996 and 1999

---

[3] At times, the Court has referred to both the alternative claims at the Slushy Jack's rebrand as "Plan B." For the purposes of sanctions, Plan B refers to the alternative claims under the 1996 and 1999 Agreements.

Agreements—which ICEE expressly assumed liability for in its Asset Purchase Agreement. (Doc. 73-19, PageID # 1541-42).

90.    And of course, the issue with the "Plan B" is not relevant to the sanctions issue. ICEE has not sought sanctions based upon the pursuit of the claims under the 1996 and 1999 Agreements. In fact, it has not even filed a motion for summary judgment—or other dispositive motion—attacking SPL's ability to pursue claims under those agreements.

91.    To be sure, when those claims were first added to the case in 2019—as alternative claims—ICEE expressly admitted it was bound by the 1996 and 1999 Agreements:

- "ICEE admits that in or around 2006, ICEE purchased from DPSU the Slush Puppie trademarks and businesses, and inherited DPSU's rights and obligations under the 1996 Appointment." (Answer and Countercl. ¶ 92, Doc. 29, PageID # 491).

- "ICEE admits that in or around 2006, ICEE purchased from DPSU the Slush Puppie trademarks and business, and inherited DPSU's rights and obligations under the 1999 Agreement." (*Id.* at ¶ 100, PageID # 492).

- "ICEE operated pursuant to the 1996 Manufacturing Appointment and the 1999 Distributor Agreement in its relationship with SPL following the acquisition of The Slush Puppie business from DPSU." (*Id.* at ¶ 43, PageID # 504).

92.    So, the Court finds that when the claims were first added to the case—in 2019— ICEE freely agreed that it "inherited DPSU's rights and **obligations**." (*Id.* at ¶¶ 92, 100, PageID # 491–92) (emphasis added).

93.    Further, ICEE repeatedly asserts—in binding fashion in the pleadings—that it terminated both the 1996 and 1999 Agreements on June 25, 2019. (*See, e.g. id.* at ¶¶ 12–23, PageID

# 483–85). If those agreements were not enforceable, then how could ICEE "terminate" those agreements?

94. Therefore, while the so called "Plan B" is not at issue with respect to the sanctions, the Court recognizes that ICEE had made multiple statements—in binding fashion in pleadings—which recognize it was bound by those agreements until at least June 25, 2019—roughly 13 years after the relationship with SPL began.

### E. Prior to the Discovery of the Issues with the Wendsday Email, Benesch had No Reason to Think SPL and Mark Peters Were Engaging in Any Type of Forgery or Fraud.

95. ICEE has repeatedly argued that Benesch had reason to believe Mark Peters was a forger prior to February 25, 2020. The Court finds there is no basis to conclude this.

96. The Court recognizes this matter cannot be looked at in hindsight.[4] Rather, the Court must examine the facts as Benesch knew them, at the time(s) it made each decision. There is no "Monday-morning quarterbacking" here. Benesch must be judged on the facts *each lawyer knew* when they made the decisions they made, without the benefit of hindsight. Thus, ICEE's continual assertion that Benesch's conduct should be judged with the knowledge of how this matter played out is inappropriate.

97. To be sure, ICEE asked the Court to infer that Benesch knew the Wendsday Email was a forgery because it did not attach it to the Complaint. The Court cannot accept this inference for several reasons. *First,* Benesch attached far more convincing evidence of the existence of the 2000 Appointment to the Complaint—(a) the 2000 Appointment itself; (b) a transmittal letter from ICEE's prior president sending the executed 2000 Appointment to SPL; and (c) a second letter specifically referencing the 2000 Appointment. (*See* Doc. 27-4; Doc. 282-3; Doc. 282-2). *Second,*

---

[4] *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010).

Benesch's conduct with respect to the 2000 Appointment would make no sense if it knew the Wendsday Email was a forgery. To be sure, Mr. House specifically directed that it be produced for discovery. (Doc. 274-12, PageID # 12590–95).

98.　　　Plus, there are both emails to the client and internal emails within Benesch confirming that Benesch learned of the problem in late February of 2020. (Doc. 95-4, PageID # 2474, 2480; Doc. 276-10, PageID # 13290). And then Benesch withdrew it—apparently before ICEE and Duane Morris saw the misspelling. It makes no sense that Benesch would produce a document it thought was fraudulent and withdraw it unilaterally months later—shining a light on its fraudulent nature. Plus, Mr. Avsec, in writing to RPC, specifically referred to the Wendsday email—clearly expressing a belief that it was authentic. (Doc. 276-3, PageID # 13067 ("We are aware of course, of the email communications establishing that the royalties had been paid under the August 8, 2000 Agreement.")). Therefore, the inference ICEE requests the Court make is not a reasonable one, requires stacking inferences, and is surely not the most reasonable inference, as required by the clear and convincing standard.

99.　　　Further, ICEE asserts Benesch must have known the email was a forgery, otherwise it would have attached it to the letters to ICEE's counsel. But again, this ignores that Benesch had: (1) the 2000 Appointment; (2) transmittal letters; (3) financial data; and (4) a Cadbury Schweppes fax and contract referencing it. (*See* Doc. 27-4; Doc. 282-3; Doc. 276-2; Doc. 282-5). Plus, they also had an explanation from Mark Peters as to how it was found and why he did not know about it before its discovery. (House Dep. Vol. II 156:24-157:10, Doc. 254-2, PageID # 9867-68). This information, which was within a year of the execution date of the 2000 Appointment, was far more convincing as to its authenticity. ICEE's assertion further requires the Court to use inferences, as discussed above in the preceding paragraph. And as discussed above, Mr. Avsec clearly thought it

was authentic, as referenced in his email to RPC. (Doc. 276-3, PageID # 13067, ("We are aware, of course, of the email communications establishing that royalties have been paid under the August 8, 2000 Agreement.")).

100. The Court also notes that ICEE's insistence the Court infer Benesch knew the Wendsday Email was a forgery is contradicted by multiple different positions ICEE has taken with respect to Benesch's motives and conduct in connection with the Wendsday Email. First, ICEE asserts "Zalud, Avsec [and Gurbach] . . . reviewed and understood the implications of the Wendsday email before filing the Complaint"—arguing the Benesch attorneys were aware of the forgeries, since they withheld it from the original production. (Doc. 89, PageID # 2325). But then, ICEE argues that Benesch willfully produced it, knowing it was a fake in an attempt to convince ICEE to settle. (Doc. 73, PageID # 1308). Yet ICEE does not deny that the Wendsday Email was never—at any time—mentioned or used in an attempt to force a settlement. (*Compare* Doc. 73, PageID # 1308; *with* Doc. 98, PageID # 2503, 2507, 2513, 2517). Simply, ICEE's position does not make sense. ICEE expects the Court to accept that Benesch knew it was forged, withheld it from production as such, but then produced it in an attempt to settle. Yet Benesch never mentioned it in any settlement attempts and then withdrew it—without ever relying upon it—shining a light on the problems with it before ICEE's counsel had yet to even discover those problems. The inferences here are convoluted, require stacking, and simply do not make sense.

101. ICEE's counsel has been repeatedly challenged (by Mr. Kasson) in oral arguments to indicate whether his firm had discovered the misspelling of Wendsday in the four months they had it before it was withdrawn and he has refused to answer the question. (Tr. of Feb. 20, 2025 Oral Arg. 71:7–9, Doc. 256, PageID # 14299). Given that ICEE has repeatedly come to the Court within days or hours on every single discovery issue that has arisen, the Court infers that ICEE's

counsel had the email, which ICEE says was important, for months, and did not catch the misspelling either. So, the Court rejects ICEE's contention that Benesch "must have" seen the misspelling before February 25, 2020. It is disingenuous to argue Benesch "must have" seen the misspelling, when lawyers as fastidious about details as Mr. Wolfsohn and Mr. Marandola did not.

102.    It is simply illogical to infer Benesch must have noticed the Wendsday misspelling when ICEE's counsel did not.

**F.    ICEE's Counsel has Conceded it Was Appropriate for Benesch—in Evaluating the Authenticity of the 2000 Appointment—to Look at Contemporaneous Documents and Statement by Clients.**

103.    Benesch's conduct in concluding the 2000 Appointment was authentic—in pursuing the case—is obviously central to the Court's analysis. Benesch has repeatedly argued that it relied upon contemporaneous documents, course of conduct, and statements of witnesses, in believing the 2000 Appointment was authentic. The Court finds that relying upon documents and multiple witnesses to authenticate the 2000 Appointment was reasonable. And ICEE is precluded from arguing it is not, because ICEE's counsel expressly conceded this was an appropriate way to determine if a document was authentic.

104.    To be sure, ICEE's lawyer, Karen Kline, wrote a letter to Benesch stating as follows:

> By the way of timeline, the 2000 Document is dated August 8, 2000; DPSU purchased the Slush Puppie business from Slush Puppie Corp. in about January 2001; and attached is a fax communication from Slush Puppie Corp. to DPSU dated February 7, 2001.
>
> . . .
>
> Based on our review, the actions of Slush Puppie Corp., including its exchanges with DPSU, since the August 8, 2000 date of the 2000 Document demonstrate that the parties were operating and continued to operate under only the 1996 and 1999 Agreements, as amended for the royalty rate. Based on our review, the actions of Slush Puppie Corp., including its exchanges with DPSU, and that the 2000 Document (if in existence) was not assumed by DPSU or my client. The totality of

circumstances raised serious questions about the authenticity of the 2000 Document. ICEE previously asked Slush Puppie Ltd., both directly and through the parties' UK counsel, for documentary evidence to support the 2000 Document and an explanation of why the document was never mentioned by Slush Puppie Ltd. to J&J/ICEE until now. To date, no sufficient or substantive response, and no documents have been provided.

(Doc. 73-19, PageID # 1541–42)

105.    In doing so, Ms. Kline only pointed to two things ICEE had to suggest the 2000 Appointment was not authentic:

      a.   ICEE's 2010s management was not aware of the 2000 Appointment; and

      b.   A contemporaneous document—a February 7, 2001, fax from Diane Menzer asking that the royalty rate in the 1996 Agreement be adjusted from 5 percent to 2.5 percent.

(*Id.*)

106.    There is no question ICEE concedes that statements from people with knowledge of the 2000 Appointment, contemporaneous documents explaining the move from a 5 percent to a 2.5 percent royalty, and the course of the parties' dealings are appropriate ways to inquire as to whether the 2000 Appointment was authentic. *Id.*[5]

107.    As discussed below, Benesch ultimately had nearly a dozen documents supporting the existence of the 2000 Appointment. And it later heard statements from two signatories to the documents vouching for their existence. (R. Peters Dep., Doc. 84, PageID # 2145–50; Emanuel Dep. 197:16–168:4, Doc. 275-1, PageID # 12881; Turk Dep. Vol. II 340:21–343:13, 344:12–19, Doc. 274, PageID # 12332–36; Doc. 274-10, PageID # 12584–85). And they had an explanation

---

[5] It is worth noting that, as Benesch explained at the oral argument, the sole document Ms. Kline relies upon—the fax—fits nicely into a group of six documents which convincingly establish the existence of the 2000 Appointment. (*See* Section K(1), *infra*).

for why no one knew about the document as well. (House Dep. Vol. II 156:24-157:10, Doc. 254-2, PageID # 9867-68).

**G. Pre-Suit—Benesch Had Six Documents, a Course of Dealing, and a Witness Supporting the Existence of the 2000 Appointment.**

108. As Benesch filed suit, it had Ms. Kline's letter and was aware that ICEE's management between 2010 and 2018 was not aware of the 2000 Appointment and that there was a fax referencing changing the royalty rate under the 1996 Agreement. But that was all of ICEE's evidence. Benesch, however, had significantly more evidence, pre-suit, which the Court finds gave a reasonable basis to file suit.

*1. Benesch Received Multiple Documents Referring to the 2000 Appointment.*

109. **The Letters:** Benesch—pre-suit—received several letters that support the existence of the 2000 Appointment:

a. An August 8, 2000, letter from Will Radcliff, Slush Puppies Corporation's president. This letter transmitted the 2000 Appointment. (Doc. 282-3).

b. A second letter, again from Will Radcliff, that specifically discusses changing the 1996 Agreement and reducing SPL's royalty owed to 2.5 percent. (Doc. 282-2).

c. Both letters specifically reference the 2000 trademark agreement.

(Doc. 282-2, PageID # 13676; Doc. 282-3, PageID # 13678).

110. **The Fax Cover Sheet:** The April 10, 2001, letter from Will Radcliff references a sale from Slush Puppie Corporation to Dr. Pepper/Seven Up, which happened in 2001. (Doc. 282-2, PageID # 13676). In connection with this, Benesch had a fax cover sheet from Gary Ruffell, an SPL employee, to Greg Salcido of Dr. Pepper/Seven Up. (Doc. 282-4). This specifically references both the August 2000 Agreement and the agreed royalty rate of 2.5 percent. (Doc. 282-4, PageID # 13680).

111. **Two Documents from Dr. Pepper/Seven Up:** RPC provided Benesch with a draft contract and associated email from the ICEE's predecessor, Cadbury Schweppes, a UK affiliate of Dr. Pepper/Seven Up. (Doc. 282-5). The recitals to the draft contract state:

> WHEREAS, this Agreement is supplemental to an Agreement made on the 8th August 2000 between Slush Puppie Corporation and (the "Principle Agreement") whereby Slush Puppie Corporation granted certain rights to SPL in perpetuity subject only to the provisions for termination therein specified the right to on the terms and in the Territory therein stated, including the right to use in connection with such Slush Puppie products the SLUSH PUPPIE trademarks registered by Slush Puppie.

(*Id.* at PageID # 13683).

112. **The 2000 Appointment:** It cannot be ignored that Benesch had a signed, written agreement, which seemed to explain the current relationship between the parties. The 2000 Appointment appeared to be signed by the president of each company. It was provided to Benesch by RPC. And importantly, the 1996 Agreement required that the 5 percent royalty rate could only be changed by a writing *signed* by both parties. (Doc. 27-2, PageID # 397). Importantly, the 2000 Appointment was the only agreement that was signed by both parties and changed the 5 percent to 2.5 percent. So, with the benefit of hindsight, the Court may look upon the 2000 Appointment with skeptical eyes. Pre-suit, Benesch did not have the benefit of hindsight. And it appeared to have a contract that explained quite a bit.

113. So, pre-suit—in terms of records—Benesch had significantly more documents suggesting the existence of the 2000 Appointment than ICEE had pointed to, suggesting that it did not exist:

| ICEE | SPL |
|---|---|
| • The February 7, 2001, Diane Menzer Fax | • The 2000 Appointment<br><br>• The August 8, 2000, Letter transmitting the 2000 Appointment<br><br>• The April 10, 2001, Letter referring to the 2000 Appointment<br><br>• The August 1, 2001, Gary Ruffel Fax referring to the 2000 Appointment<br><br>• The January 2022 Cadbury Schweppes email<br><br>• The January 2022 Cadbury Schweppes draft contract |

### 2. *Pre-Suit—Benesch Knew the Parties' Conduct Supported the Existence of the 2000 Appointment.*

114. ICEE was accepting half the royalty rate it was due under the prior agreement. (Doc. 27-2, PageID # 394). Indeed, it was reasonable for Benesch to believe that ICEE (and its predecessor) would not accept half the royalties, absent a written agreement modifying the 1996 Agreement signed by both parties. (Gurbach Dep. 109:13–24, Doc. 255-1, PageID # 10332; Avsec Dep. 54:7–12, Doc. 256-1, PageID # 10782).

115. Indeed, the prior agreement could only be modified through a written agreement: "This appointment expresses fully the understanding and all prior understandings are hereby canceled, and no further changes in the terms of this appointment shall except when and if **reduced to writing and signed by both Manufacturer and SLUSH PUPPIE, by legally authorized officials**." (Doc. 27-2, PageID # 397) (emphasis added).

116. The Court concludes that it was reasonable for Benesch to believe the parties' conduct—using 2.5 percent—was explained by the 2000 Appointment. It was the only written

document signed by the parties that could have legally modified the five percent royalty obligation under the 1996 Agreement, as that Agreement could only be modified by a signed writing. (*Id.*).

117.     Benesch's pre-suit conduct was reasonable. It only had one contract, signed by both parties, which would explain accepting the 2.5 percent royalty rate. And the parties' conduct—as Benesch reasonably understood it pre-suit—was consistent with the terms of this contract. In fact, ICEE could not produce a contract—signed by both parties—which would explain the conduct.

### 3.     *Pre-suit—Benesch Had Financial Records Tying the Reduction of the Royalty Rate to the Timeframe in Which the 2000 Appointment was Executed.*

118.     Benesch knew the rate was being paid at 2.5 percent, and the 5 percent rate could only be modified through a written document signed by both parties. (*See id.*). No party has produced a document signed by both parties, which reduced the 5 percent rate to 2.5 percent, other than the 2000 Appointment—pre-suit, or through today. But to Benesch's credit, it sought further information tying the royalty rate reduction to the timeframe in which the 2000 Appointment was executed.

119.     To be sure, despite having multiple documents, plus the 2000 Appointment, Mr. Avsec sought proof that the reduction in the royalty rate to 2.5 percent was a result of the 2000 Appointment executed in August of 2000. (Doc. 276-3, PageID # 13067).

120.     Mr. Avsec asked the logical question: did the royalty rate change from 5 percent to 2.5 percent *at the time the 2000 Appointment* was executed? (*Id.*). Obviously, the Court agrees, if the payment changed from 5 percent to 2.5 percent at the time the 2000 Appointment appeared to be executed, it would lend support to the notion that the 2000 Appointment was authentic.

121.     There was no other document—dated in the summer of 2000—that would have explained the change in the royalty rate at that time. (*See* Avsec Dep. 211:20–212:6, Doc. 256-1, PageID # 10943–44). And, in fact, given that the 1996 Agreement had an integration clause—

requiring any changes to be made in writing—the Court concludes it was reasonable for Mr. Avsec and Benesch to believe a change in the royalty rate in the summer of 2000—to the royalty rate contained in the 2000 Appointment—was strong evidence to support the 2000 Appointment was authentic.

122. Mr. Avsec directly asked if ICEE had accepted the 2.5 percent royalty rate since the 2000 Appointment. In discussing the allegations that Benesch planned to assert in the Complaint, Mr. Avsec asked RPC and Mark Peters:

> **Is it accurate to allege that, after ICEE's acquisition of the SLUSH PUPPIE trademarks and business that SPL continued to pay royalties under the August 8, 2000 Agreement to ICEE (in the amount of 2.5% of the total cost of the Syrups charged and sold to distributors after appropriate discounts as permitted)??** (We are aware of course of the e-mail communications establishing that royalties have been paid under the August 8, 2000 Agreement, but **were these royalties consistently paid ever since ICEE acquired the SLUSH PUPPIE trademarks and business) and they continued to be paid to this day)?**

(Doc. 276-3, PageID # 13067) (emphasis added).

123. RPC replied that "As is noted above, the evidence of payment that we have seen dates back to 2014. Mark Peters may be able to confirm whether SPL has consistently paid royalties under the 2000 Agreement following ICEE's acquisition of the business." (Gurbach Dep. 133:21–134:5, Doc. 255-1, PageID # 10356–57). RPC then invited Mark Peters's further input where they had additional questions. (*Id.*).

124. Mark Peters responded that the royalty rate was, in fact, 2.5 percent *since the time the 2000 Appointment* was signed in the Summer of 2000. (Doc. 276-3, PageID # 13065–66).

125.     Moreover, Mark Peters sent documents that seemed to support this. One document showed the drop in royalties—by about half—consistent with the 2000 Appointment's execution:[6]

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | Year | | Prod Comm | Listed as | Payment For Sales Year |
| 2 | Of Sales | Tournover | as per accounts | | |
| 3 | | | | | |
| 4 | 1998 | 6,4m | 177,667 | Other external Charges | 1997 |
| 5 | 1999 | 6.9m | 187,154 | Other external Charges | 1998 |
| 6 | 2000 | 6.8m | 160,080 | Other Cost of sales 1 | 1999 |
| 7 | 2001 | 7.0m | 83,800 | Other external Charges | 2000 |
| 8 | 2002 | 6.1m | 65,235 | Manufacturing Commission | 2001 |

(Doc. 276-2, PageID # 13029).

126.     The Court finds, pre-suit, Benesch both inquired and had evidence that the royalty rate dropped from 5 percent to 2.5 percent at the time the 2000 Appointment was executed. And there was no other written contract, signed by both parties, from 2000 to explain this other than the 2000 Appointment.

### 4.     *Pre-suit—Benesch Had Evidence of Further Course of Conduct That Supported the Existence of the 2000 Appointment.*

127.     Under the prior contracts (1996 and 1999) SPL only had the ability to sell in the United Kingdom. The 2000 Appointment purports to provide that opportunity for trademark rights throughout Europe. (Doc. 27-4, PageID # 411).

128.     But Benesch had, pre-suit, documents which suggested ICEE was referring European business as a matter of course—to SPL. (Gurbach Dep. 109:25–110:20, Doc. 255-1, PageID # 10332–33). Examples include:

---

[6] It is important to note that the agreements were paid in arrears, so the royalty due each year is for the prior year period.  (Gurbach Dep. 356:18-357:1, Doc. 255-1, PageID # 10579-80).

**From:** "Every, Steve" <severy@icee.com>
**To:** Mark Peters <mark@slushpuppie.co.uk>
**Subject:** FW: Spain
**Date:** 2010-06-24 19:00:06 +0000
**Importance:** Normal
**Inline-Images:** image001.jpg; image002.jpg

---

HI Mark,

If Taco Bell did proceed with a test in Madrid, would the company selling Slush in Spain be interested to engage in this type of service??

(Doc. 282-9, PageID # 13695).

**From:** "Every, Steve" <severy@icee.com>
**To:** Mark Peters <mark@slushpuppie.co.uk>
**Subject:** FW: distributors
**Date:** 2010-01-13 18:15:07 +0000
**Importance:** Normal

---

Hi Mark,

IS this a lead you would want to follow up??

Please advise.

Best regards,

Steve Every - Director International
The ICEE Company - 4701E Airport Drive, Ontario CA 91761
Ph: +1 909.390.4233 Fax: +1 909.218.3903

-----Original Message-----
From: Aldrete, Justin On Behalf Of ContactSlush
Sent: Wednesday, January 13, 2010 9:05 AM
To: Every, Steve
Subject: FW: distributors

NORWAY...

(Doc. 282-7, PageID # 13690).

129.     So, in addition to six independent documents evidencing the existence of the 2000

Appointment, financial records, and a course of conduct with respect to payment, Benesch also

had evidence that SPL was performing the function throughout Europe that the 2000 Appointment contemplated. (Doc. 282-7; Doc. 282-9). And there was no other agreement, signed by both parties, that would explain this other than the 2000 Appointment.

### 5. *Pre-suit—Benesch Had an Explanation as to why Company Officials Did Not Know of the 2000 Appointment from 2010 to 2018.*

130. Pre-suit, Mark Peters explained to Benesch that he had found the 2000 Appointment in his father's paperwork. (Gurbach Dep. 155:17–22, Doc. 255-1, PageID # 10378). This is consistent with what Benesch was told: that Mark Peters spent days looking for hard documents. (*See* L. Peters Dep. 42:10–48:19, Doc. 99, PageID # 2787-88; Somorin Dep. 28:13–19, 29:7, Doc. 100, PageID # 2821).

131. And the Court recognizes Benesch reasonably evaluated this explanation from Mark Peters in light of (a) the file being referred from RPC who had a long history with SPL and Ralph and Mark Peters; (b) the six documents supporting the existence of the 2000 Appointment; (c) the course of conduct of the 2.5 percent rate; (d) the lack of any other signed agreement explaining the 2.5 percent royalty rate; and (e) the evidence provided to Mr. Avsec showing that the royalty rate dropped in half right about when the 2000 Appointment would have been signed. The Court finds that Benesch's acceptance of Mark Peters's explanation—that he found the document and did not know about it—is reasonable in light of the circumstances and is not evaluated in hindsight.

132. As such, the Court rejects ICEE's continual assertion that Benesch "knew" Mark Peters had lied about the 2000 Appointment, pre-suit. It was reasonable for Benesch to believe Mark Peters in light of the information they had.

### H. ICEE's Argument about "Red Flags" Lacks Merit.

133. ICEE has continued to argue that there are all these "red flags" [plural] that Benesch ignored. (*See* Doc. 276-1, PageID # 12973–78). **But, in truth, there was only one "red flag."** It was just the same issue expressed in several documents: no one seemed to know of the existence of the 2000 Appointment in the 2010s. Indeed, the documents ICEE continued to refer to as red flags all deal with this issue: why didn't ICEE's manager know of the 2000 Appointment in the 2010s?

134. **So, there was only one red flag**: Mark Peters and other individuals operating the business in the 2010s did not know of the existence of the 2000 Appointment. ICEE's attempt to portray this as a "bunch" of red flags is not accurate. There was simply one red flag. (*Id.*, PageID # 12973).

### I. Benesch Had Sufficient Evidence Which Explained this Red Flag Prior to Filing Suit.

135. ICEE demands that the matter be judged in hindsight. It cannot be.

136. Mr. Peters simply told Benesch that he had found the 2000 Appointment in his father's belongings and had not known of its existence. (Gurbach Dep. 155:17-22, Doc. 255-1, PageID # 10378). This explained why no one in the 2010s would have been referring to the 2000 Appointment. It was simply in Ralph Peters's files, a document he and Will Radcliff signed shortly before the sale of the company to Cadbury Schweppes. *Id.*

137. Given the fact that SPL was a small, closely held business, the idea that it would simply be run in a certain way, paying a 2.5 percent royalty, without anybody looking at a contract from 2000 on a regular basis is not unreasonable to believe.

138.     Without the benefit of hindsight, the discovery of the 2000 Appointment made complete sense. Benesch had the following contemporaneous documents, which seem to comport with the existence of the 2000 Appointment:

- The August 8, 2000, Letter;

- The April 1, 2001 Letter;

- The August 1, 2001, Gary Ruffell Fax; and

- The January 2022 Cadbury Schweppes email and draft contract.

(Doc. 282-3, Doc. 282-2, Doc. 283-4, Doc. 282-5).

139.     Further, Benesch had a course of dealing that matched up with the 2000 Appointment. (Doc. 276-3, PageID # 13065–66). And financial records seemed to suggest the drop in the 2.5 percent royalty occurred when the 2000 Appointment was executed. (*See* Doc. 276-2, PageID # 13029).

140.     As such, the Court concludes that Benesch's acceptance of Mark Peters's explanation—that he did not know of the 2000 Appointment and had found it in Ralph Peters's papers—simply made sense. Benesch did not accept this in a vacuum—they had multiple documents and a course of conduct that supported the existence of the document. And it did not have the benefit of hindsight at the time they accepted Mark Peters's explanation. As such, Benesch's conduct was reasonable, pre-suit, in accepting the explanation from Mark Peters.

141.     As such, the Court rejects ICEE's contention that "Benesch knew Mark Peters lied" pre-suit.

**J.     February 12, 2019:   PRE-SUIT—Benesch Had Sufficient Information to Justify Filing the Suit.**

142.     The Court concludes that Benesch, pre-suit, had sufficient information—previously discussed in detail—which would allow it, in good faith, to file the lawsuit:

a.    **RPC agreed:** RPC, having represented SPL for decades, had three lawyers ("us") approve the filing of the Complaint, indicating that their view of the evidence supported its filing. (Doc. 293-1, PageID # 14131).

b.    **The 2000 Appointment itself:** Benesch had the 2000 Appointment, which appeared on its face to be a valid agreement. And it explained the parties' course of conduct since that time.

c.    **The transmittal letter:** Benesch had a transmittal letter, signed by Will Radcliff, transmitting the 2000 Appointment.

d.    **The follow-up letter:** There was a follow-up letter, signed by Will Radcliff, referencing the 2000 Appointment.

e.    **The fax cover sheet:** Benesch had a fax cover sheet, between the SPL and Dr. Pepper/Seven Up, specifically referencing the 2000 Appointment.

f.    **The subsequent purchaser evidence:** Cadbury Schweppes (ICEE's predecessor) had an email and a draft contract which specifically referenced the 2000 Appointment.

g.    **The course of conduct:** Financial evidence seemed to indicate that the parties had been operating under the 2.5 percent royalty rate since the Summer of 2000, with nothing other than the 2000 Appointment to explain it.

h.    **The lack of another signed Agreement:** The 1996 Agreement required a written document signed by all the parties to modify the 5 percent rate. There was no other document, signed by all the parties, which would explain why ICEE's predecessor would have been accepting a 2.5 percent royalty (half of what the 1996 Agreement called for) other than the 2000 Appointment.

i.      **An explanation for the so-called "red flag":**  Mark Peters explained that he found the 2000 Appointment—which seemed to explain the parties' conduct in the other documents Benesch had—in his father's papers. This explained why, 10 to 15 years later, individuals who were not signatories to the 2000 Appointment did not know about it. Without the benefit of hindsight, Benesch and RPC accepted this explanation in light of the other evidence they had above and RPC's long relationship with SPL.

j.      **ICEE's Acknowledgement that Use of Other Documents as Contemporaneous Evidence Made Sense:** Benesch relied upon the 2000 Appointment, contemporaneous written documents, evidence of when the 2.5 percent royalty rate started, and other evidence of the parties' conduct, which was consistent with the 2000 Appointment. ICEE's counsel expressly agreed that using contemporaneous documents to authenticate the 2000 Appointment was valid. (Doc. 73-19, PageID # 1541–42).

143.    Therefore, the Court factually concludes that Benesch had sufficient evidence to file, in good faith, the Complaint and Amended Complaint based upon the 2000 Appointment.

K.      **After Filing the Complaint, Benesch Continues to Develop a Strong Case for the Authenticity of the 2000 Appointment.**

1.      *By February 2020, Benesch Had a Set of Six Documents that Were so Intertwined that they Seemed to Conclusively Support the Existence of the 2000 Appointment.*

144.    But, Benesch had a collection of six **interrelated** documents that would have led a reasonable lawyer to conclusively believe the 2000 Appointment was authentic.

145.    **In summary:** The significance of these documents is three-fold. First, most reference the existence of the 2000 Appointment. (Doc. 282-2; Doc. 282-3; Doc. 282-4; Doc. 282-6; Doc. 282-8). But more importantly, they are so intertwined that it would be hard to imagine—without the benefit of hindsight—that the 2000 Appointment was forged. To be sure, they show:

44

- *August 8, 2000*—Will Radcliff sends a letter to Ralph Peters transmitting the 2000 Appointment.

- *January 30, 2001*—Blevins Franks sends a letter to Gary Ruffell of SPL referencing the 2000 Appointment and suggesting amending the 1996 Agreement to the same 2.5 percent royalty for tax purposes.

- *February 7, 2001*—Diane Menzer sends a fax to Kim Yee, outlining the need to amend the 1996 Agreement to a 2.5 percent royalty rate, in line with Blevins Franks' suggestions a week earlier.

- *March 22, 2001*—Blevins Franks sends a letter to Inland Revenue referencing the 2000 Appointment and directly quoting from it as well.

- *April 10, 2001*—Will Radcliff sends a letter to Ralph Peters referencing both the 2000 Appointment and the amended royalty rate for the 1996 Agreement.

- *August 1, 2001*—Gary Ruffell sends a fax to Greg Salcido of Dr. Pepper/Seven Up referencing the 2000 Appointment and requesting support to show that the 2.5 percent royalty rate applied to the period before the 2000 Appointment.

146. Moreover, the sole document ICEE has relied upon to say the 2000 Appointment was not authentic (before its handwriting expert's report) is explained by this transaction. While the February 7, 2001, fax from Diane Menzer does not explicitly reference the 2000 Appointment, when read in concert with the other documents, it supports the existence of a contract and the explanation for amending the royalty rate in the 1996 Agreement.

147. **The Details:** Benesch received a January 30, 2001, letter from Blevins Franks to Gary Ruffell. (Doc. 282-8). The January 30th letter explicitly refers to a "Trademark Agreement dated 8 August 2000," and describes the 2.5 percent royalty rate. (*Id.* at PageID # 13692).

148. The accountants raised concerns about how to calculate the royalty for the full 2000 year, given that the 2000 Appointment was only effective starting in August 2000. (*Id.*). For tax purposes, Blevins Franks suggested that SPL amend the 1996 Agreement to apply the 2.5 percent royalty for the full year. (*Id.*).

> We have discussed the amount of royalty and the potential tax implication for the 2000 accounts in some detail. Whilst the Trademark agreement dated 8 August 2000 states that the Royalty is to be calculated at 2.5% and supersedes any other agreements. It is not clear on how the period of royalty before the trademark agreement came into effect is to be treated for unpaid Royaltys. For clarity I would recommend that a simple amendment to the 5 February 1996 agreement is made to state that the royalty is calculated at 2.5%. This will allow you to compute the amount of Royalty for 2000 at a consistent 2.5%. I believe this will help alleviate the potential for more issues to be raised by the Revenue.

149.     Benesch also received a copy of the letter from Blevins Franks to the Inland Revenue, the UK Tax Authority, dated March 22, 2001.  (Doc. 282-6).  The letter also references the 2000 Appointment as the "8 August 2000 Renewal Contract," which aligns with the advice in its previous letter to SPL.  (*Id.* at PageID # 13687).

150.     Most notably, this letter directly quotes from the 2000 Appointment, and even contains the odd "Ohio County, USA" language.  (*Id.*).

> (24) This Agreement and all of its terms and conditions shall be governed by and interpreted under the laws of the State of Ohio and that the exclusive venue for any litigation arising from or in any way connected with this Agreement shall lie exclusively in Ohio County, USA.

151.     Blevins Franks directly cites the venue and choice of law provision in the 2000 Appointment.  (Doc. 27-4, PageID # 414).

> 24)     This Agreement and all of its terms and conditions shall be governed by and interpreted under the laws of the State of Ohio and that the exclusive venue for any litigation arising from or in any way connected with this Agreement shall lie exclusively in Ohio County, USA.

152.     In fact, these two letters align with the contents of the other evidence that Benesch had in support of the 2000 Appointment pre-suit.  (*See* Doc. 282-2; Doc. 282-3; Doc. 282-4).  But even more, the Blevins Franks letters actually show that the February 7, 2001, fax—ICEE's key document—actually supports the existence of the 2000 Appointment even though it does not explicitly refer to it.

153.	The February 7, 2001, fax sheet from Diane Menzer aligns with what Blevins Franks had asked SPL to pursue to reconcile their taxes. (*See* Doc. 73-19, PageID # 1545).

154.	Specifically, the fax sheet discusses amending the manufacturing license—the 1996 Agreement—to reflect a 2.5 percent royalty rate instead of the existing 5 percent rate. (*Id.*).

*Following is the UK manufacturing license that needs to be adjusted to reflect 2½% commission vs. 5%. (3A.)*

155.	This fax was sent eight days after Blevins Franks suggested that SPL amend the 1996 Agreement. (Doc. 282-8, PageID # 13692; Doc. 73-19, PageID # 1545).

**30th January 2001**
**KB/DSF**

**Dear Gary**                                              Date: *2/7/01*

**Royalty Payments to USA**

156.	Additionally, Will Radcliff's April 10, 2001, letter also aligns with the Blevins Franks documents. Will Radcliff's letter discusses reducing the manufacturing royalty under the 1996 Agreement to 2.5 percent from July to August 7, 2000, the month before the 2000 Appointment would be effective. (Doc. 282-2, PageID # 13676).

157.	And the Gary Ruffell fax is also consistent. There, Mr. Ruffell was asking Dr. Pepper/Seven Up, Slush Puppie Corporation's purchaser, for documentation that would support an agreement to apply the 2.5 percent royalty rate to the months before August 2000 for their tax auditors. (Doc. 282-4, PageID # 13680). Mr. Ruffell even directly refers to Inland Revenue, the entity that Blevins Franks suggested would need some sort of documentary support. (*Id.*).

> Can you please supply us with an invoice or a letter that shows the period January to September 2000, covered before the August 2000 agreement, to reflect the agreed royalty rate@2.5% and net amount due so that we have something on file for our auditors and any possible question from the Inland Revenue regarding our tax computation. Thanks for your help

158. This collection of documents explains the one document ICEE's counsel produced as to the facts purportedly explaining the difference in royalty rates. (*See* Doc. 73-19; PageID # 1541–42). Indeed, that document ICEE relied upon actually fits in with the quest to ensure a tax exemption continued, as referenced in these six documents. (*Id.* at PageID # 1545) (it sought amendment of the prior 1996 Agreement as requested by Blevins Franks). Simply, the interrelationship in these six documents would reasonably support Benesch's belief that the 2000 Appointment was authentic.

159. These documents are crucial. The way they are interconnected, describing a tax strategy executed over a year period, is crucial. This explains much—and is supported by the course of conduct where payments dropped in half in 2000. It was completely reasonable for Benesch to believe these documents conclusively prove the existence of the 2000 Appointment. Especially in light of the absence of any other document, signed by both parties, establishing a reason to drop the royalty rate to 2.5 percent.

## 2. *Ralph Peters—the Only Living Party Signatory to the 2000 Appointment—Testifies to its Authenticity.*

160. In early 2020, Ralph Peters was confined to his home due to his physical condition and was reliant on 24/7 care to meet his needs. (Doc. 33, PageID # 659). SPL did not identify Ralph Peters as a witness in its disclosures due to his fragile medical condition and physical inability to testify. (*See* Doc. 30-8, PageID # 613).

161. But, because he was "the only living party signatory to the 2000 Appointment," ICEE moved to compel his deposition. (*See generally* Doc. 30). This Court granted the Motion,

ordering the deposition to occur in Ralph Peters's home and permitted his aides and certain family members to be present should he need assistance or attention. (Doc. 44, PageID # 707). On February 24, 2020, Ralph Peters was deposed. (*See generally* Doc. 84).

162.    Ralph Peters's testimony confirmed the existence of the 2000 Appointment.

163.    First, Ralph Peters testified to the reduction of the royalty rate, discussing his conversations with Will Radcliff, the owner of Slush Puppie Corporation. (R. Peters Dep. 43:2–7, PageID # 2148).

> **A.     Well, we were paying a royalty of 5 percent, but when we first . . . he said, "well, I am going to help you because I am out, I cannot help you after this, but at least I am going to help you by reducing the royalty you pay." That is a lot of help.**

164.    Additionally, he testified to the amount of the reduction: from 5 percent to 2.5 percent. (*Id.* at 43:8–16, PageID # 2148).

165.    And, **without prompting or being asked a direct question**, Ralph Peters stated that the 2000 Appointment contained a term that stated that the agreement was "in perpetuity." (*Id.* at 44:16–45:7, PageID # 2149–50) (emphasis added):

> Q.     Can you follow along, it says:
>
> "NOW, THEREFORE, SPC hereby GRANTS to SPL the exclusive use of the SLUSH PUPPIE trademark(s), subject to and conditioned upon SPL compliance with the following terms and conditions."
>
> Did I read that correctly?
>
> A:     Okay.
>
> Q.     Okay, do you know if this agreement established the exclusive use for your company?
>
> MR. WOLFSOHN:    Objection, leading.
>
> A:     **I believe so, but somewhere it should say in perpetuity**. That is what Will agreed.
>
> MS. EMANUEL:      Okay.

THE WITNESS: **There should be a document which says, "in perpetuity."**

166. The Court finds this is significant. There is no other document in the record that used the terms "in perpetuity," other than the 2000 Appointment. Ralph Peters—without prompting—knew the terms of the deal even before he fully looked at the Agreement. (*Id.*).

167. While ICEE asked Ralph Peters about his signature on *every* other document, it did not ask him about the 2000 Appointment. (*See id.* at 11:19–12:25, 23:16–24:22, PageID # 2116–17, 2128–29).

168. It was Ms. Emanuel who asked Ralph Peters about the signatures on the 2000 Appointment, which he confirmed were his and Stefan Loos's. (*Id.* at 40:9–20, PageID # 2145).

169. Further, in his testimony, Ralph Peters was outraged at the suggestion that the 2000 Appointment was forged. (*Id.* at 54:8–21, PageID # 2159):

THE WITNESS: I think that to call this a forgery is a joke. How can you call it a forgery? I mean . . . if it is a forgery then I must have forged Stephan's signature, and Will's signature and I presume, I do not know who that is, but I must have forged all those.

And I must say that if I was in business for myself from when I was 17 years old here when I was what, god knows what, I was in business for 50, 60 years, nobody has ever accused me of forging anything. I find that quite annoying to say it is a forgery. I think that is outrageous to call me a forger. I have never done anything dishonest.

170. So Benesch—through questioning—had Ralph Peters confirm the existence of the 2000 Appointment. ICEE's counsel did nothing in cross-examination to discredit this.

### 3. *Stefan Loos Confirms the Existence of the 2000 Appointment in Discussions with Benesch.*

171. In February 2020, Benesch spoke with Stefan Loos, who is identified as a witness to the 2000 Appointment.

172.     Mr. Gurbach, Ms. Emanuel, and Ms. Turk had all spoken with Mr. Loos. (Gurbach Dep. 185:1–5, Doc. 255-1, PageID # 10408; Emanuel Dep. 167:16-23, Doc. 275-1, PageID # 12881; Turk Dep. Vol. II 340:21–343:13, Doc. 274, PageID # 12332–36).

173.     Ms. Emanuel recalled that Mr. Loos was going to authenticate the 2000 Appointment. (*See* Emanuel Dep. 167:16–23, Doc. 275-1, PageID # 12881).

174.     And Ms. Turk kept contemporaneous notes during her February 11, 2020, call with Mr. Loos, which reflect that Mr. Loos was aware of the 2000 Appointment, but was not very involved in the negotiations. (Doc. 274-10, PageID #12584–85):



"2000 Agreement
    - aware of the negotiations
        - semi part of it (negotiations)
        - went to conference in State contracts discussed there"

"Aware of 2000 A but did not negotiate it. Part of some conversations about it"

175.     And in the notes Ms. Turk documented something crucial:

**"2000 A was a mutual thing. Feels Will aware that he might be selling SP Cinci and he was trying to make sure Ralph was safe."**

(Doc. 274-10, PageID # 12585). (Emphasis added).

176. The significance of this cannot be understated. From Benesch's perspective, ***Mr. Loos remembered it the exact same way as Ralph Peters***—that Will Radcliff was selling the business and wanted to take care of Ralph Peters by reducing the royalty rate. *Id.* So, in February 2020, Benesch had two witnesses, whose signatures were on the Agreement, who independently recall Will Radcliff's motivations and the drop in the royalty rate, exactly the same way.

177. Additionally, **Mr. Loos verified Ralph Peters's signature** and was 99 percent certain that it was his own signature on the 2000 Appointment. (*Id.*).



178. ICEE's counsel has conceded the significance of this. As Mr. Wolfsohn put it, having Mr. Loos confirm the existence of the deal and his signature "ends all dispute":

> You know, if I had a witness—there's a contract that it's disputed about whether it's authentic. And if I have a guy who said I was there, we looked at the document, there were two copies, I'm with Ralph in my house in Majorca, and I signed it, and I remember Ralph signing it, and yes, Will Radcliff's and BJ Cork's signatures were on it, that ends all dispute. Right?

(Tr. of Apr. 3, 2025 Status Conf. 19:8–14, Doc. 300, PageID # 14565)

179. Mr. Loos was deposed on August 25, 2020. The evidence indicates that Ms. Turk expected him to testify consistently with the phone call. (Doc. 274-11, PageID # 12587–88). In fact, her deposition notes reflect her intent to ask questions consistent with her understanding of those notes:

6. Appointment of Trade Mark License between SPL and SPC dated 8 August 2000
   - are you familiar with this agreement?
   - who negotiated this agreement?
   – what do you know about negotiations? (aware of the negotiations, semi part of it. Went to a conference in the States and the contract was discussed there)
   - Discuss terms with Ralph / SPC? Discuss terms with anyone else? (remember they always wanted to return to the in perpetuity agreement that had been

done in the past. In the early 80's or late 70's there were in perpetuity contracts and verbal contracts between Ralph and Will. Always a gentleman's agreement)
   - Is that Ralph Peters' signature (yes)
   - Were you with Ralph Peters when he executed it?
   - where were you
   - Is that your signature as a witness (yes)

180. Mr. Loos was deposed on August 24, 2020. And while he did not testify as Benesch expected, there is no question that up until Mr. Loos's deposition—on August 24, 2020—Benesch fully expected him to authenticate and support the existence of the 2000 Appointment. (*Id.*) Ms. Turk's contemporaneous deposition preparation documents, combined with her notes of the call with Mr. Loos, "end all dispute" in this matter.

### L.     Benesch Wanted to Produce All Discoverable Documents.

181. At various points, the Court ordered and allowed for the production of attorney/client and work-product privileged documents. There is no evidence that the Benesch lawyers, when these were written, ever expected that they would be utilized in a sanctions context. Therefore, these documents obviously show an insight into Benesch's intentions. And that insight is that Benesch wished to produce all discoverable documents:

**From:** House, Ronald <rhouse@Beneschlaw.com>
**Sent:** Saturday, February 08, 2020 10:30 AM EST
**To:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; Gurbach, Matthew <mgurbach@Beneschlaw.com>; Emanuel, Elizabeth <EEmanuel@beneschlaw.com>
**CC:** McCann, Donald S. <DMcCann@beneschlaw.com>; Avsec, Mark <mavsec@Beneschlaw.com>
**Subject:** FW: FW: MATT, HERE ARE THE CORE DOCUMENTS, AND SEE BELOW FW: Slush Puppie - privileged & confidential
**Attachment(s):** "image001.png","Attachments.zip"

I am looking through old e-mails to see where the hard copies of Slush Puppie docs came from. Here is one with a zip file attached. I will forward others if I can find any.

Mark, can you search your old e-mails from RPC attaching documents to ensure that we are able to assemble all docs we have received. We need to make sure that all docs are produced to ICEE if requested. Thanks.

(Doc. 282-14, PageID # 13711).

182. Mr. House was clear—he wanted everything produced to ICEE that it was entitled to. (*Id.*) And there are no documents that contradict that direction from then-lead counsel.

**M. Benesch Took Reasonable Measures in Late February and Early March of 2020, When It Discovered the Issue with the Wendsday Email.**

183. In early winter 2020, Ms. Turk got involved in the litigation to assist with the briefing on Ralph Peters's deposition and to assist with document production.

184. On February 8, 2020, Mr. House sent Ms. Turk and Ms. Emanuel multiple emails forwarding documents sent by RPC early in the case to produce to ICEE.

185. Mr. House advises that he is looking through his old emails to see where hard copies of the documents came from and that all documents responsive to ICEE's request would be produced. (Doc. 282-14, PageID # 13711). And he directs others to do this as well:

**From:** House, Ronald <rhouse@Beneschlaw.com>
**Sent:** Saturday, February 08, 2020 10:30 AM EST
**To:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; Gurbach, Matthew <mgurbach@Beneschlaw.com>; Emanuel, Elizabeth <EEmanuel@beneschlaw.com>
**CC:** McCann, Donald S. <DMcCann@beneschlaw.com>; Avsec, Mark <mavsec@Beneschlaw.com>
**Subject:** FW: FW: MATT, HERE ARE THE CORE DOCUMENTS, AND SEE BELOW FW: Slush Puppie - privileged & confidential
**Attachment(s):** "image001.png","Attachments.zip"

I am looking through old e-mails to see where the hard copies of Slush Puppie docs came from. Here is one with a zip file attached. I will forward others if I can find any.

Mark, can you search your old e-mails from RPC attaching documents to ensure that we are able to assemble all docs we have received. We need to make sure that all docs are produced to ICEE if requested. Thanks.

(*Id.*)

186. In the documents that Mr. House forwarded to Ms. Turk and the other lawyers, Mr. House sent an email that contained a scanned copy of the Wendsday Email. (Doc. 274-12, PageID # 12590–95).

187. Mr. House states that the attachment—the Wendsday Email—is "discoverable," again showing a desire to produce everything. (*Id.* at PageID # 12590).

**From:** House, Ronald <rhouse@Beneschlaw.com>
**Sent:** Saturday, February 08, 2020 10:35 AM EST
**To:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; Gurbach, Matthew <mgurbach@Beneschlaw.com>; Emanuel, Elizabeth <EEmanuel@beneschlaw.com>
**CC:** McCann, Donald S. <DMcCann@beneschlaw.com>
**Subject:** FW: Summary of Slush Puppies from Avsec,
**Attachment(s):** "17NCOLOR.pdf"

Attachment is discoverable and below is another good summary for Jennifer and Elizabeth

188.    As Mr. House is sending these emails, Mr. Gurbach responds that he is sending

them to Don McCann, Benesch's litigation ESI support.  (Doc. 282-10, PageID # 13698). Mr.

Gurbach also stated that many of these emails with attachments were saved in iManage, so Mr.

McCann should look there for documents as well. (*Id.*).

189.    On February 10, 2020, Mr. McCann responded and informed Benesch that he had

added the documents and attachments to the Everlaw database and shared them with the attorneys

for their review. (Doc. 276-19, PageID # 13465).

190.    After this effort to collect all versions of hard copies of SPL's documents, Benesch

believed that all documents they had received were uploaded into Everlaw. (Turk Dep. Vol. II

364:17–21, Doc. 274, PageID # 12356).

191.    But the only version of the Wendsday Email that is uploaded into Everlaw is the

scan of a hard copy that one of the lawyers used. (Doc. 276-10, PageID # 13290).

192.    On February 19, 2020, Ms. Turk produced documents responsive to ICEE's request

for production, including the Wendsday Email. (*See* Turk Dep. Vol. I 97:7-25, Doc. 273, PageID

# 11789).

193.    On February 24, 2020, Ms. Turk was reviewing documents to get up to speed on

the case. (Turk Dep. Vol. II 351:14–23, Doc. 274, PageID # 12343). Ms. Turk's process when she

is brought onto a case is to lay out the documents chronologically and review them in that order.

(*Id.*). As Ms. Turk was reviewing those emails, she caught an inconsistency in the emails that had

been produced.  (*Id.*). One of those emails was a thread between Lindsay Kirby and Jerry Bird that

appeared to be an alternate response to the thread contained in the Wendsday Email.  (*Id.*).

194. Ironically, this is the exact way that ICEE says Benesch should have caught this problem with the Wendsday Email—but ICEE apparently never did, despite also having both documents. (*See* Doc. 98, PageID # 2513–14).

195. Unable to reconcile the document that ICEE had produced and the Wendsday Email, Ms. Turk brought the copies of those documents to Mr. House's office. (*Id.* at 352:2–15, PageID # 12344).

196. Mr. House reviewed the two documents and then noticed the misspelling of the word "Wendsday." (*Id.*). After discovering the issue, Benesch took multiple steps to address the document.

197. First, Benesch reasonably consulted with its in-house ethics counsel. (*Id.* at 352:16–18, PageID # 12344).

198. Next, Benesch wanted to give SPL a chance to explain where the Wendsday Email came from. (Gurbach Dep. 370:3-6, Doc. 255-1, PageID # 10593). On February 25, 2020, Mr. House emailed Mark Peters to ask him about the Wendsday Email and asked him to provide the native copy. (Doc. 95-4, PageID #2474).

**From:** "House, Ronald" <rhouse@Beneschlaw.com>

**To:** Mark Peters <mark@slushpuppie.co.uk>

**Cc:** "Gurbach, Matthew" <mgurbach@Beneschlaw.com>, "Avsec, Mark"
<mavsec@Beneschlaw.com>, "Turk, Jennifer M." <JTURK@Beneschlaw.com>,
"Emanuel, Elizabeth" <EEmanuel@beneschlaw.com>

**Subject:** SPL - ICEE

**Date:** 2020-02-25 17:02:44 +0000

**Importance:** Normal

**Attachments:** Nov_12,_2008_e-mail.PDF

---

Mark,

As we spoke, here is the attached e-mail string for which we need more information. In preparing for your deposition we reviewed the attached which we received from RPC early in the case. It is an e-mail string between SPL's Lindsay Kirby and ICEE's Jerry Bird. We need to know whether the attached e-mail string can be retrieved in native format by your IT people and where the string came from. The word "Wednesday" is misspelled as "Wendsday" in the date of the top e-mail. An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition. Thanks. Ron

199.     Mr. House noted that the "word 'Wednesday' is misspelled as 'Wendsday' in the date of the top email. An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition." (*Id.*).

200.     Mr. House follows up with Mark Peters again the next day to ask where SPL's IT people are on retrieving the email string. (*Id.* at PageID # 2480).

**From:** "House, Ronald" <rhouse@Beneschlaw.com>

**To:** Mark Peters <mark@slushpuppie.co.uk>

**Cc:** "Gurbach, Matthew" <mgurbach@Beneschlaw.com>, "Avsec, Mark"
<mavsec@Beneschlaw.com>, "Turk, Jennifer M." <JTURK@Beneschlaw.com>, "Emanuel,
Elizabeth" <EEmanuel@beneschlaw.com>

**Subject:** RE: SPL - ICEE

**Date:** 2020-02-26 15:37:55 +0000

**Importance:** Normal

---

Mark,

Please advise where your IT people are on retrieving the e-mail string. Thank you. Ron

201.     Having heard nothing further from Mark Peters on the email string, on March 3, 2020, Mr. House follows up with Mark Peters again and asks for the native of the Wendsday Email.

(*Id.* at PageID # 2483).  Mr. House notes the importance of tracking down the native copy of this email, stating that "**This is critical**":

**Finally, with your IT person back please have that person search for the November 12, 2008 e-mail from Lindsay Kirby to Jerry Bird in native format. And, we need to know where the e-mail came from.   This is critical.**

Thanks, Ron

(*Id.*).

202.    Mark Peters responds that he would work on locating the native document, but he **was limited on what he could access as COVID lockdowns** had already begun in the UK.  (*See id.*, PageID # 2481). This is not surprising as SPL responded to Benesch's ESI discovery questionnaire by indicating the legacy email systems from May 2014 and earlier were hosted on-site and servers at the facility. (*See* Doc. 276-30, PageID #13546).

203.    Having not received the native email thread from Mark Peters, Benesch internally investigated the origin of the Wendsday Email and asked Mr. McCann to assist.  (Doc. 276-10, PageID # 13290).

**From:** Emanuel, Elizabeth <EEmanuel@beneschlaw.com>
**Sent:** Tuesday, March 10, 2020 2:29 PM
**To:** McCann, Donald S. <DMcCann@beneschlaw.com>
**Cc:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; House, Ronald <rhouse@Beneschlaw.com>; Gurbach, Matthew <mgurbach@Beneschlaw.com>
**Subject:** Slush Puppie - Document question

Don:

Per our discussion today, we are trying to determine the origin of the attached email bates stamped SP003569-70. It is an e-mail string between our client SPL's Lindsay Kirby and ICEE's Jerry Bird.  We need to know how we received the attached e-mail string and whether it was in native format.  We've asked the client to send us the native format from his IT people but he has not been able to get it to us yet.  The word "Wednesday" is misspelled as "Wendsday" in the date of the top e-mail.  We need to understand the origin of this document and all ways in which this chain was produced from both sides.

Any information you can have will be appreciated. ████████████████████████████████

Thanks,

Elizabeth Emanuel, Esq.
Benesch, Friedlander, Coplan & Aronoff LLP
Direct:  216.363.4559
Mobile:  330.519.2903

204.    Specifically, Ms. Emanuel tells Mr. McCann that they need to know how Benesch received the Wendsday Email and "whether it was in native format."  (*Id.*).

205.    Mr. McCann responded the same day and noted that it did not appear that Benesch had the document in native format anywhere in Everlaw.  (*Id.*).

From: McCann, Donald S. <DMcCann@beneschlaw.com>
Sent: Tuesday, March 10, 2020 2:52 PM EDT
To: Emanuel, Elizabeth <EEmanuel@beneschlaw.com>
CC: Turk, Jennifer M. <JTURK@Beneschlaw.com>; House, Ronald <rhouse@Beneschlaw.com>; Gurbach, Matthew <mgurbach@Beneschlaw.com>
Subject: RE: Slush Puppie - Document question
Attachment(s): "FW Summary of Slush Puppies from Avsec,.msg"

Elizabeth,

Thank you.  SP003569 is the produced copy of #1515.1, which was uploaded by me as a PDF file on 2/20/2020.  This PDF was part of a small collection of documents that Ron forwarded as he was looking through his email for any other items that may not have been in the database and also apparently based on conversations with Mark Avsec.  The email sent to me with this specific document attached is attached here for your review.

Since the PDF is named "17NColor.pdf" it is safe to assume the PDF was created at Benesch and it looks to be a scan of a hard copy of the email.  If this was originally in Mark's possession, then the question is whether he only ever had this in hard copy or if he received it electronically/natively at some point.  It does not appear that we have it in native format anywhere in Everlaw.

Don


Donald S. McCann
Litigation Support Manager
Litigation
Direct:  216.363.4552

206.    The very next day, the COVID-19 pandemic takes a turn in Ohio, and Governor DeWine issues lockdown protocols. (Tr. of Feb. 20, 2025 Oral Arg. 78:14–79:6, Doc. 294, PageID # 14306–07).

**N.      February 25, 2020: Benesch Had Overwhelming Evidence that Supported the Existence of the 2000 Appointment Allowing them to Proceed.**

207.    ICEE has continued to argue that, when Benesch learned of the misspelling in the Wendsday Email, it should have been a watershed moment leading to the dismissal of the claim based upon the 2000 Appointment. But this argument ignores that Benesch—on February 25, 2020 (when it discovered the misspelling of Wendsday)—had overwhelming evidence of the existence of the 2000 Appointment. And nothing suggesting it was a forgery. As Ms. Turk testified, Benesch

may have thought something stupid had gone on with the Wendsday Email, but it did not dissuade them from their belief that the 2000 Appointment was authentic. (*See* Turk Dep. Vol. I 172:13-20, Doc. 273, PageID # 11864). Simply put, there was too much evidence supporting the existence of the 2000 Appointment:

a. **Six Interrelated Documents:** Two letters from Will Radcliff, two letters from Blevins Franks, and two faxes—all of which reference the 2000 Appointment and a complex tax strategy orchestrated by Blevins Franks to have the 2000 Appointment be considered a renewal of the 1996 Agreement. (Doc. 282-2; Doc. 282-3; Doc. 282-4; Doc. 282-6; Doc. 282-7; Doc. 73-19, PageID # 1545).

b. **The 2000 Appointment Itself:** This is the only document that would explain the conduct of the parties, accepting 2.5 percent from 2000 on. And it was required, given that the 1996 Agreement mandated a written agreement signed by the parties to modify the 5 percent rate. (Doc. 27-2, PageID # 397). There was no other agreement signed by both parties that could explain this.

c. **The Conduct of the Parties:** Why would Cadbury Schweppes and its successor, ICEE, ever accept a 2.5 percent royalty without a written agreement modifying the 1996 Agreement? But they did accept 2.5 percent. And ICEE could not produce any written agreement that explained it other than the 2000 Appointment.

d. **Ralph Peters's Testimony:** Ralph Peters emphatically indicated the Agreement was not a forgery. He confirmed the testimony. And a review of his deposition shows he seemed to support it, without any prompting. (R. Peters Dep. 44:16–45:7, Doc. 84, PageID # 2148).

e. **Calls with Stefan Loos:** Multiple Benesch lawyers confirmed that Stefan Loos— a witness to the Agreement—confirmed the existence of the deal, and was 99 percent sure it was

his signature on the Agreement. (Doc. 274-10). He also confirmed it was Ralph's signature on the Agreement. Finally, he explained why the Agreement was reached. (*Id.*).

**f.** **The Interplay Between Mr. Loos's and Ralph Peters's Recollections:** One of the most crucial facts is how Ralph Peters and Stefan Loos's recollections were exactly the same. Both recalled that Will Radcliff wanted to take care of Ralph Peters by reducing the royalty rate to 2.5 percent before Will Radcliff sold the company (to Cadbury Schweppes). (*Id.*; R. Peters Dep. 43:2–7, Doc. 84, PageID # 2148). Benesch had two signatories to the Agreement, by February 24, 2020, who both remembered exactly why Will Radcliff wanted to enter into the 2000 Appointment exactly the same way. It was the "end" of the argument, as Mr. Wolfsohn has conceded.

**g.** **An Email and Draft Contract with Cadbury Schweppes that Specifically Referenced the 2000 Appointment.** The email from the successor company, Cadbury Schweppes, and the attached draft agreement clearly referenced the 2000 Appointment.

**h.** **The Financial Documents:** Mr. Avsec had obtained financial documents for the royalty payments that showed them dropping in half after 2000.[7] This was completely consistent with the 2000 Appointment having been executed in 2000. And now, having the Blevins Franks six related documents, it was also consistent with the 1996 Agreement being modified for the first half of 2000 for the tax scheme.

**i.** **ICEE's Key Document is Discredited:** ICEE relied heavily upon the fax from Diane Menzer for its explanation as to why the royalty rate was 2.5 percent. (*See* Doc. 73-19, PageID # 1541–42). But as discussed above, Ms. Menzer's fax was one of six interrelated documents. And it was explained by the Blevins Franks letters: they were reducing the royalty rate

---

[7] These were paid in arrears.

on the 1996 Agreement—for the first half of 2000—to make an argument to the tax authorities that the 2000 Appointment was merely a continuation of another document.

**j.      ICEE's Counsel Conduct at Ralph Peters's Deposition:** As will be discussed below, Mr. Wolfsohn appeared to—at Ralph Peters's deposition—functionally concede the authenticity of the 2000 Appointment.

208.    As such, on February 25, and into early March of 2020, Benesch had a mountain of evidence demonstrating that the 2000 Appointment was authentic. It was completely reasonable for Benesch, as Ms. Turk testified, to still believe the 2000 Appointment was authentic, even with the knowledge that the Wendsday email had potentially been manufactured or altered. To be sure, most of the documents listed above have never been questioned as forgeries as of this date.

**O.      Had Benesch Conducted a Further Investigation Pre-Suit, it Would Have Only Strengthened Its Belief that the 2000 Appointment Was Authentic.**

209.    Pre-suit Benesch had quite a bit of evidence the 2000 Appointment was authentic as discussed above. To deflect, ICEE has repeatedly disingenuously888 questioned Benesch's pre-suit investigation and asked questions such as:

- Why didn't Benesch talk to Ralph Peters?

- Why didn't Benesch talk to Stefan Loos?

- Why didn't Benesch track down someone from ICEE or its predecessors?

(276-1, PageID # 12977).

210.    But, had Benesch done the things ICEE says they should have pre-suit, Benesch's conviction that the 2000 Appointment was authentic would have been strengthened.[8]

---

[8] Moreover, Benesch's continued investigation of the 2000 Appointment after filing the Complaint does not negate its investigation pre-suit. As discussed in Section III(G), supra, Benesch conducted a thorough pre-suit investigation, where it received documents referencing the 2000 Appointment,

211. Post-filing, Benesch continued to investigate the authenticity of the 2000 Appointment and asked every question ICEE says Benesch should have asked. And the answers all supported the existence of the 2000 Appointment.

212. **Ralph Peters:** ICEE claims Benesch should have talked to Ralph Peters pre-suit. Yet, Ralph Peters was deposed in February of 2020. And he strongly supported the existence of the 2000 Appointment. (Doc. 84, PageID # 2145–50).

213. So, the Court finds that, had Benesch spoken to Ralph Peters prior to filing suit, he presumably would have said the same thing he said after filing suit: that the agreement was not a forgery and that was his signature. (*Id.* at 40:1–13, 53:11–54:21, PageID # 2145, 2158–59). And he would have given testimony, as he did here, that he knew the terms of the Agreement (2.5 percent and "in perpetuity") before he even saw the Agreement. (*Id.* at 42:13–43:16, PageID # 2147–48 ("'I am going to help you because I am out . . . but at least I am going to help you by reducing the royalty you pay.'")). And there was no other contract from that time that contained the "in perpetuity" term.

214. **Stefan Loos:** ICEE's counsel repeatedly asks why Benesch did not speak to Stefan Loos, a witness signatory to the Agreement. Yet Benesch spoke to Stefan Loos in February of 2020. Ms. Turk's notes and her deposition outline make clear that Stefan Loos remembered the agreement and was 99 percent sure it was his signature on the agreement. (Doc. 274-10, PageID # 12585).

215. **The Interplay Between Ralph Peters's and Mr. Loos's Recollection:** It is significant that Mr. Loos's recollection in February 2020 was the same as Ralph Peters's

---

financial records, and evidence to support a course of performance consistent with the terms of the contract.

recollection: that Will Radcliff was selling Slush Puppie Corporation and wanted to take care of Ralph Peters. (*Id.*; R. Peters Dep. 43:2–7, Doc. 84, PageID # 2148 ("'I am going to help you because I am out . . . but at least I am going to help you by reducing the royalty you pay.'")).

216. And Ms. Turk obviously believed—up until Mr. Loos's deposition in August of 2020—that he was going to support the authenticity of the Agreement. The deposition preparation outline specifically reflects her belief. She was going to ask questions consistent with what her notes of their conversation said. (Doc. 274-11).

217. So, if Benesch had spoken to Stefan Loos pre-suit, it would have learned that Mr. Loos would effectively confirm the signatures and remember the contract negotiations. They also would have learned that Mr. Loos remembered the reasons for the Agreement exactly the same as Ralph Peters did. Thus, regardless of ICEE's contention that Benesch should have done more pre-suit, it does not matter. This would have only further strengthened Benesch's conviction that the 2000 Appointment was authentic, as it did once Benesch spoke to those two individuals post-filing in February of 2020.

218. **Diane Menzer:** Benesch also spoke with Diane Menzer, who was the personal assistant to Will Radcliff at the time the 2000 Appointment was purportedly signed. She confirmed that she was sure the April 2001 letter mentioning the 2000 Appointment was from Will Radcliff: it was authentic. (Doc. 274-4).

219. **Blevins Franks:** Post-filing suit, Benesch received letters from SPL's accountants—Blevins Franks. These letters—when read together with other documents—also support the existence of the 2000 Appointment.

220. The interrelationship of these documents cannot be ignored:

**a.** **August 8, 2000, Letter:** This letter from Will Radcliff references the 2000 Appointment as of August 8, 2020. The rate drops to 2.5 percent. (282-3, PageID # 13678).

**b.** **January 30, 2001, Blevins Franks Letter:** This references the August 8, 2000, Appointment and notes that, for tax purposes, the prior agreement should be amended so that the royalty for the entire year of 2000 is 2.5 percent. This would make it less likely that the government would believe it was a new agreement, thus maintaining prior, favorable tax treatment. (Doc. 282-8, PageID # 13692)

**c.** **February 7, 2001, Fax:** Seven days later, Diane Menzer of Slush Puppie Corporation sends a fax confirming the 1996 Agreement will be adjusted to the 2.5 percent, in line with what was recommended by Blevins Franks. (Doc. 73-19, PageID # 1545).

**d.** **March 22, 2001, Letter to British Tax Authorities:** Roughly a month after the amendment of the 1996 Agreement—as requested by the Blevins Franks—they wrote the tax authorities. And they argued that the 2000 Appointment was simply a renewal of prior contracts arguing that "Slush Puppie, Ltd. should continue to enjoy exemption from taxation, . . . because, under Ohio law both the 1996 and 2000 contracts are renewals and continuations of the 1979 amended contract with Slush Puppie Corporation." (Doc. 282-6, PageID # 13688).

**e.** **Blevins Franks is Referring to the 2000 Appointment:** The Blevins Franks letter specifically referenced the odd venue provision—"Ohio County USA" in its letter to British tax authorities. (*Id.*, PageID # 13687).

**f.** **April 10, 2001, Letter from Will Radcliff:** A few weeks after Blevins Franks wrote to British tax authorities, Will Radcliff confirms that the 1996 manufacturing agreement has been reduced to 2.5 percent for the period prior to the 2000 Trademark Agreement. (Doc. 282-2).

And this letter references the 2000 Appointment as well. (*Id.*). Just as important, Diane Menzer confirmed that this was written by Will Radcliff. (Doc. 274-4).

g.      **August 1, 2001 Fax Referencing the 2000 Appointment:**  Gary Ruffell, the person at SPL involved in the tax issue with Blevins Franks, seeks an invoice for the 2000 Appointment "before the August 2000 Agreement" to reflect the 2.5 percent royalty reduction rate that Blevins Franks required. (Doc. 282-4). And specifically, Mr. Ruffell indicates that it is to help with "Inland Revenue,"—the British tax authorities. (*Id.*).

221.    The Court finds that even if Benesch needed to conduct additional investigations pre-suit, that investigation would not have yielded anything that would have stopped the suit from being filed. Rather, it simply would have strengthened Benesch's convictions that the 2000 Appointment was authentic. Simply, the investigation after filing suit just strengthened the argument for the existence of the 2000 Appointment.

222.    Therefore, there is no evidence to suggest that Benesch could have done anything, pre-suit, which would have made it doubt the 2000 Appointment was authentic. Benesch's post-filing investigation—most of which ICEE demanded Benesch should have done—just further strengthened the case for the existence of the 2000 Appointment.

P.      **It Was Reasonable for Benesch to Believe, After February of 2020, that ICEE No Longer Thought the 2000 Appointment Was a Forgery.**

223.    As of February 24, 2020—at the end of Ralph Peters's deposition—it was reasonable for Benesch to assume that ICEE was not serious about their claim the 2000 Appointment was forged. The weight of the evidence and ICEE's counsel's conduct at Ralph Peters's deposition strongly suggested this.

224.    Prior to Ralph Peters's deposition, ICEE's counsel insisted he needed the deposition to verify the authenticity of the 2000 Appointment. (Doc. 31, PageID # 639):

As recently as December 16, plaintiff alleges that a "true and correct copy" of the Purported 2000 Appointment was attached to the amended complaint. How could plaintiff know that if the only living party who supposedly signed the agreement—Ralph Peters—is not capable of testifying? Mr. Peters apparently understood the significance of the Purported 2000 Appointment when it was discovered at his house in Spain in 2017, so why shouldn't that discovery be explored with him under oath? If SPL has obtained information from Ralph Peters, defendant is entitled to do the same. And if Ralph Peters unfortunately has some sort of condition that is worsening, that is a reason for him to be deposed without further delay.

225.    But on February 19, 2020, Benesch produced the Blevins Franks documents, which (1) set forth the complex tax transaction involving six documents and the 2000 Appointment, and (2) destroyed ICEE's contention, referenced in Ms. Kline's letter, that the fax disputed the existence of the 2000 Appointment. (*See* Doc. 282-2; Doc. 282-4; Doc. 282-6; Doc. 282-7; Doc. 73-19, PageID # 1545). By that date, ICEE had received a boatload of documents which seemed to support the existence of the 2000 Appointment. (*Id.*).

226.    It is significant that the Blevins Franks documents were produced after Mr. Wolfsohn stated he needed Ralph Peters's deposition to authenticate the 2000 Appointment. And it seems that Mr. Wolfsohn likely viewed those interrelated documents the way Benesch did—"game ending" with respect to ICEE's argument the 2000 Appointment was not authentic.

227.    To be sure, the Court assumes Mr. Wolfsohn was candid: when he demanded the deposition of Ralph Peters, it was because he could not verify the authenticity of the 2000 Appointment without it. As such, the Court would expect Mr. Wolfsohn would inquire of Ralph Peters on the authenticity of the 2000 Appointment. Simply, that is why Mr. Wolfsohn said he needed the deposition—and why the Court granted the motion to compel to depose him—to see if the 2000 Appointment was authentic. (*See* Doc. 31, PageID # 639). Surely, ICEE does not contend

that Mr. Wolfsohn misrepresented to the Court the reason he needed a Benesch lawyer to fly to London, during the initial stages of COVID, to depose Ralph Peters.[9]

228.    But at Ralph Peters's deposition, Mr. Wolfsohn did no such thing. Mr. Wolfsohn never questioned Ralph Peters about whether the 2000 Appointment was authentic, whether it was his signature, or any other topics that would support Mr. Wolfsohn's contention that he needed Mr. Peters to verify the authenticity of the Agreement. (*See* R. Peters Dep. 7-36, 50-52, Doc. 84, PageID # 2112-41, 2155-57). And this is odd. Because Mr. Wolfsohn questioned Ralph Peters on his signature on every other relevant document, except the 2000 Appointment. (*See generally id.*).

229.    Simply, if ICEE still harbored doubts about the authenticity of the 2000 Appointment, the Court would have expected Mr. Wolfsohn—a relatively aggressive lawyer—to inquire about this. But the simple fact is, he did not. (*Id.*).

230.    So there is no dispute that the following occurred: (a) Mr. Wolfsohn believed he needed Ralph Peters's deposition to inquire about the authenticity of the 2000 Appointment; (b) Mr. Wolfsohn then received the remainder of the six interrelated documents detailing the complex tax maneuver which clearly seemed to suggest the 2000 Appointment was authentic; and (c) Mr. Wolfsohn made a choice not to question Ralph Peters on the authenticity of the 2000 Appointment.

231.    Rather, when Mr. Wolfsohn was done with his questions, it was Benesch who questioned Ralph Peters about the authenticity of the document. And, as is discussed in Paragraphs 160 through 170, *supra.,* Ralph Peters overwhelmingly confirmed its existence and authenticity. (*Id.* at 40:1–13, 42:13–43:16, 44:24–45:20, PageID # 2145, 2147–50). He was simply offended at the notion that it might be inauthentic. (*Id.* at 53:11–54:21, PageID # 2158–59).

---

[9] As an aside, Ms. Emanuel ended up getting a severe case of Covid, being one of the first people in Cleveland to have it, on her trip.

232. So, it would be reasonable for Benesch lawyers to infer—as the Court does—that ICEE, at that moment, believed the evidence demonstrated the 2000 Appointment was authentic. Otherwise, why not ask Ralph Peters about it?

233. So, in terms of worrying about whether the 2000 Appointment was authentic, the Court understands Ms. Turk's testimony that neither the Wendsday Email nor other matters would require a dismissal of the Amended Complaint. Benesch had a mountain of evidence to support its authenticity. This was reinforced by ICEE's counsel passing on asking any questions of Ralph Peters—suggesting ICEE agreed this was no longer a hot issue. (*See id.* at 7–36, 50–52, PageID # 2112–41, 2155–57). So, by the end of Ralph Peters's deposition, it would be reasonable for Benesch, also having spoken to Stefan Loos, not to be focused, in any significant way, on the authenticity of the 2000 Appointment. And it seemed to be a closed topic.

**Q.    Benesch Withdraws the Wendsday Email on June 25, 2020, Without it Ever Having Been Used.**

234. In June of 2020, COVID slowed down a bit. And Benesch reached back out to Mark Peters to get an explanation for the Wendsday Email. But it could not get one.

235. To be sure, on June 25, 2020, Mr. House emailed Mark Peters to see if his IT was able to locate the native email thread. (Doc. 95-4, PageID # 2486).

236. But Mark Peters was unable to provide a good answer as to the origins of the document. (*Id.*).

237. So Benesch, once again, consulted with counsel. And it wrote an email to Mark Peters confirming that it was going to withdraw the document. (*Id.*). It then wrote to ICEE's counsel—effectively shining a light on the document's issue that ICEE's counsel had never noticed—and withdrew it. (Doc. 60-10).

238. What is crucial to note is that the document was never used by Benesch on behalf of SPL. The Court never relied upon it. It was never cited in a motion, nor in any type of settlement demand or mediation document. It was merely produced in a document production and then withdrawn with a promise that it would never be used. (*Id.*).

239. Benesch's conduct is consistent with the requirements of the Ohio Professional Rules of Responsibility. It withdrew the document and ensured it was never going to be used and that it had not already been used or relied upon.

**R.    June 25, 2020: Benesch Had Overwhelming Evidence that the 2000 Appointment Was Authentic Allowing It to Proceed.**

240. So, on June 25, 2020, Benesch had withdrawn the Wendsday Email. The Court concludes the Benesch lawyers knew there was a significant chance the email had likely been forged. So, the question becomes: did the forged Wendsday Email require Benesch to withdraw the Amended Complaint based upon the 2000 Appointment? The Court concludes that Benesch's actions in the weeks after June 25, 2020, in continuing the pursuit of the claim based upon the 2000 Appointment, were reasonable. Simply, Benesch had a mountain of evidence, at that time, which continued to support the existence of the 2000 Appointment, even if the Wendsday Email was forged:

- **The Interrelated Documents:** Benesch had six interrelated documents, referencing tax issues, which seemed to support the existence of the 2000 Appointment.

- **A Course of Dealing:**  Benesch had evidence from SPL that it was paying a smaller royalty from the time the Agreement was signed going forward. (*See* Doc. 276-2, PageID # 13029).

- **Ralph Peters's Deposition:**  One signatory to the Agreement swore that it was not a forgery. (R. Peters Dep. 53:11–54:21, Doc. 84, PageID # 2158–59). And he was further

aware of the terms, without even being prompted. (*Id.* at 42:13–43:16, 44:24–45:20, PageID # 2147–50).

- **Stefan Loos's Conversation:** Benesch believed the other signatory witness to the document was going to authenticate it and confirm this was a deal reached. (Doc. 274-10).

- **The Interrelationship Between Stefan Loos's and Ralph Peters's Recollections:** Ralph Peters and Stefan Loos both remembered Will Radcliff's motivation in executing the 2000 Appointment the exact same. Mr. Radcliff was selling the company (ultimately to Cadbury Schweppes) and wanted to take care of Ralph Peters by giving him a reduced royalty. It is significant that two signatories remembered the document exactly the same.

- **The "In Perpetuity" Language:** Ralph Peters volunteered—without any prompting— that the "in perpetuity" language should be in the 2000 Appointment. And Mr. Loos confirmed to Ms. Turk that Will Radcliff—a close friend of Ralph Peters—was trying to protect Ralph Peters when Mr. Radcliff sold the business. (*Id.*, PageID # 12585). Simply put, this concept of a never-ending contract, where Mr. Radcliff wanted to "protect" his good friend Ralph Peters, makes perfect sense. And there was no other contract from that time that contained that language.

- **The Cadbury Schweppes Documents:** An email and contract with Cadbury Schweppes, the subsequent purchaser, mentioned the 2000 Appointment.

- **The 2000 Appointment Itself:** No party had produced an expert report that the 2000 Appointment was forged. It appeared to be an authentic document, referenced in nearly a dozen other documents, and was the only document that explained why the parties would possibly be operating under a 50 percent reduction in the royalty rate.

- **A Handwriting Expert:** Benesch was in the process of obtaining a handwriting expert. (Tr. of Feb. 20, 2025 Oral Arg. 110:11–13, Doc. 294, PageID # 14338).

**S.     Benesch Continued to Investigate the 2000 Appointment After June 25, 2020, Finding More Support for it.**

241.     Despite this mountain of evidence, the Court finds that Benesch—in good faith—continued to investigate the authenticity of the 2000 Appointment after the Wendsday Email was withdrawn.

### *1.     Diane Menzer Confirms Will Radcliff's Signature.*

242.     On July 2, 2020, Mr. Gurbach spoke with Diane Menzer, Will Radcliff's assistant at ICEE's predecessor. (Doc. 274-7, PageID # 12543).

243.     While he was still on the phone with Ms. Menzer, Mr. Gurbach emailed Mr. House and Ms. Turk about his conversation, attaching Exhibit G to the Complaint: the April 10, 2001, letter from Will Radcliff. (*Id.*).

244.     Mr. Gurbach referred to Ms. Menzer as a "gold mine" and noted that while "she didn't type the April 2001 letter, it for sure came from Will." (*Id.*).

245.     Ms. Menzer pointed out the last four digits of Will Radcliff's fax number: 9455—which would spell "WILL." (*Id.*).

**From:** Gurbach, Matthew <mgurbach@Beneschlaw.com>
**Sent:** Thursday, July 02, 2020 9:19 AM EDT
**To:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; House, Ronald <rhouse@Beneschlaw.com>
**Subject:** Call
**Attachment(s):** "Exhibit G.pdf"

Guys,
I am STILL on the phone with Diane.  1:15.  A gold mine.  She is sending me to Will's sister.

Had to share this.  While she didn't type the April 2001 letter, it for sure came from Will.  How do we know?  The fax number ends in 9455.

Which would spell "WILL" on your phone.

246. So, after the Wendsday Email was withdrawn, Benesch obtained information from Will Radcliff's former secretary confirming that a letter, referencing the 2000 Appointment, was authentic. (*Id.*).

### 2. *Benesch Retains a Handwriting Expert.*

247. On June 15, 2020, Benesch hired a handwriting expert, Vickie Willard, to examine the 2000 Appointment. (*See* Gurbach Dep. 375:22-25, Doc. 255-1, PageID # 10598).

248. Because Benesch was not able to establish that the Wendsday Email was authentic and ICEE's discovery responses suggested that the 2000 Appointment was forged, Benesch thought it was prudent to preemptively have an outside authority verify the document. (*Id.* at 376:1–4, PageID # 10599).

249. The Court finds it significant, in determining Benesch's mindset with respect to Mark Peters and the authenticity of the key document, that Mark Peters quickly and overwhelmingly approved the hiring of an expert. (*Id.* at 377:2–23, Doc. 255-1, PageID # 10600). The Court finds it reasonable that this would have boosted lawyers at Benesch's belief that the 2000 Appointment was authentic, given that Peters offered no opposition to spending the money to determine if it was a forgery.

250. Notably, Benesch provided their expert with a set of documents showing signatures. (*See id.* at 376:18-23, PageID # 10599). And this is the exact same thing ICEE did with its handwriting expert. (Doc. 73-10). The Court finds Benesch's conduct in providing these documents to its expert reasonable. And before receiving ICEE's expert report, Benesch's expert did not find the 2000 Appointment was forged. (Tr. of Feb. 20, 2025 Oral Arg. 110:11–13, Doc. 294, PageID # 14338). This further confirmed Benesch's belief that the 2000 Appointment was authentic. ICEE has not offered any evidence that suggests it was unreasonable for Benesch to believe their expert on that date.

## T. As of August 23, 2020, Benesch Had Overwhelming Evidence that the 2000 Appointment Was Authentic.

251. There is no question that things changed for Benesch, with respect to the 2000 Appointment's authenticity, in late August of 2020. *But up until that point*—even after they withdrew the Wendsday Email—Benesch had overwhelming evidence that allowed it to reasonably continue to pursue SPL's claims based upon the 2000 Appointment, until August 24, 2020. In fact, Benesch's position had strengthened since the Wendsday Email was withdrawn on June 25, 2020, in that Benesch had (a) retained a handwriting expert; and (b) spoken to Will Radcliff's secretary to authenticate a key document referencing the 2000 Appointment. Simply put—*without the benefit of hindsight*—on the morning of August 24, 2020, the Benesch lawyers had the following evidence in front of them supporting the authenticity of the 2000 Appointment:

- **Diane Menzer:** Will Radcliff's secretary was going to authenticate a letter, from shortly after the execution of the 2000 Appointment, which referenced the 2000 Appointment.

- **The Interrelated Documents:** Benesch had six interrelated documents, referencing tax issues, which seemed to support the existence of the 2000 Appointment.

- **The 2000 Appointment Itself:** Benesch had the only document that would have explained why the parties were operating under the 2.5 percent royalty rate versus the 5 percent rate. Given the 1996 Agreement's requirement of a written modification, and no other documents being produced explaining that, this was significant.

- **A Course of Dealing:** Benesch had evidence from SPL that it was paying a smaller royalty from the time the Agreement was signed going forward. (*See* Doc. 276-2, PageID # 13029).

- **Ralph Peters's Deposition:** One signatory to the Agreement swore that it was not a forgery. (R. Peters Dep. 53:11–54:21, Doc. 84, PageID # 2158–59). And he was further

aware of the terms, without even being prompted. (*Id.* at 42:13–43:16, 44:24–45:20, PageID # 2147–50).

- **Stefan Loos's Conversation:** Benesch believed the other signatory witness to the document was going to authenticate it and confirm this was a deal reached. (Doc. 274-10).

- **The Interrelationship Between Stefan Loos's and Mr. Peters's Recollections:** Ralph Peters and Stefan Loos both remembered Will Radcliff's motivation in executing the 2000 Appointment the exact same. Mr. Radcliff was selling the company (ultimately to Cadbury Schweppes) and wanted to take care of Ralph Peters by giving him a reduced royalty. It is significant that two signatories remembered the document exactly the same.

- **The "In Perpetuity" Language:** Ralph Peters volunteered—without any prompting— that the "in perpetuity" language should be in the 2000 Appointment. And Mr. Loos confirmed to Ms. Turk that Will Radcliff—a close friend of Ralph Peters—was trying to protect Ralph Peters when Mr. Radcliff sold the business. (*Id.*, PageID # 12585). Simply put, this concept of a never-ending contract, where Mr. Radcliff wanted to "protect" his good friend Ralph Peters, makes perfect sense. And there was no other contract from that time that contained that term.

- **The Cadbury Schweppes Documents:** An email and contract with Cadbury Schweppes, the subsequent purchaser, mentioned the 2000 Appointment.

- **A Handwriting Expert:** Benesch obtained a handwriting expert. (Tr. of Feb. 20, 2025, Oral Arg. 110:11–13, Doc. 294, PageID # 14338).

**U.    Benesch Moved Quickly to Withdraw the Claims Under the 2000 Appointment When It Could No Longer Authenticate It.**

252.    Knowing that Benesch had significant documents authenticating the 2000 Appointment as of August 24, 2020, the Court finds it significant how reasonably Benesch moved

when the authenticity was put into doubt. This occurred within the short span of a few days, when Stefan Loos did not testify as expected and Benesch received ICEE's expert report. And then, shortly after confirming with Benesch's expert that it could no longer authenticate the 2000 Appointment, Benesch learned of the issue with the second History of Working Practise document. Benesch's actions when it learned this information were reasonable and appropriate.

253.    And, even after Benesch had to withdraw the Wendsday Email, Benesch's handwriting expert confirmed that the signatures on the 2000 Appointment were authentic.  (Tr. of Feb. 20, 2025, Oral Arg. 110:11–13, Doc. 294, PageID # 14338).

254.    But, on August 24, 2020, Benesch received ICEE's expert report, which opined that the signatures on the 2000 Appointment were forged from the History of Working Practise document.  (Doc. 274-27, PageID # 12704).

255.    And the next day, August 25, 2020, Mr. Loos did not testify as Benesch expected. (Turk Dep. Vol. II 343:16–21, Doc. 274, PageID # 12335).

256.    Faced with these two new developments, Benesch gave Ms. Willard, SPL's handwriting expert, a copy of ICEE's expert report for her analysis and opinion.  (*Id.* at 389:19–24, PageID # 12381).

257.    Within a week, on September 1, 2020, Benesch had a call with Ms. Willard to discuss ICEE's expert report. She informed Mr. House and Ms. Turk that, while she does not completely agree with ICEE's expert's conclusion, one of the two documents (the 2000 Appointment and the History of Working Practise) was forged.  (Doc. 276-28, PageID # 13540). But unlike ICEE's expert—who concluded that the 2000 Appointment was the forged document— Ms. Willard could not determine which one was the forgery.  (*Id.*).  She then set out to do some additional testing to see if she could make a determination on which document was forged.  (*Id.*).

258.     Then, on September 11, 2020, Ms. Turk and Mr. House discovered that there were two different versions of the History of Working Practise.  (Doc. 276-25, PageID # 13521).

259.     Faced with these recent revelations, Benesch contacted its in-house counsel. Then, Benesch had a call with RPC and Mark Peters to try and get some answers about what happened. (Doc. 274-25, PageID # 12684; Doc. 274-26, PageID # 12694).

260.     Mark Peters did not provide any explanation. (*See* Turk Dep. Vol. II 447:24–448:8, Doc. 274, PageID # 12439–40).

261.     Then on September 16, 2020, Mr. House and Ms. Turk have a final call with Ms. Willard to discuss the results of her recent testing. (Doc. 274-31, PageID # 12709–10). She informed them that she could not make a determination as to which of the two documents was forged.  (Turk Dep. Vol. II 393:7–13, Doc. 274, PageID # 12385).

262.     During this period, Benesch had produced its communications with Mark Peters as well as RPC's communications with Mark Peters about the Wendsday Email pursuant to the Court's Order on ICEE's Motion to Compel.  (*See* Doc. 67).  After the Court conducted its *in camera* review, Benesch produced the documents to ICEE.

263.     On September 21, 2020, Benesch received a supplemental report from ICEE analyzing the metadata for the PDF of the Wendsday Email.  (Doc. 69).

264.     Benesch sent ICEE's supplemental report to Mr. McCann the next morning to confirm the analysis and conclusion.  (Doc. 282-15, PageID # 13792).

**From:** House, Ronald <rhouse@Beneschlaw.com>
**Sent:** Tuesday, September 22, 2020 9:41 AM
**To:** McCann, Donald S. <DMcCann@beneschlaw.com>
**Cc:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; Monday, Justin L. <JMonday@beneschlaw.com>
**Subject:** SPL - ICEE

Don,
See the attached. I need to know if the paragraph below the metadata accurately describes what the metadata tells us. Thanks. Ron

265.    Mr. McCann responded confirming that he viewed the document's metadata the same way: that it was not generated from Outlook, but instead from a Word document.  (*Id.*).

From: McCann, Donald S. <DMcCann@beneschlaw.com>
Sent: Tuesday, September 22, 2020 10:21 AM EDT
To: House, Ronald <rhouse@Beneschlaw.com>
CC: Turk, Jennifer M. <JTURK@Beneschlaw.com>; Monday, Justin L. <JMonday@beneschlaw.com>
Subject: RE: SPL - ICEE

I would agree that the description they provide is how I would interpret the metadata as well.  It is not necessarily unusual to have some emails in a case provided to us by the client in PDF format.  Sometimes there are emails that only exist in paper form so they scan them to us.  Sometimes, especially early in a case, a client may try to be helpful and get us some key documents quickly so they convert some emails to PDF and send them to us.  However, in those cases the resulting PDF would not be derived from a Microsoft Word document.  Typically, it would either reflect the copy machine made to make the scan or the email system the file was converted from.  The metadata for this particular file indicates that the PDF originated from a Word document which would be an unusual process to use to convert an email.

Obviously, the metadata being referenced is not coming from the alleged email itself but rather from the PDF we were given.  In other words, the metadata provides information about the origin of the PDF but says nothing about the authenticity of the alleged source email.  Of course, if no native version of that email exists, the point is moot.

Don

266.    The very same day, Benesch had a call with Mark Peters to further discuss the issues that had arisen with the Wendsday Email, the 2017 History of Working Practise, and the 2000 Appointment.  (Turk Dep. Vol. II 303:11-304:12, Doc. 274, PageID # 12295-96).

267.    Because SPL had no way to authenticate the 2000 Appointment, there was no option other than to withdraw all claims asserted under the 2000 Appointment.  (*Id.* at 397:1–20, PageID # 12389).

268.    On October 15, 2020, three weeks after ICEE's supplemental report on the Wendsday Email metadata, and within a month of the final call with Benesch's expert, Benesch filed a motion for leave to withdraw all claims that SPL had asserted under the 2000 Appointment.  (Doc. 72).

269.    Curiously, ICEE opposed SPL's motion to withdraw those claims.  (Doc. 81).

270.    In sum, Benesch moved to withdraw all claims based on the 2000 Appointment within seven weeks of its first indication that it would not be able to authenticate the contract. ICEE produced its expert report on August 24, 2020, and Benesch moved to withdraw the claims under the 2000 Appointment on October 15, 2020.  (Doc. 72; Doc. 274-27).

271. The Court finds Benesch's conduct reasonable. As of the morning of August 24, 2020, Benesch had significant evidence tending to authenticate the 2000 Appointment. Then Benesch obtained three pieces of evidence. First, ICEE's expert report, which Mr. House characterized as very convincing. (House Dep. Vol. I 75:15-20, Doc. 254-1, PageID # 9764). Second, knowledge that a second document had likely been altered: the 2017 History of Working Practise. And third, an understanding that the metadata for the Wendsday Email indicated it was created by "markp." Despite the mountain of contemporaneous documents suggesting the 2000 Appointment was authentic, Benesch followed its expert's conclusion, rendered on September 16, 2020, and moved to dismiss the claim. The Court finds this conduct was reasonable in light of what Benesch knew at the time. Simply, as information came in, Benesch reacted to it appropriately.

## V. Benesch Took Reasonable Steps to Instruct SPL About Its Evidence Preservation Obligations and Believed that all Information Was Preserved.

272. ICEE has alleged that Benesch did not properly preserve evidence. The Court finds this is not true.

273. First, it is important to note that RPC was acting as an intermediary with its client, SPL, during the initial stages of the case. (Gurbach Dep. 55:2–12, Doc. 255-1, PageID # 10278). Information requests were made to RPC. (*See id.*).

274. SPL was advised of its obligations to preserve data and documents throughout the course of the dispute by both RPC and Benesch.

275. Benesch, almost immediately, inquired if RPC had taken any evidence preservation instructions or measures. (*Id.* at 379:23–380:16, PageID # 10602–03).

276.    RPC provided SPL with its Litigation Guide, which outlines the client's preservation obligations on the first page. (Doc. 273-24, PageID # 12245; Doc. 282-16, PageID # 13795).

**Introduction**
This guide is for RPC clients only. Its purpose is to provide information about key aspects of the process of litigation in the courts and tribunals of England & Wales (particularly financial aspects, searching for and preserving documents, and acting on insured disputes).

Please note that this guide is not a substitute for legal advice on specific aspects of your dispute, and it does not seek to describe all aspects of the litigation process.

**Preserving and disclosing documents**
In most forms of dispute resolution in this jurisdiction (England & Wales) there will come a point in the process when the parties have to provide each other with disclosure of their documents.

The scope of disclosure can be complex and usually reflects the issues in dispute at that stage. It may not always be possible to predict accurately the scope of disclosure at the start of a dispute.

In anticipation of the need to disclose documents, litigants are under a legal duty to **preserve** relevant documents. It is very important that you comply with this duty from the earliest possible stage as well as throughout the life of your dispute.

Accordingly, as soon as you think you **might** become involved in a legal dispute you should take steps to identify and keep safe all documents and other evidence that are in your possession or under your control and that may be relevant to your matter.

We can of course advise you on what documents may be relevant to your dispute and whether or not they are in your possession or under your control.

By **document** in this regard we mean both paper documents and any other kind of electronic document or digital data including, but not limited to, emails, text messages, word-processing documents, sound files, slide presentations, images, movies and PDFs.

It is especially important that you take immediate steps to preserve any relevant electronic documents which might otherwise be deleted accidentally or in accordance with the routine operation of a document retention policy or in the ordinary course of your business.

You should also consider carefully where electronic documents may be held, eg computers, mobile phones, hard-drives, databases, cloud storage facilities, mobile devices, servers, USB drives, backup tapes, DVDs and CD-ROMs.

We are well aware that searching for electronic documents can be complex, expensive and time-consuming. Furthermore, at the stage of disclosure there are detailed court rules about the scope of such searches. We therefore strongly recommend that you talk to us before undertaking any kind of search for electronic documents, so as to make the most efficient use of resources.

**The duration of your dispute**
At the start of a dispute it is rarely possible to predict with certainty how long it may take to reach a final outcome. Much depends in this regard on factors outside your (or our) control,

277.    This preservation instruction extended to the client's electronic devices, such as computers and hard drives. (Doc. 282-16, PageID # 13795):

You should also consider carefully where electronic documents may be held, eg computers, mobile phones, hard-drives, databases, cloud storage facilities, mobile devices, servers, USB drives, backup tapes, DVDs and CD-ROMs.

278.    Further, Benesch prepared a detailed eDiscovery Questionnaire for SPL, which RPC facilitated the completion of. (Doc. 276-30, PageID # 13545–47).

279.    Benesch inquired about potential custodians, SPL's email platform, and how that electronic information was stored and backed up. (*Id.* at PageID # 13546):

7.    Are any legacy email systems relevant to the current Dispute? That is, has the current email platform been in place during the entire period of interest for this Dispute? If not, please describe the legacy system and any available data. Email has been stored on 3 email platforms as detailed below:

| Period | Email platform |
| --- | --- |
| Prior - May-14 | On-premises Exchange 5.5 server |
| May-14 - Mar-18 | Rackspace hosted Exchange |
| Mar-18 - present | O365 |

Any *archive.pst* files which may have existed on the workstations were not migrated from Rackspace hosted Exchange to Office 365.

280.    And Benesch asked, *twice*, whether any steps would be necessary to prevent the alteration or deletion of information. (*Id.* at PageID # 13546–47):

12.    Please describe any steps that have been taken or would be required to secure data relevant to this Dispute to prevent alteration/deletion of information. None at present.

22.    Please describe any steps that have been taken or would be required to secure data relevant to this Dispute to prevent alteration/deletion of information. None. Old data is kept for tax purposes.

281.    Both of these answers were clear: nothing was necessary to preserve any data. (*Id.*). Rather, "old data is kept for tax purposes." (*Id.*).

282.    After the lawsuit was filed and discovery was underway, Ms. Emanuel sent an email to RPC to discuss document collection and remind SPL of its obligation to preserve documents and electronic devices. This instruction was forwarded to Mark Peters by RPC. (282-17, PageID # 13802).

---

**From:** Emanuel, Elizabeth [mailto:EEmanuel@beneschlaw.com]
**Sent:** 29 August 2019 Thursday 16:09
**To:** O'Hagen, Esme - RPC
**Cc:** Gurbach, Matthew; House, Ronald; Cran, David - RPC; McCann, Donald S.
**Subject:** Slush Puppie Limited v. The Icee Company

*Privileged & Confidential*

Esme:

By way of introduction, my name is Elizabeth Emanuel and I am working with my colleagues, Matt Gurbach and Ron House, on the above-captioned lawsuit between Slush Puppie Limited and Icee. I write to propose a call next week to discuss SPL's collection of documents responsive to the attached document requests from Icee, and SPL's duty to preserve paper records and electronic data in this lawsuit. I have also attached SPL's completed EDiscovery Questionnaire from last October. As you know, discovery was essentially put on hold pending mediation of this matter; however, this week the parties did not mediate and, instead, the case will be actively litigated at this time, which means that SPL needs to escalate the document collection so that we can begin to review and produce documents. Defense counsel has already followed up with us in an effort to start pushing discovery in this case. As such, please let me know your availability next week for a call to discuss the attached document requests and SPL's related collection and processes, and please include any IT personnel or others that may assist SPL in its collection and document preservation duties. We can have our Litigation Support Manager, Don McCann (copied), on the line as well so that he can walk your SPL's representative through any issues.

In the meantime, SPL must continue to preserve all paper and electronic documents, records, files, data, communications and/or correspondence that relate to or involve in any way the lawsuit, including, without limitation, all computers, hard-drives, or any other electronic devices used by custodians identified in the attached questionnaire.

Thank you,

**Elizabeth Emanuel, Esq.**
**Benesch, Friedlander, Coplan & Aronoff LLP**
200 Public Square, Suite 2300
Cleveland, OH 44114-2378
Direct: 216.363.4559 | Fax: 216.363.4588 | Mobile: 330.519.2903
eemanuel@beneschlaw.com | www.beneschlaw.com

---

283.    On August 13, 2020, ICEE issued a discovery request to inspect Mark Peters's computers. (Doc. 276-31, PageID # 13549–56). Benesch, as required, informed Mark Peters that he would need to have his computers imaged. (House Dep. Vol. IV 349:14–350:14, Doc. 254-4, PageID # 10104–05). The Court finds ICEE's accusation that Benesch "tipped off" Mark Peters lacks merit. (*See* Doc. 89, PageID # 2322). What was Benesch to do? ICEE was requesting Mark Peters's personal computer. How else was Benesch to get it? It had to tell Mark Peters of their

request. ICEE's accusation that Benesch "tipped off" Mark Peters is just another example of hyperbole and attacks on Benesch lawyers, unsupported by the record.

284. From the time that Benesch received ICEE's discovery request through the time that Benesch served SPL's response, Benesch had no indication from Mark Peters that the devices did not exist. (*Id.* at 350:15-17, PageID # 10105).

285. When Benesch learned from Mark Peters that his laptop had been stolen, it promptly supplemented SPL's written response to ICEE's request. (Doc. 282-18, PageID # 13805–12).

286. Ten days after Benesch served SPL's supplemental response, Mark Peters was deposed and testified that his laptop had been stolen from his car. (M. Peters Dep. 170:1–10, Doc. 76, PageID # 1873). And once Benesch received the police report for the theft, it promptly produced it to ICEE. (Doc. 276-33, PageID # 13562).

### W. Benesch Did Not Engage in a Willful Withholding of the Metadata of the Wendsday Email.

287. Benesch lawyers testified that, once documents came in, they were put into the firm's document management system: Everlaw. (*See* Turk Dep. Vol. I 29:11-16, Doc. 273, PageID # 11722). And when Benesch realized that there were hard copy documents that had not been added to Everlaw, they worked to ensure the documents were uploaded so they could be produced. (*See id.* at 51:19-52:24, 94:1-8, PageID # 11743-44, 11786).

288. So, in early February of 2020, as the case was heating up, Mr. House directed all lawyers at Benesch to gather up all the documents in their emails to make sure they got into Everlaw. (Doc. 282-14, PageID # 13711).

289.     Significantly, every Benesch lawyer was on this email: Ron House, Matthew Gurbach, Jennifer Turk, Elizabeth Emanuel, and Mark Avsec.[10]

290.     And then there is clear evidence that the lawyers were gathering the documents they had and directing the firm's internal manager of Everlaw to get them into Everlaw. (Doc. 282-10, PageID # 13698; Doc. 282-11, PageID # 13701; Doc. 282-13, PageID # 13706; Doc. 282-14, PageID # 13711). In fact, Mr. Gurbach specifically directed Mr. McCann to where all his documents were, so they could be put into Everlaw. (Doc. 282-10, PageID # 13698).

291.     Mr. McCann, on February 10, 2020, confirmed that every document was now in Everlaw. (Doc. 276-19, PageID # 13465).

292.     Therefore, it was reasonable for Benesch lawyers to believe that everything they had in their possession had been put into Everlaw in the form in which they received it. (Turk Dep. Vol. II 364:17-21, Doc. 274, PageID # 12356; *see also* Doc. 276-19, PageID # 13465).

293.     So, when Benesch discovered the inconsistency with the Wendsday Email, it reached out to its client asking for the document in its native format. (Doc. 95-4, PageID # 2474, 2480).

294.     But it did not stop there—it sought its internal expert to determine whether it had the document in native format. (Doc. 276-10, PageID # 13290):

---

[10] Mr. Zalud was not on this email, but had not been involved in the case since the initial contact with RPC, and would not be involved again until late 2020.

**From:** McCann, Donald S. <DMcCann@beneschlaw.com>
**Sent:** Tuesday, March 10, 2020 2:52 PM EDT
**To:** Emanuel, Elizabeth <EEmanuel@beneschlaw.com>
**CC:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; House, Ronald <rhouse@Beneschlaw.com>; Gurbach, Matthew <mgurbach@Beneschlaw.com>
**Subject:** RE: Slush Puppie - Document question
**Attachment(s):** "FW Summary of Slush Puppies from Avsec,.msg"

Elizabeth,

Thank you. SP003569 is the produced copy of #1515.1, which was uploaded by me as a PDF file on 2/20/2020. This PDF was part of a small collection of documents that Ron forwarded as he was looking through his email for any other items that may not have been in the database and also apparently based on conversations with Mark Avsec. The email sent to me with this specific document attached is attached here for your review.

Since the PDF is named "17NColor.pdf" it is safe to assume the PDF was created at Benesch and it looks to be a scan of a hard copy of the email. If this was originally in Mark's possession, then the question is whether he only ever had this in hard copy or if he received it electronically/natively at some point. It does not appear that we have it in native format anywhere in Everlaw.

Don


**Donald S. McCann**
Litigation Support Manager
Litigation
Direct: 216.363.4552


**From:** Emanuel, Elizabeth <EEmanuel@beneschlaw.com>
**Sent:** Tuesday, March 10, 2020 2:29 PM
**To:** McCann, Donald S. <DMcCann@beneschlaw.com>
**Cc:** Turk, Jennifer M. <JTURK@Beneschlaw.com>; House, Ronald <rhouse@Beneschlaw.com>; Gurbach, Matthew <mgurbach@Beneschlaw.com>
**Subject:** Slush Puppie - Document question

Don:

Per our discussion today, we are trying to determine the origin of the attached email bates stamped SP003569-70. It is an e-mail string between our client SPL's Lindsay Kirby and ICEE's Jerry Bird. We need to know how we received the attached e-mail string and whether it was in native format. We've asked the client to send us the native format from his IT people but he has not been able to get it to us yet. The word "Wednesday" is misspelled as "Wendsday" in the date of the top e-mail. We need to understand the origin of this document and all ways in which this chain was produced from both sides.

Any information you can have will be appreciated. ████████████████████████████████

Thanks,

**Elizabeth Emanuel, Esq.**
Benesch, Friedlander, Coplan & Aronoff LLP
Direct: 216.363.4559
Mobile: 330.519.2903

295.     From the perspective of the Benesch partners—*without the benefit of hindsight*—the Court concludes that they made a good faith attempt to produce the Wendsday Email in native format. Everyone was under the impression, given Mr. McCann's email, that all the relevant documents had been put in Everlaw. And Mr. McCann told them the native format was not in Everlaw. (*Id.*)

296.    The Court recognizes, as well, that some of the Benesch partners indicated they were not expecting the native format to be a PDF. (*See* Gurbach Dep. 246:21-247:10, Doc. 256-1, PageID # 10469-70). But rather, a Microsoft Outlook file. (*Id*.). The Court agrees what occurred was unusual, to say the least.

**X.      Benesch Mistakenly Marked the 2017 Version of the History of Working Practise as Nonresponsive and Duplicate.**

297.    Benesch received the 2017 Version of the History of Working Practise as one of the several documents provided by RPC at the outset of the case. (Doc. 282-1, PageID # 13613-14). SPL never provided Benesch with the 2011 Version of the History of Working Practise. (Turk Dep. Vol. I 30:20-31:4, Doc. 273, PageID # 11723).

298.    Ultimately, both versions were uploaded into Everlaw. (Doc. 276-25, PageID # 13519). The 2011 Version was uploaded as part of ICEE's document production on October 28, 2019. (*Id.*). The 2017 Version was uploaded on December 5, 2019. (*Id.*).

299.    Everlaw stores data about when documents on its platform are uploaded, viewed, tagged, and other routine functions. (*See generally id.*).

300.    Here, the Everlaw logs for both versions of the History of Working Practise show that Benesch did not realize there were two distinct versions of the History of Working Practise. (Doc. 276-25, PageID # 13519–22). Rather, the logs are clear, the lawyers believed that they were looking at the same document and had not reviewed the signature pages of both versions in short order of each other. (*Id.*).

**1.      *The Versions of the History of Working Practise Are Nearly Identical, Except for the Signature Page.***

301.    A page-by-page comparison highlights the similarities between the two documents.

302.    The first pages of both versions are the same:



(*Compare* Doc. 73-12, PageID # 1479, *with* Doc. 73-29, PageID # 1604).

303.    The second pages of both versions are the same:



(*Compare* Doc. 73-12, PageID # 1480, *with* Doc. 73-29, PageID # 1605).

304.    The third pages of both versions are the same:



(*Compare* Doc. 73-12, PageID # 1481, *with* Doc. 73-29, PageID # 1606).

305.    The fourth page of the History of Working Practise is the only page where there are differences.  The 2011 Version does not contain any reference to the 2000 Appointment.  (Doc. 73-12, PageID # 1482).  The 2017 Version does contain references to the 2000 Appointment. (Doc. 73-29, PageID # 1607).  And the documents have different signatories.



(*Compare* Doc. 73-12, PageID # 1482, *with* Doc. 73-29, PageID # 1607).

306.     This side-by-side comparison highlights how, in a voluminous review and on an initial look, a mistake could be made and the documents could appear to be the same document.

### 2.     Benesch's Logs Show that, When the Lawyers Were Reviewing the Two Documents, they Never Saw Both Signature Pages at the Same Time.

307.     For example, on January 28, 2020, Ms. Emanuel viewed pages one and two of the 2011 Version of the History of Working Practise that ICEE produced. (Doc. 276-25, PageID # 13519). And that same day she viewed pages one and four of the 2017 History of Working Practise. (*Id.*).

|  | ICEE Version - ICEESPL_002455 | Benesch Version |
|---|---|---|
| 1/28/2020 12:25pm | Elizabeth Emanuel viewed pages 1-2 | Elizabeth Emanuel viewed pages 1, 4 |

308.     Because Ms. Emanuel did not look at both signature pages, it would be reasonable for her to believe that they were both the same document.

309.     Similarly, on February 3, 2020, Ms. Turk viewed the first page of the 2011 Version of the History of Working Practise and the first and third pages of the 2017 Version of the History of Working Practise. (*Id.*). Again, based on those pages, the documents would appear identical. (*Id.*).

|  | ICEE Version - ICEESPL_002455 | Benesch Version |
|---|---|---|
| 2/3/2020 1:02-1:06pm |  | Jennifer Turk viewed pages 1, 3 |
| 2/3/2020 1:03pm |  | Jennifer Turk downloaded the PDF file for this document |
| 2/3/2020 3:44pm | Jennifer Turk viewed page 1 |  |

310.     And, on multiple occasions, the attorneys simply viewed the first page of either of the documents, which looked the same. (*Id.* at PageID # 13519–21).

311.    Even though there were days when the lawyers viewed both versions of the document, they never looked at both signature pages at the same time. (*Id.*).

### 3.    Benesch Made a Mistake by Not Producing the 2017 Version of the History of Working Practise.

312.    Benesch does not dispute that the 2017 Version of the History of Working Practise should have been produced to ICEE.  (Turk Dep. Vol. I 98:19–99:7, Doc. 273, PageID # 11791).

313.    And Ms. Turk's testimony did not mince words; she candidly admitted that she made a tagging mistake by not tagging it to produce:

Q.    Explain to me why you're tagging of this as nonresponsive—Well, first of all, why did you tag it as nonresponsive?

A.    It was a mistake.

Q.    And what does that mistake have to do with whether or not it would be produced?

A.    Because when it's tagged nonresponsive, nonresponsive documents are not produced.

. . .

Q.    And then looking at your second declaration, which we marked as Plaintiff's Exhibit?

A:    Correct.

Q.    And that's a true statement?

A:    Yes.

Q.    And—and it's your testimony that that's the reason that this—the version of the "History of Working Practise" that ICEE didn't have that's now produced is because of your inadvertent tagging.  Correct?

A.    Correct.

Q.    Otherwise, it would have gone out on February 19th.  Correct?

A.    Yes, had it been tagged correctly, it would have gone out.

Q.    Should have gone out on February 19th?

A.    It should have, yes.

(*Id.* at 51:6–15, 98:6–99:7:, PageID # 11743, 11790–91).

314.    But Benesch did not intentionally withhold the document from ICEE. *Indeed, Benesch thought that ICEE already had it*. (Doc. 274-21, PageID # 12676). This is shown in Ms. Turk's February 4, 2020, email to Ms. Emanuel, asking about the History of Working Practise and ICEE's position on that document. (*Id.*). *This document is a clear insight into Ms. Emanuel's and Ms. Turk's minds—they thought ICEE already had the document*. (*Id.*).

315.    **And the significance of this document cannot be understated because it shows two things. First, there could be no intentional withholding of this version of the History of Working Practise, if Ms. Emanuel and Ms. Turk thought ICEE already had it. Why would Ms. Turk withhold something that she believed ICEE had already produced to Benesch and had in its possession? Second, Ms. Turk was unaware there were two versions of it. Her comments make no sense unless she believed the 2017 History of Working Practise document was the same document ICEE produced—the 2011 History of Working Practise. After all, they look the same except for the fourth page**.

316.    The Court finds Ms. Turk's explanation convincing. She made a mistake in not producing it. But it was not an intentional mistake.

317.    ICEE's argument that Benesch willfully withheld this version of the working practices document as privileged is simply incorrect. It was attached to an email, which was privileged, and it was that email—along with attachments—that was marked privileged.

318.    To be sure, Benesch was ordered to produce its communications with SPL related to the Wendsday Email. (*See generally* Doc. 67). Benesch prepared a Privilege Log to accompany that production. (Doc. 276-20). That log listed emails that were privileged and identified the attachments to those emails—which included the History of Working Practise. (*Id.*).

319.    Benesch did not decide that the 2017 History of Working Practise was privileged itself. It was attached to a privileged email. (*Id.*). And where there were privileged communications between a lawyer and client, attachments to those emails are considered privileged as well. (Turk Dep. Vol. II 387:6–20, Doc. 274, PageID # 12379).

### 4.    *Mistakes Can Happen in Complex Litigation: ICEE also Made ESI Discovery Tagging Mistakes.*

320.    The Court recognizes—as do the Sixth Circuit and many other courts—that the practice of law is hard and mistakes are made. Ms. Turk admitted she made a mistake in tagging a document, so it was not produced. But these mistakes happen, as ICEE well knows.

321.    To be sure, ICEE had its share of mis-tagged documents in this matter. On multiple occasions, ICEE mis-tagged documents, resulting in the disclosure of its privileged attorney-client communications to Benesch.

322.    As early as February 4, 2020, (after being informed by Benesch of its mistake) ICEE requested a clawback of privileged information that was produced "inadvertent[ly]." (Doc. 184-2, PageID # 6233).

323.    And a second tagging mistake was identified on November 2, 2020. (Doc. 184-3, PageID # 6235).

324.    These are just two examples of ICEE—in the production of electronically stored information, mis-tagging a document—in ICEE's case, to produce, when it should not have. And it should not be ignored that Benesch made no attempt to take advantage of ICEE's mis-tagging of privileged information. They gave them back, without any type of fuss.

325.    ICEE's attack on Ms. Turk's mistake—when (a) ICEE has made ESI mis-tagging mistakes; and (b) Benesch's internal email is clear Ms. Turk thought ICEE already had it—is unnecessarily harsh.

**5.** ***Benesch Learns that There are Two Versions of the History of Working Practise in September 2020—It Did Not Purposely Withhold the Document.***

326. Again, the Everlaw data shows that Benesch first became aware that there were two Versions of the History of Working Practise on September 11, 2020. (Doc. 276-25, PageID # 13521).

| | ICEE Version - ICEESPL_002455 | Benesch Version |
|---|---|---|
| 9/11/2020 2:54-2:55pm | | Ron House viewed pages 1-4 |
| 9/11/2020 2:55-2:56pm | Ron House viewed pages 1-4 | |
| 9/11/2020 2:57pm | | Ron House viewed page 1 |
| 9/11/2020 3:15pm | | Ron House viewed page 1 |
| 9/11/2020 3:15-3:17pm | | Ron House viewed pages 1, 3-4 |
| 9/11/2020 3:16pm | | Ron House downloaded the PDF file for this document |
| 9/11/2020 3:17-3:24pm | Ron House viewed pages 1-2 | |
| 9/11/2020 3:17pm | Ron House downloaded the PDF file for this document | |
| 9/11/2020 3:41-3:43pm | Ron House viewed page 1 | |
| 9/11/2020 3:41-3:44pm | Jennifer Turk viewed page 1 | |
| 9/11/2020 3:47-3:48pm | | Ron House viewed page 1 |
| 9/11/2020 4:10pm-03/23/2021 2:22pm | | Jennifer Turk viewed pages 1, 3-4 |

327. And Ms. Turk testified to her discussions with Mr. House when they made the discovery. (Turk Dep. Vol. I 227:12–228:7, Doc. 273, PageID # 11919–20). Here, the data shows Mr. House compared the two documents, going back and forth looking at all pages. (Turk Dep. Vol. II.; Doc. 276-25, PageID # 13521). The above metadata clearly shows a lawyer making a discovery about the signature on Page 4 of the two documents. Within one minute, Mr. House reviews Page 4 of both documents. (*Id.*). Then he reviews Page 1 of another, then Pages 1, 3–4.

And then he downloads the document. Then, a minute later, he downloads the second document. And shortly after, Ms. Turk looks at Page 4 of the Working Practise document. This is the way lawyers would behave—if they had discovered the documents were different—a scramble back and forth between the documents.

328.    After Mr. House made this realization, he informed Ms. Turk that he had found this issue and she began to view the documents as well.  (Turk Dep. Vol. I 227:12–228:7, Doc. 273, PageID # 11919–20; Doc. 276-25, PageID # 13521).

329.    Benesch contacted both Mark Peters and RPC, *providing both* versions of the documents to discuss and get an explanation.  (Doc. 274-25, PageID # 12684; Doc. 274-26, PageID # 12694):

**From:** House, Ronald <rhouse@Beneschlaw.com>
**Sent:** Tuesday, September 15, 2020 1:00 PM EDT
**To:** Cran, David - RPC <David.Cran@rpc.co.uk>
**CC:** Turk, Jennifer M. <JTURK@Beneschlaw.com>
**Subject:** SPL - ICEE
**Attachment(s):** "History of Working Practise from RPC.PDF","History of Working Practise - 2011.PDF","4_26_11 Email.PDF"

David,
Can you call me about the attached? Ron

From: House, Ronald <rhouse@Beneschlaw.com>
Sent: Wednesday, September 16, 2020 12:04 PM EDT
To: Mark Peters <mark@slushpuppie.co.uk>; Laura Peters <laura.peters@slushpuppie.co.uk>
CC: Turk, Jennifer M. <JTURK@Beneschlaw.com>
Subject: FW: SPL - ICEE
Attachment(s): "History of Working Practise from RPC.PDF","History of Working Practise - 2011.PDF","4_26_11
Email.PDF"

Mark,
Please call to discuss. Ron


**Ronald L. House**
Partner
Litigation
Direct:  614.223.9338
Cell:    614.940.8782

From: House, Ronald
Sent: Tuesday, September 15, 2020 6:12 PM
To: Mark Peters <mark@slushpuppie.co.uk>
Cc: Turk, Jennifer M. <jturk@beneschlaw.com>
Subject: SPL - ICEE

Mark,
In follow up to our call yesterday, I have attached two copies of the "History of Work Practise."  As you can see,  the chronology for
both ends on page 4.  The first attachment ends in 2001. The second attachment end with 1981-1996. I have also attached an email
dated 4/26/11 from you to ICEE's counsel which transmitted the second attachment.  We need to discuss this. Please call me. Ron

330. The Court concludes that Benesch's explanation here is credible. The data clearly shows two lawyers focused on the two different documents—going back and forth. Mr. House looks at both signature pages within a minute of each other, then it was immediately addressed with Mark Peters, RPC, and Mr. Gurbach. (*Id.* at 303:11–304:12, PageID # 12295–96). The Court believes that Benesch did not discover the existence of two documents until September 11, 2020.

331. The Court also concludes this supports its prior conclusion that Ms. Turk did not purposely withhold the 2017 Working Practise document. If Benesch knew there were two versions, the scramble between the documents, seen here, would not have occurred.

**Y.    ICEE's Invitation to Stack Inferences is Inappropriate.**

332. The actual direct documentary evidence is exonerating for Benesch. There is a mountain of actual documents suggesting the 2000 Appointment was authentic. There are internal emails from Benesch demonstrating Ms. Turk thought ICEE already had the 2017 Version of the

History of Working Practise, and thus her mistake in not producing it was not willful, and that Mr. House directed that everything be produced. **And the internal exonerating emails were written at a time when the Benesch lawyers would not expect anyone to ever see them—heightening their importance and impact upon the Court.** Quite frankly, with now: (a) nearly 700 pages of briefing; (b) 51 hours of depositions; and (c) the complete evisceration of the attorney-client and work product privileges, it seems as if ICEE should not have to resort to inferences to prove these sanctions. But it does. And its requested inferences are improper—they all stack and/or are speculative.

333.     For example, ICEE asks the Court to infer Benesch lawyers were engaged in a willful conspiracy with Mark Peters to utilize forged documents in this case, because they do not remember much of the conversations with Mark Peters from four to five years ago. Notably, this is not altogether true, as they certainly remembered the import of those meetings (i.e., "come to Jesus"). (*See* Turk Dep. Vol. II 303:11-304:12, 447:24-448:8, Doc. 274, PageID # 12295–96, 12439–40). And there are emails demonstrating what likely went on. (*See e.g.* Doc. 95-4, PageID # 2486; Doc. 274-25, PageID # 12684; Doc. 274-26, PageID # 12694).  In short, ICEE's request for the Court to infer Benesch lawyers were engaged in a willful conspiracy is improper because: (a) it requires the Court to stack inferences; and (b) the inferences ICEE wants are not the most logical inferences.

334.     First, ICEE asks the Court to stack inferences. To make anything of the Benesch lawyers' lack of recollection of meetings with Mark Peters, the Court must **first,** infer that they actually do recall the meetings. Then **second,** infer that they are purposely lying in their depositions. From that inference, the Court must then **third**, infer that what occurred at the meetings was something the Benesch lawyers would have a reason to lie about. And, from that

inference, the Court must **fourth**, stack on another inference: that Benesch somehow was engaged in improper conduct in connection with Mark Peters's alleged conduct. Plus, a fifth inference as to whatever specific misconduct ICEE claims occurred. That is stacking *five* unsupported inferences, which is inappropriate under any standard.

335.     Second, under the clear and convincing standard, this Court must only accept ICEE's invitation to adopt an inference if it is the single most logical inference. If there are two inferences that are each just as likely, the Court must give the benefit of the doubt to Benesch. Given the contemporaneous emails surrounding the conversations with Mark Peters, it is more likely that the Benesch lawyers were not engaged in any type of fraud with Peters. There is simply too much evidence, as discussed above, (such as where Mr. House demanded that all documents be produced andBeenesch asked their in-house ESI expert if they had the Wendsday Email in its native form, etc.), to infer that Benesch was engaged in some nefarious activity. And it is even more unlikely that six lawyers conspired in the way ICEE suggests.

336.     Another example is ICEE asking the Court to infer nefarious things because Mr. Gurbach (Mid-August 2020), Mr. House (Fall 2020) and Ms. Emanuel (Spring 2020) left the firm during the case. Aside from the stacking issues here, this is rank speculation. If there was clear evidence in support of sanctions, there would be no need to resort to such spurious requests.

337.     The simple fact is this: tortured stacked inferences are all that ICEE has here. The documents are clear that Benesch had a good faith basis to believe the 2000 Appointment was authentic. And when real doubts came, it quickly moved to withdraw the claim. The Court will not accept ICEE's tortured and stacked inferences over the well-documented evidence Benesch has produced.

**Z.** **ICEE Presents No Evidence that It Incurred Any Additional Attorney Fees as a Direct Result of Benesch's Conduct.**

338.     ICEE functionally assumes its attorney fees will be awarded if any sanctions are awarded. But there is no evidence submitted by ICEE that indicates it would have incurred fewer attorney fees even if Benesch had acted differently with respect to the Working Practise document and the Wendsday Email.

339.     With respect to the Wendsday Email, Ms. Turk testified that learning it was not authentic did not change her view of the validity of the case. (*See* Turk Dep. Vol. I 172:13-20, Doc. 273, PageID # 11864). As she indicated, they had overwhelming evidence of the existence of the 2000 Appointment. (*Id.*). And as stated before, at the time the Wendsday Email was withdrawn, Benesch had the following evidence which indicated the 2000 Appointment was authentic:

- Six interrelated documents referring to the 2000 Appointment and the need to amend the 1996 Agreement for tax purposes;

- A draft contract from Cadbury Schweppes referencing the 2000 Appointment;

- A history of ICEE accepting a 2.5 percent royalty, instead of the 5 percent royalty due under the 1996 Agreement;

- Ralph Peters's testimony verifying his signature and in support of the authenticity of the 2000 Appointment, including specific details of the agreement unprompted;

- Stefan Loos's confirmation of the 2000 Appointment, including the same details that Ralph Peters recalled; and

- The remarkable consistency with Mr. Loos's and Ralph Peter's recollections.

340.     As Mr. House indicated, it was ICEE's expert report that was convincing. (House Dep. Vol. I 75:15-20, Doc. 254-1, PageID # 9764). And it was after ICEE's expert report was presented that Benesch confirmed it could not convincingly dispute ICEE's expert opinion. (Turk

Dep. Vol. II 395:17-396:6, Doc. 274, PageID # 12387-88). And Benesch withdrew the claim after it reasonably consulted with its own expert. (*Id.*).

341.    So it was not until September 16, 2020, that Benesch had both (1) received ICEE's expert report, and (2) confirmed with its expert that they could not dispute the authenticity of the 2000 Appointment. Given the mountain of evidence Benesch had before that time on the authenticity of the 2000 Appointment, there is no evidence that it would have dismissed the suit earlier or should have. The Court finds that, given the evidence Benesch had, it would not have been required to consider dismissing any claims until after it received ICEE's expert report challenging the authenticity of the 2000 Appointment and saw Stefan Loos back out from authenticating the Appointment on August 25, 2020.

342.    Further, there is nothing contained in ICEE's expert report that Benesch had withheld. Simply put, ICEE's expert did not rely upon the second version of the Working Practise document or the Wendsday Email. Rather, ICEE's expert relied upon documents that ICEE had pre-suit, the 2000 Appointment and the first Working Practise document. (Turk Dep. Vol. II 391:22–5, Doc. 274, PageID # 12383–84).

343.    Therefore, the Court finds that ICEE expert report was not delayed in being produced by any act Benesch took, because ICEE had all the documents it relied upon pre-suit. It did not produce a report until August 25, 2020, based upon its own choice.

344.    As such, the Court concludes that the case would have continued—reasonably— even if Benesch had produced and/or had withdrawn the Wendsday Email earlier. And the same is true had Benesch produced the second version of the "Working Practise" document earlier.

345.    The Court notes that ICEE has effectively "thrown the book" at Benesch lawyers, making all kinds of accusations, such as claiming Benesch should have come to the Court and

"fessed up" that Mark Peters was a forger. Likewise, with respect to Interrogatory Responses, ICEE contends Benesch should have answered differently. These appear to have been levied at Benesch solely on an inflammatory basis, as there is no evidence that ICEE would have incurred fewer fees had Benesch behaved differently here. To be sure, ICEE alleges there can be no doubt Mark Peters is the forger—so how would Benesch admitting that change the total amount of fees ICEE incurred? (*See* Doc. 89, PageID # 2319). If this is set in stone anyway, how would a Benesch admission have changed the course of the case?

346.    Therefore, ICEE's submission of a mountain of legal bills does nothing to establish damages here. There is nothing in the record that parses out what legal fees ICEE incurred at each stage of the proceeding, which would let the Court delineate whether fees were incurred for one act or another. Rather, ICEE chose to submit fees in a manner that assumes that Benesch should not have pursued the 2000 Appointment claim as ICEE's sole measure of damages. Because Benesch had substantial evidence to pursue the 2000 Appointment claim up until the time it began to make preparations to withdraw it, ICEE has not met its burden to establish any damages as a result of Benesch's alleged conduct, even if Benesch had engaged in misconduct, which it has not.

Respectfully submitted,

*/s/ Patrick Kasson*
Patrick Kasson (0055570) (Trial Attorney)
Steven A. Chang (0088321)
Mrinali Sethi (0101295)
**REMINGER CO., L.P.A.**
200 Civic Center Drive, Suite 800
Columbus, Ohio 43215

Ian D. Mitchell (0090643)
**REMINGER CO., L.P.A.**
525 Vine Street, Suite 1500
Cincinnati, Ohio 45202

*Counsel for the Benesch Respondents*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was served upon the following counsel of record via the Court's E-filing system, this 2nd day of June, 2025.

/s/ Mrinali Sethi
Patrick Kasson (0055570)
Steven A. Chang (0088321)
Mrinali Sethi (0101295)
