## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

        Plaintiff/Counterclaim
        Defendant

      v.

THE ICEE COMPANY,

        Defendant/Counterclaim
        Plaintiff.

CASE NO. 1:19-cv-00189-MRB

Judge Michael R. Barrett

### THE ICEE COMPANY'S PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW RELATING TO MOTION FOR SANCTIONS DOC. 89[1]

## I.      PROCEEDINGS ON ICEE'S MOTION FOR SANCTIONS, DOC. 89

      1.      ICEE filed its Motion for Sanctions against Benesch, Friedlander, Coplan &

Aranoff LLP ("Benesch"), and Attorneys Mark Avsec, Elizabeth R. Emanuel, Matthew D.

Gurbach, Ronald L. House, Jennifer M. Turk and Eric Larson Zalud pursuant to 28 U.S.C. §

Section 1927, Fed. R. Civ. Proc. 26(g), and the Court's Inherent Authority on January 12, 2021.

The Benesch Respondents filed an opposition brief on February 23, 2021. Doc. 95. ICEE filed a

reply brief in support of its motion on March 19, 2021. Doc. 98. The Benesch Respondents filed

a motion to strike ICEE's reply brief on April 2, 2021. Doc. 101. ICEE filed a motion to oppose

the motion to strike on April 6, 2021. Doc 102. On April 20, 2021, Respondents filed a reply

---

[1] Certain of the proposed conclusions of law appear in bold font interspersed in the proposed findings of fact for contextual purposes, and are not repeated at length in the conclusions of law section. To the extent a finding labeled as a finding of fact is more properly considered a conclusion of law, the Court intends that it be treated as such.

brief in support of their motion to strike.  Doc. 104.  On June 11, 2021, Respondents filed a motion to file a sur-reply brief in further opposition to ICEE's motion for sanctions.  Doc. 107. ICEE filed a response to that motion, not opposing Respondents' request to file a sur-reply brief and also responding to some of the arguments made by Respondents in their proposed sur-reply brief.  Doc. 108.  On July 16, 2021, Respondents filed a reply brief in further support of their motion for leave to file a sur-reply brief.  Doc. 109.  On February 14, 2023, this Court denied the Benesch Respondents' motion to strike ICEE's reply (Doc. 98) and granted Respondents' alternative motion for leave to file a sur-reply (Docs. 101 and 107).  Doc. 182.  Respondents' sur-reply was accordingly docketed at Doc. 184.

2.       On April 20, 2023, ICEE filed a motion to take the depositions of SPL's outside counsel.  Doc. 203.  On May 4, 2023, Respondents filed their opposition to that motion and a motion for a protective order and to quash the subpoenas served on counsel.  Doc. 210.  On May 31, 2023, oral argument was held with regard to ICEE's and Respondents' cross motions.  Doc. 220.  At the end of the hearing, the Court asked ICEE's counsel to draft a proposed order outlining the areas of inquiry for Respondents Gurbach, Avsec, and House.  Counsel submitted a draft order to the Court on June 5, 2023, and that draft was discussed at a conference on August 8, 2023.  During that conference, Respondents' counsel agreed to produce Respondent Gurbach for deposition on August 29, 2023 at the courthouse, followed by Mr. Avsec and Mr. House. On August 18, 2023, the parameters and scheduling of the deposition of Mr. House was discussed. Doc. 229.

3.       Mr. Gurbach's deposition proceeded on August 29, 2023, attended by all counsel and the Court.  On September 22, 2023, a discovery conference was held with ICEE's and Respondents' counsel regarding the remaining attorney depositions.  Doc. 247.  Mr. House's

deposition proceeded on September 27, 28, 29.  Another discovery conference was held on

September 29 to discuss the completion of Mr. House's deposition.  Doc. 248.  A fourth session

with House was held on October 4, 2023.  A discovery conference was held on October 25, 2023

to discuss more issues involving the deposition of Mr. House.  Doc. 240.  Mr. House's

deposition was completed on November 2, 2023.

     4.     On December 8, 2023, a discovery conference was held to discuss the depositions

of Ms. Turk and Ms. Emanuel.  Doc. 251.  During the conference, Respondents' counsel asked

the Court for permission to file a motion for reconsideration regarding the Court's order granting

sanctions discovery, and the Court granted that request.  The motion for reconsideration was

filed on December 12, 2023.  Doc. 252.  ICEE' filed its opposition to the motion for

reconsideration on ecmeber 21, 2023.  Doc. 260.   Respondents filed their reply in further

support of their motion for reconsideration on January 2, 2024.  Doc. 261.  On April 10, 2024,

the Court denied Respondents' motion to reconsider, and ordered the depositions of Ms. Turk

and Ms. Emanuel to proceed.  Ms. Emanuel's deposition was held on May 15, 2024, and Ms.

Turk's deposition was held on May 17 and May 23, 2024.

     5.     On September 27, 2024, ICEE filed a Motion to File a Supplemental

Memorandum of Law in further support of ICEE's motion for sanctions, along with its proposed

supplemental brief.  Doc. 276-1.  Respondents filed their opposition to the motion for leave on

October 25, 2024.  On November 8, 2024, the Court granted ICEE's motion for leave to file a

supplemental brief.  Respondents filed their response to ICEE's supplemental brief on December

30, 2024.  Doc. 282.

     6.     On February 20, 2025, the Court held an all-day oral argument on ICEE's motion

for sanctions against Respondents.   Doc. 294.

7.      This Court has ruled sanctions will be imposed against Plaintiff Slush Puppie Limited ("SPL"), but that "[w]hether they will also be imposed against (any or all of) SPL's lawyers remains to be seen." Doc. 301 at PAGEID 14583.  With regard to awarding sanctions under 28 U.S.C. § 1927, this Court has held that sanctions may be awarded against an attorney where an attorney's litigation tactics needlessly obstruct the litigation of nonfrivolous claims and where "an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by the member of the bar to the court and which, as a result, causes additional expense to the opposing party.'"  Doc. 270 at PAGEID 22635-36.  The Court has also ruled that "it is axiomatic that 'trial counsel themselves have an affirmative obligation to ensure that what their clients tell them is accurate.'"  Doc. 270 at PAGEID 11642-43.

8.      The Court now sets forth its findings of fact and conclusions of law with respect to ICEE's motion for sanctions.

## II.      THE RESPONDENTS

9.      Respondent Benesch, Friedlander, Coplan & Aronoff ("Benesch") is an Am Law 200 law firm with nearly 450 attorneys and offices in Cleveland, Chicago, Columbus, New York, San Francisco, and Wilmington.  https://www.beneschlaw.com/about.html

10.      Benesch is regularly recognized by Chambers & Partners as one of the country's leading law firms.  *Id.*

11.      Benesch's Litigation Practice Group is one of the firm's largest, comprising over 160 attorneys, and it has been ranked as a Litigation Leader and Distinguished in Litigation by BTI Litigation Outlook.  https://www.beneschlaw.com/resources/beneschs-litigation-practice-group-earns-multiple-rankings-in-bti-litigation-outlook-2025.html

12.      Benesch holds itself out as "participating in thought leadership" regarding eDiscovery.  During the relevant time period, it had an eDiscovery Team that included 15

4

attorneys as well as dedicated litigation support professionals. Doc. 276-8, DX 128; Gurbach

Dep. 39:11-41:4. Among those dedicated ediscovery litigation support professionals was,

during the relevant time period, Don McCann, who was assigned to the Benesch team handling

this case. Gurbach Dep. 28:17-29:17. Benesch claims to have "critical expertise" in matters

relating to electronically stored information ("ESI"). Doc. 276-8 at PAGEID 13281 (DX 128);

Gurbach Dep. at 40:8-12, 42:14-18, Doc. 255.

13.     Benesch touts its Litigation Practice Group as experienced in assisting clients

with defensible ESI preservations plans, which include developing "a comprehensive

understanding of the Company's data systems, locations, and custodians," properly documenting

"steps required to ensure compliance," harvesting ESI that is potentially relevant from client

systems, and ensuring that the "strict guidelines regarding the production of ESI—including

metadata and text extraction—are followed. Doc. 276-8 at PAGEID 13282 (DX 128); Doc. 255,

Gurbach Dep. at 44:1-46:19. Benesch's e-discovery website page notes that document review is

"typically conducted with documents in their native format." Doc. 276-8 at PAGEID 13283.

14.     During the relevant time period, Benesch's website warned that, if ESI is deleted

or altered, even inadvertently, that could subject the party to "severe sanctions of evidence

spoliation." *Id.*

15.     Respondent Mark Avsec is an intellectual property attorney with experience

litigating trademark cases. Avsec Dep., Doc. 256 at PAGEID 10739-41. He has been the vice

chair of Benesch's Innovations, Information Technology & Intellectual Property Practice Group.

Intellectual Property Group and a partner at Benesch since 1995.

https://www.linkedin.com/in/mark-avsec-3b143/. He is recognized by Chambers and Partners.

https://www.beneschlaw.com/resources/38-benesch-attorneys-and-15-practices-recognized-by-

chambers-usa-2024-one-attorney-ranked-globally.html  He describes himself as an expert in, and

has spoken at length about, cutting edge technologies such as 3D printing.

https://www.beneschlaw.com/people/mark-e-avsec.html

16.     Respondent Matthew Gurbach is a litigator.  He is currently a partner at Bricker

Graydon, where he handles high-stakes matters involving trade secret misappropriation,

intellectual property, and product liability.  He has been first chair trial counsel in over 25 jury

trials and arbitrations.  https://www.brickergraydon.com/team/matthew-gurbach  He was a

partner at Benesch in 2017 and left Benesch on September 15, 2020.  Doc. 95-3 at PAGEID

2469.  Mr. Gurbach has ability and capacity regarding ediscovery.  Doc. 255, Gurbach Dep. at

12:9-17.

17.     Respondent Eric Zalud is associate chair of Benesch's litigation practice group

and co-chair of its Transportation & Logistics Practice Group and a partner at Benesch  He

focuses his practice on commercial litigation.  He has been an attorney at Benesch since 1990.

He was contacted by RPC regarding the parties' dispute in late 2017.  He entered his appearance

in this case on November 5, 2020.  Doc. 79.

18.     Respondent Ron House was a litigation partner at Benesch.  He began

representing SPL in this dispute in September 2018.  He was co-lead counsel in the litigation

with Matt Gurbach.  Gurbach Dep., Doc. 255 at PAGEID 10236.  When Matt Gurbach withdrew

his appearance in September 2020, House was lead counsel.  House Dep., Doc. 254-1 at

PAGEID 9767.  House withdrew his appearance on November 9, 2021.  Doc. 141.

19.     Respondent Elizabeth Emanuel (Arora) is counsel at ReliabilityFirst Corporation.

She was an associate at Benesch from September 2015 to September 2020.  She entered her

appearance in this matter on October 15, 2019 (Doc. 25) and withdrew her appearance on May 7, 2020 (Doc. 50).

20.     Respondent Jennifer Turk is a commercial litigator who has been a partner at Benesch since September 2001.  https://www.linkedin.com/in/jennifer-turk-4389436/.  She entered her appearance in this matter on February 21, 2020.  Doc. 45.  She was brought into this case in late 2019 or early 2020 and continues to represent SPL in this matter.

## III.     BACKGROUND REGARDING SLUSH PUPPIE CORPORATION AND SLUSH PUPPIE LIMITED

21.     The Slush Puppie Corporation ("SPC") was founded by Willard Lawson Radcliff. Radcliff was born in 1939 in Dayton, Kentucky and was raised in Cincinnati.  He graduated from Cincinnati's Western Hills High School. https://en.wikipedia.org/wiki/Will_Radcliff

22.     In 1978, SPC appointed Slush Puppie Limited (then known as Somportex and later known as Able Foods) as a SLUSH PUPPiE manufacturer for the U.K. and "South Ireland." Doc. 1-1 (1978 Appointment) at PAGEID 33.  Ralph Peters held a controlling interest in Able Foods.  Doc. 77, Loos Dep. at 9:2-4 (Ralph owned 60%; each of three children owned 10% and Loos owned 10%).

23.     Over the years, Ralph Peters and Will Radcliff became friends.  Doc. 84, Ralph Peters Dep. 26:9-27:1. They would fly throughout Europe on Will Radcliff's private plane. *Id.*

24.     In 1996, SPC and Able Foods (predecessor to SPL) amended the 1978 appointment by entering into the 1996 Manufacturing Appointment. Will Radcliff and Ralph Peters executed that agreement on February 1, 1996.  Doc. 1-2 at PAGEID 37-42.  The 1996 Appointment uses American English spellings.  *See, e.g*., 27-2 at PAGEID 393, 394, 395 (e.g., "license," "authorize," "flavors").  The 1996 Appointment defines the "Territory" as the U.K., Ireland, and the European countries at that time.  Among other things, SPC agreed to not

"authorize any other person, firm, or corporation to carry on the same manufacturing activities." The agreement is perpetual. *Id.* at PAGEID 394. Ralph Peters' signature was witnessed by Sharon O'Rourke, and Will Radcliff's was witnessed by Diane Menzer (Radcliff's PA). *Id.* at PAGEID 42; Doc. 72-2; Doc. 84, Ralph Peters Dep. at 25:4-10 (Menzer was Radcliff's PA).

25.    In 1999, SPC and SPL entered into an International Area Distributor License Agreement ("the 1999 Agreement" or "the 1999 Distributor Agreement") effective January 1, 2000. Doc. 27-3. The agreement was signed on December 3 by Mark Peters, witnessed by Gary Ruffell (who was corporate secretary from 1999 to 2007, https://find-and-update.company-information.service.gov.uk/officers/4zZeot7bKLqFUue1S9vplawSMe4/appointments) and on December 23 by Diane Menzer (on behalf of SPC), witnessed by Tara Bohannon. Doc. 27-3 at PAGEID 408-409; Doc. 74, July 1, 2020 M. Peters Dep. at 14:11-16:21 (Gary Ruffell appointed as director & financial director in 1999). Like the 1996 Appointment, the agreement uses American English spellings (e.g., "license," "flavors"). Doc. 27-3 at PAGEID 401, 404. The 1999 Agreement appoints SPL as "distributor of PRODUCTS in the TERRITORY." "Territory" is limited to the U.K. and Ireland. SPC agreed that, during the term of the 1999 Agreement, it would not "appoint any other distributors in the TERRITORY except as provided herein." The 1999 Distributor Agreement provided SPL with exclusive rights only in the United Kingdom and Ireland. It did not provide SPL with any exclusive rights in the rest of Europe. Unlike the 1996 Manufacturing Appointment, under the 1999 Distributor Agreement, SPC pays no royalties on any authorized sales of SLUSH PUPPiE products. The agreement is perpetual, conditioned upon Distributor's continued satisfactory performance. Doc. 27-3 at PAGEID 400. The exclusive venue for litigation is in "the Court of Common Pleas of Hamilton County, Ohio, USA." The

city of Cincinnati is located in Hamilton County, which was named after the first secretary of the treasury, Alexander Hamilton.

26.     Per Ralph Peters, at this time (1999) "Mark [Peters] was running the business, not me. . . . He was running it, but still consulted with me. . . . I had not given up completely." Doc. 84, Ralph Peters Dep. at 35:7-36:6.

27.     In January 2001, Dr. Pepper/Seven Up ("DPSU") acquired Slush Puppie Corporation ("SPC") in an asset sale.  Doc. 276-4 at PAGEID 13113; Dec. 20, 2000 Asset Purchase Agreement by and among DPSU, SPC, and Will Radcliff, attached as Exhibit A.  The APA was signed by Will Radcliff on his own behalf and on behalf of SPC.  Under the APA, Diane Menzer was retained as an employee through December 31, 2001.  Schedule 4.4(l).  At the time, DPSU was a wholly owned subsidiary of the U.K. company Cadbury Schweppes PLC. Doc. 276-6 at PAGEID 13265.

28.     In 2006, ICEE purchased the SLUSH PUPPiE business and trademarks from DPSU in an asset sale.  Doc. 276-4 at PAGEID 13113.  ICEE is a wholly owned subsidiary of J&J Snack Foods Corp.

29.     During the relevant time period, Dan Fachner was the CEO and/or president of ICEE. Doc. 112 PAGEID 3140 (Declaration of Dan Fachner).

30.     As of 2020, Mark Peters owned 90% of Ralph Peters & Sons, with Ralph Peters owning 10%.  Ralph Peters & Sons owns SPL.  Doc. 74, July 1, 2020 M. Peters Dep. 34:1-35:8.

## IV.     PRESUIT FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.     The Fizz Creations Dispute and U.K. Solicitor Correspondence

31.     In 2017, a dispute arose between SPL and ICEE concerning ICEE's licensing of a company named Fizz Creations to sell and distribute a Slush Puppie-branded toy that served

crushed ice mixed with Slush Puppie syrup.  Initially, the dispute was argued via letter between the parties' U.K. trademark solicitors.

32.     On June 23, 2017, ICEE's U.K. trademark solicitors, Gowling WLG, wrote to Mark Peters "regarding the scope of activities conducted by Slush Puppie Limited in Europe" in connection with the 1996 and 1999 Agreements (defined therein as "the Existing Agreements."). Doc. 273-6 at PAGEID 12039.  Gowling informed Mr. Peters that, under the Existing Agreements, SPL's distribution rights were limited to "PRODUCTS" as therein defined within the territory of the U.K. and Ireland.  In particular, Gowling noted that "the Existing Agreements do not grant exclusive rights to [SPL] in merchandise, and J&J is not restricted in any way by the Existing Agreements from engaging in its own merchandising activities under the SLUSH PUPPIE Marks."  Gowling further stated that, although Mark Peters had "asserted the existence of various 'oral agreements', you have provided no evidence of such 'oral agreements' and thus it is impossible for J&J to comment further, while, by contrast, the position under the Existing Agreements is clear, as described above."

33.     On August 8, 2017, SPL's U.K. trademark solicitors, Weightmans, responded to Gowling, acknowledging the "Existing Agreements," but arguing that they "do not encompass the entirety of the relationship between the parties."  Doc. 194-4. The letter proposed "updating" the Existing Agreements with various terms more favorable to SPL.  Weightmans—SPL's solicitors—was obviously unaware of any 2000 Appointment of Trade Mark License, and did not deny that Mark Peters had "asserted the existence of various 'oral agreements.'" Weightmans went on to complain, however, about the Fizz Creations novelty slush maker, enclosing a copy of a cease and desist letter in which Weightmans alleged that Fizz Creations

10

had "unlawfully infringed [SPL's] exclusive rights to exploit the Slush Puppie trademark and logo."

34.    Gowling responded to Weightmans' letter on August 30, 2017.  Gowling informed Weightmans that "Fizz Creations is an authorised licensee of J&J through ICEE for SLUSH PUPPIE branded merchandise in the UK and Europe."   Doc. 276-5 at PAGEID 13182. Gowling further explained that J&J through ICEE was not limited by the 1999 Distributor Agreement to license such "novelty, toy and homeware merchandise" to entities such as Fizz Creations.  Weightmans never responded to this letter.

**B.    Mark Peters Forges the 2000 Appointment and Alters the 2011 History of Working Practise**

35.    Shortly after this exchange, Mark Peters forged at least two documents:  an August 8, 2000 Appointment of Trade Mark License and an altered version of a 2011 document called "History of Working Practise" (hereafter "the Forged History").

     a.    The 2000 Appointment provided SPL with exclusive rights to the Slush Puppie trademarks in the U.K., Ireland, and Europe (including "Vatican City" and two countries—Montenegro and Serbia—that did not exist until 2006), thereby resolving in SPL's favor all the issues raised by Gowling in its earlier letters, and giving SPL a license to use the SLUSH PUPPiE brand in the U.K. and Europe on ***any and all*** products.

          1.    The 2000 Appointment defines the "Royalty" to be paid on "SYRUPS"  "as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts . . . in the Territory.

Royalty shall be calculated and paid without regard to tax implications, if any, to Manufacturer." § 4A.

2. The Appointment appears to bear the signatures of Ralph Peters, witnessed by a person with an illegible signature, and Will Radcliff, witnessed by a person with a signature that appears to be "BJ Cork," or something similar. These signatures were lifted from the 2011 version of the History of Working Practise:



| History of Working Practise Sent to ICEE on April 26, 2011 | Purported 2000 Appointment Sent to ICEE February 28, 2018 |
|---|---|

3.    The date of the signing is not specified.  Instead, in the same handwriting, "August 2000" is written over the signature lines for both SPL and SPC. Thus, these lines read:  "WITNESS the signature of Slush Puppie Ltd this day of *August 2000*" and "Signed and executed [sic] SLUSH PUPPIE CORPORATION Cincinnati, Ohio, this Day ___ [sic] of *August 2000*."  (italicized portions are handwritten).

4.  The 2000 Appointment contains various British spellings of words (e.g., "licence," "trade mark," "whilst,"), and numerous typos (e.g., "aberration" instead of "arbitration").

5.  The agreement contains two different choice of law/forum selection clauses, one at Par. 17 and one at Par 24, with Par. 17 providing that the exclusive venue for any litigation "arising from or in any way connected with this agreement" is to "rest exclusively in a court of competent jurisdiction located in Ohio County, USA" and paragraph 24 providing that venue "shall lie exclusively in Ohio County, USA."  Ohio County is not the name of any Ohio county.

6.  The last page contains additional substantive provisions, but, unlike the preceding pages, they are not prefaced with paragraph numbers and the indentation of the paragraphs on the last page (which contains the purported signatures) is substantially narrower.

b. The second document Mark Peters created at this time was an altered version of a document titled 2011 History of Working Practise that he had emailed to Karen Kline (a trademark attorney at Duane Morris) in 2011. Back in 2011, Mark Peters was trying to convince Kline that, even though the 1996 and 1999 agreements did not provide SPL with the exclusive rights Peters wanted, there was a "history of working practise" between his father Ralph and Will Radcliff that implied such exclusive rights. Doc. 267-4. Mark Peters likely assumed that Kline would not end up being involved in the dispute over Fizz Creations so the 2011 version of the History would never see the light of day. Accordingly, after lifting the signatures from the 2011 History, he made critical changes to the 2011 document in an attempt to corroborate the forged 2000 Appointment and to conceal the source for the signatures in the 2000 Appointment. The metadata for the forged History show that it was created from a Word document at 3:31 PM on November 20, 2017 by Mark Peters ("markp") from a Microsoft Word document with the file name "Will RPP history of SP USA Contrat [sic] V1.1."

**C.    RPC Seeks Advice From Benesch and Sends Benesch the Core Documents**

36.    Mark Peters must have decided to have his long-time London solicitors, RPC, handle the dispute with ICEE instead of Weightmans, so forty-five minutes after he created the forged History on November 20, he sent Charles Suchett-Kaye, a partner at RPC, what Peters described as five "Slush Puppie Documents from Stephan Loos": (1) the 1978 Somportex manufacturing appointment; (2) the 1996 Manufacturing Appointment; (3) the 1999 Distributor Agreement; (4) the forged August 8, 2000 Appointment of Trade Mark Licence; and (5) the forged History of Working Practise. Doc. 73-12 at PAGEID 1453, DX 077. (Benesch did not produce this during discovery, even claiming in September 2020 that it could be withheld under

14

the attorney-client privilege.  Doc. 276-20 PAGEID 13476.)  Suchett-Kaye then forwarded the

five documents to another RPC partner, David Cran.  Doc. 73-12, DX 77.

37.     Because the 1996, 1999, and 2000 agreements all provided that Ohio law applied

and contained Ohio forum selection clauses, RPC sought to consult Ohio counsel.  RPC knew

Mr. Zalud, so around this time, they reached out to him to have Benesch represent SPL regarding

the parties' dispute.  Doc. 255, Gurbach Dep. at 12:22-13:7;  Doc. 73-20, Doc. 276-15  ("Thanks

again for your assistance with this matter.").

38.     On December 1, 2017, David Cran of RPC sent Respondents Zalud and Avsec the

five "Slush Puppie Documents from Stephan Loos" that Mark Peters had sent RPC on November

20: the three real contracts, the forged 2000 Appointment, and a digital copy with its metadata of

the forged History of Working Practise.  Doc. 73-20. Respondents' counsel has described these

as the "initial central docs," Respondents' PowerPoint from Feb. 20, 2025 Oral Argument, slide

6, and some of them were later described by Respondent Avsec as the "CORE DOCUMENTS"

regarding the parties' dispute. Doc. 276-18 at PAGEID 13458, DX 189. This was the first time

RPC had sent Benesch these "initial central" documents.  The Court concludes that, given the

centrality and limited number of these documents, at least Respondents Zalud, Avsec, Gurbach,

and House must have read them carefully before filing suit.

39.     In its December 1, 2017 email to Benesch, RPC highlighted the History, 

describing it as "A chronology setting out the history of the relationship between SPC (and its

predecessors in title) and SPL."  SP007753.  Just like the copy that Peters had sent to RPC on

November 20, the December 1, 2017 Copy of the History of Working Practise ("the December 1,

2017 Copy of the History") sent to Zalud and Avsec contains metadata showing that it was

created from a Word document on November 20, 2017 by Mark Peters ("markp") with the file

name "Will RPP history of SP USA Contrat [sic] V1.1." (This and the Wendsday Email are the only two documents received by Benesch before suit was filed that quote from or paraphrase the 2000 Appointment, other than the appointment itself.)

| | |
|---|---|
| File: | Hisoty of Working Practice.pdf |
| Title: | Microsoft Word - Will  RPP history of SP USA Contrat V1.1 |
| Author: | markp |
| Subject: | |
| Keywords: | |
| Created: | 11/20/2017 3:31:42 PM |

40.     Mr. Gurbach saved digital copies of these documents to Benesch's iManage system. Doc. 255, Gurbach Dep. at 26:12-28:6 (used iManage instead of Everlaw).  Ron House printed out the forged History and put it in its own barcoded folder entitled "Client History of Relationship." Doc. 73-20 at PAGEID 1557, Doc. 276-15, Doc. 267-5.  The documents sent by RPC to Benesch ended up "residing in numerous, numerous mailboxes" at Benesch.  Doc. 255, Gurbach Dep. 147:21-148:3.

41.     Under "Key issues," Cran's December 1, 2017 email to Zalud and Avsec asks: "1. Does document 4 (ie the 2000 licence) supersede all previous documents, including document 3 (ie the 1999 agreement)? [redacted] Does the ongoing payment of royalties by SPC to The ICEE Company in accordance with the terms of document 4 constitute an assignment by conduct or equivalent) of document 4 to The ICEE Company such that The ICEE Company is bound by the terms of document 4 ***even though it has not been assigned/transferred in writing?"***   (emphasis supplied)

16

42.     Cran's December 1, 2017 statement that the 2000 Appointment had "not been assigned/transferred in writing" was made months before Mark Peters sent ICEE the forged 2000 Appointment and, up to this point, RPC had had no contact with ICEE or J&J.  Cran therefore had no information about whether ICEE had or had not received the 2000 Appointment from DPSU as part of the asset purchase agreement, or whether DPSU had received it from SPC in 2000.  Cran nonetheless assumed that the forged agreement "has not been assigned/transferred in writing," or at least that ICEE would so argue.  Thus Cran was flagging for Benesch his belief that there was going to be an issue about whether the 2000 Appointment was transferred by SPC to DPSU and/or by DPSU to ICEE. By contrast, Cran knew that the 1996 and 1999 agreements had been transferred to ICEE, even though the 2000 Appointment purported to supersede them.

**D.     RPC Seeks Proof That ICEE Was Aware of the 2000 Appointment After 2006 so Peters Forges the Wendsday Email**

43.     Since Cran was aware that ICEE and SPL had been operating under the 1996 and 1999 agreements, as set forth in the solicitor correspondence between Weightmans and Gowling, and that Mark Peters himself was unaware of the 2000 Appointment until he "provided" it to RPC in November 2017, and since Cran assumed it had not been transferred to ICEE, Cran wanted to see evidence that ICEE nevertheless was aware of the 2000 Appointment.  On December 20, 2017, Cran therefore asked Peters to "send through the further emails/correspondence with ICEE that you mentioned, as well as any royalty statements/calculations showing the agreed 2.5% royalty (under the later 2000 agreement – ie document 4, as opposed to the earlier agreements).  As mentioned, anything that fixes ICEE with knowledge of [the 2000 Appointment], or shows that ICEE has been working to its terms, would be helpful." Doc. 73-14 at PAGEID 1502-03. When Cran didn't hear back from Peters, he sent him a reminder email on this subject on January 10, 2018.  Doc. 73-14 at PAGEID 1501.

17

44.     On January 17, 2018 at 9:53 a.m. GMT Mark Peters ("markp") created the Wendsday email from a Word document. Doc. 73-14 at PAGEID 1516 (showing metadata of doc as sent to Cran).  Peters lifted real emails dating from October 24 to November 11, 2008, on which he had been copied, between his then-financial director Lindsay Kirby and ICEE's Jerry Bird and copied and pasted them into a Word document. Peters then typed an email, dated November 12, 2008, that did not exist in the genuine email chain. This new email (which has now been referred to in this litigation as the "Wendsday Email") purported to be from Kirby to Bird and purported to quote from the royalty provision "as defined in the Trade Mark Licence dated August 8, 2000."  Mark Peters, however, misspelled "Wendsday" in what should have been the automatically generated date and time field:

**From:** Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
**Sent:** Wendsday, November 12, 2008 10:57 AM
**To:** Bird, Jerry
**Subject:** Royalty 2007

Dear Jerry,

The royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000.

On page two - A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

Is this what you need?

Regards,
Lindsay

45.     Forty-three minutes later on January 17, 2018, Peters sent RPC the Wendsday Email with its metadata showing that he had just created it from a Word document, describing it as "an e mail exchange from our head of finance" with the file name "LK_E_Mail_Roylaty.pdf." [sic]:

18



46.     Peters also sent Cran two other documents, describing them as "an email and draft contract form Cadbury – the UK owners of Dr Pepper Seven Up (DPSU) the owners of the SP brand that then sold it to Icee, it refers to an agreement dated 8th of August between SP UK and SP Cincinnati."  One was a pdf that purported to be a copy of an email from Neil Harvey at Cadbury Schweppes plc that states: "(See attached file: Slush Puppie.doc)." The second was a supposed draft, unsigned contract with a different file name than the one referenced in the Neil Harvey email ("CS_Draft_Agreement.pdf") that refers to an August 8, 2000 Agreement.  Both documents were created by Mark Peters ("markp") from Microsoft Word documents on January 16, 2018:

| | |
|---|---|
| **Control Number** | SP006091 |
| **Record Type** | |
| **Media Type** | |
| **Level** | |
| **Unified Title** | |
| **Primary Sort Date/Time** | |

Email Metadata        File Metadata

| | |
|---|---|
| **Title** | Microsoft Word - Document1 |
| **Author** | markp |

Email Metadata        File Metadata        Docume

| | |
|---|---|
| **File Type** | |
| **Document Extension** | pdf |
| **File Size** | |
| **Date Created** | 1/16/2018 3:54 PM |
| **Date Last Modified** | 1/16/2018 3:54 PM |
| **Last Accessed Date/Time** | |
| **SHA1 Hash** | |
| **SHA256 Hash** | |
| **Password Protected** | |
| **File Name** | E_mail_from_Cadbury.p |

| | |
|---|---|
| **Control Number** | SP006089 |
| **Record Type** | |
| **Media Type** | |
| **Level** | |
| **Unified Title** | |
| **Primary Sort Date/Time** | |

Email Metadata     File Metadata     Docu

| | |
|---|---|
| **Title** | Microsoft Word - SlushPuppie (002) |
| **Author** | markp |

Email Metadata     File Metadata     Document

| | |
|---|---|
| **File Type** | |
| **Document Extension** | pdf |
| **File Size** | |
| **Date Created** | 1/16/2018 9:15 AM |
| **Date Last Modified** | 1/16/2018 9:15 AM |
| **Last Accessed Date/Time** | |
| **SHA1 Hash** | |
| **SHA256 Hash** | |
| **Password Protected** | |
| **File Name** | CS_Draft_Agreement.pdf |

47.  Peters then rhetorically asked Ben Mark: "Is this of any help?"  Doc. 73-14.

**E.  Peters Sends the 2000 Appointment to Fachner and Doubts About Its Authenticity Are Raised**

48.  With this preparatory "work" complete, Peters sent the forged 2000 Appointment to ICEE. On February 28, 2018, he sent Fachner the 2000 Appointment as an email attachment, telling him: "Following our previous discussions, in the course of reviewing our existing

arrangements, we have identified the attached exclusive licence dated 8 August 2000, which governs the arrangements between the parties.  This exclusive licence post-dates both the [1996 and 1999 agreements], which were the subject of our previous discussions.  This exclusive licence confirms that SPL has the exclusive rights to use the SLUSH PUPPIE trade mark in Europe in relation to freezers, syrups and products for the promotion of the SLUSH PUPPIE trade mark." Doc. 60-6.

49.     Fachner was dumbfounded: "This is the first time that you have shared another contract.  Where did this contract come from and why was this never produced or mentioned in the past decade?" March 12, 2018 Fachner-Peters email, Doc. 60-6.

50.     Peters responded on March 20, tellingly failing to explain where the agreement came from, or why it had never been mentioned in the past decade: "That exclusive licence was in fact raised with ICEE many years ago even though as an oversight it was not mentioned in more recent correspondence." Doc. 60-6.  Since Peters himself was unaware of the 2000 Appointment until he "discovered" it in November 2017 and he had taken over the business long before ICEE bought it in 2006, this was an obvious lie. And the Benesch lawyers knew that Mark Peters did not discover the 2000 Appointment "in the course of reviewing our existing arrangements."  To the contrary, he initially told the Benesch attorneys that he had discovered it in Majorca at his father's residence, later changing his story to claiming that he found it in a box of his father's papers at his father's U.K. residence.  Doc. 255, Gurbach Dep. 155:2-155:25 (Peters told them "he'd found it in his father's, in his father's belongings"); Emanuel Dep., Doc. 275-1 PAGEID 12865-66 (discussing DX188, attached hereto as Exh. B, SPL's Responses to ICEE's 3d Interrogatories at p. 6 ("[A] paper copy of the 2000 Agreement was located sometime in late 2017, in or about October/November, at Call Malola 9, Son Vida 07013, Palma de

Mallorca, Spain, the residence of Ralph Peters at the time.  Mark Peters first observed the document at the residence after that time.")).  Moreover, Peters' representation that the documents were "from Stephan Loos" did not jive with either his testimony that they were found at his father's residence in Majorca or among his father's belongings in a box in the U.K.  Loos has lived in Antwerp for many years, and had no dealings with Mark Peters after Peters took over business from his father in the late nineties. Doc. 77, S. Loos Dep. 13:13-14:17, Doc. 73-12 at PAGEID 1453 (attaching "Slush Puppie Documents from Stephan Loos").  Peters was having trouble keeping his story straight.

51.     On April 17, 2018, RPC sent Zalud and Avsec various additional documents. Doc. 73-20, DX 78.  First, RPC sent Benesch all of the "solicitor correspondence": the June 23, 2017 letter from Gowling to Mark Peters (Doc. 273-6); the August 8, 2017 Weightmans response (Doc. 194-4); and Gowling's August 30, 2017 letter (Doc. 276-5).  As noted, this correspondence makes clear that SPL's own solicitors (who would have received their information from Mark Peters[2]) were unaware of the 2000 Appointment. Indeed, RPC's email underscores that "as recently as 2017 . . . neither party mentioned the existence of the 2000 licence agreement."  Moreover, Gowling's June 23, 2017 letter makes clear that Mark Peters had been asserting "the existence of various 'oral agreements.'"  Doc. 273-6.

52.     Noting that they were sending Benesch "some helpful contemporaneous emails that refer to the payment of royalties pursuant to the 2000 licence agreement," RPC also forwarded to Avsec and Zalud the Cadbury contract and email that Peters had created, and the

---

[2] In his dealings with SPL, Gurbach communicated only with Mark Peters.  That is because "he was running the company."  Doc. 255, Gurbach Dep. 53:18-54:21.  Gurbach never spoke with any of SPL's IT people. Gurbach Dep. 55:13-56:12.  As Peters himself put it, "I am the company."  Doc. 76, Oct. 9, 2020 M. Peters Dep. at 180:13-18.

Wendsday Email, the latter described by RPC as "Email exchange between Lindsay Kirby and Jerry Bird in late 2008, regarding the basis upon which royalties were calculated. We understand that this is the only correspondence around this time dealing with this issue." As sent by RPC to Benesch, the Wendsday Email had the metadata intact, showing that it was created on January 17, 2018 by Mark Peters ("markp"") from a Word document and exported to PDF. Thereafter, the Wendsday Email—along with its incriminating metadata—"found itself residing in numerous, numerous mailboxes" at Benesch. Doc. 255, Gurbach Dep. 147:21-148:3.

53.     On April 25, 2018, Gowling wrote to Weightmans about the recently "discovered" Appointment of Trade Mark Licence: "Your client says that it 'identified' the 2000 Document 'in the course of reviewing its existing arrangements' and it now seeks to rely on it. This seems peculiar given that the 2000 Document was unknown to our clients, and apparently also to yours. Since ICEE purchased the Slush Puppie business in 2006, our respective clients have discussed and debated issues with the [1996 and 1999 agreements.] Our client asked yours where the 2000 Document had come from, and why it had not been produced or referred to during these discussions over the past several years. No satisfactory response has been received. Your client has said 'That exclusive licence was in fact raised with ICEE many years ago (even though, as an oversight, it was not mentioned in more recent correspondence)—and indeed royalties have been paid by us, and accepted by ICEE, under that agreement for many years.' This is not accepted by our client. Despite numerous and various communications, both in writing and orally, over the course of at least 11 years, there has been no mention of the 2000 Document, or any written agreements between the parties other than the 1996 Agreement and the 1999 Agreements, until Mr Peters' email to Mr Fachner in February 2018. . . . Our client has not

accepted royalties under the 2000 Document." As shall be seen, neither RPC nor Benesch ever responded to the substance of Gowling's points.

54.     In its April 25, 2018 letter (which was forwarded to Benesch and reviewed by Mark Avsec that summer, *see* Doc. 276-4 PAGEID 13098), Gowling enclosed a February 7, 2001 fax from Diane Menzer (who, after serving as Will Radcliff's PA, was hired for 2001 by DPSU) to Kim Yee at DPSU, saying that the1996 agreement "needs to be adjusted to reflect 2 ½% commission vs. 5% (3A)." Doc. 73-15. The fax is consistent with SPL board member Alan Beaney's memo (which RPC had sent to Benesch) to ICEE about DPSU agreeing to lower the royalty to 2.5%. DX76 at SP007469. She also made other "suggested changes" including changing Slush Puppie Corp. to "S/P Frozen Drink Div of DPSU, Inc.," and providing for a Texas forum selection and choice of law clause. The fax does not refer to the 2000 Appointment, or to the 1999 Distributor Agreement. At his deposition, Matt Gurbach admitted that that this fax was evidence that the 2000 Appointment had not in fact been entered into. Doc. 255, Gurbach Dep. at 101:2-103:17. Mr. Gurbach argued, however, that the fax was not "dispositive" because it was unsigned. *Id.* at 113:15:19. Yet in a subsequent pleading signed by Mr. Zalud, and joined on the signature block by Mr. House and Ms. Turk, SPL admitted that the document reflects an agreement to lower the royalty rate from 5% to 2.5% on a going-forward basis rather than based on the forged 2000 Appointment. Doc. 85 PAGEID 2180.[3]

---

[3] At oral argument on February 20, 2025, the Benesch Respondents argued that they somehow understood the Menzer fax to be referring to the need to lower the royalty to 2.5% *only for the period before August 8, 2000*. Doc. 294 at 57:16-62:7, PAGEID 14285-14290. This argument was based upon documents purporting to be from the Blevins Franks tax accounting firm. But there is no record of the Benesch Respondents ever having made or discussed this argument with the RPC solicitors in the lead-up to the filing of the Complaint. Nor is there any reason to believe that the Benesch Respondents actually pursued this line of thinking because the Blevins Franks documents were not received by Benesch until January 30, *2020*, Doc. 267-6 (DX 126) PAGEID 11399, almost a year after the Complaint was filed. Moreover, Menzer's

**F.** **RPC and Benesch Decide not to Rely on the Wendsday Email Even Though It is a "Great Document"**

55.    On May 3, 2018, RPC sent Peters a proposed response to Gowling's April 25 letter.  Doc. 73-16.  RPC's draft relied heavily on the Wendsday Email to rebut Gowling's claim that ICEE did not know about the 2000 Agreement: "We reject the assertion that the Agreement was unknown to your client prior to the email from Mr Mark Peters dated 28 February 2018.  As previously stated by our client, not only has your client been aware of the Agreement, our client has in fact paid royalties, which have been accepted by your client, under the Agreement for many years.  To confirm this position, and by way of example only pending further searches, we refer you to the attached email correspondence between Lindsay Kirby of our client and Jerry Bird of your client dated 11-12 November 2008 in which it was confirmed by our client that the 'royalty [2.5%] is calculated as defined in the Trade Mark Licence dated August 8, 2000'.  We therefore do not accept the suggestion that your client is not bound by the terms of the Agreement."  Doc. 73-16, Doc. 276-4 at PAGEID 13085-86.  If the Wendsday Email were real, this would indeed have been the best way of rebutting Gowling's and Fachner's queries and incredulity.  But, of course, it wasn't real.

56.    The same email from Ben Mark to Mark Peters reflects Ben Mark's skepticism regarding the Wendsday Email: "One point to mention is that the risk of relying on the 2008 email without having done full searches is that any response and subsequent correspondence could be highly relevant – we note in particular the email ends with a question 'is this what you

---

recommendation to Yee that the 1996 Manufacturing appointment be amended to provide for Texas to be the parties' forum for disputes, and for Texas law to apply is clearly prospective, not retrospective since that is where DPSU was located at the time.  Finally, as noted, SPL has relied on the Menzer-Yee fax is as evidence that there was a prior agreement outside of the 2000 Appointment to lower the royalty rate from 5% to 2.5%.  Doc. 85 PAGEID 2180.

need?'" To ensure that RPC had an accurate picture of the communications between RPC and ICEE on this subject, Ben Mark insisted that Peters "provide us with all of SPL's emails" by taking an image of SPL's servers: "This exercise needs to be carried out to properly answer Gowlings' [sic] allegations and it will be more compelling if we can provide a comprehensive response. The previous Weightmans letters and the recent Gowlings response show the risk of asserting a factual position that is contradicted by the documents."[4] "If the electronic documents are available and can be provided now, we can factor those into the proposed response to Gowlings. If not, this document collation and review process should be carried out as soon as possible, so we can prepare the follow up letter to Gowlings and provide US counsel with the information that they will need to prepare the further letter to ICEE on the breach of SPL's exclusive arrangements. *I remain of the view that the US letter cannot be properly prepared without clarity as to the contractual arrangements between ICEE and SPL."* (emphasis supplied). No one ever did the comprehensive collection of emails that RPC said was necessary; rather, Benesch ultimately put Peters himself in sole control of gathering and uploading to a file sharing link whatever documents he deemed relevant to the case. Emanuel Dep., Doc. 275-1 at PAGEID 12904-193.

57. In the end, RPC never sent this letter, and never responded to Gowling's April 25 letter.

58. After RPC decided not to respond to Gowling's April 25 letter, the decision was made to have Benesch (through Avsec) do so instead. Tellingly, Avsec's August 17, 2018

---

[4] The "risk of asserting a factual position that is contradicted by the documents" appears to be a reference to the Menzer-Yee fax that Gowling provided to Weightmans, which further contradicts the Benesch Respondents' contention at the February 20, 2025 oral argument that they viewed that fax as consistent with, rather than contrary to, the validity of the forged 2000 Appointment.

response to Gowling's letter did not refer to or enclose the Wendsday Email.  Avsec's letter

notes that, in preparing it, he had reviewed the "correspondence between and among solicitors"

(referencing the August 8 Weightmans and the August 30, 2017 Gowling letters), and he copied

Gowling on the letter. Doc. 1-1 at PAGEID 87-89; Doc. 73-17 at PAGEID 1533, 1535.  Thus,

Avsec had read Weightmans' own admission that the "Existing Agreements" were the 1996

Manufacturing Appointment and the 1999 Distributor Agreement, not any 2000 Appointment.

Nonetheless, Avsec boldly stated that "[t]here is no question that the parties have been operating

under the terms of the 2000 Agreement (including its royalty provisions) since ICEE's

acquisition of the SLUSH PUPPiE brand and business in 2006," noting that ICEE had cashed

SPL's royalty checks reflecting 2.5%.  Avsec then cited the 2002 draft Cadbury agreement as

proof—even though it is unclear which document it is referring to and, if real, it would have

been drafted four years *before* ICEE bought the Slush Puppie business from DPSU.

59.    Of course, the best evidence of ICEE's "operating under the terms of the 2000

Agreement" was the Wendsday email—as Cran noted—since it quotes at length from paragraph

4 (A) of the 2000 Appointment, and would be proof that ICEE *had* received the agreement from

DPSU and was aware of its terms in 2008.  As Mr. Gurbach admitted, the Wendsday Email was

"a great document," "killer evidence" that would "drive a stake through the heart of ICEE's

position that they didn't know about the 2000 agreement," Doc. 255, Gurbach Dep. 116:12-14,

137:10-15; *see also id.* at 154:12-22 (admitting that the Wendsday Email would be a helpful

piece of evidence supporting the argument that ICEE had received the 2000 Appointment as of

2008).  The Court finds that Benesch's failure to attach or reference the Wendsday Email in

Avsec's letter—particularly when Avsec recognized the need to send inferior evidence in the

form of the Cadbury draft in an attempt to rebut ICEE's position—raises an inference that the

attorneys at Benesch already had doubts about the authenticity of the Wendsday Email.[5]

60. At his deposition, when asked why he did not send the Wendsday Email to ICEE,

Avsec claimed that the Wendsday Email "meant nothing" and that "I didn't attach that much

importance" to it. Doc. 256-1, at 230:18-24, 231:21-23 ("I think I answered it. It wasn't that

important to me. I didn't know. I don't know. I don't know the reason. It wasn't top of mind.").

I have reviewed the portion of Mr. Avsec's deposition in which he makes this claim (including

the videotape), and having reviewed his demeanor and contentions, I find his testimony that he

did not believe the Wendsday Email to be "important" to the enforceability or authenticity of the

2000 Appointment to not be credible.

61. Karen Kline of Duane Morris responded to Avsec's letter on September 13. Doc.

73-19. First, she confirmed Ben Mark's suspicions that the 2000 Appointment had not been

"transferred/assigned in writing" to DPSU or ICEE as part of their asset purchase deals: ICEE

and DPSU "have had no knowledge of the 2000 Document until attached to your client's

February 28, 2018 email. . . .We have followed up with DPSU, who confirmed that only the

[1996 and 1999 agreements] were disclosed by Slush Puppie Corp. and listed as assumed

contracts." Kline also enclosed another copy of the Menzer-Yee February 7, 2001 fax. Doc. 73-

19 at PAGEID 1545. Then Kline directly addressed the elephant in the room: "The totality of

the circumstances raises serious questions about the agreement's authenticity. We asked Mark

Peters for an explanation, and he has provided no response." Doc. 73-19, DX 135, DX 162.

---

[5] The Cadbury draft's evidentiary value for the point Avsec was trying to make—that *ICEE* knew of the 2000 Appointment—was weak at best given that the document was dated many years before ICEE acquired the Slush Puppie brand. It also would have been impossible for ICEE to verify by reference to its own internal documents. In contrast, if real, the Wendsday Email would be sitting on ICEE's email servers and thus be easily verifiable by ICEE.

62.     Meanwhile, RPC sent Avsec, Gurbach, and House another copy of the Wendsday Email with its metadata on September 25, 2018, noting that it referenced the 2000 Appointment in correspondence with ICEE.  As received by Respondents Avsec, Gurbach, and House, this document also had metadata showing that Mark Peters ("markp") created it using Word on Jan 17, 2018 at 9:53 a.m. The metadata are easily viewed by simply right clicking on a mouse and viewing the document's "properties."

63.     Also on September 25, 2018, at 2:48 PM GMT, Mark Peters ("markp") created the "April 10, 2001" "fax" from a Word document. Benesch later attached this "fax" to the complaint. Doc 276-7 at PAGEID 13279, DX210.

| Email Metadata | File Metadata | Document Metadata | |
|---|---|---|---|
| File Type | | Contains Embedded Files | |
| Document Extension | pdf | Has Hidden Data | |
| File Size | | Has OCR Text | |
| Date Created | 9/25/2018 2:48 PM | Speaker Notes | |
| Date Last Modified | 9/25/2018 10:34 PM | Track Changes | |
| Last Accessed Date/Time | | Unprocessable | |
| SHA1 Hash | | Source Path | |
| SHA256 Hash | | Virtual path | |
| Password Protected | | | |
| File Name | WR_Fax_to_RPP.pdf | | |

| Email Metadata | File Metadata | Document Metadata | |
|---|---|---|---|
| Title | Microsoft Word - Will to RPP April 10 2001 Revised | Last Printed Date/Time | |
| Author | markp | Last Saved Date/Time | |

64.     Avsec chose not to respond to Kline's letter.  Instead, that task fell to Mr. Gurbach.  Gurbach's response to Kline tellingly failed to address her claim about "authenticity," said nothing about the fact that DPSU and ICEE had received the 1996 and 1999 agreements instead of the 2000 Appointment as part of their asset purchases, and failed to address the Menzer-Yee fax (much less arguing, as Mr. Kasson did at oral argument on February 20, 2025, that it was only referring to the pre-August 8, 2000 period).  Doc. 89-1 at PAGEID 2330. Mr. Gurbach could have easily rebutted all of Kline's assertions by simply enclosing the Wendsday Email, which, as noted, he admitted would have been a "great document" if it were real.  Doc. 255, Gurbach Dep. at 154:12-22, 116:12-14.

65.     At his deposition, Respondent Gurbach admitted that, in the fall of 2018, the entire Benesch team was looking for evidence that ICEE was aware of the 2000 Appointment. Doc. 255, Gurbach Dep. at 135:25-136:8.  Since the Wendsday Email was "killer evidence" that would "drive a stake through the heart of ICEE's position that they didn't know about the 2000 agreement*," id*. at 137:10-15, and prove that Mark Peters was not lying about ICEE's awareness of the 2000 Appointment, the only reasonable inference from Avsec's, Gurbach's, and House's failure to send ICEE the Wendsday email before filing this lawsuit is that they doubted its authenticity (whether or not they had noticed the mis-spelling of Wendsday).[6]

---

[6] Putting aside the misspelling of Wendsday, the Wendsday Email is facially dubious because it makes no sense that Peters' financial director Kirby (who was not hired until 2007) would have possession of a contract that Mark Peters did not have and was unaware of.  Indeed, the only person she would have received it from would have been Mark Peters, since he was running the company at the time.  Secondly, "Kirby's" November 12, 2008 email is not responsive to Bird's request:  he wanted the "production commission statement," not the royalty rate.  The royalty rate did not change between 2006 and 2007 (which Kirby and Bird would have known), so it would not explain Bird's concern with the drop in commissions. And, as RPC noted, the Wendsday Email ended with a question, "Is this what you need?," and Peters had never produced the response from Bird—in fact, he just ignored Cran's lecture about the need to collect all SPL's emails to determine if there ever had been a response.

66.     Mr. Gurbach's doubts about the authenticity of the Wendsday Email are confirmed by the responses to ICEE's requests for admission that he signed on December 23, 2019.  In RFAs 4 and 5, ICEE asked SPL to admit that "Slush Puppie Limited did not provide a copy of the Purported 2000 Agreement to ICEE until February 28, 2018" and that there "are no records indicating that the Purported 2000 Agreement was ever provided to ICEE before February 28, 2018."  If real, the Wendsday Email was just such a document.  Yet SPL's response was: "Objection.  SPL cannot 'admit' or 'deny' anything in response to this Request for Admission, nor can it provide any information requested therein, because it is without knowledge and information sufficient to respond to the Request at this time.  SPL reserves the right to supplement at a later date." Doc. 89-4 at PAGEID 2360-61, 2367-68.  At this time, Mr. Gurbach himself had digital copies of the Wendsday Email in his inbox and that he had put on iManage.

**G.     Before Filing Suit, RPC, Avsec, Gurbach, and House Have Major Doubts About the Validity of the 2000 Appointment**

67.     On September 25, 2018, Ben Mark discussed with Benesch alternative theories of liability: "[I]rrespective of whether the 2000 agreement is valid and in force, these pouches appear to fall squarely within the scope of the licence of the prior agreements.  Whilst we would still want to pursue the claims in respect of the 2000 agreement it seems that the issue of interpretation of the scope of the earlier agreements could well be appropriate for summary judgment." Doc 276-4 at PAGEID 13116. Ben Mark's use of the word "valid" in addition to "in force" implies that he had concerns about whether the 2000 Appointment was "valid," not just whether it was enforceable against ICEE.  Moreover, for Ben Mark to believe that interpretation of the scope of the 1996 and 1999 agreements "could well be appropriate for summary judgment" implies that Ben Mark doubted that the 2000 Appointment had in fact "superseded"

32

the earlier agreements, even though that is what it expressly states. If it were valid, therefore, there could be no claims under those superseded agreements.  Claims could only be viable under the 1996 and 1999 agreements if the 2000 Appointment had never been agreed to by SPC.

68.    Doubts about the 2000 Appointment were also reflected in a call on September 21, 2018 with Avsec, Gurbach, Mark Peters, Ben Mark, Ron House, and David Cran.  Ron House's notes state: "Issue[:] what K controls: need to show 11/8/00 ap[pointment] controls." Doc. 254-5 at 411:19-412:11; DX 177, Ronald House Notes.  This shows that RPC and Benesch believed the 2000 Appointment provided SPL with rights that were superior to those in the 1996 and 1999 agreements, so they were attempting to develop arguments in favor of enforcing the 2000 Appointment as opposed to the 1996 and 1999 agreements.

69.    Despite telling ICEE on August 17 that "there is no question that the parties have been operating under the terms of the 2000 Agreement," Doc. 27-11, over a month later, Avsec was raising just such fundamental questions.  Writing to RPC and Peters (and copying Gurbach) Avsec asked: "So did SPL in fact pay royalties under the August 8, 2000 Agreement to Diet [sic] Pepper/Seven Up for some period of time until ICEE acquired the business form Diet Pepper/Seven Up?  Can we allege that with accuracy?  . . . Is it accurate to allege that, after ICEE's acquisition of the SLUSH PUPPIE trademarks and business that SPL continued to pay royalties under the August 8, 2000 Agreement to ICEE (in the amount of 2.5% of the total cost of Syrups charged and sold to distributors after appropriate discounts as permitted)??" Peters responded: "The only people I know who can answer this question with accuracy are the signatures [sic] on the August 2000 agreement, Ralph Peters and Stephan [sic] Loos (witness to Ralph Peters) and both are happy to give statements to the fact that the August 2000 agreement is the final agreement with SP USA before the sale to Dr Pepper/Seven Up." Avsec then forwarded

33

this string to House, who printed it out and put it in a barcoded folder marked "Choice of

Contract." Doc. 276-3 at PAGEID 13065, Doc. 276-4 at PAGEID 13111.

70.     Despite Mark Peters' note that Ralph Peters and Loos were "happy to give

statements," Avsec, Gurbach, and House decided not to contact either of them.  Doc. 256, Avsec

Dep. at 82:25-83:8, 152:23-25; Doc. 255, Gurbach Dep. at 123:6-10, 192:17-23, 193:7-18,

412:5-6; Doc. 274, Turk May 23 Dep. at 290:7-291:2.

71.     But Avsec's September 25 query—"So did SPL in fact pay royalties under the

August 8, 2000 Agreement to Diet [sic] Pepper/Seven Up for some period of time until ICEE

acquired the business form Diet Pepper/Seven Up?  Can we allege that with accuracy?"—*was*

answered a few days later in the negative when Mark Peters forwarded to Avsec, Gurbach and

RPC a January 18, 2017 email from board member Alan Beaney to Peters.  Beaney's 2017 email

made clear that the royalties being paid at 2.5% were *not* paid "*under* the August 2000

Agreement," but instead "based on the verbally communicated change."  Doc. 276-4 at PAGEID

13096 (DX 127), DX160 at SP006308.  Beaney's email recounted to Mark Peters his

conversations at an in-person meeting with Dan Fachner and Steve Every in London in early

January 2017.  Mr. Gurbach admitted that Beaney's emails were additional evidence showing

that there was an *oral* agreement to lower the royalty from 5% to 2.5%.  Doc. 255, Gurbach Dep.

at 176:1-6.

72.     Notably, just a few days before the January 18, 2017 email, Beaney had set out in

detail SPL's view of the "Slush Puppie contractual arrangements in Europe," a document that

Karen Kline also attached to her September 13, 2018 letter to Mark Avsec. That document did

not mention the 2000 Agreement, but did include a detailed account of how SPL had supposedly

agreed *with DPSU* to lower the royalty from 5% to 2.5% based on a change in the way that SPL

sourced Slush Puppie freezers in Europe. That document was yet another direct contradiction to Avsec's question about whether SPL had paid royalties under the 2000 Appointment. Beaney claimed that after the royalty was lowered based on the freezer arrangement, "Slush Puppie Ltd have continued to pay the royalty for all UK, Ireland and other European territory sales **on this basis** and ICEE have continued to accept it. Doc. 73-19 at PAGEID 1549 (emphasis supplied). The Court finds that the Beaney communications prove that Mark Peters believed that the royalty rate in the 1996 manufacturing agreement had been lowered to 2.5% under a "verbally communicated change" rather than "under" the August 2000 Appointment of Trade Mark Licence.[7] The Court therefore finds that, as of September 2018, Gurbach, Avsec, and House knew there **was** a clear explanation for why the royalty rate was lowered to 2.5%: an orally communicated change rather than the August 2000 Appointment of trade mark licence.

73.    To summarize, at least the following were red flags indicating that the 2000 Appointment was a fake:

a.    Mark Peters had taken over the company in 1999, yet he was unaware of it. Beginning in 2009 and for the next eight years, Mark Peters had engaged in vigorous email and in-person discussion with Dan Fachner and others at ICEE about SPL's trademark rights. During these eight years of discussion, Mark Peters and his attorneys repeatedly acknowledged that the "existing agreements"

---

[7] Although the January 2017 email contains Beaney's statement to Mark Peters, Beaney was only appointed as a director in 2016, resigning in January 2020.  https://find-and-update.company-information.service.gov.uk/company/00396263/officers  Beaney's understanding of the "verbally communicated change" therefore must have come from Mark Peters himself, who tellingly did not refute it in January 2017, and instead forwarded Beaney's statement about the "verbally communicated change" to Avsec and Gurbach in 2018.  Other than Mark Peters, the only other possible source for Beaney's historical knowledge would have been Ralph Peters, either directly or through Mark Peters.

were the 1996 and 1999 agreements, with Mark Peters arguing that there were "oral agreements."  Gowling June 23, 2017 Letter to M. Peters, Doc. 273-6 PAGEID 12039,

b. In 2010, Mark and Ralph Peters had an email discussion about what rights SPL had to control the Slush Puppie trademarks.  Mark Peters told his father that he had consulted American lawyers and they said SPL had "zero wrights."  Ralph Peters disagreed: "As regards the USA lawyers you consulted I think the are wrong.  Established practice known about and not contested is tantamount to agreement.'  Doc. 73-6 at PAGEID 1373.  Ralph Peters was therefore also unaware of the 2000 Appointment as of 2010. None of the Benesch Respondents spoke to Ralph Peters before filing this litigation.  In its numerous briefs and at the oral argument on February 20, 2025, Respondents' counsel have never addressed this point.

c. Board member Beaney and finance director Kirby both had the understanding that an oral agreement lowered the manufacturing royalty from 5% to 2.5%.  Since neither of them worked for SPL around the time of the 2000 Appointment, they could only have learned about this oral agreement from Mark Peters, who could only have learned about it from Ralph Peters.  Doc. 75, M. Peters July 13, 2020 Depo. at 414:12-416:9 (Peters paying 2.5% because Ralph told him Will had agreed to 2.5%); Doc. 276-4 at PAGEID 13095 (Jan. 18, 2017 Beaney memo to M. Peters re early 2017 meeting with Fachner & Every).

d. RPC noted the lack of "clarity as to the contractual arrangements" between ICEE and SPL, and expressed reluctance to rely on the Wendsday Email.

e. Diane Menzer was unaware of any 2000 Appointment that lowered the royalty, since she asked DPSU's Yee to adjust it in early 2001. Doc. 73-16.[8]

f. Mark Peters lied to Dan Fachner, falsely claiming that the Appointment "was in fact raised with ICEE many years ago (even though, as an oversight, it was not mentioned in more recent correspondence)." Doc. 60-6. Gurbach knew that Peters was unaware of the Appointment, and that he had repeatedly raised only the 1996 and 1999 Agreements. Doc. 270 PAGEID 11621-23, Gurbach Depo. at 100:3-12.

g. Although Fachner, Gowling, and Kline repeatedly asked Peters for an explanation as to why only the 1996 and 1999 agreements had been discussed for the past 8 years and Peters had never mentioned the 2000 Appointment, Peters never provided any answers to these obvious questions.

h. In a similar vein, Peters could not get his story straight about how he came into possession of the Appointment. When he sent it to RPC, he described it as one of the "documents from Stephan Loos." But he initially told Benesch that he found it in Majorca at his father's residence in fall 2017. Exh. B, SPL's Responses to

---

[8] Respondents argue that "Benesch confirms 2001 Letter Authenticity" in a conversation that Respondent Gurbach had with Ms. Menzer. Respondents' PowerPoint slide 31. Respondents, however, chose not to contact Menzer before filing suit. The conversation in question was in July 2020, and Ms. Menzer did not confirm the April 2001 letter's authenticity. Doc. 274-7. Gurbach's email states only that the last four digits of the fax number—9455— spell "WILL." Moreover, Ms. Menzer did not remember the 2000 Appointment. May 23, 2024 Turk Depo. at 444:8-14 (Gurbach told Turk that Menzer "did not remember that Agreement"). If she did not remember the 2000 appointment, she could not have confirmed the authenticity o a letter referring to it. Finally, because this document was produced a year after Mr. Gurbach's deposition, ICEE's counsel was denied the opportunity to ask Gurbach about it. Tellingly, at his deposition, when asked about conversations with Ms. Menzer, Mr. Gurbach testified that "I didn't ask her about the facts. I think it was to gather handwriting exemplars, I think." Doc. 255, Gurbach Depo. at 415:10-416:1.

ICEE's 3d Interrogatories at pp. 5-6.  Ralph Peters had no residence in Majorca in 2017.  Doc. 77, Loos Dep. 36:3-21, 37:16-38:20 (Ralph Peters didn't own house in Majorca; stayed with Loos from 2004 to 2008; last time he was there was 2013 or 2014).

i. The 2000 Appointment appears patched together from multiple documents, with different indentations on the last page, curious markings, two different forum selection and choice of law provisions, bizarre typos ("aberration" process), and reference to the nonexistent Ohio County.  Moreover, unlike the 1996 and 1999 Agreements, it uses English spellings of such key words as "licence" and "trade mark."  Before filing suit, Benesch received from RPC an August 8, 2000 letter from Will Radcliff to Ralph Peters.  The letter says: "I am writing to officially change our syrup manufacturing agreement with your company, dated January the 1st, 1996, regarding manufacture of Slush Puppie syrups.  I enclose two signed copies of The Trademark Agreement that supersedes and voids any other previous agreements regarding territories, and commissions to be paid to Slush Puppie Corporation, please sign and returned [sic] one copy to the address below."  Radcliff's letter makes it sound like Ralph and Will have been exchanging drafts or other communications relating to the agreement leading up to this, but no drafts or communications have been produced by SPL or Benesch.  Yet Radcliff, a lifelong Cincinnatian, would not have thought there was an "Ohio County," or used English spellings.  That mistake as well as the many others in the document raise doubts about whether it really had been sent by Radcliff to Ralph Peters, as well as who the drafter(s) were.

74.     At oral argument on February 20, 2025, counsel for Respondents argued that ICEE and its predecessors accepted 2.5% "with 2000 Appointment as only explanation." Respondents' Feb. 20, 2025 Oral Argument PowerPoint, Slide 5.  But, as explained above, the Benesch Respondents had documents providing another explanation.  Gowling's June 23, 2017 letter and the emails from Beaney to Mark Peters and from Kirby to Fachner, copying Mark Peters, make clear that there had been an oral, not written, agreement. And the Menzer-Yee fax confirms this.  As Mr. Gurbach admitted, the Beaney email and Menzer-Yee fax are evidence that there was an oral agreement to lower the royalty rate to 2.5%.  Gurbach Depo. 175:25-176:6. Moreover, the fact that Mark and Ralph Peters were unaware of any 2000 Appointment as of 2010 is itself evidence of another explanation, since Mark Peters was authorizing payments to DPSU and then ICEE at 2.5%. Numerous documents that Respondents Zalud, Avsec, Gurbach, and House had before filing suit memorialized an "explanation" for the 2.5% royalty rate other than the 2000 Appointment:  an oral agreement.

75.     Counsel for Respondents also argued that the August 8, 2000 letter from Will Radcliff confirmed the legitimacy of the Appointment.  Respondents' PowerPoint Slide 12.   But it has a suspicious signature of Will Radcliff's, has a different list of countries than the Appointment, and refers to two countries that did not exist until 2006.  Moreover, it refers only to a change to the 1996 Manufacturing Appointment, not to the broad changes in the recently signed 1999 Distributor Agreement.  It is a suspicious document.

76.     Various Blevins Franks documents were also cited by counsel for Respondents at the February 20, 2025 oral argument.  Respondents' PowerPoint Slides 15-16, 22, 24, 25, 26-28. But there is no evidence that the Benesch attorneys reviewed the Blevins Franks documents

before suit was filed.[9]  The only document in the record showing when they were received by Benesch is the January 30, 2020 letter from Mark Peters to Ron House, Doc. 267-6 (DX 126) PAGEID 11399, and counsel for Respondents admitted that that was when Benesch first received them.  Doc. 255, Gurbach Depo. at 343:8-344:6. Moreover, the documents refer to an August 8, 2000 Appointment as being a "renewal" of the 1996 Manufacturing Appointment. The 2000 Appointment made radical changes to the parties' previous agreements; it was no "renewal."

77.     Respondents' counsel also relies upon the January 8, 2001[10] fax from Gary Ruffell to DPSU's Greg Salcido, in which Ruffell asks Salcido to "supply us with an invoice or a letter that shows the period January to September 2000, covered before the August 2000 agreement, to reflect the agreed royalty rate @2.5% and net amount due so that we have something on file for our auditors and any possible question from the Inland Revenue regarding our tax computation."  Respondents' PowerPoint Slides 33-34.  The reference to an "August 2000 agreement," however, does not state whether that agreement was oral or in writing, and the agreement itself is not attached or anywhere in the related files.  Moreover, the fax is confusing: The August 2000 Appointment only purports to lower the royalty rate to 2.5% *begins on August 8, 2000*.  The April 10, 2001 letter from Will Radcliff to Ralph Peters purports to lower it

_____

[9] At his deposition, Mr. Gurbach initially testified in responding to a leading question from Respondents' counsel that he had a letter from Blevins Frank at the time he filed suit that referenced the 2000 Appointment.  Doc. 255, Gurbach Depo. 341:6-15.  Shortly afterwards, however, Mr. Kasson agreed that Benesch did not receive the Blevins Franks documents until January 30, when they were sent by Mark Peters to Ron House, and Mr. Gurbach admitted that he did not recall when Benesch received them.  Doc. 255, Gurbach Depo. at 342:6-345:6.

[10] Respondents' counsel mistakenly referred to this as an August 2001 fax.  Because it was written by Gary Ruffell (an Englishman), the date is January 8, 2001, not August 1.

to 2.5% only *for the period July 1, 2000 to August 7, 2000*.[11] But Ruffell's earlier, January 8 letter says that there was an "agreed royalty rate @ 2.5%" for the period *January to September 2000*. If DPSU had agreed to 2.5% for all of 2000, then there would have been no need for Radcliff's April 10, 2001 letter,[12] and Radcliff's letter is at variance with any such agreement. Also, Ruffell's letter assumes that the 2000 Appointment went into effect on September 1, 2000, not on August 8, 2000, as the 2000 Appointment clearly states. Doc. 1-1 PAGEID 46 ("EFFECTIVE: August 8, 2000"). In short, these documents posed more questions than answers about what "agreement" or "agreements" each of their authors was referring to. Given the fact that none of the documents attach any of the referenced "agreements," and given the discrepancies, the obvious thing to have done would be to call Gary Ruffell and ask him. But RPC and Benesch decided not to do that.

**H. Despite their Doubts about the 2000 Appointment's Authenticity, Avsec, Gurbach, and House Prepare a Complaint Asserting Claims Under It**

78. On February 12, 2019, SPL filed a complaint in the Hamilton County Court of Common Pleas against ICEE based on the forged 2000 Appointment, attaching the forged contract and the two letters purporting to be from Will Radcliff to Ralph Peters. Ron House signed the pleading, and Matt Gurbach is on the signature block. Doc. 1-1.

---

[11] Respondents' counsel mistakenly describes this letter as referencing a "modified rate" "billing entire year at 2.5%." Respondents' PowerPoint Slide 37. The letter refers to "our earlier agreement regarding commission due . . . for the period from July 1, 2000 through December 31, 2000," memorializing a reduced commission "to 2.5% July 1st to August 7th 2000." Doc. 1-1 PAGEID 55.

[12] The Court need not determine definitively whether the August 8, 2000 letter and the April 10, 2011 letter are genuine or not for the purposes of its decision here. But it is certainly curious that Mark Peters, who was unaware of the 2000 Agreement until he "discovered" it in 2017, was suddenly able to easily locate multiple documents purporting to corroborate the 2000 Agreement.

79. At oral argument on February 20, 2025 and in their PowerPoint slides, Respondents argue that they had a reasonable basis for believing the 2000 Appointment was authentic because "RPC saw it the same way," there was "[o]verwhelming documentary evidence," "[s]ix documents are interrelated," "ICEE/predecessors accept 2.5 percent with 2000 Appointment as only explanation," "[w]itnesses confirm it is authentic," and "Benesch expert never views it as a forgery." Slide 5.

80. As noted above, however, RPC had doubts about the Wendsday Email and the 2000 Appointment itself: RPC received no response from Mark Peters to its May 1 or May 3, 2018 emails regarding its insistence that all of SPL's emails be collected forensically, and no satisfactory answer to the problem of "asserting a factual position [that the 2000 Appointment was the contract governing the parties' relationship] that is contradicted by the documents." Doc. 73-16. RPC questioned whether the 2000 Appointment was "valid," and expected ICEE to argue that the neither DPSU nor ICEE had received it as part of the 2001 or 2006 asset purchases. In light of these doubts, RPC never responded to Gowling's April 25, 2018 letter asserting that the discovery of the 2000 Appointment was "peculiar," and that Menzer thought the 1996 Manufacturing Appointment needed to be adjusted to reflect the 2.5% royalty rate as of February 7, 2001. While an RPC associate did review the draft complaint, this was for filing in a jurisdiction where RPC would have no responsibility for the ethical consequences of such a filing, and in which it had no obligation, as British counsel, to ensure compliance with U.S. sanctions laws.

81. Respondents' reference to "overwhelming documentary evidence" and six interrelated documents appears to refer to the correspondence involving SPL's accountants, Blevins Franks. But Respondents did not receive those documents until over a year after the

complaint was filed. As noted above and discussed further below, the August 8, 2000 and April 2001 letters did not attach the 2000 Appointment so it was not clear what agreement they were referring to, and they also were facially suspect.

82. As to the alleged absence of an explanation for the 2.5%, as discussed above, Respondents had internal correspondence involving an SPL board member—Alan Beaney—and Mark Peters himself, as well as correspondence between Mark Peters and SPL financial director Lindsay Kirby stating that there had been an oral agreement to lower the royalty to 2.5%. And this occurred many years before ICEE acquired the Slush Puppie business from DPSU, so ICEE clearly was not involved.

83. Regarding the assertion that witnesses confirmed the authenticity of the 2000 Appointment, Respondents chose not to contact any witnesses who might have had knowledge of the issue before they filed the complaint. They decided not to interview Ralph Peters, Stefan Loos, Lindsay Kirby, Diane Menzer, or Gary Ruffell before filing the complaint. Indeed, not a single witness could confirm that the document attached to the complaint as Exhibit D was in fact an authentic, final agreement between SPC and SPL.

84. As discussed further below, Benesch did not contact a handwriting expert until June 2020—well over a year after Respondents filed the complaint--and that was not to investigate Mark Peters' forgeries but rather an attempt to support continued prosecution of SPL's claims under the forged Appointment.

85. Had the Benesch Respondents conducted a proper investigation given all of the red flags concerning the 2000 Appointment's authenticity, they would not have filed this complaint based on three forged documents.

86.     **The Court therefore concludes that Respondents Avsec, Gurbach, and House**
**were more than negligent in filing the complaint based on the forged 2000 Appointment**

## V.     POST-SUIT FINDINGS OF FACT

### A.     Benesch Fixates at the Outset of Discovery on the Production of Metadata

87.     From the outset of discovery, the Benesch attorneys were focused on reviewing document metadata and receiving all emails produced by ICEE in native format. *E.g.,* Doc. 89-6 at PAGEID 2377 ("SPL specifically requested, again, that ICEE confirm whether ICEE maintains the associated metadata for any of the e-mails contained in its first production.").

88.     Consistent with the firm's focus on metadata, on October 16, 2019, Matt Gurbach asked Duane Morris' why ICEE's initial production lacked metadata. "Please confirm that ICEE maintains the associated metadata for emails contained in your production so far." Doc. 31-5. Thirteen days later, on October 29, 2019, Matt Gurbach again asked ICEE to confirm that it has produced "the associated metadata for any of the *e-mails* contained in its first production." Doc 98-6.

89.     On November 19, 2019, Respondent Emanuel, copying Respondents House and Gurbach, under the heading "ICEE's Metadata," demanded metadata for various emails, listing dozens of them by Bates number. Doc. 89-6, DX 182.

90.     Benesch attorneys also discussed metadata with Mark Peters. For example, on November 13, 2019 Respondent Emanuel updated Don McCann on metadata fields, and conferred "with the client" (Peters) regarding metadata. Doc. 276-11, Part of DX 124.

91.     A document's metadata can be viewed within the Adobe PDF application or on the Everlaw application that the Benesch firm used for document review in this case, and Ms. Turk knew how to do that. Doc. 274 PAGEID12432.

92.     Despite the Benesch Respondents' expertise in e-discovery and their focus in this case on the production of emails in native format with all available metadata, Respondents Avsec, Gurbach, Emanuel, House, and Gurbach claim never to have examined the metadata for any of the forged documents that they had received numerous times from RPC, circulated among themselves via email, prepared for production to ICEE, and accessed for deposition preparation and other purposes throughout discovery.  Even after Mr. Gurbach knew that Mark Peters had forged the Wendsday Email and suspected the 2000 Appointment to be a forgery, and Mr. Avsec and Mr. House were "shocked" about the Wendsday Email (see below) they all testified that they did not bother to take a few minutes to review the forged documents' metadata.  **If this testimony was truthful, it displays at least gross negligence on the part of the Benesch Respondents.**

**B.      ICEE Makes Clear Early in the Litigation That It Believes the 2000 Appointment is a Forgery**

93.     Early on in the case, ICEE's counsel raised the issue of forgery regarding the 2000 Appointment.  For example, a November 14, 2019 letter to the Court from ICEE counsel noted that the 2000 Appointment turned up under suspicious circumstances.  "Putting aside whether the document is a forgery, . . . ."  Then, ICEE's December 24, 2019 responses to SPL's interrogatories stated that the "2000 Agreement" was never agreed to by Slush Puppie Corporation, and that plaintiff counsel's continued litigation based on this fake document is sanctionable.  Doc. 177-5.

**C.      Respondents Gurbach, House, Emanuel, and Turk Fail to Produce the Forged History of Working Practise and Permit Mark Peters to Be in Charge of the Collection of Documents**

94.     From the outset of Benesch's representation of SPL, the focus was on the forged history as one of a handful of "core documents."  As noted, the forged History refers to and

45

paraphrases the royalty provision of the 2000 Appointment. Doc. 254-2 at PAGEID 9840-43. Along with the Wendsday Email, it was one of only two documents that purport to date from after ICEE acquired the SLUSH PUPPiE business in 2006 and that quote from that key provision. The forged History is smoking gun evidence of Mark Peters' forgery of the 2000 Agreement because it was his attempt to conceal the fact that he had lifted the Will Radcliff and "BJ Cork" signatures from the 2011 History and pasted them into the 2000 Appointment. Despite this, Benesch failed to produce it to ICEE until well after fact discovery, and then only after claiming it was privileged.

95. **The Benesch Respondents were at least grossly negligent if not acting in bad faith by failing to produce the forged History of Working Practise to ICEE, and at least grossly negligent in failing to confront Mark Peters with the obvious evidence of his alteration of that document until ICEE was forced to incur the costs of numerous depositions, letters, motions to compel, and expert reports.** Considering the many copies of both the forged History and the 2011 version that the Benesch attorneys had in their inboxes, in iManage, in hard copy, and on Everlaw, and considering the focus on the History throughout the case (beginning in December 2017 with RPC's transmittal of it as one of five core documents), the Court finds that it is not credible that at least some of the Benesch Respondents did not notice that they had failed to produce to ICEE the forged History of Working Practise and that Mark Peters had deliberately pulled the 2011 History and its transmitting email from production. **That there was at least deliberate indifference to whether that smoking gun document was produced, if not an intentional withholding of it, is clearly supported by the evidence in the record.**

### 1. The 2011 History of Working Practise

96.     As noted, the 2011 History was sent by Mark Peters to Karen Kline (ICEE trademark attorney at Duane Morris) in an effort to convince ICEE that Will Radcliff and Ralph Peters had agreed to terms more favorable to SPL in oral understandings or practices that were not set forth in the 1996 and 1999 agreements.  On April 26, 2011, Mark Peters stated to Karen Kline: "Since our phone call I can confirm that my father and Will Radcliffe [sic] have documented the history behind the agreements we have today and what they intended the agreements to secure for both parties. I am currently in France. . . and will be in the UK tomorrow. I will then be able to get the signed statement of facts scanned and sent over to you." Doc. 267-4.

97.     Later that day, Mark Peters sent Kline the "History of working practice" with the attachment name "Will & RPP history of SP USA Contrat Vl .pdf."  Doc. 60-4, Doc. 267-7.  The history or chronology ends in 1996. The document was signed by Ralph Peters on February 16, 2011, and by Will Radcliff and "BJ Cork" on February 22, 2011.  In late 2017, Mark Peters copied and pasted the Will Radcliff and "BJ Cork," and illegible signatures and pasted them into the 2000 Appointment.  Mr. House admitted that, "to the naked eye," these signatures appear identical.  Doc. 254-1, House Sept. 27, 2023 Depo. at 75:11-24.   The Benesch Respondents never (and still have not) produced the transmitting email and the 2011 version of the History.

### 2.      The Forged History of Working Practise

98.     As noted, Peters created the forged History from a Word documents on November 20, 2027, shortly before sending it RPC as one of five "documents from Stephan Loos."  Doc. 73-20.  The forged History contains a different Will Radcliff signature and substitutes "B Bell" for "JB Cork" in an apparent effort to conceal the source of the signatures for the 2000 Agreement.  Unlike the 2011 version, its chronology goes up to 2001, and it paraphrases the 2000 Appointment, referring to exclusive rights in Europe and a 2.5% royalty.  Doc. 276-15,

Sept. 28, 2023 House Depo. at 129:15-20.  The forged History thus makes it appear that Ralph

and Mark Peters were aware in 2011 of the 2000 Appointment.  The title of the History is at odds

with the reference to the 2000 Appointment since, if it were real, Peters didn't need a "working

practice" to prove exclusive rights in Europe.  Doc. 274, Turk Depo. at 419:2-9 (2000

Appointment inconsistent with oral agreement to operate in Europe).  The forged History is thus

itself a red flag.

99.     **The Court finds that the Benesch Respondents' failure to produce in**

**discovery the forged History—which they had in their files from before the case was filed—**

**multiplied the proceedings and forced ICEE to incur fees and costs that it would not**

**otherwise have incurred.** When placed alongside the 2011 History, the forged History is clear

evidence that Mark Peters had forged core documents in the case since both documents purport

to be the same thing yet differ in content and signatures. Production of that document in 2019

would thus have effectively ended the case by making clear that SPL, through Mark Peters, had

forged documents central to its case.

### 3.     Benesch Receives, Distributes, Stores, and Files Numerous Copies of the Forged History

100.    After receiving the forged history from Mark Peters, on December 1, 2017, RPC

forwarded it to Mark Avsec and Eric Zalud, labeling it "Document 5"—one of the five

"documents from Stephan Loos."   Doc. 73-20.   (Three years later, Benesch claimed that this

copy of the forged History was protected from production by the attorney-client privilege.  Doc.

276-20 at PAGEID 13476.)

101.    On September 19, 2018, Mark Avsec forwarded to Matt Gurbach electronic

copies of the documents he and Zalud had been sent by RPC on December 1, 2017: "Matt,

HERE ARE THE CORE DOCUMENTS."  The CORE DOCUMENTS include the Forged

History. Doc. 276-18 at PAGEID 13458, DX 189.  *See also* Doc. 255, Gurbach Dep. at 8:14-0:22 (Avsec sent Gurbach the key documents electronically, attached to various emails). Gurbach received from Avsec "all the key documents that [Avsec] had received from RPC." Gurbach Dep. at 131, 18-22.  Avsec wanted Gurbach to review them for feedback.  *Id.* at 8:1-10:125.

102.    Gurbach stored all of his working files electronically, saving them on the firm's iManage system (as opposed to the firm's EverLaw system).  Doc. 255, Gurbach Dep. at 26:12-28:6 (used iManage instead of Everlaw).

103.    On the morning of September 21, 2018, Avsec forwarded the "CORE DOCUMENTS" to Ron House, including the forged History.  House printed out the forged History and put it in a barcoded folder called "Client Hx of Relationship."  Doc. 276-15, Sept. 27, 2023 House Depo. at 52:16-22.

104.    On September 25, 2018, RPC also sent Avsec, Gurbach, and House **another** digital copy of the forged History ("the Sept. 25, 2018 Copy of the Forged History"), but this document is digitally distinguishable from the one sent on December 1, 2017. (Two years later, Benesch would claim that **this** copy of the forged History was protected by the attorney client and work product privileges, and Benesch withheld it from production on those grounds.  Doc. 276-20 at PAGEID 13488.

### 4.    Benesch Puts Mark Peters in Charge of Collecting Documents, so He Pulls from the Collection the 2011 History and Its Transmittal Email

105.    ICEE's May 2019 document requests sought all documents regarding the 2000 Appointment, communications between ICEE and SPL, and communications with Radcliff and Ralph and Mark Peters. Doc. 98-1 at PAGEID 2574-76.

106. Benesch put Mark Peters in charge of collecting email and other documents for production. Doc. 75, M. Peters July 13, 2020 Depo. at 316:3-7; Doc. 273, Turk Depo. at 29:11-16, 179:12-180:3 (discussing DX 199, which is attached as Exhibit C; Doc. 255, Gurbach Depo. at 318:6-20.

107. On October 11, 2019, Elizabeth Emanuel produced emails collected by Mark Peters. Doc. 276-21. Emanuel failed to produce the "CORE DOCUMENTS" or the five "documents from Stephan Loos" that Benesch had been sent in 2017 and that had been circulated among the Benesch Respondents in 2018. But Emanuel did produce the Mark Peters April 26, 2011 email to Karen Kline stating that "my father and Will Radcliffe [sic] have documented the history behind the agreements we have today and what they intended the agreements to secure for both parties" stating that he would scan and send this history when he returned to the U.K. Doc. 267-4. Importantly, Peters had failed to provide Benesch with the email transmitting the 2011 History.

### 5. Duane Morris Produces the 2011 History and Its Transmittal Email and It is Marked "Hot" by Benesch

108. Although Peters did not provide the 2011 History or its transmitting email to Benesch, ICEE produced both on October 28, 2019 (Doc. 276-2, Doc. 276-19). Doc. 60-4; Doc. 73-29. These were uploaded to Benesch's Everlaw database the same day, and a Benesch associate marked them "hot." Doc. 276-25. The April 26, 2011 transmittal email was shown to Mark Peters at his July 1, 2020 Rule 30(b)(6) deposition, which was attended by Gurbach and House. Doc. 267-4.

109. When Jennifer Turk joined the team in January 2020, she printed out and reviewed the 2011 History. Doc. 273, Turk Depo. at 24:1-10, 27:2-28:5, 351:12-16. At this point, every Benesch Respondent had multiple electronic and paper copies of the forged History

as well as of the 2011 History from ICEE's production marked "hot," which Peters had suspiciously not produced to Benesch.

110.    The Benesch Respondents also had email threads in their own production that made it clear that Peters had not given them the 2011 History or the actual transmittal email.  For example, on May 3, 2011. Kline responded to Peters' email forwarding the History. Doc. 276-24 (May 2011 strings including April 26 email forwarding History). The string includes Peters' April 26 email sending the History but ***not the attached History.*** Emanuel, supervised by Gurbach & House, produced this document to ICEE.  Doc. 276-24 (showing SP Bates number used by SPL).  Turk testified that she reviewed all of the produced documents that had been tagged "hot" when she got up to speed on the case in late 2019 and/or early 2020.  Doc. 273 PAGEID 11715-16.

### 6.    Benesch Serves Evasive Discovery Responses and Fails to Produce the Forged History

111.    On December 23, 2019, Matt Gurbach signed SPL's response to ICEE's written discovery, with House and Emanuel on the signature block.  Doc. 89-4.  Regarding the History, SPL claimed not to know whether it had the original and what had happened to it.  Doc. 89-4 at PAGEID 2355.  **Gurbach, House, and Emanuel could not have conducted a reasonable inquiry required by Fed. R. Civ. P. 26 (g) into what had happened to the original without sending the History to Ralph Peters (who had signed it) and to Mark Peters (who had scanned it and sent it to Kline in 2011).**  If Gurbach, House, or Emanuel had bothered to ask Ralph and Mark Peters about the History, they would have noticed that Mark Peters had not given them the 2011 version and its transmitting email, and they would have noticed that Mark Peters had sent them the forged version instead. That would have ended the case in December 2019. **Either Gurbach, House, and Emanuel did not conduct a reasonable inquiry into the**

51

History, or, if they did send the History to Mark and Ralph Peters, they had to have noticed that Mark Peters had not sent them the 2011 History or its transmittal email, and that he had created a different version that replaced signatures and paraphrased the 2000 Appointment. Respondents Gurbach, House, and Emanuel were at least grossly negligent with regard to the History. Mr. Gurbach did not fulfill his duty of reasonable inquiry under Rule 26(g) in signing these responses.

112.    ICEE's Interrogatory 7 asked SPL to identify all communications about the History between SPL and Radcliff between January 26 and April 26, 2011 (which Mark Peters sent it to Kline). Gurbach signed responses stating that SPL would produce all responsive documents. Doc. 89-4 at p. 8. **To have performed the "reasonable inquiry" required by Rule 26(g) regarding this "core document" and its transmittal to ICEE, Respondent Gurbach should have reviewed the April 26, 2011 transmittal email and the forged version he had saved to iManage and that was in his inbox.** Again, had he done so, the case would have ended in 2019. **Either Mr. Gurbach was grossly negligent in not reviewing the April 26, 2011 transmittal email and forged version of the History, or he did review them and, in bad faith, he failed to disclose to the Court and ICEE this compelling evidence of his client's forgery.**

113.    On January 3, 2020, counsel held a meet and confer to discuss SPL's discovery responses. Doc. 4905 at PAGEID 794. Duane Morris sent a followup letter on January 8, 2020, again referencing Mark Peters' April 26, 2011 transmittal email and noting the absence of any communications with Radcliff. Doc. 89-5. According to logs from Benesch's Everlaw system produced after Elizabeth Emanuel's deposition, she viewed ***both*** versions of the History on January 28, 2020. Doc. 276-25, DX 196 p. 1; Doc. 273, Turk Depo. 105:21-106:8. **Ms.**

**Emanuel was at least grossly negligent in failing to call attention to the fact that the forged version quoted from the 2000 Appointment and the 2011 version did not.**

114.    Just hours later on the same day, Respondent Emanuel claimed that SPL had "engaged in reasonable diligence to gather information to formulate SPL's good-faith written discovery responses to date."  Doc. 73-18 at PAGEID 1539.  She promised that "[a]ny responsive documents regarding the History of Working Practise will be produced, to the extent any exist."  *Id.* at PAGEID 1537-38.  **If Respondents Turk, Gurbach, House, and Emanuel had engaged in reasonable diligence at this point, they would have asked Mark Peters why he had not produced the transmittal email and attachment, and  it would have been crystal clear that the reason was that Mark Peters had sent Benesch a forged version of the History that differed from what ICEE had produced (and which Benesch had marked as "hot"). And reasonable diligence likewise would have required Benesch to investigate and determine that they had not produced the forged History that they received from Peters, and to remedy that non-production.**

### 7.    Gurbach, House, Turk, and Emanuel Can Easily See That the Chronologies and Signatures on the Two Histories Are Different but They Continue to Withhold the Forged History

115.    After the Court overruled SPL's objections to Ralph Peters' deposition, Don McCann created a virtual prep binder for Ralph Peters' deposition containing the forged History, labeled "Not Produced."  Doc. 276-32.  On February 8, 2020, House again circulated the "CORE DOCUMENTS" including the forged History.  Doc. 276-24.  On February 20, Turk marked one of the copies in Everlaw as "Not Responsive/Duplicate."  Doc. 276-32.  Her affidavit states that this was the copy of the forged History sent on December 1, 2017.  Doc. 107-5 at PAGEID 3114.  But there was another copy of the forged History in Everlaw—the one sent by RPC on September 25, 2018.  Doc. 73-4.  Ms. Turk testified that the different copies of the forged

History attached to the December 1, 2017 and September 25, 2018 RPC emails were separately

uploaded to Everlaw, and Turk only marked *one* of them as a duplicate. Doc. 273, Turk Depo. at

67:22-68:24. The Benesch Respondents have never offered an explanation for why the

September 25, 2018 copy of the forged History--a "core document" and smoking-gun evidence

of Mark Peters' forgery of the 2000 Appointment—was never produced. At oral argument on

February 20, 2025, counsel for the Benesch Respondents did not offer an explanation, nor is this

failure addressed in counsel's oral argument PowerPoint slides.

116. **The Court concludes that Respondents Gurbach, Turk, House, and Emanuel were at least grossly negligent in failing to produce the forged History.**

117. On February 20, 2020, Don McCann added the forged History to the Ralph Peters

prep binder. Doc. 276-25 at PAGEID 13519-20. A few days before the deposition, paralegal

Carrie Tolaro exported both the 2011 and forged Histories to PDF. Doc. 276-25 at PAGEID

13520. Based on the logs produced after Emanuel's deposition, it can be seen that, a few hours

before Ralph Peters' deposition, Turk and Emanuel *viewed both histories in Everlaw*. Doc. 276-

25 at PAGEID 13520; Turk Depo. at 128:17-129:21. Emanuel downloaded the 2011 History at

9:37 GMT and then viewed the first page of both the 2011 History and the forged version. Doc.

276-25 at PAGEID 13520-21.

118. It was easy to see that the forged History had not been produced. **Respondents Emanuel and Turk (who had methodically reviewed all of ICEE's production, Turk Depo. at 398:14-399:9) were grossly negligent if they indeed did not notice that.** *Id.* at 11:2-7,

128:17-129:21, 219:23-220:21.

119. At Ralph Peters' deposition on February 24, attended by Respondents Gurbach,

Turk, and Emanuel, ICEE counsel marked the 2011 History as Exhibit 1, and that document was

shown on the Zoom platform. ICEE counsel specifically focused on the last page of the 2011 version of the History, which Mark Peters had not provided to RPC or Benesch.  Doc. 84, Ralph Peters Dep. 11:19-14:15.

**1980**

WR & RP travel around Europe setting up SP distributors in Europe

**1981 to 1996**
WR attended annual Distributor sales conferences in Europe and helps to sell syrups, products, freezers

Signed by Ralph Peters                    Date  *06/2/2011*

in the presence  of

Signed by Will Radcliff                    Date  *2/22/11*

in the presence  of                        *2/22/11*

120.    Ms. Emanuel had viewed the very different signature page of the forged version on January 28, Doc. 276-25 at PAGEID 13519, and Ms. Turk had viewed the very different signature page of the forged version on February 20, and had downloaded the PDF file for it on February 3 (meaning that she had it on her laptop) (*id.* at PAGEID 13520):

1980

WR & RP travel around Europe setting up SP distributors in Europe

1981 to 1999
WR attended annual Distributor sales conferences in Europe and helps to sell syrups, products, freezers. RP and SL visit WR - SP Cincinnati each year

2000 - End 2000
WR and RPP agree that all merchandising and any sub licensing, brand, protection, exclusive manufacturing rights and the right to use the trade mark Slush Puppie as Slush Puppie Ltd see fit for all of the UK, Southern Ireland and Europe have been vested to Slush Puppie Ltd for in perpetuity, in return for a revised royalty payment that is to be an amount proportionally equal to 2.5% of the cost of Slush Puppie syrups in pounds sterling prices to distributors in the UK for the previous calendar year

2001
Slush Puppie Corporation is Sold to Dr Pepper/Seven Up Inc



Signed by Ralph Peters                    Date  06/2/2011

in the presence of

Signed by                                  Date  2/22/11

in the presence of                               2/22/11

121.    All of the Benesch Respondents had access to the forged version in the Ralph Peters prep binder.  Doc. 276-25 at PAGEID 13519.  Ron House had the forged version in his "Client Hx of Relationship" folder.  Matt Gurbach had it in his iManage files and it was in "numerous, numerous inboxes" an described as a "CORE DOCUMENT." Nevertheless, Respondents Gurbach, Emanuel, House, and Turk said nothing about the forged History.

122.     Respondents **Gurbach, Turk, House, and Emanuel were at least grossly negligent in not calling attention to the two versions of the History, which were compelling proof that Mark Peters had forged the 2000 Appointment.**  Had they done so at this point, SPL's prosecution of claims based on a forged contract would have ended immediately.

### 8.     Respondents Gurbach, House, and Turk Prepare and Defend Mark Peters as Rule 30(b)(6) Designee on the History of Working Practise

123.     On March 6, 2020, ICEE served a Rule 30(b)(6) notice on SPL asking for someone knowledgeable about the location, storage, destruction, and loss of originals of the History; its execution and who signed it; and all communications about it. Doc. 276-27 at PAGEID 13536.  At this point, Benesch had still not produced the forged version to ICEE.  But the 2011 version was curious as well because it was unclear how Mark Peters had obtained the signature of Will Radcliff since no correspondence had been produced (email or snail mail) with Radcliff, and the original of the History had supposedly disappeared.

124.     This Court has previously held that, at this point, "SPL did its best to stonewall," Doc. 270 at PAGEID 11626, including its "motion for a 'moratorium' on discovery, nominally based on the COVID-19 pandemic, and a motion for a protective order to prevent a remote video deposition of Mark Peters."  *Id.*  On May 26, 2020, the Court denied SPL's motion and ordered Mark Peters' Rule 30(b)(6) deposition to go forward.  May 26, 2020 Minute Entry.

125.     The Rule 30(b)(6) deposition notice was revised and sent out again on June 26, 2020 in expectation of the July 1 deposition of Mark Peters. Again, the topics included the location, destruction, or loss of originals of the 2011 History; circumstances involving its execution; identity of those who signed it; and all communications about it. Doc. 276-27.

126.     On June 23, 2020, Mr. House informed Duane Morris that Mark Peters would be the SPL designee on the Rule 30(b)(6) topics. Doc. 89-7.

127. The deposition began on July 1, 2020, with Mr. House defending and Mr. Gurbach attending. ICEE counsel accused Peters of cutting and pasting Will Radcliff's signature into the 2000 Appointment. Doc. 74, July 1, 2020 Peters Dep. at 128:10-129:13. Peters denied it. Mr. House thought Peters' testimony "was suspect," Doc. 254, Sept. 29 House Dep. 235:23-236:1, but House and Gurbach said nothing.

128. ICEE counsel examined Peters extensively on the 2011 History. Doc. 74, July 1 Peters Depo. at 120-123, 190:19-211:14. ICEE counsel showed Peters the April 26, 2011 transmittal email and 2011 History, both produced by ICEE in 2019 but not produced by SPL, and tagged by Benesch as "hot." Doc. 276-19; Doc. 74, July 1 Peters Depo. at 195:18-21.

129. **Respondents Gurbach and House were at least grossly negligent in failing to inquire into Peters' failure to provide them with these key documents.**

130. ICEE counsel focused on the last page—which ends the "history" in 1996—and asked about the BJ Cork signature—which does not appear in the forged version. *Id.* at 203:2—206:2.

**1980**

WR & RP travel around Europe setting up SP distributors in Europe

**1981 to 1996**
WR attended annual Distributor sales conferences in Europe and helps to sell syrups, products, freezers

Signed by Ralph Peters          Date   06/2/2014

in the presence of

Signed by Will Radcliff         Date   2/22/11

in the presence of        2/22/11

131. Mr. Gurbach's copies of the History in his inbox and saved to iManage were, of course, of the forged version—referring to the forged 2000 Appointment. Mr. House's "Client Hx of Relationship" hard copy was also the forged version.

59



**1980**

WR & RP travel around Europe setting up SP distributors in Europe

**1981 to 1999**
WR attended annual Distributor sales conferences in Europe and helps to sell syrups, products, freezers. RP and SL visit WR – SP Cincinnati each year

**2000 – End 2000**
WR and RPP agree that all merchandising and any sub licensing, brand, protection, exclusive manufacturing rights and the right to use the trade mark Slush Puppie as Slush Puppie Ltd see fit for all of the UK, Southern Ireland and Europe have been vested to Slush Puppie Ltd for in perpetuity, in return for a revised royalty payment that is to be an amount proportionally equal to 2.5% of the cost of Slush Puppie syrups in pounds sterling prices to distributors in the UK for the previous calendar year

**2001**
Slush Puppie Corporation is Sold to Dr Pepper/Seven Up Inc

Signed by Ralph Peters        Date  06/2/2011

in the presence of

Signed by                              Date  2/22/11

in the presence of              2/22/11

132.    Yet Respondents House and Gurbach said nothing.

133.    The deposition continued on July 13, 2020, with Mark Peters this time defended by Respondents House and Turk.  A few days before, on July 7, 2020, Mr. House had downloaded the forged History, which, because it still had not been produced, lacked Bates numbers, and one copy of it had been tagged by Ms. Turk as "nonresponsive" and "duplicate." Doc. 276-25.  Mr. House therefore could easily see that the forged History had not been produced to ICEE.

134. **The Court concludes that Respondents House and Gurbach were at least grossly negligent in failing to rectify the fact that the forged History had not been produced to ICEE and that there were two versions of the History of Working Practise.**

135. On July 13, ICEE counsel spent more time going over the 2011 History and the transmittal email that Benesch still had not produced.  Doc. 75, July 13, 2020 M. Peters Depo. at 353:6-357:3.

136. Counsel for ICEE asked Mark Peters: "You'd agree with me that the History of Working Practice that was signed by your father in 2011 does not refer to an August 8, 2000, exclusive license agreement, correct?"  Peters answered: "Correct."  Doc. 75, July 13, 2020 Peters Depo. at 349:10-24.

137. The forged version (which Mr. House had just downloaded and had in his barcoded folder), and which he, Gurbach, and Turk must have shown Peters to prep for his Rule 30(b)(6) testimony (otherwise, they violated Rule 37(d)(1(A)(i)), does indeed refer to the 2000 Appointment, as Turk had noticed in February.  Doc. 274, Turk Depo. at 448:15-450:7.  But Respondents House, Turk, and Gurbach said nothing and continued to withhold it.

138. At oral argument on February 20, 2025, counsel for the Benesch Respondents did not rebut any of these facts.  Nor have Messrs. Gurbach or House explained how they could have even minimally prepared Mr. Peters for his Rule 30(b)(6) deposition regarding the History without noticing that there were two versions, two sets of signatures, and that Peters had not given them the 2011 version or its transmittal email.

139. **The Court therefore finds that Respondents House and Gurbach were at least grossly negligent in failing to produce the forged History and in failing to investigate**

the fact that Mark Peters had not provided Benesch with the 2011 History or its April 26, 2011 transmittal email.

> ### 9. Benesch Forces ICEE to Incur the Expense of Having a "Quite Convincing" Expert Report Prepared, but Continues to Withhold the Forged History

140.    On August 24, 2020, ICEE served its expert report, showing that Radcliff's and "JB Cork's" signatures had been cut and pasted into the 2000 Appointment, and that the signature in the August 8, 2000 letter from Radcliff to Ralph Peters looked digitally manipulated. Doc. 73-10.  House found the report "pretty convincing."  Doc. 254-1, House Sept. 27, 2023 Depo. at 75:11-20, and Willard agreed that signatures had been manipulated.  Doc. 276-28.

141.    House sent the expert report to Peters, telling him that Willard mostly agreed with Leonard.  Doc. 276-29.  Peters denied any knowledge, but House did not find Peters' denials credible.  Doc. 254-3, Sept. 29, 2023 House Depo. at 285:8-22.  House said nothing to the Court or ICEE about this, and did nothing to ensure that evidence of the forgeries was preserved.  Doc. 254-3, Sept. 29, 2023 House Depo. at 287:10-19; Doc. 254-5, Nov. 2, 2023 House Depo. at 425:15-19.

142.    Mr. House's September 11 email to Mark Peters reporting on ICEE's expert report asks Peters no questions, and expresses no surprise at Ms. Leonard's findings.  This email appears to have been drafted and sent to Peters to document the fact that Ms. Leonard's shocking findings were in fact communicated to Mark Peters in case a dispute arose between Benesch and SPL or Benesch and Peters.  The fact that Mr. House did not ask Mr. Peters who could have engaged in the forgeries analyzed by Ms. Leonard shows that House and Turk already knew that Peters was the forger.  And even though Ms. Leonard's report makes clear that the forgeries were accomplished through digital manipulation, Respondents House and Turk did not ask to examine or preserve the likely means of accomplishing these forgeries:  Mr. Peters' laptops.

143.    In SPL's opposition to ICEE's crime fraud motion, House falsely stated that "[n]o evidence exists of any intent on the part of SPL to deceive the Court" and that "[n]one of the emails to be reviewed show an intent by SPL to facilitate or actively conceal a crime or fraud." Doc. 65 PAGEID 1112.  At this point, however, House and Turk knew that Peters had forged the 2000 Appointment and the Wendsday Email (see below) and had sent emails to RPC and Benesch in furtherance of his criminal scheme.  **The Court finds that Respondent House's false representation to the Court was made in bad faith.**

144.    On September 11, Respondents House and Turk compared the History's two versions, as logs produced *after* House's deposition prove.  Doc. 276-25 at PAGEID 13521. They could see that none of the copies of the forged History were Bates stamped and that two separate copies of the forged History had been withheld on different claimed privileges. Nonetheless, Respondents House and Turk decided to continue to withhold the forged History and to say nothing to the Court or opposing counsel about this conclusive proof of Peters' forgery of the 2000 Appointment.  Doc. 274, Turk Depo. at 451:21-453:13.  At oral argument on February 20, 2025, Respondents' counsel did not offer any excuse for this failure to produce the forged History at this juncture, and did not even address it.  The continued refusal to produce this "core" document, with its devastating evidence of Mark Peters' fraud and with full knowledge that it had not been produced to ICEE during fact discovery creates a strong inference that one or more of the Respondents had all along intended to withhold this document.  **The Court concludes that the continued withholding of this smoking gun document by Respondents House and Turk was done in bad faith.**

145.    On September 15, 2020, House sent ICEE a privilege log claiming different privileges for the two different copies of the forged Histories that had been attached to the

December 1, 2017 and September 25, 2018 emails from RPC. Doc. 73-11 at pp. 8 & 20. To prepare such a log, Mr. House would have had to have again noticed that none of the firm's copies of the forged histories had been produced to ICEE. Yet Mr. House said nothing about this to ICEE. Certainly, he did not claim that the reason the forged History had not been produced was because someone had mis-tagged it as duplicate/nonresponsive. **The Court finds that Mr. House acted in bad faith in continuing to fail to produce the forged History.**

146. The Benesch Respondents have argued that claiming these privileges for attachments to the RPC emails was justified. Doc. 282 at PAGEID 13607-13608. But this argument contradicts their position that in February 2020 they were "making sure they [ICEE] Have Everything," especially all the attachments to "old e-mails from RPC attaching documents." Doc. 282-11 at PAGEID 13701; Respondents' PowerPoint Slides 72-73. If the Benesch Respondents were not considering the attachments to RPC emails privileged in February 2020, they cannot in good faith claim that somehow those same attachments (e.g., the forged History) were privileged in September 2020. Moreover, if only the email to which the forged History was attached was privileged, the forged History should have been produced, since it was obvious to Respondents House and Turk as of this date that it had not been produced. Respondents have never explained why they did not produce the forged History on September 15.

147. **The forged History of Working Practice was not a privileged document. The fact that Respondents Turk and House continued to withhold it even after they admit that they realized it was forged and not produced to ICEE is compelling evidence of their deliberate indifference toward their duty of candor to the Court and their discovery**

obligations.  It further suggests that the fact that the forged History was not produced in 2019 and then again in early 2020 was not an accident.

### D. The Benesch Respondents Knew That Mark Peters Forged the Wendsday Email no Later Than February 24, 2020

148.    On October 28, 2019, ICEE produced the real Lindsay Kirby-Jerry Bird email chain (ICEESPL_133-6612), to which the Wendsday email would have belonged, if genuine, as well as the 2011 History of Working Practise with the cover email from Peters to Kline, and Kirby's 2009 email stating that "I have previously explained that Will Radford [sic] entered into a legally binding verbal contract on this matter with Ralph Peters." Doc 98-5, Doc. 60-11 (genuine Kirby-Bird chain).

149.    On February 8, 2020, Mr. House asked Mark Avsec to "search your old e-mails from RPC attaching documents."  Those would include the two emails forwarding the Wendsday Email with metadata and the two emails forwarding the forged History with metadata.

150.    Mr. Gurbach informed Don McCann that "I have many of these saved on iManage, so we may want to look there as well." Doc. 276-19 at PAGEID 13465, DX 176, DX 191.

151.    Instead of producing the Wendsday Email as it had been received by Benesch from RPC, however, someone at Benesch scanned a hard copy of the document for production, thereby removing the document's incriminatory metadata showing that "markp" created it on Jan 17, 2018 using Word. Doc. 276-10 at PAGEID 13290 ("Since the PDF is named '17NColor.pdf' it is safe to assume the PDF was created at Benesch and it looks to be a scan of a hard copy of the email.").  The Benesch Respondents knew that scanning a PDF removes its original metadata.  Doc. 273, May 17, 2024 Turk Depo. at 82:7-23 (printing out an electronic document and scanning it removes whatever metadata is associated with the electronic document).

152.     On February 19, 2020, Elizabeth Emanuel then produced this scanned copy of the Wendsday email.  Doc. 60-8, 60-9.

153.     On February 24, 2020, Ms. Turk noticed that Kirby's November 12, 20008 response to Bird in the Wendsday Email was missing from the string produced by ICEE.  She brought that to the attention of Mr. House, who then noticed that Wendsday was mis-spelled in what should have been the automatically generated date/time field within Microsoft Outlook. Ms. Turk asked Ms. Emanuel to talk to Mark Peters about this since Ms. Emanuel was in London with Mark Peters for the Ralph Peters deposition. Doc. 273, Turk Dep. 134:4-135:21.

154.     Avsec and House were "shocked."  Doc. 256, Avsec Depo. at 20:20-23, 163:11-18, 256:17-257:24.  Respondents House, Gurbach, Turk, and Avsec concluded that the Wendsday Email had been "doctored."  Doc. 254-3, Sept. 29 House Depo. at 247:12-248:22, 397:11-12.  Ms. Turk admitted that, as of August 2020, she knew the document had been forged by Mark Peters, but Ms. Turk learned nothing between February 24 and August 2000 and about the provenance of the Wendsday Email, so the Court concludes that she knew it was forged by Mark Peters in February 2024.  Respondents Gurbach and House knew that only Mark Peters had the means, motive, and opportunity to fabricate the Wendsday email.  Doc. 254-3, House Sept. 29 Depo. at 232:1-10, 285:3-4 (can't identify any other suspects); Doc. 255, Gurbach Depo. at 53:1825, 226:6-9, 248:18-24.  The Court therefore concludes that Avsec, House, Emanuel, Turk, and Gurbach knew as of late February 2000 that Mark Peters was the forger.

155.     Avsec, Turk, Gurbach, and Emanuel could see that Lindsay Kirby's other emails showed she was unaware of the 2000 Appointment.  Doc. 267-2.  They could also see that her Outlook account automatically generated the correct spelling of "Wednesday."  Doc. 276-5 at 8th unnumbered page (Kirby Jan. 28, 2009 email); Doc. 273, May 17, 2024 Turk Depo. at 152:15-

153:21, Doc. 274, May 23, 2024 Turk Depo. at 428:23-429:20. They could also see that Mark Peters was copied on the emails below the fabricated one, so only he had access to them (Kirby left SPL in 2009). Doc. 60-9. They knew that "Outlook did not generate that" and that a computer was used to copy a string from Outlook into a Word document, and then type up a fake email. Doc. 273, May 17, 2024 Turk Depo. at 161:1-162:6, 164:7-165:18; Doc. 256, Avsec Depo. at 260:3-8 ("a computer would spell it correctly"); Doc. 255, Gurbach Depo. at 217:7-23 (day of week is automatically generated by Microsoft Outlook), *id.* at 240:19-25.

156.     At this point, Mr. Gurbach had concerns that the 2000 Appointment had been forged. Doc. 255, Gurbach Dep. at 158:7-159:8. Indeed, Mr. Gurbach testified under questioning from his own counsel that the lack of authenticity of the Wendsday Email raised concerns because "we had Mr. Wolfsohn's discovery responses indicating that the 2000 appointment was, was somehow forged and so, yes, it raised a concern as it relates to the 2000 appointment, in my mind." Doc. 255-1 PAGEID 10598. That "concern" is inconsistent with the Benesch Respondents' testimony that they did not consider the Wendsday Email to be significant, and further indicates that the Benesch Respondents did not in fact consider the Blevins Franks documents to be trustworthy as a source of authentication for the 2000 Agreement. Just as compellingly, even after the Benesch Respondents received the Blevins Franks documents on January 30, 2020, there is no evidence that they ever tried to contact Blevins Franks or Gary Ruffell to inquire about the documents.

157.     On the same day, February 24, 2020, Respondents Gurbach, Turk, and House all spoke to Benesch's general counsel Joe Gross to obtain advice about the Wendsday Email. Doc. 273, May 17, 2024 Turk Dep. 163:9-164:2, May 23, 2024 Turk Depo., Doc. 274, 352:16-18.

158.    After consulting with Benesch's general counsel, Ron House sent the following email to Mark Peters: "In preparing for your deposition we reviewed the attached which we received from RPC early in the case.  It is an e-mail string between SPL's Lindsay Kirby and ICEE's Jerry Bird.  We need to know whether the attached e-mail string can be retrieved in native format by your IT people and where the string came from.  The word 'Wednesday' is misspelled as 'Wendsday' in the date of the top e-mail.  An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition."  At this time, Mark Peters' deposition was scheduled for early March 2020. Doc. 73-21.

159.    As noted, by this time, Respondents House, Gurbach, Turk, and Emanuel knew that the November 12, 2008 email between Lindsay Kirby and Jerry Bird had been forged. House, Gurbach, and Turk therefore knew that no native format of the forged email could exist since Outlook would not generate a native email with a misspelled date line.  Doc. 255, Gurbach Depo. at 245:24-246:4; Doc. 273, May 17, 2023 Turk Depo. at 161:1-162:6. Indeed, they already had reviewed the real email thread produced by ICEE; that was, after all, how Ms. Turk discovered the fake email.

160.    As Respondents' counsel conceded at the February 20, 2025 oral argument, the purpose of House's February 25 email to Mark Peters was to "give client a chance to explain." Respondents' PowerPoint Slide 87.  It was not to conduct an investigation.  The apparent idea was that, as long as Mr. Peters did not confess, Benesch could continue to represent SPL in the case.  This created an incentive for Benesch to bury its head in the sand and avoid discovering additional incriminating evidence.

161.    For example, if Respondents Avsec, House, Gurbach, Turk, or Emanuel had thought there was any chance the email might have been genuine, one or more of them would

68

have called Lindsay Kirby, or sought Jerry Bird's deposition, or they would have followed up with IT after Mr. Peters ignored Ron House's March 3, 2020 bold-faced request: **"Finally, with your IT person back please have that person search for the November 12, 2008 email from Lindsay Kirby to Jerry Bird in native format. And, we need to know where the e-mail came from. This is critical."** Doc. 276-12 at PAGEID 13308 (emphasis in original). They did not. Doc. 255, Gurbach Dep., 123:6-12 (Gurbach never asked Kirby re Wendsday email; does not know whether anyone else did).

162. Instead, the Benesch Respondents only contacted the person they suspected of having forged the document--Mark Peters. *See* February 25, 26, and March 3, 2000 emails from Ron House to Mark Peters. Docs. 73-21, 73-22, 276-12. Since the emails to Peters received no substantive response from him, the Court concludes that the emails were pro forma—an attempt to make it appear that Benesch had conducted an investigation and had put the client on notice that it was "all on him." Even though House's March 3 email told Peters that it was "critical" for Benesch to know where the forged email came from, Peters never responded. Doc. 255, Gurbach Depo. at 264:23-265:25 (referring to DX 87—the March 3, 2020 email from House to Peters). And because the "investigation" was only pro forma, the Benesch Respondents did nothing to "investigate." The failure to investigate shows that Benesch knew that Mark Peters was the forger.

163. Instead of withdrawing from representing a known forger, once Benesch had confirmed that Mark Peters had forged the Wendsday Email and was concerned that the 2000 Appointment was a forgery, "SPL did its best to stonewall," Doc. 270 PAGEID 11626. First, on March 11, 2020, Benesch canceled Mark Peters' deposition and filed a motion seeking a moratorium on discovery. Doc. 46; Doc. 49-8. A few weeks later, Benesch refused to produce

Mark Peters via Zoom, insisting on in-person deposition in London, which is impossible given the pandemic. Doc. 46-1 PAGEID 721. During this period of time, because the pandemic made travel difficult if not impossible, litigators were adopting the use of Zoom and similar platforms for depositions. But Benesch instead used the pandemic as an excuse to try and delay or settle the case.

164.    On May 7, 2020, Benesch claimed that Mark Peters could not be deposed for "health related issues." The delay tactics also included a "motion for a 'moratorium' on discovery, nominally based on the COVID-19 pandemic, and a motion for a protective order to prevent a remote video deposition of Mark Peters." Doc. 270. They also sought a moratorium "to engage in settlement discussions," and claimed that a Zoom deposition was impossible because "SPL is unable to retrieve the documents and information needed to allow its counsel to prepare Mr. Peters adequately for his deposition." Doc. 51 PAGEID 913-917. **The latter statement was made in bad faith since Mark Peters had told Benesch on or around March 3 that his IT person was "back" and all the relevant documents were retrievable remotely.**

165.    On May 26, 2020, the Court overruled Benesch's objections to Zoom depositions, and ruled that the Zoom deposition of Mark Peters should go forward in the last two weeks of June. May 26, 2020 Minute Entry. It was then scheduled for July 1, 2020. *Id.* This prompted Gurbach and House to circle back to Peters and RPC about the Wendsday Email. On June 25, 2020, Gurbach wrote to David Cran at RPC: "An issue has arisen with regard to a document that we received at the inception of this case and I would like to discuss it with you." Doc. 98-7, DX 139. Mr. Gurbach claimed at his deposition that Mr. Cran had nothing to say on the subject. Gurbach Dep. at 273:17-276-10 (Cran knew nothing; didn't discuss who forged the Wendsday Email). The Court finds that this email shows (1) that Benesch had not bothered contacting RPC

70

about Peters' forgery of the Wendsday Email even after they consulted counsel in late February 2020 about the ethical issue his forgery presented and (2) that Gurbach was well aware that he had received the Wendsday Email from RPC "at the inception of the case" yet he did not pull that electronic document for production even after he was told by Don McCann on March 10, 2020 that only a scanned version--stripped of its metadat--had been produced to ICEE. Doc. 274-16. **The Court concludes that this is further evidence of Benesch's willful blindness to Peters' fraud.**

166. On June 25, 2020, in another pro forma letter, Mr. House informed Mark Peters, copying Respondents Gurbach and Turk, that Benesch has "reached the conclusion inferred from circumstances that the e-mail is not authentic." Doc. 73-23. The reference to "inferred from the circumstances" is a reference to the definition of "Knowingly" in the Ohio rules of Professional Conduct. "Knowingly" is defined as denoting "actual knowledge of the fact in question" but "a person's knowledge may be inferred from circumstances." The word "Knowingly" is then used in Rule 3.3, precluding lawyers from "knowingly" offering "evidence that the lawyer knows to be false." This was therefore the Benesch firm's polite way of telling Mark Peters that they believed the Wensday Email was fraudulent. The letter was clearly intended to create documentation that could be used to distance the Benesch firm from Peters' fraudulent scheme.

167. Importantly, Respondents had learned nothing from Mark Peters, David Cran, or anyone else about the Wendsday Email after discovering the misspelling on February 24, 2020. Peters did answer any of House's questions in his February 25, 26, and March 3 emails; Cran knew nothing; and Respondents did not communicate with anyone else outside of the firm. On February 24, they spoke to GC Joe Gross; and on March 10, they learned from Don McCann that they had stripped the metadata from the Wendsday Email when they produced it. Yet they did

nothing to inform the Court or opposing counsel that they had concluded their client had fabricated evidence.

168.    On June 26, 2020, Mr. Gurbach "withdrew" the Wendsday Email from production, without offering an explanation as to the reasons for the withdrawal.  Doc. 60-10. This withdrawal gave Respondents Gurbach, House, and Turk another reminder that the firm had stripped the Wendsday Email of its metadata and produced it as a scan of a paper document, yet Respondents did nothing to rectify this breach of their own ediscovery rules.

### E.    Ralph Peters and Stefan Loos Did not Authenticate the 2000 Appointment

169.    Respondents argue that Ms. Turk's heavily redacted notes support the position that Loos would authenticate the 2000 Appointment.  Respondents' PowerPoint Slide 46.  The notes are from a call that Mr. House had with Mr. Loos on February 11, 2020.  The notes indicate that Mr. Loos was confused, since he states that SPL "always wanted to return the in perpetuity agreement that had been done in past before companies changed.  Doc. 274-10 at PAGEID 12585.  This alone suggests his memory was faulty because both the 1996 and 1999 agreements are "in perpetuity."

170.    The notes then state that Loos recognizes Ralph Peters' signature and he's 99% sure his signature also appears.  Doc. 274-10 at PAGEID 12585.  But Mr. House apparently never asked Mr. Loos whether he had seen the agreement executed by both parties, and never asked him about the "Will Radcliff" or "BJ Cork" signatures.  If the August 8, 2000 letter (Exhibit E to the complaint) was real, then Ralph Peters would have received two copies of the Appointment already executed by Will radcliff and "BJ Cork," yet Mr. House stayed away from that important subject.  Nor did Mr. House take Mr. Loos through the agreement—including its many peculiarities—to see whether Mr. Loos in fact recalled seeing this unusual document executed by both sides.  In particular, Mr. House asked nothing about the 2.5% royalty or about

72

the expansive broadening of exclusivity regarding use of the Slush Puppie trademarks.  Nor did he ask why the Territory for distribution was being expanded so greatly given that the 1999 Distribution Agreement had just been entered into.  Mr. Loos said he was "aware of the negotiations—semi part if it"—and that he "went to conference in states," but Mr. House asked nothing about what the negotiations concerned, who was involved and present during them, where the "conference" was, etc.

171.    Ms. Turk's heavily redacted deposition outline reflect these glaring lacunae. Where Ms. Turk thought she knew the answer from the February 11 call, she wrote it into her outline.  So, since Loos recognized Ralph Peters' siganture, she writes: "Is that Ralph Peters' signature (yes)."  Doc. 274-11 at PAGEID 12588.  But as for whether he was with Ralph Peters when he executed it, where he was, whether Radcliff had already signed it, whether he ever saw a fully executed copy, etc., it is clear that Ms. Turk did not know what Mr. Loos would say because none of those questions were asked by Mr. House on February 11.  Mr. House's reluctance to ask these key questions on February 11 suggest he was afraid of the answers, which would explain why Respondents did not seek Mr. Loos' deposition.  If he truly had been a "key witness" as Respondents now argue (Respondents' PowerPoint at Slide 47) they would have wanted to memorialize his testimony given that he lives in Belgium.  Instead, it was ICEE that sought his testimony.

172.    As for Ralph Peters' testimony at his deposition on February 24, Respondents were similarly reluctant to ask him the key questions.  Ms. Emanuel was afraid to walk him through the document and ask him about its terms; about the negotiations that Mr. Loos had alluded to two weeks before; about whether he had received it, as the August 8, 2000 letter states, already signed by Mr. Radcliff and "BJ Cork," about the great expansion of the applicable

"Territory" for distribution; about who drafted it (given its curious British spellings); about where and how it was found in late 2017 (whether in Majorca or at his home in England); and so forth. Given that Mr. Peters could recall nothing about the document he signed 11 years afterwards—the 2011 History (11:19-13:24) and Respondents' earlier insistence that his "mental limitations" made him "incapable of being deposed and that SPL would not be calling Ralph Peters as a witness," his very limited and confused testimony regarding the 2000 Appointment falls many miles (or kilometers) short of "confirming the existence of the 2000 Appointment." Respondents' PowerPoint Slide 51.

> **F.     Respondents Emanuel, Avsec, Gurbach, and Turk Knowingly Fail to Produce the Wendsday Email as They Had Received It from RPC: With Its Incriminating Metadata**

173.    On March 10, 2020, Don McCann explained to Ms. Emanuel that the copy of the Wendsday Email produced to ICEE was a PDF created at Benesch and that Benesch does not have it "in native format anywhere in Everlaw." Doc. 274-16. Respondents Gurbach, House, and Avsec, however, were aware that they had twice received the Wendsday Email electronically from RPC: first, when RPC sent it to Mr. Avsec and Mr. Zalud on April 17, 2018, Doc. 73-20, and then when RPC sent it to Avsec, Gurbach, and House on September 25, 2018. Doc 73-13. In fact, on February 8, 2020, House told the team: "I am looking through old e-mails to see where the hard copies of Slush Puppie docs came from." Doc. 276-19 at PAGEID 13465.

174.    The Benesch attorneys knew that scanning the document at Benesch removed the document's metadata. Doc. 273 at PAGEID11774; Doc. 255, Gurbach Dep. at 273:10-16. They therefore knew as well that they had not produced the document to ICEE with the document's metadata—as they had repeatedly insisted ICEE was required to do—and as Elizabeth Emanuel had promised to do in 2019. They routinely checked to see what the metadata for electronic documents showed. *See, e.g.*, Benesch_000977 (Sept. 22, 2020 email from Ms. Turk to McCann

("From the metadata, it appears that the document they produced is a pdf that was created on 4/26/11").  Even though Respondents Avsc, Gurbach, and House had the metadata "residing in numerous mailboxes" and knew their production lacked it, they decided not to pull it from their inboxes and not to make a proper production to ICEE that would include the incriminating metadata.  Doc. 255, Gurbach Depo. at 144:16-146:14, 147:16-148:3, 236:12-24 (never looked at metadata or asked Zalud or Avsec to see how they received it; 272:17-273:11 (Gurbach knew that Zalud and Avsec had received the Wendsday Email from RPC and that scanning removes metadata); Doc. 256, Avsec Depo. at 266:8-267:9 (never bothered checking where he got the Wendsday Email from), 267:1-269:18 (Avsec didn't investigate; "I did not take steps."); Doc. 254-3, House Sept. 29, 2023 Depo. at 258:23-264:4 (it was a concern as to how Benesch had received the Wendsday Email, but he wasn't involved in finding out).

175.    The very first step of the most rudimentary investigation into the forgery would have been to examine the document as it was received from RPC, and to inquire of RPC how they had received it.  The next step would have been to examine the computers and devices that likely were used to create the forgery.  Since the only one the Benesch attorneys suspected of forging the Wendsday Email was Mark Peters, that would mean imaging Mark Peters' laptops and devices (or asking him for that data if they really believed he had already preserve it).

176.    At the end of August, Turk and House were yet again reminded of what McCann had told them on March 10:  That they had produced the Wendsday Email without the metadata they had received repeatedly from RPC.  On August 27, 2020, ICEE filed a Motion to Compel allegedly privileged communications and documents relating to the Wendsday email on the grounds of the crime-fraud exception to attorney-client privilege.  In its motion, ICEE pointed out the lack of metadata for the Wendsday email as it was produced in February. Doc. 60. House

and Turk did nothing at this juncture to retrieve the original Wendsday Email from their in boxes.

177.    Then, after numerous emails on the subject, on September 18, 2020, Benesch produced some nonprivileged attachments requested in ICEE's counsels' earlier emails. The production included, for the first time, the Wendsday email with its original metadata showing a creation date of January 17, 2018 by "markp" from a document titled "Microsoft Word - Document2". Doc. 98-8.  But Respondents Turk and House said nothing about the metadata and offered no excuse for why it had not been produced in February or March.

178.    Then, on September 21, 2020, ICEE wrote to the Court highlighting the significance of the newly produced metadata, which shows that Mark Peters fabricated the Wendsday email shortly before sending it to British counsel at RPC. Doc. 69.  Mr. House received confirmation from Don McCann that ICEE's characterization of the incriminating metadata was correct (Doc. 282-15), but instead, of informing the Court that they agreed with ICEE's counsel on this subject, Mr. House accused Duane Morris of "ascribing only the most sinister motive to the 'facts'." Doc. 70.  House knew that Duane Morris' recounting of all of those facts was entirely accurate—and damning for both Mr. Peters and the Benesch Respondents.

179.    If in fact the Benesch attorneys (1) failed to examine the Wendsday Email's metadata, (2) failed to examine the emails from RPC forwarding it, (3) failed to ask RPC how they received it, (4) and failed to collect Mark Peters' relevant electronic data, that is compelling evidence that the Benesch attorneys had decided not to try and uncover any information about Peters' forgeries and not to conduct a legitimate investigation.  **The Court concludes that this failure to act was done in bad faith—in an attempt to not have to withdraw from the case.**

76

**By making these decisions, Benesch unreasonably imposed costs on ICEE in having to defend against fraudulent claims and to spend scores of hours taking depositions and seeking documents about the forgeries.**

### G. Respondents Retained Ms. Willard to Perpetuate Their Prosecution of Claims Under the Forged 2000 Appointment, not to Investigate Peters' Forgeries

180.    The Benesch Respondents have argued that their retention of handwriting expert Vickie Willard shows that they had conducted an investigation into Peters' forgeries. Respondents' PowerPoint Slides 5, 104.  But the record shows that Willard was not retained to get to the bottom of the forgeries, but instead to try and shore up SPL's claims under the 2000 Appointment.  Gurbach's concern that the 2000 Appointment was forged was engendered by the fact that Peters had forged the Wendsday Email, which Gurbach, House, Emanuel, and Turk knew as of February 25, 2020. Yet Gurbach waited four months before retaining Ms. Willard, and then gave her a deadline that was the same as the one for serving expert reports for which the party had the burden of proof.  Doc. 255-1, at 375:8-376:2 (Willard retained June 25, 2020); Doc. 55 (court extends discovery deadlines so that expert reports for the party with the burden of proof are now due on August 24, 2020).  This is conclusively shown by Matt Gurbach's August 14, 2020 email, in which he informs Willard that "we obviously did get that extension.  The new deadline is August 24." Doc. 291, at 23.  SPL had the burden of proof to show that the 2000 Appointment was genuine.  The Court concludes that Benesch's intent in hiring Willard was to try and fulfill that burden, not to try and get to the bottom of Peters' forgeries.

181.    If Benesch had had any concern about imposing costs on ICEE due to Peters' forgeries, and if the purpose was to have the 2000 Appointment examined professionally to decide if the claims under it should be dropped, such an investigation would have been

conducted immediately after Benesch consulted their general counsel about the ethical issue presented by Mark Peters' forgery of the Wendsday Email.

182.    Moreover, Mr. Gurbach did not send Ms. Willard the critical documents for getting to the bottom of Peters forgeries:  the Wednesday Email, the 2011 History of Working Practise, the forged History, and the forged August 8, 2000 and April 2001 letters.  Ms. Willard was not asked to review or consider any of those.  Mr. Gurbach testified that he was concerned that the 2000 Appointment might be a forgery because Mark Peters had forged the Wendsday Email.  The Wendsday Email was digitally manipulated.  But Gurbach did not ask Willard about any digital manipulations, and Gurbach did not obtain an image of the laptops and/or devices that Mark Peters used to make his digital manipulations.   Retaining Ms. Willard thus had nothing to do with "Benesch Launch[ing] its Own Investigation," as Respondents have argued. Respondents' PowerPoint Slide 104.

**H.    Respondents Gurbach, House, Turk, and Emanuel Fail to Take Reasonable Measures to Preserve Evidence of Peters' Forgeries**

183.    Benesch had the same deliberately indifferent attitude toward collecting and preserving evidence of Mark Peters' forgeries that it had toward investigating those forgeries and frauds.  At various junctures when Benesch was presented with evidence of Mark Peters' digital forgeries, the Benesch Respondents stuck their collective head in the sand—refusing to take the most rudimentary measures (and ones that the Benesch firm counsels its own clients to take as a matter of best ediscovery practice, Doc. 276-8) to collect and preserve evidence of fraud.

184.    The Benesch Respondents point to three documents as putatively demonstrating that they did not facilitate spoliation:  a litigation hold sent by RPC to Peters in 2018; an ediscovery questionnaire prepared by Gurbach and filled out by SPL's Simon Shale; and a phone

call in August 2019, followed up with an email from Elizabeth Emanuel to RPC. Respondents'

PowerPoint, Slide 70. But those documents are inculpatory rather than exculpatory.

185. RPC's litigation hold was sent to Peters on December 20, 2017. Doc. 73-13. The

Guide states: "It is especially important that you take immediate steps to preserve any relevant

electronic documents which might otherwise be deleted accidentally or in accordance with the

routine operation of a document retention policy or in the ordinary course of your business. You

should also consider carefully where electronic documents may be held, eg computers, mobile

phones, hard-drives, . . . mobile devises . . . " Doc. 282-16 at PAGEID 13795. Doc. 276-4

atPAGEID 13114. But at no time did any of the Benesch attorneys ask Mark Peters or anyone

else at SPL for a backup of his computers or phone. The only reasonable inference from that fact

is that Benesch did not believe he had preserved them.

186. The ediscovery questionnaire was filled out by SPL and returned to Gurbach,

House, Avsec, and associate Nora Cook on October 26, 2018. Doc. 276-30. The questionnaire

lists as custodians Treacher, Lindsay Kirby, Alan Beaney, Gary Ruffell, Mark Peters, and

Accounts Payable. None of these custodians' accounts were ever collected by RPC or Benesch.

Doc. 255, Gurbach Dep. at 76:19-77:12 (nothing done to collect Lindsay Kirby's emails);

78:14-24 (nothing done to collect Gary Ruffell's emails).

187. The questionnaire also states that nothing was done to take steps to secure

relevant data to prevent alteration or deletion of information. Doc. 276-30 at PAGEID 13546,

13547; Doc. 255, Gurbach Dep. 80:17-22. None of the Benesch Respondents followed up on

this statement—ensuring that all reasonable measures were taken to secure relevant data to prevent alteration or deletion.[13]

188.    The Benesch Respondents argue that one call with Peters in August 2019 and a vague reminder about preserving "all documents relating to or involving in any way the lawsuit, including computers, and hard drives used by custodians," Doc. 282-17 at PAGEID 13802, discharged its ediscovery obligations.

189.    Once the Benesch Respondents knew, however, that Mark Peters had engaged in digital manipulation to create the Wendsday Email and they suspected the 2000 Agreement was a fake as well, they had an obligation to preserve and collect digital evidence regarding known and suspected forgeries.  This obligation included collecting the laptops and devices used by Peters, as well as ensuring that all relevant email had been collected.  That is because they knew that laptops and devices need to be backed up or imaged so that files on them are not deliberately or inadvertently deleted.  Doc. 273, Turk Depo. at 240:18-241:1; Doc. 255, Gurbach Dep. at 423:14-19.  Instead, the Benesch Respondents did nothing.  Doc. 273, Turk Depo. at 241:2-9. Indeed, they continued to leave Peters in charge of collection of email, and they never contacted Peters or anyone at IT about performing the collection and preservation of email and data on Peters' laptops and devices.

---

[13] Benesch Respondents argue that the word "none" following the statement: "Please describe any steps that have been taken or would be required to secure data relevant to this Dispute to prevent alteration/deletion of information" means that no steps were *required*.  That reading makes no sense.  The survey response says that "[r]etention is not enabled in Office 365" for email.  Moreover, the survey does not list any steps that have been taken to preserve data on relevant custodian's laptops and devices.  Accordingly, the better reading of "none" would be that no steps had been taken.  And perhaps that is why the RPC associate sending the questionnaire notes: "We note that some of the answers may need expanding upon."  Doc. 276-30 at PAGEID 13544.  But the Benesch Respondents did not follow up for clarification of the answer "none," nor did they ask SPL's IT people about preserving email—which the questionnaire says was not being retained.

190.     That the Benesch Respondents knew that Mark Peters had done nothing to preserve his laptops or devices is shown by their actions after ICEE served a notice to inspect those devices on August 13, 2020.  Doc. 73-24.  Right after receiving it, Mr. Gurbach searched his files to see what Benesch had done to fulfill its preservation responsibilities. Doc. 276-32.  All he could come up with was the September 2019 exchange between Elizabeth Emanuel and Mark Peters.  *Id.* ("See highlighted below.  I can look further."; forwarding Emanuel's Sept. 11, 2019 email to Mark Peters)  In fact, nothing had been done to preserve Peters' laptops and devices since then, despite the facts that Respondents knew Peters had engaged in digital forgery to create the Wensday Email on his laptops and that Gurbach suspected him of having forged the 2000 Appointment.  Doc. 273, Turk Depo. 279:5-20.

191.     On August 13, 2020, ICEE served its notice to inspect Peters' laptops.  Doc. 276-31.  On September 14, 2020, Mr. House signed SPL's response, stating that SPL will, "to the extent such devices exist, . . . produce the requested devices" to a third party vendor for imaging. Doc. 73-25.

192.     But on August 16, 2020 at 10:45 PM GMT, Peters had called the Thames Valley Police from a Birmingham landline to report that his car—parked a few hundred yards from his office parking lot (which has numerous CCTV cameras)—was broken into 85 minutes before the call and that his laptops (plural) were stolen along with his phone and rucksack. Doc. 276-33, DX 209.

193.     Over a month later, on September 24, 2020, Benesch told ICEE that it "will be coordinating the document imaging efforts on SPL's end." Doc. 89-10.  Presumably, Mr. Peters had still not informed Benesch of the supposed break-in and theft.

81

194.    However, on September 29, 2020, Benesch sent a "supplemental" response (signed by Respondent House) to ICEE's inspection request stating that "SPL does not have possession or control of any devices responsive to this Request."   House provided no explanation for this change of position. Doc. 73-26. And House failed to produce the police report memorializing Peters' August 16 call to Thames Valley until November 2020.  Doc. 276-33.

195.    If Gurbach, House, and Turk really believed Peters had taken steps to preserve his laptops and devices, they would have asked him for those images or data collection.  They did not. This is evidence that they knew that their cursory and conclusory notification to Peters in 2019 to "preserve all documents" including computers, Respondents' PowerPoint Slide 69, was insufficient, especially once they all knew that he was a digital forger.

196.    Respondents argue that none of this matters because they moved to dismiss their claims under the 2000 Appointment on October 15, 2020.  But if Respondents had collected the relevant data off of Peters' laptops and devices in February or March 2020, it likely would have shown that Peters had forged the 2000 Appointment, as well as the other forged documents. That would have ended the case in March 2020.  Eight months of legal fees and expenses incurred by ICEE would have been avoided.

I.    **Respondents' Continued Incomplete and Misleading Discovery Responses Regarding the Wendsday Email and Other Forgeries Fell Short of their Professional Obligations Causing Additional Expense to ICEE**

197.    As noted, Respondent House believed that the first Leonard report was "pretty convincing."  He sent it to Mark Peters on August 25, 2000 and Peters had nothing to say about it.  Doc. 274-27. House took no steps at this point to attempt to prevent ICEE from having to incur additional fees defending against claims House knew to be meritless.

198.     ICEE was thus forced to incur the cost of its Motion to Compel Information

Relating to Plaintiff's Fabricated Evidence, and the subsequent voluminous correspondence with

the Court and Respondents regarding SPL's claimed privilege over numerous documents that

were belatedly logged on a lengthy, and confusing, privilege log.  Doc. 60.  In response, SPL

falsely argued that "[n]o evidence exists of any intent on the part of SPL to deceive the Court."

Doc. 65 at PAGEID 1112.  Respondents House and Turk knew that to be false.  They had

received numerous emails from Mr. Peters via RPC sending documents Peters was claiming to

be real that in fact were forged.  And since by this time, Respondents Turk and House believed

Peters had forged the Wendsday Email and also believed he had forged the 2000 Agreement,

they knew that there was compelling evidence of SPL's intent to deceive the Court.

Respondents' refusal to come clean at this point fell short of their obligations as attorneys, and

caused ICEE great additional expense.

199.     Meanwhile, on July 10, 2020, ICEE served its Third Set of Requests for

Admission, which concerned the Wendsday Email.  Respondents waited until the last day to

respond—on August 10, 2020.  Doc. 60-12 at PAGEID 1050-1054.  The responses were signed

by Respondent Gurbach, with Respondents House and Turk on the signature block.  Respondents

finally admitted that the Wendsday Email was not genuine—something they had known since

February—but asserted that, after making "a reasonable inquiry," they could neither admit nor

deny whether Lindsay Kirby had written it, whether it was created after November 1, 2017,

whether it was authored by Mark Peters, or whether SPL's computer systems were programmed

within Outlook to mis-spelling the days of the week, including Wednesday.  Doc. 60-12 at

PAGEID 1052.  A reasonable inquiry, however, would have quickly shown that Mark Peters had

authored it in early 2018 and that Lindsay Kirby did not write it.  That was shown by the

metadata in the documents that Mark Peters sent to RPC, and that RPC sent to the Respondents. As for mis-spelling the days of the week, Respondents knew that Outlook does not do that, and "SPL" knew that as well, as shown by Abi Somorin's testimony in 2021. Doc. 100 at PAGEID 2822 (Outlook does not mis-spell days of the week in the automatically generated field). **Mr. Gurbach failed to conduct the reasonable inquiry required by Rule 26(g) in signing these responses. Moreover, Respondents Gurbach, House, and Turk violated Section 1927 in serving these responses.**

200.    Because Respondents continued to refuse to admit what they knew about Peters' forgeries, on October 2, 2020, ICEE served a Rule 30(b)(6) Notice of Deposition on SPL seeking testimony about the Wendsday email. Respondents Turk and House designated Mark Peters as SPL's Rule 30(b)(6) witness, but they did nothing to prepare him. At his deposition October 9, 2020, he admitted that he had no knowledge regarding any of the 18 topics for which he was designated. Benesch Respondents did not produce witnesses with knowledge until March 16, 2021, and only after ICEE had to move the Court for an order. Doc. 98-10. All of the fees incurred by ICEE in connection with this discovery would have been avoided if Respondents had been candid about what they knew about Peters' forgeries, and had not lent their names to false and misleading discovery responses. **The Court finds that Respondents Turk and House violated Section 1927 in refusing to inform ICEE that Mark Peters had authored the Wendsday Email and that the Leonard report was "pretty convincing."**

201.    Meanwhile, because Respondents Turk and House had entirely failed to inform ICEE that they agreed that the 2000 Appointment was fraudulent, ICEE was forced to prepare a lengthy motion for summary judgment on SPL's meritless claims under that forgery. In fact, defense counsel called Respondent House on or around October 14 to request an extension of the

summary judgment deadline, which at that point was on October 19, 2020.  Doc. 71.  ICEE

counsel also asked for consent to file a motion up to 30 pages in length.  *Id.*  Unbeknownst to

ICEE, Respondents House and Turk were preparing a motion to withdraw SPL's claims under

the forged 2000 Appointment.  But Respondent House said nothing about this, so defense

counsel continued to work on the lengthy summary judgment motion.

202.    On October 15, 2020, Respondents Turk and House  filed a motion for leave to

amend to withdraw claims based on 2000 Appointment, writing that "SPL will not seek to

enforce any rights set forth under the 2000 Agreement." Doc. 72.  Far from admitting that the

2000 Agreement was a forgery, therefore, this statement continues to imply that Benesch

believed it was legitimate. Respondents gave no reason for their motion, and continued to remain

mum about ICEE's "pretty convincing" expert report.  Nor did Respondents give ICEE any hint

of their awareness of how Mark Peters had created a forged version of the History of Working

Practise to try and conceal his forgery of the 2000 Appointment. This required ICEE to incur the

expense of having Ms. Leaonard prepare a supplemental report to explain the role of the forged

History in the forgery of the 2000 Appointment.  Doc. 73-27.

203.    On November 5, 2021, Respondent Zalud entered his appearance.  Doc. 79.

204.    On November 24, 2020, ICEE's counsel wrote to Respondents House, Zalud**,** and

Turk to point out that Mark Peters was unprepared to testify about the Wendsday email on

October 9 and to seek a fully prepared witness. Doc. 98-11.

205.    On December 1, 2020, Respondent Turk wrote to ICEE counsel that "[r]egarding

the 30(b)(6) topics from Mark Peters' October 9, 2020 deposition, other than what has already

been testified to, there is no one at SPL who has knowledge regarding the Kirby email or where

the email was located." The March 16, 2021 deposition of Abiodum Somorin showed that this

statement was false. Doc. 100. Notably, neither Ms. Turk nor any other Benesch attorney had tried to speak with SPL's IT professionals about the Wendsday email, and neither did Mark Peters. Doc. 98-12.

206. Because of the intransigence of Respondents Zalud, Turk, and House, on January 26, 2021, ICEE was compelled to ask the Court to order SPL to produce a properly prepared 30(b)(6) witness on the topics relating to the Wendsday email. Doc. 98-13.

207. On February 8, 2021, Respondent Zalud represented to the Court that "no one at [SPL] has the knowledge sought" by ICEE's requests, and asked that the Court rule that SPL has complied with its discovery obligations. This statement was false, and as of this date Respondent Zalud had not spoken to SPL's IT professionals regarding the deposition topics, and neither had Mark Peters. Doc. 98-14.

208. On February 8, 2021, the Court held a conference and ordered SPL to find an appropriate Rule 30(b)(6) witness to testify on the topics in ICEE's notice.

209. On February 19, 2021, respondent Zalud wrote to ICEE's counsel proposing testimony from Abiodum Somorin, whom he characterized as SPL's "IT consultant," and from Mark Peters. Respondent Zalud proposed deposition dates of "April 27, 28, or 29" for each witness, and proposed that ICEE's counsel travel to the United Kingdom and Northern Ireland to take the depositions. As of this date, Mr. Zalud still had not spoken directly to Somorin. Doc. 98-15.

210. Because of Mr. Zalud's unreasonable position that these depositions take place overseas, ICEE was once again compelled to seek the Court's assistance. Accordingly, on February 22, 2021, the Court held a conference with the parties. During the conference, Respondent Zalud admitted that, despite his representations that there was no one at SPL with

knowledge of the Wendsday Email, he had not yet even spoken with Mr. Somorin to determine if he had relevant information to provide.

211. On March 1, 2021, the Court held another conference. The Court ordered the depositions to go forward by Zoom, in March. At this point, SPL changed its designees to Abiodum Somorin and Laura Peters. The depositions were scheduled for March 16, 2021.

212. On March 10, 2021, ICEE served an amended Rule 30(b)(6) Notice on SPL. Doc. 98-16. On March 15, 2021, Respondent Zalud signed SPL's Response to 7th Amended 30(b)(6) Notice, claiming that "[t]here is no one at SPL with knowledge of who typed the Wendsday Email, although it does indicate, on its face, Lindsay Kirby as the sender and that is who SPL believes typed it. She last worked for SPL in 2009." Doc. 98-17. That statement was knowingly false. The Benesch attorneys all knew that Peters had fabricated the Wendsday Email, and they certainly knew that Lindsay Kirby did not type it since it was created in 2018, and only Peters had access to the legitimate email string. Nor did anyone at "SPL" believe that she had typed it.

213. On March 16, 2021, ICEE took the deposition of SPL's designee, Abiodum Somorin, who works as SPL's head of IT. Somorin testified that Outlook does not generate mis-spelled days of the week in the automatically generated date/time field, and that the only explanation would be that someone typed it that way. Doc. 100 at PAGEID 2824, 40:2-13. Mr. Somorin confirmed that no one at the company had access to the legitimate string other than Mark Peters, since Lindsay Kirby's email had not been migrated over to the new Office 365 system in 2015 or 2016. Doc. 100 at PAGEID 2825, 42:17-20. Indeed, Mr. Somorin could think of no other explanation for the mis-spelling other than that mark Peters copied the legitimate string from Outlook and typed in the November 12, 2008 Wendsday email, pasted it into Word, and converted it to PDF. Doc. 100 at PAGEID 2825 43:18-44:11. All of this

information had been available to SPL all along, and Respondents never bothered to ask Somorin about it. ICEE had to incur the expense of moving the Court for this deposition and taking it because of Respondents' continued denials in discovery responses that Mark Peters had not forged the Wendsday Email, that it could have been written by Lindsay Kirby, and that SPL had no knowledge about whether Microsoft Outlook mis-spells the days of the week.

## CONCLUSIONS OF LAW

1.      ICEE seeks sanctions against the Benesch Respondents under three sources of sanction power: (i) the Court's inherent authority; (ii) 28 U.S.C. § 1927, which provides for sanctions against an "attorney or other person" who "so multiplies the proceedings in any case unreasonably and vexatiously"; and (iii) Fed. R. Civ. P. 26(g), which authorizes sanctions for violating the duty to ensure that a discovery disclosure is "complete and correct as of the time it is made" against "the signer, the party on whose behalf the signer was acting, or both."

2.      Rule 26(g)(3) itself authorizes sanctions for a violation of the certification that discovery responses were "complete and correct as of the time" they were made against "the signer, the party on whose behalf the signer was acting, or both."

3.       In light of the explicit language of Rule 26(g) referring to the "signer," and the parallels to an earlier version of Federal Rule of Civil Procedure 11 which the Supreme Court held permit sanctions only against the attorney who signed a pleading or paper, *Pavelic & LeFlore v. Marvel Entertainment Grp.*, 493 U.S. 120, 126-27 (1989) [14], Rule 26(g) only permits sanctions against the signer of a discovery response, and not non-signing counsel or counsel's

---

[14] The language of Rule 11 was changed after *Pavelic & LeFlore* to explicitly allow sanctions against an attorney's law firm, and to make the law firm jointly and severally liable with the attorney by default, "absent exceptional circumstances." Fed. R. Civ. P. 11(c)(1). But the corresponding language in Rule 26(g) was left unchanged.

law firm. This reading is also consistent with the Sixth Circuit's treatment of sanctions under Federal Rule of Civil Procedure 37. *See NPF Franchising, LLP v. SY Dawgs, LLC*, 37 F.4th 369, 383 (6th Cir. 2022) ("Rule 37 makes no mention of a party's law firm but explicitly lists a party and a party's attorney. The canon of expressio unius est exclusio alterius—the express mention of one thing excludes others—thus supports the view that Rule 37 does not provide for sanctions against a law firm.").

4.      Under Federal Rule of Civil Procedure 26(g), the burden is on the "party whose conduct is being scrutinized" to "establish the reasonableness of its conduct." *N.T. ex rel. Nelson v. Children's Hosp. Med. Ctr.*, 2017 WL 5953118, at *5 (S.D. Ohio Sept. 27, 2017) (Barrett, J.); *see also DR Distributors, LLC v. 21 Century Smoking, Inc.*, 2024 WL 2846035, at *24 (N.D. Ill. June 5, 2024). That burden fits the nature of the rule, which requires the signing attorney to certify that a response is complete and correct "to the best of the person's knowledge, information, and belief ***formed after a reasonable inquiry.***" Fed. R. Civ. P. 26(g)(1)(A). Requiring the signer to justify the challenged conduct thus comports with the affirmative duty required by Rule 26(g) to make a reasonable inquiry before signing discovery responses.

5.      Here, the Court has analyzed the facts in light of both the burden described above and based on the alternate view that ICEE bears the burden of showing a violation of Rule 26(g) by a preponderance of the evidence. Regardless of where the burden lies in this case, the Court would find the sanctions that it imposes warranted.

6.      Under 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct"

7. The Sixth Circuit has held that 28 U.S.C. § 1927 "does not authorize the imposition of sanctions on law firms." *BDT Prods.*, 602 F.3d at 751.

8. The parties agree that ICEE bears the burden of establishing that sanctions are appropriate under 28 U.S.C. § 1927, but disagree about what burden of proof applies. ICEE contends that the preponderance standard applies to Section 1927 sanctions, while the Benesch Respondents argue that such sanctions must be imposed by clear and convincing evidence. The Sixth Circuit, as the parties agree, has not explicitly decided this issue.

9. I conclude that the preponderance of the evidence standard applies to sanctions under 28 U.S.C. § 1927, for several reasons. First, Section 1927 itself does not dictate a standard of proof, and therefore the default rule in civil litigation—the preponderance of the evidence standard—should apply. The United States Supreme Court has made clear that the preponderance of the evidence standard is the norm in civil cases. *See, e.g.*, *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 50 (2025) ("[T]he preponderance-of-the-evidence standard has remained the default standard of proof in American civil litigation.").

10. Applying the preponderance of the evidence standard is also consistent with Supreme Court precedent reversing circuit courts that applied higher burdens to attorney fee-shifting statutes. For example, in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 557-58 (2014), the Supreme Court overturned the Federal Circuit's long-standing rule that entitlement to fee shifting under the Patent Act should be governed by the clear and convincing evidence standard. Instead, the Court held that the preponderance standard—the "standard generally applicable in civil actions"—applies to fee-shifting determinations. *Id.* Courts, including the Sixth Circuit, have similarly applied *Octane Fitness'* preponderance standard to fee shifting motions under the Lanham Act, which uses identical statutory language. *Verisign, Inc. v.*

*XYZ.COM LLC*, 891 F.3d 481, 484 (4th Cir. 2018); *La Bamba Licensing, LLC v. La Bamba Authentic Mexican Cuisine, Inc.*, 75 F.4th 607, 613-14 (6th Cir. 2018); *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839 F.3d 1179, 1181 (9th Cir. 2016); *Baker v. DeShong*, 821 F.3d 620, 623-24 (5th Cir. 2016).

11. Courts' refusal to impose a clear and convincing standard for "exceptional case" fee shifting motions strongly favors similarly applying the preponderance standard to 28 U.S.C. § 1927, which is also a fee-shifting statute. Indeed, the Sixth Circuit has suggested—if not outright held—in the related (though more stringent) context of inherent authority sanctions that cases that "involve[] a court's inherent power to sanction for misconduct in litigation" do not trigger the higher clear and convincing standard. *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 302 (6th Cir. 2016); *see also Plastech Holding Corp. v. WM Greentech Automotive Corp.*, 257 F. Supp. 3d 867, 873 (E.D. Mich. 2017) (*Williamson* means Sixth Circuit "would likely not require the higher burden of clear and convincing proof").

12. Second, the preponderance standard is consistent with the Sixth Circuit's rule that the compensatory sanctions under Section 1927 do not require a finding of subjective bad faith, but instead require "something more than negligence or incompetence." *Rentz v. Dynasty Apparel Industries, Inc.*, 556 F.3d 389, 396 (6th Cir. 2009). This standard does not require "allegations of fraud or other quasi-criminal wrongdoing" by the sanctioned party of the type that would trigger a heightened standard of proof. *See Addington v. Texas*, 441 U.S. 418, 424 (1979). As the Supreme Court has held in other contexts, it is only where particularly important individual rights are at stake in a civil context, like deportation, involuntary commitment, or termination of parental rights, that the clear and convincing standard is appropriate. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389-90 (1983). In contrast, "imposition of even severe

civil sanctions that do not implicate such interests has been permitted after proof by a preponderance of the evidence." *Id.*

13.     The Seventh Circuit has followed this guidance in holding that even case-terminating sanctions—severe though they may be—require proof only by a preponderance. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 777 (7th Cir. 2016).[15] And other courts have likewise held in the inherent power context that monetary sanctions do not implicate the sorts of individual rights—such as in cases of attorney suspension or disbarment—that would trigger the clear and convincing standard. *See In re Cochener*, 360 B.R. 542, 573 (S.D. Tex. 2007) ("The holding in *Crowe* suggests that, in the Fifth Circuit, when a court imposes sanctions on attorneys using its inherent powers, the standard is a preponderance of the evidence unless the sanction is disbarment or suspension, in which event the standard is clear and convincing proof."). This Court finds the Seventh Circuit's reasoning persuasive.

14.     In contrast, the cases cited by Respondents as supporting the clear and convincing evidence come from circuits that treat sanctions under 28 U.S.C. § 1927 differently from the Sixth Circuit. The Fifth Circuit case cited by Respondents, *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 871-72 (5th Cir. 2014), made clear that the Fifth Circuit requires "evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court" in order to impose Section 1927 sanctions. The same is true of other circuits that use the clear and convincing evidence standard. *See, e.g.*, *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996) (under circuit law, Section 1927 "authorizes penalties only when there is a clear showing of bad faith on the part of an attorney"); *see also In re Avandia Marketing, Sales*

---

[15] The *Ramirez* decision was not *en banc*, but did overrule a contrary precedent. Thus, the court circulated the opinion to all active judges before publishing, none of whom requested to hear the case *en banc*. *Ramirez*, 845 F.3d at 781.

*Practices & Prods. Liability Litigation*, 469 F. Supp. 3d 357, 360 (E.D. Pa. 2020) (finding of bad faith required for Section 1927 sanctions). While these out-of-circuit cases are incorrect about the proper burden in light of the Supreme Court's more recent precedent discussed above favoring the preponderance standard, the Court does not need to make that call for the purposes of Section 1927; rather, the cases relied upon by Respondents are inapplicable because they apply a different (and more difficult for the movant) standard to Section 1927 sanctions than does the Sixth Circuit. Respondents' authorities therefore do not militate in favor of this Court applying the clear and convincing standard for sanctions under 28 U.S.C. § 1927.

15. The Court also has the inherent authority to sanction attorney conduct that is in "bad faith" or that is "tantamount to bad faith." *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 751 (6th Cir. 2010). Again, while the Sixth Circuit has not explicitly resolved the burden of proof, as noted above, *Williamson* points strongly to the preponderance standard being the correct one. The preponderance rule also aligns with the default standard of proof in civil cases that the Supreme Court has repeatedly applied in the fee-shifting context. *See also Cochener*, 360 B.R. at 573 (fee shifting sanctions against attorneys subject to preponderance standard, and clear and convincing standard only applies to more serious individual sanctions such as suspension and disbarment). Notably, most out-of-circuit courts applying the clear and convincing standard do not analyze the issue in light of the Supreme Court's instruction that the preponderance standard is the default civil standard of proof. In contrast, the Seventh Circuit, which has done so, has held that inherent authority sanctions are governed by the preponderance of the evidence standard. *See Ramirez,* 845 F.3d at 777.

16. The Court's inherent authority is broader and does permit the Court to sanction a law firm. *See NPF Franchising*, 37 F.4th at 383 ("While we cannot sustain sanctions against the

Buchalter Law Firm under Rule 37, the district court could impose sanctions against the firm pursuant to its inherent authority."). The Court can impose such law firm sanctioned either under the "bad faith" rule or the "interests of justice" rule. *See BDT Prods.*, 602 F.3d at 752 (bad faith exception); *Grinnell Bros., Inc. v. Touche Ross & Co.*, 655 F.2d 725, 726 (6th Cir. 1981) (no bad faith, but finding sanctions appropriate where the "interests of justice so require"). Importantly, the "bad faith" requirement does not actually require subjective bad faith, and can be met by conduct "tantamount to bad faith." *BDT Prods*, 602 F.3d at 752. The Sixth Circuit has a three-pronged test, making sanctions against a law firm appropriate where: (1) the claims advanced were meritless; (2) counsel knew or should have known this, and (3) the motive in filing or maintaining the suit was for an improper purpose such as harassment. *Id.*

17.     Due process in the sanctions context requires that each attorney be given "notice and an opportunity to be heard." *Cook v. Am. S.S. Co.*, 134 F.3d 771, 775 (6th Cir. 1998); *see also Metz v. Unizan Bank*, 655 F.3d 485, 491 (6th Cir. 2011).

18.     The Court concludes that the Benesch Respondents have had more than the process that was due in connection with ICEE's motion. As detailed in the above findings, the Court has received numerous sets of briefs and proposed findings, held numerous discovery conferences on various issues involved in the sanctions motion, and held a full day oral argument on February 20, 2025.  In addition, Respondents' counsel conducted direct examinations of Respondents Gurbach, Emanuel, and Turk at their depositions, and .

19.     The Court concludes that, under 28 U.S.C. § 1927, Respondents Avsec, Gurbach, and House were more than negligent in filing the complaint based on the forged 2000 Appointment, and thus I find that Respondents Avsec, Gurbach, and House are jointly and severally liable for ICEE's attorney's fees and costs from the filing date of the Complaint

through the depositions and supplemental expert report in late 2020 and March 2021 relating to the genuineness of the Wendsday Email, the 2000 Appointment and the forged History, as well as the fees and costs incurred in connection with this motion.

20.     Under Federal Rule of Procedure 26(g), the Court finds that Respondent Gurbach must be sanctioned for his violation of the certification that SPL's response to ICEE's 7th Interrogatory was, "to the best of [Gurbach's] knowledge, information, and belief *formed after a reasonable inquiry* . . . not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation" or that it is "neither unreasonable nor unduly burdensome or expensive." Doc. 89-4. "Sanctions under Rule 26(g)(3) are appropriate if the attorney fails to fulfill the "duty to make a reasonable investigation to assure that their clients have provided all available responsive information and documents."" *N.T. ex. rel. Nelson*, 2017 WL 5953118, at *5 (S.D. Ohio Sept. 27, 2017).

21.     Respondent Gurbach failed to live up to this certification by failing to "assure" that his client—SPL—had produced the requested documents relating to the 2011 History of Working Practise and the altered History of Working Practise. The Benesch Respondents could not have conducted a reasonable inquiry into these documents without sending the History to Ralph Peters (who had signed it) and to Mark Peters (who had scanned it and sent it to Kline in 2011).

22.     Further, to have performed the "reasonable inquiry" regarding this "core document" and its transmittal to ICEE, Respondent Gurbach should have reviewed the April 26, 2011 transmittal email and the forged version he had saved to iManage and that was in his inbox. That SPL did not produce either version of the History of Working Practise is a violation of the Rule 26(g) certification.

23.     Further, under 28 U.S.C. § 1927, the Benesch Respondents (Respondents Gurbach, House, Turk and Emanuel) were at least grossly negligent in failing to produce the forged History of Working Practise to ICEE at any time prior to September 21, 2020, and at least grossly negligent in failing to confront Mark Peters with the obvious evidence of his alteration of that document until ICEE was forced to incur the costs of numerous depositions, letters, motions to compel, and expert reports.

24.     Specifically, the withholding of a crucial document like the forged History of Working Practise (and, indeed, the original History of Working Practise) is the type of conduct that "trial judges, applying the collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Rentz*, 556 F.3d at 396.

25.     Notably, according to logs from Benesch's Everlaw system produced after Elizabeth Emanuel's deposition, she viewed ***both*** versions of the History on January 28, 2020. Doc. 276-25, DX 196 p. 1; Doc. 273, Turk Depo. 105:21-106:8.  Even if no member of her team had noticed the different versions until then (which would have itself been grossly negligent), Ms. Emanuel was at least grossly negligent in failing to call attention to the fact that the forged version quoted from the 2000 Appointment while the 2011 version did not.

26.     The Court concludes that the failure to produce the forged History of Working Practise plainly "multiplie[d] the proceedings in [this] case unreasonably and vexatiously." 28 U.S.C. § 1927. As explained in detail in the above findings of fact, the two versions made clear that at least one was altered, and the circumstances made clear that the alter-er could be only Mark Peters. Had ICEE had access to the forged History early in discovery, there is little

question that SPL's case surrounding the 2000 Appointment would have crumbled even sooner than it ultimately did.

27.     Under the Court's inherent authority, the Court further finds that the withholding of both the forged History and the 2011 History is at least "tantamount to bad faith" and thus sanctionable. *See BDT Prods.*, 602 F.3d at 753. The forged History was a "smoking gun" document that each of the Benesch Respondents had access to, along with the 2011 History produced by ICEE, including versions of the 2011 History that were marked at depositions and the subject of significant examination. The parties also exchanged discovery and letters directed ***specifically*** to the History of Working Practise. Without limiting the more detailed recitation of facts above that support this conclusion, the Court finds that at least some of the Benesch Respondents were aware that there were two versions of the History of Working Practise and that neither version had been produced by SPL. That there was at least deliberate indifference to whether that smoking gun document was produced, if not an intentional withholding of it, is clearly supported by the evidence in the record.

28.     There is strong evidence in the record that the Benesch Respondents were specifically aware of the two versions of the History of Working Practise, as detailed above. Respondent Emanuel's January 28, 2020 letter claimed that SPL had "engaged in reasonable diligence to gather information to formulate SPL's good-faith written discovery responses to date" and said that "[a]ny responsive documents regarding the History of Working Practise will be produced, to the extent any exist."  Doc. 73-18 at 3-4. If Respondents Turk, Gurbach, House, and Emanuel had engaged in reasonable diligence to this point, they would have asked Mark Peters why he had not produced the transmittal email and attachment for the History of Working Practise, and it would have been crystal clear that the reason was that Mark Peters had sent

Benesch a forged version of the History that differed from what ICEE had produced (and which Benesch had marked as "hot"). Thus, either the Benesch Respondents (Gurbach, House, Turk, and Emanuel) knew about the forged History and were responding falsely, or they were willfully blind—the legal equivalent of knowledge. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) ("[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts.").

29.     That conclusion, and the facts recited, satisfies the "something more" required by the Sixth Circuit for sanctions under the Court's inherent authority. *See BDT Prods.*, 602 F.3d at 754 ("In *First Bank of Marietta [v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 518 (6th Cir. 2002]] the 'something more' was a party's improper use of the courts, which was demonstrated by the fact that the plaintiff 'file[d] a meritless lawsuit ***and*** [withheld] material evidence in support of a claim.'").  Accordingly, the Court concludes that the Benesch Respondents (Gurbach, House, Turk, Emanuel, and Zalud) are jointly and severally liable for ICEE's attorney's fees and costs from the filing date of the Complaint through the depositions and supplemental expert report in late 2020 and into March 2021 relating to the genuineness of the 2000 Appointment and the forged History, as well as the fees and costs incurred in connection with this motion. Furthermore, because these sanctions are imposed under the Court's inherent authority, the Court finds that Respondents' law firm (Benesch, Friedlander, Coplan & Aronoff) is jointly and severally liable as well.

30.     Under 28 U.S.C. § 1927, the Court finds that the Benesch Respondents (Gurbach, House, and Turk) were at least grossly negligent in failing to bring the fact of the forgery of the Wendsday email, and Mark Peters' commission of the forgery, to ICEE's and the Court's

attention by, at the latest, February 2020. Again, without limiting the detailed findings of fact set forth above, even if the Benesch Respondents are being truthful that they did not notice the "Wendsday" misspelling before that date, it was at least grossly negligent to not reach the conclusion by February 2020 that, based on the totality of the circumstances, the Wendsday Email was a forgery by Mark Peters.

31.     The Court concludes that the failure to inform ICEE and the Court of Mark Peters' forgery of the Wendsday email plainly "multiplie[d] the proceedings in [this] case unreasonably and vexatiously." 28 U.S.C. § 1927. ICEE was forced to undertake numerous depositions, the motion to compel based on the crime-fraud exception, two expert reports, and dispositive motion practice in order to prepare to demonstrate what the Benesch Respondents (Gurbach, House, and Turk) already knew. Under the circumstances, the Benesch Respondents' failure to correct what they knew to be the production of a forged document and Mark Peters' false and misleading testimony about the origin of the document is sanctionable. *See Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 508-09 (N.D. Ohio 2013) (failure to correct "false and misleading testimony" at deposition warranted sanctions); *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 561-62 (7th Cir. 2007) (withholding "smoking gun" documents led to sanctions against counsel). Accordingly, the Court concludes that the Benesch Respondents (Gurbach, House, and Turk) are jointly and severally liable for ICEE's attorney's fees and costs from February 25, 2020 (the date of the first email from House to Mark Peters about the misspelling) through the depositions and supplemental expert report in late 2020 and March 2021 relating to the genuineness of the 2000 Appointment and the forged History, as well as the fees and costs incurred by ICEE in connection with this motion.

32.     Under the Court's inherent authority, the Court concludes that Respondent House acted in bad faith when he represented in SPL's opposition to ICEE's crime fraud motion to compel that "[n]o evidence exists of any intent on the part of SPL to deceive the Court" and that "[n]one of the emails to be reviewed show an intent by SPL to facilitate or actively conceal a crime or fraud."  Doc. 65 PAGEID 1112.  At this point, however, House and Turk knew that Peters had forged the 2000 Appointment and the Wendsday Email and that Mark Peters had sent emails to RPC and Benesch in furtherance of his criminal scheme. The Court finds that Respondent House's false representation to the Court was made in bad faith.

33.     Under the Court's inherent authority, the Court concludes that Respondent Gurbach acted in bad faith when, on May 7, 2020, he wrote in a reply brief in support of a discovery "moratorium" that a Zoom deposition of Mark Peters was impossible because "SPL is unable to retrieve the documents and information needed to allow its counsel to prepare Mr. Peters adequately for his deposition." Doc. 51 PAGEID 913-917.  The latter statement was made in bad faith since Mark Peters had told Benesch on or around March 3, 2020 that his IT person was "back" and all the relevant documents were retrievable remotely.

34.     If in fact the Benesch attorneys (1) failed to examine the Wendsday Email's metadata, (2) failed to examine the emails from RPC forwarding it, (3) failed to ask RPC how they received it, (4) and failed to collect Mark Peters' relevant electronic data, that is compelling evidence that the Benesch attorneys had decided not to try and uncover any information about Peters' forgeries and not to conduct a legitimate investigation.  The Court concludes that this failure to act was done in bad faith—in an attempt to not have to withdraw from the case.  By making these decisions, Benesch unreasonably imposed costs on ICEE in having to defend against fraudulent claims and to spend scores of hours taking depositions and seeking documents

about the forgeries. Accordingly, the Court concludes that the Benesch Respondents (Gurbach, House, and Turk) and the Benesch firm are jointly and severally liable for ICEE's attorney's fees and costs from February 25, 2020 (the date of the first email from House to Mark Peters about the misspelling) through the depositions and supplemental expert report in late 2020 and into March 2021 relating to the genuineness of the 2000 Appointment and the forged History, as well as the fees and costs incurred by ICEE in connection with its motion.

35. The Court further concludes that the Benesch Respondents and the Benesch firm are jointly and severally liable for the costs and fees incurred by ICEE in filing and litigating this sanctions motion, including the fees and costs associated with the depositions of the Respondents and the February 20, 2025 oral argument, and all related motions.

36. The Court thus **GRANTS** ICEE's Motion for Sanctions (Doc. 89) and **DIRECTS** ICEE to file a formal Motion for Attorney's Fees consistent with the Court's findings within ninety (90) days of the date of this opinion. Within sixty (60) days of the date of this opinion, ICEE shall serve on the Benesch Respondents the time entries (for fees) and documentation sufficient to support (for costs) the amount of fees and costs that ICEE contends are subject to this opinion. Within twenty (20) days of receiving those documents, the Benesch Respondents shall identify any disagreements.

Dated:  June 2, 2025                    Respectfully submitted,

                                         **DUANE MORRIS LLP**

                                         BY:  */s/ David J. Wolfsohn*
                                         David J. Wolfsohn (*admitted pro hac vice*)
                                         Tyler R. Marandola (*admitted pro hac vice*)
                                         30 South 17th Street
                                         Philadelphia, PA 19103
                                         Tel.: (215) 979-1000
                                         Fax: (215) 979-1020
                                         djwolfsohn@duanemorris.com
                                         tmarandola@duanemorris.com

                                         *Attorneys for Defendant/Counterclaim Plaintiff*
                                         *The ICEE Company*

## <u>CERTIFICATE OF SERVICE</u>

I, Tyler R. Marandola, certify that I served a true and correct copy of the foregoing to all counsel of record by ECF filing.

Dated: June 2, 2025                                   By:<u>*/s/ Tyler R. Marandola*</u>