**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

SLUSH PUPPIE LIMITED,

      Plaintiff/Counterclaim Defendant,

      v.

THE ICEE COMPANY,

      Defendant/Counterclaim Plaintiff.

Case No. 1:19-cv-00189

Judge Michael R. Barrett

**OPINION & ORDER**

This matter is before the Court on two interrelated motions: Slush Puppie Limited's ("SPL") Fed. R. Civ. P. 12(b)(1) and 12(b)(6) Motion to Dismiss (Docs. 201, 212, 218) The ICEE Company's ("ICEE") Amended Counterclaims; and SPL's Motion to Stay (Docs. 222, 225, 226) Non-United States Discovery Pending Resolution of its Motion to Dismiss. Several additional filings paper the docket. (*See* Docs. 221, 228–29, 231, 243, 246, 249–50 (Motion to Dismiss); Docs. 232–35, 237 (Motion to Stay)).[1]

---

[1] SPL initially requested oral argument when it filed its (first) Notice of Supplemental Authority (Doc. 221, *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412 (2023)) in support of its Rule 12(b)(1) Motion to Dismiss. SPL reiterated its request when it filed its ensuing Motion to Stay. (*See* Doc. 222 PAGEID 8745, 8747; Doc. 226 PAGEID 8841). Then, in response to what it refers to as ICEE's "Extra Letter" (Doc. 232), SPL asked again for oral argument "[i]n light of the copious briefing (before the Court and, by ICEE, through the backdoor) on these two motions, and the very clear U.S. Supreme Court and Sixth Circuit precedent[.]" (Doc. 235 PAGEID 9049). Later on, though, it reconsidered and withdrew its request. (*See, e.g.*, Doc. 287, Discovery Conference, "Transcript of Proceedings" PAGEID 14045–14046 (24:17–25:4) (THE COURT: . . . . [T]he question is, is an argument appropriate. So give me your thoughts on that, and then I'll hear David's. . . . MR. ZALUD: Okay. Good. Yeah, I mean, I believe it's kind of been – And I say this with respect to everyone. – beat to death. I think we filed many, many briefs on these points. We have had many discussions. Maybe they weren't formal hearings, but there were lengthy discussions citing cases and facts. So, you know, our belief is it's not necessary.")).

ICEE has pled six counterclaims[2] to SPL's Second Amended Complaint: Count One (Breach of Contract – 1996 Manufacturing Appointment); Count Two (Breach of Contract – 1999 Distributor Agreement); Count Three (Lanham Act – Trademark Infringement under 15 U.S.C. § 1114); Count Four (Lanham Act – Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125); Count Five (Deceptive Trade Practices – Ohio Rev. Code §§ 4165.01 et seq.); and Count Six (Unjust Enrichment). SPL moves to dismiss Counts Three and Four pursuant to Fed. R. Civ. P. 12(b)(1) (and, in the alternative, pursuant to Fed. R. Civ. P. 12(b)(6)). SPL also moves to dismiss Counts Five and Six pursuant to Fed. R. Civ. P. 12(b)(6). Briefly stated, SPL contends that the Court lacks subject-matter jurisdiction over ICEE's Lanham Act claims. And, because none of the conduct ICEE alleges occurred in Ohio (or even in the United States), ICEE's statutory DPTA and common law unjust enrichment claims must be dismissed as well.[3]

The following taken-to-be-true facts provide a backdrop to the Court's analysis:

- While ICEE is a citizen of a State (both Delaware and Tennessee), SPL is a citizen of a foreign state (both England and Wales).[4]

- SPL entered into two limited licenses with ICEE's predecessor: the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. **The 1996 Appointment authorized SPL (exclusively) to use "formulas, recipes and processes," now owned by ICEE, to manufacture SLUSH PUPPIE syrup and neutral base for use with SLUSH PUPPIE machines and products in 27 European**

---

[2] (*See* Doc. 194 PAGEID 6983–7032).

[3] SPL does not challenge ICEE's breach of contract counterclaims (Counts One and Two).

[4] England and Wales are two of the four countries that comprise the United Kingdom, along with Scotland and Northern Ireland. Britannica: Geography & Travel, Countries of the World, "United Kingdom" available at  https://www.britannica.com/place/United-Kingdom (last visited 6/27/2025).

**countries, including the United Kingdom and Ireland.[5]
The 1999 Agreement authorized SPL (exclusively) to sell
SLUSH PUPPIE products, but only in the United Kingdom
and Ireland.[6]**

- On June 25, 2019 ICEE provided written notice to SPL's Mark
  Peters that it was terminating the 1996 Manufacturing
  Appointment and the 1999 Distributor Agreement because
  SPL filed the instant lawsuit. (Doc. 29-6). The notice quoted
  from the relevant language within both agreements. This
  Court later determined, as a matter of law, that ICEE's
  termination was effective that date. (Doc. 189, Opinion &
  Order, entered 3/16/2023).

- Upon termination of the 1996 Manufacturing Appointment,
  SPL was obliged to cease using SLUSH PUPPIE trademarks
  and immediately change its name to remove any reference to
  SLUSH PUPPIE products.[7] Upon termination of the 1999
  Distributor Agreement, SPL waived the right to any
  compensation "for any claim for 'build-up of TERRITORY' or
  recoupment of investment[.]"[8] Also, SPL was required to
  return (to ICEE) any materials that identified it as associated
  with SLUSH PUPPIE and, consistent with the applicable
  terms set forth in the 1996 Manufacturing Appointment,
  change its name to remove any reference to SLUSH
  PUPPIE.[9]

- For approximately 16 months after ICEE terminated the
  licenses, SPL, through one of its American attorneys, claimed
  that "ICEE's purported termination of the 1996 Appointment
  and the 1999 Distributor Agreement is a nullity – each has
  been superseded by the 2000 Appointment."[10] Based on the
  2000 Appointment, which was forged (as were other
  documents) by SPL's Mark Peters, "SPL held itself out to its
  customers and potential customers as possessing the right to

---

[5] (*See* Doc. 194 PAGEID 6985 (¶ 11) (bold emphasis added); Doc. 194-1 PAGEID 7035).

[6] (*See* Doc. 194 PAGEID 6986 (¶ 21) (bold emphasis added); Doc. 194-2 PAGEID 7043, 7052).

[7] (*See* Doc. 194 PAGEID 6986 (¶¶ 15, 16); Doc. 194-1 PAGEID 7037 (¶ 11)).

[8] (*See* Doc. 194-2 PAGEID 7048 § VIII.I).

[9] (*See* Doc. 194 PAGEID 6987 (¶ 23); Doc. 194-2 PAGEID 7044 § III.B).

[10] (Doc. 194 PAGEID 7017 (¶ 221); Doc. 194-7 PAGEID 7093).

sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brands."[11] **This prevented ICEE "from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe."**[12]

- **"SPL took affirmative steps to block ICEE's attempt to license the SLUSH PUPPiE brand in the United Kingdom and Europe.** For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, . . . SPL falsely informed recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud, and also referred recipients of ICEE's letters to SPL's American attorneys."[13]

- In October 2020, SPL's American attorneys "inform[ed] ICEE and the Court that they did not intend to proceed with claims based on the forged 2000 Appointment."[14] SPL's American attorneys admitted that the 2000 Appointment was not "genuine" and the claims "premised" on it were "meritless[.]"[15] Thus, they "could no longer ethically continue to prosecute" those claims.[16]

- "SPL pivoted to the frivolous position that the terminated 1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect[.]"[17]

- **"At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in Europe.** SPL sent out thousands of communications stating that it was 'retiring' the SLUSH PUPPiE brand, leaving the impression with consumers that it

---

[11] (Doc 194 PAGEID 7016 (¶ 217), 7017 (¶ 222)).

[12] (Doc. 194 PAGEID 7017 (¶ 223) (bold emphasis added)).

[13] (Doc. 194 PAGEID 7018 (¶ 224) (bold emphasis added).

[14] (Doc. 194 PAGEID 7007 (¶ 158).

[15] (Doc. 194 PAGEID 7007 (¶¶ 157, 159); *see* Doc. 85 PAGEID 2174).

[16] (Doc. 194 PAGEID 7018 (¶ 225); *see* Doc. 82 PAGEID 2050).

[17] (Doc. 194 PAGEID 7018 (¶ 225)).

had the power to do so, and that the reasons were because the SLUSH PUPPiE brand was not 'socially responsible' or 'sustainable' and not consistent with the company's 'vision and strategy.' SPL then began telling its customers and potential customers as well as consumers that it would be selling the same Slush Puppie product under a new name— Slushy Jack's."[18]

- "[F]or more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, **SPL has continued to sell SLUSH PUPPiE syrup and other products, and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe knowing that it had no right to do so."**[19]

- "[S]ince approximately November 2020, SPL has generated interest in its 'Slushy Jack's' product by giving customers and consumers the false impressions that it is authorized to sell and control SLUSH PUPPiE, and that Slushy Jack's uses the 'same recipe' and has 'the same great taste as SLUSH PUPPiE.' SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name."[20]

- "Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE customers, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits."[21]

- SPL "deliberately designed its Slushy Jack's artwork and branding to be confusingly similar to that used for SLUSH PUPPiE so that consumers would be less likely to notice the difference."[22]
- "By illegally using the SLUSH PUPPiE® trademarks for years after ICEE had terminated SPL's rights in this scheme, SPL

---

[18] (Doc. 194 PAGEID 7018–19 (¶ 226) (bold emphasis added)).

[19] (Doc. 194 PAGEID 7019 (¶ 229) (bold emphasis added)).

[20] (Doc. 194 PAGEID 7019 (¶ 230)).

[21] (Doc. 194 PAGEID 7019 (¶ 231)).

[22] (Doc. 194 PAGEID 7020 (¶ 232)).

was able to pressure hundreds of its SLUSH PUPPiE customers into signing long term contracts whereby SPL would be the exclusive supplier of frozen uncarbonated beverages.  This effectively blocked ICEE from penetrating this market."[23]

## I.    LAW & ANALYSIS

### A.  Rule 12(b)(1) standard

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."  *In re DePuy Orthopaedics, Inc.*, 953 F.3d 890, 893–84 (6th Cir. 2020) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).  "[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."  *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).

Fed. R. Civ. P. 12(b)(1) authorizes dismissal of a claim when a court lacks jurisdiction over its subject matter.[24]  "If the court determines **at any time** that it lacks

---

[23] (Doc. 194 PAGEID 7020 (¶ 233)).

[24] "The Sixth Circuit has distinguished between facial and factual attacks among motions to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)."  *Pritchard v. Dent Wizard Int'l Corp.*, 210 F.R.D. 591, 592 (S.D. Ohio 2002).  A *facial* attack on subject-matter jurisdiction merely questions the sufficiency of the pleading.  *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).  When reviewing a facial attack, the court must take each of the allegations in the complaint as true.  *Id.*  In contrast, a *factual* attack on subject-matter jurisdiction does not challenge the sufficiency of the pleading, but, instead, challenges the factual existence of subject-matter jurisdiction.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  As such, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.* (internal citation omitted).  In reviewing a factual attack, the court has "wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325.

SPL lodges both a facial and a factual attack as to subject-matter jurisdiction.

subject-matter jurisdiction, the court **must** dismiss the action."  Fed. R. Civ. P. 12(h)(3) (bold emphasis added).[25]

## B. This Court has subject-matter jurisdiction over ICEE's Lanham Act counterclaims

Briefing on SPL's 12(b)(1) Motion to Dismiss was complete prior to the Supreme Court issuing its decision in *Abitron Austria GmbH v. Hetronic Int'l Inc.*, 600 U.S. 412 (2023), which SPL considers dispositive[26].  Nonetheless, a synopsis of the arguments made by the parties in their initial papers is helpful for context.

**Original arguments.**  SPL maintains that ICEE "complains *only* of extraterritorial conduct."  (Doc. 201 PAGEID 7520 ("ICEE does *not* allege that SPL has taken *any* action in the U.S.  ICEE does *not* allege that SPL sells products in the U.S., that any U.S. consumers have seen or purchased SPL's products, or that any U.S. consumers are even *likely* to be confused by SPL's alleged conduct.") (italics emphasis in original)).[27]  And when a statute "gives no clear indication of an extraterritorial application, it has none." (*Id.* PAGEID 7522 (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).  "Courts, including the Sixth Circuit, considering the extraterritorial application of the Lanham Act treat the question as one of **subject matter jurisdiction** to hear the dispute."  (*Id.* PAGEID 7523 (citing, *inter alia*, *Steele*[ *v. Bulova Watch Co.*, 344 U.S. 280,

---

[25] "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868)).

[26] "The *Abitron* Court's decision makes resolution of SPL's motion a foregone conclusion-- § 1114(1)(a) and § 1125(a)(1) are not extraterritorial and do not reach entirely extraterritorial conduct. Because ICEE brings claims under these provisions and *no* conduct occurred in commerce in the United States, ICEE's Counts Three and Four cannot survive."  (Memorandum in Support of Motion to Stay Non-United States Discovery Pending Resolution of Motion to Dismiss for Lack of Jurisdiction (Doc. 201), Doc. 222 PAGEID 8747 (italics emphasis in original)).

[27] "Again, ICEE makes exactly zero allegations of any impact on U.S. commerce."  (Doc. 201 PAGEID 7521).

281 (1952)] ("The issue is whether [the District Court] has **jurisdiction** to award relief[.]")
(bold emphasis added)); *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 638–39 (2d
Cir. 1956) (same); *Liberty Toy Co. v. Fred Silber Co.*, 149 F.3d 1183, at *6 (6th Cir. 1998)
("[T]he district court should apply the [*Vanity Fair*] test to determine whether it has
**jurisdiction** over Liberty Toy's Lanham Act claim.") (bold emphasis added)).

"To establish whether circumstances call for extraterritorial application of the
Lanham Act," the *Vanity Fair* test asks whether: (1) "the defendant's conduct had a
substantial effect on United States commerce"; (2) "the defendant was a United States
citizen"; and (3) "there was no conflict with trade-mark rights established under the foreign
law." (*Id.* PAGEID 7524 (quoting *Vanity Fair*)).  SPL contends that "*each* of the *Vanity
Fair* factors counsels against extraterritorial application of the Lanham Act, and thus, to
the inevitable conclusion that this Court lacks subject matter jurisdiction to hear [ICEE's
Lanham Act counterclaims]." (*Id.* PAGEID 7524–7525 (italics emphasis in original)).

ICEE responds that, after the Supreme Court's decisions in *Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006) and *Morrison*, *supra* (in 2010), "questions about the extraterritorial
reach of the Lanham Act go to the **merits** of the dispute and not to the Court's subject
matter jurisdiction." (Doc. 212 PAGEID 8223 (bold and italics emphasis in original)).
"*Morrison*'s rule that extraterritorial reach presents a merits question has been applied to
the Lanham Act by both federal appellate courts to have squarely confronted the question
since." (*Id.* PAGEID 8223–8224 (citing *Trader Joe's Co. v. Hallatt*, 835 F.3d 960, 968
(9th Cir. 2016) & *Derma Pen, LLC v. 4Ever Young Limited*, 736 F. App'x 741, 748 (10th
Cir. 2018))).  "[E]very case cited by SPL treating the extraterritoriality analysis as
jurisdictional pre-dates *Morrison*, often by decades, and did not turn on the distinction
between a merits question and a subject-matter jurisdiction question." (*Id.* PAGEID
8225).  ICEE points out that *Liberty Toy*, the Sixth Circuit case on which SPL relies, "was

8

an unpublished decision that only referred to 'jurisdiction' in passing when instructing the district court on remand to determine whether the defendant's alleged conduct was within the reach of the Lanham Act." (*Id.*). "*Liberty Toy* and the other cases of its ilk cited by SPL are the sort of "'drive-by jurisdictional rulings' that should be accorded 'no precedential effect'" per Justice Ginsburg in *Arbaugh*. (*Id.* (footnote omitted) (quoting *Arbaugh*, 546 U.S. at 511)). Because its Lanham Act claims "arise under" the laws of the United States (28 U.S.C. § 1331) and the specific jurisdictional provision of the Lanham Act (15 U.S.C. § 1121(a)), there is no question that this Court has subject-matter jurisdiction of ICEE's Lanham Act counterclaims. (*See id.*).

SPL replies that "[n]either *Arbaugh* nor *Morrison* resolve the question of whether extraterritorial application of the Lanham Act asserted against acts occurring in a foreign county and done by a foreign defendant is a jurisdictional or merits question and nothing in those decisions overrules *Steele*." (Doc. 218 PAGEID 8633). "Many courts, post-*Arbaugh* and *Morrison*, have examined the extraterritorial application of the Lanham Act as a subject matter jurisdiction question." (*Id.* (quoting *Polymeric Res. Corp. v. Pounds of Plastic, LLC*, No. 3:20-cv-00013-GFVT-EBA, 2022 WL 4227512, at *6–9 (E.D. Ky. Sept. 13, 2022) (applying the *Vanity Fair* factors, Canadian defendant must be dismissed "because the Court does not have extraterritorial jurisdiction over [plaintiff's Lanham Act] claims against him."))). Because *Steele* has "direct application" to this case, "**this Court must** follow it and **consider the extraterritorial application of the Lanham Act as a jurisdictional issue**." (*Id.* PAGEID 8635 (bold emphasis added)).

**The Supreme Court's 2023 ruling in *Abitron*.** Writing for a five-member majority, Justice Alito begins by explaining, "This case requires us to decide the foreign reach of 15 U.S.C. § 1114(1)(a) and § 1125(a)(1), two provisions of the Lanham Act that prohibit trademark infringement." *Abitron,* 600 U.S. at 415. "Applying the presumption against

extraterritoriality, we hold that these provisions are not extraterritorial and that they extend only to claims where the claimed infringing use in commerce is domestic." *Id.*

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 417 (quoting *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 255 (2010)) (cleaned up). This principle, "which we call the presumption against extraterritoriality, refers to a 'presumption against application to conduct in the territory of another sovereign.'" *Id.* (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 119 (2013) (citing *Morrison*, 561 U.S. at 265)).

"Applying the presumption against extraterritoriality involves 'a two-step framework.'" *Id.* (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)). "At step one, we determine whether a provision is extraterritorial[.]" *Id.* at 417. "[T]hat determination turns on whether 'Congress has affirmatively and unmistakably instructed' that the provision at issue should 'apply to foreign conduct.'" *Id.* at 417–18 (quoting *RJR Nabisco*, 579 U.S. at 335, 337). "If a provision is not extraterritorial, we move to step two, which resolves whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision." *Id.* at 418.[28] Step two requires that a court not only "identify a statute's focus" but also "ask whether the *conduct relevant to that focus* occurred in United States territory." *Id.* (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413–14 (2016)) (cleaned up) (italics emphasis added in *Abitron*). "Step two is designed to apply the presumption against extraterritoriality to claims that involve **both** domestic and foreign activity, **separating the activity that matters from the activity that does not**." *Id.* at 419 (bold emphasis added). "'If the

---

[28] Courts may take these steps "in any order." *Abitron*, 600 U.S. at 418 n.2; *see WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018).

conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application' of the statute, 'even if other conduct occurred abroad.'" *Id.* at 419 (quoting *WesternGeco*, 585 U.S. at 414 (quoting *RJR Nabisco*)). "If the relevant conduct occurred in another country, 'then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.'" *Id.* But if <u>all</u> the conduct took place outside the United States, "the focus test has no filtering role to play." *Id.* at 419 (citations omitted).[29]

Two other opinions were produced: "a sole concurrence by Justice Jackson; and a four-member opinion (concurring in the judgment) penned by Justice Sotomayor and joined by Chief Justice Roberts, Justice Kagan, and Justice Barrett." *Shenzhen Kinwong Elec. Co., LTD v. Kukreja*, No. 18-cv-61550-ALTMAN/Hunt, --- F. Supp. 3d ---, 2025 WL 1009008, at *34 (S.D. Fla. Apr. 4, 2025). "In sum, the *Abitron* Court splintered over the scope of the Lanham Act *vis-à-vis* certain kinds of extraterritorial conduct. To Justice Sotomayor and the minority, the Lanham Act covers any conduct that *causes* consumer confusion in the United States—even if the conduct itself occurred entirely outside the country." *Id.* at *35 (citation to *Abitron* omitted) (italics emphasis added by *Kukreja* court). "The majority, by contrast, held that the Lanham Act focuses on where the 'use in commerce' takes place. If there has been an 'infringing use in commerce' in the United States, the Lanham Act's provisions apply; if the 'use in commerce' is extraterritorial, the Lanham Act doesn't apply." *Id.* (citations omitted).

---

[29] "The *Abitron* decision wiped the slate clean and launched the law in a new direction." 4 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 29:59 (5th ed. (May 2025 update)). "[T]he Supreme Court effectively expunged all the various tests used by the Courts of Appeal to determine if the Lanham Act reached conduct outside the United States." *Id.* "The majority opinion in *Abitron* did not even mention the various tests used by the lower courts." *Id.*

*Abitron* **is a merits decision.**[30]   We begin by acknowledging "the distinction between two sometimes confused or conflated concepts: federal-court 'subject-matter' jurisdiction over a controversy; and the essential ingredients of a federal claim for relief." *Arbaugh*, 546 U.S. at 503.  As Justice Ginsburg explained,

> On the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, this Court and others have been **less than meticulous**. "Subject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief—a merits-related determination." 2 J. Moore et al., Moore's Federal Practice § 12.30[1], p. 12–36.1 (3d ed.2005) (hereinafter Moore). Judicial opinions, the Second Circuit incisively observed, "often obscure the issue by stating that the court is dismissing 'for lack of jurisdiction' when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim." *Da Silva* [*v. Kinsho Int'l Corp.*], 229 F.3d[ 358,] 361 [(2d Cir. 2000)]. **We have described such unrefined dispositions as "drive-by jurisdictional rulings" that should be accorded "no precedential effect" on the question whether the federal court had authority to adjudicate the claim in suit.** *Steel Co.* [*v. Citizens for Better Env't*], 523 U.S.[ 83,] 91 (1998)].

*Id.* at 511 (bold emphasis added).  Mindful of this dichotomy, the Supreme Court held that the threshold number of employees for application of Title VII—"fifteen or more"[31]—is "an element of a plaintiff's claim for relief, not a jurisdictional issue."  *Id.* at 516.

We move next to *Morrison*, where the Supreme Court decided that § 10(b) of the Securities Exchange Act of 1934 does not provide a cause of action "to **foreign plaintiffs**

---

[30] In a letter to the Court dated December 6, 2023, counsel for SPL represents that it "has *never* claimed" that *Abitron* "is subject matter jurisdictional[.]" (Doc. 249 PAGEID 9593 (italics emphasis in original)).  In turn, ICEE decries this "remarkable about-face[.]" (Doc. 250 PAGEID 9606–9607). Regardless, the Court presses forward to examine whether *Abitron* decided a question of subject-matter jurisdiction or instead established a predicate-for-relief under the Lanham Act.

[31] *See* 42 U.S.C. § 2000e(b) ("The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person[.]").

12

suing **foreign and American defendants** for **misconduct** in connection with securities traded on **foreign** exchanges." *Morrison*, 561 U.S. at 250–51, 273 (bold emphasis added). But "[b]efore addressing the question presented," Justice Scalia *sua sponte* corrected a "threshold error" in the Second Circuit's analysis, which had "considered the extraterritorial reach of § 10(b) to raise a question of subject-matter jurisdiction[.]" *Id.* at 253. "But to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a **merits** question." *Id.* at 254 (bold emphasis added). "Subject-matter jurisdiction, by contrast, 'refers to a tribunal's 'power to hear a case.'" *Id.* (quoting *Union Pacific R. Co. v. Locomotive Eng'rs*, 558 U.S. 67, 81 (2009) (quoting *Arbaugh*, 546 U.S. at 514)). "It presents an issue quite separate from the **question whether the allegations the plaintiff makes entitle him to relief**." *Id.* (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)) (bold emphasis added). The Court noted that the district court had jurisdiction under 15 U.S.C. § 78aa "to adjudicate the question whether § 10(b) applies to [Defendant] National's conduct." *Id.* at 254 & n.3 (quoting § 78aa, "The district courts of the United States . . . shall have exclusive jurisdiction of violation of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder."). It stands to reason, then, that this Court has jurisdiction of ICEE's Lanham Act claims under 15 U.S.C. § 1121(a)[32]. (*See* Doc. 212 PAGEID 8223–8225).

As the undersigned reads *Abitron*—decided in the wake of *Arbaugh* and *Morrison*—subject-matter jurisdiction was a given. It's true that *Abitron* didn't expressly

---

[32] "The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States (other than the United States Court of Appeals for the Federal Circuit) shall have appellate jurisdiction, of all actions arising under [the Lanham Act], without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties." 15 U.S.C. § 1121(a).

overrule *Steele v. Bulova Watch Co.*, 344 U.S. 280 (1952). Instead, *Abitron* "put aside" *Steele*, because it was a decision "of little assistance here." *Abitron*, 600 U.S. at 421–22 ("Because *Steele* implicated both **domestic conduct and a likelihood of domestic confusion**, it does not tell us **which one** determines the domestic applications of § 1114(1)(a) and § 1125(a)(1)."). *Abitron* considered *Steele* a merits decision, notwithstanding its reference to "jurisdiction". In turn, this Court will treat *Steele* as an "unrefined disposition" on the issue of "lack of subject-matter jurisdiction" versus "failure to state a claim" and will accord it "no precedential effect". *Arbaugh*, 546 U.S. at 511 (*quoting Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)).

That leaves *Liberty Toy Co., Inc. v. Fred Silber Co.*, No. 97-3177, 149 F.3d 1183 (table), 1998 WL 385469 (6th Cir. June 29, 1998), which SPL insists is "binding, precedential" Sixth Circuit authority holding that the extraterritorial application of the Lanham Act is a jurisdictional issue[.]" (*See, e.g.*, Doc. 231 PAGEID 8981). It is not. First and foremost, *Liberty Toy* is an unpublished[33] decision; as such, "it is not binding authority." *In re Blasingame*, 986 F.3d 633, 637 n.2 (6th Cir. 2021); *Farmer v. United Parcel Serv. Co.*, No. 3:24-CV-460-CHB, 2025 WL 278630, at *5 (W.D. Ky. Jan. 23, 2025) (citing *Blasingame*). Second, it is a prime example of a "drive-by jurisdictional ruling" that *Arbaugh* instructs "should be accorded 'no precedential effect[.]'" 546 U.S. at 511 (quoting *Steel Co. v. Citizens for a Better Env't*). And, third, the *Vanity Fair*[34] test followed in *Liberty Toy* was "expunged" by *Abitron*.[35]

---

[33] *See generally Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 778 (S.D. Ohio 2021) (Cole, J.) ("[T]he Sixth Circuit has recognized, albeit in an unpublished decision, that domestic ties to international infringement can bring the [Copyright Act] within the **jurisdiction** of U.S. courts.") (bold emphasis added).

[34] *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 642–43 (2d Cir. 1956).

[35] *See supra* n.29.

## C. Rule 12(b)(6) standard

To withstand a 12(b)(6) motion, a complaint must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Courts do not require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is **plausible** on its face." *Id.* at 570 (bold emphasis added).[36] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*). A district court examining the sufficiency of a complaint must accept the well-pleaded allegations of the complaint as true. *Id.*; *DiGeronimo Aggregates, LLC v. Zemla*, 763 F.3d 506, 509 (6th Cir. 2014).

## D. SPL's 12(b)(6) motion, even though procedurally improper, will be considered on its merits

As background, SPL filed an original Complaint (in the Court of Common Pleas for Hamilton County, Ohio) on February 12, 2019[37]; an Amended and Supplemental Complaint on December 16, 2019[38] (pursuant to the Calendar Order entered post-removal)[39]; and a Second Amended Complaint on March 20, 2023[40] (by leave of Court)[41].

---

[36] "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of th[e] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

[37] (Doc. 2.)

[38] (Doc. 27).

[39] (10/30/2019 Minute Entry.)

[40] (Doc. 191).

[41] (Doc. 190). The Court subsequently allowed SPL to withdraw its ODTPA claim from its Second Amended Complaint, but declined to grant SPL leave to file a third amended complaint. (Doc. 299).

ICEE pled one counterclaim (on April 29, 2019) to SPL's original Complaint, asking for a declaration that "the 2000 Appointment of Trade Mark Licence" is "invalid, void, unenforceable," such that SPL had no rights—and ICEE had no obligation—under it.[42] ICEE pled six counterclaims (on January 6, 2020) to SPL's Amended and Supplemental Complaint, asking not only for a declaratory judgment with respect to the 2000 Appointment, but also alleging (for the first time) two breach of contract claims (1996 Manufacturing Appointment & 1999 Distributor Agreement), two Lanham Act claims (trademark infringement & unfair competition and false designation of origin), and a claim for deceptive trade practices under Ohio (statutory) law.[43]

As noted, ICEE likewise pled six counterclaims (on April 3, 2023) to SPL's Second Amended Complaint, eliminating its claim for declaratory judgment (as to the 2000 Appointment) and adding a claim for unjust enrichment under Ohio (common) law. But instead of filing an answer as it did with respect to ICEE's original counterclaim and supplemental counterclaims,[44] SPL responded by filing the instant 12(b)(6) motion. ICEE takes exception to this filing, particularly with regard to its (previously pled) Lanham Act counterclaims. "If SPL had wanted to file a 12(b)(6) motion in response to ICEE's counterclaims, its opportunity for doing so came and went in January 2020. . . . [B]y choosing not to assert its extraterritoriality defense then, SPL waived the right to raise it by 12(b)(6) motion." (Doc. 212 PAGEID 8227).

---

[42] (Doc. 13 PAGEID 273–75).

[43] (Doc. 29 PAGEID 497–522).

[44] (*See* Docs. 19, 32).

Caselaw and a preeminent treatise support ICEE's position. "The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading[.]" 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1388 (3d ed.)[45]. *See, e.g., Rowley v. McMillan*, 502 F.2d 1326, 1333 (4th Cir. 1974) ("An unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended."); *City of Las Cruces v. Lofts at Alameda, LLC*, 591 F.Supp.3d 1038, 1051–52 (D.N.M. 2022) ("This argument presents an interesting procedural question—whether an amended complaint revives a defendant's opportunity to file a motion to dismiss a claim that it has previously answered. The Court can find no Tenth Circuit authority on this issue. However, it appears that many courts have held that once a claim has been pled, the defendant must assert his 12(b)(6) motion; the right to file a motion to dismiss for failure to state a claim is not revived when the claim is pled again in an amended complaint.") (citing, *inter alia*, *Rowley*); *Lifestyles CFL LLC v. Adams*, No. 6:22-cv-1934-ACC-DCI, 2023 WL 11724670, at *1 (M.D. Fla. May 26, 2023) ("[A]n amended complaint does not revive a party's opportunity to file a motion to dismiss a claim that it has previously answered.") (citing *City of Las Cruces*).

The Sixth Circuit has not spoken "directly" on this issue. *McGlone v. Centrus Energy Corp.*, No. 2:19-cv-02196, 2022 WL 974381, at *4 (S.D. Ohio Mar. 31, 2022); *see Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, No. 2:18-cv-735, 2019 WL 1981864, at *3 (S.D. Ohio May 3, 2019) ("The Sixth Circuit has not yet decided whether

---

[45] "[C]onversely, a Rule 12 defense that becomes available because of new matter in the amended complaint may be asserted by motion." *Id.* Thus, SPL's 12(b)(6) motion to dismiss ICEE's (previously unpled) unjust enrichment claim under Ohio (common) law is procedurally permissible.

17

an amended complaint triggers a new Rule 12(b) process.") (collecting cases).  But the Court is not without guideposts.

We start with the civil rules.  The defense of "failure to state a claim upon which relief can be granted" *may* be asserted in a motion to dismiss.  Fed. R. Civ. P. 12(b)(6).[46] However, the defense of "[f]ailure to state a claim upon which relief can be granted" may *also* be raised "by a motion under Rule 12(c)" or "at trial."  Fed. R. Civ. P. 12(h)(2).  "Thus, a party does not waive a 12(b)(6) **claim**—even though not raised in an earlier motion to dismiss—if asserted: (1) in an answer, (2) in a motion for judgment on the pleadings, or (3) at trial."  *Premier Dealer Servs.*, 2019 WL 1981864, at *3 (citing *Swart v. Pitcher*, 9 F.3d 109, 109 (6th Cir. 1993) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 701 n.3 (6th Cir. 1978))) (bold emphasis added).[47]  In addition, a 12(b)(6) claim can be raised "in a post-pleading dispositive summary judgment motion[.]"  *Williamson v. Recovery Ltd. P'ship*, No. C2-06-292, 2009 WL 3172648, at *3 (S.D. Ohio Sept. 30, 2009).

Next, we examine the procedural facts underlying three rulings here in the Southern District.  The defendants in *Williamson* filed an initial motion to dismiss plaintiffs'

---

[46] "A **motion** asserting [this defense] **must be made before pleading** if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b) (bold emphasis added).

[47] See Fed. R. Civ. P. 12(g)(2) ("**Except as provided in Rule 12(h)(2)** or (3), a party that makes a motion under this rule **must not make another motion** under this rule **raising a defense** or objection that was **available** to the party **but omitted from its earlier motion**.") (bold emphasis added).  As the Sixth Circuit explains:

> Subdivision (g) contemplates the presentation of an omnibus pre-answer motion in which defendant advances every available Rule 12 defense and objection he may have that is assertable by motion.  He cannot delay the filing of a responsive pleading by interposing these defenses and objections in piecemeal fashion but must present them simultaneously.  Any defense that is available at the time of the original motion but is not included, may not be the basis of a second *pre-answer* motion.

*English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994) (quoting *Rauch*) (italics emphasis added to original text).

original complaint (on grounds of improper venue (Rule 12(b)(3)) and lack of subject-matter jurisdiction (Rule 12(b)(1))). *Id.* at *2. This Court denied that motion. *Id.* Defendants later filed a Rule 12(b)(6) motion in response to plaintiffs' amended complaint. *Id.* This Court denied that motion, too, because Rule 12(g) "prohibit[s] a party who makes a Rule 12 motion that omits a Rule 12 defense available at the time from making a subsequent motion based on the omitted defense." *Id.* at *3 (citing *English v. Dyke*, 23 F.3d 1086, 1090 (6th Cir. 1994)).[48] "Defendants were required by Rule 12(g) to present any of their defenses simultaneously. The consequence of the consolidation provision of Rule 12(g) is that Defendants' previous Motion to Dismiss for lack of proper venue or subject matter jurisdiction bars the Defendants from asserting another Rule 12(b) defense by a subsequent pre-answer motion. Defendants have not asserted, and the record cannot support a conclusion, that they had no knowledge of the bases of the defenses they raise in the instant Motions to Dismiss at the time they filed their first motions under Rule 12(b)." *Id.* at *3.

In *Premier Dealer Servs.*, the plaintiff filed its original complaint, and then an amended complaint, on the same day. 2019 WL 1981864, at *2. Defendants filed a Rule 12(b)(6) motion that this Court granted in part and denied in part. *Id.* Plaintiff then filed a second amended complaint (with leave of Court). *Id.* One of the defendants filed a motion to dismiss, arguing it was a nominal defendant "who has no legal interest in the instant action," and because plaintiff failed to assert any "material" factual allegations against it, plaintiff "therefore failed to plead a claim for which relief can be granted." *Id.* at *3. Plaintiff countered (in part) that the motion was untimely under Rule 12(h)(2). *Id.* This

---

[48] *See supra* n.47.

Court agreed that the motion was untimely under Rule 12(h)(2). *Id.* at *4. But because it had raised a Rule 12(b)(6) defense in its original pre-answer motion, the defendant had not waived that defense for purposes of inclusion in its second motion to dismiss. *Id.*

Finally, in *McGlone*, this Court rejected a waiver argument—and proceeded to consider the merits of the defendants' statute of limitations defense—finding "the rule articulated by *Williamson* and clarified in *Premier* persuasive." 2022 WL 974381, at *4–5. Judge Marbley noted that the "rule first articulated in *Williamson*" had its limits. *Id.* Even though a defendant waives it ability to assert a second Rule 12(b) motion, it *still* can raise that defense *post pleading*—in a summary judgment motion or at trial. *Id.* (quoting *Williamson*, 2009 3172648, at *3)). *Premier Dealer Servs.*, moreover, "clarifies the **level of generality** at which the rule was supposed to operate." *Id.* at *4 (bold emphasis added).

SPL did not file a 12(b)(6) motion to dismiss ICEE's Lanham Act counterclaims when they were first asserted (in January 2020) in response to SPL's (first) amended complaint. Instead, it filed an answer, which thereafter precluded it from asserting this defense in a pre-answer motion. Thus, when ICEE re-pled these (and other) counterclaims (in April 2023) to SPL's (second) amended complaint, SPL could only raise this defense in an answer, in a Rule 12(c) or Rule 56 motion, or at trial. ICEE's waiver argument, therefore, is procedurally correct.

Still, this Court has discretion to proceed to the merits of SPL's 12(b)(6) arguments. *Briscoe v. NTVB Media Inc.*, No. 4:22-cv-10352, 2023 WL 2950623, at *5 (E.D. Mich. Mar. 3, 2023) ("Other Circuit Courts have not strictly applied rule 12(g) where the waived defense could be raised later under Rule 12(c)."), *report & recommendation adopted as*

*modified sub nom. Russett v. NTVB Media, Inc.*, 2023 WL 6315998 (E.D. Mich. Sept. 28, 2023). Were the Court to deny SPL's Rule 12(b)(6) motion on the ground of waiver (except as to ICEE's new unjust enrichment counterclaim), no doubt a Rule 12(c) motion would immediately follow. This delay would further burden an already-congested case docket. Accordingly, we advance to the merits of SPL's Rule 12(b)(6) motion.

### E. ICEE's Lanham Act counterclaims fail to state a claim under *Abitron*

As just explained, the Supreme Court held in *Abitron* that the Lanham Act provisions that underpin Counts Three and Four of ICEE's counterclaims "are **not** extraterritorial and that they **extend *only* to claims where the claimed infringing use in commerce is *domestic***." 600 U.S. at 415 (bold and italics emphasis added). "[I]f the mark is used 'in connection with' goods and services ***only* outside United States territory**, **the Lanham Act *cannot* apply**." *LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*, 124 F.4th 1122, 1127 (9th Cir. 2024) (bold and italics emphasis added); *see Commodores Entm't Corp. v McClary*, No. 6:14-cv-1335-RBD-EJK, 2024 WL 4349623, at *2 (M.D. Fla. May 14, 2024) ("In essence, the new gloss from [*Abitron*] is that **the location of the infringing conduct is what matters** rather than the location where the effects of the infringement are felt.") (bold emphasis added).

On their face, the facts alleged by ICEE in support of its Lanham Act claims indicate that the "location" of the infringing conduct is in the United Kingdom and Europe. (*See supra* pp. 2–6 (bolded text)). True, "effects" on United States commerce are alleged in

paragraphs 234[49], 235[50], and 236[51] of ICEE's § 1114 trademark infringement counterclaim. But those facts, assumed accurate, don't compromise SPL's extraterritorial defense. While Justice Sotomayor's concurrence argues for "any" conduct that "causes" consumer confusion in the United States, the *Abitron* majority rule focuses <u>only</u> on "where" the "use in commerce" takes place. *See Kukreja*, 2025 WL 1009008, at *35.

Post-*Abitron*, ICEE concedes that "[t]he parties in this case will no doubt dispute whether and to what extent SPL's 'infringing use in commerce is domestic' and thus subject to the Lanham Act." (Doc. 228 PAGEID 8899). And ICEE submits that the "unique circumstances" of this case, "SPL's targeting of Ohio courts with its fraudulent conduct to support its infringement[,]" should factor in to the "use in commerce" analysis. (*Id.*; *see* Doc. 246 PAGEID 9570–9571).

While inventive, ICEE's proposal is at odds with the majority's criticism of Justice Sotomayor's "expansive" application of the Lanham Act, which, to its thinking, "threatens international discord." *Abitron*, 600 U.S. at 426 (quoting *Kiobel*[ *v. Royal Dutch Petroleum Co.*], 569 U.S. [108,]115 [(2013)]). As Justice Alito pointed out:

---

[49] "SPL's infringement has a substantial effect on U.S. commerce, including ICEE's ability to license the SLUSH PUPPIE® Marks in the U.S. and elsewhere. By way of example, SPL operated its own website, slushpuppie.co.uk, which was available to U.S. consumers and is in English. SPL obstructed ICEE's efforts to obtain control of that URL, falsely claiming that it did not own it or control it in testimony submitted to this Court." (Doc. 194 PAGEID 7020 (¶ 234)).

[50] "Additionally, in the run-up to filing this lawsuit, SPL presented itself in English-language media, available in the United States, as the owner of the SLUSH PUPPIE® brand. For example, an article in the online publication Food, Drink & Franchise quoted Mark Peters, Managing Director of "Slush Puppy Ltd.", **who owns brands such as Tango Ice Blast and Slush Puppie**." See Laura Mullan, *Comment: Is the Soft Drinks Industry Prepared for the UK "Sugar Tax"?*, Food, Drink & Franchise, March 31, 2018." (Doc. 194 PAGEID 7020 (¶ 235) (bold emphasis in original)).

[51] "Additionally, SPL's illegal licensees have sold or offered for sale infringing products in the United States. For example, Truffle Shuffle, an SPL licensee, offerred (sic) SLUSH PUPPIE® branded lip balm on its website, and had the option to ship the product to customers in the United States." (Doc. 194 PAGEID 7020 (¶ 236)).

> The European Commission gravely warns this Court against applying the Lanham Act "to *acts of infringement* occurring ... in the European Union" and outside of the United States. Brief for European Commission on Behalf of the European Union as *Amicus Curiae* 4 (emphasis added). To "police allegations of infringement occurring in Germany," it continues, would be an "unseemly" act of "meddling in extraterritorial affairs," given "international treaty obligations that equally bind the United States." *Id.*, at 28. As the Commission and other foreign *amici* recognize, the "system only works if all participating states respect their obligations, including the limits on their power." *Id.*, at 29; see also, *e.g.*, Brief for German Law Professors as *Amici Curiae* 12; Brief for Guido Westkamp as *Amicus Curiae* 2–3. It thus bears repeating our longstanding admonition that "United States law governs domestically but does not rule the world." *Microsoft Corp.*[ *v. AT & T Corp.*], 550 U.S. [437,] 454 [(2007)].

*Id.* at 427–28. Lanham Act recovery is linked strictly to domestic "use in commerce".

ICEE instead alleges <u>foreign</u> "use in commerce" made worse by SPL attempting to trick

this (domestic) Court into sanctioning illegal conduct (in the United Kingdom and Europe)

using forged documents. Fraud this insolent unquestionably demands redress; the

Lanham Act, however, is not a means to this end.

## F. ICEE's counterclaims under Ohio law

ICEE advances one counterclaim under Ohio statutory law, Deceptive Trade

Practices in violation of Ohio Rev. Code §§ 4165.01 et seq. ("DPTA"). This Court very

recently considered the plausibility of a DTPA claim when the proponent is not a citizen

of Ohio. As Judge Cole explained:

> [S]ince both Plaintiffs are non-Ohio entities, their invocation of Ohio law contravenes the "fundamental principle that a state cannot punish conduct that does not occur within its borders nor causes any harmful effects within its borders," **at least absent the state legislature's clear intention to do so**. *Logan Farms v. HBH, Inc. DE*, 282 F. Supp. 2d 776, 790 (S.D. Ohio 2003); *see also Mitchell v. Abercrombie & Fitch*, No. C2-04-306, 2005 WL 1159412, at *2 (S.D. Ohio May 17, 2005) ("Generally, statutes are presumed not to have an extraterritorial effect unless the legislature clearly manifests a contrary intent."). Plaintiffs don't identify—and the Court cannot

23

find—any provision of the DTPA or the [Business Opportunity Plans Act[52]] manifesting the Ohio General Assembly's intent for these statutes to apply to harm suffered in Colorado (as to [Plaintiff] Western State) and Texas (as to [Plaintiff] Brave Optical).

*Brave Optical, Inc. v. Luxottica of Am. Inc.*, No. 1:23-cv-793, 2025 WL 962827, at *9 (S.D. Ohio Mar. 31, 2025) (bold emphasis added). Plaintiffs in *Brave Optical*, like ICEE here, relied on a contract choice-of-law provision. A choice-of-law provision, however, neither moots nor trumps the extraterritoriality question. *Id.* at *10 (citing *McClendon v. N.C. Mut. Life Ins.*, 406 F. Supp. 3d 677, 682 n.4 (M.D. Tenn. 2019)). SPL and ICEE agreed to Ohio law in both the 1996 Appointment[53] and in the 1999 Amendment[54] without exception or qualification. But "the question remains of whether the scope of the [DTPA] extends past Ohio's borders." *Id.* (citing *HandMaker v. CertusBank, N.A.*, No. 3:15-cv-129, 2015 WL 13635662, at *6–7 (W.D. Ky. July 7, 2015) (explaining that if a law doesn't apply extraterritorially, "courts will not apply it to parties falling outside [the state's jurisdiction], even if the parties stipulate that the law should apply")). Noting that the plaintiffs "identify no statutory provision or judicial interpretation that supports reading either [the DPTA or the BOPA] as doing so[,]" Judge Cole dismissed both statutory claims.

Because ICEE principally relies on a choice-of-law provision to state a claim under Ohio's DTPA, (*see* Doc. 212 PAGEID 8238), dismissal is warranted. A choice-of-law provision cannot best the reality that the Ohio legislature is silent as to application of the DTPA to harm suffered outside Ohio (much less the United States). Simply put, ICEE's

---

[52] Ohio Rev. Code §§ 1334.01 et seq. ("BOPA")

[53] (Doc.191-2 ¶ (24) ("This appointment and all of its terms and conditions shall be governed by and interpreted under the laws of the State of Ohio[.]")).

[54] (Doc. 191-3 § XVI ("The parties agree that in all matters pertaining to this Agreement, the laws of the State of Ohio, USA shall be applicable and controlling.")).

DTPA counterclaim isn't plausible. Accordingly, SPL's motion to dismiss ICEE's DPTA counterclaim (with prejudice)[55] is **GRANTED**.

On the other hand, ICEE's unjust enrichment counterclaim <u>is</u> plausible. Unlike statutory claims, common law claims are not hamstrung by what the Ohio General Assembly intended. So, the Court can defer to the parties' choice-of-law provision. Some unjust enrichment claims rely on a theory of implied contract. In that instance, Ohio law would certainly apply. *See generally Eagle Express, Inc. v. Paycor, Inc.*, 732 F. Supp. 3d 753, 758 (S.D. Ohio 2024) (citing *Unifund CCR Partners Assignee of Palisades Collection, LLC v. Childs*, 2010-Ohio-746, ¶¶ 17–18, 2010 WL 703274 (2d Dist.) (holding that same law governs express and implied contract claims); *accord Lion Fed. Credit Union v. Worldpay, LLC*, No. 1:24-cv-163, 2024 WL 1704551, at *3–*5 (S.D. Ohio Apr. 19, 2024)). But that's not the case here. ICEE's unjust enrichment claim is both styled as and sounds in tort. Still, the harm alleged unequivocally emanates from ICEE's decision to terminate the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.[56] If the parties chose Ohio law to govern their contractual relations, it would seem logical to extend their choice to a correlate tort. Moreover, there is a "reasonable basis" to do so, inasmuch as the State of Ohio has considerable interest in determining, among other things, whether, at the behest of their client, Ohio lawyers knowingly filed

---

[55] In *Brave Optical*, Judge Cole dismissed the claims without prejudice "as to seeking leave to amend the claims under an appropriate state's (or states') law." 2025 WL 962827, at *10. That makes no sense in this case, because ICEE concedes that the conduct and consequences of which it complains occurred in the United Kingdom and Europe. (*See*, *e.g.*, Doc. 194 PAGEID 7025 ¶¶ 260–61).

[56] As previously noted, this Court determined, as a matter of law, that ICEE's termination of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement was effective as of June 25, 2019. (Doc. 189, Opinion & Order, entered 03/16/2023).

and prosecuted a lawsuit in Ohio based on (what ICEE alleges is) a forged contract. *See generally Eagle Express*, 732 F. Supp. 3d at 758.

"To state a claim for unjust enrichment, a plaintiff must allege that (1) a plaintiff conferred a benefit upon a defendant; (2) the defendant knew of the benefit; and (3) it would be unjust for the defendant, under the circumstances, to retain the benefit." *Barnett v. Kroger Co.*, No. 1:22-cv-544, 2025 WL 712741, at *12 (S.D. Ohio Mar. 5, 2025) (citing *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)). "To determine whether it would be unjust for a defendant to retain the benefit, a court must consider whether the plaintiff has a 'superior equity' such that it would be 'unconscionable for the defendant to retain the benefit.'" *Id.* (citing *Longmire v. Danaci*, 155 N.E.3d 1014, ¶ 32 (Ohio Ct. App. 10th Dist. 2020) (cleaned up)). In short, ICEE must allege that it conferred a benefit on SPL that would be inequitable for SPL to retain. *See id.*, at *6. It has, decidedly, and SPL doesn't argue otherwise. Accordingly, SPL's motion to dismiss ICEE's unjust enrichment counterclaim is **DENIED**.

### G. SPL's Motion to Stay non-United States discovery pending resolution of its Motion to Dismiss is now moot

Inasmuch as the Court has (1) denied SPL's motion to dismiss for lack of subject-matter jurisdiction and (2) granted in part and denied in part SPL's motion to dismiss for failure to state a claim, SPL's motion to stay non-United States discovery (pursuant to Fed. R. Civ. P. 26(c)) is now moot. Accordingly, SPL's Motion to Stay (Doc. 222) is **DENIED as moot**.

## II.      CONCLUSION

For the foregoing reasons, SPL's Rule 12(b)(1) Motion to Dismiss (Doc. 201) ICEE's Lanham Act counterclaims (Counts Three and Four) is **DENIED**; but SPL's Rule 12(b)(6) Motion to Dismiss (Doc. 201) ICEE's Lanham Act counterclaims (Counts Three and Four) is **GRANTED**.  In addition, SPL's Rule 12(b)(6) Motion to Dismiss (Doc. 201) is **GRANTED** as to ICEE's DTPA counterclaim (Count Five) but **DENIED** as to ICEE's unjust enrichment counterclaim (Count Six).  Finally, SPL's Motion to Stay (Doc. 222) Non-United States Discovery Pending Resolution of its Motion to Dismiss is **DENIED as moot**.

**IT IS SO ORDERED.**                    /s/ *Michael R. Barrett*
                                    JUDGE MICHAEL R. BARRETT