# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

SLUSH PUPPIE LIMITED,

      Plaintiff/Counterclaim Defendant,

         v.

THE ICEE COMPANY,

      Defendant/Counterclaim Plaintiff.

Case No. 1:19-cv-00189

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court on The ICEE Company's ("ICEE") Motion for Sanctions against Slush Puppie Limited ("SPL"). (Docs. 73, 82, 87).[1]

---

[1] It was understood that this motion for sanctions against SPL would proceed on the briefs only. (Transcript of Proceedings, *Discovery Conference via Telephone on Friday, February 7, 2025*, Doc. 287 PAGEID 14037–14038). But oral argument was (requested and) held on ICEE's *second* motion for sanctions (Doc. 89) against SPL's outside counsel, the law firm of Benesch, Friedlander, Coplan & Aronoff, as well as individual Benesch attorneys Avsec, Emanuel, Gurbach, House, Turk, and Zalud (the "Benesch Respondents"). (See 02/21/2025 Minute Entry & Transcript of Proceedings, *Oral Arguments on Motion for Sanctions on Thursday, February 20, 2025*, Doc. 294). The Court had made clear, however, that if anything came up in the hearing on the Benesch sanctions motion that trial counsel Eric Zalud wished to address on behalf of SPL, he would be given the opportunity to do so.

> THE COURT: . . . At one point in time, you know, I said in terms of your client I'm happy to proceed on the pleadings. I don't think anybody raised any objections to that. But as I was thinking about it, whenever we have this argument, David is certainly going to be saying stuff that involves the law firm; but in saying it, he's also going to be saying things that he thinks Mark Peters has done. **And I think that when we have that hearing, you should be there just to throw your two cents in if you think something's out of line.**
> MR. ZALUD: Okay, Your Honor. I planned on attending but kind of sitting in the gallery. I'm named in it, but I understand what you're saying and I –
> THE COURT: Yeah, yeah. I mean, David's focus, I think, is going to be on you guys; but, in doing so, he's also going to have to talk about what he alleges Mark Peters has done and things like that. **And I think if there's something that you don't think has been covered properly in the pleadings on the Motions for Sanctions against Slush Puppie, that you should be absolutely entitled to chime in and add your perspective.**
> MR. ZALUD: Okay, that -- yeah, that makes sense, Your Honor.
> THE COURT: **I just think it's fair.**

(Doc. 287 PAGEID 14037–14038 (16:6–17:3) (bold emphasis added)).

Filed on October 28, 2020, ICEE's motion clearly has been ripe for some time. The Court purposefully delayed its ruling in the hopes that the parties would broker a settlement.  Now that trial is set to begin next month,[2] postponement no longer serves a purpose.  All this said, a finding that sanctions are warranted should come as no surprise to SPL or its lawyers (or its lawyers' lawyers).  (*See, e.g.*, Transcript of Proceedings, *Motions Hearing on Wednesday, May 31, 2023*, Doc. 220 PAGEID 8676 (23:11–17) ("THE COURT [addressing Mr. Kasson]: And the order, you know, I haven't issued an order on sanctions yet, but there's going to be an order on sanctions.  There's going to be a real question about whether it's the client or it's joint and several.  We spent a lot of time and a lot of money chasing down the 2000 Agreement, and that's just not going to go unaddressed.  And your clients, the [Benesch] law firm, needs to know that."); Transcript of Proceedings, *Discovery Teleconference on Tuesday, May 14, 2024*, Doc. 271 PAGEID 11671 (27:7–12) ("THE COURT [addressing Mr. Kasson and Mr. Wolfsohn]: Yeah.  I mean, it shouldn't be a surprise to anybody that a potential sanction against Slush Puppie would be barring the Amended Complaint, you know, knocking out the earlier agreements from this case.  I mean, that's a distinct possibility based upon the way this case is set up.  So you guys should know that.")).[3]

---

[2] (*See* 09/23/2025 Updated Case Management Order).

[3] (*See also* April 24, 2025 ORDER, Doc. 301 PAGEID 14583 ("Consider the basis underlying SPL's Motion for Leave: learning that the claims premised upon the 2000 Agreement were 'meritless,' because the 2000 Agreement 'is not a genuine document.'  But what SPL calls 'not a genuine document' ICEE calls a 'fabrication' and, to this end, has filed a comprehensive Motion for Sanctions against SPL (to redress the forgeries by its principal, Mark Peters).  ICEE also has filed a Motion for Sanctions against the Benesch firm and six individual attorneys who, at one point or another, represented or continue to represent SPL.  This case has been fraught with discovery disputes generally, but particularly on this issue.  So much so that the Court has advised the parties that—based on the record evidence with which the undersigned is all too familiar—sanctions eventually will be imposed against SPL.  Whether they will also be imposed against (any or all of) SPL's lawyers remains to be seen.") (footnotes and docket citations omitted)).

## I.    BACKGROUND

The Court begins by restating sections of its April 10, 2024 Opinion & Order. (Doc. 270).  These sections (naturally) refer to the then-operative pleadings.  Facts will be added as necessary to reflect the current state of events.

The SLUSH PUPPIE frozen drink business was started by Willard ("Will") Radcliff, who founded the Slush Puppie Corporation ("SPC") in Cincinnati, Ohio, and built it into a successful international business. (Defendant The ICEE Company's Counterclaims to the Amended Complaint, Doc. 29 PAGEID 498 ¶ 5).  From (around) 1978 until (early) 2001, SPC owned the trademarks for SLUSH PUPPIE along with various logos and designs used in connection with SPC's goods and services.  (*Id.*).[4]

## A.    1996 Manufacturing Appointment

On or about January 1, 1996, SPC entered into an Appointment of Syrup Manufacturer ("1996 Manufacturer Appointment") with Able Foods Ltd. ("Manufacturer"), later known as Slush Puppie Limited[5] ("SPL").  (Doc. 27-2). The appointment grants SPL "THE LIMITED USE OF [SPC] FORMULAS, RECIPES AND PROCESSES, WHICH SHALL REMAIN TRADE SECRETS AND THE EXCLUSIVE PROPERTY OF [SPC] FOR THE PURPOSE OF MANUFACTURING NEUTRAL BASE AND SYRUP."  (*Id.* PAGEID 393 (recitals)).    The appointment is exclusive (<u>to a list of 27 European countries, including the United Kingdom</u>) and  "is subject to and conditioned

---

[4] The SLUSH PUPPIE marks include U.S. Trademark Registration No. 1,665,188 covering "nonalcoholic slush type beverages, syrups, and preparations for making slush type beverages" and U.S. Trademark Registration No. 3,132,350 covering "clothing, namely tops, t-shirts, pants and loungewear, headwear, jackets and footwear." (Defendant The ICEE Company's Counterclaims to the Amended Complaint, Doc. 29 PAGEID 498 ¶ 7).

[5] (Amended and Supplemental Complaint, Doc. 27 PAGEID 353 ¶ 19).  Able Foods Ltd. was formerly known as Somportex Ltd.  (*Id.*).

upon the Manufacturer's continued performance meeting the standards of [SPC] for quality and performance quotas[.]" ( *Id.* PAGEID 393 ¶ (1)).  SPL's royalty payment (for manufacturing rights) was set at 5%.  (*Id.* PAGEID 394 ¶ (3.A)).

The appointment provides that SPL "shall not manufacture, bottle, distribute, or sell directly or indirectly, any other product for use in Slush machines not promoted by [SPC]" and that it "shall continually use its primary and best efforts . . . to fill all orders for, and deliver product to, [SPC] authorized customers[.]" ( *Id.* PAGEID 394 ¶¶ (4)(5)).

The appointment also provides that "[SPC] is the registered owner of the trademark 'SLUSH PUPPIE' and all labels and designs incidental thereto . . . [and] [s]hould this appointment be terminated, Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . tradenames, signs, emblems, insignias, symbols, tokens, or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever[.]" (*Id.* PAGEID 395 ¶ (11)).  Moreover, "[u]pon any termination, . . . any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products." (*Id.*).

Although the appointment is perpetual, it lists several grounds upon which SPC can terminate.  Pertinent to this litigation:

> (8) This appointment is perpetual, however, in addition to any and all rights and remedies [SPC] may cancel and terminate this appointment by written notice to Manufacturer for any one of the following reasons:
>
> . . . .
>
> D. The voluntary or involuntary petition of Manufacturer seeing relief under any provision of any receivership or bankruptcy law or other law for relief of debtors[    ].  **The filing of any legal action other than for collection on account against [SPC]**, its representatives, distributors, customers, manufacturers, or suppliers[.]

4

(*Id.* PAGEID 394–95 ¶ (8) (bold emphasis added)).  Upon termination "for any reason by either party and for two years thereafter," Able Foods agreed to not divulge any SLUSH PUPPIE trade secrets.  (*Id.* PAGEID 395 ¶ (12)).  It also agreed to not compete with SPC.  (*Id.*).  And "[t]his provision regarding trade secrets and covenants not to compete shall be construed liberally in favor of SLUSH PUPPIE."  (*Id.*).

Finally, the appointment contains an integration clause[6] and a choice-of-law (Ohio) provision.[7]  It was signed on February 5, 1996 (in Cincinnati, Hamilton County, Ohio) by Ralph Peters[8] on behalf of Able Foods and by Will Radcliff on behalf of SPC. There is no drafting history in the record regarding the 1996 Manufacturing Appointment.

## B.    1999 Distributor Agreement

Next, SPC ("Company") entered into an International Independent Area Distributor License Agreement with SPL ("Distributor"), that was executed in 1999 and effective January 1, 2000 ("1999 Distributor Agreement").  (Doc. 27-3 PAGEID 400 (recitals), 408 § XIX, 409 (Exhibit A)).  Mark Peters, Ralph Peters' son,[9] signed on behalf of SPL. (*Id.*; Ralph Peters depo., Doc. 84 PAGEID 2136 (31:4–18)). This license granted different rights,[10] to include "THE RIGHT TO THE USE OF THE NAME 'SLUSH PUPPIE' FOR

---

[6] (Doc. 27-2 ¶ (22) ("This appointment expresses fully the understanding and all prior understandings are hereby canceled, and no further changes in the terms of this appointment shall be valid except when and if reduced to writing and signed by both Manufacturer and SLUSH PUPPIE, by legally authorized officials."); Doc. 27-2 PAGEID 398 ("This appointment represents the full agreement of the parties and supersedes and replaces any and all previous manufacturing appointments.")).

[7] (Doc. 27-2 ¶ (24) ("This appointment and all of its terms and conditions shall be governed by and interpreted under the laws of the State of Ohio[.]")).

[8] (Ralph Peters depo., Doc. 84 PAGEID 2128–2131 (23:10–26:8)).

[9] (Ralph Peters depo., Doc. 84 PAGEID 2122 (17:13–14); 2139–2141 (34:7–36:6)).

[10] (Doc. 27-3 § VII ("This Agreement is not a license or consent for DISTRIBUTOR to enter into the manufacturing of any of the PRODUCTS.  In the event that such license or consent is granted, this agreement shall exist independent thereof.")).

THE PROMOTION AND DISTRIBUTION OF PRODUCTS [i.e., freezers, neutral base, flavors, cups, other related items, and other products which may be specifically approved in writing from time to time] OFFERED BY COMPANY" in the United Kingdom and Ireland. (Doc. 27-3 PAGEID 400 (recitals), 409 (Exhibit A)). As Distributor, SPL agreed to "vigorously promote" the sale of SPC's products in "important commercial centers" within its exclusive territory and to keep SPC "regularly informed" of its "operating and sales activities" relating to SPC's products. (*Id.* PAGEID 402 §§ IV.A, IV.C). The agreement provides that SPC owns the SLUSH PUPPIE trademarks (name and logo), allowing SPL to use them only upon "continued qualification" as a "bona fide" Distributor. (*Id.* PAGEID 403 § VI.D). SPL's use of the SLUSH PUPPIE trademarks "is unauthorized upon termination of this Agreement." (*Id.*). To this end, SPL agreed, upon termination, "to immediately cease and desist from the further use of the Slush Puppie name and logo, and return any and all PRODUCTS, materials, signs, emblems, and the like, bearing the Slush Puppie name and logo, to COMPANY in Cincinnati, Ohio, freight prepaid." (*Id.* PAGEID 404 § VI.H).

Although the agreement is perpetual, it lists bases upon which SPC will terminate the license, subject to notice and a (60-day) opportunity to cure. (*Id.* PAGEID 404 §§ VIII.A–D). It also lists bases upon which SPC will immediately terminate the license (without opportunity to cure), including SPL filing for bankruptcy protection or SPL's inability to pay its debts to SPC. (*Id.* PAGEID 405 §§ VIII.F.1–5). Pertinent to this litigation, SPC may, "for good cause[ ]" immediately terminate the license upon "[t]he filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives,

DISTRIBUTORS, manufacturers, or suppliers[.]" (*Id.* PAGEID 405 § VIII.F.4). Upon termination, SPL waived the right to any compensation "for any claim for 'build-up of TERRITORY' or recoupment of investment, as such is done at DISTRIBUTOR'S risk." (*Id.* PAGEID 405 § VIII.I). Additionally, SPL (to include its "subsidiary or associated companies, [and] its appointees/sublicensees") agreed to not "make or sell the PRODUCTS within or without the TERRITORY for a period of five (5) years" post-termination. (*Id.* PAGEID 406 § VIII.M).

Finally, like the manufacturing appointment, the distributor agreement contains an integration clause[11] and a choice-of-law (Ohio) provision.[12] It was signed on December 23, 1999 (in Cincinnati, Ohio) by Mark Peters on behalf of SPL and by Diane Menzer on behalf of SPC. There is no drafting history in the record regarding the 1999 Distributor Agreement.[13]

## C.    Sale of the SLUSH PUPPIE trademarks & related business

In 2001, Dr Pepper/Seven Up, Inc. ("DPSU") purchased the SLUSH PUPPIE trademarks and business from SPC. (Doc. 29 PAGEID 503 ¶ 34). All trademarks relating to the SLUSH PUPPIE business were thereafter assigned to DPSU. (Doc. 27 PAGEID 356 ¶ 35 & Exh. F (Doc. 27-6); Doc. 29 ¶ 35). In 2006, The ICEE Company purchased the SLUSH PUPPIE trademarks and business from DPSU and became obligated under

---

[11] (Doc. 27-3 § XVII ("This Agreement expresses the full agreement and understanding between the parties, and supersedes any and all prior grants of license or other oral or collateral agreement, understanding, or representation of any kind. Any amendment of this Agreement must, of necessity, be in writing.")).

[12] (Doc. 27-3 § XVI ("The parties agree that in all matters pertaining to this Agreement, the laws of the State of Ohio, USA shall be applicable and controlling.")).

[13] Mark Peters testified during his (July 1, 2020) deposition that he signed, but did not negotiate, the distribution agreement on behalf of SPL. (Mark Peters Doc. 74 PAGEID 1673 (130:1–18, 131:19–24)).

the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. (Doc. 27 PAGEID 357 ¶ 38; Doc. 29 PAGEID 503 ¶ 38). All trademarks relating to the SLUSH PUPPIE business were thereafter assigned to ICEE. (Doc. 27 PAGEID 357 ¶ 39 & Exh. H (Doc. 27-8); Doc. 29 PAGEID 503 ¶ 39).

**D.    Subsequent correspondence between SPL & ICEE concerning the 1996 Manufacturing Appointment and the 1999 Distributor Agreement**

On July 27, 2009, Mark Peters sent copies of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement to Dan Fachner as a follow-up to Peters' request for help with "the issue with Slush Costa Blanca (SCB)." (Doc. 60-1 PAGEID 975). (Fachner currently serves as President of J&J Snack Foods Corp., which owns 100% of The ICEE Company; he has served as the president and/or CEO of ICEE since 1997.)[14]   On September 27, 2009, Peters corresponded with Fachner again about a "major problem" with "ex Distributors" in Spain, attaching once more the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.  Peters points out that the exclusive territory defined in the manufacturing appointment is significantly greater than the territory identified in the distributor agreement ("because of the way the contracts was set up between my Father and Will [Radcliff] many years ago").  "What I need to allow us to [initiate a trademark action in Spain] is a side letter from you amending the International Independent Area Distribution Agreement executed the 23rd December 1999 section Exibit A [*sic*] TERRITORY to be the same as the Manufacturing agreement."  (*Id.* PAGEID 977–78 (underline emphasis added)).

On April 1, 2010, Peters emailed Fachner about expanding the distributor license beyond the United Kingdom and Ireland.  (Doc. 60-2 PAGEID 997 ("Dan I know you are

---

[14] *(See* Dan Fachner decl., Doc. 103-1 ¶ 3; *see also* Dan Fachner decl. (2d), Doc. 112 ¶ 3).

now the brand owner and we are at your mercy on this.  I just know that to have a third party agency who can make a little money from selling a trinket or two and they have not got one cent invested in it.  For them to be representing Slush Puppie at trade shows is something that will do untold damage to our business and ultimately your brand.  It is simply not worth it.  I think my last suggestion to you was that we take a little time out to look at the best way for both businesses, on how we work together on the Slush Puppie brand by re looking at the master agreements.") (underline emphasis added)).  As part of an ongoing exchange, Peters emailed Fachner on April 10, 2010 and attached another copy of the 1996 Manufacturing Agreement.  (*Id.* PAGEID 996 ("Thank you for your time on the telephone.  I am not sure if you have a copy of the manufacturing agreement.  Please see attached.")).

Speed ahead to January 10, 2017, when SPL's Alan Beaney—in an email to Steve Every, ICEE's Vice President for Managed Service and International—described "the Slush Puppie contractual arrangements in Europe[ ]" as the contract effective on 1st January 1996 (Syrup Manufacture (and sale) in Europe) and the contract effective on 1st January 2000 (Distribution Agreement in UK and Ireland).  (Doc. 73-9 PAGEID 1381–1388).

Later that same year, on August 8, 2017, SPL's Manchester counsel sent return correspondence to ICEE's London counsel, in which it refers to "the International Independent Area Distributor License Agreement dated 23 December 1999 (the 'Distribution Agreement') and the Appointment of Syrup Manufacturer Agreement dated 5 February 1996 (the 'Manufacturer Agreement') (collectively the 'Existing Agreements')."  (Doc. 60-3 PAGEID 1008).  "Whilst it is clear that the Existing

Agreements form the basis of the relationship between Slush Puppie and Icee, the terms of the Existing Agreements do not encompass the entirety of the relations between the parties, as the Existing Agreements have been varied by agreement since 1999. . . . Given the uncertainties that have developed as a result of modifications to the Existing Agreements over the course of the last 17 years, we consider that it would be in the interests of both Slush Puppie and Icee to attempt to codify, and where necessary update, the terms of the Existing Agreements so as to take into account the reality of Slush Puppie's business, on behalf of Icee and the Slush Puppie brand, in the UK and Europe and to create a clearer understanding of the parties' respective roles going forward." (*Id.* PAGEID 1008–1009).

## E.    The 2000 "Appointment of Trade Mark Licence"

Peters first sent what has become known as the "2000 Appointment" to a solicitor at the British law firm of Reynolds Porter Chamberlain ("RPC") on "20 November 2017 Monday 16:14." (*See* Doc. 73-11 PAGEID 1426).[15] Attached to his email was a doctored version of the 16/02/2011 "History of working practise between Slush Puppie USA and Slush Puppie UK formerly Able Foods Ltd formerly Somportex Ltd" to "corroborate" the 2000 Appointment. The metadata for the "History of working practise" indicates that the .pdf was created "11/20/2017 3:31:42 PM" and authored by "markp" approximately 40 minutes before it was forwarded to RPC. (Doc. 73-12 PAGEID 1483).[16]

---

[15] Peters testified that his father, Ralph, handed him "several items in a box" sent from Ralph's home in Mallorca to his home in Buckinghamshire. (Doc. 74 PAGEID 1668–1669 (112:16–114:12)). One of those items supposedly was a copy of the 2000 Appointment. (*Id.*).

[16] ICEE's forensic document/handwriting examiner J. Wright Leonard later opined that the 2011 "History of working practise" was the "source" document for the signatures on the 2000 Appointment. (*See* Doc. 73-10 PAGEID 1395–1399; *see also* Doc. 73-26).

Likely anticipating a lawsuit, on <u>December 20, 2017</u>, RPC sent Mark Peters an engagement letter along with its "Litigation Guide" that included a section on preserving documents.  (Doc. 73-13 PAGEID 1490).  That email from Partner David Cran read in part:

> As we discussed, please do send through the further emails/correspondence with ICCE [*sic*] that you mentioned, as well as any royalty statements/calculations showing the agreed 2.5% royalty (under **the later 2000 agreement – ie document 4**, as opposed to the earlier agreements).  As mentioned, **anything that fixes ICEE with knowledge of that document 4, or shows that ICEE has been working to its terms, would be helpful**.

(Doc. 73-14 PAGEID 1502–1503 (bold emphasis added)).  Cran renewed his request on January 10, 2018.  (*Id.* PAGEID 1501–1502).

To further his scheme, Peters put together the now infamous "Wendsday" email. He copied a genuine email sent ("<u>11 November 2008 14:27</u>") by ICEE's Jerry Bird to SPL's then-finance director Lindsay Kirby[17] asking for "the supporting information on how the 2007 Royalty was determined. . . . It appears that our Royalty has dropped dramatically from the past and would like to try and understand."  (*Id.* PAGEID 1514). Peters then pasted it into a Word document and typed a bogus reply from Kirby that began, "The royalty is calculated as defined in the Trade Mark Licence dated August 8." (*Id.*).  And then he quotes from the 2000 Appointment:

> On page two – A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

---

[17] Kirby left SPL's employ in 2010.  (*See* Doc. 74 PAGEID 1650 (39:6–24)),

> Is this what you need?

(*Id.*).[18]  When Peters replied to Cran a week later (on <u>2018-01-17 10:26:29 +0000</u>), he attached this purported "e mail exchange from our head of finance to DPSU explaining we are paying 2.5% royalty." (*Id.* PAGEID 1501).  Peters concludes his reply with the prescient question, "Is this of any help?" (*Id.*).

Cran apparently was not fully persuaded.  He drafted a letter to Gowlings WLG, UK counsel for J&J Snack Foods and subsidiary ICEE, which he sent to Peters for his approval. (*See* Doc. 73-16 PAGEID 1522–1530).  In his email transmittal to Peters, Cran cautions him, "One point to mention is that the risk of relying on the 2008 email without having done full searches is that that any response and subsequent correspondence could be highly relevant – we note in particular the [Kirby] email ends with a question 'is this what you need?'" (*Id.* PAGEID 1522).

The metadata—which was not produced until the Court granted ICEE's discovery motion[19]—indicates that this document was created "<u>1/17/2018 9:53 AM</u>" and authored by "markp" less than 35 minutes before it was forwarded to RPC. (Doc. 73-14 PAGEID 1516).  Notably, in the email header, on the "Sent" line, "Wendsday" is spelled phonetically and, therefore, incorrectly.

On <u>February 28, 2018</u>, Mark Peters informs Dan Fachner about "identifying" the 2000 Appointment:

> Following our previous discussions, in the course of reviewing our existing arrangements, **we have identified the attached exclusive licence**[20] **dated 8 August 2000, which governs the**

---

[18] (*Cf.* Doc. 27-4 PAGEID 412 ¶ (4.A)).

[19] (*See* Docs. 60, 62, 67).

[20] (Doc. 60-5 PAGEID 1022–1027).

**arrangements between the parties**. **This exclusive licence post-dates both the Appointment** of Syrup Manufacturer Agreement dated 5 February **1996 and** the International Independent Area Distributor License **Agreement** dated 23 December **1999**, which were the subject of our previous discussions. This exclusive licence confirms that SPL has the exclusive rights to use the SLUSH PUPPIE trade mark in Europe in relation to freezers, syrups and products for the promotion of the SLUSH PUPPIE trade mark.

(Doc. 60-5 PAGEID 1021 (bold emphasis added)). Fachner responded on <u>March 12, 2018</u>, noting that "[f]or the past 11 years we have had many discussions live and documented around the challenges of our agreements dated 1996 and 1999. . . . This is the first time that you have shared another contract. Where did this contract come from and why was this never produced or mentioned in the past decade?" (Doc. 60-6 PAGEID 1029).

Benesch attorney Mark E. Avsec responded (on <u>August 17, 2018</u>) on behalf of SPL with a cease-and-desist letter, which begins:

This firm serves as U.S. intellectual property litigation counsel to Slush Puppie Limited ("SPL"). We have reviewed the correspondence (including between and among solicitors) and the various agreements concerning SPL's exclusive right to use the SLUSH PUPPIE® trademarks in the United Kingdom, Southern Ireland and Europe. The SLUSH PUPPIE APPOINTMENT OF TRADE MARK LICENCE dated August 8, 2000 (the "2000 Agreement") is the current operative agreement governing the relationship between SPL, on the one hand, and J&J Snack Foods Corp. ("J&J") and its subsidiary The ICEE Company ("ICEE") (together, "you"), on the other hand. **There is no question that the parties have been operating under the terms of the 2000 Agreement (including its royalty provisions) since ICEE's acquisition of the SLUSH PUPPIE® brand and business in 2006**. . . .

This firm is now engaged because the 2000 Agreement is expressly governed by Ohio law and recites that any dispute must be litigated in the State of Ohio. The 2000 Agreement, which *supersedes all previous agreements* between or among the parties (or their predecessors-in-interest) granted SPL the *perpetual* and

13

> *exclusive* use of the SLUSH PUPPIE® trademarks in connection with the manufacturing *and* distribution of SLUSH PUPPIE® products in the subject territories, including the U.K. and Europe. Notwithstanding this stark language, J&J (through ICEE) has inexplicably granted other parties the right to use the SLUSH PUPPIE® trademark in connection with the manufacturing and distribution of SLUSH PUPPIE® products in the U.K. and Europe.

(Doc. 27-11 PAGEID 468–69 (italics emphasis in original, bold emphasis added)). Avsec closed with the admonition, "If you elect not to respond and/or continue to license the use of the SLUSH PUPPIE® brand in violation of our client's rights, be advised that SPL will not hesitate to seek redress as permitted under the 2000 Agreement." (*Id.* PAGEID 469).

Duane Morris attorney Karen C. Kline responded (on September 13, 2018) on behalf of ICEE, pointing out that (1) the 2000 Appointment was not among the contracts ICEE acquired from (predecessor-in-interest) DPSU; (2) DPSU and ICEE had always operated under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement; (3) SPL had never (before February 28, 2018) mentioned the 2000 Appointment; and (4) there were "serious questions" about the document's authenticity, which SPL had failed to support. (Doc. 73-19 PAGEID 1541–1543). Benesch attorney Matthew Gurbach responded (on November 6, 2018), reiterating that the 2000 Agreement "currently governs the relationship" between SPL and ICEE, such that SPL has "the exclusive right to use the SLUSH PUPPIE trademark in the United Kingdom, Ireland and elsewhere in Europe." (Doc. 89-1 PAGEID 2330). Gurbach threatened legal action. (*Id.*).

## F.    SPL sues ICEE

SPL filed suit against ICEE in the Court of Common Pleas for Hamilton County, Ohio on February 12, 2019, asserting causes of action arising out of the 2000 Appointment (only). (Doc. 2). ICEE removed the suit to the Southern District of Ohio on

March 8, 2019. (Doc. 1). ICEE answered and counterclaimed against SPL on April 29, 2019. (Doc. 13).

Thereafter, on June 25, 2019, ICEE (through Duane Morris attorney and current trial counsel David J. Wolfsohn) provided written notice to Mark Peters that it was terminating the 1996 Manufacturing Appointment and the 1999 Distributor Agreement because of SPL's lawsuit. (Doc. 29-6). The notice quotes from the relevant language within both agreements, observing that SPL had filed a legal action "other than for collection on account" against ICEE. (*Id.* PAGEID 575). Benesch attorney Gurbach responded to Wolfsohn (on June 28, 2019) that "ICEE's purported termination of the 1996 Appointment and the 1999 Distributor Agreement is a nullity—**each has been superseded by the 2000 Appointment**." (Doc. 29-7 PAGEID 578 (bold emphasis added)).

The Court first entered a Calendar in this civil action on October 30, 2019. (10/30/2019 Minute Entry). In connection therewith, SPL filed an Amended and Supplemental Complaint on December 16, 2019. (Doc. 27).[21] The first four claims for relief asserted causes of action arising out of the 2000 Appointment; the next eight (new) claims were asserted "in the alternative" and arise out of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. (*Id.*).

ICEE answered and counterclaimed against SPL on January 6, 2020. (Doc. 29). SPL filed its Answer to ICEE's counterclaims on January 27, 2020. (Doc. 32). Throughout, SPL maintained it had *no* obligations under the

---

[21] The Amended and Supplemental Complaint was signed by Matthew D. Gurbach, Elizabeth Emanuel, and Ronald L. House. At various times, all three attorneys withdrew their appearance as counsel of record (Docs. 50, 68, 141) and they are no longer affiliated with the Benesch law firm.

1996 Manufacturing Appointment and the 1999 Distributor Agreement because they were *superseded* by the 2000 Appointment. And SPL reiterated its allegation that "the purported termination of agreements that were no longer effective is a nullity[.]" (*Id.* ¶ 39).

Much of ICEE's efforts in the initial stages of this litigation were focused on the validity of the 2000 Appointment, which it had persistently questioned since March 2018. Discovery included the monitored depositions of Ralph Peters and Mark Peters. SPL did its best to stonewall, especially as to Ralph Peters. (*See* Docs. 30–31, 33, 35, 37–39, 42, and 44 & Minute Entries dated 01/29/2020 and 02/11/2020). Then came SPL's joint motion (filed on April 2, 2020) for a "moratorium" on discovery, nominally based on the COVID-19 pandemic, and for a protective order to prevent a remote video deposition of Mark Peters. (Docs. 46, 49, and 51 & Minute Entries dated 05/21/2020, 05/26/2020, 06/03/2020, 06/16/2020, 06/24/2020, and 07/13/2020). On August 27, 2020, ICEE filed a motion to compel with respect to the November 12, 2008 "Wendsday" email. (Doc. 60 PAGEID 952–53 ("Because the email quotes from the forged Appointment of Trade Mark Licence, it was obviously created with the intent of trying to prove to this Court and the jury that the Appointment is genuine.")). ICEE explained:

> Based on a privilege log that plaintiff's counsel recently served, **SPL's attorneys have had numerous communications with SPL's managing director, Mark Peters, about the forged email beginning in the spring of 2018, continuing after the email was produced in discovery earlier this year [2020], and concluding at the end of June of this year [2020], when SPL's counsel finally wrote to ICEE's counsel to "withdraw" the fabricated document.[22]** According to SPL's current American counsel, the forged email was sent by SPL to SPL's British counsel,

---

[22] (Doc. 60-10 PAGEID 1044). Former trial counsel Matthew Gurbach later testified he withdrew the "Wendsday" email from production because, "Forged or we couldn't vouch for the, the – where it came from. Again, we hadn't looked at the metadata on, on, on the, on the PDF but, no, we could not vouch for the authenticity of it." (Gurbach depo., Doc. 255-1 PAGEID 10510 (287:10–23)).

> RPC (formerly known as Reynolds Porter Chamberlain), who then forwarded it on April 17, 2018 to the Benesch firm.  **The email was produced in discovery in February of this year [2020].  Unlike every other email produced in this case by plaintiff, the email lacks the metadata that would show when it was created and by whom.**  Interestingly, SPL's privilege log shows that, shortly after the forged email was produced, plaintiff's counsel discussed the lack of metadata numerous times with SPL's managing director, Mark Peters, but decided to produce it anyway.  Then, without explanation, plaintiff's counsel suddenly withdrew the document from production on June 26[, 2020]—a few days before Mark Peters' many-times postponed deposition.  On August 10[,2020], **SPL finally admitted that the November 12, 2008 email was fabricated** when it responded "admit" to ICEE's request to admit that the document was not genuine.

(*Id.* PAGEID 953–54 (bold emphasis added)).  The undersigned granted ICEE's motion to compel in an Order docketed on August 31, 2020 (Doc. 62), which it later amended (on SPL's motion) on September 10, 2020 (Doc. 67).  The Court advised that it "w[ould] conduct an *in camera* review of all communications between SPL and Reynolds Porter Chamberlain relating to the transmission of the November 12, 2008 email from Lindsay Kirby to Jerry Bird, and reserve[d] ruling on whether the crime-fraud exception to the attorney-client privilege applies.  As to the deposition of Mark Peters, . . . to ensure that ICEE's follow-up questions [we]re 'solely related to the alleged fabrication of the November 12, 2008 email,' or—stated another way—limited to inquiries 'about the generation, transmission, production, and withdrawal of the November 12, 2008 email,' at the suggestion of ICEE the Court w[ould] attend the deposition of Mark Peters as it did the deposition of Ralph Peters."  (*Id.* PAGEID 1127).  Letter filings followed from ICEE (Doc. 69) and SPL (Doc. 70).

On October 15, 2020, SPL filed a motion for leave to file a second amended complaint to withdraw its (four) claims based on the August 8, 2000 Appointment of Trade

Mark Licence. (Doc. 72). In support of its motion for leave to withdraw, SPL conceded that the 2000 Appointment "is not a genuine document" and any claims premised upon it "were meritless[.]" (Doc. 85 PAGEID 2176). SPL explained it changed course when, "on August 24, 2020, [ICEE] produced to SPL's counsel the report of J. Wright Leonard, which cast[ ] doubt on the authenticity of the 2000 Agreement. Prior to that time, the only 'evidence' pointed to by [ICEE] as evidence of lack of authenticity was such things as misspelling of words, lack of a county name and lack of reference to the document in the past. Although counsel [for SPL] disputes some of the conclusions reached by Ms. Leonard, after an investigation into Ms. Leonard's findings, counsel for SPL determined that it could no longer ethically continue to prosecute claims under the 2000 Agreement. Accordingly, after consulting with SPL, counsel for SPL properly moved for leave to amend the complaint to dismiss all claims related to the 2000 Agreement. Doc. 72." (Doc. 82 PAGEID 2049–2050). "SPL did not learn that the 2000 Agreement is not a genuine document until well after SPL filed its December 16, 2019 Amended Complaint. Upon learning that the claims premised upon the 2000 Agreement were meritless, SPL quickly moved to withdraw such claims." (Doc. 85 PAGEID 2176).[23]

---

[23] Former trial counsel Matthew Gurbach testified that he hired a handwriting expert in late June 2020 (after SPL withdrew the "Wendsday" email from production) to examine the 2000 Appointment. (Gurbach depo., Doc. 255-1 PAGEID 10598 (375:5–376:2); PAGEID 10599 (376:12–23) (A. . . . And I got that ball rolling. I don't know where, where it ended up. That, that had happened – or concluded, I assume concluded after I had departed. Q. So timing-wise when you left mid[-]August, where was that ball? A. There were discussions with the, with the handwriting analyst, but I'd never gotten any opinions or anything like that. Q. All right. Had she asked for stuff? A. Yeah. She had asked for a number of, I believe, handwriting exemplars.")).

Vickie L. Willard was the forensic document examiner hired by Gurbach (in mid-July 2020, according to Willard's invoice for professional services). (See Doc. 274-13 PAGEID 12710). Notes from a telephone call with former trial counsel Ronald House and current trial counsel Jennifer Turk indicate, "**Ms. Willard did not disagree with Leonard's 'red flag' of potential signature manipulation of Will Radcliff's signature on the August 8, 2000 letter** as a result of the signature being on a line that was not even with the rest of the writing." (*See* Doc. 274-29 PAGEID 12707 (bold emphasis added)). "Ms. Willard **does find fault with Ms. Leonard's conclusion that one can determine that the 2000**

ICEE followed (on <u>October 28, 2020</u>) with this motion for sanctions (Doc. 73) against SPL, asking for (1) judgment in its favor on all of SPL's claims pled in SPL's then-operative amended complaint (Doc. 27); and an award of all its attorneys' fees and costs to date.[24]

## G.    SPL's operative complaint

On <u>March 16, 2023</u>, the Court granted ICEE's Motion (Doc. 175) for Summary Judgment—as to SPL's Twelfth Claim for Relief in its Amended and Supplemental Complaint (Doc. 27).  (*See* Doc. 189).  The Court determined (as a matter of law) that ICEE's termination was effective, which precludes SPL from claiming declaratory relief (or seeking damages) relating to ICEE's alleged breaches of the 1996 Manufacturing Appointment or the 1999 Distributor Agreement taking place after June 25, 2019.  (*Id.* PAGEID 6862).  The same day the Court granted SPL's motion (for leave to file a second amended complaint) to withdraw its claims based on the 2000 Appointment.  (Doc. 190 PAGEID 6863 (¶ 1)).

SPL's Second Amended Complaint ("SAC") (Doc. 191), filed <u>March 23, 2023</u>, alleged five claims against ICEE: Breach of Contract – Declaratory Judgment (1996 Appointment); Breach of Contract – Declaratory Judgment (1999 [Agreement]); violation of Ohio Rev. Code §§ 4165.01 et seq., Ohio's Deceptive Trade Practices Act ("ODTPA");

---

Agreement is the false document rather than the 2011 document** in the basis that the signature has deteriorated more on the 2000 Agreement, indicating that the source document was the 2011 document." (*See id.* (bold emphasis added)).  "**Willard does not see how one can conclude that the 2000 Agreement is the fake document rather than the 2011 document.**"  (*See id.* (bold emphasis added)). In other words, according to Turk, Willard concluded that *either* the 2000 Appointment *or* the 2011 "History of working practise" was a fabrication, but she couldn't discern which document was the "copy." (*See* Turk depo., Doc. 274 PAGEID 12383 (391:12–21)).

[24] ICEE's second motion for sanctions (Doc. 89) against the Benesch Respondents was filed on January 12, 2021, and remains pending.

Breach of Contract – Damages (1996 Appointment); and Breach of Contract – Damages (1999 [Agreement]). SPL later moved to withdraw (Doc. 257) its ODPTA claim against ICEE pursuant to Fed. R. Civ. P. 15(a)(2),[25] which the Court allowed (Doc. 299).[26] But "[i]n an exercise of its inherent power to manage its own docket," the undersigned declined to grant SPL leave to file a third amended complaint. (*Id.* PAGEID 14546). Instead, the Court advised that "this civil action will proceed as if SPL had alleged (only) four claims (Breach of Contract – Declaratory Judgment (1996 Appointment); Breach of Contract – Declaratory Judgment (1999 [Agreement]); Breach of Contract – Damages (1996 Appointment); and Breach of Contract – Damages (1999 [Agreement])) in its SAC." (*Id.*).

## II. ANALYSIS

## A. Standard

In *Chambers v. NASCO, Inc.*, the Supreme Court explored "the scope of the inherent power of a federal court [sitting in diversity] to sanction a litigant for bad-faith conduct." 501 U.S. 32, 35 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980)). "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44. "As we recognized in *Roadway Express*, outright dismissal of a lawsuit, which we had upheld in *Link*[ *v. Wabash R.R. Co.*, 370 U.S. 626 (1962)], is a particularly severe

---

[25] *See SAAP Energy v. Greenwich Ins. Co.*, No. 1:2-CV-00098-TBR, 2014 WL 12726322, at *4 (W.D. Ky. May 21, 2014) (under Rule 15(a)(2), court has discretion to allow a plaintiff to withdraw a claim it no longer wishes to pursue "by way of" an amended pleading).

[26] At ICEE's request, and without objection from SPL, SPL's ODPTA claim was dismissed with prejudice. (Doc. 299 PAGEID 14545).

sanction, yet is within the court's discretion." *Id.* (citing *Roadway Express*, 447 U.S. at 765). "Consequently, the 'less severe sanction' of an assessment of attorney's fees is undoubtedly within a court's inherent power as well." *Id.* Relevant here, a court may assess attorney's fees when a party has acted in "bad faith." *Id.* (cleaned up). "In this regard, if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party[.]" *Id.* (quoting *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 560 (1946)).

ICEE argues that the decision to file a lawsuit based on forged documents warrants *both* the ultimate sanction of a judgment against SPL *as well as* an award of attorneys' fees (and costs). *See Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573 (S.D.N.Y. 1996). This Court agrees.

The facts in *Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867 (E.D. Mich. 2017), are curiously analogous to the record evidence here. Defendants there moved for sanctions contending that the plaintiff "engaged in bad-faith conduct by fabricating evidence and submitting it to th[e] Court as an exhibit to the first and second amended complaints." *Id.* at 869. That exhibit was a signed "Framework Agreement" that purportedly gave the plaintiff ("PHC") the "exclusive right" to distribute passenger vehicles (in the United States) that were manufactured by JAC Motors, a Chinese entity. *Id.* at 869–70. Initially the plaintiff sued (only) the defendants that entered into a separate distribution agreement with JAC Motors despite knowing about its exclusive relationship with PHC. *Id.* at 870. Eventually, JAC Motors asked to intervene in the suit; thereafter, the parties agreed to PHC filing a second amended complaint (to

which the signed Framework Agreement was again attached) that named JAC Motors as an additional defendant.  *Id.*

Almost two years after the initial complaint was filed, PHC emailed the defendants to ask whether they would consent to the filing of a third amended complaint.  *Id.*  Of note, the signed Framework Agreement was *not* attached as an exhibit to this proposed pleading.  *Id.*  No explanation was offered in the email, nor did it suggest that there were any irregularities with the document.  However, the pleading that was filed alleged that JAC Motors "kept" the signed copy of the Framework Agreement such that PHC didn't have an executed copy.  *Id.*  Following the depositions of PHC's current chief executive officer and its former chief information officer, the defendants took the position that the signed Framework Agreement on which PHC had relied was "fabricated."  *Id.* at 871.

PHC "acknowledge[d]" the fabrication.  *Id.*  It was created at the behest of PHC's former (and since deceased) chief executive officer, who "wanted to have a nice, clean document to show the dealers and help increase creditability [*sic*]."  *Id.*  JAC Motors argued (in its sanctions motion) that PHC emailed the fabricated document to third parties as proof of the alleged exclusive relationship, hoping to attract financing and cement dealer relationships.  *Id.*  PHC neither admitted nor denied the purpose of the "prettied-up" document.  *Id.*

The district judge was tasked with deciding "whether PHC's use of a fabricated document as an exhibit to its first and second amended complaints, which served as the centerpiece for its claims, amount[ed] to either bad-faith conduct or conduct that is

tantamount to bad faith." *Id.* at 873 (citing *First Bank of Marietta v. Hartford Underwriters Inc. Co.*, 307 F.3d 501, 507 (6th Cir. 2002)). And, if so, the "appropriate" sanction. *Id.*[27]

PHC changed lawyers before the third amended complaint (which did *not* attach the signed Framework Agreement) was filed. *Id.* at 874–75. New counsel argued a "mistaken belief" that the document was genuine when the first two amended complaints were filed, but submitted no sworn testimony in support. *Id.* at 875. The district judge found this explanation "unavailing" and ultimately determined that "PHC's use of the fabricated agreement was either intentional or, at the very least, unquestionably reckless, such that its conduct was tantamount to bad faith." *Id.* at 875–77. Moreover,

> to the extent PHC is suggesting that Defendants were not harmed or prejudiced by PHC's prior reliance on the fabrication, the record evidence shows that PHC emailed the fabricated Framework Agreement to GreenTech on November 12, 2014 (approximately one month before it was filed under seal with the first amended complaint) to demonstrate that PHC and JAC Motors had an exclusive relationship. Upon receipt of that fabrication, GreenTech immediately terminated its business relationship with JAC Motors. Thus, PHC's use of the fabrication was not innocent, as it claims, because its use during the pendency of this case had the real-world consequence of ending Defendants' business relationship.

*Id.* at 877–78 (record citations omitted). "[A] court's inherent power to dismiss a case and protect the sanctity of the judicial process is never more compelling than in a situation of individuals who engage in fraud upon the court." *Id.* at 878 (quoting *Perna v. Elec. Data Sys., Corp.*, 916 F. Supp. 388, 397 (D.N.J. 1995)). Accordingly, the *Plastech* court concluded that PHC's use of fabricated evidence warranted dismissal of its claims with

---

[27] The *Plastech* court satisfied itself that PHC's due process rights had been preserved. 257 F.Supp.3d at 873. The defendants' motions for sanctions provided PHC with fair notice that the court may impose sanctions pursuant to its inherent authority; PHC, in turn, filed papers in opposition. *Id.* In addition, PHC had "participated fully during the hearing on the sanctions motions." *Id.* The same is essentially true here. (*See supra* n.1).

prejudice, "[t]o insure the integrity of the judicial process and deter future parties from engaging in similarly egregious conduct[.]" *Id.*

## B.    Evidence of SPL's bad faith

Bad faith "is associated with conduct that is intentional or reckless." *Plastech,* 257 F. Supp. 3d at 872 (citing, *inter alia*, *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008)). Here, the record evidence supports a finding that SPL's conduct surrounding the so-called "2000 Appointment" was undeniably intentional.[28]

Mark Peters is SPL's only managing director. (Mark Peters depo., Doc. 74 PAGEID 1643 (11:6–20, 12:2–13:2) (taken 7/1/2020)). In his words, "I run a very flat business." (*Id.* PAGEID 1643 (13:6)).[29] Also in his words, "I am the company."

Peters consistently describes SPL as "a very small family business[.]" (*Id.* PAGEID 1644 (17:21–22); *see id.* PAGEID 1645 (19:8–9), PAGEID 1662 (88–89:11)). This characterization matters, not because it rings true, but because it suits Peters' David-and-Goliath mindset:

Q. Is this litigation of any importance to you?

A. Incredibly important.

Q. Why?

A. Because we have been – we're a small family business that has worked incredibly hard to make a living and stick within the terms and conditions of many agreements, and – who owns The **Icee** Company of the trademark **seem to just want to bully us into anything they wish to do, and at some point you just have to stand up and say this is fundamentally wrong**, yes.

---

[28] The *Plastech* court noted a split in the circuits as to the burden of proof, clear and convincing versus a preponderance of evidence, with no decision yet by the Sixth Circuit. 257 F. Supp. 3d at 873. Even under the more rigorous clear and convincing standard, the undersigned concludes that SPL's bad-faith conduct has been established.

[29] "I don't really run a pyramid business, so it doesn't work in the classic pyramid business." (Doc. 74, PAGEID 1643 (13:3–9)).

A very large corporation has a lot more money and a lot more resources and this is incredibly damaging to a small family business. But at some point you just got to say, I need to – I need to try to do my best at what I'm doing, and that's why it's important.

Q. So you have personally taken charge of the litigation from the client point of view at Slush Puppie UK?

A. Yes.

(*Id.* PAGEID 1662 (88:15–89:15) (bold emphasis added)).

Once ICEE acquired the SLUSH PUPPIE® brand (from DPSU) in 2006, Mark Peters made it his mission to expand SPL's distribution rights (limited to the United Kingdom and Ireland) to the same 27 countries for which it had the exclusive right to manufacture neutral base and syrup. Fair enough. Over the course of ten years or so, he pitched every angle to ICEE's principal, Dan Fachner, with no success.[30] So, Peters took a different tack. He fabricated a contract that gave SPL just what it wanted: an "exclusive licence" that "post-dates" both the 1996 Appointment and the 1999 Agreement and "confirms" SPL rights to use the SLUSH PUPPIE® trademarks "in relation to freezers, syrups and products" throughout Europe, plus an obligation to pay only a 2.5% (versus 5%) royalty. To substantiate his forgery, Peters concomitantly ginned up a revised "History of working practise" and was careful to replicate Will Ratcliffe's signature on the 2000 Appointment rather than Diane Menzer's, inasmuch as Ratcliffe had died but Menzer—with the potential to challenge authenticity—had not.

---

[30] Peters consulted with his father, Ralph, as to strategy: "Hi Dad Sorry but even the USA lawyers I have asked just last month says the license to manufacture for Europe clearly states the [*sic*] all Distribution Licenses can only be issued by the USA – **we have zero wrights** [*sic*] – that is why I say the agreements our [*sic*] ambiguous and out dated as that is not how we have been trading. Dan is not good if you attack him and he with £100,000,000 turnover company has a big stick to hit us with if he feels like it. So I hope I have positioned my response where he knows that we have been resiving [*sic*] revenue for licenses and products sold in Europe for some time. As he is aware of this and not stopping us his position is getting weaker all the time. Love Mark[.]" (Doc. 73-6 PAGEID 1372–1373 (bold emphasis added)).

Peters concedes that his February 28, 2018 email was the first time he ever brought up the 2000 Appointment with anyone at ICEE. (Mark Peters depo., Doc. 75 PAGEID 1759–1760 (352:11–353:5) (taken 7/13/2020)). Fachner replied almost immediately, asking why this document hadn't been "produced or mentioned" all the while Peters was lobbying for expanded distribution rights and a reduced royalty percentage. ICEE would spend more than two years, and a boatload of attorneys' fees, to learn the answer to that question.

SPL retained the Benesch firm as its "U.S. intellectual property litigation counsel." The cease-and-desist letter sent to J&J Snack Foods and ICEE by partner Marc Avsec provided the seed for this civil action. The Duane Morris firm responded, questioning the authenticity of the 2000 Appointment. Benesch partner Matthew Gurbach, soon-to-be trial counsel, dug in his heels.

As previously noted, the original Complaint that SPL filed in state court alleged four claims for relief based solely on the 2000 Appointment. ICEE answered (and counterclaimed), challenging its validity. SPL then filed an Amended Complaint (per the Court's original Calendar Order) that still alleged that the 2000 Appointment had been breached, but, in the alternative, resurrected the 1996 Appointment and the 1999 Agreement. ICEE again answered (and counterclaimed) and filed an "Emergency Motion to Preserve Evidence by Compelling the Prompt Deposition of the Only Living Party Signatory to the Purported 2000 Appointment" (Doc. 30). To say that SPL "resisted" would be an understatement. In the end, though, notwithstanding a contrived medical assessment and videotapes suggesting he was too infirm to testify, the undersigned concluded that Ralph Peters could be deposed with caregivers in attendance. In addition,

the Court remotely monitored the examination (held on February 24, 2020), which son

Mark Peters attended live. Ralph Peters, almost 90 years-old, was coherent and

cooperative, though he remembered very little. He recognized his "signature" on the copy

of the 2000 Appointment he was shown, but took umbrage at the suggestion of now-

former Benesch associate Elizabeth Emanuel that "there are thoughts that this agreement

is a forgery in this lawsuit[.]" (*See* Ralph Peters depo., Doc. 84 PAGEID 2158–2159

(53:10–54:1)). With no question pending, he admonished Emanuel, and everyone else

present:

> THE WITNESS: I think that to call this a forgery is a joke. How can
> you call it a forgery? I mean . . . if it is a forgery then I must have
> forged [Stefan Loos]'s signature, and Will's signature and I presume,
> I don't know who that is, but I must have forged all those.
> And I must say that if I was in business for myself from when
> I was 17 years old here when I was what, [G]od knows what, I was
> in business for 50, 60 years, nobody has every accused me of forging
> anything. I find that quite annoying to say it is a forgery. I think that
> is outrageous to call me a forger. I have never done anything
> dishonest.

(*Id.* PAGEID 2159 (54:8–21)). Clearly it did not occur to father (Ralph) that son (Mark)

was under suspicion.

The undersigned remotely monitored approximately 80% of the continued-in-

progress deposition of Mark Peters taken on October 9, 2020. (*See* Doc. 76 PAGEID

1830–1871).[31] His testimony generally lacked candor[32] and he was entirely averse to

---

[31] Mark Peters was first deposed on July 1, 2020. (*See* Doc. 74). That deposition was continued in progress, first to July 13, 2020 (*see* Doc. 75) and next to September 29, 2020. The September 29 session was postponed to October 9, 2020 (*see* Doc. 76), because Peters, then occupying an oyster boat on the River Thames, inexplicably had no laptop to review exhibits.

[32] The undersigned was sworn to the Bench on May 25, 2006, nearly 20 years ago. Prior to that, I served as a state administrative hearing officer and a county (assistant, and later a chief) prosecutor in the felony trial division. I was subsequently engaged in private practice, both civil and criminal, representing plaintiffs and defendants, for more than 20 years. The ability to assess a witness's credibility is part and parcel of each of these roles.

answering questions about the not "genuine" 2000 Appointment, the fabricated-in-support 2011 "History of working practise" or the November 12, 2008 "Wendsday" email. His mantra throughout was, "I'm not an IT expert." (*See id.* PAGEID 1836–1837 (22:7–26:19),1837 (26:20–28:13), 1837–1838 (29:21–32:18), 1840 (38:17–40:16), 1845–1846 (60:5–65:21), 1848 (70:5–19), 1849 (75:3–76:9), 1850–1851 (78:3–83:14), 1852 (87:11–19), 1855 (100:7–23), 1863–1864 (130:20–134:22), 1865 (141:2–23), 1871 (165:1–15), 1872 (166:11–167:12), and 1877 (188:3–13)).

Peters claims he first saw the "Wendsday" email when preparing (with counsel) for his July 1, 2020 deposition. (Doc. 75 PAGEID 1747 (303:6–22)). Following up, ICEE's counsel asked for an explanation as to how Kirby could quote from the 2000 Appointment in her 20<u>08</u> email when he, Mark Peters, testified he discovered that document (in a box of his father's belongings) in 20<u>17</u>. (*Id.* PAGEID 1747–1748 (304:13–307:14), 1749 (309:12–19)). Peters was once again evasive. (*Id.* PAGEID 1748 (306:19–307:14) ("Q. Lindsay Kirby is quoting from a document in 2008 that you didn't have a copy of for nine more years, right? A. No. That's not – she had a paragraph defining how royalty is calculated. Q. And where did she get paragraph 4A from the August 8, 2000, agreement?[33] A. Don't know. Q. And doesn't that strike you – that's of no interest to you whatsoever? A. No. Q. You didn't have the document, right? A. Which document? Q. The August 8, 2000, Appointment of License agreement that is attached to the Complaint and the basis for your claims here? A. No. I didn't have it.")).

---

33 *See supra* p.11–12.

Mark Peters denied fabricating the 2000 Appointment,[34] its companion 2011 "History of working practise,"[35] and the November 12, 2008 "Wendsday" email.[36] But ICEE argues and the Court agrees that the evidence leads to the clear-and-convincing conclusion that Mark Peters cooked up these documents.

Despite an initial promise to do so, SPL never produced an original "2000 Appointment" or the oldest copy thereof supposedly located in a "file that's been found in Malaysia." (*See* Doc. 74 PAGEID 1670 (119:22–121:14) ("Q. And what sort of courier was used to sent [*sic*] it from Malaysia? A. I don't know. Q. How long has it been in transit? A. I don't know.")).[37] SPL produced metadata for all documents save for the

---

[34] (*See* Doc. 74 PAGEID 1672 (129:4–13)).

[35] (*See* Doc. 76 PAGEID 1844–1845 (57:17–61:9)).

[36] (*See* Doc. 74 PAGEID 1654 (55:2–57:14); Doc. 76 PAGEID 1838 (31:5–32:18)).

[37] Peters testified on July 1, 2020 that the "copy closest to the original" of the 2011 "History of working practise" also was *en route* from Malaysia, and would be delivered "to wherever the maid sent it[.]" (Doc. 74 PAGEID 1692–1693 (209:19–210:17)). When his deposition resumed on July 13, 2020, he was asked if the package from Malaysia had arrived yet:

> A. Not yet.
> Q. Not yet?
> A. Not yet.
> Q. Do you have any explanation for how it would take more than 12 days –
> A. No.
> Q. – for documents to go from Malaysia to the UK?
> A. No.
> Q. Do you have any tracking number for this package with a particular courier like DHL or FedEx?
> A. No.
> Q. So do you have any information at all about the whereabouts of the package that's coming from Malaysia that you think may have documents relating to the History of Working Practi[s]e in it?
> A. No.
> Q. And who has that information?
> A. Sorry. You have to ask your question again. I'm not clear what you're asking.
> Q. Who would know what happened to this package?
> A. The maid. Well, I don't know.
> Q. So there no way for you, the managing director of Slush Puppie UK, to contact somebody and find out what's happened to this package?
> A. The maid, BB.
> Q. BB is the name?

"smoking gun" ones. When SPL's hand was forced, ICEE learned that the metadata listed "markp" as author. Peters begrudgingly conceded that he is the only "markp" at SPL.[38] Review of Mark Peters' emails (generally) reveal that he is a poor speller, which would account for the misspelling of "Wednesday." More than that, one does not need to be an "IT expert" in this era of electronic communication to know that Outlook auto-fills the email header, to include the day of the week, date, and time. Plus, fabricating an email from Lindsay Kirby was somewhat of a safe bet, as she, according to Peters, embezzled £40,000 from SPL's bank account and then separated from the company. (Doc. 75 PAGEID1750 (313:20–315:14)).

One also cannot overlook the laptop debacles. Counsel for ICEE asked Mark Peters what actions he took to comply with RPC's (December 2017) litigation hold; he again equivocated. (Doc. 76 PAGEID 1858–1859 (110:16–117:14)). Peters finally gave a straightforward answer—he used only one laptop in the 2017–2018 period. (*Id.* PAGEID 1859 (117:15–17)). But, it "malfunctioned" so he took it to a "local shop" in Monaco for repair:

Q. Monaco, okay. And did you have a backup of –

A. No.

Q. – your hard drive? No?

_____

A. No. We just – the maids – they're called BB.
Q. BB?
A. Yeah.
Q. What's the name of the maid in this case?
A. I only know her as BB.
Q. It's a generic name for maid?
A. I believe so.

(Doc. 75 PAGEID 1761 (359:8–360:24)).

[38] (*See* Doc. 76 PAGEID 1837–1838 (28:2–31:4)).

A. No.

Q. So you must have lost a lot of data.

A. I don't – I try – I mainly do phone calls. I'm not so – yeah, I've had hard drives break before. My very first computer, yeah, probably did.

**Q.** Okay. **And would you have any record of getting this repaired and having them destroy it?**

A. No.

Q. So after they destroyed it, did you communicate with them, or you just said, Hey, that's great; I didn't want that anyway?

A. My French is not very good.

Q. I see. Well, how did you – how did – who – did you take – did you actually take it to be repaired?

A. Yes.

Q. Okay. And what words did you use to describe repair?

A. More sign language than probably anything else.

Q. Okay. Show me – show me on the camera what signs you used? How do you –

A. I can't recall but I –

Q. How do you sign –

A. My French is – you always – you always refer to it – you always have to say to a French person, Bonjour, or something, otherwise they don't talk to you, and parlez-vous anglaise?
        They go, Un petit peu.
        And then you sort of hand the thing over and go, Broken, broken. Do you repair?
        He goes, Yes.
        I don't know. I can't recall fully. I mean, I just – my French is – is really – well, my language skills are very poor.

**Q. And so then after they destroyed it, how did you find out that they destroyed it? Was it a phone?**

31

**A. I went to – no I went – I went to get – went to get – went to get it, and broken, poof.**

Q. That was it?  So what did you do?

A. I don't remember the exact conversation.

**Q. So – so when they said, poof, what did you do?  What did you say?**

**A. I just – I don't recall.**

**Q. That was it?**

**A. It's very French.**

**Q. And so you left it – you left this poof computer with the repair person?**

**A. I did.**

**Q. You have – do you have any records whatsoever of – of – that show the name of the repair person for the computer?**

**A. No.**

**Q. No records at all?**

**A. No.  They didn't charge me.**

**Q. What – what street are they on in Monaco?**

**A. I don't recall.**

**Q. How did you find their name?**

**A. I don't recall.**

**Q. And there's no way of finding out?**

**A. This was a while ago.  It's quite transient in Monaco.  It may have been closed.**

**Q. What do you mean a while ago?  I thought you said you don't know when it was.  What –**

**A. It was a while ago.  It wasn't yesterday.  So it's quite transient in Monaco –**

**Q. It wasn't yesterday.  Was it the day before?**

**A. I don't recall.**

**Q. When you say "a while ago," what do you mean?**
**A. Well, it wasn't yesterday.**

**Q. So you had no backup for this computer that was destroyed; is that what your testimony is?**

**A. Yes.**

Q. And you were not upset with them for destroying your computer that had no backup?

A. Nothing surprises me anymore.  I have the same thing when I take my car to be repaired.

**Q. And when did you tell your attorneys that it had been destroyed?**

**A. I can't recall.**

(*Id.* PAGEID 1860–1861 (118:1–122:3) (bold emphasis added)).  Peters acquired a replacement laptop at some later point.  Counsel agreed to arrange for it (and his phone) to be forensically imaged.  That never happened, though, because Peters' car—parked outside of SPL's headquarters in High Wycombe—was vandalized and the devices stolen.  (*Id.* PAGEID 1872–1873 (168:6–170:24); *see* Doc. 87-1 (Thames Valley Police Occurrence 43200255516)).

The Court again agreed to (remotely) monitor Mark Peters' most recent deposition (taken January 29, 2026) concerning Peter Splatt's role in SPL's transition from SLUSH PUPPIE® branded products to the new Slushy Jack's concept.  (*See* Doc. 398-1).  This

time, Peters consistently (and incredibly) responded, "I don't recall six years ago." The undersigned does, however.

In the Court's judgment, the record evidence positively establishes that Mark Peters forged documents to SPL's economic gain and then lied about it. His perjury subverted the discovery process in this litigation for nearly two years, wasting time and money. He also squandered this Court's resources, which are in short supply.

To some degree, SPL's counsel argues the playing-field principle of "no harm, no foul." But like the defendants in *Cerruti*, SPL did not withdraw the 2000 Appointment until Peters was caught.[39] 169 F.R.D. at 583; *see In re Bavelis*, 563 B.R. 672, 692–93 (S.D. Ohio 2017) (citing *Cerruti*). This argument also fails to account for Peters' tergiversations when being deposed. *See Cerruti*, 169 F.R.D. at 583. His insincerity and obfuscation were on full display in an exchange regarding his father, Ralph's, signature:

Q. – is that your father's signature?

A. Again, I'm not qualified to say whether that's my father's signature, yes or no.

Q. So you don't recognize your father's signature on the document; is that – is that what you're saying?

A. I'm just saying I'm not an expert to say that that's my father's signature, yes or no.

Q. I'm not asking whether you're an expert. You – your father is your father, right? Ralph Peters is your father, right?

A. You – you—is that a question? Is that – is that –

---

[39] (*See generally* Transcript of Proceedings, *Status Conference via Telephone on Thursday, September 29, 2022*, Doc. 174 PAGEID 5645 (28:8–15) ("THE COURT: . . . Although, you know, Eric [Zalud, trial counsel for SPL], I've said this before. It's kind of hard for me as a neutral party to fathom a Complaint that's brought pursuant to a document which supposedly changes the earlier agreements and then, failing that, you go back to assert a claim based off the earlier agreements. It just seems a little incongruous to me, but we'll have to let you guys play out your string and see where it goes.")).

Q. Is Ralph Peters – Ralph Peters was your father, right, is your father?

A. I don't understand the question. Is Ralph Peters my father?

Q. Yes, that's the question.

A. Well, he claims to be my father, yes.

Q. Are you denying that Ralph Peters is your father?

A. No. I'm just saying I don't understand the question. I don't know who my – how do I know – yeah, my – he says he's my father.

> JUDGE BARRETT: The question is very simple. Is Ralph your dad?
> THE WITNESS: Yes, he's my dad.
> JUDGE BARRETT: Are you familiar with his signature?
> THE WITNESS: I'm not – I'm not an expert. I just – I'm not an expert.
> JUDGE BARRETT: Are you familiar with his signature?
> THE WITNESS: Not – am I familiar with his signature?
> JUDGE BARRETT: Yes. Have you seen your dad sign his name before?
> THE WITNESS: Yes.
> JUDGE BARRETT: All right. David.
> MR. WOLFSOHN: Thank you, your Honor.

BY MR. WOLFSOHN:
Q. And does this look like your father's signature on page 24?

A. Well, his signature – I don't think that's fair. I'm not there. I don't know. I really don't know. My father – I'm not an expert in signatures.

Q. Let's just take a five-minute break, okay?

(*See* Doc. 76 PAGEID 1840–1841 (41:5–43:8)).

As a general principle, there is a strong preference in the law for resolving disputes on the merits and not by default. "[J]udgment against an offending party is appropriate only in extreme circumstances." *Cerruti*, 169 F.R.D. at 583 (citing *Marfia v. T.C. Ziraat Bankasi, N. Y. Branch,* 100 F.3d 243, 248–49 (2d Cir.1996)). But, as in *Cerruti*, "[t]he

circumstances here are extreme because we are dealing here with repeated rather than with isolated or discrete abuses." *Id.* at 583.  Similarly, Mark Peters' (and, therefore, SPL's) misconduct "did not concern a peripheral or an incidental matter," but, rather, "goes to the heart of the case[.]" *Id.*  SPL tenders a remarkable set of circumstances: it concedes that the sole document (the 2000 Appointment) underpinning the original Complaint is not "genuine," but only after contentious discovery and confrontation does it withdraw that document and matter-of-factly pivot to documents (the 1996 Appointment and the 1999 Agreement) previously referred to in the First Amended Complaint as "superseded" by the not "genuine" one.

SPL argues against the imposition of sanctions, period.  This all-or-nothing result is problematic.[40]

As noted, use of fabricated evidence in *Plastech* prompted that district judge to dismiss the plaintiff's claims with prejudice, "[t]o insure the integrity of the judicial process and deter future parties from engaging in similarly egregious conduct[.]"  257 F. Supp. 3d at 878.  This Court will do the same, for the same reasons.

The Court also will award ICEE its attorneys' fees (and costs) for time spent uncovering Mark Peters' forgeries, which were crafted to boost SPL's bottom line.  And, in turn, his own.[41]

---

[40] On its own initiative, the Court considered whether imposition of some lesser sanction might tick the boxes of gravitas and deterrence.  No other penalty suggested itself.

[41] When he was deposed on July 1, 2020, Mark Peters testified that he owned 90% (and his father, Ralph, the remaining 10%) of the shares in Ralph Peters & Sons, the holding company that owned SPL.  (*See* Doc. 74 PAGEID 1649 (34:1–35:8)).  When he was deposed on October 29, 2025, Mark Peters confirmed that Ralph Peters & Sons owns 100% of the shares of Frozen Brothers Limited, the successor company to SPL.  (*See* Doc. 376 18482–18484 (9:22–11:22)).  He (now) is the sole (100%) shareholder of Ralph Peters & Sons; plus, Peters owns 100% of the shares of Frozen Brothers Limited.  (*Id.*).

## III.  CONCLUSION

Based on the foregoing, The ICEE Company's ("ICEE") Motion for Sanctions against Slush Puppie Limited ("SPL") (Doc. 73) is hereby **GRANTED**.  The four (remaining) claims in SPL's Second Amended Complaint—(Breach of Contract – Declaratory Judgment (1996 Appointment)); Breach of Contract – Declaratory Judgment (1999 A[greement]); Breach of Contract – Damages (1996 Appointment); and Breach of Contract – Damages (1999 A[greement]))—are **dismissed with prejudice**.  Additionally, the Court will award to ICEE its reasonable attorneys' fees (and costs) incurred through the filing of its reply in support of sanctions (Doc. 87) on December 2, 2020.  ICEE may also include the fees (and any costs) incurred to submit a fee application to the Court.  A briefing schedule on the matter of fees will be set once trial (on the merits) concludes.[42]

**IT IS SO ORDERED.**

/s/ *Michael R. Barrett*
JUDGE MICHAEL R. BARRETT

_____

[42] As of this writing, SPL will be responsible to pay 100% of the award.  In the event the undersigned grants the pending Motion for Sanctions (Doc. 89) against past and present trial counsel—collectively referred to as the Benesch Respondents—liability may either be apportioned or shared as joint and several.