IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

SLUSH PUPPIE LIMITED,

    Plaintiff/Counterclaim/Defendant

    v.

THE ICEE COMPANY,

        Defendant/Counterclaim
Plaintiff

CASE NO. 1:19-cv-00189-MRB

**COUNTERCLAIM PLAINTIFF THE ICEE
COMPANY'S AMENDED COUNTERCLAIMS**

For its amended counterclaims against Slush Puppie Limited ("SPL"), The ICEE Company

("ICEE") pleads as follows:

**PARTIES AND JURISDICTION**

1. On information and belief, counterclaim defendant Slush Puppie Limited is a

company organized under the laws of the United Kingdom, with its principal place of business at

Coronation Road, Cressex Business Park, High Wycombe, Buckinghamshire, HP12 3TA.  On

information and belief, Slush Puppie Limited has changed its name to Frozen Brothers Limited.

2. Counterclaim Plaintiff The ICEE Company is a corporation organized under the

laws of the State of Delaware, with its principal place of business at 265 Mason Road

La Vergne, TN 37086.

3. This Court has subject matter jurisdiction over these counterclaims based on

diversity of citizenship, 28 U.S.C. § 1332(a)(2) since the amount in controversy exceeds the sum

or value of $75,000 exclusive of interest and costs, and the counterclaims are between a citizen

of a State and a citizen of a foreign state.

4. This Court has personal jurisdiction over SPL because, among other reasons, SPL

has consented to personal jurisdiction by filing its Complaint, Amended Complaint, and Second Amended Complaint in this District, by forging a contract and having it provide for jurisdiction in this district and then suing on that forged contract, and because these counterclaims arise from the same nucleus of operative facts as alleged in the Complaint, Amended Complaint, and/or Second Amended Complaint.

## FACTS

### THE SLUSH PUPPIE® BUSINESS AND MARKS

5.      The SLUSH PUPPIE® frozen drink business was started by Willard ("Will") Radcliff, who founded the Slush Puppie Corporation in Cincinnati, Ohio and built it into a successful international business.

6.      From around 1978 until early 2001, Slush Puppie Corporation owned the trademarks for SLUSH PUPPIE® along with various logos and designs used in connection with Slush Puppie Corporation's goods and services (collectively, the "SLUSH PUPPIE® Marks").

7.      The SLUSH PUPPIE® Marks and various logos and designs are registered trademarks in the United States, the United Kingdom, and the European Union, among other places.  Among other marks, the SLUSH PUPPIE® Marks include:

   a. U.S. Trademark Registration No. 1,665,188 covering "nonalcoholic slush type beverages, syrups, and preparations for making slush type beverages,"

   b. U.S. Trademark Registration No. 3,132,350 covering "clothing, namely tops, t-shirts, pants and loungewear, headwear, jackets and footwear."

8.      Since 2006, ICEE has been the owner of the Slush Puppie business and of the SLUSH PUPPIE® Marks, which it bought from Dr. Pepper/Seven Up, Inc. ("DPSU") pursuant to an asset purchase agreement.  DPSU, in turn, had purchased the business from Slush Puppie Corporation in a 2001 asset purchase agreement.

9. By virtue of its purchase of certain SLUSH PUPPIE® assets from DPSU, ICEE assumed two contracts with SPL relating to SPL's rights to certain limited use of certain SLUSH PUPPIE® Marks: a 1996 Appointment of Syrup Manufacturer that had been entered into by Slush Puppie Corporation and Able Foods, Ltd. ("the 1996 Manufacturing Appointment") and a 1999 "International Independent Area Distributor License Agreement" with SPL (the "1999 Distributor Agreement").

## THE 1996 MANUFACTURING APPOINTMENT

10. The 1996 Manufacturing Appointment was originally entered into on or about January 1, 1996, by Slush Puppie Corporation and SPL's predecessor, Able Foods, Ltd. A copy of the 1996 Manufacturing Appointment is attached hereto as Exhibit A.

11. The 1996 Manufacturing Appointment provided SPL with a limited license to manufacture SLUSH PUPPIE syrup and neutral base for use with SLUSH PUPPIE machines and products in certain European countries and the United Kingdom.

12. Section 3A of the 1996 Manufacturing Appointment defines the "royalty" SPL must pay as "an amount proportionately equal to 5% of the cost of SLUSH PUPPIE's products in pound sterling prices to distributors in the U.K. for the previous calendar year."

13. The 1996 Manufacturing Appointment provides in paragraph 8.D that Slush Puppie Corporation may cancel and terminate the appointment by written notice to SPL for, among other reasons, "[t]he filing of any legal action other than for collection on account against SLUSH PUPPIE, its representatives, distributors, customers, manufacturers, or suppliers....... "

14. The 1996 Manufacturing Appointment provides that, "[u]pon any termination of this Agreement, [SPL] shall make no claim of any kind because of such termination, and [SPL] agrees to waive, and does hereby waive the right to any compensation which may be allowable or imposed for such termination as liquidated damages or other such payments, if any. The

termination of this agreement, as herein provided, shall not affect [SPL's] obligation to pay any amount accruing to SLUSH PUPPIE or any of its affiliates under the provisions of the agreement while it was in effect."

15.     The 1996 Manufacturing Appointment provides that, upon termination, "Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever ......."

16.     The 1996 Manufacturing Appointment provides that, "[u]pon any termination, Manufacturer shall immediately cease and desist from further use of any SLUSH PUPPIE trademarks, names, logos or references and any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products."

17.     Will Radliff executed the 1996 Manufacturing Appointment on behalf of the Slush Puppie Corporation on February 5, 1996.

18.     Diane Menzer, a vice president of the Slush Puppie Corporation, witnessed Will Radcliff's execution of the 1996 Manufacturing Appointment.

### THE 1999 DISTRIBUTOR AGREEMENT

19.     On or about December 23, 1999, Slush Puppie Corporation entered into the 1999 Distributor Agreement.  A copy of the 1999 Distributor Agreement is attached hereto as Exhibit B.

20.     The 1999 Distributor Agreement became effective on January 1, 2000.

21.     The 1999 Distributor Agreement provided SPL with a limited license to distribute certain SLUSH PUPPIE® Products as therein defined within the defined territory of the United Kingdom and Ireland.

22.     Paragraph VIII.F. of the 1999 Distributor Agreement provides, *inter*

*alia*, that "COMPANY may, for good cause, IMMEDIATELY terminate this grant of Independent Area Distributor License upon written notice to DISTRIBUTOR, without regard to the above stated cure provisions, where DISTRIBUTOR has committed or COMPANY reasonably anticipates that DISTRIBUTOR is about to commit any of the following acts: . . . 4. The filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers or suppliers."

23. Paragraph III.B of the 1999 Distributor Agreement provides, *inter alia*, that, "[u]pon termination of this Agreement, DISTRIBUTOR shall return to COMPANY, or effectively destroy, all literature, signs, advertising material, promotional matter, and other materials identifying the former DISTRIBUTOR with COMPANY or its PRODUCTS and shall immediately cease to identify itself with COMPANY or use the MARKS or any confusing similarity thereof, and shall discontinue or change it's [sic] company name if DISTRIBUTOR employed any such company name or product mark as a part of DISTRIBUTOR'S name, logo, or business. It is agreed that after expiration (without renewal) or termination of this agreement, any use of the MARKS by DISTRIBUTOR will result in irreparable injury to COMPANY and DISTRIBUTOR hereby consents to a court order enjoining DISTRIBUTOR from using the MARKS in any way, notwithstanding any other enforcement remedy."

24. Paragraph VI.H of the 1999 Distributor Agreement provides, *inter alia*, that "[a]ny breach of this DISTRIBUTOR Agreement, or termination ...... shall, of necessity, require Distributor to immediately cease and desist from the further use of the Slush Puppie name and logo, and return any and all PRODUCTS, materials, signs, emblems, and the like, bearing the Slush Puppie name and logo, to COMPANY in Cincinnati, Ohio, freight prepaid."

25. The 1999 Distributor Agreement defines "COMPANY" as Slush Puppie

Corporation and DISTRIBUTOR as SPL.

26.     The 1999 Distributor Agreement was executed on behalf of the Slush Puppie Corporation by Diane Menzer, a vice president of the company.  Tara Behanan witnessed Menzer's execution of the agreement.

**DR. PEPPER/SEVEN UP BUYS THE SLUSH PUPPIE® BUSINESS IN 2001 AND CONTINUES OPERATING UNDER THE 1996 AND 1999 AGREEMENT**

27.     In or around January 2001, Dr. Pepper/Seven Up, Inc. ("DPSU") purchased the SLUSH PUPPIE® Marks and related business from Slush Puppie Corporation pursuant to an asset purchase agreement.

28.     SPL has alleged in this litigation that Slush Puppie Corporation and SPL entered into an "Appointment of Trade Mark Licence" on or about August 8, 2000 and that this purported agreement superseded the 1996 and 1999 agreements.  SPL further alleged that a "true and correct" copy of the original 2000 "Appointment of Trade Mark Licence" was attached to SPL's amended complaint (Doc. 27) at Exhibit D.

29.     The "2000 Appointment of Trade Mark Licence" ("Purported 2000 Agreement") referred to in SPL's Amended Complaint, however, was never provided to DPSU as part of its acquisition of certain SLUSH PUPPIE® assets.

30.     Moreover, SPL never provided DPSU with a copy of the Purported 2000 Agreement at any time before or during DPSU's ownership of the SLUSH PUPPIE® business.

31.     DPSU did, however, receive copies of the 1996 Manufacturing Appointment and of the 1999 Distributor Agreement in connection with its purchase of the SLUSH PUPPIE® assets.

32.     DPSU operated pursuant to the 1996 Manufacturing Appointment and the 1999 Distributor Agreement during its ownership of the Slush Puppie business.

33.     In approximately late 2000 or early 2001, SPL and Slush Puppie Corporation agreed to lower the royalty rate to be paid under the 1996 Manufacturing Appointment to 2.5%.

34.     On February 7, 2001, Diane Menzer, a former Slush Puppie Corporation employee who worked for DPSU after its acquisition of the SLUSH PUPPIE® business, informed Kim Yee of DPSU by fax that the 1996 "manufacturing license" needed "to be adjusted to reflect the 2 ½% commission" that had been lowered by agreement from its original 5%.  The fax references paragraph  "(3A)," which is the section of the 1996 Manufacturing Appointment that defines the royalty payable by SPL.

35.     Menzer believed that the 1996 Manufacturing Appointment was still in effect as of February 7, 2001.

36.     Beginning at some point in 2000 or early 2001, SPL compensated Slush Puppie Corporation and its successors with royalty payments of only 2.5% of the total cost of syrups charged and sold to distributors after appropriate discounts.

**ICEE BUYS THE SLUSH PUPPIE® BUSINESS AND CONTINUES OPERATING UNDER THE 1996 AND 1999 AGREEMENT**

37.     In May of 2006, ICEE and Dr. Pepper/Seven Up, Inc. entered into an asset purchase agreement relating to the SLUSH PUPPIE® business and trademarks.

38.     As a result of the asset purchase agreement with DPSU, ICEE became the owner of the SLUSH PUPPIE® business and trademarks throughout the world.

39.     By Trademark Assignment dated May 26, 2006, ICEE acquired all right, title, and interest of Dr. Pepper/Seven Up, Inc. with respect to the SLUSH PUPPIE® Marks in various geographic territories throughout the world, including, without limitation, in the United States and, for purposes of this action, specifically in the territories listed in the 1996 Manufacturing

Appointment and the 1999 Distributor Agreement.  A copy of the Trademark Assignment is attached hereto as Exhibit C.

40.     ICEE never received a copy of the Purported 2000 Agreement as part of its acquisition of the SLUSH PUPPIE® business from DPSU.

41.     The Purported 2000 Agreement was not listed or referenced on any of the disclosure schedules or anywhere else in the asset purchase agreement between DPSU and ICEE.

42.     ICEE did receive copies of the 1996 Manufacturing Appointment and 1999 Distributor Agreement from DPSU in connection with ICEE's purchase of the SLUSH PUPPIE® assets.

43.     ICEE operated pursuant to the 1996 Manufacturing Appointment and the 1999 Distributor Agreement in its relationship with SPL following the acquisition of the SLUSH PUPPIE® business from DPSU.

44.     ICEE understood that the 1996 Manufacturing Appointment and the 1999 Distributor Agreement had not been superseded by any more recent, written agreement.

45.     ICEE accepted 2.5% as a royalty under the 1996 Appointment on the basis of the modification between the parties of the royalty rate from 5% to 2.5%, as reflected in Ms. Menzer's February 7, 2001 fax to Ms. Yee.

**SPL REPEATEDLY CONCEDES THAT THE OPERATIVE LICENSING AGREEMENTS BETWEEN THE PARTIES ARE THE 1996 MANUFACTURING AGREEMENT AND THE 1999 DISTRIBUTOR AGREEMENT**

46.     Between 2010 and 2018, SPL and ICEE engaged in discussions about the scope of SPL's rights to use the SLUSH PUPPIE trademarks.  Some of those discussions took place in the United States.

47.     In the course of the discussions of ICEE and SPL between 2010 and 2017, SPL repeatedly affirmed that the 1996 Manufacturing Appointment and the 1999 Distributor Agreement were in effect between SPL and ICEE.

48.     In the course of the discussions between ICEE and SPL between 2010 and 2017, SPL affirmed that there was no written agreement other than the 1996 and 1999 agreements that governed SPL's and ICEE's relationship.

49.     For example, on August 8, 2017, SPL's United Kingdom counsel, Josh Conroy of Weightmans LLP, sent a letter to ICEE's United Kingdom counsel.  In that letter, Mr. Conroy referred to the 1996 Manufacturing Appointment and the 1999 Distributor Agreement together as the "Existing Agreements" and wrote that "[I]t is clear that the Existing Agreements form the basis of the relationship between Slush Puppie and ICEE."  A copy of Attorney Conroy's August 8, 2017 letter is attached hereto as Exhibit D.

50.     Between 2010 and February 28, 2018, SPL always referred to the 1996 Manufacturing Appointment and 1999 Distributor Agreements as the operative written agreements between the parties.

## MARK PETERS FORGES THE PURPORTED 2000 AGREEMENT

51.     SPL's Managin Director--Mark Peters--however, was not happy with the limited rights provided under the 1996 Manufacturing Appointment and the 1999 Distributor Agreement, even though he had signed the latter.

52.     Peters argued to ICEE that certain oral understandings, procedures, and methods, and "working practise" gave SPL broader rights than those contained in the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.

53.     According to Peters, procedures and methods established over the 35 years before 2010 gave SPL the responsibility to represent, license, manufacture, and sell Slush Puppie

products in Europe.

54.     But Peters knew from his own attorney that the written agreements did not support the rights he claimed.

55.     Peters' American lawyers had told him in 2010 that SPL had "zero wrights" [*sic*] outside of those set forth in the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.

56.     Nonetheless, Peters attempted to convince ICEE's American lawyers that there was a "working practise" that provided SPL with broader trademark rights to ICEE's SLUSH PUPPiE® trademarks than the rights set forth in the 1996 and 1999 agreements.

57.     In 2011, Peters sent ICEE's counsel a document titled "History of Working Practise," claiming that "my father [Ralph Peters] and Will Radcliffe [sic] have documented the history behind the agreements we have today and what they intended the agreements to secure for both parties."

58.     The PDF that Peters sent ICEE's counsel is dated February 16, 2011 and has the file name "Will & RPP History of SP USA Contrat [*sic*] V1.pdf."  It is signed by both Ralph Peters and Will Radcliff, along with two witnesses:



Signed by Ralph Peters  Date

in the presence of

Signed by Will Radcliff  Date

in the presence of

59.     This History of Working Practise claims to trace the "history" of the parties' relationship up to 1996.

60.     In discovery, SPL's counsel at the Benesch firm never produced this document.

61.     Between 2011 and 2017, Mark Peters attempted to negotiate various agreements with ICEE that would supersede the 1996 Manufacturing Appointment and 1999 Distributor Agreement, but he was unable to reach a deal.

62.     Mark Peters then set out to defraud ICEE out of its trademark rights by creating in 2017 a fake "Appointment of Trade Mark Licence," dated August 8, 2000.

63.     The forged 2000 Appointment purported to grant SPL "the exclusive use of the SLUSH PUPPIE trademark(s)" in a broad range of European territories:

THIS APPOINTMENT IS LIMITED TO THE CONDITIONS OF THIS AGREEMENT, AND SHALL BE WITHIN THE FOLLOWING DEFINED "TERRITORY".

The exclusive TERRITORY is defined as, the following geographical entities or States as each is defined to exist as of the date of this Agreement:

| | | | |
|---|---|---|---|
| Austria | Belgium | Bosnia/Hercegovina | Croatia |
| Cyprus | Czech Republic | Denmark | Finland |
| France | Germany | Gibraltar | Greece |
| Hungary | Ireland | Italy | Liechtenstein |
| Luxembourg | Macedonia | Malta, Gozo | Monaco |
| Montenegro | Netherlands | Norway | Poland |
| Portugal | Serbia | Slovakia | Slovenia |
| Spain | Sweden | Switzerland | UK |
| Vatican City | | | |

1) SPL is hereby appointed the Territory, which shall be its exclusive area for the SLUSH PUPPIE trademark(s).

64.    Peters wanted any dispute regarding the SLUSH PUPPiE® trademark rights to be resolved in the American courts, so he put a provision in the forged agreement that provided that the exclusive venue for any litigation arising from or in any way connected with the agreement would be in Ohio.

65.    Peters copied Radcliff's signature and that of a witness from the 2011 History of Working Practise into the forged 2000 Appointment:

66.    Radcliff had died before Peters engaged in this fabrication--in 2014--a fact that

Peters was aware of in 2017.

67. After fabricating the 2000 Appointment, Peters sent it to Solicitor Charles Suchett-Kaye at the British law firm of Reynolds Porter Chamberlain ("RPC") on November 20, 2017.

68. Peters also attached a "History of Working Practise" to his November 20, 2017 email to Suchett-Kaye, but he changed the 2011 version to conceal his lifting of the Radcliff signature from the original "History" and his pasting of it into the forged 2000 Appointment.

69. While the 2011 version of the History of Working Practise ended with entries up to the year 1996, Peters added two entries for 2000 that paraphrased paragraph 4A of the forged 2000 Appointment:

> 2000 - End 2000
> WR and RPP agree that all merchandising and any sub licensing, brand, protection, exclusive manufacturing rights and the right to use the trade mark Slush Puppie as Slush Puppie Ltd see fit for all of the UK, Southern Ireland and Europe have been vested to Slush Puppie Ltd for in perpetuity, in return for a revised royalty payment that is to be an amount proportionally equal to 2.5% of the cost of Slush Puppie syrups in pounds sterling prices to distributors in the UK for the previous calendar year
>
> 2001
> Slush Puppie Corporation is Sold to Dr Pepper/Seven Up Inc

70. Peters also replaced the original Radcliff signature and witness signatures with a different Radcliff signature and a different witness name:



71. The metadata for this document show that it was created on November 20, 2017 from a Microsoft Word document titled "Will RPP history of SP USA Contrat [sic] V1.1" and authored by "markp." These metadata were intact when the documents was received by both RPC and the Benesch attorneys in Ohio representing SPL.

72. As of November 20, 2017, the only person at SPL named Mark with a last name beginning with a "P" was Mark Peters.

73. On December 20, 2017 RPC told Peters that "anything that fixes ICEE with knowledge of" the 2000 Appointment "or shows that ICEE has been working to its terms, would be helpful."

74. After receiving this email, Peters fabricated such "helpful" evidence.

75. Peters copied and pasted a genuine November 11, 2008 email generated in Microsoft Outlook from ICEE's Jerry Bird to SPL's then finance director, Lindsay Kirby, on which Peters had been copied, seeking "supporting information on how the 2007 Royalty was determined," into a Microsoft Word document.

76. The only people at SPL who received the genuine email with ICEE's Jerry Bird were Lindsay Kirby and Mark Peters. Kirby left SPL in 2009, so the only person at SPL who had access to the genuine email exchange was Mark Peters.

77. Peters then typed up a reply to the genuine November 11 email in Word saying

that the "royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000."

From: Lindsay Kirby [mailto:lindsay.kirby@slushpuppie.co.uk]
Sent: Wendsday, November 12, 2008 10:57 AM
To: Bird, Jerry
Subject: Royalty 2007

Dear Jerry,

The royalty is calculated as defined in the Trade Mark Licence dated August 8, 2000.

On page two - A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory.  Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

Is this what you need?

Regards,
Lindsay

78.     "Kirby's" November 12  email paraphrases Paragraph 4A of the 2000 Appointment of Trade Mark Licence.

79.     As noted, Kirby had left SPL in 2009.

80.     In the November 12, 2008 email purportedly from Kirby, Peters mis-spelled "Wednesday" as "Wendsday."

81.     Since the time, date, and day of the week of an email are and were at the time automatically generated by Microsoft Outlook, the mis-spelling of Wendsday made it clear to anyone who noticed the misspelling that the November 12, 2008 email was not genuine.

82.     The metadata for this document show that the pdf was created by "markp" from a "Microsoft Word – Document2" created on January 17, 2018.

83.     Both RPC and the attorneys at the Benesch firm who represented SPL received the PDF document containing the forged November 12, 2008 email with these metadata.

84.     As of January 17, 2018, the only person at SPL named Mark with a last name beginning with a "P" was Mark Peters.

85.     On that same date—January 17, 2018—Peters sent the Kirby email to RPC, asking "Is this of any help?"

86.     On April 17, 2018, Ben Mark at RPC sent the "Wendsday Email" with its metadata to Mark Avsec and Eric Zalud of the Benesch firm, who had been hired to initiate litigation in Ohio.  Noting that this email exchange was "helpful," Ben Mark informed Avsec and Zalud that the "Wendsday Email" was "the only correspondence around this time dealing with the issue."

87.     Until February 28, 2018, SPL never mentioned the Purported 2000 Agreement with ICEE.

88.     Until February 28, 2018, SPL never provided ICEE with a copy of the Purported 2000 Agreement.

89.     On or about February 28, 2018, Mark Peters sent a copy of the Purported 2000 Agreement for the first time to ICEE.  A copy of Mr. Peters' February 28, 2018 email is attached hereto as Exhibit E.

90.     In his February 28, 2018 email to ICEE's Dan Fachner, Peters claimed that the 2000 Appointment gave SPL "the exclusive rights to use the SLUSH PUPPIE trade mark in Europe in relation to freezers, syrups and products for the promotion of the SLUSH PUPPIE trade mark."

91.     In reply, ICEE's Dan Fachner asked Peters where the 2000 Appointment came from and why it had never previously been produced or mentioned in the past decade.

92.     Peters responded to Fachner's questions by stating that the 2000 Appointment "was in fact raised with ICEE many years ago (even though, as an oversight, it was not mentioned in more recent correspondence) – and indeed royalties have been paid by us, and accepted by ICEE, under that agreement for many years."

93.     That claim was false.

94.     On April 25, 2018, ICEE counsel at Gowling informed SPL's U.K. trademark

counsel that Peters had failed to say where the 2000 Appointment had come from, or to explain why it had not previously been produced.  Gowling further stated that ICEE would not accept that the 2000 Appointment had any binding effect, or which should be considered further as part of any discussions.

95.     On May 3, 2018, SPL's U.K. counsel at RPC expressed doubts about the authenticity of the 2008 "Wendsday Email," noting to Mark Peters himself that it was curious that the email ended with the question "is this what you need?" when Peters was unable to produce any response to that question: "One point to mention is that the risk of relying on the 2008 email without having done full searches is that any response and subsequent correspondence could be highly relevant – we note in particular the email ends with a question 'is this what you need?'"

96.     Yet neither RPC nor Benesch ever conducted "full searches" of SPL's email to try and authenticate the "helpful" "Wendsday Email" that purported to be from 2008.

97.     On August 17, 2018, SPL's American counsel—specifically, Mark Avsec of the Benesch firm—responded to Gowling's letter.

98.     Avsec's August 17, 2018 letter insisted that "there is no question that the parties have been operating under the terms of the 2000 Agreement (including its royalty provisions) since ICEE's acquisition of the SLUSH PUPPIE brand and business in 2006."

99.     Avsec further stated that the 2000 Appointment "supersedes all previous agreements between or among the parties (or their predecessors-in-interest)" and that it "granted SPL the perpetual and exclusive use of the SLUSH PUPPIE trademarks in connection with the manufacturing and distribution of SLUSH PUPPIE products" in the U.K. and Europe.

100.    Avsec insisted that Ohio law applied to the parties' trademark rights in the U.K. and Europe, and that "any dispute must be litigated in the State of Ohio."

101. Avsec demanded that ICEE immediately cease and desist from licensing third parties with distribution rights to SLUSH PUPPiE, and that ICEE immediately contact licensees and instruct them to cease and desist as well.

102. Meanwhile, RPC told Mark Peters to preserve relevant evidence for potential litigation in December 2017, and sent him RPC's Litigation Guide, which included a section on preserving documents.

103. Notwithstanding receiving this litigation hold, Peters later destroyed all digital evidence of his various fabrications.

104. On September 25, 2018, RPC attorney Holly Pownall and Benesch attorneys Matt Gurbach, Ron House, and Mark Avsec exchanged emails in which they noted how important the "Wendsday Email" was to trying and prove in litigation in United States courts that the forged 2000 Appointment was genuine.

**SPL FILES A MERITLESS LAWSUIT BASED ON THE FORGED 2000 APPOINTMENT**

105. ICEE refused to accede to Avsec's demand that it cease and desist from licensing its SLUSH PUPPiE® trademarks.

106. On February 12, 2019, SPL filed a complaint initiating this action and asserting various claims against ICEE in the Court of Common Pleas of Hamilton County, Ohio.

107. The complaint alleges that it attaches a "true and correct copy of the 2000 Appointment," but SPL knew that to be a false statement.

108. Any "original" of the 2000 Appointment was on Mark Peters' laptop, which he destroyed at some point after he received a litigation hold from RPC.

109. ICEE removed SPL's lawsuit to this Court on March 8, 2019.

110. As noted above, under the 1996 Manufacturing Appointment, ICEE is entitled to terminate the appointment based on "the filing or any legal action other than for collection on account against SLUSH PUPPIE, its representatives, distributors, customers, manufacturers, or

suppliers." The claims that SPL asserted in the initial complaint in this action are not for collection on account.

111.     As further noted above, under the 1999 Distributor Agreement, ICEE is entitled to terminate the agreement based on "the filing by [SPL] of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers, or suppliers."

112.     On June 25, 2019, ICEE sent notice to SPL that it was immediately terminating SPL's rights under the 1996 Manufacturing Appointment and 1999 Distributor Agreement based on SPL's filing of this litigation against ICEE. A copy of that notice is attached hereto as Exhibit F.

113.     ICEE's terminations of the 1996 Manufacturing Appointment and 1999 Distributor Agreement were proper under the terms of those agreements, as this Court has held.

114.     SPL received ICEE's notice of termination no later than the end of June 2019.

115.     SPL has acknowledged receipt of the June 25, 2019 notice of termination of the 1996 and 1999 agreements.

116.     As of the time that SPL received ICEE's notice of termination, SPL had no right to use, license, or sublicense any of the SLUSH PUPPIE® Marks.

### SPL FAILS AND REFUSES TO COMPLY WITH THE TERMINATION PROVISIONS OF THE 1996 AND 1999 AGREEMENT

117.     Notwithstanding receiving notice of termination, SPL failed and refused to comply with its various termination-related obligations under the 1996 Manufacturing Appointment and 1999 Distributor Agreement, including, but not limited to, failing to cease using the SLUSH PUPPIE® Marks, continuing to hold itself out as a licensee of the SLUSH PUPPIE® Marks in its business and on its website, and maintaining its relationships with its current licensees for slush beverages and other products, among other breaches and infringements.

118.     SPL even claimed without any basis that ICEE's termination of the 1996 Appointment and 1999 Agreement is "a nullity" based on its fraudulent claim that the Purported 2000 Agreement "supersedes" the 1996 and 1999 agreements.  June 28, 2019 letter from M. Gurbach to D. Wolfsohn, Exh. G.

119.     Yet, at the same time, SPL claimed in its Amended Complaint that the 1996 Manufacturing Appointment and 1999 Distributorship Agreement were still in effect and that the Purported 2000 Agreement did *not* supersede the 1996 and 1999 agreements.

120.     SPL's argument that, on the one hand, the Purported 2000 Agreement superseded the 1996 and 1999 agreements but, on the other hand, the 1996 and 1999 agreements are somehow still in effect is nonsensical and has been made in bad faith.

121.     SPL's continued insistence in this U.S. litigation after ICEE's termination that the forged 2000 Appointment governed the parties' trademark rights was made to allow it to continue to infringe ICEE's SLUSH PUPPiE trademarks and to force ICEE to incur huge costs as a result of that litigation in an effort to impede ICEE from stopping SPL from continuing to use the SLUSH PUPPiE® trademarks.

## SPL'S AMERICAN LAWYERS ARE DIRECTED BY SPL'S MARK PETERS TO ENGAGE IN DISCOVERY MISCONDUCT AND DELAY SO THAT SPL CAN CONTINUE TO INFRINGE ICEE'S SLUSH PUPPIE TRADEMARKS

122.     Beginning in the summer of 2019, the parties began discovery in this case.

123.     By November 18, 2019, SPL had produced 3568 pages of responsive documents.

124.     Because SPL's litigation counsel at the Benesch firm had doubts about the authenticity of the Kirby email, they initially withheld it from production despite the fact that they had received it on April 27, 2018.

125.     SPL's litigation counsel at the Benesch firm also withheld from production the 2011 version and the forged version of the History of Working Practise, even though they had

received those documents from RPC in 2017 and/or 2018.

126.    In February 2020, SPL's litigation counsel at the Benesch firm produced the Kirby email to ICEE in an effort to convince ICEE to settle this case.

127.    This was shortly before SPL urged the Court to declare a moratorium during which the parties would be required to engage in settlement negotiations.

128.    With ICEE pressing for a deposition of Peters, SPL's litigation counsel at the Benesch firm became concerned that the optics of the "Wendsday Email" would not be favorable if Peters had to testify about it at a deposition.

129.    On February 25 and 26, 2020, SPL counsel Ron House, copying co-counsel Gurbach, Avsec, Turk, and Emanuel, wrote to Peters, attaching the "Wendsday Email."  House attached the email string, noting that it had been received from RPC "early in the case."  House said that he needed "to know whether the attached e-mail string can be retrieved in native format by your IT people and where the string came from.  The word 'Wednesday' is misspelled as 'Wendsday' in the date of the top e-mail.  An explanation is critical so please have your IT people look at this as soon as able and prior to your deposition."

130.    Peters failed to provide any of the Benesch lawyers with an explanation for why "Wendsday" was misspelled.

131.    Concerned about how Peters would testify, the Benesch lawyers cancelled Peters' deposition, which had been scheduled for February 27, 2020, and filed for a moratorium of discovery.

132.    Peters next falsely claimed to the Benesch attorneys that SPL's "IT person" was away and could not respond but would be back in a few days.

133.    House and the other Benesch attorneys had still not received an explanation for the mis-spelling of Wendsday as of March 3, 2020.  On that date, House wrote: "Finally, with

your IT person back please have that person search for the November 12, 2008 email from Lindsay Kirby to Jerry Bird in native format.  And we need to know where the e-mail came from.  This is critical."

134.    House asked these questions of Peters because House knew that the spelling of "Wendsday" had to mean that the email had been forged.

135.    None of SPL's counsel at Benesch ever received information from SPL's "IT people" about the Wendsday email.

136.    None of SPL's counsel at Benesch ever received an explanation from Peters for why "Wendsday" was misspelled.

137.    None of SPL's counsel at Benesch ever received a native version of the "Wendsday Email."

138.    No later than early March 2020, Benesch attorneys House and Gurbach knew that it was likely that Mark Peters had created the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

139.    Although they had noticed the mis-spelling of "Wendsday" no later than February 2020, as of early March 2020, Benesch attorneys House and Gurbach had no plausible explanation for the mis-spelling of Wendsday in the November 12, 2008 email between Lindsay Kirby and Jerry Bird other than that it was written by Mark Peters.

140.    Between early March 2020 and late June 2020, the Benesch attorneys did nothing to inform the Court or ICEE about their suspicions that Mark Peters had forged the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

141.    On June 25, 2020, Benesch attorney Matt Gurbach spoke with RPC attorney David Cran about the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

142.    The June 25, 2020 call was prompted by the fact that Mark Peters' deposition via

Zoom had been ordered by the Court—over Benesch's objections—to take place on July 1, 2020.

143. During the June 25, 2020 call, the attorneys from Benesch and RPC shared their suspicions that Mark Peters had written the "Wendsday Email" himself.

144. Later that day, Benesch attorneys Gurbach and House discussed the November 12, 2008 email from Kirby to Bird with Peters.  Again, Peters had no explanation for the misspelling of Wendsday and had never found a native version.

145. The June 25, 2020 conversation with Peters confirmed for the Benesch attorneys that Peters had forged it.

146. The Benesch attorneys were aware that no other person at SPL would have had the means, motive, or opportunity to forge this email.

147. None of the Benesch attorneys ever informed ICEE or its counsel about their suspicions that Mark Peters had written the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

148. Despite suspecting that Mark Peters was a forger and that Peters had tried to "corroborate" the authenticity of the 2000 Appointment with the "Wendsday Email," SPL's attorneys at Benesch continued to insist in discovery that the forged 2000 Appointment governed the parties' trademark rights and superseded the 1996 Manufacturing Appointment and the 1999 Distributor Agreement.

149. SPL's attorneys at Benesch even denied in discovery that Mark Peters had written the November 12, 2008 email between Lindsay Kirby and Jerry Bird.

150. SPL's attorneys at Benesch engaged in this conduct in the United States to facilitate SPL's continued use of ICEE's SLUSH PUPPiE® trademarks.

### MARK PETERS SPOLIATES EVIDENCE TO TRY AND HIDE HIS FORGERIES

151. On August 13, 2020, ICEE served a Request for Inspection and Request for

Production of documents to inspect all computers and other devices used or accessed by Mark Peters between June 1, 2017 and November 1, 2018.

152.    On September 14, 2020, SPL responded that it "will produce the requested devices to an agreed upon third-party vendor for purposes of imaging the devices" and would produce the images to ICEE after reviewing them for privilege.

153.    Fifteen days later, on September 29, 2020, SPL's attorneys at Benesch stated that SPL "does not have possession or control of any devices responsive to this Request."

154.    Mark Peters destroyed or disposed of the devices that he used between June 1, 2017 and November 1, 2018 to prevent the detection of evidence of his multiple forgeries.

155.    SPL's attorneys at Benesch did nothing to ensure that Peters preserved the evidence of his forgeries.

### FORCED INTO A CORNER, SPL'S ATTORNEYS FINALLY ADMIT THAT THE 2000 APPOINTMENT IS "NOT GENUINE" BUT THEY NONETHELESS AID AND ABET MARK PETERS' PLAN B

156.    In August 2020, ICEE served on SPL its expert report showing that the 2000 Appointment had been forged.

157.    SPL's Benesch attorneys later admitted that the report conclusively proved that the 2000 Appointment was not genuine.

158.    Consistent with their directive from Mark Peters to delay, however, the Benesch lawyers representing SPL waited until just before summary judgment motions were due—October 15, 2020—to inform ICEE and the Court that they did not intend to proceed with claims based on the forged 2000 Appointment.

159.    The Benesch attorneys representing SPL admitted that the claims they had filed in this case in February and December 2019 based on the 2000 Appointment were "meritless" and that they had determined that they could no longer ethically continue to prosecute those claims,

yet they refused to admit that the only person who could have engaged in this forgery was Mark Peters.

160. At this point, Mark Peters pivoted to his "Plan B." Aided and abetted by the attorneys at Benesch, SPL now claimed that it had "performed its obligations under the terms" of the 1996 and 1999 agreements—even though SPL and its attorneys had earlier alleged that those same agreements had been superseded by the forged 2000 Appointment.

161. The purpose of this "Plan B" was to gradually transition all of the SLUSH PUPPiE customers to an identical product that SPL would call Slushy Jack's while holding itself out as the source for SLUSH PUPPiE.

162. In thousands of emails sent to SLUSH PUPPiE customers and potential customers in 2020 and 2021—long after SPL's rights to use the SLUSH PUPPiE name had been terminated—SPL held itself out as the source for SLUSH PUPPiE products.

163. For example, a November 2020 "rebranding" letter from Mark Peters prominently featured the SLUSH PUPPiE logo, reading "Important news from SLUSH PUPPiE®" and reassured retailers that the rebranding would not "in any way affect existing commercial relations with customers, partners, suppliers, management, manufacturing, contracts, and personnel."

164. SPL deliberately made its artwork for the marketing of "Slushy Jack's" look confusingly similar to that for SLUSH PUPPiE, for example by using the same color scheme and similar imagery of a cartoonish character holding a slush drink.

165. SPL used the same recipe for "Slushy Jack's" that it had used and was using for SLUSH PUPPiE syrup.

166. SPL told its customers that Slushy Jack's was SLUSH PUPPiE syrup, using the "SAME ORIGINAL no added sugar recipe and flavor range."

167. Until at least fall of 2021, SPL continued to offer for sale SLUSH PUPPiE syrup, cups, and consumables to hundreds of customers who had branded their retail freezers as "Slushy Jack's."

168. Until at least fall of 2021, SPL offered for sale Slushy Jack's syrups, cups, and consumables to customers who had branded their retail freezers as "SLUSH PUPPiE."

169. For months after SPL announced its rebranding effort in October and November 2020, SPL continued to sell SLUSH PUPPiE to SLUSH PUPPiE customers.

170. In violation of its duty to preserve evidence, SPL then destroyed evidence of its "transition" to Slushy Jack's, including destruction of documents relating to web design, the layout of SPL's sales ordering portals, and internal communications about the execution of SPL's "Plan B."

171. To ensure that it could continue with its illegal infringement unmolested, SPL board member Laura Peters submitted a false affidavit to this Court, claiming that use of the SLUSH PUPPiE name had ceased by December 2020. That statement was blatantly false and perjurious.

172. Meanwhile, SPL deliberately tied up various of ICEE's domain names and social media accounts, including by offering some for sale and informing the World Intellectual Property Organization that the domains should not be transferred to ICEE because this Court "has yet to decide this." SPL had used these domains for communication by email with "customers, suppliers" and others for long after ICEE had terminated SPL's rights to use the name Slush Puppie. And Mark Peters directed SPL's digital director Peter Splatt to file numerous spurious trademark applications using the Slush Puppie and ICEE name—or confusingly similar words--in various jurisdictions in bad faith in an attempt to confuse the public. Mark Peters also directed Splatt to incorporate new entities using the Slush Puppie name,

notwithstanding Laura Peters' testimony before this Court that SPL "was moving completely away from the Slush Puppie Name" and would never change its name back to Slush Puppie. *See, e.g.*, Doc. 143, which is hereby incorporated by reference as if set forth fully herein.

**COUNT ONE**
(Breach of Contract – 1996 Manufacturing Appointment

173.    ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

174.    ICEE is the rightful owner of all rights previously held by Slush Puppie Corporation under the 1996 Manufacturing Appointment.

175.    The 1996 Manufacturing Appointment provides that SPL "shall not manufacture, bottle, distribute, or sell director or indirectly, any other product for use in Slush machines not promoted by SLUSH PUPPIE."

176.    The 1996 Manufacturing Appointment provides in paragraph 8.D that Slush Puppie Corporation may cancel and terminate the appointment by written notice to SPL for, among other reasons, "[t]he filing of any legal action other than for collection on account against SLUSH PUPPIE, its representatives, distributors, customers, manufacturers, or suppliers....... "

177.    As alleged above, ICEE properly terminated the 1996 Manufacturing Appointment on June 25, 2019, and SPL has acknowledged receipt of that notice.

178.    The 1996 Manufacturing Appointment provides that, "[u]pon any termination of this Agreement, [SPL] shall make no claim of any kind because of such termination, and [SPL] agrees to waive, and does hereby waive the right to any compensation which may be allowable or imposed for such termination as liquidated damages or other such payments, if any.  The termination of this agreement, as herein provided, shall not affect [SPL's] obligation to pay any amount accruing to SLUSH PUPPIE or any of its affiliates under the provisions of the agreement while it was in effect."

179. SPL breached that obligation when it filed its Amended Complaint alleging claims based on ICEE's termination of the 1996 Manufacturing Appointment and continued to litigate such claims until this Court entered partial summary judgment in favor of ICEE on its right to terminate the 1996 Manufacturing Appointment.

180. The 1996 Manufacturing Appointment provides that, upon termination, "Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever ......."

181. The 1996 Manufacturing Appointment provides that, "[u]pon any termination, Manufacturer shall immediately cease and desist from further use of any SLUSH PUPPIE trademarks, names, logos or references and any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products."

182. SPL has breached its express obligation under the 1996 Manufacturing Appointment to immediately cease using SLUSH PUPPIE® trademarks upon termination.

183. SPL has breached its express obligation under the 1996 Manufacturing Appointment to immediately change its name to delete any reference to SLUSH PUPPIE® products.

184. SPL's breaches were made in bad faith. SPL was notified of the termination of the 1996 Manufacturing Appointment, acknowledged receipt of that notice, yet it claimed that it could ignore the notice because the Purported 2000 Agreement supposedly superseded the 1996 Manufacturing Appointment. Yet, at the same time, SPL argued that the Purported 2000 Agreement did *not* supersede the 1996 Manufacturing Appointment.

185. SPL's breaches have caused damage to ICEE consisting of attorney's fees and costs incurred in defending SPL's claims in this litigation and lost licensing opportunities.

**COUNT TWO**
(Breach of Contract – 1999 Distributor Agreement)

186.　ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

187.　ICEE is the rightful owner of all rights of Slush Puppie Corporation under the 1999 Distributor Agreement.

188.　The 1999 Distributor Agreement granted SPL a limited right to distribute "PRODUCTS" defined as "Slush Puppie freezers, neutral base, flavors, cups, other related items, and other products which may be specifically approved in writing from time to time as meeting COMPANY's marketing plans and quality standards."

189.　SPL breached this obligation by distributing, or granting licenses to distribute, products that were not within the limited scope of the definition of "PRODUCTS" in the 1999 Distributor Agreement.  SPL knew of its limited rights under the 1999 Distributor Agreement, and violated them purposely and repeatedly by selling or licensing products that are not encompassed by those agreements, and/or selling outside the territory covered by those agreements.

190.　For example, SPL distributed, or granted licenses to distribute apparel, spray candy, and ice pops, none of which are "PRODUCTS" as defined by the 1999 Distributor Agreement.

191.　SPL also claims it has "been in discussions with Tesco about selling its own SLUSH PUPPIE products for resale."  Such products are/would be outside the scope of the definition of PRODUCTS in the 1999 Distributor Agreement.

192.　Accordingly, SPL has breached the 1999 Distributor Agreement.

193.　On various occasions, ICEE has informed SPL that its licensees' sales are outside the scope of the 1999 Distributor Agreement and therefore illegal.

194. For example, on May 21, 2019, ICEE, through its counsel, informed SPL's UK counsel that SPL licensees' sales of various products were unauthorized and illegal. May 21, 2019 Letter from D. Wolfsohn to J. Conroy, Esq., Exhibit H. ICEE insisted that SPL cease and desist from engaging in such licensing and sublicensing activities, and also demanded that SPL provide ICEE with information about its licensing activities.

195. SPL ignored ICEE's cease and desist letter. It has failed and refused to cease its illegal licensing activities, and failed and refused to provide ICEE with the requested information.

196. SPL's licensing activities constitute willful violations of the 1999 Distributor Agreement.

197. The terms of the 1999 Distributor Agreement also limited SPL's distribution rights to the United Kingdom and Ireland.

198. SPL breached this obligation by distributing, or granting licenses to distribute, PRODUCTS (or other SLUSH PUPPIE® branded goods) outside of the United Kingdom and Ireland.

199. SPL has encouraged its licensees to continue to sell SLUSH PUPPIE® products.

200. SPL has informed its licensees that they are permitted to continue to sell SLUSH PUPPIE® products.

201. Paragraph III.B. of the 1999 Distributor Agreement provides that, upon termination, SPL must return to ICEE or destroy all literature, signs, advertising material, promotional matter, and other materials identifying SPL with ICEE or its SLUSH PUPPIE "PRODUCTS," and shall immediately cease to identify itself with ICEE or use the SLUSH

PUPPIE  Marks or any confusingly similar marks, and shall discontinue or change its company name to remove references to "SLUSH PUPPIE."

202. SPL has failed and refused to return or destroy the material referenced in Paragraph III.B, and it has continued to identify itself and hold itself out as a SLUSH PUPPIE licensee.

203. SPL has failed and refused to change its name to remove the reference to "SLUSH PUPPIE."

204. Paragraph VI.H. of the 1999 Distributor Agreement provides that, upon termination, SPL must "immediately cease and desist from the further use of the Slush Puppie name and logo, and return any and all PRODUCTS, materials, signs, emblems, and the like, bearing the Slush Puppie name and logo, to" ICEE.

205. SPL has failed and refused to cease using the SLUSH PUPPIE name and logo, and has failed and refused to return all "PRODUCTS" bearing the SLUSH PUPPIE name and logo to ICEE.

206. Paragraph VIII.M of the 1999 Distributor Agreement provides that, in the event of termination, SPL will deliver to ICEE all documents supplied to SPL, its subsidiary and associated companies, and appointees/sublicensees, by and on behalf of ICEE, containing information that is the subject of the 1999 Distributor Agreement, and thereafter, neither SPL, its subsidiary, or associated companies, nor its appointees/sublicensees, shall make or sell Products, as defined therein, within or without SPL's territory for a period of five years after termination.

207. SPL has failed and refused to comply with Paragraph VIII.M of the 1999 Distributor Agreement. After it received notice of termination in June 2019, not only did

SPL fail to cease and desist from further using the SLUSH PUPPIE name and logo, but it continued to license and encourage its illegal licensees to manufacture, offer for sale, and/or sell unauthorized products.

208.    SPL's breaches have caused damages to ICEE, including lost revenue from sales of products outside the scope of the 1999 Distributor Agreement, lost revenue from sales outside the territories covered by the 1999 Agreement, and lost licensing opportunities.

209.    SPL's breaches have also caused irreparable harm that cannot be remedied by money damages, and therefore SPL's conduct should be enjoined, including its continued distribution of products outside the scope of the 1999 Agreement and outside the territory of the 1999 Agreement.  In paragraph III.B. of the 1999 Distributor Agreement, SPL acknowledged that any use of the SLUSH PUPPIE® Marks will result in irreparable injury to ICEE, and has consented to a court order enjoining it from using the SLUSH PUPPIE® Marks in any way.

### COUNT THREE
(Trademark Infringement under Trade Marks Act 1994 Section 10(1))

210.    ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

211.    As SPL alleges and admits (Doc. 191 PAGEID 6866, Doc. 325 PAGEID 15254, 15257) ICEE is the owner of registered trademarks for the SLUSH PUPPIE® Marks for a variety of services in the United States, the United Kingdom, and the European Union, including but not limited to U.K. Registration No. UK00003249489 for the word mark SLUSH PUPPIE, registered effective August 10, 2017 and entered on the U.K. trademark register on November 3, 2017, for, inter alia, Class 7: beverage making machines; apparatus for preparing refrigerated beverages; Class 11: refrigerated beverage dispensing units;

apparatus for refrigerating beverages; apparatus for dispensing chilled beverages; refrigerated dispensing units for beverages; Class 30: edible ices, water ices, frozen confectionery and ingredients for making the same; ice, natural or artificial; flavourings, other than essential oils, for beverages; ice for refreshment; and Class 32: non-alcoholic drinks; syrups, fruit juices, concentrates and other preparations for making beverages and frozen beverages. ICEE is also the owner of a substantial valuable goodwill in the business carried on under and/or by reference to the figurative signs shown below (collectively "the SLUSH PUPPIE Marks"):







212. The SLUSH PUPPIE® Marks are inherently distinctive and strong. The public recognizes the SLUSH PUPPIE® Marks as designating the source of ICEE's

products and services.

213.    SPL, through the 1996 Manufacturer Appointment and the 1999 Distributor Agreement, was granted a limited right to use the SLUSH PUPPIE® Marks.  Specifically, the 1999 Agreement provided SPL with the limited right to use the "name 'SLUSH PUPPIE' only for the promotion and distribution of PRODUCTS offered by" ICEE  or other products "specifically approved in writing from time to time as meeting [ICEE's] marketing plans and quality standards."

214.    SPL has also infringed the SLUSH PUPPIE Marks after ICEE's proper termination of the 1996 Manufacturing Appointment and the 1999 Distributor Agreement. As alleged above, ICEE has properly terminated all of SPL's rights to use any of the SLUSH PUPPIE® Marks.

215.    SPL argued that the Purported 2000 Agreement superseded the 1996 and 1999 agreements, but that document was forged by Mark Peters with the intent of perpetrating a fraud on this Court and on ICEE.

216.    Accordingly, the Purported 2000 Agreement does not provide SPL with any right to use the SLUSH PUPPIE® Marks.

217.    Since SPL's rights under the 1996 and 1999 agreements have been terminated, and since the Purported 2000 Agreement is a forgery and unenforceable, SPL's use of the SLUSH PUPPIE® Marks (including licensing, sublicensing, manufacture and export using signs identical with the SLUSH PUPPIE® Marks and, in particular, the SLUSH PUPPIE® word mark identified in U.K. Registration No. UK00003249489) on goods identical to those listed in U.K. Registration No. UK00003249489, is therefore unlicensed, unauthorized, and unlawful and it infringes on

ICEE's rights in the SLUSH PUPPIE® Marks.

218.    For the first approximately sixteen months after termination of those agreements, SPL engaged in a fraudulent scheme of promoting the forged Purported 2000 Agreement as an alleged basis for claiming that SPL was party to a license of the SLUSH PUPPiE® Marks, notwithstanding ICEE's termination of the only legitimate agreements between the parties on June 25, 2019.  In connection with this scheme, SPL conspired with its American attorneys at the Benesch firm to misuse the American courts to continue to hold itself out as the brand owner of SLUSH PUPPiE to SPL's hundreds of customers for years after ICEE had terminated all of SPL's rights.

219.    For example, SPL attorney Matthew Gurbach claimed that ICEE's "purported termination of the 1996 Appointment and the 1999 Distributor Agreement are a nullity – each has been superseded by the 2000 Appointment."  Based on this forged contract, Attorney Gurbach asserted that SPL "intends to continue operations under the 2000 Appointment and expects ICEE to abide by the terms thereof."  *See* Exh. G.

220.    Based on the forged Purported 2000 Agreement and other forged documents, SPL held itself out to its customers and potential customers as possessing the right to sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brand.

221.    By relying upon the Purported 2000 Agreement that it knew it had forged and pursuing its sanctionable filing of meritless claims based on that agreement in the United States, SPL was able to prevent ICEE from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe.

222.    Indeed, SPL took affirmative steps to block ICEE's attempt to license the

SLUSH PUPPiE brand in the United Kingdom and Europe. For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, SPL directed one of its U.S. attorneys-- Matthew Gurbach—to falsely claim that the forged Purported 2000 Agreement was in effect, and that SPL had and would "continue operations" under the fraudulent document that Gurbach had relied upon in asserting meritless claims against ICEE in the United States. See Exhibit I. Moreover, SPL falsely informed recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud, and also referred recipients of ICEE's letters to SPL's American attorneys.

223. As alleged above, in November 2021, SPL's attorneys were forced to admit that the claims they had asserted based on the forged Purported 2000 Agreement were "meritless" (Doc. 85 PAGEID 2176) and that they "could no longer ethically continue to prosecute" those claims (Doc. 82 PAGEID 2050). Accordingly, SPL pivoted to the frivolous position that the terminated 1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect, despite concurrently alleging that the forged Purported 2000 Agreement had "superseded" those agreements.

224. At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in Europe. SPL sent out thousands of communications stating that it was "retiring" the SLUSH PUPPiE brand, leaving the impression with consumers that it had the power to do so, and that the reasons were because the SLUSH PUPPiE brand was not "socially responsible" or "sustainable" and not consistent with the company's "vision and strategy." SPL then began telling its customers and potential customers as well as consumers that it would be

selling the same Slush Puppie product under a new name—Slushy Jack's.

225.    SPL was only able to use the new Slushy Jack's name for the old SLUSH PUPPiE product by illegally piggy-backing on the goodwill of ICEE's SLUSH PUPPiE brand (i.e., riding on its coatttails) and continuing without authorization to supply Slush Puppie product under the Slushy Jack's name, which SPL described as using "the same recipe as it has always been."

226.    SPL then relied upon false and perjurious filings by its American attorneys—including declarations under penalty of perjury--in this Court to forestall any action by this Court against SPL's illegal use of the SLUSH PUPPiE® trademarks in the U.K. and Europe.

227.    Thus, for the more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, SPL has continued to sell in the United Kingdom and export identical SLUSH PUPPiE syrup and other products, and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe, using the identical SLUSH PUPPIE® Marks, knowing that it had no right to do so.

228.    Moreover, since approximately November 2020, SPL has generated interest in its "Slushy Jack's" product by giving customers and consumers the false impressions that it is and has been since termination on June 25, 2019 authorized to sell and control SLUSH PUPPiE, that it is the brand owner, and that Slushy Jack's uses the "same recipe" and has "the same great taste as SLUSH PUPPiE." SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name.

229.    Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE

customers, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits.

230. By illegally using the SLUSH PUPPiE® trademarks for years after ICEE had terminated SPL's rights in this scheme, SPL was able to pressure hundreds of its SLUSH PUPPiE customers into signing long term contracts whereby SPL would be the exclusive supplier of frozen uncarbonated beverages. This effectively blocked ICEE from penetrating this market.

231. SPL's infringement has had a substantial effect on U.K. commerce, including ICEE's ability to license the SLUSH PUPPIE® Marks in the U.K. and elsewhere.  By way of example, SPL operated its own website, slushpuppie.co.uk, which was available to U.K. consumers and is in English.  SPL obstructed ICEE's efforts to obtain control of that URL, falsely claiming that it did not own it or control it in testimony submitted to this Court.

232. Additionally, in the run-up to filing this lawsuit, SPL presented itself in English- language media as the *owner* of the SLUSH PUPPIE® brand. For example, an article in the online publication Food, Drink & Franchise quoted Mark Peters, Managing Director of "Slush Puppy Ltd., *who owns brands such as Tango Ice Blast and Slush Puppie*." *See* Laura Mullan, *Comment: Is the Soft Drinks Industry Prepared for the UK 'Sugar Tax'?*, Food, Drink & Franchise, March 31, 2018.  Beginning in autumn 2020 and throughout 2021 if not later, SPL also presented itself to SLUSH PUPPiE® customers as the brand owner.

233. Additionally, SPL's illegal licensees have sold or offered for sale infringing products in the United Kingdom.  For example, Truffle Shuffle, an SPL licensee, offered SLUSH PUPPIE® branded lip balm on its website, and had the option to ship the product to

customers in the United Kingdom. And between June 25, 2019 and at least the end of 2021, SPL continued to use an identical SLUSH PUPPIE® mark to sell identical products—SLUSH PUPPIE syrups, products, and machines—to hundreds of retailer customers in the UK and outside the UK through its affiliates.

234. SPL's infringing activities are causing and will cause ICEE irreparable harm based on SPL's presentation of itself as the owner of the brand, or as a licensed and authorized distributor of genuine SLUSH PUPPIE® drinks and products, when in fact it is unlicensed and unauthorized.

235. In addition to the illegal acts described above, SPL has encouraged its licensees of SLUSH PUPPIE® Marks to continue to manufacture, offer for sale, and sell unauthorized products, and to ignore ICEE's notices to SPL's licensees to cease and desist from engaging in such illegal conduct.

236. SPL knew that the 1999 Distributor Agreement had been properly terminated by ICEE and yet it continued to engage in licensing activities using the SLUSH PUPPIE® Marks. Indeed, SPL brazenly and without basis has claimed that its illegal licensees somehow still had "the right to use the SLUSH PUPPIE trademarks and brand . . . ." December 27, 2019 Letter from M. Gurbach to D. Wolfsohn, Exh. I. SPL informed its licensees that they were permitted to continue to sell SLUSH PUPPIE® products. SPL continued to sell SLUSH PUPPiE products to hundreds of SLUSH PUPPiE customers for years after ICEE had terminated all of SPL's rights to use the SLUSH PUPPiE trademarks.

237. SPL's continued use and encouragement of its licensees to use, the SLUSH PUPPIE® Marks constitutes willful infringement conducted in bad faith.

238. SPL's uses of identical SLUSH PUPPIE® Marks on identical goods to those

included in at least U.K. Registration No. UK00003249489, as described above, infringe ICEE's exclusive rights in the registered SLUSH PUPPIE® Marks.

239. As a direct result of these actions, SPL has caused and, unless enjoined, will continue to cause ICEE to suffer irreparable injury.

240. ICEE has no adequate remedy at law and is therefore entitled to injunctive relief.

241. In paragraph III.B. of the 1999 Distributor Agreement, SPL acknowledged that any use of the SLUSH PUPPIE® Marks will result in irreparable injury to ICEE, and has consented to a court order enjoining it from using the SLUSH PUPPIE® Marks in any way.

242. ICEE is entitled to recover damages, infringer profits (an account of profits), and attorneys' fees (costs) for SPL's infringement.

243. SPL's infringement has been and is willful and in bad faith. First, SPL knew of its limited rights under the 1996 Manufacturer Appointment and the 1999 Distributor Agreement, and further knew that the Purported 2000 Agreement was a forgery or otherwise not a binding agreement. Second, after ICEE provided notice to SPL of its termination of the 1996 Manufacturer Appointment and 1999 Distributor Agreement, SPL was well aware that it had no right to continue to license the sale or offer for sale of any SLUSH PUPPIE products. Despite this knowledge, SPL concocted a flimsy excuse for ignoring the termination—arguing that the forged Purported 2000 Agreement superseded the 1996 and 1999 agreements. Yet at the same time, SPL also argued that the forged Purported 2000 Agreement did not supersede the 1996 and 1999 agreements.

244. SPL has also engaged in litigation misconduct. For example, SPL destroyed and spoliated evidence in an attempt to hide its infringement. SPL has also engaged in

dilatory practices, has lied about the status of witnesses, and has tried to conceal the fraudulent nature of the Purported 2000 Agreement. SPL directed the Benesch lawyers to engage in a multi-year strategy of delay in this case, which the Benesch lawyers duly executed.

245. An essential part of SPL's scheme to continue to use the SLUSH PUPPiE marks was failing false statements and forged documents in this Court, thereby perverting the cause of justice and engaging in obstruction of justice. SPL leveraged its misuse of this Court overseas to perpetuate its continued misuse of the SLUSH PUPPiE marks until it could sign up virtually all of the SLUSH PUPPiE customers to the identical "Slushy Jack's" product.

## COUNT FOUR
### (Trademark Infringement under Trade Marks Act 1994 Section 10(3))

246. ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

247. The SLUSH PUPPIE® Marks, and specifically the SLUSH PUPPIE® word mark in U.K. Registration No. UK00003249489, have, for many years, enjoyed a substantial reputation in the United Kingdom and Europe more broadly. ICEE and its predecessors, through their licensees, have supplied SLUSH PUPPIE® frozen beverages, syrups, freezers, and related products to customers throughout the UK since the 1970's. Through widespread use and marketing, the SLUSH PUPPIE® Marks have gained substantial goodwill and recognition and are recognized by a substantial portion of the consuming public as distinguishing ICEE's goods and services, and have done so since at least June 25, 2019.

248. By way of example only, SPL itself commissioned a brand awareness study that concluded, based on interviews conducted in October/November 2015, that "Slush Puppie awareness

is high in parents and children, both unprompted and prompted and much more so than competitor brands."

249.    The SLUSH PUPPIE® Marks have substantial goodwill and recognition in, among other places, the U.K., France, Germany, Benelux, and Switzerland.

250.    Through the use of ICEE's SLUSH PUPPIE® Marks in connection with its business, its encouragement of its licensees to engage in unauthorized and illegal manufacturing, offering for sale, and sale of infringing SLUSH PUPPIE® branded products, SPL is and has been knowingly and intentionally misrepresenting and falsely designating to the general public and consumers the affiliation, connection, association, origin, source, approval, endorsement, or sponsorship of SPL's goods and services, so as to create a likelihood of confusion by the public.

251.    For the first approximately sixteen months after termination of those agreements, SPL engaged in fraudulent scheme of promoting the forged Purported 2000 Agreement as an alleged basis for claiming that SPL was party to a license of the SLUSH PUPPiE Trademarks, notwithstanding ICEE's termination of the only legitimate agreements between the parties on June 25, 2019.  For example, SPL attorney Matthew Gurbach claimed that ICEE's "purported termination of the 1996 Appointment and the 1999 Distributor Agreement are a nullity – each has been superseded by the 2000 Appointment."  Based on this forged contract, Attorney Gurbach asserted that SPL "intends to continue operations under the 2000 Appointment and expects ICEE to abide by the terms thereof."  *See* Exh. G.

252.    Based on the forged Purported 2000 Agreement and other forged documents, SPL held itself out to its customers and potential customers as possessing the right to sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brand.

253. By relying upon the Purported 2000 Agreement that it knew it had forged, SPL was able to prevent ICEE from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe.

254. Indeed, SPL took affirmative steps to block ICEE's attempt to license the SLUSH PUPPiE brand in the United Kingdom and Europe. For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, SPL's attorney Matthew Gurbach again falsely claimed that the forged Purported 2000 Agreement was in effect, and that SPL had and would "continue operations" under the fraudulent document. See Exhibit I. Moreover, SPL falsely informed recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud.

255. In September 2021, SPL's U.K. and U.S. attorneys confronted him with the evidence of his forgeries. And, in November 2021, however, SPL was forced to admit that the claims it had asserted based on the forged Purported 2000 Agreement were "meritless" (Doc. 85 PAGEID 2176) and that its attorneys "could no longer ethically continue to prosecute" those claims (Doc. 82 PAGEID 2050). Accordingly, in late September 2021, SPL pivoted to the frivolous position that the terminated 1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect, despite concurrently alleging that the forged Purported 2000 Agreement had "superseded" those agreements.

256. At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in Europe. SPL sent out thousands of communications stating that it was "retiring" the SLUSH PUPPiE brand, leaving the impression with consumers that it had the power to do so,

and that the reasons were because the SLUSH PUPPiE brand was not "socially responsible" or "sustainable" and not consistent with the company's "vision and strategy."  SPL then began telling its customers and potential customers as well as consumers that it would be selling the same Slush Puppie product under a new name—Slushy Jack's.  SPL also informed the SLUSH PUPPiE customers and prospects that it owned or controlled both the SLUSH PUPPiE and Slushy Jack's brands.

257.    SPL intentionally designed the Slushy Jack's brand to be visually and phonetically similar to the SLUSH PUPPIE® brand, using a similar color scheme, similar word choice and format (two words, starting word beginning with "Slush"), and similar cartoonish imagery of a mascot holding a cup of frozen uncarbonated beverage. As a result, the Slushy Jack's brand calls to mind the distinctive SLUSH PUPPIE® Mark and creates a link between them.

258.    SPL was only able to use the new Slushy Jack's name for the old SLUSH PUPPiE product by taking unfair advantage of, and illegally piggy-backing on, the goodwill of ICEE's SLUSH PUPPiE brand and continuing without authorization to supply Slush Puppie product under the Slush Jack's name, which SPL described as using "the same recipe as it has always been." SPL adopted the Slushy Jack's name and sign intentionally to ride the coattails of the SLUSH PUPPIE® Mark and to benefit from its power of attraction and reputation, thereby gaining a commercial advantage for the Slushy Jack's brand that it would not have had on its own (as a new brand without any established customer base or reputation).

259.    Thus, for the more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, SPL has continued to sell SLUSH PUPPiE syrup and other

products, and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe knowing that it had no right to do so. Such use, coming after ICEE's termination of SPL's right to use the SLUSH PUPPIE® Marks, is without the consent or authorization of ICEE.

260. SPL's use of the SLUSH PUPPIE® Marks and the Slushy Jack's brand after June 25, 2019 is without due cause and SPL lacked any legitimate justification for its continued use.

261. Moreover, since approximately November 2020, SPL has generated interest in its "Slushy Jack's" product by giving customers and consumers the false impressions that it is authorized to sell and control SLUSH PUPPiE, that it is the owner of both the SLUSH PUPPiE and Slushy Jack's brands, and that Slushy Jack's uses the "same recipe" and has "the same great taste as SLUSH PUPPiE." SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name. SPL also deliberately designed its Slushy Jack's artwork and branding to be confusingly similar to that used for SLUSH PUPPiE so that consumers would be less likely to notice the difference.

262. Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE customers, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits. But by illegally using the SLUSH PUPPiE name and trademarks and using "Slushy Jack's in such a way as to misrepresent to consumers that goods and/or services marked with the Slushy Jack's signs were authorized by ICEE or connected with ICEE by

reason of association with the Slush Puppie brand, SPL engaged in Trade Mark infringement.

263.     By reason of the acts alleged above, SPL has misrepresented to consumers that goods and/or services marked with the SLUSH PUPPIE and/or Slush Jack's signs and/or offered under and/or by reference to them are those of ICEE's or are connected in the course of trade to ICEE, contrary to fact.  The transition to the use of the Slushy Jack's brand was done in such a way as to misrepresent to consumers that the brands were one and the same and that Slushy Jack's was replacing the Slush Puppie brand such that consumers relied on the goodwill subsisting in the Slush Puppie brand, which was and is owned by ICEE, to accept the switch to supplying the Slushy Jack's brand instead.  As such, SPL's use of "Slushy Jack's" misrepresents to consumers that goods and/or services marked with those signs and/or offered under and/or by reference to them are ICEE's or are connected in the course of trade to ICEE by reason of the association with the Slush Puppie brand, contrary to fact.

264.     SPL's use of "Slushy Jack's" takes unfair advantage of, or is detrimental to the distinctive character or the repute of the SLUSH PUPPIE Marks, contrary to section 10(3) of the Trade Marks Act 1994.

265.     In particular, Slushy Jack's is similar to the SLUSH PUPPIE Marks and has been and is being used by SPL in respect of identical goods to which the U.K. Slush Puppie Mark has been registered.

266.     SPL's use of Slushy Jack's complained of tends to cause members of the public who are exposed to it to call to mind the U.K. Slush Puppie Trade Mark such that there has been a link between that ICEE's mark and Slushy Jack's.

267.     SPL's use of Slushy Jack's takes unfair advantage of ICEE's Trade Mark and signs because it rides on the coat-tails of the mark in order to benefit from its power of attraction

and the reputation of the mark and to exploit its image.  SPL has intended in its design and usage of Slushy Jack's to take advantage of the distinctive character and the repute of the Trade Mark.

268.     Slushy Jack's recent shift to somewhat different branding—a boy and dog mascot with less emphasis on the blue and white color scheme used in the SLUSH PUPPIE brand—underscores its efforts to take advantage of the SLUSH PUPPIE brand in order to convert. The Slushy Jack's website shows the variation between the blue and white design, used in the early stages of the conversion of SLUSH PUPPiE customers to other SPL brands, and the new design introduced after SPL had converted as many customers as it could to Slushy Jack's:



269.     The acts complained of have lessened or will lessen the ability of the Trade Mark to distinguish ICEE and its goods and services from those of others in the minds of members of the public. Accordingly, there will be a whittling away or dilution of ICEE's Trade

Mark. And there has been a change in the economic behavior of consumers as a result of such dilution.

270.     ICEE is entitled to recover damages, infringer profits (an account of profits), and attorneys' fees (costs) for SPL's infringement.

### COUNT FIVE
#### (Passing Off – UK Law)

271.     ICEE incorporates and re-alleges the foregoing paragraphs of these Counterclaims as though fully set forth herein.

272.     The SLUSH PUPPIE® Marks and the SLUSH PUPPIE brand have, for many years, enjoyed substantial goodwill in the United Kingdom and Europe more broadly. ICEE and its predecessors, through their licensees, have supplied SLUSH PUPPIE® frozen beverages, syrups, freezers, and related products to customers throughout the UK since the 1970's. Through widespread use and marketing, the SLUSH PUPPIE® Marks have gained substantial goodwill and recognition and are recognized by a substantial portion of the consuming public as distinguishing ICEE's goods and services, and have done so since at least June 25, 2019.

273.     The goodwill in the SLUSH PUPPIE Marks is shown at least by the trade mark registrations for the SLUSH PUPPIE® Marks in the UK.

274.     For the first approximately sixteen months after termination of those agreements, SPL engaged in fraudulent scheme of promoting the forged Purported 2000 Agreement as an alleged basis for claiming that SPL was party to a license of the SLUSH PUPPiE Trademarks, notwithstanding ICEE's termination of the only legitimate agreements between the parties on June 25, 2019.  For example, SPL attorney Matthew Gurbach claimed that ICEE's "purported termination of the 1996 Appointment and the 1999 Distributor Agreement are a nullity – each has been superseded by the 2000 Appointment."  Based on this forged contract, Attorney Gurbach asserted that SPL "intends to continue operations under the 2000 Appointment and

expects ICEE to abide by the terms thereof." *See* Exh. G.

275. Based on the forged Purported 2000 Agreement and other forged documents, SPL held itself out to its customers and potential customers as possessing the right to sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brand.

276. By relying upon the Purported 2000 Agreement that it knew it had forged, SPL was able to prevent ICEE from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe.

277. Indeed, SPL took affirmative steps to block ICEE's attempt to license the SLUSH PUPPiE brand in the United Kingdom and Europe. For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, SPL's attorney Matthew Gurbach again falsely claimed that the forged Purported 2000 Agreement was in effect, and that SPL had and would "continue operations" under the fraudulent document. See Exhibit I. Moreover, SPL falsely informed recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud. These communications were intended to mislead distributors and consumers in the United Kingdom and caused damages to ICEE's valuable SLUSH PUPPIE brand.

278. In September 2021, SPL's U.K. and U.S. attorneys confronted him with the evidence of his forgeries. And, in November 2021, SPL was forced to admit that the claims it had asserted based on the forged Purported 2000 Agreement were "meritless" (Doc. 85 PAGEID 2176) and that SPL's attorneys "could no longer ethically continue to prosecute" those claims (Doc. 82 PAGEID 2050). Accordingly, SPL pivoted to the frivolous position that the terminated

1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect, despite concurrently alleging that the forged Purported 2000 Agreement had "superseded" those agreements.

279. At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in the U.K. and Europe. SPL sent out thousands of communications stating that it was "retiring" the SLUSH PUPPiE brand, leaving the impression with consumers that it had the power to do so, and that the reasons were because the SLUSH PUPPiE brand was not "socially responsible" or "sustainable" and not consistent with the company's "vision and strategy." SPL then began telling its customers and potential customers as well as consumers that it would be selling the same Slush Puppie product under a new name—Slushy Jack's.

280. SPL was only able to use the new Slushy Jack's name for the old SLUSH PUPPiE product by illegally piggy-backing on the goodwill of ICEE's SLUSH PUPPiE brand and continuing without authorization to supply Slush Puppie product under the Slush Jack's name, which SPL described as using "the same recipe as it has always been."

281. Thus, for the more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, SPL has continued to sell SLUSH PUPPiE syrup and other products, and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe knowing that it had no right to do so.

282. Moreover, since approximately November 2020, SPL has generated interest in its "Slushy Jack's" product by giving customers and consumers the false impressions that it is authorized to sell and control SLUSH PUPPiE, that it is the brand owner of both SLUSH

PUPPiE and Slushy Jack's, and that Slushy Jack's uses the "same recipe" and has "the same great taste as SLUSH PUPPiE." SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name.

283. Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE customers, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits. But by illegally using the SLUSH PUPPiE name and trademarks, SPL was able to pressure nearly all of the SLUSH PUPPiE customers into long term freezer rental contracts, which provide that SPL is the exclusive provider of frozen uncarbonated beverage.

284. SPL's actions were done in such a way as to mislead customers and the consuming public to believe that SPL's continued use after June 25, 2019 of the SLUSH PUPPIE brand were authorized by ICEE as the brand owner.

285. SPL's actions in transitioning to Slushy Jack's, including telling customers and the consuming public that SLUSH PUPPIE and Slushy Jack's were the "same" and allowing—indeed encouraging—retailers to mix and match Slushy Jack's and SLUSH PUPPIE syrups, cups, and freezers, and to continue using SLUSH PUPPiE point of sale assets, misled customers and the consuming public to believe that SPL's Slushy Jack's was connected to the SLUSH PUPPIE brand or authorized by ICEE.

286. As alleged above, ICEE has substantial goodwill in the U.K. and Europe in connection with the Slush Puppie products. Under the 1996 and 1999 agreements, as well as their predecessor agreements, SPL's use of the SLUSH PUPPIE Marks inured to ICEE's benefit. Accordingly, the U.K. and European public recognize the SLUSH PUPPIE Marks as denoting the goods and services of a particular manufacturer.

287.    As alleged above, SPL made numerous material representations to the public leading to the public's believing that the relevant goods and services being offered by SPL were authorized by the owner of the SLUSH PUPPIE Marks, when in fact they were unauthorized, and that SPL controlled the SLUSH PUPPIE brand and had rights to use that brand, when in fact SPL has had no such rights since June 2019.

288.    ICEE and its valuable SLUSH PUPPIE brand have been damaged by SPL's passing off of SLUSH PUPPIE and Slushy Jack's. Specifically, SPL's actions have damaged the goodwill of the SLUSH PUPPIE Marks in the United Kingdom, substantially destroyed the customer base for the SLUSH PUPPIE products, and deprived ICEE of the opportunity to continue selling SLUSH PUPPIE products to customers that SPL transitioned to Slushy Jack's and locked into multi-year contracts.

289.    In paragraph III.B. of the 1999 Distributor Agreement, SPL acknowledged that any use of the SLUSH PUPPIE® Marks will result in irreparable injury to ICEE, and has consented to a court order enjoining it from using the SLUSH PUPPIE® Marks in any way.

290.    ICEE has no adequate remedy at law and is therefore entitled to injunctive relief.

291.    Additionally, ICEE is entitled to recover damages for SPL's infringement, and its reasonable attorney's fees and SPL's profits (account of profits).

## COUNT SIX
### (Unjust Enrichment)

292.    ICEE incorporates and realleges the foregoing paragraphs as if set forth fully herein.

293.    Since ICEE's termination of the 1996 Manufacturing Appointment and the 1999 Distribution Agreement, SPL has not been licensed to sell or otherwise profit from any Slush

Puppie products or services, or to use the SLUSH PUPPiE Trademarks for any purpose.

294. For the first approximately sixteen months after termination of those agreements, SPL engaged in fraudulent scheme of promoting the forged Purported 2000 Agreement as an alleged basis for claiming that SPL was party to a license of the SLUSH PUPPiE Trademarks, notwithstanding ICEE's termination of the only legitimate agreements between the parties on June 25, 2019. For example, SPL attorney Matthew Gurbach claimed that ICEE's "purported termination of the 1996 Appointment and the 1999 Distributor Agreement are a nullity – each has been superseded by the 2000 Appointment." Based on this forged contract, Attorney Gurbach asserted that SPL "intends to continue operations under the 2000 Appointment and expects ICEE to abide by the terms thereof." *See* Exh. G.

295. Based on the forged Purported 2000 Agreement and other forged documents, SPL held itself out to its customers and potential customers as possessing the right to sell SLUSH PUPPiE products and to associate itself with the SLUSH PUPPiE brand—even holding itself out as the owner of those marks and brand.

296. By relying upon the Purported 2000 Agreement that it knew it had forged, SPL was able to prevent ICEE from licensing SLUSH PUPPiE® to another company in the United Kingdom and Europe.

297. Indeed, SPL took affirmative steps to block ICEE's attempt to license the SLUSH PUPPiE brand in the United Kingdom and Europe. For example, after ICEE sent letters in December 2019 to certain of SPL's customers explaining that SPL no longer had any rights to use the SLUSH PUPPiE marks, SPL's attorney Matthew Gurbach again falsely claimed that the forged Purported 2000 Agreement was in effect, and that SPL had and would "continue operations" under the fraudulent document. See Exhibit I. Moreover, SPL falsely informed

recipients of ICEE's letters that SPL held rights to the SLUSH PUPPiE brand, despite knowing that this assertion was a fraud.

298.    In September 2021, SPL's attorneys confronted Mark Peters about his forgeries.  And in November 2021, SPL was forced to admit that the claims it had asserted based on the forged Purported 2000 Agreement were "meritless" (Doc. 85 PAGEID 2176) and that SPL's attorneys "could no longer ethically continue to prosecute" those claims (Doc. 82 PAGEID 2050).  Accordingly, SPL pivoted to the frivolous position that the terminated 1996 Manufacturing Appointment and the 1999 Distributor Agreement were somehow still in effect, despite concurrently alleging that the forged Purported 2000 Agreement had "superseded" those agreements.

299.    At the same time of this pivot, SPL secretly used its long history with the SLUSH PUPPiE brand to confuse retailers about who had the right to sell and support the brand in Europe.  SPL sent out thousands of communications stating that it was "retiring" the SLUSH PUPPiE brand, leaving the impression with consumers that it had the power to do so, and that the reasons were because the SLUSH PUPPiE brand was not "socially responsible" or "sustainable" and not consistent with the company's "vision and strategy."  SPL then began telling its customers and potential customers as well as consumers that it would be selling the same Slush Puppie product under a new name—Slushy Jack's.  SPL deliberately designed its Slushy Jack's branding and point of sale assets to be confusingly similar to those for SLUSH PUPPiE, and it encouraged customers to dispense SLUSH PUPPiE out of Slushy Jack's-branded freezers and vice versa, to use SLUSH PUPPiE cups for serving Slushy Jack's and vice versa, and to continue using their Slush Puppie branding and point of sale assets.

300.    SPL was only able to use the new Slushy Jack's name for the old SLUSH

PUPPiE product by illegally piggy-backing on the goodwill of ICEE's SLUSH PUPPiE brand and continuing without authorization to supply Slush Puppie product under the Slush Jack's name, which SPL described as "identical" and using "the same recipe as it has always been."

301.     Thus, for the more than two years since ICEE terminated all of SPL's rights to use the SLUSH PUPPiE marks, SPL has continued to sell SLUSH PUPPiE syrup and other products, and continued to sell and lease freezers used to dispense SLUSH PUPPiE to hundreds of customers and at thousands of locations throughout the United Kingdom and Europe knowing that it had no right to do so.

302.     Moreover, since approximately November 2020, SPL has generated interest in its "Slushy Jack's" product by giving customers and consumers the false impressions that it is authorized to sell and control SLUSH PUPPiE, that it is the brand owner, and that Slushy Jack's uses the "same recipe" and has "the same great taste as SLUSH PUPPiE." SPL has thereby illegally leveraged its infringement of the SLUSH PUPPiE marks to gain crucial credibility with retailers for its sale of the same product under the otherwise completely unknown Slushy Jack's name.

303.     Without illegally leveraging SLUSH PUPPiE and the SLUSH PUPPiE customers, and the position it had acquired under the 1996 and 1999 Agreements, Slushy Jack's would be an unknown quantity, with no goodwill and no or virtually no revenue or profits.  But for SPL's illegal use of the SLUSH PUPPiE name and trademarks for years after termination of its rights, SPL would not have been able to retain the SLUSH PUPPiE customers or to lock them into long term contracts under which they agreed that SPL would be the exclusive provide of frozen uncarbonated beverages.

304.     By engaging in this scheme, SPL was able to knowingly obtain from ICEE the

benefit of its SLUSH PUPPiE name, brand, and trademarks, SPL was aware that it was obtaining

a benefit, and SPL retained the revenues received as a result of taking this benefit under

circumstances where it would be unjust for them to be retained without disgorging them to ICEE.

## **PRAYER FOR RELIEF**

WHEREFORE, ICEE respectfully requests that the Court grant the following relief:

A.  A declaration that the document SPL characterizes as "the 2000 Appointment

of Trade Mark Licence," attached as Exhibit D to SPL's Amended Complaint, is invalid,

void, unenforceable, a forgery, and/or otherwise without effect as to ICEE;

B.  A declaration that SPL has no rights under what it characterizes as "the

2000 Appointment of Trade Mark Licence";

C.  A judgment that SPL has breached the 1996 Appointment, and awarding

ICEE damages up to the time of ICEE's termination;

D.  A judgment that SPL has breached the 1999 Agreement, and awarding ICEE

damages up to the time of ICEE's termination.

E.  A judgment that SPL's use of the SLUSH PUPPIE Mark on products outside the

scope of the 1996 Appointment and 1999 Agreement, and after termination of those

agreements, is willful trademark infringement under the UK Trade Marks Act 1994, Section

10(1) and 10(3) and awarding ICEE damages, infringer profits (account of profits),

injunctive relief, and attorney's fees (costs).

F.  A judgment that SPL's use of the SLUSH PUPPIE Mark and Slushy Jack's mark

after termination on June 25, 2019 of the 1996 Manufacturing Appointment and the 1999

Distribution Agreement is passing off under UK law and awarding ICEE damages, infringer

profits, injunctive relief, and/or attorney's fees.

G.  Disgorgement of SPL's profits (an account of profits) made since termination on June 25, 2019 of the 1996 Manufacturing Appointment and the 1999 Distribution Agreement from its sale of Slush Puppie and Slushy Jack's and similar products and its sale and leasing of freezers used in connection with Slush Puppie, Slushy Jack's, and similar products.

H. Return to ICEE of all domain names using the words Slush Puppie.

I.  Such other relief as the Court deems just and proper.

Dated:  March 6, 2026            Respectfully submitted,

**DUANE MORRIS LLP**


BY:  _/s/David J. Wolfsohn_
     David J. Wolfsohn (*admitted pro hac vice*)
     Tyler R. Marandola (*admitted pro hac vice*)
     30 South 17th Street
     Philadelphia, PA 19103
     Tel.: (215) 979-1000
     Fax: (215) 979-1020
     djwolfsohn@duanemorris.com
     tmarandola@duanemorris.com

     Kenneth M. Argentieri (Ohio Bar No. 0067493)
     Trial Attorney
     600 Grant St., Ste. 5010
     Pittsburgh, PA 15219
     Tel.: (412) 497-1000
     Fax: (412) 497-1001
     kmargentieri@duanemorris.com

     Philip Han (admitted *pro hac vice*)
     1201 North Market St., Suite 501
     Wilmington, DE 19801
     Tel.: (302) 657-4900
     Fax: (302) 657-4901
     pghan@duanemorris.com


     *Attorneys for Defendant/Counterclaim Plaintiff The ICEE Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2026, I caused the foregoing document to be electronically filed with the Clerk of Court using the Court's CM/ECF system, which caused a copy to be served on all counsel of record.

BY: _/s/Tyler R. Marandola_
            Tyler R. Marandola