**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | |
|---|---|
| SLUSH PUPPIE LIMITED,<br><br>Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>THE ICEE COMPANY,<br><br>Defendant/Counterclaim Plaintiff. | Case No. 1:19-cv-00189<br><br>Judge Michael R. Barrett |

# MEMORANDUM OF DECISION ISSUED PURSUANT TO FED. R. CIV. P. 52(a)(1)

Slush Puppie Limited ("SPL") filed suit against the ICEE Company ("ICEE") in the Court of Common Pleas for Hamilton County, Ohio on February 12, 2019, asserting causes of action arising out of the now debunked "2000 Appointment." (Docs. 2, 417). ICEE timely removed the suit to the Southern District of Ohio, then answered and counterclaimed against SPL on April 29, 2019. (Docs. 1, 13). Several years of pleadings and arduous discovery ensued regarding the credibility of the 2000 Appointment, SPL Principal Mark Peters' role in the spurious documents, the activities of SPL's law firm, SPL's conduct between the filing of the initial Complaint and the trial, and SPL's financials and asserted damages.

Eventually, on May 11, 2026, this matter came on for trial. The parties' stipulated issues for trial were (1) breach of the 1996 Appointment of Syrup Manufacturer; (2) breach of the 1999 International Independent Area Distributor License; (3) unjust enrichment; (4) trademark infringement under Section 10(1) of U.K. Trade Marks Act of 1994; (5) trademark infringement under Section 10(3) of U.K. Trade Marks Act of 1994; and (6) passing off under U.K. law. (*See* Doc. 459, Joint Proposed Jury Instructions).

At the conclusion of testimony, ICEE abandoned its breach of contract claims, (Doc. 497, PAGE ID 24290), rendering the jury verdict advisory in nature. As the Court does now, the jury considered the elements of the remaining claims. After due consideration, and in accordance with Federal Rule of Civil Procedure 52(a)(1), the Court embraces the jury's unanimous verdict on liability in favor of ICEE, (*see* Doc. 488, Answers to Interrogatories 1-15, PAGE ID 23398-404), based upon the following facts proven by a preponderance[1] of the evidence at trial.[2] The Court will state its conclusions of law separately.

# I. <u>FACTS</u>

## A. Background and Ownership History

The Slush Puppie frozen drink business was started by Willard ("Will") Radcliff, who founded the Slush Puppie Corporation ("SPC") in Cincinnati, Ohio, and built it into a successful international business. From approximately 1978 until early 2001, SPC owned the Slush Puppie trademarks along with various logos and designs used in connection with SPC's goods and services.

As testified to by Dan Fachner—President of J&J Snack Foods Corp. ("J&J")—and supported by documents, Dr. Pepper/Seven Up, Inc. ("DPSU") purchased the Slush Puppie trademarks and business from SPC in 2001; all trademarks relating to the Slush Puppie business were thereafter assigned to DPSU. Then, in 2006, ICEE purchased the Slush Puppie trademarks and business from DPSU; all trademarks relating to the Slush Puppie business were assigned to ICEE, (DTX 1002), and ICEE became obligated under

[1] The evidence was, in fact, overwhelming.
[2] The parties submitted proposed findings of facts prior to the trial, (Docs. 308, 310, 312), and conclusions of law post-trial, (Docs. 524, 525).

previous agreements, including those with SPL.[3] Specifically, until June 25, 2019, ICEE had two seminal agreements with SPL (now known as Frozen Brothers Ltd.): (1) the 1996 Appointment of Syrup Manufacturer ("1996 Manufacturer Appointment"); and (2) the 1999 International Independent Area Distributor License Agreement ("1999 Distributor Agreement"). (DTX 1001).

**B. 1996 Manufacturing Appointment (JTX 001)**

On or about January 1, 1996, SPC entered into the 1996 Manufacturer Appointment with Able Foods Ltd. ("Manufacturer"), which would later become SPL. (*See* Doc. 417, PAGE ID 20529). The appointment granted SPL "[t]he limited use of [SPC] formulas, recipes and processes, which shall remain trade secrets and the exclusive property of [SPC] for the purpose of manufacturing neutral base and syrup." The appointment was exclusive (to a list of 27 European countries, including the United Kingdom) and was "subject to and conditioned upon the Manufacturer's continued performance meeting the standards of [SPC] for quality and performance quotas[.]" SPL's royalty payment (for manufacturing rights) was set at 5%.

The appointment provides that SPL "shall not manufacture, bottle, distribute, or sell directly or indirectly, any other product for use in Slush machines not promoted by [SPC]" and that it "shall continually use its primary and best efforts . . . to fill all orders for, and deliver product to, [SPC] authorized customers[.]" The appointment also provides that "[SPC] is the registered owner of the trademark 'SLUSH PUPPIE' and all labels and

[3] J&J assigned the trademarks and related rights reflected in DTX 1008 and 1009 to ICEE on March 5, 2026. Fachner confirmed at trial that ICEE is a wholly owned subsidiary of J&J, (*id.*, PAGE ID 24343-44), and also confirmed the registration and assignment of the Slush Puppie brand's U.K. and European trademarks to ICEE, (Doc. 498, PAGE ID 24435-39). He explained why the assignment was made and testified that it was not unusual for ICEE to protect the brand. (*Id.*, PAGE ID 24441-44). As a result, ICEE possesses (and possessed during the relevant period) any and all rights that either ICEE or J&J had to the Slush Puppie brand's trademarks and goodwill.

designs incidental thereto . . . [and] [s]hould this appointment be terminated, Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, . . . tradenames, signs, emblems, insignias, symbols, tokens, or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever[.]" Moreover, "[u]pon any termination, . . . any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products."

> (8) This appointment is perpetual, however, in addition to any and all rights and remedies [SPC] may cancel and terminate this appointment by written notice to Manufacturer for any one of the following reasons:
>
> . . . .
>
> D. The voluntary or involuntary petition of Manufacturer seeking relief under any provision of any receivership or bankruptcy law or other law for relief of debtors, by Distributor. The filing of any legal action other than for collection on account against [SPC], its representatives, distributors, customers, manufacturers, or suppliers[.]

Upon termination "for any reason by either party and for two years thereafter," Able Foods agreed to not divulge any Slush Puppie trade secrets. It also agreed to not compete with SPC. And "[t]his provision regarding trade secrets and covenants not to compete shall be construed liberally in favor of SLUSH PUPPIE." Finally, the appointment contains an integration clause and a choice-of-law (Ohio) provision. It was signed in Cincinnati on February 5, 1996, by Ralph Peters on behalf of Able Foods and by Will Radcliff on behalf of SPC. There is no drafting history in the record regarding the 1996 Manufacturer Appointment.

**C. 1999 Distributor Agreement (JTX 002)**

Next, SPC ("Company") entered into the 1999 Distributor Agreement with SPL ("Distributor"), effective January 1, 2000. Mark Peters, Ralph Peters' son, signed on

behalf of SPL. This license granted different rights, to include "THE RIGHT TO THE USE OF THE NAME 'SLUSH PUPPIE' FOR THE PROMOTION AND DISTRIBUTION OF PRODUCTS [i.e., freezers, neutral base, flavors, cups, other related items, and other products which may be specifically approved in writing from time to time] OFFERED BY COMPANY" in the United Kingdom and Ireland.

As Distributor, SPL agreed to "vigorously promote" the sale of SPC's products in "important commercial centers" within its exclusive territory and to keep SPC "regularly informed" of "operating and sales activities" relating to SPC's products. The agreement provided that SPC owned the Slush Puppie trademarks (name and logo), allowing SPL to use them only upon "continued qualification" as a "bona fide" Distributor. SPL's use of the Slush Puppie trademarks was "unauthorized upon termination of this Agreement." To that end, SPL agreed, upon termination, "to immediately cease and desist from the further use of the Slush Puppie name and logo, and return any and all PRODUCTS, materials, signs, emblems, and the like, bearing the Slush Puppie name and logo, to COMPANY in Cincinnati, Ohio, freight prepaid."

Although the agreement is perpetual, it listed the bases upon which SPC could terminate the license, subject to notice and a sixty-day opportunity to cure. It also listed the bases upon which SPC could immediately terminate the license (without opportunity to cure), including SPL filing for bankruptcy protection or SPL's inability to pay its debts to SPC. Again, pertinent to this litigation, SPC may, "for good cause[ ]" immediately terminate the license upon "[t]he filing by DISTRIBUTOR of any claim or legal action against COMPANY, its representatives, DISTRIBUTORS, manufacturers, or suppliers[.]" Upon termination, SPL waived the right to any compensation "for any claim for 'build-up

of TERRITORY' or recoupment of investment, as such is done at DISTRIBUTOR'S risk." Additionally, SPL (to include its "subsidiary or associated companies, [and] its appointees/sublicensees") agreed to not "make or sell the PRODUCTS within or without the TERRITORY for a period of five (5) years" post-termination.

Finally, like the 1996 Manufacturer Appointment, the 1999 Distributor Agreement contains an integration clause and a choice-of-law (Ohio) provision. It was signed in Cincinnati on December 23, 1999, by Mark Peters on behalf of SPL and by Diane Menzer on behalf of SPC. There is no drafting history in the record.

**D. Record Evidence and Testimony**

Clearly, both agreements conferred a benefit upon SPL, which was the ability to use and profit from the Slush Puppie brand and its associated goodwill. SPL certainly had knowledge of and made money from this benefit. Dan Fachner testified to the relationship between ICEE and SPL following ICEE's acquisition, as well as his various dealings with Mark Peters. Peters was interested in reshaping the business relationship between the parties. Fachner's testimony was supported by numerous documents.

In April 2010, Peters emailed Fachner about expanding the distributor license beyond the United Kingdom and Ireland. Peters confirmed the 1996 and 1999 contracts and ICEE's position ("Dan I know you are now the brand owner and we are at your mercy on this. . . . I think my last suggestion to you was that we take a little time out to look at the best way for both businesses, on how we work together on the Slush Puppie brand by re looking at the master agreements."). (DTX 1043). In various emails, Peters acknowledged the value of the trademarks as he sought from ICEE the ability to enforce them on ICEE's behalf. (DTX 1049, 1052). Peters further demonstrated his knowledge of

the concept “passing off” under U.K. law. (DTX 1430, 1432, 1433, 1436, 1446).

Fachner testified ICEE was unwilling to alter the 1996 or 1999 contracts. Further evidence confirming the applicability of 1996 and 1999 contracts (and no others) appears in various communications, such as SPL’s Manchester counsel’s August 2017 correspondence with ICEE’s London counsel, acknowledging both contracts as the existing and operative agreements. (Doc. 498, PAGE ID 24406-08; DTX 1024). On behalf of their client, SPL’s counsel sought to update the contracts. The parties continued their back-and-forth for a number of years.

Alan Beaney, the one-time Chairman of SPL, also testified as to the working relationship between SPL and ICEE and how the parties were seeking to find a path forward. Beaney acknowledged at trial that the 1996 Manufacturer Appointment and 1999 Distributor Agreement were the operative contracts governing the relationship between the two companies. (Doc. 517-2, PAGE ID 25363-64; *see also* Doc. 382-8, January 10, 2017, Letter from Alan Beaney to Steve Every). However, he was hopeful that the parties could reach a new understanding and replace the two contracts, suggesting in November 2016, that they “start with a blank sheet of paper to see if we can get a ‘letter of intent’ on what the contract for Europe should look like.” (JTX 007).

Beaney described a two-day meeting in California with J&J principals. His recollection was that the first day of the meeting went well, but the second day did not, as Dan Fachner informed SPL that if they wanted Slush Puppie licenses for non-U.K. European countries, they would also have to sell ICEE in those countries. (Doc. 517-2, PAGE ID 25366). To underscore the importance of this, it is worth noting that ICEE generally is in the frozen carbonated beverage (“FCB”) business, which is typically not

competitive with the frozen uncarbonated beverage ("FUB") business. (Doc. 507, PAGE ID 24952). ICEE, however, is also engaged in the business of marketing and selling frozen uncarbonated slush beverages under the Slush Puppie brand in the United States and around the world. (Doc. 486, PAGE ID 23364).

ICEE submitted both an internal summary of a phone call with Beaney and a recap of the meeting. (JTX 005, 149). These documents indicate that Beaney wanted to find ways of updating the licensing agreement. Steve Every—Vice President of Managed Service and International at ICEE—testified that SPL's decision to support Coca-Cola carbonated slush beverages in Europe had changed ICEE's mindset of re-building a potential partnership with SPL. (Doc. 507, PAGE ID 24954). Therefore, ICEE, now aware that SPL wanted to sell frozen Coke-branded products (which Beaney himself acknowledged was in direct competition with ICEE), did not want to change or replace the 1996 and 1999 contracts. (Doc. 517-2, PAGE ID 25367).

While the Slush Puppie brand is a significant part of SPL's business, it amounts to roughly 15% of overall sales. (Doc. 507, PAGE ID 24987-88, 25000, 25013). As noted above, some of SPL's other licensed products are in direct competition with ICEE in the carbonated beverage market. Fachner's position forced Mark Peters to a fork in the road. Peters could agree to sell ICEE in Europe and risk losing his existing customers—a likely occurrence because, as noted, those customers were in direct competition with ICEE in the carbonated beverage business—or he could abandon his European ambitions for Slush Puppie. Faced with this choice, he took neither path. Instead, Peters blazed a new trail by forging a document that would "supersede" the 1996 and 1999 contracts. This led to the creation of the so-called "2000 Appointment," which provided Peters with the

freedom to operate in Europe and pay a reduced royalty rate.

Fachner testified that in February 2018, Mark Peters brought up the existence of the 2000 Appointment for the first time. (Doc. 498, PAGE ID 24415-18; DTX 1062). Fachner immediately questioned the legitimacy of the document, (DTX 1062), and Peters told Fachner that previous failures to mention the 2000 Appointment was an "oversight," (Doc 498, PAGE ID 24418-19; DTX 1017). To support his claim, Peters took additional steps. This culminated in the creation of additional documents to support the 2000 Appointment's alleged authenticity—namely, the History of Working Practise and the so-called "Wendsday" email.

Prior to sending the recently "identified" documents to Fachner, Peters discussed the issue with his counsel. Peters sent the 2000 Appointment to his solicitor at the British law firm of Reynolds Porter Chamberlain ("RPC") on 20 November 2017. Attached to his email was a doctored version of the February 2011 History of Working Practise between Slush Puppie USA and Slush Puppie U.K. (formerly Able Foods Ltd., formerly Somportex Ltd.) to corroborate the 2000 Appointment. The metadata for the "History of Working Practise" indicates that the .pdf was created "11/20/2017 3:31:42 PM" and authored by "markp" shortly before it was forwarded to RPC. On December 20, 2017, RPC counsel asked for anything that would impute knowledge of the 2000 Appointment to ICEE.

In addition to the History of Working Practise, Peters put together the "Wendsday" email and forwarded it to his counsel. This email was intended to show that ICEE had been on prior notice of the 2000 Appointment. To accomplish this, he doctored a 2008 email chain between ICEE and SPL. (DTX 1442). Specifically, Peters copied a genuine email (sent "11 November 2008 14:27") by ICEE's Jerry Bird to SPL's then-finance

director Lindsay Kirby, asking for "the supporting information on how the 2007 Royalty was determined. . . . It appears that our Royalty has dropped dramatically from the past and would like to try and understand." Peters then pasted it into a Word document and typed a bogus reply, ostensibly from Kirby, that began, "The royalty is calculated as defined in the Trade Mark Licence dated August 8." Peters then quotes from the fake 2000 Appointment:

> On page two – A. Royalty shall be defined as an amount proportionately equal to 2.5% of the total cost of SYRUPS in pound sterling prices charged to and sold to distributors after all appropriate discounts (for all other goods and services sold directly to retailers by SPL there will be no royalty payable) in the Territory. Royalty shall be calculated and paid without regard to the tax implications, if any, to Manufacturer.

Notably, the email header reflects that it was "sent" on "Wendsday, November 12, 2008 10:57 AM." "Wendsday" is spelled phonetically and, therefore, incorrectly. Mark Peters' U.K. counsel raised concern with their client about the 2008 email:

> One point to mention is that the risk of relying on the 2008 email without having done full searches is that that any response and subsequent correspondence could be highly relevant - we note in particular the email ends with a question "is this what you need?"

(DTX 1081, Bates SP006139). In other words, RPC pointed out the risk of using the email without Peters first providing them with the following information:

> 3. You will provide us with all of SPL's emails, correspondence and hard copy records. I understand that you already have the electronic documents available, so please send those through (this could be on a memory stick or we can arrange for a document transfer link). As mentioned on Friday, if you do need any help in collating these documents, we can arrange for Iha! to take place (essentially an image is taken of SPL's servers/devices and then the documents are loaded on to a review platform, where they can be ordered, de-duplicated, etc). For the hard copy documents, we could also assist with

> the records being collated and sent to RPG - these can then be retained, or copied and returned as you prefer.
>
> This exercise needs to be carried out to properly answer Gowlings' allegations and it will be more compelling if we can provide a comprehensive response. The previous Weightmans letters and the recent Gowlings response show the risk of asserting a factual position that is contradicted by the documents. If the electronic documents are available and can be provided now, we can factor those into the proposed response to Gowlings.
>
> If not, this document collation and review process should be carried out as soon as possible, so we can prepare the follow up letter to Gowlings and provide US counsel with the information that they will need to prepare the further letter to ICEE on the breach of SPL's exclusive arrangements. I remain of the view that the US letter cannot be properly prepared without clarity as to the contractual arrangements between ICEE and SPL.

(DTX 1081, Bates SP006141). Nevertheless, Peters and his American counsel relied on the 2000 Agreement. The metadata for the "Wendsday" email—which was not produced until the Court granted ICEE's discovery motion—confirmed that the "Wendsday" email was not from 2008, but rather was created "1/17/2018 9:53 AM" and authored by "markp" less than 35 minutes before it was forwarded to RPC. (DTX 1078-A; *see generally* Doc. 417, PAGE ID 20536-39).

At trial, J. Wright Leonard, a forensic handwriting opinion witness, testified regarding the signature forgeries on the 2000 Appointment and the History of Working Practise. This issue was previously litigated and, in its February 18, 2026, Opinion & Order, the Court determined that "the record evidence positively establishes that Mark Peters forged documents to SPL's economic gain and lied about it." (Doc. 417, Page ID 20560). The testimony adduced at trial confirms the Court's earlier conclusion beyond any doubt. The eventual unraveling of this plan led Peters to engage in other testimonial

chicanery during deposition questioning on numerous subjects, including the whereabouts of his computer. At trial, Peters exercised his Fifth Amendment right not to incriminate himself and did not testify.[4]

Prior to Peters' plan unraveling, attorneys for both sides had dug in, with SPL insisting that the 2000 Appointment controlled and ICEE insisting the 1996 and 1999 contracts were in effect. As noted above, SPL filed its initial action on this basis. ICEE countered with a termination letter on June 25, 2019, (DTX 1118), which SPL's counsel immediately disputed, (DTX 1119). Relevant to the Court, however, and to SPL's actions moving forward, Mark Peters himself knew all along that his claim was bogus and the 1996 and 1999 contracts were the operable contracts between the parties. Ultimately, SPL's counsel disclosed to the Court that the 2000 Appointment was "not a genuine document." (Doc. 498, PAGE ID 24461-62).

In a November 19, 2020, filing acknowledging ICEE's handwriting analysis, SPL stated, "SPL did not learn that the 2000 Agreement is a not genuine document until after SPL filed its December 16, 2019, Amended Complaint." (*See generally* Doc. 417, PAGE ID 20543-44; DTX 1309).[5] But this statement is also not accurate because Mark Peters—i.e., SPL—was fully aware of the forgery. The exposure of Peters' forgery plan temporally coincides with his scheme to leverage the Slush Puppie brand to transition customers to SPL's new brand, Slushy Jack's.

After SPL filed this action in February 2019, ICEE terminated both the 1996

[4] ICEE requests the Court to draw adverse inferences as to spoilation (Doc. 524, PAGE ID 29520) and Peters' invocation of the Fifth Amendment (Doc. 524, PAGE ID 25921). An adverse inference, while likely warranted, is not necessary nor critical to a determination of the facts. The record evidence supports the conclusions relevant to Mr. Peters' conduct without any such inferences.

[5] Curiously, several months earlier, on June 26, 2020, SPL's counsel withdrew the "Wendsday" email (DTX 1442, Bates SP3569-70), from its document production, (DTX 1113).

Manufacturer Appointment and the 1999 Distribution Agreement on June 25, 2019. It was uncontested at trial, and the Court earlier ruled that as a matter of law, ICEE's termination was effective. (Doc. 189). Therefore, as both of those agreements were legally terminated on June 25, 2019, any rights that SPL had to manufacture Slush Puppie syrups or use the Slush Puppie trademarks and brand ended as of that date, as did any entitlement to profits.

But as Fachner testified, SPL continued to sell Slush Puppie products for a period of time after the termination letter and, during what was described as the "transition phase," sold Slush Puppie products alongside Slushy Jack's products. Indeed, not only did SPL *not* cease using the Slush Puppie marks, but it also *affirmatively* decided to keep using them, to keep holding itself out as the brand owner, and to make it appear to customers that they could no longer buy Slush Puppie because the Slush Puppie brand itself was "moving to pastures new". Although SPL had had no rights to use the Slush Puppie trademarks or sell Slush Puppie after June 25, 2019, SPL encouraged its customers to continue using the Slush Puppie name and Slush Puppie-branded products, such as cups and dispensers.

Laura Peters, Mark Peters' niece and a member of SPL's Board of Directors during the relevant period, testified that the rebranding effort (transition) began in the fall of 2020. (Doc. 500, PAGE ID 24769-70). The decision to rebrand was Mark Peters' decision, (Doc. 499, PAGE ID 24702), but Laura Peters was responsible for the supply chain, (Doc. 499, PAGE ID 24572), and managing the actual rebranding of machines from Slush Puppie to Slushy Jack's, as well as point-of-sale materials. Her role was organizing the team to plan the transition. (Doc. 499, PAGE ID 2475-6). Internal SPL communications about the name

change also provide support for this fact.[6] (JTX 065).

Laura Peters further acknowledged the transition plan in an email that said, in part, "As you have probably heard we are looking to convert some of our customers over to a new brand called Slushy Jack's…" (Doc. 499, PAGE ID 24611-12; JTX 103). In reference to a marketing campaign which read, "in just two months Slushy Jack's has become U.K.'s biggest selling slush," she opined that the statement was probably made up but *could be* possible if former Slush Puppie outlets were replaced with Slushy Jack's product. (Doc. 499, PAGE ID 24601–02; DTX 1424) She testified it was important to make the transition as seamless as possible for customers, lest SPL lose business. (Doc. 499, PAGE ID 24596). She also testified SPL was swapping out Slush Puppie for the new Slushy Jack's, (Doc. 499, PAGE ID 24703-04), and indicated rebranding instructions should be going out in December 2020 or January 2021, (Doc. 499, PAGE ID 24609). A review of these and other emails and Frozen Brothers marketing materials for the Slushy Jack's brand clearly shows that the plan was to "convert" Slush Puppie vendors to Slushy Jack's vendors. This would be done by convincing vendors that Slush Puppie itself was saying farewell to the brand as it went to "pastures new," (Doc. 499, PAGE ID 24636-38; DTX 1290), and the new Slushy Jack's brand would have greater appeal to a target market of younger consumers, (DTX 1228).

Even though Laura Peters was on the Board, she (like many other SPL employees) was unaware of the termination of the 1996 and 1999 contracts or the cease-and-desist letter that ICEE sent to Mark Peters and SPL on June 25, 2019. She first became aware

[6] For example, on September 23, 2020, Rhys Evans told Laura Peters that Slushy Jack's was "in play." Evans apparently thought that Slushy Jack's "sounds counterf[e]it," but that Mark Peters wanted the name of the new brand to contain the words slush or slushy. (JTX 065).

of the cease-and-desist letter in August 2021, (Doc. 499, PAGE ID 24576-7), but later agreed that the rights to use the marks had been terminated as of June 2019, (Doc. 499, PAGE ID 24702).[7] SPL made no Slush Puppie branding changes until late 2020 and, as of September 30, 2021, still had Slush Puppie branding in the field. The company continued to sell Slush Puppie well after the termination on June 25, 2019. (Doc. 499, PAGE ID 24557-8).

Laura Peters testified that she was unaware of any communications sent to customers in 2020 to remove Slush Puppie branding. In the fall of 2020, there were 3,000 to 4,000 machines with Slush Puppie branding in the United Kingdom, and slightly fewer than that number in the rest of Europe. She acknowledged that despite the cease-and-desist letter Mark had received, at Mark's direction, SPL continued to sell Slush Puppie products from June 25, 2019, until at least November 2021. She admitted the transition was "messy," with Slush Puppie branding remaining on trolleys, some Slush Puppie and Slush Jack's branding being together on trolleys, and both Slush Puppie and Slushy Jack's cups and other materials continuing to be used by vendor and customers. She acknowledged that Slush Puppie trademarks and branding remained in the field after January 2021, (Doc. 499, PAGE ID 24585-6), but she was hopeful the rebranding would be complete by November 1, 2021, (Doc. 499, PAGE ID 24579-80).

To implement its plan, SPL strategized how to roll out Slushy Jack's to replace Slush Puppie and keep its customers. It is clear that at least some vendors (such as Creams Franchising) were concerned about a branding change because they felt that the Slush Puppie brand was driving sales. (*See* DTX 1424; JTX 017). Laura Peters agreed

---

[7] Per an earlier deposition Mark Peters himself admitted that since ICEE terminated the 1996 and 1999 Agreements, SPL no longer had the right to use the Slush Puppie marks (Doc. 517-5, PAGE ID 25490-91).

that the Slush Puppie brand enjoyed a good reputation in the U.K., (Doc. 499, PAGE ID 24705), and testified that rebranding instructions were set to go out in December 2020 or January 2021, (Doc. 499, PAGE ID 24609). Rebranding instructions were eventually sent out in January 2021 and continued thereafter.

Evidence was presented at trial in the form of photographic array with before-and-after pictures during the transition period. (DTX 68). Contrary to the cease-and-desist letter, SPL continued to maintain the appearance and use of Slush Puppie. For example, a November 2020 email from Jessica Snow, SPL's Sales Controller, contains Slushy Jack's materials; and an email from Mark Peters on Frozen Brothers stationery touts "Important News from Slush Puppie Limited," and says that "[w]e are proud to announce that we are changing our company name and corporate identity from Slush Puppie Ltd to Frozen Brothers Ltd. The name change is a result of a rebranding effort…" (DTX 1229, Bates SP010544). Another example, from May 4, 2021, is an email from Martin Cooke to Jessica Snow and a customer regarding the name change, which contains the same Mark Peters communiqué. (JTX 014, Bates SP028864). The record is replete with evidence that, despite the name change to Frozen Brothers, Mark Peters/Frozen Brothers continued to use Slush Puppie branding.

Jessica Snow, who worked under U.K. Sales Director Kevin Scoles during the relevant time period, testified at trial about the transition. (*See* Doc. 500, PAGE ID 24721). She noted that the decision to change brands would have been made by Mark Peters. (*Id.*, PAGE ID 24725). On September 30, 2020, Helen Chyla, a National Account Manager, sent an email with things that needed to be done in connection with transitioning from Slush Puppie to Slushy Jack's. (*Id.*, PAGE ID 24730; JTX 130). Another email on

October 12, 2020, from Snow to the sales team, states the following:

> I just wanted to relay the info from today's Teams call with Kevin. Basically in a nutshell we needed to align how and what we are communicating to Customers about the re-brand of Slush Puppie to Slushy Jack's to ensure we are messaging this right. <u>Please don't mention the court case versus ICEE that Mark P is still battling with</u> and in terms of slides please use the latest deck that Barry has sent over; attached ppt version of 'Frozen Brothers Presentation'. Feel free to use some of the slides from the 'Driving Category Growth' deck if you feel this helps tell the story more and helps show why we are focusing on FCB as this is the area for growth and as the demographic of the U.K. population shows higher %age of older demographic of people that's why we aren't just focusing on FUB – as <u>FUB is more popular with children aged 8-10</u> whereas we know FCB appeals to wider spread of age groups. Please don't use slide 11 with the cross through the handshake showing Slush Puppie/ICEE. <u>You can verbally mention that as we license the Slush Puppie brand from the brand owners at J&J Snack Foods Corp in USA,</u> they also have the license for ICEE and ICEE have now spread into Europe and U.K. and are now one of our competitors so as we pay to license the brand we are basically putting money into the pockets of our Competitor ICEE. For this reason we are launching a new FUB brand Slushy Jack's . . . .
>
> If you've got any questions then please let me know.

(JTX 127) (emphasis added). The Court notes that at the time of this email, SPL/Frozen Brothers was not licensed by J&J, and it was not a "rebrand," but rather a complete change.

On October 13, 2020, an email exchange occurred between Chyla and Scoles regarding one customer inquiry about whether Slush Puppie product could be put through Slushy Jack's' machines (and vice versa), and another customer inquiry making sure that everything was acceptable from a legal perspective. (DTX 1260, Bates SP019061). An email from Snow on November 11, 2020, tells customers, in part:

> In terms of putting Slushy Jack's product through the Slush

> Puppie branded machine and retailing this in a Slush Puppie cup – I have had confirmation from our Director that is has been approved from a Tradings Standards perspective and vice versa – so if you have Slush Puppie syrup to still sell through then this can be utilised in the Slushy Jack's machine.

(JTX 116, Bates SP017675) (emphasis added).[8] In addition to being inaccurate, this email demonstrates SPL's continued improper use of Slush Puppie product and brand. As stated above, vendors and customers were told they could use Slush Puppie syrups and Slushy Jack's machines interchangeably. (JTX 116).

However, that email was contradicted the following day, November 12, 2020, by the "Director", Kevin Scoles, himself. In an email to Snow, Cooke, Chyla, and McAuley on November 12, 2020, Scoles states the following:

> Hi all please have a read of this its step one for anyone who is not sure about putting Slush Puppie through Slushy Jack's branded equipment. We haven't been to trading standards as yet as even though they will probably agree with everything we have said if they don't it leaves us with the necessity of removing all the existing stock. You can use this statement as an interim position from Josie (DO NOT FORWARD ON THIS MESSAGE BY ACCIDENT)
>
> Kind Regards
>
> Kevin Scoles
> Sales Director GB & Ireland

(Doc. 500, PAGE ID 24736-39; DTX 1240, Bates SP029112) (underline emphasis added). Scoles was clearly concerned about having to restock customers at SPL's expense. It is also clear from this email that Trading Standards had not approved putting Slush Puppie through Slushy Jack's branded equipment. This was an internal memo and the incorrect information sent to customers and vendors was left standing. But a month

[8] U.K. Trading Standards ensures that products are legislatively compliant, as Snow testified. (Doc. 500, PAGE ID 24734-35; DTX 1238).

later Chyla confirms the false statement:

> In terms of the product, this may come through branded as Slushy Jack's later this month, although as mentioned the product is exactly the same and is fine to still therefore be sold through the current Slush Puppie branded machines. We are unable to confirm an exact switch over date as it will depend on how quickly we get through the current Slush Puppie branded product we have in stock currently and that is a little unknown given the current circumstances.

(JTX 015, Bates SP015536) (emphasis added).

Snow testified that Josie Patrick was head of Quality and Standards. (Doc. 500, PAGE ID 24740). Patrick, for her part, testified she was unaware of any advice SPL sought from Trading Standards. (Doc. 517-3, PAGE ID 25373-78). Snow acknowledged at trial that, despite Scoles' internal indication that Trading Standards had not yet approved certain products, customers and vendors were misled about the Trading Standards approval. (*See generally*, Doc. 500, PAGE ID 24733-42). The above Scoles email further approves the following statement from Josie Patrick to be sent to customers. The interim position statement reads as follows:

> **Slushy Jack's / Slush Puppie Position Statement**
>
> The decision has been taken to replace the existing Slush Puppie brand with the Slushy Jack's brand. This is change has been carried out as a part of the consolidation of our brand portfolio under the Frozen Brothers Umbrella.
>
> We have drafted this position statement to assure you that the ingredients, nutritional, allergen and manufacturers address information is identical for Slushy Jack's and its equivalent Slush Puppie product. I am confident that the consumer will be unable to detect any difference in taste and appearance of the Slushy Jack's products. We have maintained the high level of integrity you have come to expect from our company
>
> Both products are manufactured in a BRCGS certified site which has recently been awarded its fourth consecutive "AA"

> grade. Also both products utilise the same ingredients and formulation. Both brands are subjected to the same rigorous manufacturing and quality regimes. Although Slushy Jack's is currently not as familiar as Slush Puppie brand we can assure you that the same high standards apply to both brands
>
> <u>As both Slushy Jack's and Slush Puppie currently fall under Frozen Brothers control there will be no legal issues raised regarding the substitution of the Slush Puppie brand by the Slushy Jack's brand by the brand owner.</u>
>
> If you require any further information, please do not hesitate to contact me.
>
> **Josie Patrick**
> Head of QSE & NPD

(DTX 1240, Bates SP029116; DTX 1189, Bates SP027598) (emphasis added).[9] Obviously, Slush Puppie was not under "Frozen Brothers control," a fact which is further supported by the language of the 1996 Manufacturer Appointment:

> (11) It is agreed that [SPC] is the registered owner of the trademark "SLUSH PUPPIE" and all labels and designs incidental thereto, and nothing herein shall be construed as conferring upon Manufacturer any right or interest in said trademarks or designs, copyrights, patents, tradenames, signs, emblems, insignias, symbols, tokens, or other marks used in connection with SLUSH PUPPIE products. Should this appointment be terminated, Manufacturer shall immediately cease using said SLUSH PUPPIE trademarks or designs, copyrights, patents, tradenames, signs, emblems, insignias, symbols, tokens, or other marks used in connection with SLUSH PUPPIE, in any manner whatsoever . . . . Upon termination, Manufacturer shall immediately cease and desist from further use of any SLUSH PUPPIE trademarks, names, logos or references and any formerly approved business name of Manufacturer shall be immediately changed to delete any reference to SLUSH PUPPIE products.

Although ICEE would eventually abandon its breach of contract claims at trial, Mark Peters was clearly on notice regarding the strict limitations on his use of the Slush Puppie

[9] Josie Patrick appeared by video deposition and was generally evasive and not responsive.

brand and product.

The Court notes numerous other examples of SPL's deception in dealing with customers. An email from Jessica Snow on August 21, 2020, has Frozen Brothers logos but continues to list Slush Puppie as one of the company's brands. (JTX 121, Bates SP01933-35). The evidence at trial proved that SPL leveraged the Slush Puppie brand by explicitly telling customers that Slushy Jack's had the same recipe and taste. Snow also testified that vendors were told they could keep using Slush Puppie posters until Slushy Jack's posters were available. (DTX 1244). SPL's continued use of the Slush Puppie brand is readily apparent from the record. (*See, e.g.*, DTX 1198, March 16, 2021, Email from Regional Sales Manager Alana McAuley to vendors, stating "Slushy Jacks is the same great taste as Slush Puppie, same recipe as it has always been"; DTX 1189, November 12, 2020, Email from Jessica Snow to customers that "[w]e have drafted this position statement to assure you that the ingredients, nutritional, allergen and manufacturers address information is identical for Slushy Jack's and its equivalent Slush Puppie product"; DTX 1229, November 24, 2020, Email from Jessica Snow to customers, stating "No Sugar Slushy Jack's is exactly the same recipe that consumers know and love, and used in the No Sugar Slush Puppie product").

Snow testified that, in retrospect, SPL's communications to customers and vendors were wrong, but she had been directed to send them.[10] (Doc. 500, PAGE ID 24760). For example, Snow also sent other internal emails instructing SPL personnel not to mention the ICEE court case, and offered the further instruction, "you can verbally mention that as we are licensed SPL brand from brand owners J&J . . . they also license ICEE." (JTX

[10] Based upon her demeanor and manner of testifying at trial in the presence of Mark Peters, Snow was clearly under considerable pressure and attempted to avoid admissions when possible.

127). As noted above, this false statement that SPL was still a J&J licensee came well after the cease-and-desist letter and contract terminations from J&J. In a response to an email from a customer asking for Slush Puppie product in November 2020, Jessica Snow instructed her employees to install a Slushy Jack's trolley. (JTX 128). Customers were told they could continue to use signs advertising Slush Puppie until the Slushy Jack's signs were available. (Doc. 500, PAGE ID 24770-72; JTX 130). There are multiple other examples by other SPL employees of the continued use of Slush Puppie following the cease-and-desist letter. (*See, e.g.*, DTX 1259, November 12, 2020, Email from Martin Cooke to a customer, stating "[a]ll product specifications are attached and the recipe is exactly the same as Slush Puppie, allergen free and no Sugar"; JTX 15, December 8, 2020, Email from Helen Chyla, stating "[i]n terms of the product, this may come through branded as Slushy Jack's later this month, although as mentioned the product is exactly the same and is fine to still therefore be sold through current Slush Puppie branded machines.").

As of February 2021, Frozen Brothers customers could still order Slush Puppie product. (Doc. 500, PAGE ID 24777-78; DTX 1143). In fact, customers were still ordering Slush Puppie products from Frozen Brothers through May 2021. (DTX 1145). Throughout 2021, customers were asking for branding kits, which meant their product and equipment still contained Slush Puppie branding. (*See, e.g.*, JTX 138, Internal Frozen Brothers email from May 2021 noting that a customer still needed 45 rebranding kits; JTX 137, Internal Frozen Brothers email from August 2021 regarding 350 rebranding kits; JTX 135, Internal Frozen Brothers email from September 2021 regarding the need for rebranding kits at Hoburne Holiday Parks; JTX 142, July 2021 invoice for rebranding kits).

In sum, the record evidence and testimony overwhelmingly establish that Mark Peters illegally capitalized on the Slush Puppie brand's goodwill to secure customers for his new Slushy Jack's product. Customers were further misled about the reason for the brand change and their ability to use both Slush Puppie and Slushy Jack's products.

## II. CONCLUSIONS OF LAW

### A. Unjust Enrichment

The elements of unjust enrichment are: (1) that ICEE conferred a benefit on SPL, that is the Slush Puppie brand and its associated goodwill; (2) that SPL had knowledge of the benefit; and (3) that SPL retained the benefit under circumstances where it would be unjust to do so without payment.

The Court finds that Mark Peters decided to leverage the continued use of the Slush Puppie name to convert Slush Puppie customers to Slushy Jack's.[11] In order to do this, SPL/Frozen Brothers maintained the facade that they still were Slush Puppie and that the transition to Slushy Jack's was intended merely to better capture the younger FUB market share. The evidence at trial showed that, by using the Slush Puppie brand to transition customers to Slushy Jack's, SPL retained a competitive advantage that extended beyond the sale of Slush Puppie branded products at least through 2022.

It is undisputed that Slushy Jack's was a completely unknown brand—a name made up by Mark Peters in late September 2020—and there was substantial evidence (including testimony from Kevin Scoles) supporting the conclusion that, without the continued use of the Slush Puppie brand, SPL would not have retained former Slush Puppie customers or made the profits it did. Use of the Slush Puppie trademark was

[11] Steve Every's testimony established the goodwill and market presence that the Slush Puppie brand enjoyed. (Doc. 507, PAGE ID 24925-96).

critical to the transition of customers. Mark Peters/SPL knew that as of June 25, 2019, it was no longer permissible to use the Slush Puppie marks, sell Slush Puppie products, use the Slush Puppie trademark, or associate with the Slush Puppie brand.

And it is undisputed that SPL kept using the Slush Puppie trademarks throughout the remainder of 2019, and into 2020, 2021, and 2022. SPL/Frozen Brothers profits are easily traceable to the Slush Puppie goodwill and market presence.[12] As for Slushy Jack's sales, the evidence amply supports that those profits were generated because of and attributable to SPL's use of ICEE's Slush Puppie trademark. ICEE is therefore entitled to disgorgement of SPL/Frozen Brothers' profits. Because "[t]he purpose of disgorgement, an equitable remedy, is to prevent a wrongdoer from profiting from their illegal or unethical behavior by forcing them to give up any gains," *Kern v. Mishler*, 2025 WL 1365643, at *16 (Ohio Ct. App. May 12, 2025), disgorgement is appropriate here from mid-2019 through 2022.

**B. Trademark Infringement—Section 10(1)**

Mark Peters was knowledgeable and sophisticated about trademark matters and the concept of passing off. The evidence at trial was overwhelming and uncontradicted that SPL leveraged the Slush Puppie brand by explicitly telling customers that Slushy Jack's was the same recipe and taste. The actions taken by SPL allowed them to retain an unfair advantage over ICEE.

ICEE proved by a preponderance of the evidence that (1) SPL used the Slush Puppie sign in the course of trade in the United Kingdom without ICEE's consent after June 25, 2019; (2) SPL used a Slush Puppie sign that was identical to U.K. Trade Mark

---

[12] By way of example, SPL/Frozen Brothers' 2020 gross profits from Slush Puppie alone ($5,915,856) outpaced their 2021 gross profits from Slush Puppie and Slushy Jack's combined ($5,912,802).

No. U.K.00003249489, (DTX 1008); (3) SPL used the Slush Puppie sign in relation to goods that were identical to at least one category of goods listed in U.K. Trade Mark No. U.K.00003249489, (DTX 1008); and (4) SPL committed trademark infringement under Section 10(1) of the Trade Marks Act of 1994 by using the Slush Puppie trademark after June 25, 2019.

**C. Trademark Infringement—Section 10(3)**

Likewise, ICEE proved by a preponderance that (1) ICEE's registered Slush Puppie mark, U.K. Trade Mark No. U.K.00003249489, had a reputation in the United Kingdom at the relevant time for the goods listed in the registration; (2) SPL used the Slush Puppie sign in the course of trade after June 25, 2019, without ICEE's consent; (3) the Slush Puppie sign used by SPL was identical to U.K. Trade Mark No. U.K.00003249489; (4) the relevant public, when encountering SPL's use of the Slush Puppie sign, would make a link or association between the sign and ICEE's registered mark; (5) the use by SPL of the Slush Puppie sign after June 25, 2019, gave rise to at least one of (a) detriment to the distinctive character of ICEE's mark; (b) detriment to the reputation of ICEE's mark; or (c) unfair advantage being taken of the distinctive character or reputation of ICEE's mark[13]; and (6) SPL committed trademark infringement under Section 10(3) of the Trade Marks Act of 1994 by using the Slush Puppie trademark after June 25, 2019.

---

[13] Among other things, SPL blurred the distinction between the Slush Puppie mark and the unknown Slushy Jack's brand by encouraging customers to use Slush Puppie alongside Slushy Jack's branded products and dispensers, and to sell Slushy Jack's under Slush Puppie advertising. SPL took unfair advantage of the distinctive character and reputation of Slush Puppie by holding itself out as the brand owner, using Slush Puppie in its company name well into 2022, and falsely claiming that Slushy Jack's was the same recipe.

### D. Passing Off—U.K. Common Law

ICEE also proved by a preponderance of the evidence that (1) it had goodwill in the United Kingdom in connection with the Slush Puppie brand; (2) SPL made multiple misrepresentations to the public within the United Kingdom which led to, or were likely to lead to, a substantial portion of the relevant public believing that goods or services offered by SPL were either the goods or services of ICEE or were connected with or authorized by ICEE[14]; (3) SPL encouraged its customers to use Slush Puppie branded products and dispensers with Slushy Jack's products and dispensers, and designed the Slushy Jack's product packaging and point-of-sale artwork to have a similar look and feel as that of Slush Puppie; and (4) ICEE suffered, or was likely to suffer, damage to the goodwill of the Slush Puppie brand in the U.K. as a result of SPL's misrepresentations; and (5) SPL is liable for passing off under U.K. law.

## III. DAMAGES

ICEE offered the opinion testimony of John Plumpe, managing director at Epsilon Economics, an economic consulting firm that works with companies focusing on intellectual property and/or intangible assets. Plumpe earned both a bachelor's degree and master's degree from the University of Illinois, and an MBA from the University of Chicago's Booth School of Business. He has experience in providing calculations and opinions on monetary relief, such as profits. His professional affiliations include Co-Chair of the Presidential Task Force on Intellectual Proport Reporting, Brand Valuation Project

[14] In particular, SPL's misrepresented to its vendors (and told its vendors to relay to consumers) that SPL controlled Slush Puppie years after all of SPL's rights had been terminated, that Slushy Jack's was the same great recipe, that Trading Standards had approved using one brand's products with the other brand's dispensers, that Slushy Jack's had become the bestselling slush brand in the U.K. over just two months, and that Slush Puppie was being put out to pasture for marketing purposes, rather than SPL's rights to sell it having long since been terminated.

Team, and IP Accounting & Brand Valuation Standards Project Team with the International Trademark Association; and the Expert Consultative Group on Valuation of Intangible Assets with the World Intellectual Property Organization. In his twenty-six years of experience, he has established expertise in the areas of brands and trademarks. (Doc. 507, PAGE ID 42967-71).

Plumpe was asked to calculate SPL's damages from unjust enrichment, infringement, and passing off. His assumptions were based on SPL being found liable at trial. (Doc. 507, PAGE ID 24975). He began his calculation as of July 1, 2019, and reviewed SPL's financial data, deposition transcripts, exhibits to those depositions, and court filings. (Doc. 507, PAGE ID 24976-78). Plumpe also reviewed SPL/Frozen Brothers documents and management reports prepared for Slush Puppie products and Slushy Jack's products.[15] (Doc. 507, PAGE ID 24983). He reviewed the total sales and/or revenues for products on a monthly basis and subtracted the cost of sales to establish profit. He did not consider in his calculations of SPL profits any products other than Slush Puppie or Slushy Jack's. (Doc. 507, PAGE ID 24986-88). The Court finds that Plumpe's calculations are an accurate account of SPL/Frozen Brothers profits for Slush Puppie and Slushy Jack's on a year-by-year basis.

Plumpe converted foreign currency amounts to U.S. dollars based upon U.S. Federal Reserve data. (Doc. 507, PAGE ID 24989-90). He examined the management reports for revenues and the cost of sales as to each product. (Doc. 507, PAGE ID 24994-95). SPL's sales and profits from selling Slush Puppie products in the U.K. and certain European countries from July 2019 through December 2021 resulted in $12,453,598 from

[15] The following exhibits were admitted and referred to during Plumpe's trial testimony: JTX 30-39, JTX 54-62, JTX 70-71, DTX 1349-1356, DTX 1388-1389, DTX 1392-1393, DTX 1397-1398.

sales and gross profits of $10,747,258. From January 2021 through July 2025, SPL sales of identified products came to $36,804,325, resulting in profits of $30,982,546. (Doc. 507, PAGE ID 24976). Using demonstrative exhibits at trial, Plumpe showed the jury the following calculations, supported by his testimony, for Slush Puppie and Slushy Jack's products:

**Slush Puppie Limited: SLUSH PUPPIE estimated revenues by country**

| | Jul - Dec 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|
| United Kingdom | $2,861,322 | $2,980,584 | $173,730 | **$6,015,636** |
| Netherlands | $924,297 | $1,155,158 | $52,417 | **$2,131,873** |
| Germany | $277,307 | $299,874 | $6,473 | **$583,654** |
| Switzerland | $619,790 | $1,351,398 | -$15,199 | **$1,955,989** |
| France | $681,418 | $890,318 | $194,710 | **$1,766,446** |
| Total | $5,364,135 | $6,677,333 | $412,130 | **$12,453,598** |

**Slush Puppie Limited: SLUSH PUPPIE estimated cost of sales by country**

| | Jul - Dec 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|
| United Kingdom | $445,067 | $435,193 | $57,060 | **$937,320** |
| Netherlands | $119,069 | $124,713 | $5,767 | **$249,549** |
| Germany | $162,399 | $28,015 | $456 | **$190,870** |
| Switzerland | $43,686 | $66,393 | -$233 | **$109,846** |
| France | $93,365 | $107,164 | $18,227 | **$218,755** |
| Total | $863,586 | $761,477 | $81,276 | **$1,706,340** |

**Slush Puppie Limited: SLUSH PUPPIE estimated gross profit by country**

| | Jul - Dec 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|
| United Kingdom | $2,416,255 | $2,545,391 | $116,670 | **$5,078,316** |
| Netherlands | $805,228 | $1,030,446 | $46,650 | **$1,882,324** |
| Germany | $114,908 | $271,859 | $6,017 | **$392,784** |
| Switzerland | $576,105 | $1,285,006 | -$14,967 | **$1,846,144** |
| France | $588,053 | $783,155 | $176,483 | **$1,547,690** |
| Total | $4,500,548 | $5,915,856 | $330,854 | **$10,747,258** |

**Slush Puppie Limited: Slushy Jack's estimated revenues by country**

| | 2021 | 2022 | 2023 | 2024 | Jan – July 2025 | Total |
|---|---|---|---|---|---|---|
| United Kingdom | $2,794,374 | $2,938,194 | $2,790,096 | $3,836,802 | $1,980,388 | **$14,339,852** |
| Netherlands | $1,284,693 | $1,684,692 | $1,959,981 | $1,746,635 | $1,052,850 | **$7,728,852** |
| Germany | $382,926 | $604,014 | $700,259 | $609,028 | $385,666 | **$2,681,892** |
| Switzerland | $1,256,684 | $1,722,177 | $1,746,038 | $1,407,891 | $949,336 | **$7,082,127** |
| France | $668,232 | $1,241,367 | $1,045,098 | $1,125,927 | $890,978 | **$4,971,603** |
| Total | $6,386,909 | $8,190,444 | $8,241,472 | $8,726,282 | $5,259,218 | **$36,804,325** |

**Slush Puppie Limited: Slushy Jack's estimated cost of sales by country**

| | 2021 | 2022 | 2023 | 2024 | Jan – July 2025 | Total |
|---|---|---|---|---|---|---|
| United Kingdom | $482,750 | $753,222 | $753,565 | $813,957 | $356,624 | **$3,160,119** |
| Netherlands | $148,781 | $296,613 | $327,138 | $253,304 | $130,396 | **$1,156,232** |
| Germany | $43,659 | $95,262 | $126,719 | $73,942 | $42,791 | **$382,373** |
| Switzerland | $61,982 | $140,683 | $133,436 | $84,456 | $54,799 | **$475,357** |
| France | $67,789 | $189,827 | $157,293 | $138,729 | $94,060 | **$647,698** |
| Total | $804,961 | $1,475,608 | $1,498,151 | $1,364,388 | $678,671 | **$5,821,779** |

**Slush Puppie Limited: Slushy Jack's estimated gross profit by country**

| | 2021 | 2022 | 2023 | 2024 | Jan – Jul 2025 | Total |
|---|---|---|---|---|---|---|
| United Kingdom | $2,311,623 | $2,184,972 | $2,036,530 | $3,022,844 | $1,623,763 | **$11,179,733** |
| Netherlands | $1,135,913 | $1,388,079 | $1,632,844 | $1,493,331 | $922,454 | **$6,572,620** |
| Germany | $339,267 | $508,752 | $573,539 | $535,086 | $342,875 | **$2,299,519** |
| Switzerland | $1,194,702 | $1,581,493 | $1,612,602 | $1,323,435 | $894,537 | **$6,606,769** |
| France | $600,443 | $1,051,540 | $887,805 | $987,199 | $796,918 | **$4,323,905** |
| Total | $5,581,948 | $6,714,836 | $6,743,320 | $7,361,895 | $4,580,547 | **$30,982,546** |

Plumpe's calculations for the period of July 1, 2019, through December 2019, showed SPL profits of $4,500,548. For the period of January 1, 2020, through December 31, 2020, he calculated $5,915,856. For the period of January 1, 2021, through December 31, 2021, he calculated $5,612,802 ($330,854 for Slush Puppie and $5,281,948 for Slushy Jack's). For the period of January 1, 2022, through December 31, 2022, he calculated $6,714,836. For the period of January 1, 2023, through December 31, 2023, he calculated $6,743,320. For the period of January 1, 2024, through December 31, 2024,

he calculated $7,361,895. And for the period of January 1, 2025, to July 31, 2025, he calculated $4,580,547.

Although very much mindful of the jury's advisory damages determination,[16] the Court finds Plumpe's methodology and calculations to be particularly compelling. Based on the evidence presented, the Court also concludes that the disgorgement of profits should occur only for the period during which SPL/Frozen Brothers used the Slush Puppie brand and false marketing materials to mislead vendors and customers; that is, the period during which Slush Puppie remained in the field and overlapped with Slushy Jack's, from July 1, 2019, through December 31, 2022. Additional disgorgement would venture from equitable relief to penalty. *See Liu v. Securities and Exchange Commission*, 591 U.S. 71, 79-80 (2020) (reiterating that it is inequitable for a wrongdoer to make profit from its own wrongdoing, but also noting that a wrongdoer should not be punished by paying more than fair compensation to a wronged party).

## IV. CONCLUSION

For the aforementioned reasons, the Court awards damages to ICEE as follows: (1) unjust enrichment in the amount of $23,044,042.00 (disgorgement for the period of July 1, 2019, through December 31, 2022); (2) infringement under Section 10(1) in the amount of $23,044,042.00; (3) infringement under Section 10(3) in the amount of $23,044,042.00; and (4) passing off in the amount of $23,044,042.00. However, as essentially the same conduct gave rise to the damages for each claim as specified,

[16] For the period of July 1, 2019, through December 2019, the jury calculated damages of $4,000,000. For the period of January 1, 2020, through December 31, 2020, the jury calculated damages of $5,000,000. For the period of January 1, 2021, through December 31, 2021, the jury calculated damages of $5,000,000. For the period of January 1, 2022, through December 31, 2022, the jury calculated damages of $6,000,000. For the period of January 1, 2023, through December 31, 2023, the jury calculated damages of $6,000,000. For the period of January 1, 2024, through December 31, 2024, the jury calculated damages of $5,000,000. And for the period of January 1, 2025, to July 31, 2025, the jury calculated damages of $2,000,000.

separate recoveries would result in a windfall and therefore be inequitable. Accordingly, the Court awards damages to ICEE in the aggregate amount of $23,044,042.00.

Finally, because the claims resolved by this Memorandum are sufficiently distinct from the outstanding claims for attorneys' fees and sanctions, the Court finds no just reason for delay and hereby **DIRECTS** the Clerk of Court to enter final judgment in the aggregate amount of $23,044,042.00. *See* Fed. R. Civ. P. 54(b).

**IT IS SO ORDERED.**

Michael R. Barrett
United States District Judge